## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| STATE OF NEW YORK, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> ADMINISTRATION FOR CHILDREN AND FAMILIES, *et al.*, <br><br> *Defendants*. | Case No. 1:26-cv-02726-JEB |

### PLAINTIFF STATES' MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND STAY UNDER 5 U.S.C. § 705

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................ii

PRELIMINARY STATEMENT........................................................................................... 1

BACKGROUND ................................................................................................................. 3

    I.    The Temporary Assistance for Needy Families Program ..................................... 3

    II.   Statutory Protections for the Confidentiality of TANF Information................................... 6

    III.  Defendants Have Repeatedly Targeted TANF Funding with Unsubstantiated
         Allegations of Fraud. ........................................................................................... 7

    IV.  The TANF System of Records Notice ................................................................ 10

    V.   Plaintiff States Will Be Harmed by the SORN and the TANF Data System of
        Records It Creates ............................................................................................... 13

ARGUMENT ..................................................................................................................... 18

    I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims....................................... 18

      A.   The SORN and Associated Revision of the TANF System of Records Are
          Final Agency Action Under the APA.............................................................. 18

      B.   The SORN Is Contrary to Law ...................................................................... 20

          1.   The SORN Violates the TANF Statute........................................................... 20

          2.   The SORN Violates the Privacy Act............................................................. 25

          3.   The SORN Violates Section 1306............................................................... 28

          4.   The SORN Violates Section 405................................................................. 30

          5.   The SORN Violates Section 1905............................................................... 31

          6.   The SORN Violates the Computer Matching and Privacy Protection Act ... 32

      C.   The SORN is Arbitrary and Capricious ......................................................... 34

      D.   The SORN Violates the Spending Clause....................................................... 37

    II.   Plaintiffs Will Suffer Irreparable Harm ........................................................... 38

    III.  The Balance of the Equities and Public Interest Favor Plaintiffs ..................................... 44

CONCLUSION.................................................................................................................. 45

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aamer v. Obama*,
 742 F.3d 1023 (D.C. Cir. 2014) ....................................................................................18

*Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*,
 836 F.3d 963 (8th Cir. 2016) .......................................................................................20

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
 786 F. Supp. 3d 647 (S.D.N.Y. 2025) ..........................................................................19

*Am. Pub. Health Ass'n v. Nat'l Institutes of Health*,
 791 F. Supp. 3d 119 (D. Mass. 2025) ..........................................................................37

*Ames v. U.S. Dep't of Homeland Security*,
 153 F. Supp. 3d 342 (D.D.C. 2016) .............................................................................26

*Ames v. U.S. Dep't of Homeland Security*,
 861 F.3d 238 (D.C. Cir. 2017) .....................................................................................26

*Arlington Cent. Sch. Dist. v. Murphy*,
 548 U.S. 291 (2006) ......................................................................................................38

*Bechhoefer v. U.S. Dep't of Justice*,
 179 F. Supp. 2d 93 (W.D.N.Y. 2001) ...........................................................................28

*Bennett v. Spear*,
 520 U.S. 154 (1997) ................................................................................................19, 20

*Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin.*,
 972 F.3d 83 (D.C. Cir. 2020) .................................................................................34, 35

*Boehner v. McDermott*,
 484 F.3d 573 (D.C. Cir. 2007) .....................................................................................31

*Britt v. Naval Investigative Serv.*,
 886 F.2d 544 (3d Cir. 1989) ............................................................................25, 27, 34

*California v. Trump*,
 786 F. Supp. 3d 359 (D. Mass. 2025) ..........................................................................41

*California v. United States Dep't of Agric.*,
No. 25-CV-026-cv-6310-MMC, 2025 WL 2939227 (N.D. Cal. Oct. 15, 2025)....................45

*Cement Kiln Recycling Coal. v. EPA*,
493 F.3d 207 (D.C. Cir. 2007)..............................................................................29, 30

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ..............................................................................38, 43

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)..............................................................................................31, 32

*City & Cnty. of San Francisco v. Trump*,
779 F. Supp. 3d 1077 (N.D. Cal.) .................................................................................39

*City of Los Angeles v. Sessions*,
No. CV 17-7215-R, 2018 WL 6071072 (C.D. Cal. Sept. 13, 2018)........................................39

*Concilio De Salud Integral De Loiza, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
538 F. Supp. 2d 139 (D.D.C. 2008) .............................................................................19

*Cooper v. FAA*,
816 F. Supp. 2d 778 (N.D. Cal. 2008) ..........................................................................28

*Covert v. Harrington*,
876 F.2d 751 (9th Cir. 1989) ....................................................................................28

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019)..............................................................................................39

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)................................................................................................34, 35

*District of Columbia v. U.S. Dep't of Agric.*,
444 F. Supp. 3d 1 (D.D.C. 2020)..............................................................18, 39, 40, 41, 44

*Doe v. U.S. Dep't of Labor*,
451 F. Supp. 2d 156 (D.D.C. 2006).............................................................................26

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)..............................................................................................35

*Ethyl Corp. v. EPA*,
306 F.3d 1144 (D.C. Cir. 2002)..................................................................................29

*FTC v. Bunte Bros*,
   312 U.S. 349 (1941)..............................................................................................24

*Georgia v. Brooks-LaSure*,
   No. 2:22-CV-6, 2022 WL 3581859 (S.D. Ga. Aug. 19, 2022)................................35

*Human Touch DC, Inc. v. Merriweather*,
   No. 15-cv-00741, 2015 WL 12564166 (D.D.C. 2015).........................................39

*Ipsen Biopharmaceuticals, Inc. v. Azar*,
   943 F.3d 953 (D.C. Cir. 2019)..........................................................................19, 20

*Jibril v. Mayorkas*,
   20 F.4th 804 (D.C. Cir. 2021)..............................................................................43

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986)..............................................................................................20

*Landor v. La. Dep't of Corr. & Pub. Safety*,
   146 S. Ct. 1931 (2026)..........................................................................................37

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)........................................................................38, 44, 45

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
   No. CV 25-3501 (SLS),
   2026 WL 1784297 (D.D.C. June 22, 2026).........................................2, 20, 24, 26, 31, 36, 43

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)..............................................................................................24

*Louisiana v. Biden*,
   55 F.4th 1017 (5th Cir. 2022) ..............................................................................41

*Lugo v. U.S. Dep't of Justice*,
   214 F. Supp. 3d 32 (D.D.C. 2016)........................................................................26

*Massachusetts v. Dep't of Educ.*,
   828 F. Supp. 3d 198 (D. Mass. 2026) ..........................................................3, 40, 43

*Mexichem Specialty Resins, Inc. v. EPA*,
   787 F.3d 544 (D.C. Cir. 2015)..............................................................................39

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)................................................................................................35

iv

*MST Exp. v. Dep't of Transp.*,
  108 F.3d 401 (D.C. Cir. 1997) ....................................................................................29, 30

*Nat'l Council of Nonprofits v. McMahon*,
  No. CV 25-13242-MJJ, 2026 WL 1876366 (D. Mass. June 30, 2026) ...........................36, 43

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ...................................................................................................37

*Navajo Nation v. Dep't of Health & Hum. Servs.*,
  325 F.3d 1133 (9th Cir. 2003) .......................................................................................3

*New York v. Admin. for Children & Families*,
  No. 26-CV-172, -- F. Supp. 3d --,
  2026 WL 673848 (S.D.N.Y. Mar. 10, 2026) ..................................................3, 9, 41, 43, 44, 45

*New York v. U.S. Dep't of Just.*,
  804 F. Supp. 3d 294 (D.R.I. 2025).........................................................................41, 42, 44

*New York v. United States Dep't of Homeland Sec.*,
  969 F.3d 42 (2d Cir. 2020)...........................................................................................40

*Nken v. Holder*,
  556 U.S. 418 (2009)....................................................................................................18

*Oceana, Inc. v. Locke*,
  670 F.3d 1238 (D.C. Cir. 2011) ...............................................................................29, 30

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981)....................................................................................................37, 38

*South Dakota v. Dole*,
  483 U.S. 203 (1987)....................................................................................................37

*Sterling Com. Credit--Michigan, LLC v. Phoenix Indus. I, LLC*,
  762 F. Supp. 2d 8 (D.D.C. 2011) ...................................................................................18

*Sw. Airlines Co. v. Saxon*,
  596 U.S. 450 (2022)....................................................................................................23

*Swenson v. U.S. Postal Serv.*,
  890 F.2d 1075 (9th Cir. 1989) ..................................................................................25, 34

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994).....................................................................................................41

v

*U.S. Army Corps of Engineers v. Hawkes Co.*,
　578 U.S. 590 (2016)..................................................................................19

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*,
　489 U.S. 749 (1989)....................................................................................7

\**U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
　9 F.3d 138 (D.C. Cir. 1993)...............................................................7, 28, 34

*United States v. California*,
　921 F.3d 865 (9th Cir. 2019) ...................................................................25

*United States v. Illinois*,
　796 F. Supp. 3d 494 (N.D. Ill. 2025) .......................................................25

*Venetian Casino Resort, LLC v. EEOC*,
　530 F.3d 925 (D.C. Cir. 2008)..............................................................20, 31

*Winter v. Nat. Res. Def. Council, Inc.*,
　555 U.S. 7 (2008)......................................................................................18

**Constitution and Federal Statutes**

U.S. Const. art. I, § 8, cl. 1.........................................................................37

5 U.S.C.
　§ 552a.........................................................1, 7, 20, 25, 28, 32, 33, 34, 36
　§ 704...........................................................................................................18
　§ 705..............................................................................................3, 18, 45

8 U.S.C.
　§ 1373.........................................................................................................24

31 U.S.C.
　§ 7501..............................................................................................5, 22, 23, 24

42 U.S.C.
　§ 405.................................................................................... 1, 6, 30-31
　§ 601.................................................................................................4, 40
　§ 602...............................................................................1, 5, 6, 21, 36
　§ 609.............................................................................5, 18, 22, 23, 27
　§ 610...........................................................................................................18
　§ 611...............................................5, 11, 22, 26, 27, 28, 29, 30, 32, 34
　§ 617.............................................................................1, 5, 20, 21, 29
　§ 1306.................................................................................. 1, 6, 20-21, 28

vi

**Miscellaneous Authorities**

Executive Order No. 14395 .................................................................................................. 9-10

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ............................................................22

**PRELIMINARY STATEMENT**

Congress has erected substantial safeguards to ensure that, when needy families with dependent children apply for critical subsistence benefits, their most sensitive personal information is not unlawfully disseminated or disclosed. The Temporary Assistance for Needy Families (TANF) statute requires States administering the program to take "reasonable steps as the State deems necessary to restrict the use and disclosure of information about individuals and families receiving assistance." 42 U.S.C. § 602(a)(1)(A)(iv). The same Act sharply limits the authority of the Department of Health and Human Services (HHS) to disclose that information—repealing a provision of an earlier statute that had granted HHS the authority to share personal information to conduct audits, and issuing instead a strict direction that "[n]o officer or employee of the Federal Government may regulate the conduct of States under this part or enforce any provision of this part, except to the extent expressly provided in this part." *Id.* § 617. In addition, Congress enacted a web of privacy statutes that bar HHS from disclosing Social Security numbers, income, personal records, or any information HHS collects in the course of its duties without express statutory authorization. *See id.* §§ 405(c)(2)(C)(viii)(I), 1306(a)(1); 5 U.S.C. 552a(b); 18 U.S.C. § 1905.

In defiance of these limits, HHS has issued a notice in the Federal Register that, absent Court intervention before August 11, will allow it to share sensitive personal information of millions of TANF recipients and their family members with any federal, State, or private entity, at any time, in order to monitor compliance with any provision of the TANF statute. The document that authorizes these disclosures is innocuously named—a "System of Records Notice," or SORN—but its consequences would be severe. The private data that States have collected from millions of individuals under assurances of confidentiality—including their Social Security numbers, income, employment history, parentage, citizenship status, marital status, and county of

residence—would be subject to widespread disclosure to federal, State, and private actors. Many individuals will predictably refuse to participate in TANF going forward under this intolerable condition. And the States that administer TANF will suffer immediate and irreparable injuries. Not only will participation by parents and children in TANF decline, and dependence on other State anti-poverty programs correspondingly increase, but States will have to expend resources to review and update their TANF programs to notify applicants about this new, unbounded use of their data. In addition, States will face the threat of spurious new "oversight" actions based on the novel authority that HHS claims.

This disclosure is unlawful and should be swiftly enjoined. Nothing in the TANF statute authorizes HHS to disclose participants' personal information at will. On the contrary, the statute forbids HHS from taking steps to administer or enforce "all" of TANF's provisions, as this SORN purports to do. What is more, the disclosure directly contradicts the numerous confidentiality restrictions by which HHS is bound, from the Privacy Act to the Social Security Act to the bedrock confidentiality rule governing all HHS operations. And the SORN is procedurally and constitutionally infirm: HHS has not offered a reasoned explanation for its dramatic change in practice, provided for even a single day to review comments, or furnished the fair notice the Spending Clause requires before imposing a new condition on the receipt of federal funding. Each of these defects is independently fatal and requires that the SORN be enjoined.

This SORN is not the Administration's first attempt to share sensitive information with the Department of Homeland Security ("DHS") and others in disregard of clear statutory restrictions on disclosure. *See, e.g.*, *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. CV 25-3501 (SLS), 2026 WL 1784297, at *2-4 (D.D.C. June 22, 2026) (enjoining disclosure of Social Security Numbers to DHS). Nor is this SORN the Administration's first effort to stretch its enforcement

2

authority over TANF and other social safety-net programs past its breaking point. *See, e.g., New York v. Admin. for Children & Families*, No. 26-CV-172, --- F. Supp. 3d ---, 2026 WL 673848, at *28 (S.D.N.Y. Mar. 10, 2026) (enjoining five-state freeze on TANF funding).

Like the prior courts that have confronted similar efforts, this Court should stay and enjoin the SORN and uphold the confidentiality protections that Congress enacted. Specifically, the Court should: (1) issue a temporary restraining order and a § 705 stay delaying the August 11 effective date of the new routine use in the SORN by 14 days; (2) set a briefing schedule that permits the parties to brief Plaintiffs' preliminary injunction motion before that delayed effective date; and (3) thereafter issue a preliminary injunction and § 705 stay blocking implementation of the SORN. Such an injunction would prevent harm to Plaintiff States that is paradigmatically irreparable—the unlawful sharing of information that will be exceptionally difficult if not impossible to recall—while preserving the status quo under which the federal government has operated for decades. *Cf. Commonwealth of Massachusetts v. Dep't of Educ.*, 828 F. Supp. 3d 198, 201 (D. Mass. 2026) (granting a preliminary injunction against federal data policy after having granted brief TRO to permit orderly adjudication of preliminary injunction motion). The Court should not permit this unlawful and potentially irreversible change in the administration of the TANF program to take effect without an opportunity for judicial review.

## BACKGROUND

### I.    The Temporary Assistance for Needy Families Program

TANF is a "pass-through" program under which the federal government provides block grants to States, territories, and tribal governments, which have broad discretion to use the funds to provide assistance to low-income families with children. *Navajo Nation v. Dep't of Health & Hum. Servs.*, 325 F.3d 1133, 1135 (9th Cir. 2003). TANF currently funds over $16 billion per year

3

in grants to all fifty States, the District of Columbia, and several territories and tribal governments. Pub. L. No. 119-75, div. J, tit. III, § 6304, 140 Stat. 173, 686 (2026). It is a one of the largest sources of cash assistance to low-income American families and a crucial component of Plaintiff States' anti-poverty work. Many of the children and their families who receive TANF assistance are "the poorest of the poor" and depend on TANF for their essential needs, including electricity, heat, housing, clothing, transportation, and diapers. NY-Chawla ¶¶ 6-7.[1]

When it established TANF in 1996, Congress sought to remedy what it perceived as the flaws in its predecessor program, Aid to Families with Dependent Children (AFDC)—principally, the excessive role that AFDC gave the federal government. *See* 42 U.S.C. § 601(a) (TANF's purpose "is to increase the flexibility of States in operating a program" to assist needy families); 64 Fed. Reg. 17,720, 17,721–22 (1999) (explaining that TANF "reflect[ed] widespread, bipartisan agreement" that "[t]he Federal government should focus less attention on eligibility determinations and place more emphasis on program results"). To that end, the TANF statute grants States significant flexibility to administer TANF. It provides that States may expend TANF funds "in any manner that is reasonably calculated to accomplish the purpose of this part," 42 U.S.C. § 604(a), thereby leaving them "broad discretion to determine their own eligibility criteria, benefit levels, and the type of services and benefits available to TANF cash assistance recipients."[2] It similarly entrusts States with ensuring that individuals meet the eligibility requirements for their respective TANF programs, directing them to establish an "income and eligibility verification system," under which individuals, employers, and State agencies must submit certain information to the State to

---

[1] Exhibits and declarations referenced herein are attached to the Declaration of Jessica Ranucci.
[2] ACF, Fiscal Year 2024 Justification of Estimates for Appropriations Committee at 386, https://acf.gov/sites/default/files/documents/olab/fy-2024-congressional-justification.pdf.

4

confirm eligibility. *See* 42 U.S.C. § 1320b-7(a), (b)(1).

By contrast, the TANF statute sharply limits the federal government's authority to administer its provisions. It states that "[n]o officer or employee of the Federal Government may regulate the conduct of States under this part or enforce any provision of this part, except to the extent expressly provided in this part." 42 U.S.C. § 617. It then delineates the specific provisions of the statute that HHS may enforce. (HHS has in turn delegated most of these functions to the Administration for Children and Families, or ACF.) On the front end, it authorizes HHS to confirm that State-submitted plans under TANF contain the information required by statute, but not to scrutinize or regulate their contents. *See* 42 U.S.C. § 602(a). It also requires HHS to collect from States each quarter detailed demographic information for a sample of TANF assistance recipients, such as date of birth, Social Security number, and citizenship status, in order to write a report to Congress about the general composition and effectiveness of the TANF program. *Id.* § 611(a)-(b).

On the back end, the TANF statute allows HHS to penalize States for failing to comply with fifteen specifically listed statutory requirements. *Id.* § 609(a)(2)-(16). HHS may not independently enforce any program requirements not listed in those provisions; instead, Congress specifically stated that HHS may penalize States for failing to comply with the remaining provisions of the statute only "[i]f an audit conducted under chapter 75 of title 31"—a statute that requires States to undergo a regular audit, conducted by an independent auditor, pursuant to generally accepted auditing principles—"finds that" the TANF funds have "been used in violation of this part." 42 U.S.C. § 609(a)(1)(A); *see* 31 U.S.C. §§ 7501-7506. Consistent with that requirement, until now ACF has assessed State compliance based on that audit, and has never engaged—or been permitted to engage—in the kinds of additional oversight and review announced in the SORN. *See infra* p. 16 & n. 11.

5

## II.    Statutory Protections for the Confidentiality of TANF Information

In addition to limiting the federal government's authority over the TANF program, Congress has enacted extensive protections to safeguard the confidentiality of TANF information. In the TANF statute itself, Congress provided that each State must "[t]ake such reasonable steps as the State deems necessary to restrict the use and disclosure of information about individuals and families receiving assistance" under TANF. 42 U.S.C. § 602(a)(1)(A)(iv). It also provided that, when States verify whether individuals have an immigration status that permits them to receive TANF assistance, it must use a system that permits "efficient verification" and "protects the individual's privacy to the maximum degree possible." *Id.* § 1320b-7(d)(3); *see also* 8 U.S.C. § 1612(b) (providing categories of noncitizens eligible for TANF).

Several other statutes also bar the sharing of TANF information absent specific authorization. The bedrock HHS confidentiality statute, 42 U.S.C. § 1306(a), bars HHS employees from disclosing "any file, record, report . . . or information" obtained in the course of the duties as statutorily authorized except "as the head of [HHS] may by regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306(a)(1)-(2). The Social Security Act provides that "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such Social Security account number or related record." *Id.* § 405(c)(2)(C)(viii)(I). And the Trade Secrets Act makes it a criminal offense for any "employee of the United States or of any department or agency thereof" to "make[] known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties" that "concerns or relates to the . . . identity" or the "amount or source of any income . . . of any person." 18 U.S.C. § 1905.

Further, the Privacy Act of 1974 imposes government-wide limits on the disclosure of personal information that HHS, like all agencies, must follow. 5 U.S.C. § 552a. Congress' principal aim in enacting the Privacy Act was to prevent the compilation of "computerized data banks," which Congress believed would erode trust in government and deter individuals from participating in government services, among other harms. *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 766 (1989); *see, e.g.*, S. Rep. No. 93-1183, at 4, 8 (1974). The statute achieves these aims by prohibiting the disclosure of "any record" about an individual "which is contained in a system of records" without that individual's written consent, unless one of the statute's exceptions is satisfied. 5 U.S.C. § 552a(b). One of those exceptions authorizes disclosure for a "routine use," defined as a use "for a purpose which is compatible with the purpose for which [the record] was collected." *Id.* § 552a(a)(7), (b)(3). To permit a new routine use, an agency must publish in the Federal Register a system of records notice, or SORN, that describes the new routine use and gives the public 30 days' notice and an opportunity to comment before putting the SORN into effect. *Id.* § 552a(e)(4), (11). The agency also must inform each individual of the routine uses of their information at the time of collection. *Id.* § 552a(e)(3); *see U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 146 (D.C. Cir. 1993). In addition, before agencies match data held in different systems of records to verify eligibility for public benefits, they must have in place a "written agreement between the source agency and the recipient agency" specifying how the matching program will work. *See* 5 U.S.C. § 552a(a)(8)(A), (o).

III.    **Defendants Have Repeatedly Targeted TANF Funding with Unsubstantiated Allegations of Fraud.**

Plaintiff States have adopted comprehensive programs for deterring, detecting, and

stopping fraud among TANF beneficiaries.[3] Among other things, Plaintiffs have robust processes in place to ensure that individual applicants prove their eligibility under all TANF program requirements, including immigration status, such as cross-checking with other State and federal databases and with lists of incarcerated individuals, tracking out-of-state transactions, and establishing staff training requirements, data and documentation retention policies, fraud whistleblowing hotlines, and in-person interviews. *See, e.g.*, CO-McMahon ¶¶ 8-23; DE-Horn ¶¶ 10, 14; KY-Dennis ¶¶ 17-18; MA-Cole ¶ 9; MD-Rodgers ¶ 8. In addition, they independently check beneficiaries' eligibility using approved federal and State databases, such as the Systematic Alien Verification for Entitlements (SAVE) system.[4] And when Plaintiff States find fraud, they work to correct it by initiating administrative disqualification proceedings and by referring cases to local, State, and federal law enforcement to recover benefits paid and hold accountable those responsible. *See, e.g.*, CO-McMahon ¶¶ 20-21; DE-Horn ¶ 15; KY-Dennis ¶ 20; MA-Cole ¶ 16; MD-Rodgers ¶ 19; OR-Carpenter-Seguin ¶¶ 22-23; PA-Pham ¶ 14; RI-Merolla-Brito ¶ 21.

Despite these processes and safeguards, Defendants have repeatedly used unsubstantiated allegations of "fraud" to target States' TANF funding. On January 6, 2026, following a purported exposé by a 23-year old YouTube content creator, ACF announced that it had "froze[n] access to" all TANF funds for five Plaintiff States. HHS Freezes Child Care and Family Assistance Grants

---

[3] CO-McMahon ¶¶ 8-23; DE-Horn ¶¶ 7-18; KY-Dennis ¶¶ 8-22; MA-Cole ¶¶ 8-17; MD-Rodgers ¶¶ 8-21; OR-Carpenter-Seguin ¶¶ 9-25; PA-Pham ¶¶ 9-18; RI-Merolla-Brito ¶¶ 9-23; DC-Campbell ¶¶ 8-18; MI-Frisch ¶¶ 8-25; IL-Outland ¶¶ 7-21; ME-Yaffe ¶¶ 6-20; CT-Hadler ¶¶ 8-27; MN-Moore ¶¶ 9-27; NJ-Cha ¶¶ 8-21; VA-Storen ¶¶ 8-16; VT-Bocash ¶¶ 7-20; WA-Reyes ¶¶ 8-19; WI-Horn ¶¶ 9-21; NY-Chawla ¶¶ 8-21; CA-Witchey ¶¶ 13-25; AZ-Rodgers ¶¶ 11-21.
[4] CO-McMahon ¶¶ 24-31; DE-Horn ¶¶ 19-25; KY-Dennis ¶¶ 23-29; MA-Cole ¶¶ 18-19; MD-Rodgers ¶¶ 22-28; OR-Carpenter-Seguin ¶¶ 26-31; PA-Pham ¶¶ 19-25; RI-Merolla-Brito ¶¶ 24-27; DC-Campbell ¶¶ 19-25; MI-Frisch ¶¶ 26-28; IL-Outland ¶¶ 22-27; ME-Yaffe ¶¶ 21-26; CT-Hadler ¶¶ 28-31; MN-Moore ¶¶ 28-32; NJ-Cha ¶¶ 22-28; VA-Storen ¶¶ 17-21; VT-Bocash ¶¶ 21-26; WA-Reyes ¶¶ 20-27; WI-Horn ¶¶ 22-28; NY-Chawla ¶¶ 22-32; CA-Witchey ¶ 21; AZ-Rodgers ¶ 19.

(Jan. 6, 2026), https://perma.cc/D374-NR62. That same day, HHS asserted that "Democrat-led states and Governors have been complicit in allowing massive amounts of fraud to occur under their watch."[5] In letters effectuating the freeze, ACF claimed, without evidence, that it had unspecified "concerns" about "the potential for extensive and systemic fraud in" the States' TANF programs, including that States were "illicitly providing illegal aliens with TANF benefits." ACF demanded the "complete universe of TANF administrative data . . . for all recipients for all available years," and "documentation demonstrating that the" State "has verified the eligibility of all TANF applicants and recipients," including "confirm[ing] citizenship or qualified alien status."

A federal court issued a temporary restraining order enjoining the freeze of TANF funding. *New York v. Admin. for Children & Families*, No. 26-CV-172 (S.D.N.Y.), ECF No. 22. The court later found, in granting a preliminary injunction, that Defendants did not "offer any concrete evidence of fraud in Plaintiff States" and that the evident purpose of the freeze was "partisan targeting." *New York*, 2026 WL 673848, at *18–19 (quotation omitted); *see Am. Fed'n of State, Cnty., & Mun. Emps. v. U.S. Dep't of Health and Human Services*, No. 26-cv-00759-TLT (N.D. Cal.), ECF No. 56 (second court granting preliminary injunction). The federal government has not appealed these rulings, and ACF recently "rescind[ed]" the January letters. *See New York v. Admin. for Children & Families*, No. 26-CV-172 (S.D.N.Y.), ECF No. 119-2.

Nevertheless, the Administration has continued to target States by making unsubstantiated claims of "fraud" in public benefits programs. On March 16, 2026, President Trump signed Executive Order 14395, 91 Fed. Reg. 13,485 (2026), which claims that "some States have

---

[5] Adora Brown & Raymond Fernández, *Trump Admin. to Freeze $10B in Social Programs to New York and Other Dem States*, The City (Jan. 6, 2026), available at https://www.thecity.nyc /2026/01/06/trump-cuts-funding-social-welfare-child-care/.

9

embraced loopholes that avoid individual eligibility validation" and "refused to institute basic fraud controls," and "[a]s a result, illegal aliens" and other individuals "exploit [benefits] programs . . . with ease." The Executive Order established a Task Force to Eliminate Fraud, with duties including to "maximize enforcement of eligibility requirements," "promote the facilitation of information and data sharing and coordination," and "audit and ensure prospective compliance monitoring, including for use in identifying fraud in Federal benefits programs." 91 Fed. Reg. at 13,487. Following the executive order, on June 10, 2026, ACF published a report claiming that States are unlawfully "channel[ing] substantial taxpayer-funded cash assistance into households headed by parents who are barred from receiving TANF because of immigration status, including illegal aliens,"[6] when in fact TANF assistance may be provided to "eligible children" regardless of the eligibility of their parents, *see* 64 Fed. Reg. 17,720, 17,740 (April 12, 1999).

## IV.    The TANF System of Records Notice

On June 23, 2026, ACF initiated the next step in its campaign by publishing the SORN at issue here. *See* Ex. 1, 91 Fed. Reg. 37,406 ("SORN"). That SORN purports to dramatically expand ACF's oversight over the TANF program and authorizes ACF to disclose TANF recipients' and family members' personal information to nearly any State, federal, or private entity it chooses.

ACF has long maintained a system of records—formally identified as System No. 09-80-0375, Temporary Assistance for Needy Families (TANF) Data ("TANF System of Records")—that consists of the demographic data on TANF assistance recipients and their family members that States are required to send to ACF each quarter. *See* 89 Fed. Reg 25,880, 25,880–81 (Apr. 12,

---

[6] David Swegle and Alex J. Adams, The Prevalence of TANF Child-Only Cases Involving Immigration-Status-Ineligible Parents (June 10, 2026), *available at* https://acf.gov/ofa/policy-guidance/prevalence-tanf-child-only-cases-involving-immigration-status-ineligible.

2024). That system of records contains highly sensitive personal information about individuals receiving TANF assistance, including their Social Security numbers, dates of birth, citizenship status, marital status, parentage, zip codes, employment information, income, race, education level, and much more. *See* Ex. 3, ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions at 3-31 (detailing the 77 data fields). The system also contains this data for former TANF recipients, for family members of current and former TANF recipients who are not themselves receiving TANF, and for recipients of State-funded poverty assistance programs. *Id.* Because the statute only requires States to submit a statistical sample of such data, *see* 42 U.S.C. § 611(a)(1)(B)(i), some States do so, while others submit this data for all TANF assistance recipients in the State.[7]

Until recently, ACF stated that the TANF System of Records could be used for only three purposes: (1) to "determine whether grantees are meeting certain requirements prescribed by" the TANF statute, such as the statute's "work participation and time-limit requirements"; (2) to "compile information used in the report to Congress" required by 42 U.S.C. § 611, and (3) to "perform research on the caseload dynamics and employment trajectories of TANF recipients." 89 Fed. Reg. at 25,881. In addition, ACF previously authorized the disclosure of the information only for nine narrow "routine uses." 89 Fed. Reg. at 25,882. Those uses were standard ones found in numerous agency SORNs, like authorizing disclosure for statistical, research, or reporting purposes or to mitigate the harms from a security breach. *Id.* at 25,882.

The new SORN announces a significant revision ("the Revision") to the TANF System of Records in three respects. First, the SORN states that ACF is enlarging the set of records included

---

[7] *Compare, e.g.,* CO-McMahon ¶ 34; MA-Cole ¶ 25; MD-Rodgers ¶ 31; PA-Pham ¶ 28 (all sampling States); *with* DC-Campbell ¶ 28; DE-Horn ¶ 28; KY-Dennis ¶ 32; OR-Carpenter-Seguin ¶ 34; RI-Merolla-Brito ¶ 30 (all full data States).

in this database. It provides that, in addition to the millions of records of TANF recipient and family information furnished by States, the system will now also include "verification information obtained from [TANF grantee] agencies, other HHS records, or other government agencies or entities." *Id.* at 37,408.

Second, the SORN provides notice that ACF is dramatically expanding the authorized purposes for which the system of records may be used. The SORN revises the first listed purpose of the system of records to state that TANF recipient and family data (along with the new "verification information" added to this system) may be used "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of" the TANF statute. *Id.* at 37,407. And the SORN adds a lengthy new purpose, which states that this personal information may be used "to ensure compliance with *all* TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship and immigration status." *Id.* (emphasis added). The SORN further notes that ACF will ensure that grantees are satisfying such requirements "through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)." *Id.*

Third, the SORN adds a significant new "routine use" to the system of records. In addition to the nine standard uses previously authorized, the SORN also authorizes disclosure of TANF recipients' and their family members' personal information without prior consent "to another federal or grantee agency or entity engaged by ACF (*e.g.*, DHS or TANF program administrators),

12

to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status." *Id.* at 37,409. Absent judicial intervention, this routine use will take effect on August 11, 2026—the same day comments are due. Ex. 2, 91 Fed. Reg. 45,278 (July 20, 2026).

**V.      Plaintiff States Will Be Harmed by the SORN and the TANF Data System of Records It Creates**

If the SORN's modifications take full effect as planned on August 11, Plaintiff States will suffer immediate and irreparable harm.

*First*, the sharing of TANF information will irreparably damage the trust individuals place in the TANF program and chill families from participating in TANF, with dire consequences for Plaintiff States that rely on these programs to keep their residents out of poverty.[8] States have long encouraged individuals to participate in the TANF program on the assurance that their information and the information of their family members will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. MD-Rodgers ¶ 28; NY-Chawla ¶ 54; PA-Pham ¶ 23; VT-Bocash ¶ 26; WI-Horn ¶ 28 ("[R]ecipients are assured multiple times . . . of the confidentiality of the information they provide."). For example, the District of Columbia's application states that "[a]ll information and documentation gathered" for a TANF application "is confidential" and that releasing this information to "anyone not authorized to receive [it] . . . is a violation of Federal and D.C. law." DC-Campbell ¶ 25.

If ACF can proceed with sharing TANF data with virtually any entity it wishes, many

---

[8] AZ-Rodgers ¶ 36; CA-Witchey ¶ 42; CO-McMahon ¶ 52; CT-Hadler ¶ 56; DC-Campbell ¶ 46 (noting "unique" considerations for D.C.); IL-Outland ¶ 46; KY-Dennis ¶ 49; MA-Cole ¶ 44; MD-Rodgers ¶ 48; ME-Yaffe ¶ 46; MI-Frisch ¶ 51; MN-Moore ¶ 55; NJ-Cha ¶ 47; NY-Chawla ¶ 55; OR-Carpenter-Seguin ¶ 52; RI-Merolla-Brito ¶ 45; VT-Bocash ¶ 46; WA-Reyes ¶ 47; WI-Horn ¶ 45.

TANF recipients will inevitably conclude that those assurances were false and decline to participate in the program in the future. *See, e.g.*, CO-McMahon ¶¶ 50-51; CT-Hadler ¶ 55; DC-Campbell ¶ 45. In addition, many qualified families will be chilled from participation because they fear that the recipient agencies—particularly DHS—will use that information to engage in immigration enforcement against them or their family members.[9] Mixed status families—such as households with citizen children residing with non-citizen parents—are "particularly vulnerable," as the data shared will include not only TANF recipients themselves, but also non-recipient family members, including those ineligible for TANF due to immigration status (or other reasons). MD-Rodgers ¶ 47. And many others, such as domestic violence victims, are likely to withdraw from participation because they may fear their sensitive information will be disclosed or mishandled by these agencies in a way that will subject their most private details to public exposure. *Id.*

Reduced participation in TANF will cause significant harm to Plaintiff States. Residents will lose access to services that prevent homelessness, provide employment, and allow them to contribute to the workforce; as a result, those individuals will inevitably rely on other services that are more expensive to States, such as State child welfare, foster care, shelter, juvenile justice, food bank, and emergency health care systems. CA-Witchey ¶¶ 43-46; CO-McMahon ¶ 53; CT-Hadler ¶ 57; DE-Horn ¶ 48; KY-Dennis ¶ 50; MD-Rodgers ¶ 49; NJ-Cha ¶ 48; NY-Chawla ¶ 56; MI-Frisch ¶ 53; MN-Moore ¶ 56; OR-Carpenter-Seguin ¶ 53; PA-Pham ¶ 47; WI-Horn ¶ 46. The result will be greater expenditures by the States: TANF is "more cost-effective than dealing with

---

[9] CA-Witchey ¶¶ 41-42 (citing evidence of decline in participation under previous efforts); CO-McMahon ¶ 50; CT-Hadler ¶ 55; DC-Campbell ¶ 45; DE-Horn ¶ 46; IL-Outland ¶ 45; KY-Dennis ¶ 47-48; MA-Cole ¶ 43; MD-Rodgers ¶ 47; ME-Yaffe ¶ 45; MI-Frisch ¶ 50; MN-Moore ¶ 41; NJ-Cha ¶ 46; NY-Chawla ¶ 52; OR-Carpenter-Seguin ¶¶ 50; PA-Pham ¶ 45; RI-Merolla-Brito ¶ 44; VT-Bocash ¶ 45; WA-Reyes ¶¶ 45-46; WI-Horn ¶ 44.

downstream crises," and research shows that every dollar spent on poverty reduction efforts yields seven dollars in downstream economic benefits. MI-Frisch ¶¶ 53-55; VT-Bocash ¶ 47; WA-Reyes ¶ 48. And because in many States the TANF application is used for other critical benefits like SNAP and Medicaid, the chilling effect would extend to a loss of these other benefits, compounding the harms. *See, e.g.*, DC-Campbell ¶ 47; *see also* MI-Frisch ¶ 54 (effects on child support system).

**Second**, the SORN will impose on Plaintiff States an immediate obligation to review and revise their disclosures to TANF applicants and participants to ensure that the new routine use of the data collected from them—*i.e.*, sharing with any federal, State, or private entity—is adequately disclosed. CO-McMahon ¶ 54; IL-Outland ¶ 47; MI-Frisch ¶ 56; NJ-Cha ¶ 49; NY-Chawla ¶ 57; WI-Horn ¶ 47.[10] States could never have anticipated the new routine use of the TANF data announced in the SORN. *See, e.g.*, DE-Horn ¶ 25; ME-Yaffe ¶ 42; NY-Chawla ¶ 32; IL-Outland ¶ 25; MI-Frisch ¶ 31; MN-Moore ¶ 35; OR-Carpenter-Seguin ¶ 31; WA-Reyes ¶ 27. In many circumstances, the new routine use is not currently included in the State's disclosures, including in the application forms themselves, creating a mismatch between TANF applicant and recipient expectations about privacy and how ACF now asserts it may use their data. MD-Rodgers ¶ 28 ("facially inconsistent"); NY-Chawla ¶ 54 ("mismatch"); *see also* CO-McMahon ¶ 31; CT-Hadler ¶ 34; MA-Cole ¶ 22; NY-Chawla ¶ 31; VA-Storen ¶ 21.

Many Plaintiff States will therefore have to incur financial costs in updating communications with TANF applicants and participants that notify them of the new manner in

---

[10] State and federal law requires Plaintiff States to maintain confidentiality of TANF applicants' data and to disclose its use. *See, e.g.*, AZ-Rodgers ¶ 35; DC-Campbell ¶¶ 23-25; DE-Horn ¶ 24; NJ-Cha ¶¶ 26-28; MD-Rodgers ¶¶ 26-27; NY-Chawla ¶¶ 27-30; OR-Carpenter-Seguin ¶ 30; RI-Merolla-Brito ¶ 27; WA-Reyes ¶¶ 24-25; WI-Horn ¶¶ 25-26.

15

which their personal data may be used and shared.[11] Updating the application here in the District "alone would cost several hundred thousand dollars." DC-Campbell ¶ 48. Where applications are combined with other benefits, the process is more complicated. *See, e.g.*, CO-McMahon ¶ 54; NY-Chawla ¶ 57. Updating the application will require a number of steps, including plain language review and translation, all increasing costs on the States. CO-McMahon ¶ 54; NY-Chawla ¶ 57 (New York performs translation to 12 non-English languages and four formats for the visually impaired). And States will need to take numerous other costly steps to implement these changes, including printing new paper applications; making technological updates on electronic application systems; updating guidance documents, staff training manuals, and call scripts; and destroying old paper copies. CO-McMahon ¶ 54; MD-Rodgers ¶ 50; OR-Carpenter-Seguin ¶ 54; PA-Pham ¶ 48; NY-Chawla ¶ 57; *see* DC-Campbell ¶ 48; RI-Merolla-Brito ¶ 46. For many States, this process will take "months to implement," NY-Chawla ¶ 57, or even "up to a year," CA-Witchey ¶ 47. In the meantime, the new routine use may create risk of claims against some States by individuals asserting violations of their privacy rights. NY-Chawla ¶ 58.

*Third*, the SORN will place Plaintiff States at immediate risk of new oversight and enforcement actions. Consistent with the limits on its authority, ACF has not historically engaged in the oversight mechanisms listed in the SORN, such as program integrity reviews or projects, additional audits, or site visits to State agencies.[12]  These new oversight mechanisms will burden

---

[11] *See, e.g.*, AZ-Rodgers ¶ 38; CA-Witchey ¶¶ 47-49; CO-McMahon ¶ 50; CT-Hadler ¶ 58; IL-Outland ¶ 47; MA-Cole ¶ 46; MD-Rodgers ¶ 50; ME-Yaffe ¶ 48; MN-Moore ¶ 57; NY-Chawla ¶ 57; PA-Pham ¶ 48; RI-Merolla-Brito ¶ 46; VT-Bocash ¶ 42; WI-Horn ¶ 47.

[12] *Compare* 91 Fed. Reg. at 37,407 *with* AZ-Rodgers ¶ 26; CA-Witchey ¶ 30; CO-McMahon ¶¶ 35-37; CT-Hadler ¶¶ 41-42; DC-Campbell ¶¶ 31-32; DE-Horn ¶¶ 31-32; MA-Cole ¶¶ 26-27; NJ-Cha ¶ 33; KY-Dennis ¶¶ 34-35; MD-Rodgers ¶ 33; ME-Yaffe ¶ 31; MI-Frisch ¶¶ 35-36; NY-Chawla ¶¶ 38-39; OR-Carpenter-Seguin ¶¶ 37-38; PA-Pham ¶¶ 31-32; RI-Merolla-Brito ¶¶ 32-33; VT-Bocash ¶¶ 32-33; WA-Reyes ¶ 33.

State agencies with unnecessary and time-consuming work, as States will need to, for example: coordinate meetings and interviews; track, identify, gather, and produce documentation and review and validate it; engage IT to query data and ensure that it has privacy protections; generate new reports; and respond to inquiries. *See, e.g.*, NY-Chawla ¶ 48; OR-Carpenter-Seguin ¶ 47; WI-Horn ¶ 41. States may need to recreate existing eligibility checks. CO-McMahon ¶ 46; ME-Yaffe ¶ 40; NY-Chawla ¶ 48; WI-Horn ¶ 41. States may also need to expend resources to gather data from localities. CA-Witchey ¶ 38; CO-McMahon ¶ 46; KY-Dennis ¶ 44; MD-Rodgers ¶ 42; NJ-Cha ¶ 42. States will need to expend time and resources to address these oversight activities, either by hiring additional staff or by diverting their limited TANF staff, "undermining" the program's "efficient and equitable administration." MD-Rodgers ¶ 43; *see also* CA-Witchey ¶ 38 ("shift in workload" will cause "delayed issuance of benefits"); CO-McMahon ¶¶ 46-47; CT-Hadler ¶ 51; DC-Campbell ¶ 41; DE-Horn ¶¶ 41-42; IL-Outland ¶¶ 41-42; MA-Cole ¶ 38; OR-Carpenter-Seguin ¶ 47; NY-Chawla ¶ 49; VT-Bocash ¶¶ 42-43.

Further, Plaintiff States face a substantial risk that these oversight activities will be based on erroneous analysis of the records included in the modified TANF system of records. CO-McMahon ¶ 48; MA-Cole ¶ 40; MD-Rodgers ¶ 44; WA-Reyes ¶ 43. SAVE does not save manual documentation checks, leading to possible discrepancies if the TANF recipients were cross-checked against SAVE. CO-McMahon ¶ 48; NY-Chawla ¶ 50; NJ-Cha ¶ 44 (similar as to SSN applications). In addition, the data provided by States to ACF is taken at a single point in time and often provided to ACF months later; as a result, even at the time the data is provided to ACF it does not reflect the current circumstances. ME-Yaffe ¶ 41; NY-Chawla ¶ 50.

Moreover, ACF may rely on this authority to attempt to impose penalties on States. While it is plainly unlawful for ACF to penalize States outside of the narrow circumstances provided by

17

statute and without following the statutorily required procedures, *see* 42 U.S.C. §§ 609(c), 610, earlier this year ACF did exactly that, by "fr[eezing] access to" all TANF Funds for five Plaintiff States with no statutory basis and no procedure at all. *Supra* pp. 8-9. Any disruption to TANF funding would have devastating consequences for Plaintiff States, including likely staffing reductions and the elimination of non-mandated services, and including for the five States who recently experienced the freeze. *See, e.g.*, AZ-Rodgers ¶ 34; CO-McMahon ¶ 49; CT-Hadler ¶ 53; IL-Outland ¶ 43; MN-Moore ¶ 52; NY-Chawla ¶¶ 51-52; PA-Pham ¶ 43; WI-Horn ¶ 42.

## ARGUMENT

This Court applies a familiar four-factor test in determining whether to issue a temporary restraining order, preliminary injunction, or a stay under 5 U.S.C. § 705. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (preliminary injunction and § 705 stay); *Sterling Com. Credit--Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 13 (D.D.C. 2011) (TRO). The movant must demonstrate that it is (1) "likely to succeed on the merits"; (2) "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor,"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first factor, likelihood of success, is the "most important." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The final two factors—the balance of hardships and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, all of these factors weigh in favor of Plaintiff States.

## I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims

### A.    The SORN and Associated Revision of the TANF System of Records Are Final Agency Action Under the APA

As an initial matter, the SORN and Revision are archetypal final agency action within the meaning of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 704. An agency action

18

is "final" if it (i) "mark[s] the 'consummation' of the agency's decisionmaking process," *i.e.*, it is not "of a merely tentative or interlocutory nature," and (ii) is one "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Courts take a "pragmatic" approach to finality, *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quotation omitted), under which they focus on an action's "concrete consequences." *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019). "The core question for determining finality is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will *directly* affect the parties." *Concilio De Salud Integral De Loiza, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 538 F. Supp. 2d 139, 147 (D.D.C. 2008) (cleaned up).

Both criteria for finality are met here. *First*, there is nothing "tentative" or "interlocutory" about the SORN and the Revision. *Bennett*, 520 U.S. at 177–78. The SORN purports to authorize ACF to add records obtained from other agencies or entities to the TANF System of Records, share the entire system of records with other agencies and entities, and use these records to verify compliance with all TANF requirements, including by conducting "program integrity reviews," "additional audits," and "monitoring." 91 Fed. Reg. at 37,407, 37,409. The SORN thus "mark[s] the consummation of the agency's" decision to authorize the disclosure of TANF records. *Bennett*, 520 U.S. 154, 177–78; *see, e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 691 (S.D.N.Y. 2025) (finding finality where an agency gave another agency "access to sensitive and legally protected records").

*Second*, the SORN and the Revision are actions from which "legal consequences will flow." *Bennett*, 520 U.S. at 178. The SORN supplies the (purported) legal authority for ACF to introduce new records into this system, significantly expand the purposes of this system, and

19

disclose TANF information pursuant to a new routine use. *See* 5 U.S.C. § 552a(e)(3)–(4) (requiring a SORN to authorize each new routine use). These modifications will have "concrete consequences" for States and TANF recipients. *Ipsen Biopharmaceuticals*, 943 F.3d at 956. Among other things, they will foreseeably diminish enrollment in TANF, require States to incur costs notifying TANF recipients of the disclosure, and subject States to novel audits and program integrity reviews. *See supra* pp. 13-18. The SORN thus satisfies the second prong of the *Bennett* test. *See Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("[a]dopting a policy of permitting employees to disclose confidential information without notice" is final action); *League of Women Voters*, 2026 WL 1784297, at *20 (SORNs were "undoubtedly final agency action" because they "authoriz[ed] the challenged disclosures to occur") (citation omitted); *Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*, 836 F.3d 963, 969 (8th Cir. 2016) (similar).

## B. The SORN Is Contrary to Law

ACF seeks to disclose the sensitive personal information of millions of children and adults—their Social Security numbers, zip codes, parentage, and much more—to any federal or State entity it chooses for the purpose of monitoring grantees' compliance with "all" provisions of the TANF statute. At least six statutes independently bar the transfer of States' data to facilitate this gross breach of personal privacy.

### 1. The SORN Violates the TANF Statute.

An agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). That principle applies with redoubled force in the case of the TANF statute, which specifically provides that "[n]o officer or employee of the Federal Government may regulate the conduct of States under this part or enforce any provision of this part, except to the extent expressly provided in this part." 42 U.S.C. § 617; *see id.* § 1306 (barring HHS entity from disclosing information "except as otherwise provided by

20

Federal law"). Accordingly, for ACF to share TANF data, it must point to some statute authorizing it to do so.

There is none. It is beyond dispute that no provision of the TANF statute *expressly* permits ACF to disclose TANF data to other federal or State agencies. On the contrary, the statute repeatedly reflects its concern with safeguarding the privacy and confidentiality of TANF recipients' and family members' information. It requires each State to adopt measures "necessary to restrict the use and disclosure of information about individuals and families receiving assistance," 42 U.S.C. § 602(a)(1)(A)(iv), subject to narrow exceptions requiring disclosure including, for example, to federal law enforcement officials about individuals associated with criminal conduct, *id.* § 608(a)(9)(B). Congress also provided that, when State agencies verify an individual's immigration status, they must use a system that permits "efficient verification" and "protects the individual's privacy to the maximum degree possible." *Id.* § 1320b-7(d)(3). Indeed, in establishing TANF, Congress eliminated a provision of the AFDC statute that permitted the disclosure of information for the very purpose the SORN purports to allow—that is, disclosure of benefits recipients' personal information to assist "any audit or similar activity conducted in connection with the administration of [AFDC] by any governmental entity." 42 U.S.C. § 602(a)(9) (1994). Had Congress wished to preserve a similar authority for ACF, it could easily have done so. But Congress did not, and the TANF statute confers no such power.

Nor is it plausible that the TANF statute *implicitly* authorizes ACF to share information with other federal and State entities. The statute itself forecloses any such finding of implicit authority, as it permits ACF to enforce the statute only "to the extent" the statute "expressly" authorizes. 42 U.S.C. § 617; *see id.* § 1306(a)(1)(A) (disclosure unlawful "except as otherwise provided by Federal law"). And even if it were possible to find implicit authorization for ACF to

carry out the statute, it would, at minimum, need to be "necessary" to carry out a "power" that is actually "given by . . . statute." Antonin Scalia & Bryan A. Garner, *Reading Law* 192–93 (2012). The SORN, however, purports to authorize disclosure to carry out an authority that ACF plainly does not possess: namely, to use the information collected from TANF recipients to ensure a State has complied with "all" of the requirements of the TANF statute, including its requirement to "ensur[e] that TANF recipients are eligible." 91 Fed. Reg. at 37,407, 37,409.

Nothing in the TANF statute permits ACF to use information that it collects from the States to enforce "all" of the requirements of the statute against States, or its eligibility-verification requirement in particular. Section 609 contains sixteen provisions that set forth, in detail, which requirements of the TANF statute ACF may enforce against States and how it may enforce them. Fifteen of those provisions identify specific statutory requirements that ACF may penalize States for failing to comply with. *See* 42 U.S.C. § 609(a)(2)–(16). Those provisions state, for instance, that ACF may reduce a State's funding if it fails to submit the report required under section 611, *id.* § 609(a)(2), or if it fails to cooperate in the federal child-support system, *id.* § 609(a)(5). None of those provisions allows ACF to enforce "all" of the statute's requirements against a State, and none permits ACF to penalize States for alleged errors in verifying recipients' eligibility.

The sixteenth provision, section 609(a)(1), does provide general authorization for ACF to penalize a State for expending funds "in violation of this part," including the statute's eligibility-verification requirements. But, unlike the remaining fifteen provisions of section 609, it specifies precisely the basis on which ACF may invoke that authority: "*If an audit conducted under chapter 75 of title 31* finds that an amount paid to a state . . . has been used in violation of this part." 42 U.S.C. § 609(a)(1)(A). The referenced chapter, 31 U.S.C. §§ 7501-7506, requires recipients of federal funding to undergo a single annual audit to confirm their compliance with program

22

requirements. *Id.* § 7502(a)(1)(A), (b)(1). Among other things, that statute dictates that each such audit must be "conducted by an independent auditor," that it must comply with "generally accepted government auditing standards," and that it must be consistent with guidance promulgated by the Office of Management and Budget (OMB). *Id.* § 7502(c), 7505. OMB, in turn, has issued guidance that specifies in painstaking detail how such audits must be conducted, including as to TANF in particular. *See* 2 C.F.R. §§ 200.0-200.521; Ex. 4, 2 C.F.R. Part 200, App. XI, § 93.558.

The annual audit conducted under sections 7501 *et seq.* is thus the sole mechanism for assessing compliance with TANF requirements not set forth elsewhere in section 609(a). The plain text of the TANF statute makes that audit a necessary condition for the imposition of penalties under section 609(a)(1). 42 U.S.C. § 609(a)(1) ("*If* an audit conducted under chapter 75 of title 31 finds . . ."). And that is particularly clear when section 609(a)(1) is compared with the subsequent fifteen subsections of section 609(a), each of which allows enforcement "[i]f the Secretary determines" or "[i]f the Secretary finds" a violation, *see id.* § 609(a)(2)–(6), (8)-(11), (14)–(16), or simply if such a violation occurs, *id.* § 609(a)(7), (12)-(13); *see Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022) ("[W]here [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." (quoting Scalia & Garner, *supra* p. 22)). Indeed, if section 609(a)(1) allowed ACF to enforce any provision of the TANF statute based on anything other than the results of the 31 U.S.C. § 7501 *et seq.* audit, then this provision would largely swallow the remaining subsections of section 609(a).

The statute's history confirms that Congress intended to make the 31 U.S.C. § 7501 *et seq.* audit process the sole mechanism for enforcing TANF requirements not set forth elsewhere in section 609(a). In the statute governing AFDC—the predecessor to TANF—Congress gave HHS blanket authority to cut funding "if the Secretary . . . finds . . . a failure to comply substantially

23

with *any* provision" the statute required States to follow. 42 U.S.C. § 604(a) (1994) (emphasis added). Further, that statute allowed the Secretary to establish her own "quality control system" for determining whether violations of the statute occurred. *Id.* § 608(a), (d), (f) (1994). In enacting the TANF statute, Congress conspicuously departed from this approach by detailing the specific provisions that ACF could enforce on its own, and leaving the remaining provisions only to be enforced through a 31 U.S.C. § 7501 *et seq.* audit process in which ACF plays no role. Consistent with that revised approach,  HHS has never before claimed the sweeping authority it now asserts to disclose TANF recipients' information in service of a wide swath of "oversight activities," including "program integrity reviews, "comprehensive assessments," "additional audits," "programmatic audits," and "on-site or virtual visits to TANF agencies." *Supra* p. 16 & n. 11. That too suggests that it does not possess such a power. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (agency's "longstanding practice" in administering a statute is entitled to "the most respectful consideration"); *FTC v. Bunte Bros*, 312 U.S. 349, 352 (1941) ("the want of assertion of power by those who presumably would be alert to exercise it, is . . . significant in determining whether such power was actually conferred").

Finally, to the extent HHS argues that 8 U.S.C. § 1373 authorizes this disclosure, it is wrong. Section 1373 does not *authorize* disclosure at all; it is a *prohibition* stating that federal and State agencies "may not" restrict the sharing of information "regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). As another court in this District recently explained in rejecting an identical argument, "prohibitory language such as 'shall not' or 'may not' is generally not read as an 'an affirmative grant of power.'" *League of Women Voters*, 2026 WL 1784297, at *33 (quotation omitted). And, in any event, the TANF System of Records contains a wealth of information—about parentage, income, county of residence, and

24

much more, including for non-recipient family members—that does not qualify as information "regarding . . . citizenship or immigration status" under any plausible construction of those terms. *See, e.g.*, *United States v. California*, 921 F.3d 865, 891–92 (9th Cir. 2019); *United States v. Illinois*, 796 F. Supp. 3d 494, 516–18 (N.D. Ill. 2025).

### 2.    *The SORN Violates the Privacy Act.*

The SORN is independently unlawful because it violates the Privacy Act. That statute provides that agencies may not disclose records contained in a system of records without the written consent of the person to whom they pertain, unless one of twelve standard exceptions applies or the disclosure is for a "routine use" described in the SORN for that system of records. 5 U.S.C. § 552a(b). The routine use exception authorizes disclosure of a record only if, among other requirements, the use for which the record is disclosed is "compatible with the purpose for which it was collected," *id.* § 552a(a)(7), and the agency "inform[s] each individual" from whom the information is collected of "the routine uses which must be made of the information" at the time of collection, *id.* § 552a(e)(3). Here, neither requirement is satisfied.

***First***, the new routine use authorized by the SORN is not "compatible" with the purpose for which the records were collected. *Id.* § 552a(a)(7). In 1971, as now, the term "compatible" meant "capable of existing together in harmony." Webster's Seventh New Collegiate Dictionary 169 (1971). Consistent with that definition, courts have long held that, for a proposed use to be compatible, "there must be a . . . concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 549-50 (3d Cir. 1989); *see Swenson v. U.S. Postal Serv.*, 890 F.2d 1075, 1078 (9th Cir. 1989) (agreeing with this interpretation). For instance, in *Britt*, the Third Circuit held that information collected for the purpose of investigating "a specific instance of possible wrongdoing" could not be disclosed under the routine use

25

exception to conduct "a general inquiry into [a person's] background." 885 F.2d at 549-50.

Although the D.C. Circuit has not "definitively determined the precise meaning of 'compatible,'" *Ames v. U.S. Dep't of Homeland Security*, 861 F.3d 238, 241 n.1 (D.C. Cir. 2017) (Kavanaugh, J.), its opinions accord with this interpretation. In *Doe v. Stephens*, the D.C. Circuit held that the disclosure of medical records to satisfy a grand jury subpoena was not "compatible" with the agency's purpose in collecting them to diagnose a medical condition. 851 F.2d 1457, 1467 (D.C. Cir. 1988). So, too, in *Mazaleski v. Treusdell*, the court observed that disclosing information in an employee's personnel file to communicate "derogatory information" to "a prospective employer" was not compatible with the agency's purpose of maintaining a record of "adverse actions or involuntary terminations." 562 F.2d 701, 712-13 & n.31 (D.C. Cir. 1977). District courts in this circuit have repeatedly relied on the same interpretation in construing the compatibility requirement. *See League of Women Voters*, 2026 WL 1784297, at *24; *Lugo v. U.S. Dep't of Justice*, 214 F. Supp. 3d 32, 40 (D.D.C. 2016); *Ames v. U.S. Dep't of Homeland Security*, 153 F. Supp. 3d 342, 347 (D.D.C. 2016), *aff'd*, 861 F.3d 238; *Doe v. U.S. Dep't of Labor*, 451 F. Supp. 2d 156, 174 (D.D.C. 2006), *vacated pursuant to settlement*, 2007 WL 1321116 (D.D.C. 2007).

Here, ACF proposes to disclose information collected pursuant to 42 U.S.C. § 611 for the purpose of conducting "program integrity reviews" and monitoring States' compliance with "all" provisions of the TANF statute. But section 611 does not authorize the collection of information for these purposes, or anything close to them. Instead, the principal purpose of section 611 is to authorize the collection of demographic information about TANF recipients in order to enable ACF to write a report to Congress about TANF "participation rates" and the general effectiveness and demographics of the TANF program. That is evident in section 611(b), which directs the Secretary to use the information in section 611(a) to compile a report to Congress for precisely this purpose.

26

*See* 42 U.S.C § 611(b). It is also reflected in the drafters' description of section 611, which they characterized as intended to ensure that "information on the effectiveness of State programs is publicly available." H.R. Rep. No. 104-651, at 1364.

Indeed, the design of section 611 would make little sense if Congress had wished this section to be used to assess general program compliance. The types of data listed in section 611 do not map in any coherent way onto the eligibility requirements of the TANF statute: for instance, they require States to report information about the "citizenship" of TANF recipients, but not immigration-status information that would illuminate their eligibility for TANF assistance. 42 U.S.C. § 611(a)(1)(A)(xv); *cf. id.* § 1612(b) (listing categories of noncitizens eligible for TANF). More to the point, Congress made clear that it affirmatively did *not* wish ACF to use information collected through section 611 to assess TANF recipients' general program compliance. As noted, section 609(a)(1) provides that the only means by which ACF may enforce provisions of TANF not specifically listed in the succeeding subsections of section 609(a) was by reviewing the findings of an audit conducted under chapter 75, not data provided to ACF under section 611.

Thus, there is no "meaningful convergence" between the routine use ACF proposes and the purpose for which information in the TANF System of Records was collected. *Britt*, 886 F.2d at 550. The use of information to assess grantees' compliance with TANF statutory requirements is categorically unlike the purpose of providing a public report on the effectiveness of the TANF program. *Cf. Mazaleski*, 562 F.2d at 712-13 & n.31 (collection of information for programmatic purposes is incompatible with its use to share derogatory information). And there is plainly no compatibility between that narrow public-report purpose and the use of information for a purpose that Congress expressly sought to foreclose. *See Stephens*, 851 F.2d at 1467 (finding it "inconceivable" that an agency could circumvent limits imposed elsewhere in the statute "merely

27

by taking the 'routine use' route").

**Second**, the SORN's new routine use is independently unlawful because ACF has not provided the individualized notice that the statute requires. The Privacy Act requires an agency to "inform each individual" from whom the information is collected of "the routine uses which must be made of the information." 5 U.S.C. § 552a(e)(3). As the D.C. Circuit has explained, an agency's failure to provide "actual notice" of a routine use "at the time the information is collected" "prevent[s] the disclosure from qualifying as a routine use." *U.S. Postal Serv.*, 9 F.3d at 146 & n.12; *accord Covert v. Harrington*, 876 F.2d 751, 755 (9th Cir. 1989); *Bechhoefer v. U.S. Dep't of Justice*, 179 F. Supp. 2d 93, 101 (W.D.N.Y. 2001); *Cooper v. FAA*, 816 F. Supp. 2d 778, 788-89 (N.D. Cal. 2008).

Here, there is no question that ACF has failed to provide individual users notice of the routine use it first announced in the Federal Register just over a month ago. The TANF System of Records includes data on TANF recipients dating back as much as 20 years, and reports supplied by States that date back as much as 3 years. 91 Fed. Reg. at 37,409. By definition, any prior quarterly reports in the system of records include records collected a minimum of 3 months ago. *See* 42 U.S.C. § 611(a). None of the users who submitted information that was later compiled into those reports was told, "at the time the information [was] collected," that ACF would subsequently spring on them a routine use that allowed their information to be shared with any other federal, State, and private entities ACF deemed helpful in conducting "program integrity reviews." 91 Fed. Reg. at 37,409; *see supra* p. 15 (describing State disclosures to TANF applicants). The routine use is therefore straightforwardly unlawful for that reason, as well.

### 3.  *The SORN Violates Section 1306.*

Section 1306 of the Social Security Act leads to the same result. That statute imposes an independent confidentiality requirement on HHS: It provides that "[n]o disclosure of . . . any file,

28

record, report, or . . . any information, obtained at any time by . . . any officer or employee of [HHS] in the course of discharging the duties of the head of [HHS] under this chapter . . . shall be made except as the head of [HHS] may by regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306(a)(1)–(2). Section 611, along with the rest of the TANF statute, falls within the same "chapter" of title 42 as section 1306. *See* 42 U.S.C. ch. 7, §§ 301 to 1397mm. And information provided pursuant to section 611 is obtained by HHS officers and employees "in the course of discharging the duties" of the HHS Secretary. *See* 42 U.S.C. § 611 ("Each eligible state shall . . . report *to the Secretary* on a quarterly basis, the following disaggregated case record information . . . (emphasis added)). Thus, this information may be "disclos[ed]" only as the Secretary "may by regulations prescribe" and "as otherwise provided by Federal law."

Neither of those requirements is met here. No "Federal law" "provide[s]" for the disclosure. 42 U.S.C. § 1306(a)(1). As already discussed, the TANF statute not only fails to "provide" for the disclosure of information to assist ACF in enforcing all of the provisions of the TANF statute, but—because such disclosure is not "expressly" authorized—affirmatively forbids the disclosure of information for that purpose. 42 U.S.C. § 617; *see supra* pp. 20-25.

In addition, the Secretary has not "prescribed" any "regulations" authorizing the disclosure. As the D.C. Circuit has previously explained in construing parallel statutory language—which is frequently used in the U.S. Code—a directive to "prescribe by regulation" refers to regulations that are "promulgated through notice and comment rulemaking," *MST Exp. v. Dep't of Transp.*, 108 F.3d 401, 402 (D.C. Cir. 1997), and that articulate an "identifiable standard governing the information" that may be disclosed, *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 220-21 (D.C. Cir. 2007); *see Oceana, Inc. v. Locke*, 670 F.3d 1238, 1241 (D.C. Cir. 2011); *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1149 (D.C. Cir. 2002). But the SORN was not, and does not purport to have

29

been, promulgated in conformity with the notice-and-comment procedures of the APA: the agency will put the SORN into effect the very day the comment period closes, without responding to comments or providing even a shred of the reasoned explanation the APA requires. In addition, the SORN does not adequately "prescribe" which disclosure it authorizes. It allows ACF to share *any* information in the TANF System of Records with *any* federal, State, or private entity to scrutinize compliance with *any* TANF program requirement. *See* 91 Fed. Reg. at 37,409. This is a standard "so vague" as to be nearly "meaningless." *Oceana*, 670 F.3d at 1241. An individual or State agency reviewing this rule could not determine "under what circumstances" private information will be disclosed, *MST Exp*, 108 F.3d at 406, nor what conditions will "trigger" disclosure, *Oceana*, 670 F.3d at 1241. Unlike cases in which the D.C. Circuit has found rules sufficiently prescriptive, the SORN does not set forth "factors" or "standards" that "guide the type of information that can be" disclosed. *Cement Kiln*, 493 F.3d at 220-21. The SORN is thus unlawful for this reason, as well.

### 4.   *The SORN Violates Section 405.*

The disclosure also violates 42 U.S.C. § 405. That provision of the Social Security Act states that "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such Social Security account number or related record." 42 U.S.C. § 405(c)(2)(C)(viii)(I). The records in the TANF System of Records were "obtained and maintained" pursuant to a "law enacted on or after October, 1990," *id.*— namely, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996. Pub L. No. 104-193, § 103, 110 Stat. 2105, 2148 (codified as amended at 42 U.S.C. § 611). HHS personnel with access to those records are "authorized persons." *Id.* § 405(c)(2)C)(viii)(III). And, as the SORN acknowledges, those records contain "Social Security number[s]." 91 Fed. Reg. at 37,408.

It follows that no HHS official may disclose either those "social security account number[s]

30

*or related records*." 42 U.S.C. § 405(c)(2)(C)(viii)(I) (emphasis added); *see Boehner v. McDermott*, 484 F.3d 573, 578 (D.C. Cir. 2007). The term "related records" is defined to include "any record, list, or compilation that indicates, directly or indirectly, the identity of any individual with respect to whom a social security account number . . . is maintained pursuant to this clause." *Id.* § 405(c)(2)(C)(viii)(III). Accordingly, it is unlawful for HHS to disclose either the Social Security numbers of individuals in the TANF System of Records, or to disclose any related records that "directly or indirectly" reveal that identify of such individuals. The records at issue do so; they contain highly personal identifying information about TANF recipients and their family members. Thus, this statute, too, bars the disclosure that the SORN contemplates. *Accord League of Women Voters*, 2026 WL 1784297, at *20.

### 5.    *The SORN Violates Section 1905.*

For similar reasons, the SORN violates 18 U.S.C. § 1905. That statute makes it a criminal offense for any "employee of the United States or of any department or agency thereof" to "make[] known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties" that "concerns or relates to the . . . identity" or to the "amount or source of any income . . . of any person." 18 U.S.C. § 1905. The Supreme Court has held that "a party may file an action under the APA to enjoin an agency" from disclosing "information in violation of" this statute. *Venetian Casino Resort*, 530 F.3d at 931-32 (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 317-318 (1979)). And the Supreme Court has affirmed that this statute bars disclosure unless some statute contains "a delegation of . . . disclosure authority" to the relevant agency. *Chrysler Corp.*, 441 U.S. at 306.

The SORN again contravenes the plain text of this statute. It would disclose information that "concerns or relates to the . . . . identity" and the "amount [and] source of . . . income" of TANF recipients—including a TANF recipient's earnings and employment, along with a wealth of

other personally identifying information. *See, e.g.*, 42 U.S.C. § 611(a)(1)(A)(v), (xiv). And, for the reasons detailed above, no statute "delegate[s] . . . disclosure authority" to ACF, *Chrysler Corp.*, 441 U.S. at 306; on the contrary, the relevant statutes foreclose it. The SORN is thus unlawful for this reason, too.

### 6.    The SORN Violates the Computer Matching and Privacy Protection Act.

Finally, the SORN violates two separate provisions of the Privacy Act as amended by the Computer Matching and Privacy Protection Act: the obligation to provide notice of a new "matching program," *see* 5 U.S.C. § 552a(e)(12), and the requirement to enter into a computer matching agreement pursuant, *id.* § 552a(o)(1).

**First,** the Privacy Act requires federal agencies to publish notice in the Federal Register of "any establishment or revision of a matching program" at least 30 days before implementing such program. *Id.* § 552a(e)(12). The Privacy Act's "requirement for agencies to publish a matching notice allows the Federal Government to foster transparency and accountability with respect to agencies' matching programs."[13] The SORN indicates that Defendants have created a new "matching program" but did not publish this required notice.

Matching programs include "computerized comparison of . . . two or more automated systems of records or a system of records with non-Federal records for the purpose of . . . establishing or verifying the eligibility of, or continuing compliance with statutory and regulatory requirements by, applicants for, recipients or beneficiaries of, participants in, or providers of services with respect to, cash or in-kind assistance or payments under Federal benefit programs." 5 U.S.C. § 552a(a)(8). The SORN describes activities that clearly amount to matching programs.

---

[13] OMB, Circular No. A-108 at 18-19, available at https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A108/omb_circular_a-108.pdf.

In it, ACF discusses combining non-federal records ("data reported to ACF by TANF grantee agencies") with data found in Federal systems of records (*i.e.*, the new "categories of records" it is receiving from DHS and SSA). As part of the new routine use, ACF also discusses disclosing TANF data to "another federal or grantee agency or entity." In both cases, the SORN reveals that ACF will engage in computerized comparisons of non-federal records provided by States with data contained in federal systems of records, or disclose States' TANF data to other entities or agencies for the purpose of such comparisons, in order to verify recipient eligibility and compliance with program requirements. Thus, ACF's proposed uses of TANF data amount to matching programs regulated by Privacy Act. Yet, no agency has published notice of these matching programs in the Federal Register. Defendants failed to comply with this legally required procedure.

***Second***, Defendants have also failed to comply with the requirement to enter into a computer matching agreement pursuant to 5 U.S.C. § 552a(o)(1). The Privacy Act prohibits disclosure of a record contained in a system of records to any recipient agency for use in a computer matching program except pursuant to a written agreement between the source agency and the recipient agency. *Id.* § 552a(o). Among other things, such an agreement must specify: the purpose of the program; each data element that will be used; procedures for verifying information produced by the program; procedures for protecting data security and privacy; and prohibitions on the duplication and redisclosure of records. *Id.* § 552a(o)(1)(A)-(K). Such written agreements are required by federal law to limit the use and disclosure of data, ensure that data matching is accurate, and protect the rights of public benefits users.[14] But no agency has published computer matching agreements between ACF and DHS or any other recipient agency to which ACF intends to disclose

---

[14] *See* Cong. Res. Serv., *Computer Matching and Privacy Protection Act* (Dec. 6, 2022) at Summary & 15, https://www.congress.gov/crs_external_products/R/PDF/R47325/R47325.3.pdf.

33

data pursuant to the SORN.

Furthermore, without any written agreement in place, the proposed disclosure of TANF data creates unacceptable risks that DHS or other recipients may subsequently use this data in ways that are not "compatible with the purpose for which [that information] was collected"—such as for immigration enforcement purposes that have nothing to do with the administration of TANF or the narrow reason for collecting information under 42 U.S.C. § 611. *See supra* pp. 25-28 (discussing statute's compatibility requirement). Defendants' procedural failure thus opens the door for incompatible data uses that would violate the Privacy Act. *See, e.g., U.S. Postal Serv.*, 9 F.3d at 145*; Britt*, 886 F.2d at 549–50; *Swenson*, 890 F.2d at 1078. The absence of any such agreement also makes clear that ACF has failed to adopt "safeguards to insure the security and confidentiality" of TANF records, as required by section 552a(e)(10).[15]

### C.  The SORN is Arbitrary and Capricious

The APA "requires agencies to engage in reasoned decision-making" and "to reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020) (quoting *DHS v. Regents of the Univ. of Cal.* (*Regents*), 591 U.S. 1, 16 (2020)). An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not

---

[15] Although the Privacy Act includes a carve-out for "matches performed by the Secretary of Health and Human Services … with respect to potential fraud, waste, and abuse," 5 U.S.C. § 552a(a)(8)(B)(ix), this exception does not apply here. The SORN goes far beyond the limited purposes outlined in the carveout—stating that the data will be used for all sorts of eligibility verification and compliance enforcement. Further, it would apparently allow matches to be "performed by" agencies other than HHS, such as DHS, that cannot invoke this exception.

be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although an agency may change its policies within statutory limits, it must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). And agencies cannot simply turn policies on their head without considering that "longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Regents*, 591 U.S. at 30 (citation omitted). Here, Defendants have satisfied none of these requirements.

*First*, there is no indication that the Revision or the SORN are the product of "reasoned decision-making." *Bhd. of Locomotive Eng'rs*, 972 F.3d at 115. Indeed, the SORN provides no meaningful reasoning at all, instead containing a rote description of the changes to the prior SORN without any consideration of costs and benefits, reliance, or alternative courses of action, as the APA requires. *See State Farm*, 463 U.S. at 43. There is nothing to indicate that Defendants meaningfully considered the chilling effect that the SORN would have on TANF participation and the consequent considerable costs to the public, including to the Plaintiff States. *See supra* pp. 13-15; *see also Georgia v. Brooks-LaSure*, No. 2:22-CV-6, 2022 WL 3581859, at *12-13 (S.D. Ga. Aug. 19, 2022) (finding HHS's recission of "new pathway to Medicaid coverage for low-income Georgians" arbitrary and capricious because HHS "did not mention, let alone consider or weigh" the "likely possibility" that doing so "would result in *less* Medicaid coverage"). The SORN also contains no consideration of relevant reliance interests, including as to States, who must ensure their communications with TANF applicants and recipients adequately disclose the use of data they collect, and as to past TANF participants, who provided their personal data without any expectation that it would one day be shared with multiple other entities, including DHS.

*Second,* the SORN effectively announces that ACF will not engage in a reasoned decision-

making process by stating that the bulk of the Revision became effective upon the SORN's publication in June, with the new routine use effective *immediately* upon the expiration of the comment period. Defendants have thus made clear they have no intention of meaningfully considering any concerns raised by other parties. *See League of Women Voters*, 2026 WL 1784297, at *29 ("[B]y failing to engage in notice and comment . . . the Federal Defendants neither 'consider[ed] serious reliance interests' nor considered opposing views.").[16]

**Third**, the SORN provides no explanation for why it is necessary for ACF to conduct its own "oversight activities" given the robust eligibility determination processes that States *already* have in place for TANF applicants and recipients, and which are a required feature of State plans. *See supra* pp. 7-8; 42 U.S.C. § 602(a)(6); *see also Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO*, 2025 WL 1249608 at *76 (finding that plaintiffs had shown a likelihood of success on their arbitrary and capricious claim where SSA already "ha[d] practices in place for audits or other searches for alleged fraud or abuse"). Nor does it explain why such "oversight activities" are warranted in light of ACF's inability to take any enforcement action arising out of those "oversight activities," except in very narrow circumstances. *See supra* pp. 21-24.

**Fourth**, the SORN is arbitrary and capricious because it fails to explain the scope of the data sharing that it would permit, seemingly allowing Defendants to share *any* TANF recipient's or family member's personal information with *any* federal, State, or private entity to enforce compliance with *any* TANF program requirement. *See* 91 Fed. Reg. at 37,409. *Nat'l Council of Nonprofits v. McMahon*, No. CV 25-13242-MJJ, 2026 WL 1876366, at *30 (D. Mass. June 30,

---

[16] For the same reasons, the SORN is procedurally invalid under the Privacy Act. *See* 5 U.S.C. § 552a(e)(4), (11); *League of Women Voters*, 2026 WL 1784297, at *26-27 (holding that opportunity to comment on SORNs prior to their effective date must be "meaningful" and that the federal government's process must be "open-minded" (quotation marks omitted)).

36

2026) (finding agency action arbitrary and capricious where it "provides no objective limiting principle to constrain the [agency's] discretion"). The SORN would "allow[] [HHS] to arrive at whatever conclusion it wishes" as to which entities TANF data can be shared, for which purposes, and "without adequately explaining the standard on which its decision is based." *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 791 F. Supp. 3d 119, 180 (D. Mass. 2025) (quotation omitted).

### D. The SORN Violates the Spending Clause

Finally, the SORN violates the Spending Clause. Though Congress may "attach conditions on the receipt" of federal funds, its power to do so is "not unlimited." *South Dakota v. Dole*, 483 U.S. 203, 206, 207 (1987). Conditions attached to federal spending are "much in the nature of a contract," and States must be able to "voluntarily and knowingly accept[] the terms." *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 577 (2012) (plurality opinion) (quotation omitted). Under the Spending Clause, U.S. Const. art. I, § 8, cl. 1, Congress must "clearly and unambiguously alert a grant recipient to any condition on federal funds," *Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1941 (2026), and federal agencies may not "surprise[e] participating States with post acceptance or 'retroactive' conditions," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981).

The SORN violates this limit because it imposes new requirements that the States could not have foreseen when they accepted TANF funding. In replacing the AFDC program with TANF, Congress sharply restricted ACF's power to oversee States' compliance with program requirements. *See supra* pp. 23-24. States had no reason to believe that ACF could later claim a programmatic review power, or that it would use their residents' sensitive data for such oversight projects. *Supra* p. 15. In publishing the SORN, ACF upended these understandings by announcing that the agency will conduct open-ended "program integrity reviews," "programmatic audits," "fraud investigations," "financial audits," and "monitoring" of the States' TANF programs, 91 Fed.

37

Reg. at 37,407, and that it will support these and other "oversight activities" by sharing beneficiaries' personal information with DHS and other federal agencies. *Id.* at 37,409.

These new provisions are exactly the sort of "surprising" "post acceptance . . . conditions" that the Spending Clause prohibits. *Pennhurst State Sch. & Hosp.*, 451 U.S. at 25. As a result of the SORN, the States must now divert resources to participate in ACF's audits, investigations, and "comprehensive assessments of how [States] administer TANF programs," and they must supply (indirectly) other federal, State, and private agencies with residents' sensitive information to facilitate these "oversight activities," all on pain of losing TANF funding. 91 Fed. Reg. at 37,407; *supra* pp. 16-18. The Spending Clause bars Defendants from mandating compliance with new conditions like these, which the States were "unable to ascertain" when they agreed to participate in a program that expressly limited ACF's oversight role. *Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17).

## II.    Plaintiffs Will Suffer Irreparable Harm

Plaintiff States face irreparable harm from the SORN that is "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Immediately upon the August 11 effective date of the routine use, absent Court intervention, the harm to Plaintiff States is "certain and great" and "actual and not theoretical," as described below. *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quotation omitted). And, critically, once the routine use goes into effect and data can be shared, it will be impossible to claw back— underscoring the irreparability of the harm.    *Id.* (harm irreparable when "there can be no do over and no redress") (quotation omitted). Moreover, there is no "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 (quotation omitted); *District*

*of Columbia*, 444 F. Supp. 3d at 34 ("[E]conomic loss caused by federal agency action" is irreparable); *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015).

***First***, as soon as the new routine use goes into effect, it will erode public trust and chill participation in Plaintiff States' TANF programs, causing irreparable harm to Plaintiff States' anti-poverty programs. *Supra* pp. 13-15. The SORN authorizes the disclosure of TANF households' sensitive personal information to a vast set of federal, State, and private entities. TANF recipients reasonably fear that some of those entities—such as DHS—may redisclose their data, and may use it to take adverse action against them or their family members, such as subjecting them to immigration-enforcement proceedings or fraud investigations. *See supra* p. 14. If the SORN takes full effect, many individuals will predictably decline to participate in the TANF program to avoid these unacceptable risks. *See supra* pp. 13-15.

States will in turn suffer immediate and irreparable injury if individuals no longer trust that their information will be kept secure. *Cf. Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019) (standing may be based on "the predictable effect of Government action on the decisions of third parties"). The States have a substantial interest in preserving their relationship of trust with TANF recipients, which cannot be easily restored once it is broken. *See supra* pp. 13-15; *see also, e.g.*, *Human Touch DC, Inc. v. Merriweather*, No. 15–cv–00741, 2015 WL 12564166, at *5 (D.D.C. 2015) (finding irreparable harm from "unauthorized use and disclosure" of information provided to plaintiff because people will "come to believe that [plaintiff] cannot be trusted to maintain the confidentiality of [their] information"); *City of Los Angeles v. Sessions*, No. CV 17-7215-R, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018) ("The harm to the City's relationship with the immigrant community . . . is irreparable.") (quotation omitted), *aff'd sub nom. City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019); *City & Cnty. of San Francisco v. Trump*, 779 F. Supp. 3d

39

1077, 1082 (N.D. Cal.), *opinion clarified*, 782 F. Supp. 3d 830 (N.D. Cal. 2025).

Withdrawal from the TANF program by needy families will harm Plaintiff States because those individuals will place a greater strain on other State and local anti-poverty services, such a child welfare and emergency medical services, not only undermining the purpose of the TANF program, but also requiring a greater expenditure of State resources and irreparably harming the States' interest in providing appropriate resources for individuals at risk of falling into poverty. 42 U.S.C. § 601; *supra* pp. 14-15; *see, e.g.*, *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (finding consequences from reduced public benefit participation such as burden on State systems constitutes irreparable harm).

***Second***, because it is the States who administer the TANF program, it is the States who imminently bear the costs of compliance associated with the SORN's new routine use. Absent Court intervention, Plaintiff States must immediately begin the process of reviewing their disclosures to all TANF applicants to ensure that they adequately disclose the new use of their personal information—that is, that their data may be shared with any federal or State agency, or other entity, engaged for program oversight—as required by State and Federal law. *Supra* pp. 15-16. That legal review itself will be time-intensive, diverting States' resources. *Cf. Massachusetts*, 828 F. Supp. 3d at 220-21 (noting that "administrative upheaval from complying with government regulation may constitute an irreparable harm") (quotation omitted). And because States could have never anticipated this new use of their data, many will need to incur financial costs in updating communications with TANF applicants about their data use, ranging from translation to printing to electronic system upgrades. *Supra* pp. 15-16; *District of Columbia*, 444 F. Supp. 3d at 38 (changes to State activities based "a complex program serving" millions of people would be "self-evidently onerous to implement").

These compliance costs are a well-recognized irreparable harm. Courts routinely find that where States would bear the cost of complying with a federal policy either by out-of-pocket expenditures by the State or by diversion of resources from other State programs or projects, the harm suffered is irreparable. *See, e.g.*, *id.* at 34-42 (collecting cases); *New York*, 2026 WL 673848, at *26 (finding irreparable harm when "compliance with [data demands] would require a diversion of resources away from other vital programs"); *New York v. U.S. Dep't of Just.*, 804 F. Supp. 3d 294, 330 (D.R.I. 2025) (finding irreparable harm based on "compliance costs [that] are, indeed, costly"), *appeal dismissed* No. 25-2099, 2025 WL 4717710 (1st Cir. Dec. 11, 2025); *California v. Trump*, 786 F. Supp. 3d 359, 390-91 (D. Mass. 2025); *Louisiana v. Biden*, 55 F.4th 1017, 1033 (5th Cir. 2022); *cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring) ("complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs").

Indeed, in an analogous context, then-Chief Judge Howell found that a new federal requirement necessitating that the States "rewrite[e] legal notices" to "comport with complex legal requirements . . . on a very short time frame" constituted irreparable harm. *District of Columbia*, 444 F. Supp. 3d at 36-38. There, the court considered a challenge by States to federal changes to SNAP, a public benefit program that, like TANF, serves the neediest Americans and, like TANF, is administered via States. The States explained that the federal changes would require them to provide notice to recipients, causing them to incur out-of-pocket mailing costs and divert State resources. *Id.* at 36-37. The court rejected the agency's argument that these harms were conclusory, finding that "anticipated injuries are significant" and noting that the States' "descriptions of the steps required to provide notice. . . fill[ed] in the concrete details." *Id.* at 37-38. The same reasoning applies here: any updates to States' application materials will require the same State harms,

41

diverting resources from the administration of State benefits programs and creating out of pocket costs, as detailed with specificity in the States' declarations. *Supra* pp. 15-16.

Moreover, the "very short timeframe" in the SNAP case was up to three months. *Id.* at 38. Here, States have had just weeks to implement even as updates will take months, or even up to a year. *Supra* p. 16. This puts Plaintiff States in an untenable position by creating risk of claims that they have violated TANF recipients' privacy rights. *Id.* And critically, once the data is shared, States will necessarily need to undertake at least some of the administrative and compliance steps to account for potential disclosure, even if the routine use were to be later enjoined. Moreover, if the routine use were enjoined later, without a preliminary injunction preserving the status quo in the interim, there would be substantial additional compliance costs for States reversing the disclosure changes, and substantial confusion for State TANF employees as well as TANF program participants.

***Third***, the SORN's announcement of new oversight and enforcement actions creates a significant risk of harm to Plaintiff States. Indeed, the entire point of the SORN is "to ensure and confirm [State] compliance with TANF program requirements through HHS agency oversight activities." 91 Fed. Reg. at 37,407. This is a substantial departure from longstanding agency practice. *Supra* p. 16 & n. 11. To start, this harms States in the form of operational and budgetary uncertainty: the vagueness of the SORN's announcement, combined with the departure from past practice, means that States cannot adequately budget or allocate staff time to the new oversight mechanisms. *New York*, 804 F. Supp. 3d at 330 (the "uncertainty that stems from" the threat of enforcement and "confusion and chaos imposed by an overnight change to a thirty-year-old interpretation of a law" can itself constitute irreparable harm).

Any of the new oversight activities will harm Plaintiff States by requiring them to

42

undertake unnecessary and time-consuming work, causing out-of-pocket expenditures and/or diverting State resources, well recognized irreparable harms. *Supra* pp. 16-18. Moreover, this oversight is likely to be based on false red flags prompted by inaccurate data matching. *See supra* p. 17; *see also League of Women Voters*, 2026 WL 1784297, at *16. The "strong risk" of the use of "inconsistent and inaccurate data" by the federal government as the basis for erroneous enforcement and oversight is additional irreparable harm. *Massachusetts*, 828 F. Supp. 3d at 221. Moreover, the additional oversight announced in the SORN may put Plaintiff States' TANF funding at risk, which would have devastating consequences for Plaintiff States. *Supra* pp. 17-18; *New York*, 2026 WL 673848, at *25-26 (describing harm from loss of TANF and related funding as "catastrophic") (quotation omitted).

While potential enforcement may not always be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm," *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (cleaned up), it certainly is here. To start, Defendants froze all TANF funding for five of the Plaintiff States earlier this year, with no evidence and no process. *New York*, 2026 WL 673848, at *25-26. This "past wrong[]" is "evidence" that Plaintiffs face "a real and immediate threat of repeated injury." *Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021) (cleaned up); *Nat'l Council of Nonprofits v. McMahon*, No. CV 25-13242-MJJ, 2026 WL 1876366, at *15 (D. Mass. June 30, 2026) (rejecting government's argument that enforcement of an Administration policy against many Plaintiff States was speculative based on "the Administration's history of prosecution"). Further, the President himself has ordered this Administration to "maximize enforcements" for public benefits program—precisely what is contemplated by the SORN. 91 Fed. Reg. at 13,487; *see Massachusetts*, 2026 WL 918941, at *17 (rejecting government's argument that enforcement is speculative where, as here, the President specifically

43

directed enforcement).

### III.    The Balance of the Equities and Public Interest Favor Plaintiffs

The balance of the equities and public interest favor the States. Plaintiff States seek to preserve the use of their TANF data as it has existed for years preceding the SORN, and "the balance of the equities and the public interest favors maintaining the status quo." *New York*, 804 F. Supp. 3d at 330; *District of Columbia.*, 444 F. Supp. 3d at 45 (finding that government's harm of "be[ing] required to keep in place the existing regulation—which [it] has used for 19 years—while judicial review of its new regulation runs its course" "pales in comparison" to harm faced by States in administering public benefits programs). Further, the SORN threatens to disrupt one of Plaintiff States' most critical anti-poverty programs, *supra* pp. 3-4. As described above, this would cause significant harm to Plaintiff States. *Supra* pp. 13-18. Where, as here, "critical social services programs" are affected, "courts have repeatedly found that the public interest was supported by a preliminary injunction." *New York*, 2026 WL 673848, at \*27 (collecting cases). And "[t]here is a strong public interest in restraining the arbitrary exercise of power by the federal government," further supporting injunctive relief. *Id*. Critically, once the routine use goes into effect and data can be shared, it will be impossible to claw back, harming Plaintiffs irreparably. *See Newby*, 838 F.3d at 9 (quotation omitted) ("no do over and no redress").

On the other side of the ledger, Defendants would not be harmed by delay. All of the State records ACF seeks to share are already in its possession, meaning there is no risk that they will become unavailable to Defendants throughout the course of this litigation. *Cf. id*. And while identifying fraud in public benefits programs, including TANF, is in the public interest, States already engage in robust processes to do so, *see supra* pp. 7-8, and Defendants have identified not even a single fact that would support any need for immediate novel federal oversight. *California*

44

*v. United States Dep't of Agric.*, No. 25-CV-06310-MMC, 2025 WL 2939227, at \*13 (N.D. Cal. Oct. 15, 2025) (explaining that "while eliminating fraud, waste, and abuse in a government assistance program is in the public interest," this factor does not favor the government when there has been no "showing" of potential fraud); *see New York*, 2026 WL 673848, at \*18-19, 26-27 (quotation omitted) (finding balance of the equities in Plaintiffs' favor by "endangering the vital childcare and family assistance services that Plaintiff States provide" and noting that in the five-State TANF freeze earlier this year, the government did "not identify even a *single dollar* that has gone to any [of those States] that has been used fraudulently").

Finally, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. If the "mere existence of the Executive Branch's desire to enact a policy" were determinative, then "no act of the Executive Branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction and that cannot be so." *California*, 2025 WL 2939227, at \*13 (cleaned up).

## <u>CONCLUSION</u>

Plaintiff States respectfully request that the Court: (1) immediately grant a Temporary Restraining Order with a fourteen-day delay of the August 11 effective date of the SORN to allow the Parties to fully brief and the Court to hear Plaintiffs' Motion for a Preliminary Injunction and § 705 stay; (2) set a briefing schedule that would permit adjudication of the States' motion for a preliminary injunction and § 705 stay before the delayed effective date; (3) thereafter stay the effective date of the SORN and Revision under 5 U.S.C. § 705 and preliminarily enjoin Defendants from implementing the SORN or Revision of the TANF System of Records as to Plaintiff States, including as to data reported to ACF by Plaintiff States or verification information obtained from Plaintiff States; and grant other relief as the Court deems just and proper.

Dated: August 4, 2026

Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Jessica Ranucci*
Jessica Ranucci
Mark Ladov
Stephen Thompson
*Special Counsel*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
28 Liberty St.
New York, NY 10005
(929) 736-3392
jessica.ranucci@ag.ny.gov
mark.ladov@ag.ny.gov
stephen.thompson@ag.ny.gov
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Mitchell P. Reich*
Mitchell P. Reich (1044671)
*Senior Counsel to the Attorney General*
Karthik Reddy (1048848)
*Special Assistant Attorney General*
Office of the Attorney General for the District
of Columbia
400 Sixth St. NW
Washington, DC 20001
(202) 279-1261
mitchell.reich@dc.gov

*Counsel for the District of Columbia*

**ROB BONTA**
Attorney General of California

By: */s/ Camille Framroze*
Todd Grabarsky
Matthew Wise
*Supervising Deputy Attorneys General*
William Bellamy
Camille Framroze
Harald Kirn
Andrew Kushner
*Deputy Attorneys General*
455 Golden Gate Ave., Ste. 11000
San Francisco, CA 94102-7004
(415) 510-3619
Camille.Framroze@doj.ca.gov

*Counsel for the State of California*

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Luci D. Davis*
Luci D. Davis
Jaylia Yan (90007649)
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Luci.Davis@azag.gov
Jaylia.Yan@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

46

**PHIL WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
David Moskowitz (994469)
*Deputy Solicitor General*
Reed W. Morgan
*Assistant Solicitor General*
1300 Broadway, 10th Fl.
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Counsel for the State of Colorado*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Lison
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Delaware Department of Justice
820 N. French St.
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Harpreet K. Khera*
Harpreet K. Khera
*Bureau Chief, Special Litigation*
Sherief Gaber
*Assistant Attorney General*
115 S. LaSalle St., 35th Fl.
Chicago, IL 60603
(773) 590-7127
Harpreet.Khera@ilag.gov
Sherief.Gaber@ilag.gov

*Counsel for the State of Illinois*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Katherine Zdrojeski*
Katherine Zdrojeski
*Assistant Attorney General*
165 Capitol Ave.
Hartford, CT 06106
(860) 808-5210
Katherine.Zdrojeski@ct.gov

*Counsel for the State of Connecticut*

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

By: */s/ Kaliko'onālani D. Fernandes*
Kaliko'onālani D. Fernandes
*Solicitor General*
425 Queen St.
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai'i*

**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
In his official capacity as Governor of the Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo
*General Counsel*
Sam Flynn
*Chief Deputy General Counsel*
Laura C. Tipton
*Deputy General Counsel*
Office of the Governor
501 High St.
Frankfort, KY 40601

47

(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Brendan Kreckel*
Brendan Kreckel
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
brendan.kreckel@maine.gov

*Counsel for the State of Maine*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Michelle Pascucci*
Michelle Pascucci
*State Trial Counsel*
Jak Kundl
*Assistant Attorney General*
One Ashburton Pl.
Boston, MA 02108
(617) 963-2255
Michelle.pascucci@mass.gov
jak.kundl@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Keith M. Jamieson*
Keith M. Jamieson (187911)
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6960
kjamieson@oag.maryland.gov

*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

48

**KEITH ELLISON**
Attorney General of the State of Minnesota

By: */s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp
*Special Counsel, Rule of Law*
445 Minnesota St., Suite 600
St. Paul, MN 55101
(651) 300-0711
lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*


**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Kashif T. Chand*
Kashif T. Chand
*Assistant Attorney General*
New Jersey Office of the Attorney General,
Division of Law
124 Halsey St., 5th Fl.
Newark, NJ 07101
(973) 648-2052
Kashif.Chand@law.njoag.gov

*Counsel for the State of New Jersey*


**DAN RAYFIELD**
Attorney General State of Oregon

By: */s/ Leanne Hartmann*
Leanne Hartmann
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
(971) 673-1880
Leanne.Hartmann@doj.oregon.gov

*Counsel for the State of Oregon*


**AARON D. FORD**
Attorney General of the State of Nevada

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-3420
kireland@ag.nv.gov

*Counsel for the State of Nevada*


**RAÚL TORREZ**
Attorney General for the State of New
Mexico

By: */s/ Anjana Samant*
Anjana Samant
*Deputy Counsel*
NM Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 270-4332
asamant@nmdoj.gov

*Counsel for the State of New Mexico*


**JOSH SHAPIRO**
In his official capacity as Governor of the
Commonwealth of Pennsylvania

By: */s/ Jacob B. Boyer*
Jennifer C. Selber
Jacob B. Boyer
Governor's Office of General Counsel
30 North 3rd St.
Suite 200
Harrisburg, PA 17101
(717) 831-2847
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*

49

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Marissa D. Pizaña*
Marissa D. Pizaña
*Special Assistant Attorney General*
150 South Main St.
Providence, RI 02903
(401) 274-4400
MPizana@riag.ri.gov

*Counsel for the State of Rhode Island*


**JAY JONES**
Attorney General for the Commonwealth of Virginia

By: */s/ Megan C. Keenan*
Megan C. Keenan (1672508)
*Deputy Solicitor General*
202 North Ninth St.
Richmond, VA 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*


**JOSHUA L. KAUL**
Attorney General of the State of Wisconsin
By: */s/ Faye B. Hipsman*
Faye B. Hipsman
*Assistant Attorney General*
Wisconsin Department of Justice
PO Box 7857
Madison, WI 53707-7857
(608) 264-9487
faye.hipsman@wisdoj.gov

*Counsel for the State of Wisconsin*


**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan Patrick Kane*
Ryan Patrick Kane
*Deputy Solicitor General*
109 State St.
Montpelier, VT 05609
(802) 828-3171
Ryan.kane@vermont.gov

*Counsel for the State of Vermont*


**NICHOLAS W. BROWN**
Attorney General of the State of Washington

By: */s/ Mina Shahin*
Mina Shahin
*Assistant Attorney General*
William McGinty
*Deputy Solicitor General*
800 Fifth Ave., Ste. 2000
Seattle, WA 98104
(206) 464-7744
Mina.Shahin@atg.wa.gov
William.McGinty@atg.wa.gov

*Counsel for the State of Washington*

50