# EXHIBIT 19

## <u>DECLARATION OF STEPHEN CHA, MD, MHSR</u>

I, Stephen Cha, MD, MHSR, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am currently the Commissioner of the New Jersey Department of Human Services ("NJDHS"). I have led NJDHS since January 2026—initially in an acting capacity, and then, in February 2026, I was confirmed as Commissioner. Prior to becoming the NJDHS Commissioner, I served as Counselor to the Secretary of the U.S. Department of Health and Human Services.

2.      NJDHS is New Jersey's largest agency, serving approximately 2.1 million residents. These New Jerseyans include, but are not limited to: (a) older residents, individuals, and families with low incomes; (b) people with developmental disabilities, or late-onset disabilities; (c) people who are blind, visually impaired, deaf, hard of hearing, or deaf-blind; (d) parents needing child care services, child support and/or healthcare for children; (e) people who are dealing with addiction and mental health issues; and (f) families facing catastrophic medical expenses for their children. NJDHS's divisions and offices provide numerous programs and services designed to give eligible individuals and families assistance with economic and health challenges.

3.      NJDHS's Division of Family Development ("NJDFD") supervises four (4) programs to support New Jersey families, including New Jersey's Temporary Assistance for Needy Families Program ("TANF"), which serves to provide cash assistance and non-cash benefits and services to low-income families with children.

4.      I am familiar with the information in the statements set forth below either through personal knowledge, consultation with NJDHS-DFD staff, or from my review of relevant documents and information.

***TANF in New Jersey***

5.      NJDHS administers TANF in New Jersey.

6. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income families with children. It is one of the largest sources of cash assistance to low-income families and a cornerstone of New Jersey's anti-poverty work. New Jersey receives approximately $402 million annually in TANF funding. New Jersey utilizes TANF funds for basic cash assistance and non-cash assistance. On average, 27,000 New Jersey residents receive basic recurring cash assistance each month. Not represented in this figure, significant portions of TANF funds are used to assist low-income families through non-cash assistance benefits, such as expanding access to pre-kindergarten/Head Start and childcare services, or by providing Earned Income Tax Credits (EITC) to working families.

7. TANF funding is essential to providing services to some of the most vulnerable families in New Jersey. Cash and emergency housing assistance are provided through Work First New Jersey (WFNJ), the State's TANF basic assistance program. WFNJ eligible families must meet strict income and resource requirements, demonstrating an inability to pay for basic living expenses without aid. Cash assistance recipients access work training opportunities to reduce reliance on public assistance. New Jersey transfers portions of the TANF block grant funds to the Child Care Development Fund, helping lower-income working families access child care so they remain employed and reduce dependence on public assistance. TANF supports at-risk youth through a variety of programs in New Jersey, including through transfers to Head Start and expanded access to pre-kindergarten education. Working families may receive EITCs which are funded in part through TANF. These tax credits help working families keep more of their earnings and promote work.

*New Jersey's TANF Fraud Prevention Procedures*

8.      NJDHS, on behalf of New Jersey, ensures that robust procedures are in place to prevent ineligible TANF benefits distributions and address erroneous payments or attempted fraud.

9.      To ensure TANF funds are issued only to TANF eligible recipients, NJDHS has a robust eligibility determination process that New Jersey County Social Service Agencies ("CSSAs") must follow for applicants and recipients of recurring and emergency cash assistance, and clearly defined program requirements for other TANF funded services and supports.  Further, NJDHS conducts reviews of CSSAs to ensure program compliance, in accordance with federal and State statutes, rules and regulations. NJDHS provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, phone calls, and emails to CSSAs to help guide them in ensuring the accuracy of their determinations.

10.      Applicants and recipients of cash assistance grants must provide documentation to CSSAs demonstrating they are TANF eligible as part of the application and recertification process. Additionally, if a household experiences a change in between certifications, they are required to report the change to the CSSA within 10 days to ensure that the household continues to be eligible for the assistance.

11.      The eligibility determination process includes an interview conducted by the CSSA with the applicant or recipient. As part of this determination/redetermination process, appropriate documents are collected by the CSSA to verify eligibility information.  Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to the CSSA verifying those factors which affect initial eligibility and benefit amount, including: identity, residence, family composition, housing costs, income and resources, and United States citizenship or, if not a United States citizen, evidence of satisfactory immigration status for TANF eligibility.

12.     NJDHS also ensures that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. NJDHS utilizes the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7 to confirm continuing eligibility and benefit levels.  NJDHS uses IEVS to receive information from a variety of other sources to confirm whether an individual's income and resources permit them to be eligible for TANF. Federal law and the written agreements that NJDHS signs to access this income and eligibility information require NJDHS to confirm the accuracy of any red flags raised by such data matches, and to provide affected individuals an opportunity to contest these data findings, before terminating, denying, suspending or reducing benefits to an applicant or recipient. Accordingly, cases that appear to have income exceeding TANF income and resources are flagged by the CSSA to determine if the identified income and resources impact the recipient's continuing eligibility.

13.     NJDHS's systems also review the Public Assistance Reporting Information System (PARIS) interstate match to identify if an individual is receiving benefits in more than one state at the same time. NJDHS and the CSSAs rely on match results for investigation and appropriate case action.

14.     NJDHS's systems conduct a Prison Match to identify cash assistance recipients who are incarcerated and have been sentenced to a term in a New Jersey prison, or a federal prison as reported on the SSA Federal Prison file. NJDHS and the CSSAs rely on match results for investigation and appropriate case action.

15.     NJDHS's systems perform monthly matches of active TANF recipients with the federal National Directory of New Hires (NDNH), which contains nationwide W-4 information.  The TANF matches involve all active adult recipients.  NDNH matches are verified through a third-party vendor or by sending Manual Employment Verification (MEV) forms to

4

employers. Responses from the third-party vendor and MEVs are relied on by NJDHS and the CSSAs for investigation and appropriate case action.

16.     NJDHS's systems also runs daily and monthly matches against New Jersey's State Directory of New Hires (SDNH), to identify applicants and recipients who have filed a W-4 with New Jersey and thus potentially identify new employment that could impact TANF eligibility.

17.     The Online Fraud Reporting Form, located at https://www.nj.gov/humanservices/dfd/resources/fraud/report.shtml, enables the public to electronically submit welfare fraud allegations to NJDHS. These submissions contain information regarding individuals suspected of public assistance fraud and are relied on by NJDHS and the CSSAs for investigation and appropriate case action.

18.     In addition to computer matches, NJDHS requires each CSSA to establish claims to recover any benefits issued in error when it is determined that an agency error, inadvertent household error, or fraud has occurred.

19.     When a CSSA determines it has issued benefits to a recipient as a result of fraud, Intentional Program Violation (IPV) procedures are implemented in addition to the establishment of a claim to recover benefits.  Recipients who commit IPVs may be disqualified from participation in the program for 6 or 12 months or permanently disqualified. IPV cases may be referred for prosecution.

20.     Moreover, as part of its internal controls, NJDHS conducts work participation verification reviews, which is a quality assurance process that selects representative samples of work-eligible assistance cases for purposes of verifying the accuracy of the participation reporting processes, the accuracy of reporting, and compliance with federal and state regulations. NJDHS

conducts a yearly review of a sample of cases according to NJDHS's approved Work Verification Plan.

21.    New Jersey conducts systematic real-time matches on all new applications and redeterminations, flagging discrepancies in name, date of birth, or alien registration number.

***New Jersey's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status***

22.    New Jersey requires CSSAs to use the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien status.

23.    Applicants for cash assistance provide documentation with an Alien Registration Number or Social Security Number (SSN). This information is input into the case management system which runs automated SAVE verifications, returning information about applicants' immigration related status. If additional verifications are required, CSSA staff initiate additional verifications directly through SAVE. All CSSAs have access to SAVE.

24.    Immigration related documents are maintained as part of clients' case files for six (6) years in accordance with the New Jersey records retention schedule.

25.    SAVE verifications are conducted as part of an automated process upon the submission of an application or redetermination for TANF benefits. In doing so, NJDHS complies with the Privacy Act, 5 U.S.C. § 552a, and other applicable laws, regulations, and policies.

26.    As required by law, New Jersey imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

27.    The WFNJ statute and implementing regulations, N.J. Stat. § 44:10-47, N.J.A.C. 10:90-7.7, require that information about applicants or recipients be used only for purposes directly related to the administration of public assistance and related services. Information contained in applications, reports, correspondence, evaluations, and other records concerning the condition or

6

circumstances of any person from whom or about whom information is obtained is considered confidential. Disclosure of confidential information is narrowly constrained. New Jersey's Address Confidentiality Program Act allows victims of family violence to apply to participate in the Address Confidentiality Program, allowing for a substitute address service and affording increased records handling security.

28.    New Jersey strictly protects the confidentiality of its residents' TANF data. New Jersey laws and regulations restrict the disclosure of information obtained from TANF applicants or recipient households to persons directly connected with the administration or enforcement of the NJ TANF program and other means-tested welfare programs. N.J. Admin. Code 10:90-7.7.  To safeguard TANF applicant information from disclosure, New Jersey also implements several applicable State policies, including the Data Security Policy, which is issued annually. The Data Security Policy provides that all NJDHS and CSSA staff have an obligation to "maintain client confidentiality . . . and adhere to any and all applicable Federal and State statutes, regulations, policies and procedures relating to [Federal tax information], confidential data, [personal identifying information], [personal health information], safeguarding and incident reporting." The policy also mandates the use of appropriate cybersecurity measures, which include periodic review and audit of those measures.

***Federal Oversight of New Jersey TANF Program***

29.    Pursuant to federal statute and regulation, NJDHS provides certain data on families receiving TANF assistance to ACF on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

30.    Among other things, NJDHS provides ACF with the data fields specified in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, Social Security Number, date of birth,

7

and, as to immigration status, an individual's status as either "U.S. Citizen," "Qualified alien," or "Unknown."

31.    NJDHS provides this information to ACF for all families receiving TANF assistance in New Jersey.

32.    Pursuant to the federal Single Audit Act, NJDHS engages an independent auditor with respect to its TANF program. The Single Audit is conducted annually, although the duration and scope of TANF testing may vary from year to year depending on federal expenditure levels and auditor sampling. These reviews include the State of New Jersey Single Audit Report and the Schedule of Expenditures of Federal Awards in accordance with Government Auditing Standards. The independent auditor evaluates internal controls over financial reporting and compliance with federal requirements under the Uniform Guidance. The auditor presents its findings to the State, which then formally responds and addresses any identified areas for remediation.

33.    To my knowledge, in the past five (5) years, ACF has never performed any of the following activities with respect to New Jersey's TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures. Instead, these responsibilities have been delegated to state agencies to ensure compliance.

***TANF SORN***

34.    I understand that on June 23, 2026, ACF, which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the TANF program. 91 Fed. Reg. 37406 (June 23, 2026).

35.    ***First***, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit

8

requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act".

36.     The TANF SORN adds a new additional purpose:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

37.     ***Second,*** the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.*, State agencies), but also "verification information" obtained "from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

38.     ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

9

39.     ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

***Harm To New Jersey***

40.     Without Court intervention, New Jersey faces harm stemming from the TANF SORN.

41.     The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

42.     As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require New Jersey to expend time and resources responding to an indeterminate number of ACF requests for case level information. For example, for many of the eligibility requirements, documentation is not kept at the state level and instead is maintained by CSSAs. Any additional information required to be provided by New Jersey would necessitate a time- and labor-intensive process of collecting documentation from the CSSAs. This would be separate from the process that, as noted above, New Jersey already engages in on a regular basis as part of its efforts to monitor CSSAs to ensure that CSSAs follow all state and federal requirements regarding TANF eligibility.

43.    CSSA staff perform eligibility and case management functions for multiple programs in addition to TANF, such as SNAP and Medicaid. Federal law changes to these programs have increased the administrative burden on CSSA staff. Introducing arbitrary additional reporting requirements will further strain local resources through the imposition of layers of challenges and obstacles to efficient program administration.

44.    As to immigration status verification in particular, these agency oversight activities are likely to lead to misleading results. For example, when determining initial eligibility for benefits, in the absence of a Social Security Number (SSN), applicants may submit evidence of an application for an SSN. WFNJ recipients must then subsequently furnish their SSN to the CSSA unless there is good cause for the client's failure to do so. ACF has acknowledged that placeholder SSNs may be used is such circumstances. Similarly, if SAVE prompts a user to submit additional verifications, or immigration related documents must be verified by U.S. Department of Homeland Security, eligibility may be established pending those results. Therefore, when conducting oversight activities, reliance on the absence of this information in a sampling month to claim an eligibility determination error would be incorrect.

45.    Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts for New Jersey, with likely staffing reductions and the elimination of non-mandated services. NJDHS would not be able to issue cash and emergency housing assistance to New Jersey's most vulnerable populations. Beyond basic assistance, TANF funds are used to support a variety of other essential services, all of which would be adversely impacted. These include substance use and behavioral health

11

services, childcare assistance, pre-kindergarten/Head Start, tax credits for low-income working families, and a variety of services offered to at-risk youth.

46.     Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with DHS and Immigration and Customs Enforcement (ICE) for use in immigration enforcement activities. *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-information-sharing-between-the-centers-for-medicare-and-medicaid-services-and.     In this environment, the SORN's announcement that ACF plans to begin sharing New Jersey's TANF recipients' data with DHS will cause additional harm to New Jersey, as it risks eroding the trust that NJDHS and CSSAs have developed with immigrant communities in New Jersey and increase the risk for incomplete or insufficient data collection. NJDHS has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, and to provide documentation of that status or otherwise provide certain information for ineligible household members—for the benefit of children who are eligible—to ensure accurate eligibility and benefit levels. NJDHS has told applicants that immigration status is verified with the federal government. But NJDHS has also encouraged eligible households to take advantage of TANF and other assistance to help raise their children and families out of poverty, such as work training, education, English language, and other supports designed to promote self-sufficiency. To ensure that TANF only goes to eligible assistance units and is correctly calculated, NJDHS requires disclosure of household and income information for individuals living in the home—even if certain members are nonrecipients (such as ineligible immigrants or those receiving SSI) to properly

calculate total household size and any mandatory determination of income. Without this information, incorrect TANF amounts may be issued. If ACF begins sharing TANF data with DHS without clearly defined purposes and limited required by federal law, then community fears that DHS will use that data for purposes other than valid eligibility and benefit level checks will impede that public trust and chill participation in New Jersey's TANF programs by citizens and non-citizens alike.

47.     This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in the TANF if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure.  Such concerns are bolstered by public reporting into DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' TANF programs.

48.     If fewer individuals participate in TANF, New Jersey will suffer significant harms. TANF provides cash and/or temporary housing assistance to roughly 27,000 New Jersey residents through the WFNJ program. These benefits support families in paying for basic needs. If families are deterred from participating in WFNJ, families will likely turn to alternative supports to meet their basic needs, straining emergency housing providers and food banks. WFNJ recipients may be required to participate in training or other work-directed programming to reduce reliance on public assistance. Participants that find work continue to receive transitional supports. Families

13

deterred from participating in WFNJ may not receive work-directed programming and transitional supports, potentially increasing reliance on public assistance.

49.    New Jersey will also incur a financial cost in updating communications with TANF applicants or participants that notify TANF applicants or participants of how their personal data is collected, used, and shared.  In order to provide adequate notice, the WFNJ application, participant handbook, notices would need to be updated in addition to paper and electronic mass communications providing current recipients with notice about how their information may be disclosed and used. Examples include the process for evaluating the legal requirements, incorporating those requirements into new disclosures, and then the procedures for actually effectuating the changes, such as the costs of updating paper forms.

DATED: July 31, 2026

_____

Stephen Cha, MD, MHSR

DHS Commissioner

14