# EXHIBIT 7

**DECLARATION OF IAN MCMAHON**

I, Ian McMahon, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am the Director of the Division of Economic and Workforce Support of the Colorado Department of Human Services.

2.    I oversee several cash assistance and workforce programs, including Colorado's implementation of the Temporary Assistance for Needy Families (TANF) program, known as Colorado Works (CW). In this capacity, I am responsible for the oversight of our County Block Grant, the state legislatively appropriated amount of TANF for our sixty-four county human services agencies. These funds provide for monthly cash grants to eligible children and families, as well as administration, case management, supportive services, and contracted community supports. In State Fiscal Year 2026, 46,000 children received support through the monthly cash grant, while 24,000 parents/caretakers received critical education and career training. Children and families also received targeted supports such as emergency housing assistance, transportation, and basic necessities, like clothing. Additionally, county partners utilized TANF dollars to break cyclical poverty through fatherhood programs and parenting classes, GED programming, childcare, and other TANF-eligible programming.

3.    The Colorado Department of Human Services (CDHS) is the primary agency responsible for Colorado's implementation of the Temporary Assistance for Needy Families (TANF), known as Colorado Works (CW). CW is state-supervised and administered by Colorado's sixty-four counties.  Through this partnership, counties supported approximately twenty-five thousand families with children in state fiscal year 2025-2026 through the Basic Cash Assistance (BCA) program, with an average grant of $500 per month. Counties provide further support

1

through case management and workforce training, fatherhood and parenting programs, emergency housing for low-income families impacted by wildfires, childcare assistance for working parents, services to survivors of domestic and sexual violence, and other critical support for Colorado's most vulnerable families.

4.      I am familiar with the information in the statements set forth below either through personal knowledge, consultation with CDHS and county human services staff, or from my review of relevant documents and information.

*TANF in Colorado*

5.      Colorado uses a state-supervised, county-administered system for delivering Colorado Works benefits. CDHS oversees the program, and county human services agencies provide the benefits to families in their communities.

6.      TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income families with children. It is one of the largest sources of cash assistance to low-income families and a cornerstone of Colorado's anti-poverty work. Colorado receives approximately $136 million annually in TANF funding and provides approximately 70,000 Colorado residents with basic recurring cash assistance and non-cash assistance benefits.

7.      In Colorado, 46,000 children and their guardians received an average of $500 per month in Basic Cash Assistance (BCA). The average BCA household makes less than thirty-three percent of the federal poverty level. BCA households are the poorest of the poor in Colorado, and the monthly BCA grant provides critical flexible cash for families to meet basic needs, including warm winter clothing, children's school supplies, out-of-pocket medical expenses, rent, and transportation to work. Colorado provides a variety of non-cash assistance supports to low-income families, including but not limited to, workforce training, services to survivors of domestic and

2

sexual violence, child welfare services, childcare assistance for working parents, fatherhood and parenting programs, early intervention programs, financial literacy coaching, and emergency assistance for families in poverty impacted by natural disasters.

***Colorado's TANF Fraud Prevention Procedures***

8.      CDHS, on behalf of Colorado, ensures that robust procedures are in place to prevent ineligible TANF benefit distributions and address erroneous payments or attempted fraud. For example, as further detailed below, BCA recipients have their citizenship and/or immigration status electronically verified through Social Security Administration (SSA) interfaces and/or the Systematic Alien Verification for Entitlements (SAVE) system or through physical documentation review prior to the issuance of any benefits. Income is verified electronically through the Income Eligibility Verification System (IEVS), state employment and wage records, Equifax/The Work Number, and physical documentation review prior to determining eligibility, at recertification, and anytime there is evidence to indicate that the income record in the statewide automated system is no longer accurate. Participants who receive non-cash assistance, such as parenting classes or skill-building credentials, must verify that they meet income requirements, are either U.S. citizens or have qualified immigration status, and are responsible for the care of a dependent child under nineteen. County human services agencies conduct case reviews, investigate suspected fraud, and when necessary, work with local law enforcement and the judicial system to prosecute substantiated participant fraud.

9.      To ensure TANF funds are issued only to TANF eligible recipients, county departments follow a robust eligibility determination process that county agencies must follow for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF funded services and supports.  Further, in accordance with federal and State statutes, rules and regulations, and our federally approved State

3

Plan, CDHS provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, phone calls, and emails to county human services agencies to help guide them in ensuring the accuracy of their determinations.

10. Applicants and recipients of cash assistance grants must submit documentation to county human services agencies that are TANF eligible as part of the application and recertification process. Additionally, if a household experiences a change between eligibility determinations regarding changes to their income, household composition, and residency, they are required to report the change to the county human services agencies by the 10th of the month following the month in which the change occurred.

11. Such eligibility determination process includes an interview conducted by the county human services agency with the applicant and recipient. As part of this determination/redetermination process, appropriate electronic databases are reviewed and/or documents are collected by the agency to determine eligibility. Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to the county to verify those factors which affect initial eligibility and benefit amount, including: identity, residence, household composition, income and United States citizenship or, if not a United Citizen, evidence of a qualified immigration status for TANF eligibility, in alignment with the federally approved State Plan.

12. Additionally, Colorado requires county human services agencies to utilize approved federal and State processes to validate and monitor for compliance with program eligibility for each applicant and recipient of TANF-funded cash assistance. For example, all applications must have a fully verified citizenship or eligible immigration status prior to receiving benefits. This is done using federally approved databases such as the Social Security Administration (SSA) and the

Systematic Alien Verification for Entitlements (SAVE) system, or review of original hard copy documentation for each applicant requesting benefits.

13.    Colorado also ensures that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. CDHS utilizes the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7 to confirm continuing eligibility and benefit levels.  CDHS uses IEVS to verify income, wage, tax, and other information from the SSA, which is used to confirm an individual's eligibility for TANF. Federal law and the written agreements that CDHS signs to access this income and eligibility information require CDHS to confirm the accuracy of eligibility information reported by the client, and the information known by IEVS. The county department ensures that any discrepancies between the interfaces and the information that the client reported are resolved based on the known information, and client's benefits are adjusted accordingly and in a timely, after the benefit recipients are provided notice with appeal rights to provide affected individuals an opportunity to contest these data findings, before terminating, denying, suspending or reducing benefits to an applicant or recipient.

14.    County departments also review the Public Assistance Reporting Information System (PARIS) Interstate match to identify if an individual is receiving benefits in more than one state at the same time.

15.    County departments also conduct a Prison Match to identify cash assistance recipients who are incarcerated and have been sentenced to a term in a Colorado prison as reported to the Colorado Department of Corrections or a federal prison as reported on the SSA Federal Prison file. County departments refer match results to internal fraud investigation teams, and if substantiated, to local law enforcement and/or judicial district for investigation and appropriate case action.

16.     CDHS also undertakes a monthly match to identify individuals whose Electronic Benefits Transfer (EBT) cash transactions are conducted 100% out of state during a calendar quarter which may indicate residence in a state other than Colorado. The matches are then referred to the county agency for investigation. Based upon the results of that investigation, appropriate case action is then taken by the county department.

17.     CDHS performs monthly matches of active TANF recipients with the federal National Directory of New Hires (NDNH), which contains nationwide W-4 information.  The TANF matches involve all active adult recipients.  NDNH matches are verified through a third-party vendor or by sending Manual Employment Verification (MEV) forms to employers. Responses from the third-party vendor and MEVs are provided to the county agency for investigation and appropriate case action.

18.     CDHS also runs daily and monthly matches against the Colorado Directory of New Hires, to identify applicants and recipients who have filed a W-4 with Colorado and thus potentially identify new employment that could impact Colorado Works eligibility.

19.     CDHS and local county human services agencies enable the public to telephonically and electronically submit welfare fraud allegations to the department or county agency. These submissions contain information regarding individuals suspected of public assistance fraud and are referred to county agency and/or law enforcement for investigation and appropriate case action.

20.     In addition to computer matches, CDHS requires each county department to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When a county department suspects it has issued benefits to a recipient as a result of fraud, the facts used in the eligibility determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to local law enforcement and/or judicial

6

district. If the recipient is found to have committed an intentional program violation (IPV), the claim is established and recovery is pursued from the recipient.  If a recipient is found to have committed an IPV, the recipient may be disqualified from participation in the program for a period of time.

21.    Moreover, as part of its internal controls, CDHS conducts work participation verification reviews, which is a quality assurance process that selects representative samples of work-eligible assistance cases for purposes of verifying the accuracy of the county participation reporting processes, the accuracy of reporting, and compliance with federal and state regulations. CDHS conducts a yearly review of a sample of cases according to Colorado's HHS approved Work Verification Plan. The county is required to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When the county determines benefits were issued as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to local law enforcement and/or the judicial district. If the client is found to have committed an IPV, the claim is established and recovery is sought from the client.

22.    Per Colorado's federally approved TANF State Plan, each county receives an in-depth Management Evaluation. This consists of a sample review of cash assistance cases, review of spending and finances, review of case management practices, county contracts, Work Participation Rate and training needs. In addition to Management Evaluations, state staff meet with counties individually on a monthly to quarterly basis, based on need and performance. The regular meetings focus on training needs, technical assistance, new program requirement implementation, and review of cases and areas of performance concern. Program integrity is a core focus, including appropriate documentation and utilization of verification databases, participant compliance with

work requirements, and spending reviews, when necessary. Additionally, CDHS completes case reviews on a sample of the statewide Colorado Works eligibility determinations to ensure that county departments are applying the regulations as intended. The county departments must take action to resolve any discrepancies found in the case reviews.

23.    The Office of the State Auditor performs programmatic reviews of Colorado Works typically every three years, in accordance with the federal Office of Management and Budget's Compliance Supplement. Through this process, reviews are conducted on the entire cash assistance caseload, including proper documentation of verification of income eligibility, citizenship and qualified immigration status, and Work Participation Rate compliance. Internal program controls are also reviewed, including sub-recipient guidance and validation for county human services agencies. CDHS is also audited annually to ensure its internal finance controls align with federal requirements.

***Colorado's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status***

24.    Colorado requires county human service departments to use the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien status.  County staff are provided training on the proper use of the SAVE system to ensure it is used appropriately.

25.    CDHS maintains the statewide benefits management system functionality and ensures that the system will only allow applicants that have been determined to be qualified non-citizens and data entered by the county department as qualified non-citizens, as defined by Colorado's federally approved State Plan, to be eligible and receive basic cash assistance benefits.

26.    The county department is responsible for the provision of a safe place for storage of case records and other confidential material to prevent disclosure by accident or as a result of curiosity of persons other than those involved in the administration of the programs. County

8

departments maintain the storage of case records in accordance with federal regulations. These provisions are the same for all records pertaining to eligibility, including immigration verification documents.

27. County staff and supervisors are trained to appropriately review and document use of the SAVE system in case notes, including the outcome. The state eligibility system also includes database fields to indicate when immigration status is verified by SAVE. The eligibility system also tracks when manual documentation is used for verification of immigration status, so both the county and state can review the use of these verification methods when performing case reviews,

28. As required by law, Colorado imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

29. Counties are required to retain data from any form for the current year, plus three previous years unless: 1. There is a written statutory requirement, rule, or regulation available from a county (i.e., a broader county policy), State or federal agency requiring a longer retention period; or, 2. There has been a claim, audit, negotiation, litigation or other action started before the expiration of the three-year period. If any such action has been started, the county must maintain the case record for the duration of the action. If a county department responsible for administering TANF benefits shares building space with other county offices, that department is required to securely store case material to limit access to staff not authorized to perform Colorado Works eligibility and case management. Facility and other maintenance personnel are required to be instructed concerning the confidential nature of information.

30. Colorado could never have anticipated the new routine use of TANF data announced in the SORN and therefore had no opportunity to draft disclosures to prior TANF recipients to disclose this new routine use of their data.

9

31.    Colorado Works regulations and application materials state that individuals not requesting assistance, including citizens, eligible non-citizens and those who do not have an eligible immigration status, will not have their address information shared with other entities outside the state without their prior written consent. Proper administrative procedures necessitate these individuals be notified and have the opportunity to consent to sharing this information.

***Federal Oversight of Colorado TANF Program***

32.    Pursuant to federal statute and regulation, CDHS provides certain data on families receiving TANF assistance to ACF on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

33.    Among other things, CDHS provides ACF with the data fields specified in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, social security number, date of birth, and, as to immigration status, an individual's status as either "U.S. Citizen," "Qualified alien," or "Unknown."

34.    CDHS undertakes sample TANF data collection activities, consistent with 42 U.S.C. § 611(a)(1)(B) and 45 C.F.R. § 265.5. On a monthly basis, CDHS uses random sampling to select a sufficient number of TANF/Maintenance of Effort (MOE) cases to meet federal reporting requirements. Colorado provides data for approximately 314 cases per month for the Work Participation Rate (WPR) or roughly 3,700 cases annually.

35.    Pursuant to the federal Single Audit Act, CDHS engages an auditor with respect to its Colorado Works TANF program. This programmatic audit takes place typically every three years. The auditor conducting the Single Audit is chosen by Colorado's Office of the State Auditor (OSA). The Single Audit consists of a full review of the Basic Cash Assistance (BCA) caseload to verify that eligibility is correctly determined, including but not limited to a review of income,

10

citizenship, and eligible immigration status, and compliance with the federally required Work Participation Rate (WPR). The OSA performs an annual Single Audit of CDHS fiscal controls, which includes a review of Colorado Works finances.

36.    There has historically been minimal federal oversight of Colorado's TANF program beyond the Single Audit and required federal reporting described above. In my five and a half years with CDHS, ACF has not performed any audits or oversight activities, beyond reconciling formatting and coding issues in our regular reporting.

37.    To my knowledge, in my five and a half years with CDHS, ACF has never performed any of the following activities with respect to Colorado's TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures.

### TANF SORN

38.    I understand that on June 23, 2026, U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

39.    *First*, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act".

40.    The TANF SORN adds a new additional purpose:

11

to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

41.    ***Second***, the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.*, State agencies), but also "verification information" obtained "from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

42.    ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

43.    ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

**HARM To Colorado**

12

44.    Without Court intervention, Colorado faces harm stemming from the TANF SORN.

45.    The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

46.    As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require Colorado to expend time and resources responding to ACF requests. Increased frequency or scope of ACF monitoring would require more staff time to ensure Colorado is responsive to program integrity activities beyond what ACF has historically performed. The lack of operational detail in the SORN makes it difficult to anticipate the cadence and breadth of additional oversight activities, limiting the ability to properly budget and plan for these changes. For example, many eligibility verification documents are stored at the local county level, not the state level. Any additional information required to be provided by Colorado would necessitate a time- and labor-intensive process of collecting documentation from counties. This would be separate from the process that, as noted above, Colorado already engages in regularly as part of its efforts to monitor counties to ensure that counties follow all state and federal requirements regarding Colorado Works eligibility.

47.    This would also create opportunity costs. Increased state staffing costs and technology investments to be responsive to ACF's additional oversight activities require additional

13

resources. Additionally, local county governments would also incur additional administrative burden and associated costs, further draining local resources. The broad nature of the TANF SORN and the lack of operational detail limit the state's ability to plan accordingly. Efficient budgeting and allocation of finite resources are critical to program integrity, but the lack of actionable detail undermines this effort.

48.    As to immigration status verification in particular, these agency oversight activities are likely to lead to misleading and improper results. Immigration status changes are not always reflected in the SAVE system, which is why Colorado has a robust manual documentation verification process in place with counties, in addition to utilizing SAVE. If counties are unable to verify eligible immigration status via SAVE, they are required to request and review manual documentation prior to issuing benefits. The request for manual documentation is recorded in the statewide automated system, and benefits are not issued until appropriate documentation is submitted to the county department. If a participant returns documentation and the county worker determines it is not sufficient, additional documentation is requested and if sufficient documentation is not received, the case is closed. When documentation is received, the county worker manually updates the relevant data fields in the eligibility system to determine eligibility for Colorado Works benefits. This is captured in case notes, including the type of documentation provided, whether or not it was acceptable, and the outcome of the determination. The data sharing purposes outlined in the SORN would create additional discrepancies if out-of-date SAVE data takes precedence over hard copy documentation, placing eligible non-citizens at risk for inaccurate termination of benefits. Improperly cutting off benefits would be harmful and destabilizing to the family, and erode trust in the Colorado Works program.

49. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts for Colorado, with likely staffing reductions and the elimination of non-mandated services. Similar enforcement actions would also jeopardize the ability to operate the Colorado Works program, impacting tens of thousands of children and families. These families would be cut off from vital supports, resulting in the loss of housing, childcare, and access to workforce training, and more involvement in the child welfare system and increases in incidents of domestic and sexual violence.

50. Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with DHS and Immigration and Customs Enforcement (ICE) for use in immigration enforcement activities. *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-information-sharing-between-the-centers-for-medicare-and-medicaid-services-and. In this environment, the SORN's announcement that ACF plans to begin sharing Colorado's TANF recipients' data with DHS will cause additional harm to Colorado, as it risks eroding the trust that CDHS and counties have developed with immigrant communities in Colorado. CDHS has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, and to provide documentation of that status, and has told applicants that CDHS would verify that status with the federal government. But CDHS has also encouraged eligible households to utilize TANF and other assistance to help raise their children and families out of poverty. If ACF

begins sharing TANF data with DHS, then community fears that DHS will use that data for purposes other than valid eligibility checks and will hinder public trust.

51.    Further, the TANF SORN will erode the trust that Colorado has developed with immigrant communities and deter individuals from participating in TANF. Colorado has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, and has told applicants that State and local TANF administrators would confirm that status with the federal government. But Colorado has also encouraged eligible households—including multi-citizenship status families, with children who are U.S. citizens to utilize TANF and other assistance to help raise their children and families out of poverty. Colorado has also made assurances to TANF recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in the Colorado Works program by citizens and qualified non-citizens alike. This reduction in public trust extends beyond Colorado Works. Trust is lost in accessing other benefits eligible participants qualify for, including Medicaid, SNAP, housing assistance, and childcare. All interactions with the state or counties become suspect, leaving children and families to go without medical care, food, and safe housing, and jeopardize the employment of hard working parents.

52.    This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in the Colorado Works TANF program if they believe that doing so will expose the sensitive personal

16

information of themselves and their family members to widespread disclosure.  Such concerns are bolstered by public reporting into DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' Colorado Works TANF program.

53.     If fewer individuals participate in the Colorado Works TANF program, Colorado will suffer significant harms.  Colorado Works provides critical support to the state's low-income families and is a program of last resort, and a critical intervention to reduce child welfare involvement. The benefits issued help families stabilize, prevent homelessness, and reduce instances of domestic and sexual violence. Parents who would benefit from employment and training opportunities would lose the opportunity to participate in the workforce and contribute to the local economy. Without Colorado Works, these participants may need to access other, more expensive services, such as child welfare and the judicial system, further straining state and federal resources for those programs. The impacts of increased homelessness and hunger in Colorado's communities would shift more costs to local health care systems, including uncompensated care for individuals afraid to engage in the Medicaid system, even if they are otherwise eligible.

54.     Colorado will also incur a financial cost in updating communications with Colorado Works applicants or participants that notify Colorado Works applicants or participants of how their personal data is collected, used, and shared. Updating communications and application materials require legal review. Because Colorado has a single application that includes Medicaid and SNAP, the legal review and inclusion of the new disclosure would require participation from multiple agencies. Beyond legal review, plain language reviews and required translations would increase costs to the state. Once language is finalized, costs would be incurred in printing new application

17

language, technology costs for updating system-generated correspondence, the web-based application, and the mobile app application. These updates would need to extend to forms for reporting changes and redetermination packets, both online and on paper.

DATED: July 30, 2026

S/*Ian McMahon*

DECLARANT

18