# EXHIBIT 8

## DECLARATION OF PETER HADLER

I, Peter Hadler, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am the Deputy Commissioner of the Connecticut Department of Social Services (DSS).

2.      I have been employed in this position since April 2023 and have been employed by DSS since January 2012. In my capacity as Deputy Commissioner, I oversee the state's program and policy administration for the Temporary Assistance for Needy Families (TANF) block grant, the Supplemental Nutrition Assistance Program (SNAP), the Medicaid program, the Children's Health Insurance Program (CHIP), the Low-Income Home Energy Assistance Program (LIHEAP) block grant, the Community Services Block Grant (CSBG), and numerous other public assistance programs.

3.      DSS is statutorily designated in Connecticut General Statutes section 17b-2 as the state agency responsible for "the administration of (1) the Connecticut energy assistance program pursuant to the Low Income Home Energy Assistance Act of 1981; (2) the state plan for vocational rehabilitation services for the fiscal year ending June 30, 1994; (3) the refugee assistance program pursuant to the Refugee Act of 1980; (4) the legalization impact assistance grant program pursuant to the Immigration Reform and Control Act of 1986; (5) the temporary assistance for needy families program pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996; (6) the Medicaid program pursuant to Title XIX of the Social Security Act (also referred to as "HUSKY Health" in Connecticut); (7) the supplemental nutrition assistance program pursuant to the Food and Nutrition Act of 2008; (8) the state supplement to the Supplemental Security Income Program pursuant to the Social Security Act; (9) the state child support

1

enforcement plan pursuant to Title IV-D of the Social Security Act; (10) the state social services plan for the implementation of the social services block grants and community services block grants pursuant to the Social Security Act; and (11) services for persons with autism spectrum disorder."

4.  I am familiar with the information in the statements set forth below either through personal knowledge, consultation with DSS staff, or from my review of relevant documents and information.

### TANF in Connecticut

5.  DSS administers TANF in Connecticut.

6.  TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income families with children. It is one of the largest sources of cash assistance to low-income families and a cornerstone of Connecticut's anti-poverty work. Connecticut receives approximately $265.9 million annually in TANF funding and provides approximately 12,700 Connecticut residents each month with basic recurring cash assistance.

7.  In Connecticut, in addition to cash assistance, TANF also funds numerous critical services including childcare assistance for family members preparing for employment, teen parents in need of childcare while completing high school, and families who are low-income and working, but need childcare to continue to do so. Additionally, the TANF block grant funds school readiness programs for young children, child welfare prevention and intervention services, addiction treatment supports, teen pregnancy prevention, and job training, placement, and retention services.

### Connecticut's TANF Fraud Prevention Procedures

8.  DSS, on behalf of Connecticut, ensures that robust procedures are in place to prevent ineligible TANF benefits distributions and address erroneous payments or attempted fraud.

2

9.      To ensure TANF cash assistance funds are issued only to eligible recipients, DSS uses a detailed eligibility determination process for applicants and recipients of recurring and emergency cash assistance, and clearly defined program requirements for other TANF-funded services and supports. DSS provides extensive direction and support to agency eligibility workers via on-site monitoring, policy directives, meetings, trainings, phone calls, and emails. DSS also reviews all cases suspected of fraud to ensure program compliance, in accordance with federal and state statutes, rules, and regulations. In the event of suspected fraud, eligibility staff refer cases to the Client Fraud Investigation Unit within the agency's Quality Assurance Division, who then conduct reviews to verify the accuracy of information needed to make eligibility determinations.

10.     Applicants and recipients of cash assistance benefits must document to DSS that they are TANF-eligible as part of the application and recertification process. Additionally, if a household experiences a change of circumstances in between certifications, they are required to promptly report the change to DSS to ensure that the household continues to be eligible for assistance.

11.     The eligibility determination process includes an interview conducted by DSS staff and the collection of documents to verify eligibility and the proper benefit level, including documentation concerning: identity, residence, family composition, housing costs, income and resources, and citizenship /immigration status. Data is entered into DSS' computer eligibility system, ImpaCT, which is programmed with the rules necessary to ensure accurate processing of eligibility and benefit decisions in DSS programs, including TANF-funded family cash assistance.

12.     DSS also uses approved federal and State processes to validate and monitor compliance with program eligibility rules for each applicant and recipient of TANF funded cash assistance. For example, pursuant to Connecticut General Statutes section 17b-7a and

implementing regulations, Connecticut has enacted a statewide fraud early detection system. Under the system, DSS monitors cases for the presence of specific conditions that have historically been associated with higher instances of fraud or error. When such a condition is discovered in a case, an enhanced inspection of the case is triggered, which may include a referral to the Quality Assurance Division within DSS for a review and investigation. Examples of the conditions that may trigger this enhanced review include situations where DSS has information about household composition or assets that differ from the information provided by the household, where the household provides inconsistent information, or where the applicant has been living in Connecticut for less than three months or has previously been found to have received an overpayment of benefits in a DSS program due to fraud or failure to follow program rules.

13.    DSS also ensures that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. DSS uses the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7, to confirm continuing eligibility and benefit levels. DSS uses IEVS to receive federal tax information and information about receipt of unemployment compensation, which is then used to confirm whether an individual's income permits them to be eligible for TANF. Federal law and the written agreements that DSS signs to access this income and eligibility information require DSS to confirm the accuracy of any red flags raised by such data matches, and to provide affected individuals an opportunity to contest these data findings, before terminating, denying, suspending or reducing benefits to an applicant or recipient.

14.    DSS also uses the Public Assistance Reporting Information System (PARIS) Interstate match, which identifies whether an individual is receiving benefits in more than one state

at the same time. When a positive PARIS match occurs, DSS quality assurance and eligibility staff investigate and take appropriate case action.

15. DSS conducts a daily prison match with the Connecticut Department of Corrections to identify cash assistance recipients who are incarcerated and have been sentenced to a term in a Connecticut prison. When a positive match is received, staff close the associated cash assistance. DSS also sends a file of all active individuals to the Social Security Administration (SSA) monthly. SSA responds indicating whether or not the individual has incarceration data, providing corresponding data if it exists. A report is generated and appropriate case action is taken.

16. DSS performs monthly matches of active adult TANF cash assistance recipients with the federal National Directory of New Hires (NDNH), which contains nationwide W-4 employee tax information. NDNH matches provide new hire data, quarterly wage information, and unemployment insurance information that are provided from state labor departments, including the Connecticut Department of Labor. The NDNH data is matched against the DSS eligibility system and the beneficiary is notified if there are discrepancies. Wage information is also verified by checking other available sources, including Equifax's Work Number wage verification system, and through direct contact with employers as needed.

17. DSS receives Internal Revenue Service (IRS) information concerning interest income and unearned income other than interest from Form 1099's filed yearly. The matching process is performed monthly for new individuals and annually for all active/pending applicants and beneficiaries. Matches create alerts for eligibility staff review and action.

18. DSS receives daily Beneficiary and Earnings Data Exchange (BENDEX) information from the Social Security Administration (SSA). The information is used to verify Social Security entitlement information for applicants, recipients, and individuals who may be

5

financially responsible for those applying for TANF. Matches create alerts for eligibility staff review and action.

19. DSS also uses SSA's State Verification and Exchange System (SVES) to verify Social Security numbers and other demographics data. SVES provides information daily about Title II, Title XVI, and Medicare benefits, and verifies citizenship for Medicaid. DSS also uses the State Online Query (also known as SOLQ), a real-time interface with SSA, to verify similar information.

20. DSS also uses SSA's State Data Exchange (SDX), a database that provides information about Supplemental Security Income (SSI) recipients living in Connecticut. Matches create alerts for eligibility staff review and action.

21. The State of Connecticut Judicial Branch provides DSS with information on fleeing felons and parole violators, who are ineligible for assistance, via a monthly data match against active individuals in DSS's ImpaCT eligibility system. Matches create tasks for eligibility staff review and action.

22. The DSS ImpaCT eligibility system matches with the Connecticut Department of Motor Vehicles (DMV) Registration Master File to identify information about applicants and beneficiaries concerning their location (and the location of any absent parent who has legal responsibility for a child in the household), assets, and household composition.

23. The DSS ImpaCT eligibility system interfaces with SSA to generate death matches that create an alert for eligibility to review and follow up on when it is reported that an applicant or beneficiary is deceased. ImpaCT also interfaces with the Connecticut Department of Public Health to receive and act on reports of deaths. Based on the information received and case criteria

6

related to the report, ImpaCT will either automatically close a case or create an alert for eligibility staff to review and take appropriate action.

24.    DSS maintains a Fraud Hotline that enables the public to electronically submit welfare fraud allegations to DSS. These submissions contain information regarding individuals suspected of public assistance fraud and are referred to DSS Fraud Unit investigators for investigation and appropriate case action.

25.    In addition to computer matches, DSS requires each agency Resource Center that processes applications and redeterminations to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. If the recipient is found to have committed an intentional program violation (IPV), the claim is established and recovery is pursued from the recipient. If a recipient is found to have committed an IPV, the recipient may be disqualified from participation in the program for a period of time or the case can be referred for prosecution.

26.    As part of its internal controls, DSS also conducts work participation verification reviews in accordance with an HHS-approved Work Verification Plan. These reviews, which are conducted monthly, involve an examination of a random sample of cases to verify the accuracy of various actions taken, including those concerning work participation rules. As a result of this process DSS establishes claims to recover any benefits issued in error and if benefits were issued as a result of fraud, the case is referred to the DSS Quality Assurance Division.

27.    The Auditors of Public Accounts (APA) is an independent Connecticut agency situated within the legislative branch that conducts a wide array of financial and nonfinancial audits, including audits following the federal Single Audit requirements. The APA performs its Statewide Single Audit (SWSA) on an annual basis, and, as part of this process, conducts a review of DSS' activities related to the TANF block grant, including a review of certain aspects of the

7

cash assistance eligibility determination process. Some of the objectives of the SWSA include reporting on internal controls over compliance related to major programs and offering an opinion on compliance with federal statutes, regulations, and the terms and conditions pertaining to federal awards.

### Connecticut's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status

28.    Connecticut requires DSS eligibility staff to use the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien status.

29.    DSS obtains immigration status information provided by applicants and recipients and verifies this information through SAVE. In order to run a query in SAVE, at a minimum, DSS must provide the noncitizen's first and last name, date of birth, and at least one numerical identifier, such as: an Alien Number/USCIS number, I-94 number, Student and Exchange Visitor Information System (SEVIS) ID number, Naturalization/Citizenship Certificate number, or a Social Security number. This information is electronically compared against Department of Homeland Security records to provide DSS with an initial response. If the system locates the applicant or recipient's U.S. citizenship or immigration status based on the provided information, SAVE will return a response to the agency. If the system is unable to provide the applicant's U.S. citizenship or immigration information at initial response, SAVE will either auto-escalate the case for additional verification or request that DSS provide additional information about that noncitizen in order to receive a response. The response will typically include: the most recent immigration status/category and associated information; employment authorization and associated information; additional immigration statuses co-currently held by the noncitizen; and pending USCIS applications and/or petitions.

8

30.    SAVE maintains records for queries submitted by DSS staff, which can be reviewed or accessed at a later time if needed. Hard copy documentation provided by the applicant or recipient is stored electronically in the DSS case file for the individual. Records are kept on file in accordance with Connecticut record retention guidelines.

31.    Because an individual's immigration status can change over time, it is verified at application and again at each redetermination of eligibility. All recipients are required to report changes in immigration status and provide verification of such changes. Verification can include hard copies of updated immigration documents or other updated information that is subsequently verified through SAVE.

**Confidentiality of TANF data in Connecticut**

32.    As required by law, Connecticut imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

33.     Generally speaking, the information obtained by DSS can only be used for purposes related to the administration of the TANF program, with a few, limited exceptions outlined at Connecticut General Statutes section 17b-90(b).

34.    DSS could have never anticipated the new routine use of TANF data announced in the SORN and therefore had no opportunity to draft disclosures to TANF recipients apprising them of this new routine use of their data. In fact, in reliance upon longstanding safeguards limiting the disclosure of client data, DSS explicitly advises TANF cash assistance recipients that their information will not be shared with the U.S. Citizenship and Immigration Services and that information provided in relation to their TANF eligibility cannot be used to adversely impact an immigration status review.

35.    Based on the aforementioned state confidentiality laws and the longstanding manner in which the U.S. Administration for Children and Families (ACF), which sits within the

9

U.S. Department of Health and Human Services (HHS), used TANF data prior to publication of the SORN, DSS communicated to TANF applicants and beneficiaries in Connecticut that their information would generally be used only for purposes of administration of the TANF program, such as by using it to verify an applicant's income or citizenship status. For instance, within a section describing the rights and responsibilities of applicants, the application used to request TANF-funded cash assistance indicates that information provided on the application is confidential and generally will be used only for purposes directly connected with the administration of DSS programs, which are described as including things like determining eligibility and the proper amount of benefits, providing services to applicants and beneficiaries, and investigating and prosecuting crimes associated with the programs DSS administers. Similar assurances are made in an FAQ section on the DSS website.

### *Federal Oversight of Connecticut's TANF Program*

36.     Pursuant to federal statute and regulation, DSS provides certain data on families receiving TANF assistance to ACF on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

37.     Among other things, DSS provides ACF with the ACF-199 and ACF-209 forms that summarize quarterly caseload data, demographic characteristics, and work participation information for families receiving family assistance as described in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. The ACF-199 summarizes data for families receiving TANF assistance, tracks monthly disaggregated and aggregated data on household structures, recipient ages, employment statuses, and non-assistance components, and is used to measure state work participation rates. The ACF-209 summarizes data for families enrolled in Separate State Programs (SSP) funded through State Maintenance of Effort (MOE) money, collects family-level and person-level characteristics

parallel to the ACF-199, and ensures state-funded alternate welfare programs meet similar federal accountability standards. These reports provide Social Security number, date of birth, and, as to immigration status, an individual's status as either "U.S. Citizen," "Qualified alien," or "Unknown."

38.    DSS undertakes sample TANF data collection activities, consistent with 42 U.S.C. § 611(a)(1)(B) and 45 C.F.R. § 265.5. On a monthly basis, DSS uses random sampling to select a sufficient number of TANF/Maintenance of Effort (MOE) cases to meet federal reporting requirements. DSS provides data for approximately 3,200 individuals per year.

39.    As part of TANF data collection activities, Connecticut currently provides disaggregated data for individuals receiving benefits through state-funded MOE and SSP programs, including the state program for families where at least one individual in the household does not meet the five-year residency qualified alien criteria required for federal programs.

40.    Pursuant to the federal Single Audit Act and state law, the Connecticut APA are charged with performing an independent audit of Connecticut's TANF program. This audit takes place annually. For the TANF program, the APA will test areas such as eligibility, maintenance of effort determinations, and monitoring of subrecipients of TANF funds. The eligibility testing performed by the APA is derived from the requirements that are documented in the compliance supplement specific to the TANF program. Every completed audit report by the APA is publicly available on their agency website. The most recent report completed by the APA is available on the Internet by accessing the following URL: https://wp.cga.ct.gov/apa/wp-content/cgacustom/reports/FullReports/STATEWIDE%20FULL_20260327_FY2025.pdf.

41.    There has historically been little federal oversight of Connecticut's TANF program beyond the Single Audit and required federal reporting described above.

11

42.     To my knowledge, in the years since I became Deputy Commissioner for DSS, ACF has not performed any of the following activities with respect to Connecticut's TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures. The lone, narrow exception was that, in September 2025, ACF sent a "Dear Colleague" letter to TANF recipient agencies identifying issues with inaccurate Social Security numbers and advising states to take measures to ensure all recorded Social Security numbers were valid and verified.

**TANF SORN**

43.     I understand that on June 23, 2026, ACF published a System of Records Notice ("SORN") regarding the TANF program. 91 Fed. Reg. 37406 (June 23, 2026).

44.     *First*, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act".

45.     The TANF SORN adds a new additional purpose:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and

12

Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

46.    **Second,** the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.*, State agencies), but also "verification information" obtained "from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

47.    **Third**, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

48.    **Fourth**, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

### HARM To Connecticut

49.    Without Court intervention, Connecticut faces harm stemming from the TANF SORN.

50.    The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements),

13

additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

51.     As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require Connecticut to expend time and resources responding to ACF requests. This would also create opportunity costs. With limited Quality Assurance staff, DSS would likely have to redirect resources within the division from other functions, such as fraud prevention and program integrity in other programs administered by DSS. Many of these programs, including Medicaid and the Children's Health Insurance Program, serve far more people than TANF, and present a much greater risk to the public fisc. Furthermore, program staff would likely need to be pulled off of other projects to review and respond to audit findings presented by ACF and pull requested documentation.

52.     As to immigration status verification in particular, these ACF oversight activities are likely to lead to misleading and improper results. Immigration statuses often change, expire, or are extended. While SAVE is typically reliable, depending on the recency of such a change, there may be instances in which the response returned by SAVE does not reflect the most current status. Additionally, depending on the information used to create the initial query, SAVE may not return all statuses held by an applicant or recipient. The results are often directly tied to the status or document for which relevant information was input. In these instances, applicants or recipients are required to provide hard copy documentation.

14

53.      Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts for Connecticut, with likely staffing reductions and the elimination of non-mandated services. Aside from funding cash assistance for poor families with dependent children, the TANF block grant helps fund a variety of crucial services in Connecticut, including school readiness programs for young children, child welfare prevention and intervention services, addiction treatment supports, teen pregnancy prevention, and job training, placement and retention services. If ACF were to freeze TANF payments to Connecticut, some or all of these services would need to be reduced or eliminated pending restoration of this funding, causing a variety of harm to the State. The unemployment rate would likely rise as crucial job training and placement programs shutter their doors, teen pregnancy rates would rise, and individuals with addiction disorders would relapse. Loss of TANF benefits would likely increase homelessness among the population served by TANF. Approximately 75% of Connecticut's TANF block grant is allocated to providing child abuse prevention and intervention services through the Department of Children and Families. Other TANF block grant funds support school readiness and other school supports as well as assistance to working families trying to meet the high expenses of daycare so they can work. Accordingly, Connecticut children are certain to bear the burden if services are halted or slashed due to a halt in TANF funding. While the TANF resources in question might disappear, the problems they were designed to combat would not. As a result, desperate families will likely look elsewhere for help, increasing the burden on Connecticut's non-profits, religious organizations, food banks, hospitals, municipalities, and

other public-assistance programs administered at the state level, such as Medicaid and state-funded cash assistance programs.

54.    Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with DHS and Immigration and Customs Enforcement (ICE) for use in immigration enforcement activities. *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-information-sharing-between-the-centers-for-medicare-and-medicaid-services-and.    In    this environment, the SORN's announcement that ACF plans to begin sharing Connecticut's TANF recipients' data with DHS will cause additional harm to Connecticut, as it risks eroding the trust that DSS and Connecticut state and local government at large have developed with immigrant communities in the State.

55.    Indeed, while Connecticut has always required TANF applicants who are not citizens to attest that they have an eligible immigration status and has told applicants that this status would be confirmed with the federal government, Connecticut has also encouraged eligible households—including families with U.S. citizen children who are and have always been eligible for TANF—to take advantage of TANF and other assistance to help raise their children and families out of poverty. As outlined above in this declaration, Connecticut has also made assurances to TANF recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. The rights and responsibilities document provided with all applications and renewals, as well as the FAQ section of the DSS website, indicate that information provided on the application is confidential and generally will be

16

used only for purposes directly connected with the administration of DSS programs, which are described as including things like determining eligibility and the proper amount of benefits, providing services to applicants and beneficiaries, and investigating and prosecuting crimes associated with the programs DSS administers. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in Connecticut's TANF programs by citizens and qualified non-citizens alike.

56.     This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in TANF-funded programs if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure. Such concerns are bolstered by public reporting into DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' TANF programs.

57.     If fewer individuals participate in TANF, Connecticut will suffer significant harms. As detailed in this declaration, the TANF block grant funds a variety of services and programs in Connecticut, ranging from cash assistance for needy families with dependent children and work preparation and placement programs, to programs aimed at preventing teen pregnancy and treating addiction. If fewer people use these benefits and services, fallout will manifest in the form of increased poverty rates, more teen pregnancies, and higher unemployment rates. The families

impacted by these ills will seek services elsewhere, overburdening other resources, such as unemployment insurance, hospitals, food banks, non-profits, and other state-funded public assistance programs, even while producing worse outcomes for the families currently served by TANF.

58.    Connecticut will also incur a financial cost in updating communications with TANF applicants or participants that notify them of how their personal data is collected, used, and shared. DSS' website will need to be updated, a litany of forms (including application and recertification forms) will need to be revised to amend confidentiality assurances made to those served by the agency, and a legal review of state confidentiality laws will need to be undertaken to determine whether and how DSS can comply with these laws in light of the new SORN. Apart from revising confidentiality assurances on its forms and website, DSS will likely need to proactively reach out to the populations it serves to advise them of the changes outlined in the SORN. All of these endeavors will come with a financial cost and will drain already overstrained agency resources.

DATED: July 31, 2026

Peter Hadler

Digitally signed by Peter Hadler
DN: cn=Peter Hadler, o=DSS, ou=Deputy
Commissioner, email=peter.hadler@ct.gov, c=US
Date: 2026.07.31 18:26:35 -04'00'

Peter Hadler

18