# EXHIBIT 14

## DECLARATION OF STACY L. RODGERS, ACTING SECRETARY, MARYLAND

## DEPARTMENT OF HUMAN SERVICES

I, Stacy L. Rodgers, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Acting Secretary of the Maryland Department of Human Services (MDHS).

2. As Acting Secretary, I am responsible for overseeing all programs and operations of the Department, including the administration of the Temporary Cash Assistance (TCA) program — Maryland's implementation of the federal Temporary Assistance for Needy Families (TANF) block grant program. This responsibility includes oversight of the Family Investment Administration (FIA), which administers TCA, and coordination with Maryland's 24 local departments of social services (LDSS) that carry out day-to-day program operations statewide.

3. MDHS, through its 24 Local Departments of Social Services (LDSS), aggressively pursues opportunities to assist people in economic need, provide preventive services, and protect vulnerable children and adults in each of Maryland's 23 counties and Baltimore City.

4. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with MDHS staff, or from my review of relevant documents and information.

### *TANF in Maryland*

5. The Maryland Department of Human Services (MDHS) administers TANF in Maryland.

6. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to

1

families experiencing financial hardship. It is one of the largest sources of cash assistance to low-income families and a cornerstone of Maryland's anti-poverty work. Maryland receives approximately $228 million annually in TANF block grant funding and serves 38,464 Maryland residents with basic recurring cash assistance and non-cash assistance benefits.

7. Maryland's TANF program serves as a cornerstone of the State's public assistance infrastructure, providing critical financial support and services to families with children across all 23 counties and Baltimore City. Maryland receives approximately $228 million annually in federal TANF block grant funding and administers the program through 24 LDSS under the oversight of the Family Investment Administration. In Fiscal Year 2026, the TANF program served a monthly average of 14,249 unique households, supporting an average of 38,464 participants — including 11,792 adults and 26,672 children.

   a. In addition to recurring cash grants, Maryland uses TANF funds to support the following categories of services, as reflected in the State's SFY 2024 Administration for Children and Families (ACF)-196R expenditure report submitted to ACF:

      i. Work, education, and training activities, including employment preparation and workforce development services;

      ii. Child welfare prevention and early intervention services;

      iii. Child care and early education subsidies;

      iv. Non-recurrent short-term benefits, including emergency supports for families in crisis;

2

      v.   Fatherhood and two-parent family stability programs; and

     vi.   Home visiting programs.

***Maryland's TANF Fraud Prevention Procedures***

8. MDHS, on behalf of Maryland, ensures that robust procedures are in place to prevent ineligible TANF benefits distributions and address erroneous payments or attempted fraud. All 24 LDSS follow a comprehensive eligibility determination process, requiring applicants to verify identity, residence, family composition, income, resources, and citizenship or immigration status. Maryland utilizes the Income Eligibility Verification System (IEVS) to confirm continuing eligibility and benefit levels, requiring that red flags from data matches be verified prior to any adverse action. Furthermore, the State conducts the Public Assistance Reporting Information System (PARIS) interstate match and a Border Match to identify duplicate benefit receipt, performs monthly matches against the National Directory of New Hires (NDNH) to detect new employment, and runs a Prison Match against state and federal incarceration records for all active TANF recipients. Additionally, a quarterly Electronic Benefit Transfer (EBT) out-of-state transaction match is used to identify potential out-of-state residency, while FIA monitors LDSS compliance through on-site monitoring, systems controls, policy directives, and written guidance.

9. To ensure TANF funds are issued only to TANF eligible recipients, MDHS has a robust eligibility determination process that LDSS must follow for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF-funded services and supports. MDHS conducts reviews of LDSS to ensure program compliance, in accordance with federal and State statutes, rules and regulations. MDHS provides extensive

3

direction and support via on-site monitoring, policy directives, meetings, training, phone calls, and emails to LDSS to help guide them in ensuring the accuracy of their determinations.

10. Applicants and recipients of cash assistance grants must document to LDSS that they are TANF eligible as part of the application and recertification process. Additionally, if a household experiences a change in between certifications, they are required to report the change to the LDSS within 10-days to ensure that the household continues to be eligible for the assistance.

11. The eligibility determination process includes an interview conducted by the LDSS with the applicant and recipient. As part of this determination / redetermination process, appropriate documents are collected by the LDSS to determine eligibility. Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to the LDSS to provide verification of those factors which affect initial eligibility and benefit amount, including: identity, residence, family composition, housing costs, income and resources, and United States citizenship or, if not a United States citizen, evidence of satisfactory immigration status for TANF eligibility.

12. Additionally, MDHS requires that LDSS utilize approved federal and State processes to validate and monitor for compliance with program eligibility for each applicant and recipient of TANF funded cash assistance. Effective March 30, 2026, MDHS implemented automated system verifications in Maryland's Eligibility and Enrollment (E&E) system — the statewide case management system used by all 24 local departments — that run automatically at application, when adding an individual to a

4

case, and at redetermination. Required verifications now include the State On-Line Query-Internet (SOLQi), the State Verification and Exchange System (SVES), The Work Number (TWN), BEACON (Department of Labor), and the Electronic Disqualified Recipient System (eDRS) for SNAP cases. The E&E system retrieves verification data, populates applicable information into the case record, and generates alerts for case manager review before eligibility is finalized.

13. MDHS also ensures that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. MDHS utilizes the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7 to confirm continuing eligibility and benefit levels. MDHS uses IEVS to receive federal tax information, which is used to confirm whether an individual's income and resources permit eligibility for TANF. Federal law and the written agreements that MDHS signs to access this income and eligibility information require MDHS to confirm the accuracy of any red flags raised by such data matches, and to provide affected individuals an opportunity to contest these data findings, before terminating, denying, suspending or reducing benefits to an applicant or recipient.

14. MDHS also reviews the Public Assistance Reporting Information System (PARIS) Interstate match to identify if an individual is receiving benefits in more than one state at the same time. MDHS also conducts a Border Match including neighboring states such as Delaware, Pennsylvania, Virginia, and West Virginia, to identify duplication of benefits. MDHS  refers match results to the Office of the Inspector General (OIG) for investigation and appropriate case action.

15. MDHS conducts a Prison Match to identify cash assistance recipients who are incarcerated and have been sentenced to a term in a Maryland prison as reported by the Department of Public Safety and Correctional Services or a federal prison as reported on the SSA Federal Prison file. Match results are generated as alerts in Maryland's Eligibility and Enrollment (E&E) system. Case managers at the relevant LDSS must independently verify match information using secondary sources — such as online police records, VINELink, or collateral contact with the prison — before taking adverse action. If a recipient is confirmed to have been incarcerated for more than 30 days, TCA benefits must be denied or terminated in accordance with Action Transmittal (AT) 25-03 (New Hire, Death, Prison, and PARIS Data Match Requirements, March 24, 2025).

16. MDHS runs matches of active TANF recipients against the federal NDNH, a federally maintained database of new hire and wage information — at application and redetermination. Match alerts are generated automatically in Maryland's E&E system. Case managers are required to independently verify NDNH match results using a secondary source, such as clearances including The Work Number (TWN), prior to taking any case action. Results are reviewed by the relevant LDSS reviews results and appropriate case action is taken.

17. MDHS also runs daily and monthly matches against the Maryland Directory of New Hires, to identify applicants and recipients who have filed a W-4 with Maryland and thus potentially identify new employment that could impact TANF eligibility.

18. The MDHS OIG enables the public to electronically submit welfare fraud allegations to MDHS. These submissions contain information regarding individuals suspected of

public assistance fraud and are referred to MDHS OIG by the relevant LDSS for investigation and appropriate case action.

19. In addition to computer matches, MDHS requires each LDSS to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When an LDSS determines it has issued benefits to a recipient as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to MDHS OIG. If the recipient is found to have committed an intentional program violation (IPV), the claim is established and recovery is pursued from the recipient.  If a recipient is found to have committed an IPV, the recipient may be disqualified from participation in the program for a period of time.

20. Moreover, as part of its internal controls, MDHS conducts work participation verification reviews, which is a quality assurance process that selects representative samples of work-eligible assistance cases for purposes of verifying the accuracy of the LDSS' participation reporting processes, the accuracy of reporting, and compliance with federal and state regulations. MDHS conducts a yearly review of a sample of cases according to HHS approved Work Verification Plan.  The LDSS is required to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When the LDSS determines benefits were issued as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to the MDHS OIG . If the client is found to have committed an IPV, the claim is established and recovery is sought from the client.

7

21. Pursuant to the federal Single Audit Act, 31 U.S.C. §§ 7501–7507 and 2 C.F.R. Part 200 (Uniform Guidance), the State of Maryland is required to engage an independent auditor annually to conduct a statewide Single Audit covering all major federal programs, including TANF (ALN 93.558) — the federal program Maryland administers as Temporary Cash Assistance (TANF). The auditor is selected by the State. The most recent available Single Audit covers the fiscal year ended June 30, 2023, and was conducted by CliftonLarsonAllen LLP. That audit identified three findings specific to Maryland's TANF/TCA program: (1) Finding 2023-018, a Significant Deficiency in ACF-199 and ACF-209 data reporting related to time-limit exemptions, countable months, and work participation codes, attributed to errors in implementing a new case file system; (2) Finding 2023-019, a Significant Deficiency in child support non-cooperation benefit reduction, involving one participant whose benefit was reduced by less than the required 25 percent; and (3) Finding 2023-020, a Significant Deficiency related to Special Tests and Provisions governing penalties for refusal to work. Maryland agreed with all three findings.

### Maryland's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status

22. MDHS requires LDSS to use the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien status.

23. SAVE is accessed by LDSS through Maryland's E&E system — the statewide case management system used by all 24 local departments to process and document eligibility determinations. Maryland has required this verification for many years; AT 26-03 (Mandatory Clearance/Verification Systems Requirements, effective September

30, 2025) is the most recent consolidation of these requirements, mandating that SAVE be run at application, redetermination, and when adding a new individual to a case. The E&E system retrieves the SAVE response automatically and generates an alert for case manager review before eligibility is determined. Maryland uses SAVE results as a point-in-time verification; because immigration status can change over time, a SAVE result accurately reflects a person's status as of the date of the query, which may differ from prior or subsequent queries.

24. LDSS are required to collect and retain documentation of an applicant's immigration status in the case record, including documentation of the SAVE verification result. Per AT 26-03, all data match and clearance results — including SAVE — must be uploaded into the E&E system and documented in the Electronic Content Management (ECM) system. AT 26-03 also establishes uniform documentation standards for verification systems across programs. MDHS implemented mandatory supervisory pre-review processes under AT 25-16 (Supervisory Case Pre-Review Requirements, effective May 1, 2025), which require a Lead Worker or Family Investment Supervisor to review case documentation, including immigration verification, before final eligibility approval.

25. FIA monitors LDSS compliance with SAVE and immigration status verification requirements through on-site monitoring reviews, quality assurance processes, and automated alerts generated within Maryland's E&E — the statewide case management system used by all 24 LDSS to process and document eligibility determinations. FIA provides direction to LDSS through policy directives, action transmittals (written policy instructions issued to LDSS), and staff training. Maryland

9

has required LDSS to verify immigration status through SAVE as a condition of eligibility determination for non-citizen applicants for many years. Action Transmittal 26-03 (Mandatory Clearance/Verification Systems Requirements, effective September 30, 2025) is the most recent consolidation of these longstanding requirements, establishing uniform documentation standards for verification systems across all programs and LDSS. The 2026 audit conducted by the Maryland Office of Legislative Audits — the State's independent legislative auditor — specifically examined documentation compliance and supervisory review practices, reflecting FIA's ongoing efforts to strengthen adherence to these requirements statewide.

26. As required by law, Maryland imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

27. As required by 42 U.S.C. § 1306 and COMAR 07.01.07, all information obtained by MDHS in the administration of TANF is confidential. MDHS restricts the use and disclosure of recipient information through written partnership agreements with any entity with which it exchanges information for eligibility verification purposes; such agreements specify the purposes for which information may be used and the procedures for accessing it. Additionally, as stated in Maryland's 2024–2028 WIOA Combined State Plan (TANF Section d): "Maryland does not provide information about individual recipients to external stakeholders unless requested through a valid court order." Aggregate data may be provided to external stakeholders only when a memorandum of understanding or court order has been secured, and that all MOUs are vetted by the Assistant Attorney General.

28. MDHS has publicly committed to TANF applicants and recipients that their personally identifiable information will be disclosed only: (1) with the customer's consent; (2) pursuant to a court order; or (3) to a government employee acting in an official capacity, only if the release of information is necessary to administer public assistance, medical assistance, social services, or child welfare services programs in Maryland. This commitment is published on MDHS's public-facing immigration enforcement information page and is communicated to applicants as part of the application process. The SORN's Routine Use 10 — which authorizes disclosure to MDHS and unnamed entities for undefined program integrity purposes including immigration status verification — is facially inconsistent with these published commitments, which do not contemplate disclosure to federal immigration agencies absent a court order or the customer's consent.

### Federal Oversight of Maryland TANF Program

29. Pursuant to federal statute and regulation, MDHS provides certain data on families receiving TANF assistance to ACF on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

30. Among other things, MDHS provides ACF with the data fields specified in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, social security number, date of birth, and, as to immigration status, an individual's status as either "U.S. Citizen," "Qualified alien," or "Unknown."

31. MDHS undertakes sample TANF data collection activities, consistent with 42 U.S.C. § 611(a)(1)(B) and 45 C.F.R. § 265.5. On a monthly basis, MDHS uses random sampling to select a sufficient number of TANF/Maintenance of Effort (MOE) cases

11

to meet federal reporting requirements. Maryland provides data for approximately 58 TANF cases and 242 SSP-MOE cases per month, reporting data to ACF on a quarterly basis.

32. Pursuant to the federal Single Audit Act, MDHS engages an auditor with respect to its TANF program. This audit takes place annually. The auditor conducting the Single Audit is chosen by Maryland. A recent Single Audit, covering the fiscal year ended June 30, 2023 and conducted by CliftonLarsonAllen LLP, identified three findings specific to Maryland's TANF/TCA program: (1) Finding 2023-018, a Significant Deficiency in ACF-199 and ACF-209 data reporting related to time-limit exemptions, countable months, and work participation codes, attributed to errors in implementing a new case file system; (2) Finding 2023-019, a Significant Deficiency in child support non-cooperation benefit reduction, involving one participant whose benefit was reduced by less than the required 25 percent; and (3) Finding 2023-020, a Significant Deficiency related to Special Tests and Provisions governing penalties for refusal to work. Maryland agreed with all three findings. The subsequent Single Audits covering fiscal years ended June 30, 2024 and June 30, 2025, conducted by CliftonLarsonAllen LLP and SB & Company, LLC respectively, identified no findings specific to Maryland's TANF/TCA program.. Public information about the state's participation can be found here: https://www.marylandcomptroller.gov/content/dam/mdcomp/md/reports/expenditures /Single-Audit-Report-FY2023.pdf

33. There has historically been little federal oversight of Maryland's  TANF program beyond the Single Audit, and required federal reporting described above. To my

knowledge, in the past three years, ACF has not conducted any of the following activities with respect to Maryland's TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures.

**TANF SORN**

34. I understand that on June 23, 2026, U.S. ACF, which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

35. *First*, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act".

36. The TANF SORN adds a new additional purpose:

> "[T]o ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security, U.S. Citizenship and Immigration Services (formerly the U.S.

13

Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d)."

37. **Second,** the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.*, State agencies), but also "verification information" obtained "from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

38. **Third**, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* MDHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

39. **Fourth**, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

## HARM To Maryland

40. Without Court intervention, Maryland faces harm stemming from the TANF SORN.

41. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs

14

and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

42. As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require Maryland to expend time and resources responding to ACF requests. For example, many of the eligibility requirements, documentation is not kept at the state level and instead is maintained by LDSS. Any additional information required to be provided by Maryland would necessitate a time- and labor-intensive process of collecting documentation from LDSS. This would be separate from the process that, as noted above, Maryland already engages in on a regular basis as part of its efforts to monitor LDSS to ensure that LDSS follow all state and federal requirements regarding TANF eligibility.

43. Furthermore, these requirements create substantial opportunity costs, as personnel will be diverted from their primary duties—including the processing of benefit applications, conducting of timely eligibility redeterminations, and the direct provision of case management services to vulnerable Maryland residents—thereby undermining the efficient and equitable administration of these critical public assistance programs.

44. As to immigration status verification in particular, these agency oversight activities are likely to lead to misleading and improper results. For instance, an individual's

15

immigration status evolves over time, creating a mismatch with the specific timeline of state-level status verifications.

45. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts for Maryland, with likely staffing reductions and the elimination of non-mandated services.

46. Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with MDHS and Immigration and Customs Enforcement (ICE) for use in immigration enforcement activities. *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-information-sharing-between-the-centers-for-medicare-and-medicaid-services-and. In this environment, the SORN's announcement that ACF plans to begin sharing Maryland's TANF recipients' data with MDHS will cause additional harm to Maryland, as it risks eroding the trust that MDHS and LDSS have developed with immigrant communities in Maryland.

47. Further, the TANF SORN will erode the trust that Maryland has developed with immigrant communities and deter individuals from participating in TANF. Maryland

16

has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, and has told applicants that State and local TANF administrators would confirm that status with the federal government. Maryland has also encouraged eligible households—including families with U.S. citizen children who are and have always been eligible for TANF— to take advantage of TANF and other assistance to help raise their children and families out of poverty. Maryland has also made assurances to TANF recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in Maryland's TANF programs by citizens and qualified non-citizens alike. Households of mixed immigration status—where U.S. citizen children reside with parents of uncertain or undocumented standing—are particularly vulnerable. Eligible minors may be deprived of essential support if families believe that the application process facilitates immigration enforcement against household members. Survivors of domestic violence would be subject to further risks, as the intersection of immigration status and domestic violence indicators within a centralized federal database could create a profile that heightens their vulnerability. Those seeking safety may decline to disclose such abuse during the TANF assessment process, thereby compromising the efficacy of the Family Violence Option and fundamental program safety protocols.

17

48. The chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in the TANF if they believe that doing so will expose their sensitive personal and their family information to widespread disclosure. Such concerns are bolstered by public reporting into the Department of Homeland Security's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' TANF programs. Participants who have been assured of data privacy may perceive breaches as a betrayal of trust, which would undermine the integrity of TANF and potentially jeopardize the relationship between citizens and all other State-administered programs.

49. If fewer individuals participate in TANF, Maryland will suffer significant harms. Beyond basic recurring cash assistance, TANF offers eligible households critical resources such as childcare scholarships, transportation assistance like bus passes, and vital employment supports. These programs facilitate occupational training and barrier remediation services that are compromised if a resident loses access to benefits. Consequently, any reduction in participation would likely result in increased fiscal burdens for the State.

50. Maryland will also incur a financial cost in updating communications with TANF applicants or participants that notify TANF applicants or participants of how their personal data is collected, used, and shared. Recipients receive notifications through

18

electronic channels, correspondence sent to physical and mailing addresses, and social media platforms. Implementation of these outreach efforts necessitates the expenditure of departmental resources, specifically staff hours and physical material costs for printed mailings.

DATED: July 28, 2026

_Stacy L. Rodgers_
Stacy L. Rodgers
Acting Secretary of Human Services