# EXHIBIT 23

## <u>DECLARATION OF KIMBERLY MEROLLA-BRITO, DIRECTOR OF RHODE ISLAND DEPARTMENT OF HUMAN SERVICES</u>

1.      I, Kimberly Merolla-Brito, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

2.      I am the Director of the Rhode Island Department of Human Services ("RIDHS") and have held this position since June 2022.

3.      I am the Chief Executive Officer of the RIDHS and oversee all aspects of the RIDHS.

4.      The R.I. Department of Human Services is a Rhode Island State Executive branch agency that delivers critical benefits, supports and services to more than 300,000 families, adults, children, older adults, individuals with disabilities and veterans every year. These programs include but are not limited to the Supplemental Nutrition Assistance Program ("SNAP"), Temporary Assistance for Needy Families-Rhode Island Works, Child Care Assistance Program, determining eligibility for Medicaid, and Long-Term Support Services. Through these programs, RIDHS strives to ensure families are strong, productive, healthy, and independent, so that adults are healthy and reach their maximum potential, children are safe, healthy, ready to learn and reach their full potential, Child Care providers deliver high quality services to assist adults when preparing for and/or entering the workforce. RIDHS ensures older adults, seniors and individuals with disabilities receive all necessary services to enhance their quality of life, and Veterans are cared for and honored.

5.      I am familiar with the information in the statements set forth below either through personal knowledge, consultation with RIDHS staff, or from my review of relevant documents and information.

*TANF in Rhode Island*

6.    RIDHS is the single State agency, within Rhode Island, that administers TANF in Rhode Island.

7.    TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income families with children. It is one of the largest sources of cash assistance to low-income families and is a cornerstone of Rhode Island's anti-poverty work. Rhode Island receives approximately $94.7 million annually in TANF funding and provides 7,944 Rhode Island residents with basic recurring cash assistance and non-cash assistance benefits.

8.    The goal of Rhode Island's TANF program, (hereafter RI Works) is to eliminate or reduce the harmful effects of poverty on families and children by fostering employment and opportunity as a means to economic independence (RIGL § 40-5.2-6 (a)); and to eliminate the stigma of welfare by promoting a philosophy and a perception that the purpose of welfare is to eliminate or reduce the harmful effects of poverty on families and children by promoting work opportunities for all Rhode Island residents (RIGL § 40-5.2-6 (c)). All activities and services provided through the RI Works program are intended to promote stability and economic progress for families through the provision of supportive services, the development of employment skills, and intensive work readiness services. The RI Works program supports adult family members to work by offering the following benefits and services:

- **Cash Assistance** is provided to families experiencing poverty that meet specific eligibility requirements through federal law, state law, and state regulations.
- **Comprehensive Assessment and Service Planning** for families receiving cash assistance is mandatory.

2

• **Child Care Assistance** is utilized to provide support to the family so household member(s) can prepare to enter or enter the workforce while providing families with equitable access to high-quality, safe, affordable child care, when needed

• **Employment Supports** which include assistance with job training, adult education, and obtaining employment at livable wages.

• **Transportation** reimbursement and/or bus passes are available to support preparation for employment.

*Rhode Island's TANF Fraud Prevention Procedures*

9.    RIDHS, on behalf of Rhode Island, ensures that robust procedures are in place to prevent ineligible TANF benefits distributions and address erroneous payments or attempted fraud.

10.    To ensure TANF funds are issued only to TANF eligible recipients, RIDHS has a robust eligibility determination process that RIDHS must follow for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF funded services and supports. Further, RIDHS conducts reviews of cases to ensure program compliance, in accordance with federal and State statutes, rules and regulations. RIDHS provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, phone calls, and emails to staff making eligibility determinations to help guide them in ensuring the accuracy of their determinations.

11.    Applicants and recipients of cash assistance grants must document to RIDHS that they are TANF eligible as part of the application and recertification process. Additionally, if a household experiences a change between certifications, they are required to report the change to the RIDHS within 10 days to ensure that the household continues to be eligible for the assistance.

12.    Such eligibility determination process includes an interview conducted by the RIDHS with the applicant and recipient. As part of this determination/redetermination process, the

3

district collects appropriate documents to determine eligibility. Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to RIDHS to provide verification of those factors which affect initial eligibility and benefit amount, including: identity, residence, family composition, housing costs, income and resources, and United States citizenship or, if not a United Citizen, evidence of satisfactory immigration status for TANF eligibility.

13.    Additionally, RIDHS requires that staff determining eligibility utilize approved federal and State processes to validate and monitor for compliance with program eligibility for each applicant and recipient of TANF-funded cash assistance. RIDHS conducts checks using federal agency-maintained systems such as the Systematic Alien Verification for Entitlement ("SAVE") program and the Public Assistance Reporting Information System ("PARIS"), the National Directory of New Hires ("NDNH"), the Beneficiary and Earnings Data Exchange ("BENDEX"), the State Wage Information Collection Agency ("SWICA"), the State Verification and Exchange System ("SVES"), the State Online Query ("SOLQ"), Social Security Administration ("SSA") interfaces including those providing retirement, survivors, and disability insurance payments, Supplemental Security Income ("SSI"), death master files, and verification of social security numbers ("SSN") among others. Rhode Island also matches TANF data against various state interfaces such as workers' compensation insurance, unemployment insurance, death records, child support payments and prisoner database. There are specified indicators that could uncover potential fraud or misleading/erroneous statements on the application. Any indicators that cannot be resolved by the eligibility worker are referred for investigation prior to the case being opened.

4

14.     RIDHS also ensures that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. RIDHS utilizes the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7 to confirm continuing eligibility and benefit levels. RIDHS uses IEVS to receive federal tax information, which is used to confirm whether an individual's income and resources permit them to be eligible for TANF. Federal law and the written agreements that RIDHS signs to access this income and eligibility information require RIDHS to confirm the accuracy of any red flags raised by such data matches, and to provide affected individuals an opportunity to contest these data findings, before terminating, denying, suspending or reducing benefits to an applicant or recipient. Accordingly, cases that appear to have income exceeding TANF income and resources are referred to the Office of Internal Audit to determine if the identified income and resources are available and if they impact the recipient's continuing eligibility.

15.     RIDHS also reviews the Public Assistance Reporting Information System (PARIS) Interstate match to identify if an individual is receiving benefits in more than one state at the same time. RIDHS refers match results to the Office of Internal Audit for investigation and appropriate case action.

16.     RIDHS conducts a Prison Match to identify cash assistance recipients who are incarcerated and have been sentenced to a term in a Rhode Island prison or a federal prison as reported on the SSA Federal Prison file. RIDHS refers match results to RIDHS eligibility technicians for follow up and appropriate case action.

17.     RIDHS also undertakes a quarterly match to identify individuals whose Electronic Benefits Transfer (EBT) cash transactions are conducted 100% out of state during a calendar quarter which may indicate residence in a state other than Rhode Island. The matches are then

referred to the Office of Internal Audit for investigation. Based upon the results of that investigation, appropriate case action is then taken by the social services district.

18.     RIDHS performs monthly matches of active TANF recipients with the federal National Directory of New Hires (NDNH), which contains nationwide W-4 information. The TANF matches involve all active adult recipients. NDNH matches are verified through a third-party vendor or by sending Manual Employment Verification (MEV) forms to employers. Responses from the third-party vendor and MEVs are provided to RIDHS eligibility technicians for follow up and appropriate case action.

19.     RIDHS also runs daily and monthly matches against the Rhode Island Directory of New Hires, to identify applicants and recipients who have filed a W-4 with Rhode Island and thus potentially identify new employment that could impact TANF eligibility.

20.     The Welfare Fraud Reporting Web-based Referral System enables the public to electronically submit welfare fraud allegations to RIDHS. These submissions contain information regarding individuals suspected of public assistance fraud and are referred to the Office of Internal Audit by RIDHS for investigation and appropriate case action.

21.     In addition to computer matches, RIDHS is required to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When RIDHS determines it has issued benefits to a recipient as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to the Office of Internal Audit.

22.     Moreover, as part of its internal controls, RIDHS conducts work participation verification reviews, which are a quality assurance process that selects representative samples of work-eligible assistance cases for purposes of verifying the accuracy of the participation reporting

processes, the accuracy of reporting, and compliance with federal and state regulations. RIDHS conducts a yearly review of a sample of cases according to Rhode Island's HHS-approved Work Verification Plan. The RIDHS is required to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When the RIDHS determines benefits were issued as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to the Office of Internal Audits. If the client is found to have committed an fraud, the claim is established and recovery is sought from the client.

23.     The Single State Audit process is used to identify areas of concern and improve processes, data collection, and case integrity issues. All levels of staffing, from front-line workers to administration, participate in the audit and any corrections identified.

### *Rhode Island's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status*

24.     Rhode Island requires and utilizes the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien status.

25.     The eligibility system will trigger a SAVE request by getting the immigration details for the individual for whom the verification is requested for. Next, it will generate a web service call to get a response from the USCIS. The eligibility system processes the response based on an eligibility status code which will mark the immigration status as verified or not verified. If it is not verified, the system will initiate a 2nd and 3rd level SAVE request if needed. SAVE verifications (uscis.gov ) can also be initiated by RI DHS designated staff logging into the SAVE system and manually entering the immigration information.

26.    Copies of all immigration documents provided to RIDHS are uploaded into the individual's electronic case file. Additionally, all responses received from USCIS.gov are printed and scanned into the individual's electronic case file.

27.    As required by law, Rhode Island imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF. More specifically, R.I. General Laws § 40-6-12, Records as to Assistance, states "All records pertaining to the administration of public assistance pursuant to this chapter and chapter 8 of this title are hereby declared to constitute confidential matter. It shall be unlawful for any person to make use of, or cause to be used, any information contained in records for purposes not directly connected with the administration thereof, except with the consent of the individual concerned."

***Federal Oversight of Rhode Island's TANF Program***

28.    Pursuant to federal statute and regulation, RIDHS provides certain data on families receiving TANF assistance to ACF on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

29.    Among other things, RIDHS provides ACF with the data fields specified in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, social security number, date of birth, and, as to immigration status, an individual's status as either "U.S. Citizen," "Qualified alien," or "Unknown."

30.    RIDHS is a full data state and provides this information for all families receiving TANF assistance in Rhode Island.

31.    Pursuant to the federal Single Audit Act, RIDHS engages an auditor with respect to its TANF program. This audit takes place yearly since it is identified as a major program. The Auditor General conducts the Single Audit per the federal requirement. The audit standards are

8

governed by the GAAS, Yellow Book, and UGG. The audit evaluates all aspects of the program that include reviewing federal reports for accuracy and timeliness, client flow processes, and focused mostly on auditing cases for eligibility criteria. https://www.budget.ny.gov/guide/bprm/l/l-0300.pdf.

32.     There has historically been no federal oversight of Rhode Island's TANF program beyond the Single Audit and required federal reporting described above.

33.     To my knowledge, ACF has never performed any of the following activities with respect to Rhode Island's TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures.

***TANF SORN***

34.     I understand that on June 23, 2026, U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

35.     *First*, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act". The TANF SORN adds a new additional purpose:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial

9

audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

36.     *Second,* the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.,* State agencies), but also "verification information" obtained "from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

37.     *Third,* the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

38.     *Fourth,* the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

### *HARM To Rhode Island*

39.     Without Court intervention, Rhode Island faces harm stemming from the TANF SORN.

40.     The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

41.     As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require Rhode Island to expend time and resources responding to ACF requests. Any additional information required to be provided by Rhode Island would necessitate a time- and labor-intensive process of collecting documentation. This would be separate from the process that, as noted above, Rhode Island already engages in on a regular basis as part of its efforts to monitor programs to ensure that field staff follow all state and federal requirements regarding TANF eligibility.

42.     As to immigration status verification in particular, these agency oversight activities are likely to lead to misleading and improper results. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts for Rhode Island.

43.     Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with DHS and Immigration and Customs

Enforcement (ICE) for use in immigration enforcement activities. *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-information-sharing-between-the-centers-for-medicare-and-medicaid-services-and. In this environment, the SORN's announcement that ACF plans to begin sharing Rhode Island's TANF recipients' data with DHS will cause additional harm to Rhode Island as it risks eroding the trust that RIDHS has developed with immigrant communities in Rhode Island. RIDHS has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, provide documentation of that status, and has told applicants that RIDHS would verify that status with the federal government. But RIDHS has also encouraged eligible households to take advantage of TANF and other assistance to help raise their children and families out of poverty. If ACF begins sharing TANF data with DHS, then community fears that DHS will use that data for purposes other than valid eligibility checks will impede that public trust.

44. Rhode Island has also made assurances to TANF recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in Rhode Island's TANF programs by citizens and qualified non-citizens alike.

45. This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in

12

the TANF if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure. Such concerns are bolstered by public reporting into DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' TANF programs.

46.     Rhode Island will also incur a financial cost in updating communications with TANF applicants or participants that notify TANF applicants or participants of how their personal data is collected, used, and shared. In addition, these changes will in turn require RIDHS to dedicate numerous information technology professionals, communications and operational resources, and administrative staff. This in turn will cause RIDHS to deprioritize numerous other pressing and important projects, including ongoing management of other RIDHS-issued benefits as well as preparation for upcoming changes following the effective date of the H.R.1. Running these changes within RIDHS's production system will cause significant strain on RIDHS's already overworked infrastructure and interfere with department operations.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed in Cranston, Rhode Island on July 30, 2026.

Kimberly Merolla-Brito
Director
R.I. Department of Human Services

13