**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF NEW YORK
28 Liberty St.
New York, NY 10005

DISTRICT OF COLUMBIA
400 Sixth St. NW
Washington, DC 20001

STATE OF CALIFORNIA
455 Golden Gate Ave.
San Francisco, CA 94102

STATE OF ARIZONA
2005 N. Central Ave.
Phoenix, AZ 85004

STATE OF COLORADO
1300 Broadway
Denver, CO 80203

STATE OF CONNECTICUT
165 Capitol Ave.
Hartford, CT 06106

STATE OF DELAWARE
820 N. French St.
Wilmington, DE 19801

STATE OF HAWAI‘I
425 Queen St.
Honolulu, HI 96813

STATE OF ILLINOIS
115 S. LaSalle St.
Chicago, IL 60603

OFFICE OF THE GOVERNOR *ex rel. Andy Beshear, in his official capacity as Governor of the* COMMONWEALTH OF KENTUCKY
501 High St.
Frankfort, KY 40601

Case No. ~~_______________~~1:26-CV-02726-JEB

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

STATE OF MAINE
6 State House Station
Augusta, ME 04333

STATE OF MARYLAND
200 Saint Paul Pl.
Baltimore, MD 21202

COMMONWEALTH OF MASSACHUSETTS
One Ashburton Pl.
Boston, MA 02108

STATE OF MICHIGAN
525 W. Ottawa St.
Lansing, MI 48909

STATE OF MINNESOTA
445 Minnesota St.
St. Paul, MN 55101

STATE OF NEVADA
1 State of Nevada Way
Las Vegas, NV 89119

STATE OF NEW JERSEY
124 Halsey St.
Newark, NJ 07101

STATE OF NEW MEXICO
408 Galisteo St.
Santa Fe, NM 87501

STATE OF OREGON
100 SW Market St.
Portland, OR 97201

JOSH SHAPIRO, *in his official capacity as Governor of the* COMMONWEALTH OF PENNSYLVANIA
30 North 3rd St.
Harrisburg, PA 17101

STATE OF RHODE ISLAND
150 South Main St.
Providence, RI 02903

STATE OF VERMONT
109 State St.
Montpelier, VT 05609

COMMONWEALTH OF VIRGINIA
202 North Ninth St.
Richmond, VA 23219

STATE OF WASHINGTON
800 Fifth Ave.
Seattle, WA 98104

STATE OF WISCONSIN,
PO Box 7857
Madison, WI 53707-7857

Plaintiffs,

v.

ADMINISTRATION FOR CHILDREN AND FAMILIES
Mary E. Switzer Building
330 C St. SW
Washington, DC 20201

ALEX J. ADAMS, *in his official capacity as the* ASSISTANT SECRETARY OF THE ADMINISTRATION FOR CHILDREN AND FAMILIES
Mary E. Switzer Building
330 C St. SW
Washington, DC 20201

OFFICE OF FAMILY ASSISTANCE
Mary E. Switzer Building
330 C St. SW
Washington, DC 20201

DAVID SWEGLE, *in his official capacity as the* DIRECTOR OF THE OFFICE OF FAMILY ASSISTANCE
Mary E. Switzer Building
330 C St. SW
Washington, DC 20201

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
Hubert H. Humphrey Building
200 Independence Ave. SW
Washington, DC 20201

ROBERT F. KENNEDY, JR., *in his official capacity as the* SECRETARY OF HEALTH AND HUMAN SERVICES~~,~~
Hubert H. Humphrey Building
200 Independence Ave. SW
Washington, DC 20201

U.S. DEPARTMENT OF HOMELAND SECURITY
2707 Martin Luther King Jr. Ave. SE
Washington, DC 20528-0525

MARKWAYNE MULLIN, *in his official capacity as the* SECRETARY OF HOMELAND SECURITY
2707 Martin Luther King Jr. Ave. SE
Washington, DC 20528-0525

Defendants.

## INTRODUCTION

1. The Administration for Children and Families (ACF) has issued a notice that, as of August 11September 30, will authorize the disclosure of records containing the sensitive personal information of millions of individuals receiving assistance under the Temporary Assistance for Needy Families (TANF) program to any public or private entity that ACF chooses, at any time, for the purpose of scrutinizing States' compliance with any provision of the TANF statute. ACF claims that it may engage in this wholesale disclosure of recipients' Social Security numbers, marital status, parentage, immigration status, and numerous other personal details as part of its task of ensuring that Plaintiff States and other TANF grantees comply with "all" TANF program requirements. But nothing in the TANF statute authorizes either this open-ended disclosure or the sweeping oversight authority ACF claims. And a battery of federal privacy statutes—among them the Privacy Act, the Social Security Act, and the statute setting confidentiality rules for the Department of Health and Human Services—affirmatively bar the disclosure. The notice is also contrary to the reasoned-decisionmaking requirements of the Administrative Procedure Act and the Spending Clause. For all of these reasons—each of which is independently fatal—the system of records notice is unlawful and should be swiftly enjoined. And ACF's recently revealed policy permitting the disclosure of records to any other agency or entity for "program integrity" purposes—pursuant to which ACF and DHS secretly engaged in a bulk transfer of TANF recipients' and family members' data the Department of Homeland Security (DHS) in September 2025—is likewise unlawful and should be promptly enjoined, as well.

2. The TANF program provides States billions of dollars each year that they rely on to keep needy families with dependent children out of poverty. In designing this program, Congress gave States substantial flexibility and autonomy, with the aim of eliminating the excessive

bureaucracy and overbearing federal oversight that it believed had plagued prior child-poverty programs. Thus, the TANF statute gives States broad discretion to design TANF programs that achieve the statute's goals, entrusts them with confirming the eligibility of program beneficiaries, and charges them with safeguarding individuals' sensitive information.

3. By contrast, the statute sharply limits the federal government's role in administering TANF. It restricts ACF mainly to confirming that States submit complete TANF plans and to penalizing them when they run afoul of specific, identified statutory requirements. And it makes clear that those responsibilities are exclusive: The statute provides that "[n]o officer or employee of the Federal Government may regulate the conduct of States under this part or enforce any provision of this part, except to the extent expressly provided in this part." 42 U.S.C. § 617.

4. What is more, Congress has enacted a web of statutes that require ACF to carefully safeguard the sensitive personal information that State agencies collect from TANF recipients, and that States report to ACF for strictly limited purposes. One statute bars ACF, like many other components of the Department of Health and Human Services, from disclosing "any" information it obtains except as prescribed by regulation or authorized by statute. 42 U.S.C. § 1306(a)(1). Another statute bars ACF, like other government entities, from disclosing the Social Security numbers or "related records" of any individual. *Id.* § 405(c)(2)(C)(viii)(I). A third enactment makes it a criminal offense for government agencies to disclose information concerning the "identity" or the "amount or source of any income . . . of any person." 18 U.S.C. § 1905. And the Privacy Act—one of the nation's core protections of personal privacy—prohibits ACF from disclosing any records contained in a system of records unless one of the statute's carefully drawn exceptions applies. 5 U.S.C. § 552a(b).

5. Notwithstanding these express limits on its authority, on June 23, 2026, ACF issued a System of Records Notice (SORN), ~~attached as Exhibit 1,~~ that purports to dramatically broaden the agency's role in overseeing TANF and authorize the wholesale sharing of TANF recipients' and their family members' most sensitive personal information with any federal, State, or private entity it wishes. Under this Notice, ACF claims that it possesses authority to "ensure compliance with *all* TANF program requirements," 91 Fed. Reg. 37,406, 37,407 (2026) (emphasis added), not just those "expressly" entrusted to it by statute. *Cf.* 42 U.S.C. § 617. Relying on that sweeping claim of authority, ACF asserts that it may share years' worth of data it has collected—including millions of TANF beneficiaries' Social Security numbers, marital status, income, and more—with the Department of Homeland Security (DHS) (and any other federal or State agency or private entity), to "ensure and confirm" State compliance with any TANF program requirements. 91 Fed. Reg. at 37,407–08.

6. Nothing in the TANF statute or any other act supports ACF's extravagant claims of authority and gross breach of personal privacy. There is no provision of the TANF statute that "expressly" authorizes ACF to enforce "all" provisions of the TANF statute against the States; indeed, the statute says precisely the opposite. 42 U.S.C. § 617. In addition, the sharing of such information runs afoul of a thicket of federal privacy protections. The sharing of TANF recipients' and their family members' personal information is not "prescribe[d]" by regulation or "otherwise provided by Federal law," *id.* § 1306(a)(1); to the contrary, the TANF statute assigns the *States* the role of deciding—"as the State deems necessary"—how "information about individuals and families receiving assistance" under TANF can be "use[d] and disclos[ed]." 42 U.S.C. § 602(a)(1)(A)(iv). The SORN also entails the sharing of Social Security numbers and "related records" expressly prohibited by 42 U.S.C. § 405(c)(2)(C)(viii)(I). And it is barred by the Privacy

Act for numerous reasons—including because ACF's information sharing is not "compatible" with the use for which the records were collected and because the agency did not notify individuals of the planned disclosures at the time the information was collected. *See* 5 U.S.C. § 552a(a)(7), (b)(3), (e)(3)–(4).

7. ACF's action is also procedurally invalid and constitutionally infirm. It is arbitrary and capricious, in violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559, 701–706, because ACF has given no reasoned explanation for its departure from longstanding agency practice, because it failed to weigh costs and benefits or reliance interests, and because it is inherently arbitrary for the agency to share information to assist oversight activity that is ably performed by States and that ACF cannot lawfully perform. ACF has also not entered into a "computer matching agreement required for it to share data that will be compared with information in another agency's computer system. *Id.* § 552a(o). Further, these abrupt changes violate the Spending Clause, because Plaintiff States could not have foreseen these potential uses and disclosures years ago when they collected and shared this data with ACF under established TANF program rules.

8. Although the SORN itself is problematic enough, subsequent to the initial filing of the Complaint, Plaintiffs learned further troubling information: starting in 2025, ACF initiated a policy of permitting the bulk disclosure of States' TANF information outside the agency for "program integrity" purposes. Defendants have now confirmed that ACF shared States' individual level TANF data with DHS at least once in September 2025 ("the September 2025 Data Transfer"). And ACF has taken the position that its preexisting SORN permits it to share information with any government or private entity it wishes for purposes of program-integrity review—including reviews of whether States are properly verifying recipients' eligibility—thereby rendering its new

SORN entirely superfluous. Until this litigation, neither ACF nor DHS had ever publicly disclosed this bulk data sharing policy ("the Data Disclosure Policy") nor the September 2025 Data Transfer to the public, the States, or the individuals to whom the records pertain.

9. The September 2025 Data Transfer and the Data Disclosure Policy are unlawful for nearly all of the reasons as the SORN, and more besides. No statute gives ACF authority to share TANF data with DHS or any other agency for purposes of reviewing a State's compliance with the TANF statute, and its bulk data sharing policy runs afoul of the HHS confidentiality statute, the Social Security Act, and the Trade Secrets Act. What is more, ACF did not comply with the requirements of the Privacy Act before undertaking this data sharing: contrary to Defendants' claims, the SORN in place at the time plainly did not authorize it; the SORN challenged in this lawsuit, issued nearly a year later, appears to be a belated attempt to paper up the data-sharing that had already happened; and Defendants did not enter a computer-matching agreement required for bulk data matching. And the adoption and implementation of a secret, unexplained policy at odds with decades of practice contravenes the most basic requirements of the Administrative Procedure Act.

~~8.~~10. Defendants' actions impose direct and significant costs on the States. Their decision to hand over sensitive beneficiary information for millions of people to DHS, in conflict with longstanding privacy protections and the assurances of confidentiality that States have long provided to needy families, will erode the trust that State agencies have developed with TANF recipients and will deter qualified beneficiaries from applying for TANF benefits, forcing Plaintiff States to spend more of their own money to ensure that families are housed and children do not go hungry. At the same time, Plaintiff States themselves will have to divert scarce resources to respond to ACF's unlawful new "oversight activities," which are designed to interfere with States' lawful

administration of their TANF programs. And Plaintiff States must take immediate steps to revise their systems and notices in order to ensure they are disclosing to TANF recipients this new (unlawful) use of their family's personal information.

~~9.~~11. This Administration has used every means at its disposal to erode federal confidentiality protections and deploy unsubstantiated allegations of "fraud" in order to target Plaintiff States' antipoverty programs, TANF included, and particularly to target the benefits these programs provide by law to qualified immigrants and children in immigrant communities. Courts have repeatedly enjoined the Administration's prior efforts to share information in violation of federal confidentiality protections and to target disfavored benefit recipients. For instance, the U.S. District Court for the Southern District of New York recently blocked the Administration's efforts to freeze TANF funding based on unsubstantiated fraud claims. *See New York v. Admin. for Children & Families*, No. 26-CV-172, ___ F. Supp. 3d ___, 2026 WL 673848, at *28 (S.D.N.Y. Mar. 10, 2026). ~~This SORN~~The actions challenged in this case merely represent~~s~~ the latest chapter in those ongoing and legally flawed efforts. The Court should declare the SORN, the revision to the TANF system of records it creates, the September 2025 Data Transfer, and the Data Disclosure Policy unlawful, enjoin ~~its~~their implementation as to Plaintiff States, and restore the protections that Congress enacted for States that participate in TANF and for the millions of individuals who have entrusted their most sensitive information to States under assurances of confidentiality. The Court should also order DHS to cease using and expunge any TANF records that it has received or will receive as a result of ACF's disclosures.

**JURISDICTION AND VENUE**

~~10.~~12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States). Jurisdiction is also proper under the judicial review

provisions of the APA. 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

~~11.~~13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district, and Defendants are United States agencies or officers acting in their official capacities.

**PARTIES**

~~12.~~14. Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Exec. Law § 63 to pursue this action.

~~13.~~15. Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb, who has general charge and conduct of all legal business of the District and all suits initiated by and against the District. D.C. Code. § 1-301.81.

~~14.~~16. Plaintiff the State of California is a sovereign State of the United States of America. California Attorney General Rob Bonta is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of the State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510–12511.

~~15.~~17. Plaintiff the State of Arizona joins this action by and through Attorney General Kristin Mayes, who is the chief law enforcement officer of the State and authorized to "[r]epresent this state in any action in a federal court." Ariz. Rev. Stat. § 41-193(A)(3); *see* Ariz. Const. art. V, § 1(A).

~~16.~~18. Plaintiff the State of Colorado, represented by and through its Attorney General Phil Weiser, is a sovereign State in the United States of America. The Attorney General acts as the chief legal representative of the State and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

~~17.~~19. Plaintiff State of Connecticut is a sovereign State of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under Conn. Gen. Stat. § 3-125 to pursue this action on behalf of the State of Connecticut.

~~18.~~20. Plaintiff State of Delaware is a sovereign State of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

~~19.~~21. Plaintiff the State of Hawai'i, represented by and through its Attorney General Anne Lopez, is a sovereign State of the United States of America. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Haw. Rev. Stat. § 28-1 to pursue this action.

~~20.~~22. Plaintiff the State of Illinois is a sovereign State of the United States of America. The State of Illinois is represented in this action by the Attorney General of Illinois, who is the

chief legal officer of the State and is authorized to pursue this action on behalf of the State under Article V, Section 15 of the Illinois Constitution and 15 Ill. Comp. Stat. § 205/4.

~~21.~~23. Plaintiff Office of the Governor, ex rel. Andy Beshear, brings this suit in his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," *id.* § 81. In taking office, Governor Beshear swears an oath that he will support the Constitution of the United States and the Kentucky Constitution. *Id.* § 228.

~~22.~~24. Under Kentucky statute, the Governor is the head of his General Cabinet and his Executive Cabinet. Ky. Rev. Stat. §§ 11.060, 11.065. The Governor's Executive Cabinet consists of the Secretaries of executive branch cabinets, including the Kentucky Cabinet for Health and Family Services, within which is the Department for Community Based Services. *Id.* § 11.065. Both the Governor's General Cabinet and Executive Cabinet must consider matters involving policies and procedures and advise and consult with the Governor on all matters affecting the welfare of the State and relating to the Executive Branch cabinets and agencies. *Id.* §§ 11.060, 11.065.

~~23.~~25. The Governor appoints each Executive Branch cabinet secretary. *Id.* § 12.255. The secretaries of each cabinet must serve as the Governor's liaison in carrying out the responsibilities for overall direction and coordination of the agencies in each cabinet. *Id.* § 12.270(1). Among other things, the secretaries must "advise the Governor on executive actions, legislative matters, and other steps that may be desirable for better program service." *Id.* Each cabinet secretary is authorized to accept and expend funds from any source, whether public or private, in support of the duties and responsibilities of the cabinet. *Id.* § 12.270(2).

~~24.~~26. Plaintiff the State of Maine is a sovereign State of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to Me. Rev. Stat. Ann. tit. 5, § 191.

~~25.~~27. Plaintiff the State of Maryland is a sovereign State of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

~~26.~~28. Plaintiff Commonwealth of Massachusetts is a sovereign State in the United States of America. Massachusetts is represented by Andrea Joy Campbell, the Commonwealth's chief legal officer.

~~27.~~29. Plaintiff the State of Michigan is a sovereign State of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

~~28.~~30. Plaintiff the State of Minnesota is a sovereign State of the United States of America. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who has common law and statutory authority to sue on Minnesota's behalf.

~~29.~~31. Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

~~30.~~32. Plaintiff the State of New Jersey is a sovereign State of the United States of America, and by and through Attorney General Jennifer Davenport, brings this action. The Attorney General of New Jersey is the New Jersey's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern. N.J. Stat. Ann. § 52:17A-4.

~~31.~~33. Plaintiff the State of New Mexico is a sovereign State of the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico.

~~32.~~34. Plaintiff the State of Oregon is a sovereign State of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

~~33.~~35. Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 Pa. Stat. §§ 732-204(c), 732-301(6).

~~34.~~36. Plaintiff the State of Rhode Island is a sovereign State in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

~~35.~~37. Plaintiff the State of Vermont is a sovereign State of the United States of America. Vermont is represented by its Attorney General, Charity R. Clark, who is the chief legal officer of Vermont and has authority to represent the State in this matter.

~~36.~~38. Plaintiff Commonwealth of Virginia is a sovereign State of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. *Id.* § 2.2-513.

~~37.~~39. Plaintiff the State of Washington, represented by and through the Attorney General, is a sovereign State of the United States of America. Attorney General Nick Brown is Washington's

chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

~~38.~~40. Plaintiff the State of Wisconsin is a sovereign State in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

~~39.~~41. Defendant Administration for Children and Families is an executive branch agency within the federal government, headquartered in Washington, D.C. It is a component of the United States Department of Health and Human Services.

~~40.~~42. Defendant Alex J. Adams is the Assistant Secretary for Family Support and leads the Administration for Children and Families. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

~~41.~~43. Defendant Office of Family Assistance is an executive branch agency within the federal government, headquartered in Washington, D.C. It is a component of the Administration for Children and Families within the United States Department of Health and Human Services, responsible for administering the TANF program.

~~42.~~44. Defendant David Swegle is the Director of the Office of Family Assistance. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

~~43.~~45. Defendant the United States Department of Health and Human Services is a cabinet agency within the executive branch of the United States government. 42 U.S.C. § 3501.

~~44.~~46. Defendant Robert F. Kennedy, Jr., is the Secretary of Health and Human Services, and the Department of Health and Human Services' highest ranking official. He is charged with

the supervision and management of all decisions and actions of that agency. *Id.* He is sued in his official capacity.

47. Defendant U.S. Department of Homeland Security is a cabinet level department of the executive branch of the United States government. 6 U.S.C. § 111.

48. Defendant Markwayne Mullin is the Secretary of Homeland Security and the Department of Homeland Security's highest ranking official. He is charged with the supervision and management of all decisions and actions of DHS and has direction, authority and control over the Department. 6 U.S.C. § 112. He is sued in his official capacity.

## STATUTORY AND REGULATORY BACKGROUND

### A. The Temporary Assistance for Needy Families Program

~~45.~~49. TANF is a "pass-through" program under which the federal government provides block grants to States, territories, and tribal governments, which in turn have broad discretion to use the funds to provide assistance to low-income families with children. *Navajo Nation v. Dep't of Health & Hum. Servs.*, 325 F.3d 1133, 1135 (9th Cir. 2003). TANF currently funds over $16 billion per year in grants to all fifty States, the District of Columbia, and several territories and tribal governments. It is a crucial component of Plaintiff States' anti-poverty work and one of the largest sources of cash assistance to low-income American families, providing assistance to over 1.5 million individuals in Plaintiff States each month.

~~46.~~50. Congress created TANF in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub L. No. 104-193, 110 Stat. 2105 (TANF statute codified at 42 U.S.C. §§ 601–619, often referred to as "Title IV-A"). In establishing this program, Congress sought to correct what it perceived as the flaws in its predecessor, the Aid to Families with Dependent Children (AFDC) program.

~~47.~~51. Among the principal flaws that Congress identified in AFDC was the excessive role that AFDC gave the federal government in supervising the program. The statute's drafters observed that "[m]any states are highly critical of the current welfare system's lack of flexibility and high degree of Federal regulation." H.R. Rep. No. 104-651, at 1373 (1996). And they condemned the role of "Federal bureaucrats" in "hav[ing] the last say in any decision involving the design of programs intended to attack poverty." *Id.* at 6.

~~48.~~52. TANF was designed to remedy these problems. As ACF stated in its final rule implementing the statute, TANF "reflect[ed] widespread, bipartisan agreement" that "[t]he Federal government should focus less attention on eligibility determinations and place more emphasis on program results." 64 Fed. Reg. 17,720, 17,721–22 (1999).

~~49.~~53. To that end, the statute's opening section announces that "[t]he purpose of this part is to increase the flexibility of States in operating a program designed to" achieve the goals of assisting needy families, promoting self-sufficiency, and encouraging the maintenance of family units. 42 U.S.C. § 601(a). And as "part of the tradeoff [for] state flexibility," Congress "provide[d] for a dollar limit, or 'cap,' on the federal TANF funds that a state can receive in a fiscal year," a marked change from the uncapped AFDC program, which reimbursed States for "*all* qualifying expenditures." *Pa. Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 143, 155 (3d Cir. 2012) (emphasis added).

~~50.~~54. PRWORA advances Congress's desire for more State flexibility in TANF in two mutually reinforcing ways: first, by affording the States substantial discretion to administer the program; and, second, by sharply limiting the authority of the federal government to oversee States' implementation of the program.[1]

[1] As used herein, the term "States" includes all Plaintiffs, including the District of Columbia.

### *1. Congress Gives States Broad Discretion to Implement TANF*

~~51.~~55. PRWORA grants States significant flexibility to administer TANF and to ensure that its statutory requirements are satisfied.

~~52.~~56. PRWORA provides that States may expend TANF funds "in any manner that is reasonably calculated to accomplish the purpose of this part." 42 U.S.C. § 604(a). The statute sets broad purposes for which funds can be used—such as providing assistance to needy families and ensuring that caregivers engage in work activities, *id.* § 602(a)(1)(A)—and several requirements to which they must "certify"—such as establishing protections "to ensure against program fraud and abuse," *id.* § 602(a)(6), and work participation rate requirements, *id.* § 607.

~~53.~~57. Beyond these broad outlines, however, PRWORA largely does not specify how a State must administer TANF. Instead, it leaves the States significant discretion to determine most aspects of program design, including which families are eligible for benefits, what benefits they will receive, whether to administer the program directly or through contracts with nonprofit organizations, and countless other matters.~~[2]~~ *See, e.g.*, ACF, Fiscal Year 2024 Justification of Estimates for Appropriations Committee 386 (explaining that "[S]tates . . . have broad discretion to determine their own eligibility criteria, benefit levels, and the type of services and benefits available to TANF cash assistance recipients."), https://perma.cc/UZ7D-5W8N. States have exercised that authority to fund a wide variety of benefits and services to support families in poverty, each of which the State has determined is in its residents' interest. These benefits and services include not only cash assistance, but also childcare subsidies; emergency housing for families fleeing domestic

~~[2] *See, e.g.*, ACF, Fiscal Year 2024 Justification of Estimates for Appropriations Committee 386 (explaining that "[S]tates . . . have broad discretion to determine their own eligibility criteria, benefit levels, and the type of services and benefits available to TANF cash assistance recipients."), *available at* https://acf.gov/sites/default/files/documents/olab/fy-2024-congressional-justification.pdf.~~

violence; emergency food assistance; support for grandparents caring for children in the child welfare system; pregnancy support; parental case management and workforce programming services; early childhood school readiness; and financial aid for low-income college students.

~~54.~~58. Congress also entrusted States to ensure whether individuals meet the eligibility requirements for their respective TANF programs. Each State receiving TANF funds must establish an "income and eligibility verification system," under which individuals, employers, and State agencies must submit certain information to the State (such as Social Security numbers and wage information) to confirm that individuals meet whatever income requirements the State imposes. *See* 42 U.S.C. § 1320b-7(a), (b)(1).

~~55.~~59. In addition, the statute requires States to verify a noncitizen TANF applicant's alien registration number through an automated or other system to confirm the noncitizen's immigration status. *Id.* § 1320b-7(d). The determination of which noncitizens are eligible is, however, a matter of substantial State discretion: PRWORA defines certain categories of noncitizens who are eligible for TANF and other categories who are ineligible, but otherwise provides that each "State is authorized to determine the eligibility of an alien" who does not fall within those categories. 8 U.S.C. § 1612(b)(1), (3)(A).

~~56.~~60. Furthermore, when States obtain sensitive information from individuals in the course of this process, PRWORA entrusts the States with the responsibility to safeguard their privacy. It specifies that each State must "[t]ake such reasonable steps as the State deems necessary to restrict the use and disclosure of information about individuals and families receiving assistance" under TANF. 42 U.S.C. § 602(a)(1)(A)(iv). PRWORA recognizes only limited exceptions to this restriction on use and disclosure: States may not establish safeguards that prevent the State "from furnishing a Federal, State, or local law enforcement officer, upon the request of

the officer, with the current address of any recipient" who is fleeing law enforcement or who has information necessary for the officer to conduct her official duties, *id.* § 608(a)(9)(B), and States may not establish safeguards that would interfere with providing industry councils with information for non-custodial parents "for the purpose of identifying and contacting" them regarding a TANF-authorized program on noncustodial parents, *id.* § 603(a)(5)(J).

#### 2. *PRWORA Carefully Circumscribes the Federal Government's Role in Overseeing the Administration of TANF*

~~57.~~61. In contrast with the significant flexibility and responsibility it entrusts to States, PRWORA "narrowly circumscribes" the federal government's role in administering TANF. *Pa. Dep't of Pub. Welfare*, 674 F.3d at 147.

~~58.~~62. PRWORA provides that the federal government may not take any actions to enforce the TANF statute unless the statute expressly provides otherwise. In a provision entitled "Limitation on Federal Authority," it states: "No officer or employee of the Federal Government may regulate the conduct of States under this part or enforce any provision of this part, except to the extent expressly provided in this part." 42 U.S.C. § 617. PRWORA then creates limited exceptions to this rule that grant the federal government authority to enforce the TANF statute in only a handful of circumstances relevant here.

~~59.~~63. First, PRWORA authorizes ACF, on the front end, to confirm that State-submitted plans under TANF contain the information required by statute, but not to scrutinize or regulate their contents. *See* 42 U.S.C. § 602(a).~~[3]~~ The statutory provisions referenced herein generally refer

~~[3] The statutory provisions referenced herein generally refer to the authority of the "Secretary"—that is, the HHS Secretary. *E.g.*, 42 U.S.C. § 602(a). The Secretary has delegated responsibility for administering TANF to ACF.~~

to the authority of the "Secretary"—that is, the HHS Secretary. *E.g.*, 42 U.S.C. § 602(a). The Secretary has delegated responsibility for administering TANF to ACF.

~~60.~~64. Second, PRWORA assigns ACF minimal responsibility, on the back end, to penalize States for failing to comply with certain limited specified statutory requirements. *Id.* § 609. For instance, the statute specifies that ACF may reduce a State's funding if the State fails to submit the reports required under the statute, *id.* § 609(a)(2), or if it does not "participate in" the income and eligibility verification system, *id.* § 609(a)(4). Before ACF may impose any such penalty, it must take a number of procedural steps designed to protect States from arbitrary agency action, including notifying a State of the violation in writing, allowing the State to submit a corrective compliance plan or other comments, and a period for administrative appeal. 42 U.S.C. §§ 609(c), 609(b)(1). And regardless of the nature of the State's violation, ACF is prohibited from reducing the quarterly TANF payment to any State by more than 25%. 42 U.S.C. § 609(d)(1).

~~61.~~65. Third, PRWORA authorizes ACF to collect demographic information about TANF assistance recipients and their family members (and recipients of related, State-funded programs) principally in order to produce public reports on the effectiveness of the program. PRWORA provides that States must "report to the Secretary on a quarterly basis" certain "disaggregated case record information" about members of families receiving TANF assistance, including their age, educational attainment, marital status, race, income, citizenship, and parentage. *Id.* § 611(a)(1)(A).[4] The Section 611 reporting requirements apply to "families receiving assistance under" TANF. *Id.* § 611(a)(1)(A). "Assistance" is defined as including cash payments and other

[4] ~~The Section 611 reporting requirements apply to "families receiving assistance under" TANF. 42 U.S.C. § 611(a)(1)(A). "Assistance" is defined as including cash payments and other similar expenses, but not certain other types of benefits funded by TANF, such as child care, counseling and case management. 45 C.F.R. § 260.31.~~

similar expenses, but not certain other types of benefits funded by TANF, such as child care, counseling, and case management. 45 C.F.R. § 260.31. It also permits the Secretary to require additional information by regulation, *id.* § 611(a)(7), which the Secretary has invoked to require States to provide recipients' Social Security numbers, immigration status, and dates of birth. *See* 45 C.F.R. § 265.3(b)(1); ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions ("Data Reporting Instructions"), OMB Ctrl. No. 0970-0338, https://perma.cc/VSW7-932Y. PRWORA provides that the Secretary will in turn use this data to produce "[a]nnual reports to Congress" describing the demographic characteristics of TANF recipients and assessing States' success in meeting the program's objectives. 42 U.S.C. § 611(b). And ACF, in fact, creates such reports.[5] *See* ACF, State TANF Data and Reports (June 5, 2026), https://perma.cc/A62Z-RFNM. PRWORA's provision for the collection and reporting of case information does not empower ACF to regulate the States through its own assessments. As the drafters explained, the provision simply ensures that "information on the effectiveness of State programs is publicly available," H.R. Rep. No. 104-651, at 1364, and the statute even allows States to comply with the collection requirement by providing ACF with only a small sample of the relevant data. *See* 42 U.S.C. § 611(a)(1)(B)(i).

~~62.~~66. No provision of PRWORA gives ACF open-ended authority to conduct "program integrity reviews" or to "ensure compliance with all TANF program requirements." *Cf.* 91 Fed. Reg. at 37,407. Instead, Congress specified the specific provisions of TANF that ACF may penalize States for failing to observe. And, more generally, it gave ACF authority to penalize a State only "[i]f an audit conducted under chapter 75 of title 31 finds that" the TANF funds have "been used in violation of this part." 42 U.S.C. § 609(a)(1)(A).

---

~~[5] *See* ACF, State TANF Data and Reports (June 5, 2026), *available at* https://acf.gov/ofa/programs/tanf/data-reports.~~

63. 67. Chapter 75 of title 31 is a statute that sets strict requirements for the conduct of independent audits. *See* 31 U.S.C. §§ 7501–7506. Among other things, it provides for the recipient of $300,000 or more in federal funds to undergo an annual audit conducted by an "independent auditor," in accordance with "generally accepted government auditing standards," and consistent with standards set by the Office of Management and Budget. *Id.* § 7502(a)(1)(A)–(B), (c).[6] § 7502(a)(1)(A)–(B), (c); *see also* Office of Management & Budget, Assistance Listing 93.558, https://perma.cc/7UTM-KC4N (setting specific audit requirements for TANF). PRWORA gives HHS no authority to conduct program audits outside of this statutorily provided procedure. In doing so, it conspicuously departs from the AFDC statute, which expressly authorized HHS to establish a "quality control system" under which it could review each State's implementation of AFDC, determine its "error rate," and assess a corresponding penalty. *See* 42 U.S.C. § 608(a), (d), (f) (1994).

64. 68. Nor does PRWORA grant ACF authorization to share or disclose the information it collects from States in the course of administering TANF. As noted, the statute requires States to carefully safeguard the information they collect, with narrowly drawn exceptions. *See id.* §§ 602(a)(1)(A)(iv), 608(a)(9). It authorizes ACF to collect statistical samples of that information for the purpose of preparing annual reports to Congress containing nationwide assessments of the effectiveness and composition of the TANF program. *Id.* § 611(a)–(b). PRWORA contains no provision authorizing the sharing or disclosure of TANF recipients' or their family members' information beyond that. That is, again, a conspicuous departure from the AFDC statute, which specifically directed States to authorize the disclosure of AFDC recipients' information for five

[6] *See also* Office of Management & Budget, Assistance Listing 93.558, https://www.whitehouse.gov/wp-content/uploads/2025/11/Part-4-Department-of-Health-and-Human-Services-Revised-8.11.pdf (setting specific audit requirements for TANF).

specific purposes, including for "any audit or similar activity conducted in connection with the administration" of the statute. 42 U.S.C. § 602(a)(9) (1994).

~~65.~~69. Reflecting the statute's vision of a sharply limited federal role in administering TANF, PRWORA directed the HHS Secretary to reduce by 75% the number of full-time equivalent positions that related to any direct spending program converted into a block grant program under the TANF statute. *Id.* § 616. As this provision makes plain, Congress anticipated that only a small fraction of the number of employees previously devoted to administering AFDC would be required to carry out the narrowly circumscribed federal responsibilities under TANF.

**B. Statutory Protections for the Confidentiality of TANF Information**

~~66.~~70. In addition to narrowly circumscribing ACF's authority under the TANF statute, Congress has also enacted a number of statutory protections that restrict ACF from disclosing personal information that it collects from TANF recipients. Three of those protections are relevant here.

~~67.~~71. *First*, 42 U.S.C. § 1306 provides that "[n]o disclosure of . . . any file, record, report . . . or any information, obtained at any time by . . . any officer or employee of [HHS] in the course of discharging the duties of the head of [HHS] under this chapter . . . shall be made except as the head of [HHS] may by regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306(a)(1)–(2). The TANF statute falls within the same "chapter" of title 42 as section 1306. *See* 42 U.S.C. ch. 7, §§ 301 to 1397mm. And information provided pursuant to that statute is obtained by HHS officers and employees "in the course of discharging the duties" of the HHS Secretary. *See* 42 U.S.C. § 611 ("Each eligible state shall . . . report *to the Secretary* on a quarterly basis, the following disaggregated case record information . . . ." (emphasis added)). Thus, this information may be "disclos[ed]" only as the Secretary "may by regulations prescribe" and "as otherwise provided by Federal law."

~~68.~~72. *Second*, the Social Security Act provides that "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record." 42 U.S.C. § 405(c)(2)(C)(viii)(I). ACF collects TANF recipients' personal information pursuant to a "law enacted on or after October, 1990," *id.*—namely, PRWORA, which was enacted in 1996. ACF personnel with access to those records are "authorized persons." *Id.* § 405(c)(2)(C)(viii)(IV). Accordingly, ACF may not disclose any TANF recipient's "social security account number" or "related record"—a term defined to include "any record, list, or compilation that indicates, directly or indirectly, the identity of any individual with respect to whom a social security account number . . . is maintained pursuant to this clause." *Id.* § 405(c)(2)(C)(viii)(IV).

~~69.~~73. *Third*, the Trade Secrets Act makes it a criminal offense for any "employee of the United States or of any department or agency thereof" to "make[] known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties" that "concerns or relates to the . . . identity" or the "amount or source of any income . . . of any person." 18 U.S.C. § 1905. Because ACF employees obtain access to TANF recipients' and their family members' information "in the course of [their] employment or official duties," they therefore may not disclose any information that concerns the "identity" or "amount or source of any income" about such individuals.

~~70.~~74. *Fourth*, ACF must ensure that any disclosures of TANF recipients' and their family members' personal information conform with the Privacy Act of 1974, 5 U.S.C. § 552a. Congress enacted that statute largely out of concern over "the impact of computer data banks on individual privacy." *U.S. D.O.J. v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 766 (1989) (quoting

H.R. Rep. No. 93–1416, at 7 (1974)). In particular, the statute "had its genesis in a growing awareness that governmental agencies were accumulating an ever-expanding stockpile of information about private individuals that was readily susceptible to both misuse and the perpetuation of inaccuracies that the citizen would never know of, let alone have an opportunity to rebut or correct." *Londrigan v. Fed. Bureau of Investigation*, 670 F.2d 1164, 1169 (D.C. Cir. 1981). In response to fears that data banks held by the executive branch "could soon make Orwell's vision of 1984 a reality," Congress designed the Privacy Act to prevent "illegal, unwise, overbroad investigation and record surveillance of law-abiding citizens" through "the wrongful disclosure and use . . . of personal files held by Federal agencies." *Id.* (citation omitted).

~~71.~~75. The statute achieves these aims by prohibiting the disclosure of "any record" about an individual "which is contained in a system of records" unless several statutory requirements are satisfied. 5 U.S.C. § 552a(b).

~~72.~~76. At the outset, an agency must identify an exception authorizing disclosure. As relevant here, one of those exceptions authorizes disclosures for a "routine use," which is defined as a use "for a purpose which is compatible with the purpose for which [the record] was collected." *Id.* § 552a(a)(7), (b)(3).

~~73.~~77. In order to permit a new routine use of a system of records, an agency must publish in the Federal Register a system of records notice, or SORN. *Id.* § 552a(e)(4). Among other things, a SORN must describe the relevant system of records and list "each routine use of the records contained in the system, including the categories of users and the purpose of such use." *Id.* An agency must provide the public thirty days' notice and an opportunity to comment on a SORN before putting it into effect. *Id.* § 552a(e)(11). And the agency must "inform each individual" from whom the information is collected of "the routine uses which must be made of the information,"

either "on the form which [the agency] uses to collect the information or on a separate form that can be retained by the individual." *Id.* § 552a(e)(3). As the D.C. Circuit has explained, a routine use is invalid unless the agency provides this notice to each individual at the time of collection. *See U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 146 (D.C. Cir. 1993).

~~74.~~78. Finally, pursuant to amendments added by the Computer Matching and Privacy Protection Act of 1988, Pub. L. No. 100-503, 102 Stat. 2507, the Privacy Act includes additional protections whenever data held in different systems of records are matched for purposes including verifying the eligibility of public benefit recipients. *See* 5 U.S.C. § 552a(a)(8)(A) (defining "matching program"), 552a(o) (establishing substantive and procedural safeguards for matching programs). These protections include the requirement that there be a defined "written agreement between the source agency and the recipient agency" specifying how the matching program will work. *See id.* § 552a(o). And, more generally, the Privacy Act requires that the agency maintaining the system of records "shall . . . establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm . . . or unfairness to any individual on whom information is maintained." *See id.* § 552a(e)(10).

## FACTUAL ALLEGATIONS

### A. Defendants Have Repeatedly Targeted TANF Funding with Unsubstantiated Allegations of Fraud

~~75.~~79. When Congress afforded the States flexibility in administering TANF, it also gave the States responsibility for confirming beneficiaries' eligibility. Plaintiff States take that responsibility seriously and have adopted comprehensive programs for deterring, detecting, and stopping fraud among TANF beneficiaries.

~~76.~~80. Plaintiff States have robust processes in place to ensure that individual applicants prove their eligibility under all TANF program requirements, including immigration status. For instance, Plaintiff States require applicants and recipients of cash assistance to document that they are TANF eligible, and meet requirements for income, wealth, residency, time limits, and legal status, both at the time of application and during periodic recertifications.

~~77.~~81. Plaintiff States also independently check beneficiaries' eligibility through a combination of federally mandated and State-designed processes. For example, New York uses the Front End Detection System (FEDS) to uncover any potential fraud or misleading statements in TANF applications. Plaintiff States use the Income Eligibility Verification System (IEVS) to confirm continuing eligibility and benefit levels using tax information, and many review another database, the Public Assistance Reporting Information System (PARIS), to detect whether a beneficiary is receiving benefits in another State. And Plaintiff States use the federal Systematic Alien Verification for Entitlements (SAVE) system to confirm noncitizen applicants' qualified alien status.

~~78.~~82. And when Plaintiff States find fraud, they work to correct it in the manner identified in their State plan certified by ACF—which does not include a mechanism for federal oversight—by initiating administrative disqualification proceedings and by referring cases to local, State, and federal law enforcement to recover benefits paid and to bring to justice those responsible for fraud.

~~79.~~83. Despite these processes and safeguards, Defendants have repeatedly used unsubstantiated allegations of "fraud" to target States' funding under the TANF program and related anti-poverty programs over the last year.

~~80.~~84. In late December 2025, a 23-year-old content creator shared a YouTube video that purported to expose several child care centers in Minnesota engaging in fraud, focusing blame

heavily on Minnesota's Somali community.[7] Ken Bensinger & Ernesto Londoño, *An Intense White House Response from a Single Viral Video*, N.Y. Times, Dec. 31, 2025, https://www.nytimes.com/2025/12/31/business/media/trump-conservatives-videos-viral-loop.html . The video was the focus of coverage in some media outlets and then was promoted by Vice President J.D. Vance and former presidential advisor Elon Musk.[8] Zoe Sottile & Andy Rose, *Minnesota investigators say child care centers accused of fraud are operating normally as governor drops reelection bid*, CNN, Jan. 5, 2026, https://perma.cc/5VAP-AHM4. In response to the YouTube video, on December 31, 2025, Defendants announced that there would be a categorical freeze of federal child care funding to all States, and that those funds would only be released "when states prove they are being spent legitimately."[9] *HHS freezing childcare payments to all states until they prove funds "being spent legitimately"*, ABC News, Dec. 31, 2025, https://perma.cc/YF9L-DVA9.

~~81.~~85. Instead, Defendants engaged in a set of a targeted attacks on five States only. On January 6, 2026, ACF issued a press release announcing that it had "froze[n] access to" all funding for three federal programs, of which TANF is the largest, for California, Colorado, Illinois, Minnesota, and New York.[10] ACF, HHS Freezes Child Care and Family Assistance Grants in Five

---

~~[7] Ken Bensinger & Ernesto Londoño, *An Intense White House Response from a Single Viral Video*, N.Y. Times, Dec. 31, 2025, *available at* https://www.nytimes.com/2025/12/31/business/media/trump-conservatives-videos-viral-loop.html.~~

~~[8] Zoe Sottile & Andy Rose, *Minnesota investigators say child care centers accused of fraud are operating normally as governor drops reelection bid*, CNN, Jan. 5, 2026, *available at* https://www.cnn.com/2026/01/05/us/minnesota-child-care-fraud-investigation.~~

~~[9] *HHS freezing childcare payments to all states until they prove funds "being spent legitimately"*, ABC News, Dec. 31, 2024, *available at* https://abc7.com/post/hhs-says-freezing-child-care-payments-minnesota-fraud-allegations/18335717/.~~

~~[10] ACF, HHS Freezes Child Care and Family Assistance Grants in Five States (Jan. 6, 2026), *available at* https://perma.cc/D374-NR62.~~

States (Jan. 6, 2026), https://perma.cc/D374-NR62. In a statement that same day, an HHS spokesperson said, "[f]or too long, Democrat-led states and Governors have been complicit in allowing massive amounts of fraud to occur under their watch."[11] Adora Brown & Raymond Fernández, *Trump Admin. to Freeze $10B in Social Programs to New York and Other Dem States*, The City (Jan. 6, 2026), https://perma.cc/LJ4H-27GV.

~~82.~~86. In letters sent by Defendant Alex J. Adams that same day effectuating the freeze, ACF claimed that there were unspecified "concerns" about "the potential for extensive and systemic fraud in" the States' TANF programs, including concern that the States were "illicitly providing illegal aliens with TANF benefits intended for American citizens and lawful permanent residents." None of the letters identified a single "prosecution," adduced or supported any "allegations" of fraud, or cited any evidence or "reason to believe" that any State is "illicitly providing illegal aliens" with those funds.[12] *New York v. Admin. for Children & Families*, No. 26 Civ. 172 (S.D.N.Y.), ECF No. 1-2.

~~83.~~87. As to TANF, the letters made three specific demands of each State. First, the letters demanded that the State provide the "complete universe of TANF administrative data . . . for all recipients for all available years," including sensitive information such as Social Security number, date of birth, and alien registration number. Second, ACF demanded that the States provide "documentation demonstrating that the" State "has verified the eligibility of all TANF applicants and recipients in accordance with" PRWORA, including "verification records used by [the States] to confirm citizenship or qualified alien status during the application and recertification processes."

~~[11] Adora Brown & Raymond Fernández, *Trump Admin. to Freeze $10B in Social Programs to New York and Other Dem States*, The City (Jan. 6, 2026), *available at* https://www.thecity.nyc/2026/01/06/trump-cuts-funding-social-welfare-child-care/.~~

~~[12] *New York v. Admin. for Children & Families*, No. 26-CV-172, (S.D.N.Y.), ECF No. 1-2.~~

Third, the letter insisted upon "a comprehensive list" of any "entities that received TANF funds from the [State], directly or indirectly" and, among other things, "documentation describing the State's oversight mechanisms, monitoring activities, and verification processes used to ensure proper use of TANF dollars."

~~84.~~88. A federal court issued a temporary restraining order enjoining implementation of the "entirety" of the letters and prohibiting any restrictions on TANF funding to the States outside of permitted statutory authority. *New York v. Admin. for Children & Families*, No. 26-CV-172, (S.D.N.Y.), ECF No. 22. The court later found, in granting a preliminary injunction motion, that Defendants did not "offer any concrete evidence of fraud in Plaintiff States" and did "not identify even a *single dollar* that has gone to any Plaintiff State that has been used fraudulently." *New York v. Admin. for Children & Families*, No. 26-CV-172, ___ F. Supp. 3d ___, 2026 WL 673848, at *18–19 (S.D.N.Y. Mar. 10, 2026) (citation omitted). The court explained that "Defendants' public statement provides an alternative" reason for the freeze: "partisan targeting." *Id.* at *19. The court found that the demands in the letters were "onerous and unrealistic data requests for program compliance," *id.* at *20, and concluded that it was "difficult . . . to perceive any rationality in the decision," which "endanger[ed] the states' abilities to provide vital family and childcare assistance," *id.*~~[13]~~ The Government has not appealed this ruling and the preliminary injunction remains in place. ACF recently "rescind[ed]" the January letters. *See New York v. Admin. for Children & Families*, No. 26-CV-172 (S.D.N.Y.) , ECF No. 119-2.

~~85.~~89. Nevertheless, the Administration has continued to make unsubstantiated claims of "fraud" to target State benefits programs, immigrants, and, particularly, State benefits programs

~~[13] The Government has not appealed this ruling and the preliminary injunction remains in place. ACF recently "rescind[ed]" the January letters. *See New York v. Admin. for Children & Families*, No. 26-CV-172, (S.D.N.Y.), ECF No. 119-2.~~

serving immigrants (even where the overwhelming majority of recipients—for TANF, 95% of children and 85% of adults—are U.S. citizens).

~~86.~~90. On March 16, 2026, President Trump signed Executive Order 14395, 91 Fed. Reg. 13485 (2026), which claims that:

> American taxpayers fund a vast benefits system for citizens in need that includes housing, food, medical care, cash assistance, and more. States administer these federally funded programs, and some States have embraced loopholes that avoid individual eligibility validation, allow self-certification of eligibility, and expand eligibility far beyond what the Congress intended. Worse, despite accepting Federal funds, some States have refused to institute basic fraud controls such as providing enrollee information to the Federal Government that would allow it to verify eligibility. As a result, illegal aliens, criminals, foreign gangs, bureaucrats, State and local officials, non-governmental organizations, and ineligible providers exploit these programs—which are intended to provide a safety net to lawfully eligible Americans—with ease.

~~87.~~91. The Executive Order establishes a Task Force to Eliminate Fraud, with duties including "develop[ing] measures to improve eligibility verification processes in Federal benefits programs and *maximize enforcement* of eligibility requirements, including program-specific requirements and [PRWORA]"; "promot[ing] the facilitation of information and data sharing and coordination"; and "audit[ing] and ensur[ing] prospective compliance monitoring, including for use in identifying fraud in Federal benefits programs." 91 Fed. Reg. at 13487 (emphasis added). The Task Force is "subject to the President's direct supervision and control." *Id.*

~~88.~~92. Shortly after its effort to freeze TANF funding in five of the Plaintiff States failed and after the Task Force was convened, ACF began a new effort to uncover purported "fraud" in the TANF program by targeting U.S. citizen children from immigrant families.

~~89.~~93. On June 10, 2026, ACF published a report, authored by Defendants Alex J. Adams and David Swegle, about a subset of TANF "child-only cases~~": those~~"—that is, the subset of cases ~~where~~in which TANF funds are paid on behalf of a child while an adult in the household is

excluded from receiving TANF due to immigration status.[14] David Swegle and Alex J. Adams, The Prevalence of TANF Child-Only Cases Involving Immigration-Status-Ineligible Parents (June 10, 2026), https://perma.cc/RUE9-4WAE. The report noted that "ACF's data cannot isolate the exact number of immigration-status-ineligible parents who are illegal aliens" but nonetheless concluded that it was "clear" that TANF "channels substantial taxpayer-funded cash assistance into households headed by parents who are barred from receiving TANF because of immigration status, including illegal aliens."

~~90.~~94. The report's implication that State agencies are using TANF to support ineligible households is false.~~[15]~~ PRWORA permits TANF benefits to be provided to eligible children regardless of whether their parents are eligible for TANF, based on immigration status or otherwise. And some of these children have parents who are immigrants with lawful status but are still excluded from receiving TANF under PRWORA's eligibility requirements. ACF's publication has predictably led to the press and others relying on this report to make false statements about State TANF administration. *See, e.g.*, Titus Wu, *California Main Driver of Welfare Flow to Illegal Immigrants: HHS Report*, N.Y. Post (June 10, 2026), https://perma.cc/XNK5-3HFT (falsely stating that the report showed that "[m]ore than $617 million in taxpayer-funded cash welfare flowed to California households headed by illegal immigrant parents").

---

~~[14] David Swegle & Alex J. Adams, The Prevalence of TANF Child-Only Cases Involving Immigration Status Ineligible Parents (June 10, 2026), *available at* https://acf.gov/ofa/policy-guidance/prevalence-tanf-child-only-cases-involving-immigration-status-ineligible.~~

~~[15] ACF's publication has predictably led to the press and others relying on this report to make false statements about State TANF administration. *See, e.g.*, Titus Wu, *California Main Driver of Welfare Flow to Illegal Immigrants: HHS Report*, N.Y. Post (June 10, 2026), *available at* https://nypost.com/2026/06/10/us-news/hhs-report-finds-thousands-of-illegal-immigrant-households-received-welfare/ (falsely stating that the report showed that "[m]ore than $617 million in taxpayer-funded cash welfare flowed to California households headed by illegal immigrant parents").~~

**B. The TANF System of Records Notice**

~~91.~~95. On June 23, 2026, Defendants initiated their latest effort to pursue unsubstantiated claims of fraud in the TANF program. That day, ACF published a SORN that purports to dramatically expand ACF's oversight over the TANF program and authorizes sweeping ~~new~~ disclosures of sensitive TANF information to DHS and other federal agencies. *See* ~~Ex. 1,~~ 91 Fed. Reg. 37406 ("TANF SORN").

~~92.~~96. ACF has long maintained a system of records—formally identified as System No. 09-80-0375, Temporary Assistance for Needy Families (TANF) Data ("TANF System of Records")—that consists of the demographic data on TANF recipients and their family members that States are required to send to ACF each quarter pursuant to 42 U.S.C. § 611 and its implementing regulations. *See* 89 Fed. Reg 25,880, 25,880–81 (2024). That system of records contains highly sensitive personal information about the members of families receiving TANF assistance, including their Social Security numbers, immigration status, marital status, parentage, zip codes, employment information, income, and much more. *See* Data Reporting Instructions. Although some States submit a statistical sample of such data, as they are allowed to do under federal law, *see* 42 U.S.C. § 611(a)(1)(B)(i), other States submit this data for all TANF recipients in the State.~~[16]~~ *See* ACF, Temporary Assistance for Needy Families 13th Report to Congress Fiscal Years 2016 through 2021, at 46 n.21 (listing approximately half of States as reporting sample data during the relevant time period), *available at* https://perma.cc/6JWN-6SF8. There is no federal mandate that any State provide the enumerated data points for all TANF recipients.

~~[16] *See* ACF, Temporary Assistance for Needy Families 13th Report to Congress Fiscal Years 2016 through 2021, at 46 n.21 (listing approximately half of States as reporting sample data during the relevant time period), *available at* https://acf.gov/sites/default/files/documents/ofa/13th_tanf_report_to_congress_final.pdf.~~

~~93.~~97. Until recently, ACF stated that the TANF System of Records could be used for only three purposes: (1) to "determine whether grantees are meeting certain requirements prescribed by" PRWORA, such as the statute's "work participation and time-limit requirements"; (2) to "compile information used in the report to Congress," and (3) to "perform research on the caseload dynamics and employment trajectories of TANF recipients." 89 Fed. Reg. at 25,881.

~~94.~~98. In addition, ACF previously authorized the disclosure of the information only for several narrow "routine uses." 89 Fed. Reg. at 25,882. Those uses were standard ones found in numerous agency SORNs; among other things, they authorized the disclosure of the information for statistical, research, or reporting purposes; to respond to a congressional office making a written inquiry at the request of an individual recipient; or to mitigate the harms to recipients from a security breach. *Id.*

~~95.~~99. The new TANF SORN announces a significant revision ("the Revision") to the TANF System of Records, dramatically broadening the scope of records held in this system, the stated purposes for which those records may be used, and the routine uses for which ACF permits disclosure. The TANF SORN also invokes new purported legal authority for Defendants' Revision of this system of records. ACF acknowledged in the TANF SORN that the modifications were significant enough to trigger the Privacy Act's requirement to provide advance notice of these changes to Congress and the Office of Management and Budget. *See* 91 Fed. Reg. at 37,407 (citing 5 U.S.C. § 552a(r)).

~~96.~~100. First, the TANF SORN provides notice that ACF is enlarging the set of records included in this database. It provides that, in addition to the millions of records of TANF recipient information furnished by States, the system will also include "verification information obtained from [TANF grantee] agencies, other HHS records, or other government agencies or

entities." The SORN notes that this information "may include [Social Security number], date of birth, county of residence, name, address, and detailed immigration status information," including "whether an individual is a refugee, non-immigrant, has no status, has temporary protected status, [or] requires additional verification." *Id.*

~~97.~~101. Second, the TANF SORN announces that ACF is dramatically expanding the permitted purposes for which the system of records may be used. It revises the first listed purpose of the system of records to state that TANF recipient data may be used "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of" the TANF statute. 91 Fed. Reg. at 37,407. And it adds a new purpose, which states that TANF recipients' and their family members' personal information may be used "to ensure compliance with *all* TANF program requirements including but not limited to the work participate rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship and immigration status." *Id.* (emphasis added). The SORN further notes that ACF will ensure that grantees are satisfying such requirements "through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)." *Id.*

~~98.~~102. Third, the TANF SORN adds a significant new routine use to the system of records. In addition to the nine standard uses previously authorized for these records, the SORN also authorizes disclosure of TANF recipients' and their family members' personal information "to another federal or grantee agency or entity engaged by ACF (*e.g.*, DHS or TANF program

administrators), to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status." *Id.* at 37,409.

~~99.~~103. The TANF SORN does not identify any statute that authorizes ACF to undertake these dramatic new actions—because such authority does not exist. The only statutes it cites as a basis for this expansion of the system of records are 42 U.S.C. § 1320b-7 and 8 U.S.C. § 1373. But section 1320b-7 does not grant ACF any authority to use or disclose information; it requires each "*State*" to establish a system for checking recipients' eligibility. 42 U.S.C. § 1320b-7(a). And section 1373(a) contains prohibitory language relating to the disclosure of "information regarding . . . citizenship or immigration status." 8 U.S.C. § 1373(a). It does not *authorize* the disclosure of any information, let alone a vast corpus of personal information unrelated to "citizenship or immigration status" under any plausible understanding of those terms.

~~100.~~104. No provision of the TANF Statute authorizes ACF to "ensure compliance with *all* TANF program requirements"; on the contrary, the statute bars it from "enforcing any provision of this part, except to the extent expressly provided in this part." *Id.* Likewise, no provision of PRWORA authorizes ACF to conduct "program integrity reviews" or "audits" or to check whether States are adequately checking recipients' eligibility. The sole provision of PRWORA that permits audits of TANF grantees provides that such audits must be conducted "under chapter 75 of title 31," 42 U.S.C. § 609(a)(1)(A), which mandates an audit conducted by a third-party, independent auditor pursuant to strict requirements. 31 U.S.C. § 7502.

~~101.~~105. Nor does any other statute permit ACF—let alone "expressly," 42 U.S.C. § 617—to use or disclose TANF recipients' and their family members' information for these purposes. On the contrary, the statute repeatedly reflects its concern with safeguarding the privacy

and confidentiality of TANF recipients' and family members' information and places the responsibility for doing so in the hands of the States, not HHS. It requires each State to adopt measures "necessary to restrict the use and disclosure of information about individuals and families receiving assistance," ~~42 U.S.C~~*id*. § 602(a)(1)(A)(iv), subject to narrow exceptions requiring disclosure including, for example, to federal law enforcement officials about individuals associated with criminal conduct, *id.* § 608(a)(9)(B). Congress also provided that, when State agencies verify an individual's immigration status, they must use a system that permits "efficient verification" and "protects the individual's privacy to the maximum degree possible." *Id.* § 1320b-7(d)(3). Indeed, in establishing TANF, Congress eliminated a provision of the AFDC statute that permitted the disclosure of information for the very purpose ACF seeks to advance here—that is, to assist "any audit or similar activity conducted in connection with the administration of [AFDC] by any governmental entity." 42 U.S.C. § 602(a)(9) (1994).

~~102.~~106. The TANF SORN is also inconsistent with the Privacy Act. The disclosure of TANF recipients' and their family members' information to conduct audits and enforce "all TANF program requirements," including the statute's eligibility-verification requirements, is not "compatible with the purpose for which [that information] was collected." 5 U.S.C. § 552a(a)(7). As noted, the statute requires ACF to enforce those requirements only following the results of a separate and independent audit process, not by auditing recipients itself. And the use of TANF recipients' and their family members' information to conduct such audits is in any event wholly unrelated to the narrow purpose for which PRWORA requires States to provide quarterly reports of recipient data—principally, to produce an annual report to Congress on the general demographics and effectiveness of the TANF program. *See* 42 U.S.C. § 611(a). In addition, ACF

did not notify TANF recipients that their information would be used for this purpose at the time the information was collected, as the statute requires. 5 U.S.C. § 552a(e)(3).

~~103.~~107. Furthermore, the TANF SORN contains no indication that ACF has entered into computer matching agreements required before it may share information with DHS and other agencies to cross-check recipients' eligibility, *see id.* § 552a(o), or any other written agreements to govern the proposed data sharing that would provide "appropriate . . . safeguards to insure the security and confidentiality of [those] records," *id.* 552a(e)(10). Such written agreements are required by federal law to limit the use and disclosure of data, ensure that data matching is accurate, and protect the rights of public benefits users. Without any such agreement in place, the proposed disclosure of TANF data creates unacceptable risks that DHS or other recipients may subsequently use this data in ways that are also not "compatible with the purpose for which [that information] was collected" as required by the Privacy Act.

~~104.~~108. Defendants' publication of the TANF SORN was rife with procedural irregularities that impeded the statutorily required public notice and comment process. When Defendants originally published the TANF SORN in the Federal Register on June 23, 2026, it instructed that comments "may be submitted to the Federal eRulemaking Portal electronically at http://www.regulations.gov." This portal was created by the federal government as a requirement of Section 206 of the eGovernment Act, and it is now the standard (and, for rulemaking subject to 5 U.S.C. § 553, statutorily required) vehicle for public comments in response to any federal agency notice. But contrary to the published notice, ACF did not post the TANF SORN on www.regulations.gov and did not make the TANF SORN available for comments on that website at that time. After being alerted to this initial error, HHS belatedly posted the TANF SORN on regulations.gov on July 10, 2026 (with an incorrect Document ID number), then again on July 13,

2026 (with the corrected number), but still only accepting comments through July 23, 2026. Then, on July 20, 2026, ACF announced that because its errors had "prevented the public from commenting through the Federal eRulemaking Portal until July 10, 2026," the deadline for both comments and for the effective date of the new routine use would be August 11, 2026. 91 Fed. Reg. 45278. A subsequent notice published on August 7, 2026 further extended the effective date of the new routine use to September 1, 2026, 91 Fed. Reg. 51174, and ACF has since agreed to extend the effective date to September 30, 2026, ECF No. 41.

~~105.~~109. The SORN also violates several other privacy statutes. First, under Section 1306, "[n]o disclosure of . . . any file, record, report . . . or information, obtained at any time by . . . any officer or employee of [HHS] in the course of discharging the duties of the head of [HHS] under this chapter . . . shall be made except as the head of [HHS] may by regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306(a)(1)–(2). The State-provided records at issue in the SORN are obtained by HHS officers and employees "in the course of discharging the duties" of the HHS Secretary, *see* 42 U.S.C. § 611, and as required by reporting requirements, and thus may be "disclos[ed]" only as the Secretary "may by regulations prescribe" and "as otherwise provided by Federal law." But the Secretary has not "prescribed" any "regulations" authorizing the disclosure of information to conduct program integrity reviews or to monitor States' compliance with eligibility requirements, and the SORN itself is not a "regulation" promulgated in conformity with the procedures of the APA. In addition, as detailed above, no "Federal law" "provide[s]" for disclosure": The TANF statute not only fails to authorize the disclosure of information to assist ACF in enforcing all of the provisions of the TANF statute, but forbids the use of information for that purpose and specifically delegates to the States responsibility "to restrict the use and disclosure of information about individuals and families

receiving assistance under the program." *Compare* 42 U.S.C. § 1306(a)(1) *with id.* §§ 602(a)(1)(A)(iv), 617.

~~106.~~110. Second, under Section 405, "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record." 42 U.S.C. § 405(c)(2)(C)(viii)(I). The records in the TANF System of Records are "obtained and maintained" pursuant to a "law enacted on or after October, 1990," *id.*—namely, PRWORA, which was enacted in 1996. HHS personnel with access to those records are "authorized persons." *Id.* § 405(c)(2)(C)(viii)(IV). As the SORN acknowledges, *see* 91 Fed. Reg. at 37,408, those records contain "Social Security number[s]," and the remainder of the individual data are "related records" as they contain highly personal identifying information about TANF recipients and their family members.

~~107.~~111. Third, the SORN violates 18 U.S.C. § 1905, which makes it a criminal offense for government agencies to disclose information concerning the "identity" or the "amount or source of any income . . . of any person." The TANF System of Records contains information about the "identity" and "income" of millions of TANF recipients and their family members.

~~108.~~112. In addition, the TANF SORN does not explain or justify its significant change in practice, as required by the Administrative Procedure Act. The SORN does not explain why it is rational for ACF to use and share information to confirm States' compliance with statutory provisions that ACF has no authority to enforce. Nor does it consider how ACF's sweeping assertion of authority to use and disclose sensitive information about TANF recipients and their family members may chill recipients' participation in the program and increase burdens on State grantees. And the SORN does not acknowledge or justify the agency's departure from longstanding

practice and the recognized limits on its authority that have prevailed since PRWORA, and that were integral to the design of that statute.

~~109.~~113. Finally, the TANF SORN is contrary to the Spending Clause. The States did not "knowingly and voluntarily" agree, at the time they accepted federal funding, that the data they provide to the federal government could be disclosed to any federal, State, or private entity to engage in free-ranging oversight of the States' administration of the TANF program. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 304 (2006). On the contrary, the States reasonably relied on the numerous provisions of the TANF statute and other confidentiality laws that bar such disclosures. By springing this post-acceptance condition on the States, without warning, the ACF SORN violates the Spending Clause. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981).

**C. Defendants' September 2025 Data Transfer and Data Disclosure Policy**

114. On information and belief, in early 2025, the new Administration—per the directive of White House Advisor Stephen Miller—took steps to identify any data sets held by HHS that included personally identifiable information of non-citizens and to share that data with the DHS for immigration enforcement purposes.

115. On information and belief, in mid-2025, ACF initiated a new Data Disclosure Policy that provided for and directed the sharing of States' TANF data by ACF with other entities, including DHS.

116. On information and belief, DHS and ACF entered into at least one Memorandum of Understanding regarding the Data Disclosure Policy.

117. ACF and DHS thereafter implemented the Data Disclosure Policy.

118. On September 5, 2025, ACF shared individual level data from Fiscal Year 2024 with DHS ("the September 2025 Data Transfer").

119. The September 2025 Data Transfer occurred via an online file share system (Box). According to Defendants, the purpose of the September 2025 Data Transfer was "program integrity, i.e., to help HHS ensure that states are complying with the requirements of the Social Security Act including performing the required alien status verifications with DHS." ECF No. 41.

120. On information and belief, the September 2025 Data Transfer involved ACF sharing with DHS TANF data collected from States for both U.S. citizens and non-citizens and for both TANF recipients and their family members.

121. According to Defendants, the legal basis of the September 2025 Data Transfer and the Data Disclosure Policy is Routine Use 7 of the then-applicable SORN (which remains unchanged in the SORN challenged in this lawsuit). *See* 89 Fed. Reg. 25882; 91 Fed. Reg. 37408. Routine Use 7 states:

> Disclosure to Contractors, Grantees, and Others. Information may be disclosed to contractors, grantees, consultants, or volunteers performing or working on a contract, service, grant, cooperative agreement, job, or other activity for HHS related to the purposes of this system of records and who have a need to have access to the information in the performance of their duties or activities for HHS.

122. Defendants have taken the position that Routine Use 7 authorizes the same disclosures as the new routine use—Routine Use 10—added by the agency's 2026 SORN. Defendants have further taken the position that even if the Court barred ACF from utilizing Routine Use 10, ACF could still utilize Routine Use 7 to transmit the same data because the SORN's new routine use merely clarifies the agency's prior routine uses.

123. On August 16, 2026, in a filing with this Court, DHS for the first time publicly confirmed the September 2025 Data Transfer and the Data Disclosure Policy. ECF No. 41. Until this filing, HHS and DHS never publicly disclosed the September 2025 Data Transfer or the Data Disclosure Policy.

124. Prior to this lawsuit, HHS and DHS never made public any information that would allow the public or Plaintiff States to know of the existence of the September 2025 Data Transfer or the Data Disclosure Policy.

125. HHS and DHS did not make any attempt to notify TANF recipients or Plaintiff States of the September 2025 Data Transfer or the Data Disclosure Policy.

126. The allegations in this section made on information and belief relate to "information [that] lies within defendants' control," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994), as they describe a nonpublic government policy enacted by Defendants. Plaintiff States first became aware of the Data Disclosure Policy only after the Complaint in this action was filed. Upon becoming aware, Plaintiff States promptly contacted counsel for Defendants, who confirmed the September 2025 Data Transfer occurred and confirmed the timing, provided a broad description of the type of data transferred, and asserted justification under Routine Use 7. Plaintiffs also sought "documentation pursuant to which data was shared," including "any Memorandum of Understanding, Information Exchange Agreement, or other written document governing the sharing of TANF data between ACF and DHS, as well as any written requests made by DHS (such as a formal Privacy Act letter)," but Defendants refused to provide this or any other documentation.

127. The September 2025 Data Transfer and Data Disclosure Policy are unlawful for all of the reasons explained above, and more.

128. No provision of the TANF statute, nor any other statute, allows ACF to use or disclose TANF recipients' and their family members' information to DHS or to any other agency for "program integrity" purposes. To the contrary, the statute specifically delineates and carefully cabins the circumstances in which information about TANF recipients may be shared with DHS,

*see* 42 U.S.C. §§ 608(g), 611a, 1320b-7(d)(3), and the TANF statute requires each State to adopt measures "as the State deems necessary to restrict the use and disclosure of information about individuals and families receiving assistance." *Id.* § 602(a)(1)(A)(iv). Congress also provided that, when State agencies verify an individual's immigration status, they must use a system that permits "efficient verification" and "protects the individual's privacy to the maximum degree possible." *Id.* § 1320b-7(d)(3)(B). Indeed, in establishing TANF, Congress eliminated a provision of the AFDC statute that permitted the disclosure of information for the very purpose ACF seeks to advance here—that is, to assist "any audit or similar activity conducted in connection with the administration of [AFDC] by any governmental entity." *Id.* § 602(a)(9) (1994).

129. The Data Disclosure Policy is also inconsistent with the Privacy Act. Although ACF asserts that the September 2025 Data Transfer was authorized by Routine Use 7 in the then-controlling SORN, that use does not in fact permit the September 2025 Data Transfer or the Data Disclosure Policy. If the then-effective SORN had authorized disclosure of States' TANF data to DHS or other agencies for the purpose of evaluating States' compliance with the TANF statute in general and immigration verification in particular, there would have been no need for the new SORN that explicitly purported to authorize this very same use.

130. Further, Routine Use 7 only permits disclosure if four elements are met: (1) the disclosure must be to a HHS "contractor[], grantee[], consultant[], or volunteer[]"; (2) that entity must be "performing or working on a contract, service, grant, cooperative agreement, job, or other activity for HHS"; (3) that work must be "related to the purposes of this system of records" and (4) that entity must "have a need to have access to the information in the performance of their duties or activities for HHS."

131. None of these elements are met here. First, neither DHS nor any other agency is not a contractor, grantee, consultant, or volunteer for DHS; indeed, Routine Uses 2, 8, and 9—but *not* Routine Use 7—specifically name "agencies" or "federal agenc[ies]" as entities to which records can be disclosed. Second, there is no "activity" that HHS is lawfully allowed to perform that permits or requires HHS to share Plaintiff States' TANF records with DHS because, as detailed above, HHS does not have freestanding oversight or audit authority over States' compliance with all TANF program requirements, but rather limited authority via the Title 31, Chapter 75 audit process. Third, this disclosure was not related to any of the three purposes of the system as provided in the then-effective SORN; indeed, it is the *new* SORN that purports to add the (unlawful) new purpose of "ensur[ing] compliance with *all* TANF program requirements." Fourth, there was no need for DHS to access this information, as ACF already had the information, States had already verified immigration status, and ACF has no authority to double-check States' verification, via DHS or otherwise.

132. Further, sharing TANF records for undefined "program integrity" purposes that are not authorized by statute is not "compatible with the purpose for which [that information] was collected," which is principally to create reports for Congress. *See* 5 U.S.C. §§ 552a(a)(7), 552a(b)(3).

133. In addition, ACF did not notify TANF recipients that their information would be used for this purpose at the time the information was collected, as required by statute. 5 U.S.C. § 552a(e)(3).

134. Furthermore, because the Data Disclosure Policy and September 2025 Data Transfer were not authorized by the SORN in place at the time, the Data Disclosure Policy and September 2025 Data Transfer constituted a new use of the States' TANF data. ACF was required

to publish a new SORN to publicly disclose and solicit comments on the new use of the States' TANF records *before* it did so. *See* 5 U.S.C. 552a(e)(4), (11). But ACF failed to provide any public notice of this new use until the publication of the TANF SORN nearly a year *after* the September 2025 Data Transfer. This violates the Privacy Act.

135. On information and belief, ACF intended to share TANF records with DHS so that DHS could also use them for general immigration enforcement purposes.

136. But sharing TANF records for immigration enforcement is not "compatible with the purpose for which [that information] was collected." 5 U.S.C. § 552a(a)(7).

137. DHS has never publicly announced that it is entering into a new data matching program with ACF. The Privacy Act requires the "recipient agency" in a newly established matching program to publish such a notice in the Federal Register. *See id.* § 552a(e)(12).

138. Furthermore, on information and belief, neither ACF nor DHS entered into computer matching agreements satisfying the requirements of the Privacy Act, *see id.* § 552a(o), to govern the proposed data sharing.

139. These agreements are required before Defendants may share TANF records to cross-check recipients' eligibility, *see id.* § 552a(o), and to meet the statutory requirement that Defendants must provide "appropriate . . . safeguards to insure the security and confidentiality of [those] records," *id.* § 552a(e)(10).

140. The September 2025 Data Transfer and Data Disclosure Policy also violate Section 1306, which provides that "[n]o disclosure of any . . . file, record, report . . . or information, obtained at any time by . . . any officer or employee of [HHS] in the course of discharging the duties of the head of [HHS] under this chapter . . . shall be made except as the head of [HHS] may

by regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306(a)(1)–(2).

141. In addition, the September 2025 Data Transfer and Data Disclosure Policy violate Section 405, which states that: "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record." 42 U.S.C. § 405(c)(2)(C)(viii)(I).

142. The September 2025 Data Transfer and Data Disclosure Policy violates 18 U.S.C. § 1905, which makes it a criminal offense for government agencies to disclose information concerning the "identity" or the "amount or source of any income . . . of any person." The TANF System of Records contains information about the "identity" and "income" of millions of TANF recipients and their family members.

143. Further, when they secretly adopted and implemented the September 2025 Data Transfer and Data Disclosure Policy, Defendants did not explain or justify their significant change in practice, consider costs and benefits or reliance interests, or otherwise provide the type of reasoned explanation required by the Administrative Procedure Act.

144. Finally, the September 2025 Data Transfer and Data Disclosure Policy are contrary to the Spending Clause because the States did not agree, at the time they accepted federal TANF funding, to the condition that TANF recipients' personal data would be provided to DHS.

**C.D. Plaintiff States Have Been and Will Be Harmed by the TANF SORN and the TANF Data System of Records it Creates, the Revision, the September 2025 Data Transfer, and the Data Disclosure Policy**

110.145. The TANF SORN and resulting modifications to the TANF Data System of Records will irreparably harm Plaintiff States by causing them to implement time- and resource-intensive reviews and updates to their privacy disclosures; by eroding the trust they have developed

with TANF recipients and deterring individuals from participating in TANF, which will impede the States' anti-poverty goals and may require them to spend more of their own resources to ensure that those goals are met; and by causing them to divert resources to address oversight activities that are not authorized by law.

~~111.~~146. The SORN would harm Plaintiff States by requiring them to evaluate and update their privacy disclosures and descriptions of how personal information collected from TANF recipients is used. Any update to these disclosures would be a time-intensive—virtually impossible to accomplish before the SORN's routine uses go into effect—and costly process that would include, for example, printing new paper application forms and arranging for translation into multiple languages, and might include costly mass mailings to many thousands of TANF recipients.

~~112.~~147. Further, Plaintiff States could not have known to disclose the new (unlawful) routine use in the SORN, to prior TANF recipients, for whom years' worth of data is currently in the TANF system of records. This may create risks to the States, including risk of undermining public trust in their programs.

~~113.~~148. Additionally, the SORN would permit ACF to share all of its TANF records with DHS and other entities, including the personal information of millions of TANF applicants and recipients and their family members, without providing any restrictions on DHS's subsequent use or disclosure of that data. In the Medicaid context, Defendant HHS has reversed long-standing agency policy and announced that it will now share Medicaid recipients' personal data with DHS, and DHS has announced it will use that data for immigration enforcement purposes that have

nothing to do with the administration of federally -funded public benefits.[17] 90 Fed. Reg. 53,324; U.S. Imm. & Customs Enforcement, Policy Memorandum 11066.2 (Oct. 27, 2025), https://perma.cc/JMD2-KCKW. The SORN would openopens the door for similar sharing of TANF data between HHS and DHS, which could lead to unlawful data use and disclosure.

114.149. In this environment, the SORN's announcement that ACF plans to begin sharingshare TANF recipients' and their family members' data with DHS will cause additional harm, because it will erode the trust that State and local agencies have developed with immigrant communities and deter individuals from participating in TANF. Plaintiff States have always required TANF applicants who are not citizens to attest that they have an eligible immigration status, and have told applicants that State and local TANF administrators would confirm that status with the federal government. But State agencies have also encouraged eligible households—including families with U.S. citizen children who are and have always been eligible for TANF—to take advantage of TANF and other assistance to help raise their children and families out of poverty. The States have also made assurances to TANF recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by federal and State laws. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in State TANF programs by citizens and qualified non-citizens alike.

[17] *See* HHS Centers for Medicare & Medicaid Services, Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security, 90 Fed. Reg. 53,324, 53,324–25 (2025); U.S. Imm. & Customs Enforcement, Policy Memorandum 11066.2 (Use of HHS Information and Rescission of ICE Policy Memorandum 11066.1) (Oct. 27, 2025), *available at* https://www.ice.gov/doclib/memos/11066.2.pdf.

~~115.~~150. This chilling effect goes beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Such concerns are bolstered by public reporting on DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities.~~[18]~~ *See, e.g.*, Brennan Ctr. for Just., *Dangers of Trump Administration's Data Consolidation Efforts* (July 9, 2026), https://perma.cc/K8RZ-DBRQ ("While [the Trump administration's data consolidation] has been justified as a means of combating fraud and abuse, DHS intends to integrate many of these data streams into its surveillance infrastructure to identify and target people for deportation and to monitor constitutionally protected speech."). Further, any data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' TANF programs. And this chilling effect will predictably result in fewer individuals participating in TANF, causing Plaintiff States to suffer significant harms, including needing to expend State resources to provide assistance to some of their neediest families.

~~116.~~151. As the TANF SORN makes clear, its purpose is "to ensure and confirm grantee [*i.e.*, State] compliance with TANF program requirements through HHS agency oversight activities." 91 Fed. Reg. at 37407. It thus places Plaintiff States at risk of improper enforcement action based on purported non-compliance arising from the modified TANF Data System of Records created by the TANF SORN. Indeed, as detailed above, earlier this year, ACF attempted

~~[18] *See, e.g.*, Brennan Ctr. for Just., *Dangers of Trump Administration's Data Consolidation Efforts* (July 9, 2026), *available at* https://www.brennancenter.org/our-work/research-reports/dangers-trump-administrations-data-consolidation-efforts ("While [the Trump administration's data consolidation] has been justified as a means of combating fraud and abuse, DHS intends to integrate many of these data streams into its surveillance infrastructure to identify and target people for deportation and to monitor constitutionally protected speech.").~~

to freeze all TANF funds to certain Plaintiff States, without following any of the statutorily required procedures (*see* 42 U.S.C. §§ 609(c), 610), on the basis of unsubstantiated and unspecified concerns about "fraud and misuse" in the TANF program.

~~117.~~152. Plaintiff States will be harmed if they are required to divert resources to address oversight activities that are not authorized by law. Apart from the independent third-party audit conducted under 31 U.S.C. § 7501 *et seq.* and the data reporting required by the TANF statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the "agency oversight activities" listed in the SORN. These new "agency oversight activities" will require Plaintiff States to expend time and resources that would cost the States financial harm by requiring additional funding of State staff and/or would divert resources from effective administration of their TANF programs to oversight compliance.

~~118.~~153. Plaintiff States are at risk of enforcement actions based on erroneous analysis of the records included in the modified TANF Data System of Records. The TANF SORN is specifically directed at "verify[ing] whether TANF grantee agencies [*i.e.*, States] are complying with TANF program requirements, including verifying citizenship or immigration status." 91 Fed. Reg. at 37409; *see also id.* at 37407. But the records in the SORN do not provide data that would sufficiently allow ACF to assess State compliance. In other contexts, this Administration has misused data to generate false or misleading reports about purported "fraud, waste and abuse," which demonstrate the risks of improper enforcement activity that are likely to result from Defendants' modifications to the TANF SORN. For example, USDA has claimed that its analysis of States' program data from the Supplemental Nutrition Assistance Program (SNAP) had uncovered over $1 billion per year in potential "fraud, waste and abuse" based on the presence of

dummy or missing Social Security numbers.[19] *See* U.S. Dep't of Agric., SNAP Program Integrity Data Team: Preliminary Report (May 13, 2026), https://perma.cc/QF6P-UVDB. But eligible individuals (such as newborn babies) may qualify for SNAP while they are still waiting to receive an SSN, and USDA's own Inspector General concluded in a recent audit report that missing SSNs reflect individuals who have "applied for a number" and are not evidence of fraud, waste or abuse.[20] *See* U.S. Dep't of Agric., Office of Inspector Gen., Inspection Report No. 27801-0001-31, at 18 n.22 https://perma.cc/5XYB-NUC5; *see also* Rachel Shin, *Conservative states criticize USDA probes to uncover fraud in SNAP*, Politico (July 23, 2026), https://www.politico.com/news/2026 /07/23/trump-food-aid-fraud-01008619.

119. 154. As to immigration status in particular, Plaintiff States already use DHS data to confirm that TANF applicants are eligible based on their citizenship or immigration status and Plaintiff States also already request additional documentation and proof of immigration status when DHS data on its own does not provide clear initial verification of eligibility. Cross-checking States' old TANF data with SAVE data may lead to erroneous results—most obviously because an individual's immigration status may have changed since the State performed the verification, but also for other reasons. Further, the lack of an initial verification in SAVE "does not necessarily mean that the applicant is not authorized to be in the United State[s] or is ineligible to receive the benefit," but only that additional research is required, meaning that matching TANF rolls against

---

[19] *See* U.S. Dep't of Agric., SNAP Program Integrity Data Team: Preliminary Report (May 13, 2026), *available at* https://www.fna.usda.gov/research/snap/program-integrity-data-preliminary.

[20] *See* U.S. Dep't of Agric., Office of Inspector Gen., Inspection Report No. 27801-0001-31, at 18 n.22 *available at* https://www.oversight.gov/sites/default/files/documents/reports/2026-05/27801-0001-31_FR_508.pdf; *see also* Rachel Shin, *Conservative states criticize USDA probes to uncover fraud in SNAP*, Politico (July 23, 2026), *available at* https://www.politico.com/news/2026/07/23/trump-food-aid-fraud-01008619.

DHS's data systems alone, without these additional verification checks, is likely to result in a significant number of false red flags.[21] *See* USCIS, Guide to Understanding SAVE Verification Responses (April 2022), https://perma.cc/VCB4-XJX3. One federal court recently found that DHS's use of inaccurate data resulted in "incomplete or false results" accusing American citizens of being ineligible to vote. *See League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-CV-3501, 2026 WL 1784297, at *16 (D.D.C. June 22, 2026) (citing undisputed evidence). Any oversight based on false matches will further burden State agencies with unnecessary and time-consuming work to recreate existing eligibility checks.

155. The Data Disclosure Policy subjects Plaintiff States to the risk of all the same harms described above. Like the SORN and Revision, the Data Disclosure Policy purports to authorize the transfer of Plaintiff States' data to DHS and other entities to help HHS ensure that States are complying with the TANF statute, including performing the required noncitizen status verifications with DHS. Like the SORN and Revision, these activities are not authorized by statute. And like the SORN and Revision, the Data Disclosure Policy enables ACF to provide other agencies, including DHS, with copies of State TANF records that the recipient agencies may then use for any agency purpose. Unless it is permanently halted or enjoined, the Data Disclosure Policy will thus cause a chilling effect on TANF applicants and participants in Plaintiff States; cause Plaintiff States to incur compliance costs; and place Plaintiff States at the risk of enforcement, as described above.

156. The September 2025 Data Transfer (which is a past application of the Data Disclosure Policy) has caused, and will continue to cause, additional harm to Plaintiff States. First,

---

[21] *See* USCIS, Guide to Understanding SAVE Verification Responses (April 2022), *available at* https://www.uscis.gov/sites/default/files/document/guides/SAVE_Guide%20to%20Understanding%20SAVE%20Verification%20Responses.pdf (last visited July 14, 2026).

without a Court order barring ACF and DHS from taking any future actions based on these unlawful data transfers, and requiring DHS to expunge copies of Plaintiff States' TANF records from their files, public awareness of this secretive data sharing is likely to have a chilling effect on future TANF applications and use. Second, Plaintiff States must undertake the process of legal review to determine whether they must update their disclosures going forward, and/or disclose the September 2025 Data Transfer to TANF recipients, in light of learning about the past application of the Data Disclosure Policy and the September 2025 Data Transfer. This process itself places a burden on Plaintiff States, and any updates will be costly. Third, DHS maintains data from Plaintiff States it obtained in the September 2025 Data Transfer, and both DHS and ACF maintain the ability to use that data. This risks future harm to Plaintiff States, including that ACF may take oversight action, including enforcement action, based on its erroneous use of this data.

157. The fact that ACF *already* shared TANF records with DHS in the September 2025 Data Transfer, pursuant to the Data Disclosure Policy, does not change or mitigate the harms to Plaintiff States that will result from the future application of the SORN, Revision, and Data Disclosure Policy described above. First, as to the chilling effect: the past application of the Data Disclosure Policy and the September 2025 Data Transfer were never previously disclosed to Plaintiff States or the public. While there may be a chilling effect upon those actions becoming public, an additional chilling effect may occur with additional disclosure that would be permitted under the prospective application of the SORN, Revision, and Data Disclosure Policy, and that is particularly likely as those would result in direct notice to TANF applicants and/or recipients. Second, as to the compliance costs and disclosures: Plaintiff States must undertake a legal review process to determine whether they must disclose the past September 2025 Data Transfer *and* the prospective application of the Data Disclosure Policy *and* the prospective application of the

SORN's new routine use, each of which will require a separate review process and, where applicable, may require separate notices to recipients and separate revisions to States' materials. Third, as to the potential for additional oversight and enforcement: Plaintiff States are at risk from potential oversight or enforcement from *both* the past application of the Data Disclosure Policy and the September 2025 Data Transfer *and* the future application of the Data Disclosure Policy, Revision, and SORN. ACF may take future action based on analysis performed pursuant to the September 2025 Data Transfer *or* based on future data transfers under the Data Disclosure Policy, Revision, or SORN—or all of the above.

## CAUSES OF ACTION

### COUNT I
**Violation of the Administrative Procedure Act**
**Contrary to Law and In Excess of Statutory Authority**
**TANF SORN and Revision**
**Against HHS Defendants**

~~120.~~158. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

~~121.~~159. Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

~~122.~~160. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," or "in excess of statutory . . . authority." *Id*. § 706(2)(A), (C).

~~123.~~161. The HHS Defendants' Revision of the TANF System of Records, as effectuated through the SORN, is a final agency action.

~~124.~~162. Congress enacted the APA "'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their

offices.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt*, 338 U.S. 632, 644 (1950)).

~~125.~~163. An agency may not take any action that is contrary to law or exceeds the scope of its statutory authority.

~~126.~~164. Defendants have acted in excess of statutory authority by authorizing the use of information in the TANF System of Records for purposes not authorized by PRWORA, including to "ensure compliance with all TANF program requirements" and to "assist ACF with program integrity reviews or projects" where Congress has specifically delegated broad authority to the States to perform these functions. 91 Fed. Reg. at 37,407, 37,409. PRWORA bars Defendants from taking any steps to "enforce any provision" of the TANF statute except "to the extent expressly provided in this part." 42 U.S.C. § 617. No provision of the TANF statute authorizes Defendants to "ensure compliance with all TANF program requirements," to conduct "program integrity review of projects," or to undertake the new actions contemplated by the TANF SORN. On the contrary, the statute specifically details the provisions Defendants may enforce, which do not include the statute's immigration and citizenship eligibility requirements, *see id*. § 609, and permits audits only where conducted by an independent auditor pursuant to 31 U.S.C. § 7501 *et seq.*, *see* 42 U.S.C. § 609(a)(1)(A).

~~127.~~165. The disclosure of information in the TANF System of Records for these purposes is unlawful. PRWORA itself sharply limits the circumstances in which States or the federal government may disclose TANF recipients' and their family members' personal information. ACF has identified no authority under which it would be authorized to share that information to confirm compliance with any statutory provision or to conduct a general audit of

TANF grantees. And the agency plainly may not share information with another agency to aid it in performing tasks that it is not lawfully permitted to undertake.

~~128.~~166. Furthermore, disclosure of TANF recipients' information to ~~the Department of Homeland Security~~DHS and other agencies for these purposes is not a lawful "routine use" under the Privacy Act. 5 U.S.C. § 552a(a)(7). A "routine use" must be a use for "a purpose which is compatible with the purpose for which [the record] was collected." *Id.* The information in the TANF SORN was collected by ACF pursuant to 42 U.S.C. § 611, which requires States to report information to ACF primarily to enable it to make public reports concerning the demographics of recipients in the TANF program and the States' success in meeting the program's objectives. The disclosure of that information for the unlawful purpose of assessing States' compliance with "all TANF program requirements" is not compatible with the purpose for which such information was collected.

~~129.~~167. The SORN also violates 42 U.S.C. § 1306's prohibition on the "disclosure of . . . any information, obtained at any time by . . . any officer or employee of [HHS] in the course of discharging the duties of the head of [HHS] under this chapter . . . except as the head of [HHS] may by regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306(a)(1)–(2).

~~130.~~168. The SORN violates 42 U.S.C. § 405, which provides that "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record." The TANF data obtained from States contains both Social Security numbers and "related records,"

including the highly personal identifying information about TANF recipients and their family members.

~~131.~~169. The SORN violates 18 U.S.C. § 1905, which makes it a criminal offense for government agencies to disclose information concerning the "identity" or the "amount or source of any income . . . of any person."

~~132.~~170. The SORN further violates the Computer Matching and Privacy Protection Act by creating a new "matching program." *See* 5 U.S.C. § 552a(a)(8). The SORN does not meet the requirements of the Act, including publishing notice in the *Federal Register* at least 30 days before creating the new matching program, *id*. § 552a(e)(12), and entering into detailed computer matching agreements before disclosing records to another agency. *Id.* § 552a(o), (e)(10).

~~133.~~171. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the TANF SORN and the Revision effectuated by the SORN are contrary to law and in excess of statutory authority, and in violation of the APA.

~~134.~~172. Plaintiff States are also entitled to vacatur of the TANF SORN and Revision, 5 U.S.C. § 706, a stay of the TANF SORN and Revision, 5 U.S.C. § 705, and a preliminary and permanent injunction prohibiting Defendants from implementing the TANF SORN or Revision of the TANF System of Records.

**COUNT II**
**Violation of the Administrative Procedure Act**
**Without Observance of Procedure Required by Law**
**TANF SORN and Revision**
**Against HHS Defendants**

~~135.~~173. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

~~136.~~174. Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

~~137.~~175. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law . . . [or] without observance of procedure required by law." *Id.* § 706(2)(A), (D).

~~138.~~176. The HHS Defendants' Revision of the TANF System of Records, as effectuated through the SORN, is a final agency action.

~~139.~~177. An agency may not take any action that is contrary to law or taken without the procedures required by law.

~~140.~~178. The Privacy Act includes two separate procedural requirements that are implicated here: the obligation to provide notice and an opportunity for comment on "any new use or intended use of the information," 5 U.S.C. § 552a(e)(4), (11), and the obligation to provide notice before creating a new "matching program," *id.* § 552a(e)(12). This "public notice and comment structure is an essential component of the Act and an essential piece of American democracy. Americans deserve to know the nature, scope, and routine uses of the records before they are collected by the federal government." *United States v. Weber*, 816 F. Supp. 3d 1168, 1193 (C.D. Cal. 2026). Defendants have violated both of the Privacy Act's notice requirements.

~~141.~~179. ***First,*** the Privacy Act requires that "at least 30 days prior to publication of information under" any new routine use, each agency that maintains a system of records shall "publish in the Federal Register notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." 5 U.S.C. § 552a(e)(4), (11).

~~142.~~180. Despite these requirements, the TANF SORN announced that the Revision of the TANF System of Records was effective immediately, except for the new routine use which would become effective as soon as the 30-day comment period closed. By deciding that the new

system of records will be used for entirely new purposes without soliciting *any* public comment, and by asserting that the new "routine use" to effectuate that purpose was effective as soon as the public comment period closed, ACF demonstrated that it had no intent of considering public comment on this new use of TANF data. Defendants' botched publication process for the TANF SORN encouraged confusion rather than public input.

~~143.~~181. By publishing these defective and erroneous notices, which announced in advance that Defendants would not properly consider public comments, Defendants failed to comply with the notice and comment procedure required by the Privacy Act.

~~144.~~182. ***Second,*** Defendants have decided to add new records to this system of records and to share these records with other agencies for the purpose of verifying TANF eligibility. In doing so they have created a new "matching program," *see* 5 U.S.C. § 552a(a)(8), which is subject to the requirements of the Privacy Act. These requirements include publishing notice in the Federal Register at least 30 days before creating the new matching program. *See id.* § 552a(e)(12). Defendants failed to comply with this legally required procedure.

~~145.~~183. The Privacy Act also requires agencies to enter into detailed computer matching agreements before disclosing records to another agency. *See id.* § 552a(o). These agreements include detailed procedural and substantive requirements to help ensure the accuracy of data matches and protect the rights of public benefits recipients. *See id.* By failing to enter into a computer matching agreement, Defendants failed to comply with this legally required procedure and have also failed to provide "appropriate . . . safeguards to insure the security and confidentiality of [TANF] records." *Id.* 552a(e)(10).

~~146.~~184. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the TANF SORN was implemented without observance of procedure required by law, and in violation of the APA.

~~147.~~185. Plaintiff States are also entitled to vacatur of the TANF SORN and Revision, 5 U.S.C. § 706, a stay of the TANF SORN and Revision, 5 U.S.C. § 705, and a preliminary and permanent injunction prohibiting Defendants from implementing the TANF SORN.

**COUNT III**
**Violation of the Administrative Procedure Act**
**Arbitrary & Capricious**
**TANF SORN and Revision**
**Against HHS Defendants**

~~148.~~186. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

~~149.~~187. Defendants include "agenc[ies]" under the APA, 5 U.S.C. § 551(1).

~~150.~~188. The HHS Defendants' Revision of the TANF System of Records, as effectuated through the SORN, is a final agency action.

~~151.~~189. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

~~152.~~190. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*

*Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Tr. Lines v. United States*, 371 U.S. 156, 168 (1962)).

~~153.~~191. That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id*.

~~154.~~192. An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs*., 463 U.S. at 43).

~~155.~~193. Defendants' Revision to this system of records, including by adding entirely new categories of records to this system and by using these records for entirely new purposes, is arbitrary and capricious.

~~156.~~194. Defendants' issuance of the TANF SORN to implement these modifications is similarly arbitrary and capricious.

~~157.~~195. The SORN contains no reasoning and no consideration of costs and benefits or reliance interests. For example, the SORN provides no explanation for why it is necessary for ACF to conduct its own "oversight activities" given the robust eligibility determination processes that States already have in place for TANF applicants and recipients. The SORN also fails to consider that the new routine use applies to years' worth of data collected from prior TANF recipients, who would have had no reason to expect this new use of the data they provided.

~~158.~~196. Defendants' decision to make the new routine use effective on ~~August 11, 2026,~~ the same day the comments ~~a~~were due, means that Defendants decided in advance that they would not consider meaningful aspects of the problem raised in the comments.

~~159.~~197. The TANF SORN is arbitrary and capricious in that it modifies a system of records for the purpose of "monitoring" State compliance with TANF generally, but ACF lacks general enforcement authority with respect to TANF and, instead, maintains limited enforcement authority set by Congress tied to particular statutory penalties.

~~160.~~198. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the TANF SORN and the Revision effectuated by the SORN are arbitrary and capricious and in violation of the APA.

~~161.~~199. Plaintiff States are also entitled to vacatur of the TANF SORN and Revision, 5 U.S.C. § 706, a stay of the TANF SORN and Revision, 5 U.S.C. § 705, and a preliminary and permanent injunction prohibiting Defendants from implementing the TANF SORN or Revision of the TANF System of Record.

**COUNT IV**
**Violation of the Spending Clause**
**TANF SORN and Revision**
**Against HHS Defendants**

~~162.~~200. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

~~163.~~201. The Spending Clause of the U.S. Constitution provides that "[t]he Congress shall have Power To . . . provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Legislation establishing TANF was enacted pursuant to the Spending Clause.

~~164.~~202. Among other requirements, the Spending Clause requires that States must receive "fair notice" of any conditions on the receipt of federal funds. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 304 (2006). Any conditions on federal funding must be accepted by States "voluntarily and knowingly." *Id.* at 296 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). And "States cannot knowingly accept conditions of which they are 'unaware.'" *Id.* Any condition on the States' acceptance of federal funds must thus be set forth "unambiguously." *Id.* "[I]t strains credulity to argue that participating States should have known of their 'obligations' under [a statute] when . . . the governmental agency responsible for the administration of the [statute] and the agency with which the participating States have the most contact, has never understood [it] to impose conditions on participating States." *Pennhurst State Sch. & Hosp.*, 451 U.S. at 25.

~~165.~~203. At no point did ACF advise Plaintiff States that the data they submitted to ACF pursuant to 42 U.S.C. § 611 would be made widely available to any other entity, including other federal, State, and private agencies, for the purposes of monitoring State compliance with any and all TANF program requirements. Yet, the SORN would permit ACF to share at least three prior years' data with other entities, which Plaintiff States could not have possibly foreseen when providing that data and participating in the TANF program years in the past.

~~166.~~204. At no point did ACF advise Plaintiff States that they would be subject to new "oversight activities including but not limited to program integrity reviews (*e.g.* comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (*e.g.* financial audits, programmatic audits, and fraud investigations), and monitoring (*e.g.* regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)," or that that the data they submitted

to ACF pursuant to 42 U.S.C. § 611 would be used to initiate and further these activities. 91 Fed. Reg. at 37,407. Yet, the SORN would subject the States to such new ACF assessments, audits, investigations, and reviews, and would permit ACF to use Plaintiff States' prior years' data—in combination with data collected from other entities—to conduct these unauthorized "oversight activities," which Plaintiff States could not have possibly foreseen when providing that data and participating in the TANF program years in the past.

~~167.~~205. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the TANF SORN and the Revision effectuated by the SORN violate the Spending Clause of the U.S. Constitution.

~~168.~~206. Plaintiff States are also entitled to a preliminary and permanent injunction prohibiting Defendants from implementing the TANF SORN or Revision of the TANF System of Records.

**COUNT V**
**Violation of the Administrative Procedure Act**
**Contrary to Law and In Excess of Statutory Authority**
**September 2025 Data Transfer and Data Disclosure Policy**
**Against All Defendants**

197. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

198. Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

199. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," or "in excess of statutory . . . authority." *Id.* § 706(2)(A), (C).

200. Defendants' September 2025 Data Transfer is a final agency action.

201. Defendants' Data Disclosure Policy is a final agency action.

202. An agency may not take any action that is contrary to law or exceeds the scope of its statutory authority.

207. Defendants have acted contrary to law and in excess of statutory authority by adopting and implementing the September 2025 Data Transfer and Data Disclosure Policy.

208. PRWORA sharply limits the circumstances in which States or the federal government may disclose TANF recipients' and their family members' personal information. And PRWORA does not allow ACF broad program oversight authority. No provision of the TANF statute, nor any other statute, allows ACF to disclose TANF recipients' and their family members' information to DHS. To the contrary, the statute specifically delineates and carefully cabins the circumstances in which information about TANF recipients may be shared with DHS.

209. The Data Disclosure Policy is also inconsistent with the Privacy Act. Although ACF asserts that the September 2025 Data Transfer was authorized by Routine Use 7 in the then-controlling SORN, that use does not in fact permit the September 2025 Data Transfer or the Data Disclosure Policy.

210. Further, sharing TANF records for undefined "program integrity" purposes that are not authorized by statute is not "compatible with the purpose for which [that information] was collected," which is principally to create reports for Congress. *See* 5 U.S.C. § 552a(a)(7).

211. In addition, ACF did not notify TANF recipients that their information would be used for this purpose at the time the information was collected, as required by statute. 5 U.S.C. § 552a(e)(3).

203. The September 2025 Data Transfer and Data Disclosure Policy also violate 42 U.S.C. § 1306's prohibition on the "disclosure of . . . any information, obtained at any time by . . . any officer or employee of [HHS] in the course of discharging the duties of the head of [HHS]

under this chapter . . . except as the head of [HHS] may by regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306(a)(1)–(2).

212. The September 2025 Data Transfer and Data Disclosure Policy violate 42 U.S.C. § 405, which provides that "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record." The TANF data obtained from States contains both Social Security numbers and "related records," including highly personal identifying information about TANF recipients and their family members.

204. The September 2025 Data Transfer and Data Disclosure Policy violate 18 U.S.C. § 1905, which makes it a criminal offense for government agencies to disclose information concerning the "identity" or the "amount or source of any income . . . of any person."

205. The September 2025 Data Transfer and Data Disclosure Policy further violate the Computer Matching and Privacy Protection Act by creating a new "matching program." *See* 5 U.S.C. § 552a(a)(8). Defendants did not meet the requirements of the Act, including publishing notice in the Federal Register at least 30 days before creating the new matching program, *id.* § 552a(e)(12), and entering into detailed computer matching agreements before disclosing records to another agency. *Id.* § 552a(o), (e)(10).

206. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the September 2025 Data Transfer and Data Disclosure Policy are contrary to law and in excess of statutory authority, and in violation of the APA.

207. Plaintiff States are also entitled to vacatur of the September 2025 Data Transfer and Data Disclosure Policy, 5 U.S.C. § 706, a stay of the September 2025 Data Transfer and Data

Disclosure Policy, 5 U.S.C. § 705, and a preliminary and permanent injunction prohibiting Defendants from further implementing the September 2025 Data Transfer and Data Disclosure Policy.

208. Plaintiff States are also entitled to expungement of any data held by DHS as a result of the unlawful September 2025 Data Transfer.

**COUNT VI**
**Violation of the Administrative Procedure Act**
**Without Observance of Procedure Required by Law**
**September 2025 Data Transfer and Data Disclosure Policy**
**Against All Defendants**

209. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

210. Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

211. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law . . . [or] without observance of procedure required by law." *Id.* § 706(2)(A), (D).

212. Defendants' September 2025 Data Transfer is a final agency action.

213. Defendants' Data Disclosure Policy is a final agency action.

214. An agency may not take any action that is contrary to law or taken without the procedures required by law.

215. The Privacy Act includes two separate procedural requirements that are implicated here: the obligation to provide notice and an opportunity for comment on "any new use or intended use of the information," 5 U.S.C. § 552a(e)(4), (11), and the obligation to provide notice before creating a new "matching program," *id.* § 552a(e)(12). This "public notice and comment structure is an essential component of the Act and an essential piece of American democracy. Americans

deserve to know the nature, scope, and routine uses of the records before they are collected by the federal government." *United States v. Weber*, 816 F. Supp. 3d 1168, 1193 (C.D. Cal. 2026). Defendants have violated both of the Privacy Act's notice requirements.

216. ***First,*** the Privacy Act requires that "at least 30 days prior to publication of information under" any new routine use, each agency that maintains a system of records shall "publish in the Federal Register notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." 5 U.S.C. § 552a(e)(4), (11).

217. The Data Disclosure Policy and September 2025 Data Transfer were not authorized by the SORN in effect at the time the policy was adopted and the September 2025 Data Transfer was effectuated.

218. Therefore, ACF was required by the Privacy Act to publish notice of the new use of the States' TANF data *before* that use began.

219. But ACF did not publish the SORN challenged in this lawsuit until nearly a year *after* the September 2025 Data Transfer.

220. ***Second,*** the Data Disclosure Policy purports to authorize ACF to share States' TANF records with DHS and other entities for the purpose of verifying TANF eligibility. In doing so, Defendants have created a new "matching program," *see* 5 U.S.C. § 552a(a)(8), which is subject to the requirements of the Privacy Act. These requirements include publishing notice in the Federal Register at least 30 days before creating the new matching program. *See id.* § 552a(e)(12). Specifically, DHS as the "recipient agency" in this new matching program between two federal agencies was required to publish the statutorily mandated notice. *See id.*; *see also* OMB Circular

A-108 at 18, https://perma.cc/35C4-K885 (explaining this requirement). Defendants failed to comply with this legally required procedure.

221. The Privacy Act also requires agencies to enter into detailed computer matching agreements before disclosing records to another agency or receiving records from another agency. *See id.* § 552a(o). These agreements include detailed procedural and substantive requirements to help ensure the accuracy of data matches and protect the rights of public benefits recipients. *See id.* By failing to enter into a computer matching agreement, Defendants failed to comply with this legally required procedure and have also failed to provide "appropriate . . . safeguards to insure the security and confidentiality of [TANF] records." *Id.* § 552a(e)(10).

222. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Data Disclosure Policy and September 2025 Data Transfer were implemented without observance of procedure required by law, and in violation of the APA.

223. Plaintiff States are also entitled to vacatur of the Data Disclosure Policy and September 2025 Data Transfer, 5 U.S.C. § 706, a stay of the Data Disclosure Policy and September 2025 Data Transfer, 5 U.S.C. § 705, and a preliminary and permanent injunction prohibiting Defendants from implementing the Data Disclosure Policy and September 2025 Data Transfer.

224. Plaintiff States are also entitled to expungement of any data held by DHS as a result of the unlawful September 2025 Data Transfer.

**COUNT VII**
**Violation of the Administrative Procedure Act**
**Arbitrary & Capricious**
**September 2025 Data Transfer and Data Disclosure Policy**
**Against All Defendants**

225. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

226. Defendants include "agenc[ies]" under the APA, 5 U.S.C. § 551(1).

227. Defendants' September 2025 Data Transfer is a final agency action.

228. Defendants' Data Disclosure Policy is a final agency action.

229. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

230. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

213. That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

231. An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

232. Defendants' September 2025 Data Transfer and Data Disclosure Policy are arbitrary and capricious.

233. By acting in secret, Defendants offered no reasoning whatsoever for the September 2025 Data Transfer or Data Disclosure Policy. And they failed to acknowledge that they were changing position, weigh the costs of that change, or consider reliance interests.

234. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the September 2025 Data Transfer and Data Disclosure Policy are arbitrary and capricious and in violation of the APA.

235. Plaintiff States are also entitled to vacatur of the September 2025 Data Transfer and Data Disclosure Policy, 5 U.S.C. § 706, a stay of the September 2025 Data Transfer and the Data Disclosure Policy, 5 U.S.C. § 705, and a preliminary and permanent injunction prohibiting Defendants from implementing the September 2025 Data Transfer and the Data Disclosure Policy.

236. Plaintiff States are also entitled to expungement of any data held by DHS as a result of the unlawful September 2025 Data Transfer.

**COUNT VIII**
**Violation of the Spending Clause**
**September 2025 Data Transfer and Data Disclosure Policy**
**Against All Defendants**

237. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

238. The Spending Clause of the U.S. Constitution provides that "[t]he Congress shall have Power To . . . provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Legislation establishing TANF was enacted pursuant to the Spending Clause.

239. Among other requirements, the Spending Clause requires that States must receive "fair notice" of any conditions on the receipt of federal funds. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 304 (2006). Any conditions on federal funding must be accepted

by States "voluntarily and knowingly." *Id.* at 296 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). And "States cannot knowingly accept conditions of which they are unaware." *Id.* Any condition on the States' acceptance of federal funds must thus be set forth "unambiguously." *Pennhurst*, 451 U.S. at 17. "[I]t strains credulity to argue that participating States should have known of their 'obligations' under [a statute] when . . . the governmental agency responsible for the administration of the [statute] and the agency with which the participating States have the most contact, has never understood [it] to impose conditions on participating States." *Id.* at 25.

240. At no point did ACF advise Plaintiff States that the data they submitted to ACF pursuant to 42 U.S.C. § 611 would be transferred to DHS or to other entities for "program integrity" purposes.

214. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the September 2025 Data Transfer and the Data Disclosure Policy violate the Spending Clause of the U.S. Constitution.

241. Plaintiff States are also entitled to a preliminary and permanent injunction prohibiting Defendants from implementing the September 2025 Data Transfer and the Data Disclosure Policy.

242. Plaintiff States are also entitled to expungement of any data held by DHS as a result of the unlawful September 2025 Data Transfer.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States pray that this Court:

i. Issue a judicial declaration that the TANF SORN ~~and~~, the Revision effectuated by the SORN, the September 2025 Data Transfer, and the Data Disclosure Policy are in excess of

statutory authority, contrary to law, without observance of the proper procedure, and arbitrary and capricious, in violation of the Administrative Procedure Act, and are unconstitutional;

ii. Pursuant to 5 U.S.C. § 705, stay the TANF SORN ~~and~~, the Revision~~;~~, the September 2025 Data Transfer, and the Data Disclosure Policy;

iii. Pursuant to 5 U.S.C. § 706, vacate the TANF SORN ~~and Revision~~, the Revision, the September 2025 Data Transfer, and the Data Disclosure Policy;

iv. Preliminarily and permanently enjoin Defendants from implementing the TANF SORN ~~or~~, the Revision ~~of the TANF System of Records~~, the September 2025 Data Transfer, and the Data Disclosure Policy as to Plaintiff States, including as to data reported to ACF by Plaintiff States or verification information obtained from Plaintiff States;

215. Preliminarily and permanently enjoin Defendants from using or retaining information or records transferred from ACF pursuant to the TANF SORN, the Revision, the September 2025 Data Transfer, and the Data Disclosure Policy, and order Defendants to expunge any data shared with them pursuant to these actions and policies;

v. Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

vi. Grant other such relief as this Court may deem proper.

Dated: August ~~3~~17, 2026

Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Jessica Ranucci*
Jessica Ranucci
Mark Ladov

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Mitchell P. Reich*
Mitchell P. Reich (1044671)
*Senior Counsel to the Attorney General*

Stephen Thompson
*Special Counsel*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
28 Liberty St.
New York, NY 10005
(929) 736-3392
jessica.ranucci@ag.ny.gov
mark.ladov@ag.ny.gov
stephen.thompson@ag.ny.gov
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**ROB BONTA**
Attorney General of California

By: <u>*/s/ Camille Framroze*</u>
Todd Grabarsky
Matthew Wise
*Supervising Deputy Attorneys General*
William Bellamy
Camille Framroze
Harald Kirn
Andrew Kushner
*Deputy Attorneys General*
455 Golden Gate Ave., Ste. 11000
San Francisco, CA 94102-7004
(415) 510-3619
Camille.Framroze@doj.ca.gov

*Counsel for the State of California*

**PHIL WEISER**
Attorney General of Colorado

By: <u>*/s/ David Moskowitz*</u>
David Moskowitz (994469)
*Deputy Solicitor General*
Reed W. Morgan
*Assistant Solicitor General*
1300 Broadway, 10th Fl.
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

Karthik Reddy (1048848)
*Special Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth St. NW
Washington, DC 20001
(202) 279-1261
mitchell.reich@dc.gov

*Counsel for the District of Columbia*

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: <u>*/s/ Luci D. Davis*</u>
Luci D. Davis
Jaylia Yan (90007649)
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Luci.Davis@azag.gov
Jaylia.Yan@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**WILLIAM TONG**
Attorney General of Connecticut

By: <u>*/s/ Katherine Zdrojeski*</u>
Katherine Zdrojeski
*Assistant Attorney General*
165 Capitol Ave.
Hartford, CT 06106
(860) 808-5210
Katherine.Zdrojeski@ct.gov

*Counsel for the State of Connecticut*

*Counsel for the State of Colorado*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Lison
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Delaware Department of Justice
820 N. French St.
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

By: */s/ Kaliko'onālani D. Fernandes*
Kaliko'onālani D. Fernandes
*Solicitor General*
425 Queen St.
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai'i*

**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Harpreet K. Khera*
Harpreet K. Khera
*Bureau Chief, Special Litigation*
Sherief Gaber
*Assistant Attorney General*
115 S. LaSalle St., 35th Fl.
Chicago, IL 60603
(773) 590-7127
Harpreet.Khera@ilag.gov
Sherief.Gaber@ilag.gov

*Counsel for the State of Illinois*

**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
In his official capacity as Governor of the Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo
*General Counsel*
Sam Flynn
*Chief Deputy General Counsel*
Laura C. Tipton
*Deputy General Counsel*
Office of the Governor
501 High St.
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Brendan Kreckel*
Brendan Kreckel

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Keith M. Jamieson*
Keith M. Jamieson (187911)

*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
brendan.kreckel@maine.gov

*Counsel for the State of Maine*

*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6960
kjamieson@oag.maryland.gov

*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Michelle Pascucci*
Michelle Pascucci
*State Trial Counsel*
Jak Kundl
*Assistant Attorney General*
One Ashburton Pl.
Boston, MA 02108
(617) 963-2255
michelle.pascucci@mass.gov
jak.kundl@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

**KEITH ELLISON**
Attorney General of the State of Minnesota

By: */s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp
*Special Counsel, Rule of Law*
445 Minnesota St., Suite 600
St. Paul, MN 55101
(651) 300-0711
lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
Attorney General of the State of Nevada

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-3420
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

**RAÚL TORREZ**
Attorney General for the State of New

By: */s/ Kashif T. Chand*
Kashif T. Chand
*Assistant Attorney General*
New Jersey Office of the Attorney General, Division of Law
124 Halsey St., 5th Fl.
Newark, NJ 07101
(973) 648-2052
Kashif.Chand@law.njoag.gov

*Counsel for the State of New Jersey*

Mexico

By: */s/ Anjana Samant*
Anjana Samant
*Deputy Counsel*
NM Department of Justice
408 Galisteo St.
Santa Fe, ~~New Mexico~~NM 87501
(505) 270-4332
asamant@nmdoj.gov

*Counsel for the State of New Mexico*

**DAN RAYFIELD**
Attorney General State of Oregon

By: */s/ Leanne Hartmann*
Leanne Hartmann
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
(971) 673-1880
Leanne.Hartmann@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSH SHAPIRO**
In his official capacity as Governor of the Commonwealth of Pennsylvania

By: */s/ Jacob B. Boyer*
Jennifer C. Selber
Jacob B. Boyer
Governor's Office of General Counsel
30 North 3rd St.
Suite 200
Harrisburg, PA 17101
(717) 831-2847
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Marissa D. Pizaña*
Marissa D. Pizaña
*Special Assistant Attorney General*
150 South Main St.
Providence, RI 02903
(401) 274-4400
MPizana@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan Patrick Kane*
Ryan Patrick Kane
*Deputy Solicitor General*
109 State St.
Montpelier, VT 05609
(802) 828-3171
Ryan.kane@vermont.gov

*Counsel for the State of Vermont*

**JAY JONES**
Attorney General for the Commonwealth of Virginia

**NICHOLAS W. BROWN**
Attorney General of the State of Washington

By: */s/ Mina Shahin*

By: */s/ Megan C. Keenan*
Megan C. Keenan (1672508)
*Deputy Solicitor General*
202 North Ninth St.
Richmond, VA 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

Mina Shahin
*Assistant Attorney General*
William McGinty
*Deputy Solicitor General*
800 Fifth Ave., Ste. 2000
Seattle, WA 98104
(206) 464-7744
Mina.Shahin@atg.wa.gov
William.McGinty@atg.wa.gov

*Counsel for the State of Washington*

**JOSHUA L. KAUL**
Attorney General of the State of Wisconsin
By: */s/ Faye B. Hipsman*
Faye B. Hipsman
*Assistant Attorney General*
Wisconsin Department of Justice
PO Box 7857
Madison, WI 53707-7857
(608) 264-9487
faye.hipsman@wisdoj.gov

*Counsel for the State of Wisconsin*