**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>ADMINISTRATION FOR CHILDREN AND FAMILIES, *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-02726-JEB |

**PLAINTIFF STATES' MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION AND STAY UNDER 5 U.S.C. § 705**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 3

I. Statutory and Regulatory Background ..... 3

A. The Temporary Assistance for Needy Families Program ..... 3

B. Statutory Protections for the Confidentiality of TANF Information ..... 5

C. The TANF System of Records ..... 7

II. Factual Background ..... 8

A. Defendants Have Repeatedly Targeted TANF Funding with Unsubstantiated Allegations of Fraud ..... 8

B. The 2026 SORN and the Revisions to the System of Records ..... 10

C. The 2025 Data Transfer and the Disclosure Policy ..... 11

D. Plaintiff States Will Be Harmed by the Disclosure Actions ..... 12

ARGUMENT ..... 12

I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims ..... 16

A. The Disclosure Actions Are Final Agency Actions Under the APA ..... 17

B. The Disclosure Actions Are Contrary to Law ..... 19

1. 42 U.S.C. § 1306 and the TANF Statute Bar the Disclosure Actions ..... 19

2. The Disclosure Actions Violate the Social Security Act. ..... 23

3. The Disclosure Actions Violate the Privacy Act ..... 25

C. The Disclosure Actions Are Arbitrary and Capricious ..... 34

1. The 2025 Data Transfer and Underlying Data Disclosure Are Arbitrary and Capricious ..... 34

2. The 2026 SORN and Revision Are Arbitrary and Capricious ..... 36

D. The Disclosure Actions Violate the Spending Clause ..... 37

II. Plaintiffs Will Suffer Irreparable Harm ..... 38

III. The Balance of the Equities and Public Interest Favor Plaintiffs ..... 44

CONCLUSION ..... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) ........................................17

*Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*,
836 F.3d 963 (8th Cir. 2016) ........................................19

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
786 F. Supp. 3d 647 (S.D.N.Y. 2025)........................................18–19

*Am. Pub. Health Ass'n v. Nat'l Institutes of Health*,
791 F. Supp. 3d 119 (D. Mass. 2025) ........................................37

*Ames v. U.S. Dep't of Homeland Security*,
153 F. Supp. 3d 342 (D.D.C. 2016) ........................................28

*Ames v. U.S. Dep't of Homeland Security*,
861 F.3d 238 (D.C. Cir. 2017) ........................................27, 30

*Arlington Cent. Sch. Dist. v. Murphy*,
548 U.S. 291 (2006)........................................38

*Bechhoefer v. U.S. Dep't of Justice*,
179 F. Supp. 2d 93 (W.D.N.Y. 2001) ........................................29

*Bennett v. Spear*,
520 U.S. 154 (1997)........................................17, 19, 26

*Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin.*,
972 F.3d 83 (D.C. Cir. 2020) ........................................34, 36

*Boehner v. McDermott*,
484 F.3d 573 (D.C. Cir. 2007) ........................................24

**Britt v. Naval Investigative Serv.*,
886 F.2d 544 (3d Cir. 1989)........................................27, 29

*California v. Trump*,
786 F. Supp. 3d 359 (D. Mass. 2025) ........................................41

*California v. United States Dep't of Agric.*,
No. 25-CV-026-cv-6310-MMC, 2025 WL 2939227 (N.D. Cal. Oct. 15, 2025)....................45

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)....................38, 43

*Chichakli v.Tillerson*,
882 F.3d 229 (D.C. Cir. 2018)....................27

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)....................25

*City & Cnty. of San Francisco v. Trump*,
779 F. Supp. 3d 1077 (N.D. Cal.)....................40

*City of Los Angeles v. Sessions*,
No. CV 17-7215-R, 2018 WL 6071072 (C.D. Cal. Sept. 13, 2018)....................39–40

*Commonwealth of Massachusetts v. Dep't of Educ.*,
828 F. Supp. 3d 198 (D. Mass. 2026)....................40

*Concilio De Salud Integral De Loiza, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
538 F. Supp. 2d 139 (D.D.C. 2008)....................18

*Covert v. Harrington*,
876 F.2d 751 (9th Cir. 1989)....................29

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019)....................35

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)....................34, 35

**District of Columbia v. U.S. Dep't of Agric.*,
444 F. Supp. 3d 1 (D.D.C. 2020)....................38, 41, 44

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988)....................26, 28

*Doe v. U.S. Dep't of Labor*,
451 F. Supp. 2d 156 (D.D.C. 2006)....................28

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)....................34

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) ..........34–35

*Georgia v. Brooks-LaSure*,
No. 2:22-CV-6, 2022 WL 3581859 (S.D. Ga. Aug. 19, 2022) ..........36

*Haleem v. U.S. Dep't of Defense*,
No. 23-1471, 2024 WL 230289 (D.D.C. Jan. 22, 2024) ..........26

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024) ..........31

*Human Touch DC, Inc. v. Merriweather*,
No. 15-cv-00741, 2015 WL 12564166 (D.D.C. 2015) ..........39

*Ipsen Biopharmaceuticals, Inc. v. Azar*,
943 F.3d 953 (D.C. Cir. 2019) ..........17, 19

*Jibril v. Mayorkas*,
20 F.4th 804 (D.C. Cir. 2021) ..........43

*Landor v. La. Dep't of Corr. & Pub. Safety*,
146 S. Ct. 1931 (2026) ..........37

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..........38, 45

**League of Women Voters v. U.S. Dep't of Homeland Sec.*,
No. CV 25-3501 (SLS),
2026 WL 1784297 (D.D.C. June 22, 2026) ..........18, 24, 26, 28, 33, 34, 36, 43

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) ..........41

*Lugo v. U.S. Dep't of Justice*,
214 F. Supp. 3d 32 (D.D.C. 2016) ..........28

*Massachusetts v. Dep't of Educ.*,
828 F. Supp. 3d 198 (D. Mass. 2026) ..........40, 43, 44

*Mazaleski v. Treusdell*,
562 F.2d 701 (D.C. Cir. 1977) ..........28, 29

*Mexichem Specialty Resins, Inc. v. EPA*,
787 F.3d 544 (D.C. Cir. 2015) ..........38

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................ 34

*MST Exp. v. Dep't of Transp.*,
108 F.3d 401 (D.C. Cir. 1997) ........................................ 23

*Nat'l Council of Nonprofits v. McMahon*,
No. CV 25-13242-MJJ, 2026 WL 1876366 (D. Mass. June 30, 2026) ........................................ 36, 43

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ........................................ 37, 43

*Navajo Nation v. Dep't of Health & Hum. Servs.*,
325 F.3d 1133 (9th Cir. 2003) ........................................ 3

**New York v. Admin. for Children & Families*,
No. 26-CV-172, -- F. Supp. 3d --,
2026 WL 673848 (S.D.N.Y. Mar. 10, 2026) ........................................ 9, 41, 43, 44, 45

*New York v. U.S. Dep't of Just.*,
804 F. Supp. 3d 294 (D.R.I. 2025) ........................................ 41, 43, 44

*New York v. United States Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020) ........................................ 40

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................ 17

*Oceana, Inc. v. Locke*,
670 F.3d 1238 (D.C. Cir. 2011) ........................................ 23

**Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ........................................ 37, 38

*Pa. Dep't of Pub. Welfare v. Sebelius*,
674 F.3d 139 (3d Cir. 2012) ........................................ 23

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ........................................ 35

*South Dakota v. Dole*,
483 U.S. 203 (1987) ........................................ 37

*Swenson v. U.S. Postal Serv.*,
890 F.2d 1075 (9th Cir. 1989) ........................................ 27

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .......... 41

*U.S. Army Corps of Engineers v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 17

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*,
489 U.S. 749 (1989) .......... 25

**U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
9 F.3d 138 (D.C. Cir. 1993) .......... 27, 29, 40

*Venetian Casino Resort, LLC v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008) .......... 18, 19, 25

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 17

**Constitution and Federal Statutes**

U.S. Const. art. I, § 8 .......... 37

5 U.S.C.
§ 552a .......... 6, 25, 26, 27, 29, 33
§ 704 .......... 26
§ 705 .......... 16, 45

8 U.S.C.
§ 1612 .......... 7, 29
§ 1641 .......... 7

31 U.S.C.
§ 7502 .......... 5
§ 7503 .......... 22

42 U.S.C.
§ 405 .......... 6, 23, 24
§ 601 .......... 1, 4, 40
§ 602 .......... 1, 7, 19, 20, 36
§ 609 .......... 4, 5, 16, 21, 22, 23
§ 610 .......... 16
§ 611 .......... 5, 7, 8, 25, 28, 29
§ 617 .......... 1, 4, 7, 19, 20, 22, 23
§ 1306 .......... 1, 5, 19, 20, 23, 26
§ 1320b-7 .......... 4, 7, 20

**Miscellaneous Authorities**

64 Fed. Reg. 17,720 (1999) ....................4

89 Fed. Reg 25,880 (2024) ....................2, 7, 8, 32

91 Fed. Reg. 37,406 (2026) ....................1, 10, 15, 18, 21, 24, 27, 28, 30, 32, 33, 38, 42

Executive Order No. 14395 ....................9

Antonin Scalia & Bryan A. Garner, Reading Law (2012)....................20

**PRELIMINARY STATEMENT**

Congress designed the Temporary Assistance for Needy Families (TANF) program to afford the States "increase[d] . . . flexibility" in administering programs for low-income families with children, 42 U.S.C. § 601(a), and to minimize intrusive federal oversight of those efforts. To that end, Congress has carefully circumscribed the authority of the Administration for Children and Families (ACF) to disclose sensitive personal information that it collects from the States in the course of overseeing TANF. Like all components of the Department of Health and Human Services (HHS), it is bound by a confidentiality statute that prohibits it from "disclos[ing] . . . any information" obtained "in the course of discharging [its] duties . . . except as the [Secretary] may by regulations prescribe and except as otherwise provided by federal law." *Id.* § 1306(a)(1), (2)(B). It is subject to the disclosure bars in the Social Security Act, the Trade Secrets Act, and the Privacy Act, which restrict ACF's authority to share Social Security numbers, income data, or other personal information absent express statutory authorization. And it is bound by the TANF statute itself, which, far from containing any disclosure authority that overrides these restrictions, affirmatively requires States to adopt measures "necessary to restrict the use and disclosure of information about individuals and families receiving assistance," 42 U.S.C. § 602(a)(1)(A)(iv), and bars ACF from "enforc[ing] any provision of this part, except to the extent expressly provided in this part," *id.* § 617.

In brazen defiance of all these limits, ACF issued a System of Records Notice (SORN) on June 23, 2026, that purports to authorize ACF to disclose *any* TANF information, to *any* federal, state, or private entity, for the purpose of helping ACF enforce *any* provision of the TANF statute. 91 Fed. Reg. 37,406, 37,409 (June 23, 2026). The information subject to this notice includes individuals' Social Security numbers, income history, citizenship status, parentage, marital status,

and much more. ACF has identified no statutory authority that permits it to disclose this highly protected personal information at will. And its SORN grapples with none of the statutory restrictions that bar such disclosure, let alone provides the reasoned explanation the Administrative Procedure Act (APA) requires.

But it gets worse. After filing their Complaint, Plaintiff States learned that, nine months before issuing this SORN, ACF had *already* shared—in secret—a year's worth of TANF recipients' information with the Department of Homeland Security (DHS). When Plaintiffs confronted ACF with this revelation, ACF revealed that it has taken the position—again, in secret—that whether or not a court enjoins the SORN, it may continue to make similar disclosures pursuant to a prior SORN authorizing it to share information with "contractors, grantees, consultants, or volunteers performing or working on a contract, service, grant, cooperative agreement, job, or other activity for HHS." 89 Fed. Reg 25,880, 25,882 (Apr. 12, 2024).

This policy, and ACF's decision to transmit its files *en masse* to DHS, is unlawful for all of the reasons that its new SORN is, and more besides. Indeed, it is difficult to think of an APA violation more fundamental than the agency's decision to adopt and implement a massive disclosure policy in secret, without public acknowledgement or a shred of explanation.

The Court should put a stop to this lawless disclosure regime. Plaintiff States have already been irreparably injured by ACF's previously undisclosed decision to give DHS a wealth of information that TANF recipients provided to the States under express assurances of confidentiality. ACF's breach of those assurances will inevitably undermine individuals' trust in the program, deter them from participating in TANF, and leave the neediest individuals relying on other, more costly programs funded by the States. And if ACF maintains its policies allowing further such disclosures—either through its new SORN, or through its hitherto-unrevealed

disclosure policy—it will multiply those harms, require States to take costly steps to revise their disclosures to TANF recipients, and subject the States to unlawful enforcement actions by ACF.

ACF cannot flout the confidentiality restrictions that Congress imposed on it. And it surely cannot do so in secret. The Court should issue a preliminary injunction blocking implementation of the agency's new SORN, enjoining ACF from implementing the same disclosure policy under its prior SORN, and requiring DHS to cease using the information that ACF unlawfully shared with it nearly a year ago.

## BACKGROUND

### I. Statutory and Regulatory Background

#### A. The Temporary Assistance for Needy Families Program

TANF is a pass-through program under which the federal government provides block grants to States, territories, and tribal governments, which have broad discretion to use the funds to provide assistance to low-income families with children. *See Navajo Nation v. Dep't of Health & Hum. Servs.*, 325 F.3d 1133, 1135 (9th Cir. 2003). TANF currently funds over $16 billion per year in grants to all fifty States, the District of Columbia, and several territories and tribal governments. Pub. L. No. 119-75, div. J, tit. III, § 6304, 140 Stat. 173, 686 (2026). It is one of the largest sources of cash assistance to low-income American families and a crucial component of Plaintiff States' anti-poverty work. Many of the children and their families who receive TANF assistance are "the poorest of the poor" and depend on TANF for their essential needs, including electricity, heat, housing, clothing, transportation, and diapers. NY-Chawla ¶¶ 6-7.[*]

When it established TANF in 1996, Congress sought to remedy what it perceived as the flaws in its predecessor program, Aid to Families with Dependent Children (AFDC)—principally,

---

[*] Exhibits and declarations are attached to the Declaration of Jessica Ranucci.

the excessive role that AFDC gave the federal government in supervising the program. *See* 64 Fed. Reg. 17,720, 17,721–22 (1999) (TANF "reflect[ed] widespread, bipartisan agreement" that "[t]he Federal government should focus less attention on eligibility determinations and place more emphasis on program results"). To that end, the TANF statute grants States significant "flexibility . . . in operating [the] program" and provides that States may expend TANF funds "in any manner that is reasonably calculated to accomplish the purpose of this part," 42 U.S.C. §§ 601(a), 604(a), thereby leaving them "broad discretion to determine their own eligibility criteria, benefit levels, and the type of services and benefits available to TANF cash assistance recipients." ACF, Fiscal Year 2024 Justification of Estimates for Appropriations Committee at 386, https://perma.cc/UZ7D-5W8N. It similarly entrusts States with ensuring that individuals meet eligibility requirements for their respective TANF programs, directing them to establish an "income and eligibility verification system," under which individuals, employers, and agencies must submit information to the State to confirm eligibility. *See* 42 U.S.C. § 1320b-7(a), (b)(1).

ACF, by contrast, has a sharply limited role in administering the TANF statute. The statute provides that "[n]o officer or employee of the Federal Government may regulate the conduct of States under this part or enforce any provision of this part, except to the extent expressly provided in this part." 42 U.S.C. § 617. It then details fifteen specific provisions of the law that HHS—which has delegated its TANF responsibilities to ACF—may enforce. *See id.* § 609. Among other things, it provides that ACF may assess penalties on States for failing to enforce the statute's time-limit requirement, which generally limits assistance to five years, *id.* § 609(a)(9), or its work participation requirements, *id.* § 609(a)(15). The TANF statute separately authorizes ACF to impose a "[g]eneral [p]enalty" on States for violating provisions of the TANF statute not specifically listed in this section—but only "[i]f an audit conducted under chapter 75 of Title

31 finds that an amount paid to a State under [TANF] . . . has been used in violation of this part." *Id.* § 609(a)(1)(A); *see* 31 U.S.C. § 7502(a), (c) (providing for a single annual audit for recipients of more than $300,000 in federal funding, conducted by an "independent auditor," in accordance with "generally accepted government auditing standards").

The TANF statute also requires HHS to submit a report to Congress on the general demographics and effectiveness of the TANF program. 42 U.S.C. § 611(b). To that end, each quarter, States must submit a report to ACF containing various information about TANF recipients and their family members, including their Social Security numbers, income, parentage, marital status, county of residence, citizenship status, and numerous other details. *Id.* § 611(a)(1)(A); *see* Ex. 3, ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions ("TANF Reporting Instructions") at 3-31. As the drafters explained, this provision ensures that "information on the effectiveness of State programs is publicly available." H.R. Rep. No. 104-651, at 1364 (1996).

### B. Statutory Protections for the Confidentiality of TANF Information

Numerous statutory provisions ensure the confidentiality of any information that States submit to the federal government under the TANF statute.

When administering TANF, ACF is bound by the general HHS confidentiality statute, 42 U.S.C. § 1306(a), which provides that "[n]o disclosure of . . . any file, record, report, or other paper, or any information, obtained at any time by . . . any officer or employee of [HHS] in the course of discharging the duties of the [Secretary] under this chapter . . . shall be made except as the [Secretary] may by regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306(a)(1), (2)(B).

In addition, ACF is subject to the confidentiality provision of the Social Security Act, which provides that "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1,

1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record." 42 U.S.C. § 405(c)(2)(C)(viii)(I). And it is bound by the Trade Secrets Act, which makes it a criminal offense for any federal employee to "make[] known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties" that "concerns or relates to the . . . identity" or the "amount or source of any income . . . of any person." 18 U.S.C. § 1905.

The Privacy Act, too, establishes important protections for TANF recipients' personal information. That law provides that any agency that maintains a system of records containing personal information about U.S. citizens or lawful permanent residents must publish a "system of records notice," or SORN, that describes in detail the contents of the system and its permissible uses. 5 U.S.C. § 552a(e)(4). It further provides that records in a system of records may not be disclosed without the consent of the relevant individuals unless one of several enumerated exceptions applies. *Id.* § 552a(a)(4), (b). As relevant here, one of those exceptions permits disclosure of records for a "routine use." *Id.* § 552a(b)(3). A routine use is valid only if it is "compatible with the purpose for which [the information] was collected," *id*. § 552a(a)(7), if the agency identifies that use in a SORN, *id*. § 552a(b)(3), (e)(4)(D), and if every affected individual is notified of the use at the time their information is collected, *id*. § 552a(e)(3)(D). In addition, before an agency matches information from one database with another for the purpose of determining eligibility for federal benefits, the Privacy Act requires that the agency enter a "computer-matching agreement" that is transmitted to Congress and made available to the public. *Id*. § 552a(a)(8)(A), (o).

Finally, the TANF statute itself contains important safeguards of individuals' privacy. It provides that States must adopt measures "necessary to restrict the use and disclosure of

information about individuals and families receiving assistance." 42 U.S.C. § 602(a)(1)(A)(iv). Further, it provides that, when States verify individuals' immigration status, they must do so in a manner that "protects the individual's privacy to the maximum degree possible." *Id.* § 1320b-7(d)(3)(B). (Congress prohibited some but not all noncitizens from accessing TANF benefits; for instance, lawful permanent residents, refugees, and asylees may lawfully receive TANF. *See* 8 U.S.C. §§ 1612(b)(1)–(2), (3)(A), 1641(b).) And, as noted, it bars ACF from taking actions to "enforce any provisions of" the TANF statute "except to the extent expressly provided in" that statute. 42 U.S.C. § 617.

### C. The TANF System of Records

ACF has long maintained a system of records—formally identified as System No. 09-80-0375, Temporary Assistance for Needy Families (TANF) Data ("TANF System of Records")—that consists of the information that States are required to send to ACF each quarter pursuant to 42 U.S.C. § 611(a). *See* 89 Fed. Reg. at 25,882. That system of records includes all of the personal information on TANF recipients collected from States, like Social Security numbers, income, dates of birth, and citizenship status. Ex. 3 at 3-31. The system also contains this data for former TANF recipients, for family members of current and former TANF recipients who are not themselves receiving TANF, and for recipients of State-funded poverty assistance programs. *Id.* Because the statute permits States to submit a statistical sample of such data if they choose, *see* 42 U.S.C. § 611(a)(1)(B)(i), the System contains records for all TANF recipients in some States, and only a sample of TANF recipients in others. *Compare, e.g.*, MA-Cole ¶ 25; PA-Pham ¶ 28 (sampling States), *with* DC-Campbell ¶ 28; RI-Merolla-Brito ¶ 30 (full data States).

At the start of this Administration, the TANF System of Records was governed by a SORN published in April 2024 ("the 2024 SORN"). Ex. 36, 89 Fed. Reg 25,880 (Apr. 12, 2024). Under the 2024 SORN, the TANF System of Records could be used for only three purposes: (1) to

"determine whether grantees are meeting certain requirements prescribed by" the TANF statute, "including work participation and time-limit requirements"; (2) to "compile information used in the report to Congress" required by 42 U.S.C. § 611, and (3) to "perform research on the caseload dynamics and employment trajectories of TANF recipients." *Id.* at 25,881.

In addition, under the 2024 SORN, disclosure of TANF data was only permitted for nine narrow "routine uses." 89 Fed. Reg. at 25,882. Those uses were standard ones found in numerous agency SORNs: for example, they authorized disclosure to perform statistical research or to mitigate the harms from a security breach. *Id.* at 25,882. As relevant here, Routine Use 7 allowed disclosure to "contractors, grantees, consultants, or volunteers performing or working on a contract, service, grant, cooperative agreement, job, or other activity for HHS related to the purposes of this system of records and who have a need to have access to the information in the performance of their duties or activities for HHS." *Id.* at 25,882.

## II. Factual Background

### A. Defendants Have Repeatedly Targeted TANF Funding with Unsubstantiated Allegations of Fraud.

Plaintiff States have adopted comprehensive programs for deterring, detecting, and stopping fraud among TANF beneficiaries. Among other things, they cross-check with other State and federal databases and with lists of incarcerated individuals, track out-of-state transactions, and operate fraud whistleblowing hotlines. *E.g.*, CO-McMahon ¶¶ 8-23; DE-Horn ¶¶ 7-18; KY-Dennis ¶¶ 8-22. Since some categories of noncitizens are eligible for TANF but others are not, the States independently check noncitizens' eligibility using databases, such as the Systematic Alien Verification for Entitlements (SAVE) system. *E.g.*, CT-Hadler ¶¶ 28-31; MI-Frisch ¶¶ 26-28; MN-Moore ¶¶ 28-32. And when Plaintiff States find fraud, they work to recover benefits paid and hold accountable those responsible. *E.g.*, MA-Cole ¶ 16; OR-Carpenter-Seguin ¶¶ 22-23.

Despite these processes and safeguards, Defendants have repeatedly used unsubstantiated allegations of "fraud" to target States' TANF programs. On January 6, 2026, days after a purported YouTube exposé, ACF announced that it had "froze[n] access to" all TANF funds for five Plaintiff States and claimed, without evidence, that it had unspecified "concerns" about "the potential for extensive and systemic fraud in" the States' TANF programs, including that States were "illicitly providing illegal aliens with TANF benefits." *New York v. Admin. for Children & Families*, No. 26-CV-172, (S.D.N.Y.), ECF Nos. 1-2, 40-6. A federal court granted a preliminary injunction and found that Defendants did not "offer any concrete evidence of fraud in Plaintiff States" and that the evident purpose of the freeze was "partisan targeting." *New York*, 2026 WL 673848, at *18–19 (quotation omitted).

Nevertheless, the Administration has continued to claim that "some States have embraced loopholes" and "refused to institute basic fraud controls," and "[a]s a result, illegal aliens" and other individuals "exploit" benefits programs "with ease." 91 Fed. Reg. 13,485, 13,485 (Mar. 16, 2026). In a March 16, 2026, Executive Order, President Trump established a Task Force to Eliminate Fraud, with duties including to "maximize enforcement of eligibility requirements," "promote . . . information and data sharing," and "audit and ensure prospective compliance monitoring, including for use in identifying fraud in Federal benefits programs." *Id.* at 13,487.

On June 10, 2026, ACF published a report claiming that States are unlawfully "channel[ing] substantial taxpayer-funded cash assistance into households headed by parents who are barred from receiving TANF because of immigration status, including illegal aliens." David Swegle & Alex J. Adams, The Prevalence of TANF Child-Only Cases Involving Immigration-Status-Ineligible Parents (June 10, 2026), https://perma.cc/RUE9-4WAE. In fact, TANF assistance may lawfully be provided to "eligible children" regardless of the eligibility of their parents, *see* 64

Fed. Reg. 17,720, 17,740 (Apr. 12, 1999).

**B. The 2026 SORN and the Revision to the System of Records**

On June 23, 2026, ACF announced its latest step in furtherance of its effort to deploy politicized allegations of fraud against Plaintiff States. That day, it issued a SORN that made three "significant" revisions to the TANF System of Records. Ex. 1, 91 Fed. Reg. at 37,407. (Plaintiff States refer to this SORN as the "2026 SORN," and its revision to the system of records as "the Revision.") Collectively, these revisions enable the disclosure of *any* of TANF recipients' personal information, to any federal, state, or private entity that ACF chooses, for the purpose of investigating violations of *any* provisions of the TANF statute.

First, the 2026 SORN states that ACF is enlarging the set of records included in the system. In addition to the millions of records of TANF recipient and family information furnished by States, the system will now also include "verification information obtained from [TANF grantee] agencies, other HHS records, or other government agencies or entities." *Id.* at 37,408.

Second, the 2026 SORN provides notice that ACF is dramatically expanding the authorized purposes for which the system of records may be used. The SORN revises the first listed purpose of the system of records to state that records may be used "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of" the TANF statute. *Id.* at 37,407. And the SORN adds a lengthy new purpose, which states that this personal information may be used "to ensure compliance with *all* TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship and immigration status." *Id.* (emphasis added). The SORN further notes that ACF will ensure that grantees are satisfying such requirements "through HHS agency oversight activities including but not limited to program integrity reviews (*e.g.* comprehensive assessments of how grantees administer TANF

programs and follow statutory requirements), additional audits (*e.g.* financial audits, programmatic audits, and fraud investigations), and monitoring (*e.g.* regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)." *Id.* These first two changes were effective immediately upon the SORN's June 23, 2026, publication. *Id.* at 37,406.

Third, the 2026 SORN maintains the old routine uses (including Routine Use 7) and adds a significant new "routine use" to the system of records, Routine Use 10. Routine Use 10 authorizes disclosure of TANF information "to another federal or grantee agency or entity engaged by ACF (*e.g.*, DHS or TANF program administrators), to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status." *Id.* at 37,409.

Routine Use 10 was initially scheduled to go into effect on July 23, 2026. *Id.* But ACF initially failed to make the SORN available for comment electronically, so it extended the effective date to August 11, 2026. *See* Ex. 2, 91 Fed. Reg. 45,278. Then, after Plaintiffs filed this suit and sought a temporary restraining order against Routine Use 10, ACF twice agreed to extend the effective date: first to September 1, and later to September 30, 2026. *See* Exs. 37–38, 91 Fed. Reg. 51,174 and 91 Fed. Reg. 53,876.

**C. The 2025 Data Transfer and the Disclosure Policy**

Shortly after filing this suit, Plaintiff States became aware that—although the 2026 SORN purports to make a "significant" change to the 2024 SORN—ACF had already adopted a policy, in secret, of disclosing information for precisely the purposes listed in Routine Use 10. In particular, Plaintiff States learned that, in September 2025, ACF secretly shared with DHS data from the TANF reports States submitted to ACF for Fiscal Year 2024. ECF No. 41 ¶¶ 1–2. Defendants have told Plaintiff States that this disclosure (the "2025 Data Transfer") relied on Routine Use 7 and that its purpose was to help ensure "program integrity"—in particular, to "help

ACF ensure that states are complying with the requirements of" the TANF statute, "including performing the required alien status verifications with DHS." *Id.* ¶ 2.

Furthermore, when Plaintiff States confronted Defendants with this revelation, they revealed that ACF had already taken the position—again, in secret—that it was authorized to make similar disclosures to other agencies pursuant to Routine Use 7 (the "Data Disclosure Policy"). *Id.* ¶ 3. Accordingly, Defendants told Plaintiff States that even if a court enjoins Routine Use 10, ACF's position is that it may continue to make the same disclosures under Routine Use 7. *Id.* ¶ 4.

Plaintiff States therefore amended their complaint to challenge the 2025 Data Transfer and the Disclosure Policy, in addition to the 2026 SORN and the Revision. ECF No. 42. Collectively, Plaintiff States refer to these challenged actions as the "Disclosure Actions." To permit orderly resolution of this Motion, Defendants have agreed not to make any further disclosures of TANF information to DHS until September 30, 2026.

**D. Plaintiff States Will Be Harmed by the Disclosure Actions.**

Defendants have already irreparably harmed the Plaintiff States by unlawfully sharing the information on millions of TANF recipients with DHS. And if the 2026 SORN takes full effect as planned on September 30—or if ACF ends its agreed-to pause in implementing the Data Disclosure Policy on that date—it will deepen those harms in multiple foreseeable ways.

***First***, absent Court intervention, the sharing of TANF information will irreparably damage the trust individuals place in the TANF program and chill families from participating in TANF, with dire consequences for Plaintiff States that rely on these programs to keep their residents out of poverty. *E.g.*, DC-Campbell ¶¶ 45-46; IL-Outland ¶¶ 45-46; WA-Reyes ¶¶ 46-47. States have long encouraged individuals to participate in the TANF program on the assurance that their information and the information of their family members will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. *E.g.*, MD-Rodgers ¶ 28;

NY-Chawla ¶ 54; PA-Pham ¶ 23; VT-Bocash ¶ 26; WI-Horn ¶ 28. For example, the District's application states that "[a]ll information . . . gathered" for a TANF application "is confidential" and that its unauthorized release "is a violation of Federal and D.C. law." DC-Campbell ¶ 25.

If ACF can proceed with sharing TANF data with virtually any entity it wishes, many TANF recipients will inevitably decline to participate in the program in the future. *E.g.*, CO-McMahon ¶¶ 50–51; CT-Hadler ¶¶ 55–56. Many individuals will be chilled from participation because they fear that DHS will use that information to engage in immigration enforcement against them or their family members. *E.g.*, CA-Witchey ¶¶ 41–42. Because the data include recipients' family members' information, households with citizen children residing with non-citizen parents are "particularly vulnerable." MD-Rodgers ¶ 47. And many others, such as domestic violence victims, are likely to withdraw from participation because they may fear their sensitive information will be disclosed in a way that will subject their most private details to public exposure. *Id.*

Indeed, ACF has already inflicted this harm to some degree by disclosing a year's worth on TANF information without the recipients' consent. *E.g.*, KY-Dennis Suppl. ¶¶ 3, 5; NJ-Cha Suppl. ¶ 6; NY Chawla Suppl. ¶¶ 9–10; WA-Reyes ¶¶ 3, 5. But because that Transfer was never previously disclosed to TANF participants (or to Plaintiff States), and because it occurred just a single time, its effect on TANF-recipients' behavior will not be as great as an indefinite, forward-looking policy of authorizing similar disclosures whenever ACF wishes.

Reduced participation in TANF will cause significant harm to Plaintiff States. Residents will lose access to services that prevent homelessness, provide employment, and allow them to contribute to the workforce; as a result, those individuals will inevitably rely on other services that are more expensive to States, such as State child welfare, foster care, shelter, juvenile justice, food bank, and emergency health care systems. *E.g.*, CA-Witchey ¶¶ 43–46; KY-Dennis ¶ 50; NY-

Chawla ¶ 56; WI-Horn ¶ 46. The result will be greater expenditures by the States because TANF is "more cost-effective than dealing with downstream crises." MI-Frisch ¶¶ 53–55; *see, e.g.*, VT-Bocash ¶ 47; WA-Reyes ¶ 48. And because in many States the TANF application is used for other critical benefits like SNAP and Medicaid, the chilling effect would extend to reduced participation in these other benefits, compounding the harms. *E.g.*, DC-Campbell ¶ 47.

***Second***, the Disclosure Actions will impose on Plaintiff States an immediate obligation to review their disclosures to TANF applicants and participants to ensure that the new uses of the data collected from them—*i.e.*, sharing with any federal, State, or private entity, including as "contractors"—is adequately disclosed. *E.g.*, CO-McMahon ¶ 54; NY-Chawla ¶ 57; NY-Chawla Suppl. ¶ 5; NM-Kozlowski ¶ 50 ("extensive legal review"). State and federal law requires Plaintiff States to maintain confidentiality of TANF applicants' data and to disclose its use. *E.g.*, AZ-Rodgers ¶ 35; DC-Campbell ¶¶ 23–25. States could never have anticipated the new Routine Use 10 announced in the 2026 SORN or that ACF would take the novel position that Routine Use 7 allows data sharing with DHS—or to in fact implement that policy by sharing millions of records with DHS in secret. *E.g.,* ME-Yaffe ¶ 42. MN-Moore Suppl. ¶¶ 2, 4. In many circumstances, the new uses of States' data are not currently included in the State's disclosures, creating a "mismatch" between TANF applicant and recipient expectations about privacy and how ACF now asserts it may use their data. NY-Chawla ¶ 54; *see also* MD-Rodgers ¶ 28 ("facially inconsistent").

Many Plaintiff States will therefore have to incur financial costs in updating communications with TANF applicants and participants that notify them of the new manner in which their personal data may be used and shared. *E.g.*, CA-Witchey ¶¶ 47-49; CA-Witchey Suppl. ¶ 5; NJ-Cha Suppl. ¶ 4 ("hundreds of forms and notices"); RI-Merolla-Brito ¶ 46. Updating the application here in the District "alone would cost several hundred thousand dollars." DC-Campbell

¶ 48. And States will need to take numerous other costly steps to implement these changes, including printing new paper applications; translating them; making technological updates to electronic applications; updating guidance, training manuals, and call scripts; and destroying old paper copies. *E.g.*, CO-McMahon ¶ 54; NY-Chawla ¶ 57; PA-Pham ¶ 48. For many States, this will take "months to implement," NY-Chawla ¶ 57; MN-Moore Suppl. ¶ 4, or even "up to a year," CA-Witchey ¶ 47; CA-Witchey Suppl. ¶ 5. Meanwhile, some States may be at risk of claims by individuals asserting violations of their privacy rights. NY-Chawla ¶ 58.

Further, States now need to begin an additional costly review process to determine what types of notification are appropriate to address the 2025 Data Transfer. *E.g.*, MD-Rodgers Suppl. ¶ 4; NY-Chawla Suppl. ¶¶ 6, 8. States that do so will incur the same types of substantial expenses. *E.g.*, CA-Witchey Suppl. ¶ 5; WA-Reyes Suppl. ¶ 4. And States take into consideration that, absent relief from the Court, DHS maintains the Fiscal Year 2024 data and maintains the ability to use that data going forward, creating further "potential litigation risk." NY-Chawla Suppl. ¶ 8.

***Third***, the Disclosure Actions will place Plaintiff States at immediate risk of new oversight and enforcement actions. Consistent with the limits on its authority, ACF has not historically engaged in the oversight mechanisms listed in the 2026 SORN or Data Disclosure Policy, such as program integrity reviews or projects, additional audits, site visits to State agencies, or double checking States' immigration status verifications. *Compare* 91 Fed. Reg. at 37,407; ECF No. 41 ¶ 2, *with, e.g.*, CO-McMahon ¶¶ 35–37; CT-Hadler ¶¶ 41–42; DC-Campbell ¶¶ 31–32. These new oversight mechanisms will burden State agencies with unnecessary and time-consuming work, as States will need to, for example: coordinate meetings; track, identify, gather, and produce documentation and review and validate it; recreate existing eligibility checks; gather data from localities; engage IT to query data and ensure that it has privacy protections; and generate new

reports. *E.g.*, CA-Witchey ¶ 38; NY-Chawla ¶ 48; OR-Carpenter-Seguin ¶ 47; WI-Horn ¶ 41. States will need to expend time and resources to address these novel oversight activities, either by hiring additional staff or by diverting their limited TANF staff, "undermining" the program's "efficient and equitable administration." MD-Rodgers ¶ 43; *see, e.g.*, CA-Witchey ¶ 38.

Further, Plaintiff States face a substantial risk that these oversight activities will be based on erroneous analysis of States' TANF records. *E.g.*, CO-McMahon ¶ 48; MA-Cole ¶ 40. SAVE does not save manual documentation checks, leading to possible discrepancies if the TANF recipients were cross-checked against SAVE. CO-McMahon ¶ 48; NY-Chawla ¶ 50. In addition, the data provided by States to ACF is taken at a single point in time and often provided to ACF months later; as a result, even at the time the data is provided to ACF it does not reflect the current circumstances, including changes to immigration status. ME-Yaffe ¶ 41; NY-Chawla ¶ 50.

Moreover, ACF may rely on this authority to attempt to impose penalties on States. While it is plainly unlawful for ACF to penalize States outside of the narrow circumstances provided by statute and without following the statutorily required procedures, *see* 42 U.S.C. §§ 609(c), 610, earlier this year ACF did exactly that, by "fr[eezing] access to" all TANF funds for five Plaintiff States with no statutory basis and no procedure at all. *Supra* p. 9. Any disruption to TANF funding would have devastating consequences for Plaintiff States, including likely staffing reductions and the elimination of non-mandated services, and including for the five States who recently experienced the freeze. *E.g.*, CO-McMahon ¶ 49; NY-Chawla ¶¶ 51-52.

## ARGUMENT

A preliminary injunction or a § 705 stay of the Disclosure Actions is warranted. This Court applies a familiar four-factor test in determining whether to issue a preliminary injunction or a stay under 5 U.S.C. § 705. *See District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15

(D.D.C. 2020). The movant must demonstrate that (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first factor, likelihood of success, is the "most important." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The final two factors—the balance of hardships and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, all of these factors weigh in favor of Plaintiff States. ACF has no lawful basis for its policy of turning over sensitive TANF data in bulk to DHS and other agencies, and that policy flies in the face of numerous confidentiality statutes, the Privacy Act, and the reasoned-decisionmaking requirements of the APA. The States will suffer grave and irreparable harm if ACF shares information in violation of the assurances of confidentiality they have long given TANF recipients. And the federal government will suffer no cognizable harm if it has to subject itself to orderly judicial review before resuming its lawless campaign of bulk data disclosure.

## I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims

### A. The Disclosure Actions Are Final Agency Actions Under the APA

An agency action is "final" if it (i) "mark[s] the 'consummation' of the agency's decisionmaking process," i.e., it is not "of a merely tentative or interlocutory nature," and (ii) is one "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Courts take a "pragmatic" approach to finality, *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quotation omitted), under which they focus on an action's "concrete consequences." *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019). The "core question[s]" are "whether the agency has completed its decisionmaking process, and whether the result of that

process is one that will directly affect the parties." *Concilio De Salud Integral De Loiza, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 538 F. Supp. 2d 139, 147 (D.D.C. 2008) (citation modified). The criteria for finality are satisfied here.

***First***, each of the Disclosure Actions represents the "consummation" of Defendants' "decisionmaking process." As to the 2025 Data Transfer, Defendants "engaged in a final agency action" when they decided to "[give] [DHS] access to sensitive and legally protected records" in September 2025. *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 691 (S.D.N.Y. 2025) ("*AFL-CIO*"). And the Data Disclosure Policy underlying that Transfer marks the "consummation of the agency's decisionmaking process," because the agency has taken a definitive position on the scope of its authority and has acted on the basis of that decision, *i.e.*, by transferring data to DHS. *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("Adopting a policy of permitting employees to disclose confidential information without notice is surely a consummation of the agency's decisionmaking process" (citation modified)); *Concilio De Salud Integral De Loiza*, 538 F. Supp. 2d at 147. Likewise, the 2026 SORN and the Revision "consummate" the agency's decision to authorize ACF to add records obtained from other entities to the TANF System of Records, to share the entire System with other entities, and to use these records to verify compliance with all TANF requirements. 91 Fed. Reg. at 37,407, 37,409; *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. CV 25-3501 (SLS), 2026 WL 1784297, at *20 (D.D.C. June 22, 2026) (SORNs were "undoubtedly final agency action" because they "authoriz[ed] the challenged disclosures to occur").

***Second***, similar "legal consequences" flow from all of the Disclosure Actions. With the 2025 Data Transfer, Defendants disclosed the "sensitive" records of "millions of Americans" to DHS, "a decision from which legal consequences flow." *See, e.g.*, *AFL-CIO*, 786 F. Supp. 3d at

691. The same consequences will continue to "flow" if the transfer of data from ACF to DHS continues, whether by means of the Data Disclosure Policy, or by means of the 2026 SORN and the Revision, or both. Further, this continued transfer of data will have "concrete consequences" on the States, imposing a duty to inform TANF applicants and recipients that their data is being collected, foreseeably diminishing enrollment in TANF, and subjecting them to novel oversight. *Ipsen Biopharmaceuticals*, 943 F.3d at 956; *see supra* pp. 12–16. The Disclosure Actions thus satisfy the second prong of the *Bennett* test. *See Venetian Casino Resort*, 530 F.3d at 931; *Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*, 836 F.3d 963, 969 (8th Cir. 2016) (similar).

**B. The Disclosure Actions Are Contrary to Law**

***1. 42 U.S.C. § 1306 and the TANF statute bar the Disclosure Actions.***

ACF's governing statutes squarely prohibit the Disclosure Actions. ACF is bound by a confidentiality statute, 42 U.S.C. § 1306(a), that prohibits its officers and employees from "disclos[ing] . . . any file, record, report, or other paper, or any information" that they obtain in the course of their duties "except as the [Secretary] may by regulations prescribe and except as otherwise provided by Federal law." *Id.* § 1306(a)(1), (2)(B). In addition, the statute governing TANF provides that "[n]o officer or employee of the Federal Government may . . . enforce any provision of this part, except to the extent expressly provided in this part." *Id.* § 617. Accordingly, for ACF to lawfully disclose TANF recipients' and their family members' information, it must identify a statute that "expressly" authorizes the disclosure.

There is none. No law authorizes ACF to disclose information to other federal, state, or private entities. On the contrary, the TANF statute repeatedly reflects its concern with safeguarding the privacy and confidentiality of TANF recipients' and family members' information. It requires each State to adopt measures "necessary to restrict the use and disclosure of information about individuals and families receiving assistance," 42 U.S.C. § 602(a)(1)(A)(iv), subject to narrow

exceptions requiring disclosure including, for example, to federal law enforcement officials about individuals associated with criminal conduct, *id.* § 608(a)(9)(B). Congress also provided that, when State agencies verify an individual's immigration status, they must use a system that permits "efficient verification" and "protects the individual's privacy to the maximum degree possible." *Id.* § 1320b-7(d)(3). Congress would not have set forth these detailed, highly restrictive rules governing the sharing of information if it intended to authorize the bulk disclosure of information about every TANF recipient (and their family members, citizen and noncitizen alike) with other entities whenever ACF saw fit.

The absence in the TANF statute of any authorization for information-sharing is particularly telling because the statute governing AFDC contained provisions explicitly authorizing broad disclosure of information about benefit recipients. That statute provided that information about benefit recipients could be disclosed to assist "*any* audit or similar activity conducted in connection with the administration of [AFDC] by *any* governmental entity." 42 U.S.C. § 602(a)(9) (1994) (emphases added). Had Congress wished to preserve a similar authority for ACF, it could easily have done so. But the TANF statute contains no comparable authorization.

Nor is it plausible that the TANF statute *implicitly* authorizes ACF to share information with other federal and State entities. The statute itself forecloses any such finding of implicit authority, as it permits ACF to enforce the statute only "to the extent" the statute "expressly" authorizes. 42 U.S.C. § 617; *see id.* § 1306(a)(1)(A) (disclosure unlawful "except as otherwise provided by Federal law"). The absence of an express statutory authorization for the Disclosure Actions is dispositive. But even if it were possible to find implicit authority for ACF to carry out the statute, such authority would, at minimum, need to be "necessary" to carry out a "power" that is actually "given by . . . statute." Antonin Scalia & Bryan A. Garner, Reading Law 192–93 (2012).

The Disclosure Actions, however, purport to authorize disclosure to carry out an authority that ACF plainly does not possess: namely, to use the information collected from TANF recipients to ensure a State has complied with "all" of the requirements of the TANF statute, including its requirement to "ensur[e] that TANF recipients are eligible." 91 Fed. Reg. at 37,407, 37,409; *see also* ECF No. 41 ¶¶ 2, 4 (claiming authority to share data to "help ACF ensure that states are complying with the requirements of the Social Security Act, including performing the required alien status verifications with DHS").

Nothing in the TANF statute permits ACF to use information that it collects from the States to enforce "all" of the requirements of the statute against States, or its eligibility-verification requirement in particular. Section 609 contains sixteen provisions that set forth, in detail, which requirements of the TANF statute ACF may enforce against States and how it may enforce them. Fifteen of those provisions identify specific statutory requirements that ACF may penalize States for failing to comply with. *See* 42 U.S.C. § 609(a)(2)–(16). None of those provisions allows ACF to enforce "all" of the statute's requirements against a State, and none permits ACF to penalize States for alleged errors in verifying recipients' eligibility.

The sixteenth provision, section 609(a)(1), does provide "[g]eneral" authorization for ACF to penalize a State for expending funds "in violation of this part," including the statute's eligibility-verification requirements. But, unlike the remaining fifteen provisions, it specifies precisely the basis on which ACF may invoke that authority: "If an audit conducted under chapter 75 of title 31 finds that an amount paid to a state . . . has been used in violation of this part." 42 U.S.C. § 609(a)(1)(A). Chapter 75, in turn, provides for a single annual audit for recipients of federal funding that must be "conducted by an independent auditor," comply with "generally accepted government auditing standards," and be consistent with guidance promulgated by the Office of

Management and Budget (OMB). *Id.* § 7502, 7505. OMB has issued guidance that specifies in painstaking detail how such audits must be conducted, including as to TANF in particular. *See* 2 C.F.R. §§ 200.0–200.521; Ex. 4, 2 C.F.R. Part 200, App. XI, § 93.558.

Section 609(a)(1) therefore cannot be the source of even implicit authority to disclose TANF recipients' information to scrutinize States' compliance with TANF program requirements. It explicitly limits the means ACF may use to detect noncompliance to a highly reticulated audit process conducted by a third-party auditor. And given that ACF is barred from "enforcing any provisions" of the TANF statute "except to the extent expressly provided by this part," 42 U.S.C. § 617, ACF must adhere to that single, specified process as a means of monitoring compliance with the provisions of the statute not listed in section 609(a)(2)–(15). In this way, the TANF statute represents another marked and deliberate departure from the AFDC statute, which allowed the Secretary to establish her own "quality control system" and to penalize States "if the Secretary . . . f[ou]nd[] . . . a failure to comply substantially with *any* provision" the statute required States to follow. 42 U.S.C. §§ 604(a) 608(a), (d), (f) (1994) (emphasis added).

To the extent ACF argues that 31 U.S.C. § 7503 authorizes it to rely on its own audit processes as a basis of enforcing section 609(a)(1), it is incorrect. That statute provides that, in general, nothing in chapter 75 precludes a federal agency from "conduct[ing] or arrang[ing] for audits of non-Federal entities . . . that are in addition to the audits of non-Federal entities conducted pursuant to this chapter," provided those audits are not "duplicat[ive] of the audits conducted pursuant to this chapter." 31 U.S.C. § 7503(e); *see id.* § 7503(a)–(c). In other contexts, that language would allow an agency to rely on separate sources of statutory authority to conduct audits outside the ambit of chapter 75. But for the TANF program, section 609(a)(1) specifically limits ACF to using "an audit conducted *under chapter 75 of Title 31*" to ascertain compliance with the

TANF statute. 42 U.S.C. § 609(a)(1) (emphasis added). What is more, section 617 precludes the agency from enforcing the TANF statute "except to the extent expressly authorized in this part." *Id.* § 617. Accordingly, ACF—unlike other agencies—has no freestanding audit authority that it may use to enforce compliance with provisions of the TANF statute not listed in paragraphs (2) through (16) of section 609. *Cf. Pa. Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 147–48 (3d Cir. 2012) (noting that section 617 "narrowly circumscribes the scope of HHS authority with regard to TANF," and reserving the question whether it precludes HHS from relying on means other than the single independent audit in chapter 75).

In short, no statute overcomes the statutory prohibitions that bar ACF from disclosing information or taking steps to enforce the TANF statute without express statutory authorization. And even if such a statutory authorization existed, the Secretary has not "by regulations prescribe[d]" when or how such a disclosure may take place, as section 1306(a) requires. 42 U.S.C. § 1306(a)(1). The agency's SORNs are not "regulation[s]." *See MST Exp. v. Dep't of Transp.*, 108 F.3d 401, 402 (D.C. Cir. 1997) (a directive to "prescribe by regulation" refers to regulations that are "promulgated through notice and comment rulemaking"). And even if either of those SORNs authorized bulk disclosure—which they do not, *see infra* pp. 30–32—they do not "prescribe" any identifiable standard governing when disclosure with other agencies is permitted. *See Oceana, Inc. v. Locke*, 670 F.3d 1238, 1241 (D.C. Cir. 2011) (statutes that authorize an agency "to 'establish' (or 'prescribe' or 'set,' or the like) a procedure or standard" require an agency to "adequately define the circumstances that 'trigger'" the procedure and "set an 'identifiable standard' to guide its judgment" (citations omitted)). For that reason, too, the disclosure actions are unlawful.

#### *2. The Disclosure Actions Violate the Social Security Act.*

The Disclosure Actions are independently unlawful because they violate 42 U.S.C. § 405. That provision states that "Social security account numbers and related records that are obtained

or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such Social Security account number or related record." 42 U.S.C. § 405(c)(2)(C)(viii)(I). The records in the TANF System of Records were "obtained and maintained" pursuant to a "law enacted on or after October, 1990," as the TANF program was created in 1996. Pub L. No. 104-193, § 103, 110 Stat. 2105, 2112. HHS personnel are "authorized persons." 42 U.S.C. § 405(c)(2)(C)(viii)(III). And, as ACF acknowledges, those records contain "Social Security number[s]." 91 Fed. Reg. at 37,408; *see* Ex. 3 at 13. It follows that no HHS official may disclose either those "social security account number[s] or related records." 42 U.S.C. § 405(c)(2)(C)(viii)(I); *see Boehner v. McDermott*, 484 F.3d 573, 578 (D.C. Cir. 2007).

The Disclosure Actions violate the limit. Each involves the production of "Social Security numbers": the SORNs expressly permit the disclosure of *all* information in the System of Records, and the 2025 Data Transfer appears to have involved the disclosure of *all* information the States produced to ACF. *See* ECF 41 ¶ 2. It is not clear that those Social Security numbers are segregable from the remainder of the reports the States provide. And even if they are, those reports themselves constitute confidential "related records," which are defined to include "any record, list, or compilation that indicates, directly or indirectly, the identity of any individual with respect to whom a social security account number . . . is maintained pursuant to this clause." *Id.* § 405(c)(2)(C)(viii)(IV). Accordingly, the Social Security Act bars ACF from disclosing to DHS either the Social Security numbers or any other information provided by States. *Accord League of Women Voters*, 2026 WL 1784297, at *20.

***3. The Disclosure Actions Violate the Trade Secrets Act.***

The Trade Secrets Act likewise independently prohibits the Disclosure Actions. That statute makes it a criminal offense for any federal employee or agency to "make[] known in any manner

or to any extent not authorized by law any information coming to him in the course of his employment or official duties" that "concerns or relates to the . . . identity" or to the "amount or source of any income . . . of any person." 18 U.S.C. § 1905. The Supreme Court has held that "a party may sue under the APA to enjoin an agency" from disclosing "information in violation of" this statute. *Venetian Casino Resort*, 530 F.3d at 931–32 (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 317–18 (1979)). And it has explained that this statute bars disclosure unless another statute "delegat[es]. . . disclosure authority" to the relevant agency. *Chrysler Corp.*, 441 U.S. at 306.

The Disclosure Actions again contravene the plain text of this statute. They permit or entail the disclosure of information that "concerns or relates to the . . . . identity" and the "amount [and] source of . . . income" of TANF recipients—including a TANF recipient's earnings and employment, along with a wealth of other personally identifying information. *See, e.g.*, 42 U.S.C. § 611(a)(1)(A)(v), (xiv). And, for the reasons detailed above, no statute "delegate[s] . . . disclosure authority" to ACF, *Chrysler Corp.*, 441 U.S. at 306; on the contrary, the relevant statutes foreclose it. *See supra* pp. 19–24. The Data Disclosure Policy is thus unlawful for this reason, too.

#### ***4. The Disclosure Actions Violate the Privacy Act.***

Finally, the Disclosure Actions are unlawful because they violate the Privacy Act several times over. Enacted out of concern that agencies' creation of "computerized data banks" would erode trust in government and deter individuals from participating in public services, *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 766 (1989); S. Rep. No. 93-1183, at 4, 8 (1974), the Privacy Act prohibits agencies from "disclos[ing] any record" from a system of records "to any person, or to another agency" without the written consent of the individual to whom the record pertains, unless" one of thirteen enumerated exceptions applies. 5 U.S.C. § 552a(b). And, before sharing records with another agency to confirm eligibility for government benefits, an agency must enter a "computer matching agreement." *Id.* § 552a(e)(12), (o)(1).

The Disclosure Actions involve "records" protected by the Privacy Act—that is, records with "information about" millions of "individual[s]" receiving TANF benefits. *Id.* § 552a(a)(4). They are contained in a "system of records." *Id.* § 552a(a)(5), (b). And Defendants did not obtain the written consent of TANF recipients before disclosing that information. *Id.* § 552a(b). Before disclosing such information, Defendants therefore must identify an applicable exception that authorizes such disclosure and enter a computer matching agreement.[†] But they have not done so.

At the outset, Plaintiff States may bring claims under the APA challenging Defendants' violations of the Privacy Act. In *Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988), the D.C. Circuit has held that a plaintiff may invoke the APA to seek equitable relief against an unlawful "routine use" under the Privacy Act where the Act does not itself provide a remedy for the violation. *Id.* at 1465–66; *see also Doe v. Chao*, 435 F.3d 492, 504 & n.17 (4th Cir. 2006) (similar); *League of Women Voters*, 2026 WL 1784297, at *21–23 (similar); *see generally Bennett*, 520 U.S. at 175 (existence of statutory cause of action typically does not preclude APA review). In contrast to cases in which courts have barred Plaintiffs who *have* a cause of action under the Privacy Act from using the APA to bring duplicative actions, there is no contention that Plaintiff States have "[an]other adequate remedy in a court," 5 U.S.C. § 704, because the Privacy Act itself does not afford them "relief of the same genre." *Haleem v. U.S. Dep't of Defense*, No. 23-1471, 2024 WL 230289, at *13 (D.D.C. Jan. 22, 2024) (quoting *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009)).

*a. The routine use exception does not authorize the Disclosure Actions.*

On the merits, the Disclosure Actions violate the Privacy Act because no applicable exception authorizes disclosure of TANF recipients' personal information. The sole exception that

---

[†] To be clear, a disclosure that falls within the "routine use" exception merely overcomes the Privacy Act's disclosure bar, but does *not* overcome the confidentiality restrictions in other statutes, like § 1306, the Social Security Act, and the Trade Secrets Act. *See* 5 U.S.C. § 552a(b).

the agencies have used to justify the Disclosure Actions is the "routine use" exception. *See* ECF No. 41, ¶¶ 2, 4; 91 Fed. Reg. at 37,407. That exception, codified at 5 U.S.C. § 552a(b)(2), authorizes disclosure only where three requirements are satisfied: (1) disclosure of the record is "for a purpose which is compatible with the purpose for which it was collected," *Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018) (citing 5 U.S.C. § 552a(a)(7)); (2) the agency provides individuals "actual notice" of the routine use "at the time the information is collected," *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 146 & n.12 (D.C. Cir. 1993) (citing 5 U.S.C. § 552a(e)(3)(C)); and (3) the disclosure is "within the scope of a routine use notice published by the agency," *Ames v. DHS*, 861 F.3d 238, 240 (D.C. Cir. 2017) (citing 5 U.S.C. §552a(e)(4)(D)). The Disclosure Actions satisfy none of these requirements.

***First***, the Disclosure Actions entail the disclosure of information for a use that is not "compatible" with the purpose for which the records were collected. 5 U.S.C. § 552a(a)(7). In 1971, as now, the term "compatible" meant "capable of existing together in harmony." Webster's Seventh New Collegiate Dictionary 169 (1971). Consistent with that definition, compatibility requires "a . . . concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure." *Britt v. Naval Inv. Serv.*, 886 F.2d 544, 549–50 (3d Cir. 1989); *see Swenson v. USPS*, 890 F.2d 1075, 1078 (9th Cir. 1989) (agreeing with this interpretation). For instance, in *Britt*, the Third Circuit held that information collected for the purpose of investigating "a specific instance of possible wrongdoing" could not be disclosed under the routine use exception to conduct "a general inquiry into [a person's] background." 885 F.2d at 549–50. Although the D.C. Circuit has not "definitively determined the precise meaning of 'compatible,'" *Ames v. U.S. Dep't of Homeland Security*, 861 F.3d 238, 241 n.1 (D.C. Cir. 2017) (Kavanaugh, J.), its opinions and those of District Courts in this

circuit accord with this interpretation. *See Stephens*, 851 F.2d at 1467 (disclosure of medical records to satisfy grand jury subpoena not compatible with collecting them for purpose of diagnosing a medical condition); *Mazaleski v. Treusdell*, 562 F.2d 701, 712–13 & n.31 (D.C. Cir. 1977) (disclosure of derogatory information to prospective employer not compatible with collecting it for purpose of maintaining record of adverse actions); *see also League of Women Voters*, 2026 WL 1784297, at *24; *Lugo v. U.S. Dep't of Justice*, 214 F. Supp. 3d 32, 40 (D.D.C. 2016); *Ames v. U.S. Dep't of Homeland Security*, 153 F. Supp. 3d 342, 347 (D.D.C. 2016), *aff'd*, 861 F.3d 238; *Doe v. U.S. Dep't of Labor*, 451 F. Supp. 2d 156, 174 (D.D.C. 2006), *vacated pursuant to settlement*, 2007 WL 1321116 (D.D.C. 2007).

Here, ACF has authorized the disclosure of information collected pursuant to 42 U.S.C. § 611 for the stated purpose of conducting "program integrity reviews" and monitoring States' compliance with "all" provisions of the TANF statute. 91 Fed. Reg. at 37,407; *see* ECF No. 41 ¶¶ 2–4. But section 611 does not authorize the collection of information for these purposes, or anything close to them. Instead, the principal purpose of section 611 is to authorize the collection of demographic information about TANF recipients in order to enable ACF to write a report to Congress about TANF "participation rates" and the general effectiveness and demographics of the TANF program. That is evident in section 611(b), which directs the Secretary to use the information in section 611(a) to compile a report to Congress for precisely this purpose. *See* 42 U.S.C § 611(b). It is also reflected in the drafters' description of section 611, which they characterized as intended to ensure that "information on the effectiveness of State programs is publicly available." H.R. Rep. No. 104-651, at 1364.

Indeed, the design of section 611 would make little sense if Congress had wished this section to be used to assess general compliance. The types of data listed in section 611 do not map

in any coherent way onto the eligibility requirements of the TANF statute: for instance, they require States to report information about the "citizenship" of TANF recipients, but not immigration status, which would illuminate their eligibility for TANF assistance. 42 U.S.C. § 611(a)(1)(A)(xv); *cf.* 8 U.S.C. § 1612(b) (listing categories of noncitizens eligible for TANF). More to the point, Congress made clear that it affirmatively did *not* wish ACF to use information collected through section 611 to assess TANF recipients' general program compliance. *See supra* pp. 21–23.

Thus, there is no "meaningful convergence" between the routine use ACF proposes and the purpose for which the information was collected. *Britt*, 886 F.2d at 550. The use of information to assess grantees' compliance with TANF statutory requirements is categorically unlike the purpose of providing a public report on the effectiveness of the TANF program. *Cf. Mazaleski*, 562 F.2d at 712–13 & n.31. And there is plainly no compatibility between that narrow public-report purpose and the use of information for a purpose that Congress expressly sought to foreclose. *See Stephens*, 851 F.2d at 1467 (finding it "inconceivable" that an agency could circumvent limits imposed elsewhere in the statute "merely by taking the 'routine use' route").

***Second***, the Disclosure Actions are independently unlawful because ACF did not provide the individualized notice the statute requires before undertaking or authorizing these disclosures. The Privacy Act requires an agency to "inform each individual" from whom the information is collected of "the routine uses which must be made of the information." 5 U.S.C. § 552a(e)(3). As the D.C. Circuit has explained, an agency's failure to provide "actual notice" of a routine use "at the time the information is collected" "prevent[s] the disclosure from qualifying as a routine use." *USPS*, 9 F.3d at 146 & n.12; *accord Covert v. Harrington*, 876 F.2d 751, 755 (9th Cir. 1989); *Bechhoefer v. U.S. Dep't of Justice*, 179 F. Supp. 2d 93, 101 (W.D.N.Y. 2001).

Here, there is no question that ACF failed to provide individual users notice of the Disclosure Actions before authorizing or undertaking them. It never publicly disclosed the 2025 Data Transfer or the Data Disclosure Policy until this litigation commenced—11 months *after* those actions occurred. And the 2026 SORN authorizes the disclosure of data on TANF recipients dating back as much as 20 years, and reports supplied by States that date back as much as 3 years. 91 Fed. Reg. at 37,409. None of the users who submitted information that was later compiled into those reports was told, at the time the information was collected, that ACF would subsequently spring on them a routine use that allowed their information to be shared with any other federal, State, and private entities ACF deemed helpful in conducting "program integrity reviews." 91 Fed. Reg. at 37,409; *see supra* pp. 14–15 (describing State disclosures to TANF applicants). The routine use is therefore straightforwardly unlawful for that reason, as well.

***Third***, the 2025 Data Transfer and the Data Disclosure Policy do not fall "within the scope of a routine use notice published by the agency." *Ames*, 861 F.3d at 240. At the time ACF shared data with DHS and initiated the Data Sharing Policy, it had not yet promulgated Routine Use 10, which expressly (although unlawfully) authorizes disclosure of TANF information for the purposes of ensuring recipients' compliance with TANF program requirements. *See* 91 Fed. Reg. at 37,407. Instead, ACF has claimed—nearly a year after the fact—that those disclosures were always authorized by Routine Use 7. *See* ECF No. 41 ¶¶ 3–4.

Routine Use 7, however, cannot plausibly be construed to permit the very same type of disclosure the agency later authorized in Routine Use 10—that is, disclosure to other federal agencies to ensure compliance with any TANF statutory requirements. Routine Use 7 permits disclosure to a limited class of recipients ("contractors, grantees, consultants, or volunteers . . . who have a need to have access to the information in the performance of their duties or activities")

working on a limited set of tasks ("a contract, service, grant, cooperative agreement, job, or other activity for HHS") for a limited set of purposes (those "related to the purposes of this system of records"). The Data Disclosure Policy and the 2025 Data Transfer do not meet these requirements.

To start, federal agencies are not "contractors, grantees, consultants, or volunteers." An ordinary English speaker would understand the terms to refer to private entities engaged by the government to assist it in performing some task, not another agency of the federal government. Defendants have conceded as much in litigation brought by private parties. Ex. 39, *Make the Road States v. U.S. Dep't of Health and Human Servs.*, No. 26-cv-04713 (E.D.N.Y.) (Aug. 19, 2026), Hr'g Tr. 74:14-19 ("[Y]ou can make an argument that yes, perhaps DHS for example could volunteer to assist HHS with these sort of activities but that's sort of, you know, it's sort of a lawyer's thing of like depends what volunteer means."). That plain-language reading is confirmed by the fact that other routine uses in the same SORN explicitly authorize disclosure to federal agencies: for instance, Routine Use 2 authorizes disclosure to a "federal, state, local, Tribal, or foreign agency" and Routine Use 9 authorizes disclosure to "another federal agency or federal entity." *Id.* at 25,882. Had ACF wished to authorize disclosure to other agencies in Routine Use 7, it surely would have used similar language.

Furthermore, the Data Disclosure Policy and the 2025 Data Transfer are not pursuant to a "contract, service, grant, cooperative agreement, job, or other activity for HHS." Like the list of permissible recipients, this list of nouns most naturally refers to contractual or funding agreements with private entities. It follows that the catchall phrase "other activity for HHS" refers to similar agreements. *See, e.g.*, *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 217–18 (2024). None of these terms describes assistance provided by one agency to another. And even if these terms could include an agreement between two federal agencies, there is no evidence that ACF entered any

agreement—formal or not—with DHS or any other agency with which it wishes to share information. Plaintiff States asked Defendants to produce or at least identify such an agreement, and they categorically refused. *See* Ranucci Decl. ¶ 3.

Further, the Data Disclosure Policy and the 2025 Data Transfer do not involve disclosure for an activity "related to the purposes of the system of records." 89 Fed. Reg. at 25,882. At the time those actions were undertaken, the only remotely relevant purpose was to "determine whether grantees are meeting *certain* requirements prescribed by the Social Security Act, including work participation and time-limit requirements." *Id.* (emphasis added). But this language did not contemplate the use of the System of Records to determine whether grantees were meeting *all* TANF requirements; rather, it authorized use of that information to check whether grantees were complying with those "certain" provisions (such as "work participation and time-limit requirements") that ACF has specific statutory authority to enforce. *See* 42 U.S.C. § 609(a)(15) (work participation), (a)(9) (time limit). Indeed, ACF added the "related to the purposes of the system of records" language to Routine Use 7 specifically to ensure that "the routine use wording is not overly broad," a goal that would have made little sense if it allowed use of the records for such sweeping purposes. 89 Fed. Reg. at 25,881. And ACF confirmed that reading when it amended the SORN in 2026 specifically to authorize the use of information to "ensure compliance with *all* TANF program requirements"—a change that would have been superfluous if the SORN already authorized use for that purpose. 91 Fed. Reg. at 37,407. And there is no indication that the 2025 Data Transfer was limited to those individuals at DHS "who have a need to have access to the information in the performance of their duties or activities," as Routine Use 7 requires.

*b. Defendants did not enter into a computer matching agreement.*

The Disclosure Actions also violate the provisions of the Privacy Act that govern computerized matching programs between agencies. The statute provides that, when agencies

engage in bulk data matching to check public benefits eligibility, they are required to provide public notice, *see* 5 U.S.C. § 552a(e)(12), and enter and publish detailed computer-matching agreements that define the scope of data matching and ensure the accuracy of these data matches, *see id.* § 552a(o); *see also id.* § 552a(a)(8) (defining "matching program"). Defendants are plainly authorizing disclosure for the purpose of bulk data matching: among other things, the Disclosure Actions all involve or contemplate the sharing of information with DHS for the purposes of comparing the list of TANF recipients with DHS's own lists of noncitizens. *See* ECF No. 41, at ¶¶ 2–4; 91 Fed. Reg. at 37,407. But Defendants have not published any notice of these matching programs, as the statute requires. *See* 5 U.S.C. § 552a(e)(12). And they have not published any computer-matching agreements defining the purpose or scope of that matching program or establishing protocols to ensure accuracy and protect data security. *See id.* § 552a(o)(1)(A)-(K).

*c. ACF has failed to comply with the Privacy Act's procedural requirements.*

Finally, the 2026 SORN also violates the procedural requirements of the Privacy Act, which mandate that the public have a "meaningful" opportunity to comment on a SORN prior to its effective date. *League of Women Voters*, 2026 WL 1784297, at *26–27; *see also* 5 U.S.C. § 552a(e)(4), (11). The SORN solicited comments from the public, as required by the Privacy Act, but the original effective date of Routine Use 10 was the same day the comments were due, 91 Fed. Reg. at 37,406, indicating that Defendants never intended to consider the comments. Indeed, consistent with that lack of intent, Defendants have to date not been able to represent "that anybody inside the government has even read the comments[,] let alone consider[ed] them at any length," despite the *seven weeks* of extra time that ACF's agreement (ECF No. 41 ¶ 7) to delay the effective date of the SORN to September 30 has bought them. Ex. 39 at 72:14-17; *see League of Women Voters*, 2026 WL 1784297, at *26–27.

### C. The Disclosure Actions Are Arbitrary and Capricious

The APA "requires agencies to engage in reasoned decision-making" and "to reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020) (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020)). An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although an agency may change its policies within statutory limits, it must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). And agencies cannot simply turn policies on their head without considering that "longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Regents*, 591 U.S. at 30 (citation modified); *see also League of Women Voters*, 2026 WL 1784297, at *30 (rejecting defendants' argument that a SORN is not subject to arbitrary-and-capricious review). Here, Defendants have satisfied none of these requirements.

#### 1. *The 2025 Data Transfer and Underlying Data Disclosure Policy Are Arbitrary and Capricious*

As to the 2025 Data Transfer and the underlying Data Disclosure Policy, Defendants flunk this test at the threshold, because they made no attempt to meet it. Until the filing of this lawsuit, Defendants never acknowledged even the *existence* of the Policy or the Data Transfer—let alone "explain[ed]" "the bases for the[se] actions." *Bhd. of Locomotive Eng'rs.*, 972 F.3d at 115. Nor have Defendants "display[ed] awareness" that the Data Transfer and Policy were and are a

dramatic departure from past practice. *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025). And still less have Defendants engaged in any of the "reasoned decision-making" that the APA requires: they have not explained the legal grounds for the Data Transfer and Policy, weighed their costs, considered how they may affect the legitimate reliance interests of States and individuals, or assessed alternatives. *See State Farm*, 463 U.S. at 43; *White Lion*, 604 U.S. at 568; *see also Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 57 (D.D.C. 2025) (finding IRS's "Address-Sharing Policy" arbitrary and capricious where agency "unreasonably departed from its prior policy sub silentio").

Indeed, "there was much for [ACF] to consider." *Regents*, 591 U.S. at 31. Millions of individuals have enrolled in TANF, and dozens of States have provided disclosures, based on the understanding that TANF information will be kept confidential and shared in only the narrow circumstances the law provides. *See supra* pp. 12–13. The Data Transfer and Policy upend those reliance interests. In so doing, they will impose serious costs, both by deterring individuals from enrolling in TANF—instead channeling them into other, more costly state-funded programs, where such programs exist—and by compelling the States to update their disclosures. *See infra* pp. 44–45. Defendants have not explained why they needed to undertake these actions at all, and still less why they were necessary when the TANF statute already requires States to verify noncitizens' TANF eligibility using the SAVE system or an equivalent. *See supra* p. 8.

Further, Defendants' failure to explain these actions will impede "meaningful judicial review." *Dep't of Commerce v. New York*, 588 U.S. 752, 780 (2019). This Court should not be required to guess at the legal basis for this unprecedented action. And Defendants should not be permitted to produce post hoc justifications for their actions that they failed to articulate at the time they acted. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

### 2. *The 2026 SORN and Revision Are Arbitrary and Capricious*

The 2026 SORN and associated Revision fare no better, for the following reasons.

***First***, there is no indication that the Revision or the 2026 SORN are the product of "reasoned decision-making." *Bhd. of Locomotive Eng'rs*, 972 F.3d at 115. Indeed, the SORN provides no meaningful reasoning at all, instead containing a rote description of the changes to the prior SORN without any consideration of costs and benefits, reliance, or alternative courses of action, as the APA requires. *See State Farm*, 463 U.S. at 43. As above, there is nothing to indicate that the HHS Defendants meaningfully considered the chilling effect that the SORN would have on TANF participation and the consequent considerable costs to the public, including to the Plaintiff States. *See supra* pp. 34–35; *see also Georgia v. Brooks-LaSure*, No. 2:22-CV-6, 2022 WL 3581859, at *12–13 (S.D. Ga. Aug. 19, 2022). The SORN also contains no consideration of relevant reliance interests, including as to States, who must ensure their communications with TANF applicants and recipients adequately disclose the use of the data they collect, and as to past TANF participants, who provided their personal data without any expectation that it would be shared with other entities, including DHS.

***Second,*** and as noted above, the 2026 SORN effectively announces that the HHS Defendants will not engage in a reasoned decision-making process by not considering comments. *See League of Women Voters*, 2026 WL 1784297, at *29.

***Third***, the 2026 SORN provides no explanation for why it is necessary for ACF to conduct its own "oversight activities" given the robust eligibility determination processes that States *already* have in place for TANF applicants and recipients, and which are a required feature of State plans. *See supra* p. 8; 42 U.S.C. § 602(a)(6). Nor does it explain why such "oversight activities" are warranted in light of ACF's inability to take any enforcement action arising out of those "oversight activities," except in very narrow circumstances. *See supra* pp. 19–23.

***Fourth***, the 2026 SORN is arbitrary and capricious because it fails to "constrain the [agency's] discretion," seemingly allowing ACF to share *any* TANF recipient's or family member's personal information with *any* federal, State, or private entity for assistance with "program integrity reviews or projects." *Nat'l Council of Nonprofits v. McMahon*, No. CV 25-13242-MJJ, 2026 WL 1876366, at *30 (D. Mass. June 30, 2026) (finding rule arbitrary and capricious where it "[did] not identify objective legal standards that govern whether an employer is engaged in 'substantial illegal activity.'"); *see* 91 Fed. Reg. at 37,409. The SORN would "allow[] [HHS] to arrive at whatever conclusion it wishes" as to with which entities TANF data can be shared, for which purposes, and "without adequately explaining the standard on which its decision is based." *Am. Pub. Health Ass'n v. Nat'l Inst. of Health*, 791 F. Supp. 3d 119, 180 (D. Mass. 2025).

**D. The Disclosure Actions Violate the Spending Clause**

Finally, the Disclosure Actions violate the Spending Clause. Though Congress may "attach conditions on the receipt" of federal funds, its power to do so is "not unlimited." *South Dakota v. Dole*, 483 U.S. 203, 206, 207 (1987). Conditions attached to federal spending are "much in the nature of a contract," and States must be able to "voluntarily and knowingly accept[] the terms." *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 577 (2012) (plurality opinion) (quotation omitted). Under the Spending Clause, U.S. Const. art. I, § 8, cl. 1, Congress must "clearly and unambiguously alert a grant recipient to any condition on federal funds," *Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1941 (2026), and federal agencies may not "surprise[e] participating States with post acceptance or 'retroactive' conditions," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981).

The Disclosure Actions violate this limit because ACF has imposed new requirements that the States could not have foreseen when they accepted TANF funding. In replacing the AFDC program with TANF, Congress sharply restricted ACF's power to oversee States' compliance with

program requirements. *See supra* pp. 22–23. States had no reason to believe that ACF could later claim a programmatic review power, or that it would use their residents' sensitive data for such oversight projects. *Supra* p. 14. In taking the Disclosure Actions, ACF upended these understandings by announcing that the agency will conduct open-ended "program integrity reviews," "programmatic audits," "fraud investigations," "financial audits," and "monitoring" of the States' TANF programs, 91 Fed. Reg. at 37,407, and that it will support these and other "oversight activities" by sharing beneficiaries' personal information with DHS and other federal agencies. *Id.* at 37,409; *see* ECF No. 41, ¶¶ 2–4. These new provisions are exactly the sort of "surprising" "post acceptance . . . conditions" that the Spending Clause prohibits. *Pennhurst*, 451 U.S. at 25. The Spending Clause bars Defendants from mandating compliance with new conditions like these, which the States were "unable to ascertain" when they agreed to participate in a program that expressly limited ACF's oversight role. *Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17).

## II. Plaintiffs Will Suffer Irreparable Harm

Plaintiff States face irreparable harm from the Disclosure Actions that is "beyond remediation," for which there is no "possibility that adequate compensatory or other corrective relief will be available at a later date." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–98 (D.C. Cir. 2006) *District of Columbia*, 444 F. Supp. 3d at 34; *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015). On September 30, absent Court intervention, the harm to Plaintiff States is "certain and great" and "actual and not theoretical," because there is a strong likelihood that any data shared will be impossible to claw back. *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (harm irreparable when "there can be no do over and no redress"). In an analogous context, DHS has explained that

"technical difficulties" make it impossible to ensure that "every possible variation of the file" shared from HHS to DHS were "located," with the result being that DHS could not confirm all copies of the file had been deleted. *See* Ex. 40, Notice, *California v. HHS*, No. 25-cv-5536 (N.D. Cal. 2026, July 8, 2026), Dkt. No. 181-1, ¶ 24.

***First***, the Disclosure Actions will erode public trust and chill participation in Plaintiff States' TANF programs, causing irreparable harm to Plaintiff States' anti-poverty programs. *Supra* pp. 13–14. The Disclosure Actions authorize the disclosure of TANF households' sensitive personal information to a vast set of federal, State, and private entities, including DHS. TANF recipients reasonably fear that some of those entities—such as DHS—may redisclose their data, and may use it to take adverse action, such as immigration enforcement proceedings, against them or their family members, especially in mixed-status households. *See supra* pp. 13–14. If the Disclosure Actions go forward, many individuals will predictably decline to participate in the TANF program to avoid these risks. *See supra* pp. 13–14.

States will in turn suffer immediate and irreparable injury if individuals no longer trust that their information will be kept secure. *Cf. Dep't of Commerce*, 588 U.S. at 768 (standing may be based on "the predictable effect of Government action on the decisions of third parties"). States have a substantial interest in preserving their relationship of trust with TANF recipients, which cannot be easily restored once it is broken. *See supra* pp. 12–13; *see also, e.g.*, *Human Touch DC, Inc. v. Merriweather*, No. 15–cv–00741, 2015 WL 12564166, at *5 (D.D.C. 2015) (finding irreparable harm from "unauthorized use and disclosure" of information provided to plaintiff because people will "come to believe that [plaintiff] cannot be trusted to maintain the confidentiality of [their] information"); *City of Los Angeles v. Sessions*, No. CV 17-7215-R, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018) ("The harm to the City's relationship with the

immigrant community . . . is irreparable." (citation omitted)), *aff'd sub nom. City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019); *City & Cnty. of San Francisco v. Trump*, 779 F. Supp. 3d 1077, 1082 (N.D. Cal.), *opinion clarified*, 782 F. Supp. 3d 830 (N.D. Cal. 2025). And insofar as the 2025 Data Transfer already may have harmed trust with TANF recipients, permitting virtually unlimited further improper disclosures—and continued use of that data by DHS—would only amplify that harm. Withdrawal from the TANF program by needy families will harm Plaintiff States because those individuals will place a greater strain on other State and local anti-poverty services, such a child welfare and emergency medical services, not only undermining the purpose of the TANF program, *see* 42 U.S.C. § 601, but also leading to a greater expenditure of State resources and irreparably harming the States' interest in providing appropriate resources for individuals at risk of falling into poverty, *supra* pp. 13–14; *see, e.g.*, *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (finding consequences from reduced public benefit participation such as burden on State systems constitutes irreparable harm).

***Second***, because it is the States who administer the TANF program, it is the States who imminently bear the costs of compliance associated with the Disclosure Action's announcement of new uses of their TANF data. Defendants seem to concede as much. Ex. 39 at 73:13-15 ("[I]t would be incumbent on the states to provide that notice . . . ."). Absent Court intervention, Plaintiff States must immediately begin the process of reviewing their disclosures to all TANF applicants to ensure that they adequately disclose that their data may be shared with any federal or State agency, or other entity, engaged for purported program oversight or program integrity. *Supra* pp. 14–15. That review itself will be time-intensive, diverting States' resources. *Cf. Commonwealth of Massachusetts v. Dep't of Educ.*, 828 F. Supp. 3d 198, 220-21 (D. Mass. 2026) (noting that "administrative upheaval from complying with government regulation may constitute an

irreparable harm"). And because States could never have anticipated this new use of their data, many will need to incur financial costs in updating communications with TANF applicants about their data use, ranging from translation to printing to electronic system upgrades. *Supra* pp. 14–15; *District of Columbia*, 444 F. Supp. 3d at 38 (changes to State activities based on "a complex program serving" millions of people would be "self-evidently onerous to implement").

These compliance costs are a well-recognized irreparable harm. Courts routinely find that where States would bear the cost of complying with a federal policy either by out-of-pocket expenditures by the State or by diversion of resources from other State programs or projects, the harm suffered is irreparable. *See, e.g.*, *District of Columbia*, 444 F. Supp. 3d at 34–42 (collecting cases); *New York*, 2026 WL 673848, at *26 (finding irreparable harm when "compliance with [data demands] would require a diversion of resources away from other vital programs"); *New York v. U.S. Dep't of Just.*, 804 F. Supp. 3d 294, 330 (D.R.I. 2025), *appeal dismissed* No. 25-2099, 2025 WL 4717710 (1st Cir. Dec. 11, 2025); *California v. Trump*, 786 F. Supp. 3d 359, 390-91 (D. Mass. 2025); *Louisiana v. Biden*, 55 F.4th 1017, 1033 (5th Cir. 2022); *cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.").

Indeed, in an analogous context, then-Chief Judge Howell found that a new federal requirement necessitating that the States "rewrite[e] legal notices" to "comport with complex legal requirements . . . on a very short time frame" constituted irreparable harm. *District of Columbia*, 444 F. Supp. 3d at 36–38. There, the court considered a challenge by States to federal changes to SNAP, a public benefit program that, like TANF, serves the neediest Americans and, like TANF, is administered via States. The States explained that the federal changes would require them to provide notice to recipients, causing them to incur out-of-pocket mailing costs and divert State

resources. *Id.* at 36–37. The court rejected the agency's argument that these harms were conclusory, finding that "anticipated injuries are significant" and noting that the States' "descriptions of the steps required to provide notice. . . fill[ed] in the concrete details." *Id.* at 37–38. The same reasoning applies here: any updates to States' application materials will require the same State harms, diverting resources from the administration of State benefits programs and creating out of pocket costs, as detailed with specificity in the States' declarations. *Supra* pp. 14–15.

Moreover, the "very short timeframe" in the SNAP case was up to three months. *Id.* at 38. Here, States just recently learned of the Data Disclosure Policy and must immediately work to implement these changes, even as updates will take months, or even up to a year. *Supra* p. 15. This puts Plaintiff States in an untenable position by creating risk of claims that they have violated TANF recipients' privacy rights. *Id.* And critically, without a Court order, States will necessarily need to undertake at least some of the administrative and compliance steps to account for disclosure in the interim, even if the Disclosure Actions were to be later enjoined. And if that happened, States would incur substantial costs to reverse the disclosure changes, causing substantial confusion for State TANF employees as well as TANF program participants.

***Third***, the 2026 SORN's announcement of new oversight and enforcement actions, and the parallel asserted "program integrity" purpose of the Data Disclosure Policy, create a significant risk of harm to Plaintiff States. Indeed, the entire point of the Disclosure Actions is "to ensure and confirm [State] compliance with TANF program requirements through HHS agency oversight activities." 91 Fed. Reg. at 37,407; *see also* ECF No. 41 ¶ 2 ("ensure that states are complying with the requirements of the Social Security Act including performing the required alien status verifications with DHS"). This is a substantial departure from longstanding agency practice, *supra* p. 14, which means that States cannot adequately budget or allocate staff time to the new oversight

mechanisms. *New York*, 804 F. Supp. 3d at 330 (the "uncertainty that stems from" the threat of enforcement and "confusion and chaos imposed by an overnight change to a thirty-year-old interpretation of a law" can itself constitute irreparable harm).

Any new oversight activities will harm Plaintiff States by requiring them to undertake time-consuming work, causing out-of-pocket expenses and diverting State resources, well recognized irreparable harms. *Supra* pp. 13–15. Moreover, this oversight is likely to be based on false red flags prompted by inaccurate data matching, like attempts to match States' use of the SAVE system with efforts to double check their work months or years later. *See supra* p. 16; *see also League of Women Voters*, 2026 WL 1784297, at *16. The "strong risk" of the use of "inconsistent and inaccurate data" by the federal government as the basis for erroneous enforcement and oversight is additional irreparable harm. *Cf. Massachusetts*, 828 F. Supp. 3d at 221. Moreover, the additional unauthorized oversight may put Plaintiff States' TANF funding at risk, with "catastrophic" consequences for Plaintiffs. *New York*, 2026 WL 673848, at *25–26; *supra* pp. 16. While potential enforcement may not always be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm," *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation modified), it certainly is here. To start, Defendants froze all TANF funding for five of the Plaintiff States earlier this year, with no evidence and no process. *New York*, 2026 WL 673848, at *25–26. This "past wrong[]" is "evidence" that Plaintiffs face "a real and immediate threat of repeated injury." *Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021) (citation modified); *Nat'l Council of Nonprofits v. McMahon*, No. CV 25-13242-MJJ, 2026 WL 1876366, at *15 (D. Mass. June 30, 2026) (rejecting government's argument that enforcement of an Administration policy against many Plaintiff States was speculative based on "the Administration's history of prosecution"). Further, the President himself has ordered this Administration to "maximize

enforcement" for public benefits program—precisely what is contemplated here. 91 Fed. Reg. at 13,487; *see Massachusetts*, 828 F. Supp. 3d at 221 (rejecting government's argument that enforcement is speculative where, as here, the President specifically directed enforcement).

**III. The Balance of the Equities and Public Interest Favor Plaintiffs**

The balance of the equities and public interest strongly favor the States. Absent Court intervention, ACF will be able to share years of States' TANF data with virtually any entity it wishes while this case is being litigated, and causing harm to States that will be impossible to redress at final judgment; by contrast, a preliminary injunction would allow ACF to itself keep and analyze Plaintiff States' data and to engage in oversight as it has for decades.

"[T]he balance of the equities and the public interest favors maintaining the status quo." *New York*, 804 F. Supp. 3d at 330; *District of Columbia.*, 444 F. Supp. 3d at 45 (finding that government's harm of "be[ing] required to keep in place the existing regulation—which [it] has used for 19 years—while judicial review of its new regulation runs its course" "pales in comparison" to administrative harm to States caused by changes to public benefits programs). Where, as here, "critical social services programs" are affected, "courts have repeatedly found that the public interest was supported by a preliminary injunction." *New York*, 2026 WL 673848, at *27 (collecting cases). And "[t]here is a strong public interest in restraining the arbitrary exercise of power by the federal government," further supporting injunctive relief. *Id.*

On the other side of the ledger, Defendants would not be harmed by delay. All of the State records ACF seeks to share here are already in its possession, meaning there is no risk that they will become unavailable to Defendants throughout the course of this litigation. *Cf. Massachusetts*, 828 F. Supp. 3d at 223. And "while eliminating fraud, waste, and abuse in a government assistance program is in the public interest," this factor does not favor the government where, as here, States

already engage in robust processes to do so and Defendants have made no "showing"—and have not identified even a single fact—that would support any need for immediate novel federal oversight. *California v. United States Dep't of Agric.*, No. 25-CV-06310-MMC, 2025 WL 2939227, at *13 (N.D. Cal. Oct. 15, 2025); *see New York*, 2026 WL 673848, at *18–19, 26–27 (quotation omitted) (finding balance of the equities in Plaintiffs' favor by "endangering the vital childcare and family assistance services that Plaintiff States provide" and noting that in the five-State TANF freeze earlier this year, the government did "not identify even a *single dollar* that has gone to any [of those States] that has been used fraudulently").

Finally, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. If the "mere existence of the Executive Branch's desire to enact a policy" were determinative, then "no act of the Executive Branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction and that cannot be so." *California*, 2025 WL 2939227, at *13 (citation modified).

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that, prior to September 30, 2026, the Court stay the Disclosure Actions under 5 U.S.C. § 705, preliminarily enjoin Defendants from implementing the Disclosure Actions as to Plaintiff States, preliminarily enjoin Defendant DHS from using or relying on any TANF data obtained by ACF from Plaintiff States, and grant other relief as the Court deems just and proper.

Dated: August 25, 2026

Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Jessica Ranucci*
Jessica Ranucci
Mark Ladov
Stephen Thompson
*Special Counsel*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
28 Liberty St.
New York, NY 10005
(929) 736-3392
jessica.ranucci@ag.ny.gov
mark.ladov@ag.ny.gov
stephen.thompson@ag.ny.gov
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Mitchell P. Reich*
Mitchell P. Reich (1044671)
*Senior Counsel to the Attorney General*
Karthik Reddy (1048848)
*Special Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth St. NW
Washington, DC 20001
(202) 279-1261
mitchell.reich@dc.gov

*Counsel for the District of Columbia*

**ROB BONTA**
Attorney General of California

By: */s/ Camille Framroze*
Todd Grabarsky
Matthew Wise
*Supervising Deputy Attorneys General*
William Bellamy
Camille Framroze
Harald Kirn
Andrew Kushner
*Deputy Attorneys General*
455 Golden Gate Ave., Ste. 11000
San Francisco, CA 94102-7004
(415) 510-3619
Camille.Framroze@doj.ca.gov

*Counsel for the State of California*

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Luci D. Davis*
Luci D. Davis
Jaylia Yan (90007649)
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Luci.Davis@azag.gov
Jaylia.Yan@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**PHIL WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
David Moskowitz (994469)
*Deputy Solicitor General*
Reed W. Morgan
*Assistant Solicitor General*
1300 Broadway, 10th Fl.
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Katherine Zdrojeski*
Katherine Zdrojeski
*Assistant Attorney General*
165 Capitol Ave.
Hartford, CT 06106
(860) 808-5210
Katherine.Zdrojeski@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: /s/ *Vanessa L. Kassab*
Ian R. Lison
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Delaware Department of Justice
820 N. French St.
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General for the State of Hawai‘i

By: */s/ Kaliko‘onālani D. Fernandes*
Kaliko‘onālani D. Fernandes
*Solicitor General*
425 Queen St.
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai‘i*

**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Harpreet K. Khera*
Harpreet K. Khera
*Bureau Chief, Special Litigation*
Sherief Gaber
*Assistant Attorney General*
115 S. LaSalle St., 35th Fl.
Chicago, IL 60603
(773) 590-7127
Harpreet.Khera@ilag.gov
Sherief.Gaber@ilag.gov

*Counsel for the State of Illinois*

**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
In his official capacity as Governor of the Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo
*General Counsel*
Sam Flynn
*Chief Deputy General Counsel*
Laura C. Tipton
*Deputy General Counsel*
Office of the Governor
501 High St.
Frankfort, KY 40601

(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Brendan Kreckel*
Brendan Kreckel
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
brendan.kreckel@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Keith M. Jamieson*
Keith M. Jamieson (187911)
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6960
kjamieson@oag.maryland.gov

*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Michelle Pascucci*
Michelle Pascucci
*State Trial Counsel*
Jak Kundl
*Assistant Attorney General*
One Ashburton Pl.
Boston, MA 02108
(617) 963-2255
Michelle.pascucci@mass.gov
jak.kundl@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

**KEITH ELLISON**
Attorney General of the State of Minnesota

By: */s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp
*Special Counsel, Rule of Law*
445 Minnesota St., Suite 600
St. Paul, MN 55101
(651) 300-0711
lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
Attorney General of the State of Nevada

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-3420
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Kashif T. Chand*
Kashif T. Chand
*Assistant Attorney General*
New Jersey Office of the Attorney General,
Division of Law
124 Halsey St., 5th Fl.
Newark, NJ 07101
(973) 648-2052
Kashif.Chand@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: */s/ Anjana Samant*
Anjana Samant
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 270-4332
asamant@nmdoj.gov

*Counsel for the State of New Mexico*

**DAN RAYFIELD**
Attorney General State of Oregon

By: */s/ Leanne Hartmann*
Leanne Hartmann
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
(971) 673-1880
Leanne.Hartmann@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSH SHAPIRO**
In his official capacity as Governor of the Commonwealth of Pennsylvania

By: */s/ Jacob B. Boyer*
Jennifer C. Selber
Jacob B. Boyer
Governor's Office of General Counsel
30 North 3rd St.
Suite 200
Harrisburg, PA 17101
(717) 831-2847
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Marissa D. Pizaña*
Marissa D. Pizaña
*Special Assistant Attorney General*
150 South Main St.
Providence, RI 02903
(401) 274-4400
MPizana@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan Patrick Kane*
Ryan Patrick Kane
*Deputy Solicitor General*
109 State St.
Montpelier, VT 05609
(802) 828-3171
Ryan.kane@vermont.gov

*Counsel for the State of Vermont*

**JAY JONES**
Attorney General for the Commonwealth of Virginia

By: */s/ Megan C. Keenan*
Megan C. Keenan (1672508)
*Deputy Solicitor General*
202 North Ninth St.
Richmond, VA 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**NICHOLAS W. BROWN**
Attorney General of the State of Washington

By: */s/ Mina Shahin*
Mina Shahin
*Assistant Attorney General*
William McGinty
*Deputy Solicitor General*
800 Fifth Ave., Ste. 2000
Seattle, WA 98104
(206) 464-7744
Mina.Shahin@atg.wa.gov
William.McGinty@atg.wa.gov

*Counsel for the State of Washington*

**JOSHUA L. KAUL**
Attorney General of the State of Wisconsin
By: */s/ Faye B. Hipsman*
Faye B. Hipsman
*Assistant Attorney General*
Wisconsin Department of Justice
PO Box 7857
Madison, WI 53707-7857
(608) 264-9487
faye.hipsman@wisdoj.gov

*Counsel for the State of Wisconsin*