# EXHIBIT 6

# DECLARATION OF LISA WITCHEY

I, Lisa Witchey, am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except as to those matters stated upon information and belief; as to those matters, I believe them to be true. I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

***PROFESSIONAL AND AGENCY BACKGROUND***

1. I am the California Work Opportunities and Responsibility to Kids (CalWORKs) and Temporary Assistance for Needy Families (TANF) Director in the California Department of Social Services (CDSS) and have held this position since December 2022. I oversee the CalWORKs and Family Resilience Branch, which administers the CalWORKs program, California's version of TANF.

2. As the TANF Director for the State of California, I provide planning, policy direction, and oversight for the CalWORKs program to ensure the effective development, promulgation, and implementation of policies necessary for the administration of the program. I also oversee the allocation of funding to the state's Tribal TANF programs and Indian Health Clinics.

3. Prior to my role in CalWORKs, I was the Chief of the Integrated Practice and Resource Development Bureau in the Children and Family Services Division, and I held that position from May 2017 until August 2022. In that capacity, I led statewide implementation of strategic integrated practices including Child and Family Teaming and Assessment, Wraparound, and the Children and Youth System of Care, and I oversaw statewide training for the county workforce.

4. I have a B.A. in Sociology from California State University, Chico, and a Masters in Public Administration from California State University, Northridge.

5. The CDSS provides administration and oversight of programs that affect more than 7.2 million of California's most vulnerable residents: foster children and youth, children and families receiving aid through CalWORKs, people of all ages receiving food benefits through the Supplemental Nutrition Assistance Program, adults and elderly in licensed community care facilities, and aged, blind, and disabled recipients requiring In-Home Supportive Services (IHSS) or Supplemental Security Income/State Supplementary Payment assistance and more. The mission of CDSS is to serve, protect, and support the people of California experiencing need in ways that empower wellbeing and disrupt systemic inequities.

6. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with CDSS staff, or from my review of relevant documents and information.

***TANF IN CALIFORNIA***

7. CDSS oversees CalWORKs, California's TANF program, which is state-supervised and administered by the State's 58 county Health and Human Services Agencies (HHSAs).

8. TANF is a block grant program that provides over $16.5 billion nationwide annually in federal funding to states, territories, and tribal governments, who in turn provide time-limited assistance, including cash aid and other benefits, to needy families with children. It is one of the largest sources of cash assistance to low-income American families and a cornerstone of California's anti-poverty work. California receives approximately $3.7 billion annually in TANF funding, alongside matching state Maintenance-of-Effort requirements of about $2.9 billion annually.

9. CalWORKs provides temporary cash assistance for a family's basic needs. It also provides education, employment, training programs, supportive services, housing support, and childcare subsidies to assist the family's progress toward self-sufficiency.

10. CalWORKs is a key component of California's safety net for low-income families. Families that qualify for ongoing assistance utilize that funding to pay for housing, food, electricity, and other necessary basic needs. Vulnerable Californians—including children, the elderly, domestic-violence victims, lower-income families, and people with disabilities—require the food, shelter, childcare and other critical services that the TANF funds help California provide.

11. Approximately 360,000 families including 700,000 children receive CalWORKs benefits each month.

12. To be awarded TANF funds, CDSS must submit a state TANF plan to the federal Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), that the Secretary of HHS determines is complete, meaning it includes all mandatory components. These components consist of descriptions of how the state will exercise its discretion in conducting its TANF program, such as how the state will implement privacy protections for TANF recipients, as well as certifications that the state will meet certain federal requirements such as safeguarding against program fraud and abuse. Historically, when California's TANF plan is determined complete, CDSS receives a confirmation letter from ACF that confirms the effective date and amount of entitled TANF funds, and a reminder that no determination has been made as to the state's proposed use of funds since the Secretary lacks authority to approve or disapprove TANF plans. California's current state TANF plan was deemed complete by the Secretary and effective October 1, 2022.

***CALIFORNIA'S ELIGIBILITY DETERMINATION PROCESS***

13. CDSS ensures that robust procedures are in place to ensure that TANF funds are used in compliance with state requirements, and to prevent and address fraud.

14. To ensure TANF funds are issued only to eligible recipients, California has a thorough and comprehensive eligibility determination process that counties must follow for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF-funded services and supports.

15. Further, CDSS conducts reviews of counties to ensure program compliance, in accordance with federal and State statutes, regulations, and policies.

16. Applicants and recipients of cash assistance grants must provide evidence to County HHSAs that they are eligible as part of the application and recertification process for CalWORKs. Additionally, if a family experiences certain changes between certifications—such as changes to income, address, or household composition—they are required to report the change to the County HHSA within 10 days to ensure that the family continues to be eligible for assistance and that benefits are paid accurately.

17. The CalWORKs eligibility determination process includes an interview with the applicant (and recipient, in the case of a redetermination). Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying family, furnish evidence to provide verification of those factors which affect initial eligibility and benefit amount, including: identity, residence, family composition, income and resources, and United States citizenship or, if not a United States Citizen, evidence of satisfactory immigration status for TANF eligibility.

18. CDSS also complies with several federal laws and regulations to confirm eligibility for the TANF program.

19. The Income and Eligibility Verification System (IEVS) is used to confirm applicant and continuing recipient eligibility for California's TANF program, including to review federal tax information that is used to confirm whether an individual's income permits them to be eligible for TANF. The Integrated Fraud Detection (IFD) system—a part of the IEVS system—links employer-reported wage data from the Employment Development Department with the wages budgeted for individuals; it identifies individuals who are receiving duplicate aid in more than one county and individuals receiving Supplemental Security Income (SSI) benefits.

20. Federal law and the written agreements applicable to IVES require confirmation of the accuracy of any potential discrepancies raised by such data matches, and require that affected individuals are provided with an opportunity to contest these data findings, before terminating, denying, suspending or reducing benefits to an applicant or recipient. Accordingly, for cases that appear to have income exceeding the established CalWORKs income thresholds for eligibility, for example, County HHSAs must determine whether the identified income in IEVS is available to the family, confirm whether the family's eligibility is impacted, and take action accordingly.

21. CalWORKs also ensures that an applicant's or recipient's qualified alien status is verified through the federal Systematic Alien Verification for Entitlements (SAVE) system.

22. In addition to the above TANF mandated eligibility processes and systems, CDSS requires that any benefits issued in error be recovered when the error is administrative or an unintentional household error, or when it is determined that fraud has occurred. When a County HHSA suspects it has issued benefits to a recipient as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to the county prosecuting authority, or to the CDSS State Hearings Division for an Administrative Disqualification Hearing. If the recipient is found to have committed an intentional

program violation (IPV), the claim is established through a multi-step process, and recovery is pursued from the recipient. The recipient may also be disqualified from participation in the program for a period of time

23. In addition to internal controls, CDSS also has a fraud hotline that the public can use to locate the appropriate County Agency and raise a concern about potential fraud.

24. As required by both federal and state law, California imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under CalWORKs.

25. In accordance with the California Information Practices Act and the Federal Privacy Act, California provides assurances to participants through program materials as to how personal information will be used or restricted. For example, the SAWS 2 PLUS—the multi-program application form that is utilized for CalWORKs benefits—states that information shall be used to determine whether the applicant is eligible for benefits; to monitor compliance with program regulations; and for program management; and that information will not be shared unless allowed by state or federal law. Families can also apply for CalWORKs through BenefitsCal.com. That online application informs applicants that information will only be shared as required by law or as necessary to process the application.

***Federal Oversight of CalWORKs, California's TANF Program***

26. ACF's oversight of the CalWORKs program has historically been limited to three primary components: determining completeness of California's TANF plan, as described above, requiring states to achieve the work participation rate (WPR), and mandatory reporting.

27. To meet the WPR, California must require work-eligible CalWORKs recipients to participate in federally defined "work activities" for a minimum number of hours per week, develop and submit a Work Verification Plan to ACF for approval that describes how the state will

verify work-eligible individuals' hours of participation, and report on data that allows ACF to measure California's compliance with these requirements.

28. Pursuant to federal statute and regulation, CDSS reports data and information related to the CalWORKs program to ACF. CDSS provides ACF with the data fields specified in the ACF reporting instructions. These include, for example, social security number, date of birth, and, as to immigration status, an individual's status as either "U.S. Citizen," "Qualified alien," "Non-qualified alien" or "Unknown." There is no federal mandate to report on the entire TANF caseload for the ACF-199 report. CDSS uses a scientifically acceptable random sampling methodology approved by the Secretary to report on 3,800 cases per year

29. To date, California has never been assessed a TANF penalty for failure to meet federal requirements, including but not limited to meeting the WPR, developing or complying with work participation verification procedures, timely and accurate reporting, or compliance with IEVS.

30. To my knowledge, prior to the current federal administration, ACF has never performed any of the following activities with respect to California's TANF Program: program integrity reviews, program integrity projects, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures.

***TANF SORN***

31. I understand that on June 23, 2026, ACF published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. I understand the SORN purports to amend data collection and disclosure requirements pertaining to ACF in a manner that will impact the CalWORKs program.

32. First, it purports to add new purposes for which ACF collects data which includes broad oversight activities, including eligibility-related reviews—and specifically eligibility relating to citizenship or immigration status.

33. Second, the SORN attempts to broaden the categories of records included in the system from just those records obtained from the grantee agencies through mandatory reporting to include information that could be used to verify program compliance that is obtained from: grantee agencies, other HHS records, or other government agencies or entities engaged to assist HHS with program integrity reviews or projects.

34. Finally, the SORN purports to add an additional routine use whereby TANF data can be redisclosed to any other entity engaged to assist ACF with program integrity reviews or projects, including to the Department of Homeland Security, which is explicitly named in the SORN.

***Harm To California***

35. Without Court intervention, California faces significant harm stemming from the TANF SORN.

36. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

37. TANF, as a block grant, gives states wide flexibility with how to administer the program, including the authority to set financial eligibility requirements. Statute and regulations

identify the four purposes that the funds may be used for, and states are authorized to use their grant in a manner reasonably calculated to accomplish any of those purposes.

38. As noted above, apart from the data reporting required by the TANF Statute, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require California to expend time and resources responding to ACF requests. Currently, the documentation for all of the eligibility requirements is not kept at the state level; rather, it is maintained by County HHSAs. Additional data and information required to be provided by California would necessitate a time and labor-intensive process of collecting documentation from County HHSAs. This data collection would be in addition to the process that, as noted above, California already engages in on a regular basis as part of its efforts to monitor County HHSAs to ensure that all state and federal requirements regarding TANF eligibility are followed. Significant staff resources will be diverted to the collection and submission of this additional data, reducing the staff available for other necessary activities. This shift in workload will cause delays in the processing time for applications and redeterminations, and will lead to the delayed issuance of benefits to vulnerable recipients. Further, California already matches data with federal systems. If the federal government engages in additional matching processes, this will likely lead to erroneous results or false matches that would require additional state resources to resolve.

39. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts for California, with likely staffing reductions and the elimination of non-mandated services. Similarly, HHS announced last

year that it was reversing decades of agency policy and intends to share data from the Medicaid program with DHS and Immigration and Customs Enforcement (ICE) for use in immigration enforcement activities. (*See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-information-sharing-between-the-centers-for-medicare-and-medicaid-services-and.)

40. The SORN's announcement that ACF plans to begin sharing California's TANF recipients' data with DHS will cause additional harm to California, as it risks eroding the trust that CDSS and County HHSAs have developed with immigrant communities. California has made assurances to CalWORKs recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. If ACF can proceed with sharing recipient data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in CalWORKs by citizens and qualified non-citizens alike.

41. Data shows that previous efforts by this Federal Administration to expand the public charge rule to consider the use of noncash public benefits in immigration applications led to a clear decline in program participation. (See One in Four Adults in Mixed-Status Families Did Not Participate in Safety Net Programs in 2022 Because of Green Card Concerns found at https://www.urban.org/sites/default/files/2023-08/One%20in%20Four%20Adults%20in%20Mixed-Status%20Families%20Did%20Not%20Participate%20in%20Safety%20Net%20Programs%20i

n%202022%20Because%20of%20Green%20Card%20Concerns.pdf.) The sharing of TANF data here under the SORN would similarly chill participation in the program.

42. This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in CalWORKs if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure. Such concerns are bolstered by public reporting into DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' TANF programs.

43. The delivery of child welfare programs such as emergency assistance foster care, family preservation, and kinship support would be disrupted, which would put vulnerable children at higher risk of placement in institutional settings rather than in family homes. Increased reliance on institutional settings has a negative health and safety impact on children and families and increases costs to the state.

44. The first stated purpose of TANF is to provide assistance to needy families so that children may be cared for in their own homes or in the homes of relatives. TANF, by its design, is intended to support the stabilization of families in need of temporary financial support. When families lose these financial supports, they lose the ability to provide basic items, such as food, shelter, clothing, and medical supplies, to their children, thus forcing more children into the child welfare system.

45. If fewer individuals participate in CalWORKs, California will suffer significant harms such as increased need for food, shelter, childcare and housing supports from community resources, thus creating greater financial burden for the state, counties and cities. Local public assistance programs that provide general relief benefits and public resources such as local food banks, will likely be utilized beyond their capacity to meet the increased need for basic family supports. Additionally, local school districts that provide food support, educational supports and other forms of support for low-income children will likely be engaged beyond their financial capacities to meet a growing population of children without sufficient resources. The increase in food insecurity, unstable housing, and lack of access to childcare resources will destabilize families as they will have insufficient resources to meet family member basic needs, specifically the greater needs of children. Parents will have insufficient monetary funds to supply their children with basic supplies necessary for their health, welfare, education, and development.

46. Decreased participation in programs providing economic support leads to an increase in child welfare involvement, including potential removal of children from their families due to lack of necessary resources, thus, destabilizing families. There is a clear connection between meeting families' economic and concrete needs and child welfare involvement. (https://www.chapinhall.org/wp-content/uploads/Chapin-Hall_APHSA_Collaborating-for-Child-Welfare-Transformation_Policy-Brief_Jan.-2025.pdf; https://www.chapinhall.org/wp-content/uploads/Chapin-Hall_APHSA_ECS-Full-Research-Report_Nov2023.pdf,; and, https://www.chapinhall.org/wp-content/uploads/CA-CWC-06.01.22-Chapin-Hall-final.pdf.) Decreased participation will also lead to an increased pressure on state-funded housing programs.

47. California will also incur a financial cost in updating communications with CalWORKs applicants or participants to inform them that their personal data will be collected,

used, and shared with the federal government. CDSS will need to update application and renewal forms as these describe the intended use of personal information that is collected from participants. Updating these forms can take up to a year.

48. California will also need to update the automated systems that describe the intended uses of the data. The updates to California's electronic platforms may occur quicker—although not overnight— than updates to the paper forms; however, as a result this will likely hasten the chilling effect on participation.

49. CDSS will also need to provide notice to current participants about the new use of the information that has already been collected because of the impending redisclosure by ACF of this data under the SORN. CDSS also often engages in an informational campaign when significant changes are made to the program. In this case, CDSS will need to provide informational banners for online materials and engage all participants with notice of the SORN's intended uses through an informational notice. All of this will incur staff time and state resources to accomplish.

I declare the foregoing under penalty of perjury under the laws of the State of California.

Executed this 3rd day of August, 2026, in Sacramento, California.

DATED: August 3, 2026

Lisa Witchey

Lisa Witchey