# EXHIBIT 9

# DECLARATION OF JESSICA HORN

I, Jessica Horn, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Social Service Chief Administrator of Policy and Program Development at the Division of Social Services (DSS) within the Delaware Department of Health and Social Services, which provides, either directly or through coordination, an integrated system of opportunities, services, and income support, which enables Delaware's most disadvantaged families to move toward and maintain independence. DSS' 19 client-service buildings, statewide, serve as one-stop shops for an array of public and private health and social service partners. Each center provides a mix of services based on the specific needs of the community, including resources for food assistance, childcare, housing, utilities, cash assistance, and specific medical services to those who are eligible. Additionally, DSS oversees the State Office of Volunteerism, which has over 14,000 registered volunteers and 900 registered community agencies.

2. As the Social Service Chief Administrator of Policy and Program Development, I provide leadership and strategic vision for DSS. I also ensure adherence to all Department, State, and federal laws and regulations regarding federal benefits programs, including monitoring and evaluating services provided.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with DSS staff, or from my review of relevant documents and information.

***TANF in Delaware***

4. DSS administers TANF in Delaware.

5. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income

families with children. It is one of the largest sources of cash assistance to low-income families and a cornerstone of Delaware's anti-poverty work. The State of Delaware receives approximately $32,000,000 annually in TANF funding and provides a monthly average of 4,000 residents with basic recurring cash assistance and non-cash assistance benefits.

6. TANF plays a vital role in the State of Delaware by providing financial assistance and supportive services to low-income families with children. Beyond temporary cash assistance, TANF helps fund critical services such as employment and training programs, childcare assistance, transportation support, housing stabilization, emergency assistance, and case management that enable parents to achieve long-term economic stability. TANF also supports initiatives that promote family self-sufficiency, reduce child poverty, and help prevent families from entering deeper financial crisis. By investing in these critical services, Delaware strengthens its workforce, improves outcomes for children, and ensures that vulnerable families have access to the resources they need to become financially independent and contribute to their communities.

***Delaware's TANF Fraud Prevention Procedures***

7. DSS, on behalf of Delaware, ensures that robust procedures are in place to prevent ineligible TANF benefits distributions and address erroneous payments or attempted fraud.

8. To ensure TANF funds are issued only to TANF eligible recipients, DSS has a robust eligibility determination process that each of Delaware's state service centers must follow for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF funded services and supports. Further, DSS conducts reviews of TANF-funded services and supports to ensure program compliance, in accordance with federal and State statutes, rules, and regulations. DSS provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, phone calls, and emails

to state service center staff and TANF-funded services and supports to help guide them in ensuring the accuracy of their determinations.

9. Applicants and recipients of cash assistance grants must document to DSS that they are TANF eligible as part of the certification and recertification process. Additionally, if a household experiences a change between certifications, they are required to report the change to DSS as soon as they are aware of the change. They must provide verification to DSS within ten days of reporting the change to ensure that the household continues to be eligible for assistance.

10. Such eligibility determination processes include an interview conducted by DSS with the applicant and recipient. As part of the certification and recertification process, the eligibility office collects appropriate documents to determine eligibility. Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to DSS to provide verification of those factors which affect initial eligibility and benefit amount, including: identity, residence, family composition, income, expenses, resources, and United States citizenship or, if not a United States citizen, evidence of satisfactory immigration status for TANF eligibility.

11. Additionally, DSS uses the Front End Investigation (FEI) process to look for specified indicators that would uncover potential fraud or misleading or erroneous statements on the application. Any indicators that the eligibility case manager cannot resolve are referred for investigation prior to the case being opened.

12. DSS also ensures that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. DSS utilizes the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7, to confirm continuing eligibility and benefit levels. DSS uses IEVS to receive federal tax information, which is used to confirm

whether an individual's income and resources permit them to be eligible for TANF. Federal law and the written agreements that DSS signs to access this income and eligibility information require DSS to confirm the accuracy of any red flags raised by such data matches, and to provide affected individuals an opportunity to contest these data findings, before terminating, denying, suspending, or reducing benefits to an applicant or recipient. Accordingly, cases that appear to have income exceeding TANF income and resources are referred to the Audit and Recovery Management Services (ARMS) to determine if the identified income and resources are available and if they impact the recipient's continuing eligibility.

13. DSS also reviews the Public Assistance Reporting Information System (PARIS) interstate match to identify if an individual is receiving benefits in more than one state at the same time. DSS also conducts out-of-state inquiries to identify duplication of benefits. DSS refers match results to ARMS for investigation and appropriate case action.

14. Members of the public can report suspected cash assistance fraud through multiple channels. Allegations may be submitted directly to ARMS by phone or email. Individuals may also report suspected fraud anonymously through Delaware Crime Stoppers by phone or email. Any allegation of cash assistance fraud received directly by DSS is immediately referred to ARMS for review and investigation, ensuring that all reports are evaluated through the appropriate investigative process.

15. In addition to computer matches, DSS establishes claims to recover any benefits issued in error when it is determined that fraud has occurred. When DSS determines it has issued benefits to a recipient as a result of fraud, the facts used in the determination are reviewed. If the available evidence substantiates the suspected fraud, the case is referred to ARMS. If the recipient is found to have committed an intentional program violation (IPV), the claim is established, and

recovery is pursued from the recipient. If a recipient is found to have committed an IPV, the recipient may be disqualified from participation in the program for a period of time.

16. Moreover, as part of its internal controls, DSS conducts work participation verification reviews, which are a quality assurance process that selects representative samples of work-eligible assistance cases for purposes of verifying the accuracy of participation reporting processes and compliance with federal and State regulations. DSS conducts a yearly review of a sample of cases according to Delaware's HHS-approved Work Verification Plan. DSS establishes claims to recover any benefits issued in error when it is determined that fraud has occurred. When DSS determines benefits were issued as a result of fraud, the facts used in the determination are reviewed. If the available evidence substantiates the suspected fraud, the case is referred to ARMS. If the client is found to have committed an IPV, the claim is established, and recovery is sought from the client.

17. TANF is included as a major federal program in Delaware's annual Single Audit, which is conducted in accordance with the Single Audit Act, Generally Accepted Auditing Standards (GAAS), Government Auditing Standards, and the Uniform Guidance (2 CFR Part 200). As part of the audit, TANF expenditures are reported on the State's Schedule of Expenditures of Federal Awards (SEFA), which documents federal funds expended rather than received during the fiscal year. The audit evaluates the State's compliance with federal requirements governing TANF, including eligibility determinations, allowable costs, reporting, and internal controls over program administration. Any TANF-related findings, questioned costs, or recommendations are documented in the Schedule of Findings and Questioned Costs and the program-specific compliance reports. By including TANF in the annual Single Audit, Delaware demonstrates

accountability for the stewardship of federal funds while identifying opportunities to strengthen compliance, internal controls, and program effectiveness.

18. ARMS oversees the identification, investigation, and recovery of cash assistance fraud and overpayments. The unit identifies potential fraud through sources such as IEVS, agency referrals, citizen complaints, and other information. ARMS conducts audits and investigations of suspected fraud, prepares cases for criminal prosecution or administrative overpayment actions, and serves as the Department's fiscal agent by establishing repayment agreements, tracking outstanding overpayments, and notifying DSS when debts are satisfied. In addition, ARMS is responsible for enforcing the collection of overpayments through a variety of debt recovery methods.

***Delaware's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status***

19. Delaware uses the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien status.

20. To ensure consistent statewide processing of citizenship and immigration status verification, DSS has implemented standardized procedures for the SAVE process at certification, recertification, when adding a new household member, and when a status change is reported during the certification period. Delaware verifies immigration status with the Department of Homeland Security before certifying benefits. When automated verification through the Federal Data Services Hub is unsuccessful, DSS case managers submit a SAVE request and supporting documentation to designated DSS SAVE staff, who validate the information through the U.S. Citizenship and Immigration Services (USCIS) SAVE system. Results are returned to the DSS case manager for eligibility determination and case processing. If additional verification is required, the case may be escalated to a Level 3 review, during which clients will be informed that

further documentation is needed. Staff are required to document all actions, monitor response timelines, and ensure that benefits are not unnecessarily delayed while verification is pending, in accordance with DSS policy. TANF benefits will be denied to anyone who refuses to verify their citizenship or immigration status.

21. DSS maintains standardized statewide procedures to ensure immigration status documents and other client records are accurately captured and stored in the document imaging system. Documents, including passports, visas, permanent resident cards, and other immigration-related records, must be clearly labeled with the appropriate case and client identifiers, scanned according to established protocols, and electronically indexed. Original paper documents are retained for 120 days after scanning to support quality assurance and retrieval if needed. These procedures promote accurate recordkeeping, consistent documentation, and timely access to immigration records used in eligibility determinations and verification processes.

22. DSS oversees compliance with immigration status verification requirements for applicants and recipients through established eligibility policies and procedures, ongoing staff training, supervisory review, and quality assurance activities. Benefit cases may be sampled for review to confirm eligibility factors and verification, including immigration status. Cases found to have errors are corrected, and any resulting overpayment or underpayment claim is established in accordance with program requirements.

23. As required by law, Delaware imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

24. State policy requires DSS to maintain the confidentiality of all public assistance applicant and recipient information and records. Client information may be used only for purposes directly related to the administration of public assistance programs and may not be disclosed

without the individual's written consent, except as specifically authorized by law. Limited exceptions include the release of a TANF recipient's address to law enforcement under defined circumstances and only with approval from DSS senior management, and the disclosure of records to a Court Appointed Special Advocate (CASA) or guardian ad litem when authorized to protect the interests of a child. All authorized disclosures must be appropriately documented, and when records are released to a CASA or guardian ad litem, written notification must be sent to the individual's last known address. These requirements ensure that recipient information is safeguarded while permitting only legally authorized disclosures.

25. DSS could never have anticipated the new routine use of TANF data announced in the SORN and therefore had no opportunity to draft disclosures to prior TANF recipients to disclose this new routine use of their data.

***Federal Oversight of Delaware TANF Program***

26. Pursuant to federal statute and regulation, DSS provides certain data on families receiving TANF assistance to ACF on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

27. Among other things, DSS provides ACF with the data fields specified in a publication titled “ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions,” OMB Control Number 0970-0338. These include, for example, Social Security number, date of birth, and, as to immigration status, an individual’s status as either “U.S. Citizen,” “Qualified Alien,” or “Unknown.”

28. DSS provides this information for all families receiving TANF assistance in Delaware.

29. DSS submits the ACF-199 (TANF Data Report) and ACF-209 (State Separate Program–Maintenance of Effort (SSP-MOE) Data Report) in accordance with 45 CFR Part 265 to

demonstrate compliance with federal TANF and Maintenance of Effort (MOE) reporting requirements. These quarterly reports collect both detailed individual and family-level data, as well as aggregated program data, to assess work participation rates, monitor program performance, and support federal oversight of TANF and MOE programs. The reports include demographic information, benefit receipt, work activities, and selected outcome measures for applicants, recipients, and individuals exiting assistance.

30. Pursuant to the federal Single Audit Act, DSS engages an auditor with respect to its TANF program. This audit takes place every three years. The auditor conducting the Single Audit is chosen by Delaware. The State's annual Single Audit report is in accordance with the Office of Management and Budget's Uniform Guidance. The audit is conducted under the oversight of the State Auditor's Office. The Schedule of Expenditures of Federal Awards (SEFA) is included in the Single Audit report and is prepared by the Division of Accounting. The SEFA is a report of all federal grant expenditures expended by the State of Delaware agencies and departments, and it includes both monetary and non-monetary grant awards. More information on the Single Audit, including past audits, can be found at https://accounting.delaware.gov/reports-transparency/single-audits/.

31. There has historically been little federal oversight of Delaware's TANF program beyond the Single Audit, and required federal reporting described above.

32. To my knowledge, in the past seven years, ACF has never performed any of the following activities with respect to Delaware's TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures. ACF previously conducted

quarterly check-in calls with Delaware's TANF policy team; however, those calls have not been scheduled since 2024.

***TANF SORN***

33. I understand that on June 23, 2026, the U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

34. ***First***, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act".

35. The TANF SORN adds a new additional purpose:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

36. ***Second,*** the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained

from TANF grantee agencies" (*i.e.*, state agencies), but also "verification information" obtained "from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

37. ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.*, DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

38. ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

***HARM To Delaware***

39. Without Court intervention, Delaware faces harm stemming from the TANF SORN.

40. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

41. As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed

"agency oversight activities." ACF doing so as a result of the TANF SORN would require Delaware to expend time and resources responding to ACF requests. The collection and reporting of this data and increased monitoring would require modifications to existing systems, policies, and procedures. These changes would necessitate additional staffing resources, increased staff time, and higher operational costs.

42. This would also create opportunity costs, as additional agency capacity would be required to implement and maintain data collection, reporting, and participation in reviews. In the context of existing resource constraints, these additional demands could divert limited staff time from other operational responsibilities.

43. As to immigration status verification in particular, these agency oversight activities are likely to lead to misleading and improper results. An individual's immigration status may change over time due to adjustment of status, pending applications, extensions of authorized stay, court proceedings, and legislative changes, among other reasons. Reviews conducted after an eligibility determination may not accurately reflect the information available at the time the determination was made or an individual's current immigration status. In addition, Delaware performs verification not reflected in SAVE by verifying immigration status through the Federal Data Services Hub and accepting participation in another benefit program as valid verification if citizenship or immigration status was previously verified for that program.

44. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts for Delaware, with likely staffing reductions and the elimination of non-mandated services. This could interfere with the

State's administration of TANF and impair the State's ability to provide timely and continuous benefits. These disruptions could interrupt essential assistance to eligible families, creating uncertainty and hardship for households that rely on TANF-funded services.

45. Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with DHS and Immigration and Customs Enforcement (ICE) for use in immigration enforcement activities. *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-information-sharing-between-the-centers-for-medicare-and-medicaid-services-and. In this environment, the SORN's announcement that ACF plans to begin sharing Delaware's TANF recipients' data with DHS will cause additional harm to Delaware, as it risks eroding the trust that DSS has developed with immigrant communities in Delaware. DSS has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, and to provide documentation of that status, and has told applicants that DSS would verify that status with the federal government. But DSS has also encouraged eligible households to take advantage of TANF and other assistance to help raise their children and families out of poverty. If ACF begins sharing TANF data with DHS, then community fears that DHS will use that data for purposes other than valid eligibility checks will impede that public trust.

46. Further, the TANF SORN will erode the trust that Delaware has developed with immigrant communities and deter individuals from participating in TANF. Delaware has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, and has told applicants that State and local TANF administrators would confirm that status

with the federal government. But Delaware has also encouraged eligible households—including families with U.S. citizen children who are and have always been eligible for TANF— to take advantage of TANF and other assistance to help raise their children and families out of poverty. Delaware has also made assurances to TANF recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in Delaware's TANF programs by citizens and qualified non-citizens alike.

47. This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in the TANF program if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure. Such concerns are bolstered by public reporting into DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' TANF program.

48. If fewer individuals participate in TANF, Delaware will suffer significant harms. While lower participation in Delaware's TANF program may reduce direct benefit expenditures, it may also increase long-term costs to the State. Restrictive eligibility policies and benefit cliffs can leave vulnerable families without cash assistance, increasing the likelihood that they will rely on other public assistance programs and social services. Research indicates that reduced access to

TANF is associated with higher rates of child poverty and increased demand for health care, family support, education, and justice-related services, potentially offsetting any short-term program savings. Additionally, Delaware must continue to maintain federally required administrative functions, including eligibility determination, case management, and recordkeeping, regardless of participation levels. As a result, declining TANF enrollment may not significantly reduce administrative costs while increasing expenditures in other areas of the State's human services system.

49. Delaware will also incur a financial cost in updating communications with TANF applicants and recipients that notify TANF applicants and recipients of how their personal data is collected, used, and shared. If the TANF SORN went into effect, attorneys for DSS would need to evaluate federal and State law and regulations to determine if the DSS Privacy Notice needed to be updated. If the DSS Privacy Notice is indeed updated, it is likely that all TANF applicants and recipients would need to receive a copy of the Privacy Notice, which would incur additional printing and mailing costs.

DATED: July 31, 2026

Jessica Horn
Social Service Chief Administrator
Policy and Program Development Unit
Division of Social Services
Department of Health and Social Services