# EXHIBIT 10

**DECLARATION OF BRIAN CAMPBELL**

I, Brian Campbell, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Administrator of the District of Columbia ("District" or "DC") Department of Human Services ("DHS") Economic Security Administration ("ESA").

2. I oversee eligibility determinations for the SNAP, TANF, and medical assistance programs in the District of Columbia, as well as functions associated with said eligibility determinations. I am also responsible for employment and training programs associated with the TANF and SNAP programs, respectively.

3. The mission of DHS is to provide meaningful and equitable services, support, and access to resources for District residents to realize their goals. ESA is the administration within DHS responsible for making eligibility determinations for federally and locally funded public assistance programs in the District, including, but not limited to, health care assistance, such as Medicaid, Children's Health Insurance Program ("CHIP"), District of Columbia Health Care Alliance program ("Alliance"), and Immigrant Children's Program ("ICP") benefits, Supplemental Nutrition Assistance Program ("SNAP") benefits, and Temporary Assistance for Needy Families ("TANF") benefits.

4. I am familiar with the information in the statements set forth below through personal knowledge, consultation with DHS staff, or from my review of relevant documents and information.

***TANF in the District***

5. DHS ESA administers TANF in the District.

6. TANF is a block grant program that provides federal funds to states and the District of Columbia, who in turn provide cash assistance and non-cash benefits and services to low-

income families with children. It is one of the largest sources of cash assistance to low-income families and a cornerstone of the District's anti-poverty work. The District receives approximately $92M annually in federal TANF funding, as well as an additional approximately $70M in local funding. The District provides approximately 15,000 households and 42,000 District residents with basic recurring cash assistance and non-cash assistance benefits.

7. TANF is foundational to multiple safety net programs in the District including childcare, homeless services, domestic violence services, and workforce programs.

***The District's TANF Fraud Prevention Procedures***

8. DHS, on behalf of the District, ensures that robust procedures are in place to prevent ineligible TANF benefits distributions and address erroneous payments or attempted fraud. The District has a combined application, so each TANF applicant may apply for both SNAP as well as medical assistance. As such, the application and screenings have the elevated scrutiny of Food and Nutrition Administration (FNA) and Centers for Medicare and Medicaid Services (CMS) requirements.

9. To ensure TANF funds are issued only to TANF eligible recipients, DHS has a robust eligibility determination process for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF funded services and supports. DHS ESA provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, phone calls, and emails to front line staff in DHS Service Centers and DHS's Virtual Service Center to help guide them in ensuring the accuracy of their determinations.

10. Applicants and recipients of cash assistance grants must document to DHS that they are TANF eligible as part of the application and recertification process. Additionally, if a household experiences a change in between certifications that impacts eligibility, they are generally required

to report the change to DHS by the tenth day of the month following the change to ensure that the household continues to be eligible for assistance. Some changes, such as absence of a minor from the household for 90 or more days, must be reported to DHS on a more expedited timeline.

11. Such eligibility determination processes include an interview conducted by DHS ESA with the applicant and recipient. As part of this determination/redetermination process, DHS collects appropriate documents to verify reported information and determine eligibility. Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to DHS that verifies those factors which affect initial eligibility and benefit amount, including: identity, residence, age, disability, household size, income, and U.S. citizenship or, if not a U.S. citizen, evidence of satisfactory immigration status for TANF eligibility.

12. DHS also ensures that various computer matches take place to confirm eligibility. DHS uses the Income Eligibility Verification System (IEVS) to confirm continuing eligibility and benefit levels. Cases that appear to have income exceeding TANF income and resources are reviewed by DHS to determine if the identified income and resources are available and if they impact the recipient's continuing eligibility.

13. DHS conducts a prison match to identify cash assistance recipients who are incarcerated and have been sentenced to a term in a District detention facility or a federal prison as reported on the U.S. Social Security Administration (SSA) Federal Prison file. DHS ESA follows up with individuals on matches and takes appropriate case action.

14. DHS also reviews individuals whose Electronic Benefits Transfer (EBT) cash transactions appear suspicious and are conducted out of state, which may indicate residence in a

state other than the District. The matches are then referred to the Fraud Investigation Division for investigation and, depending upon the results of that investigation, further appropriate case action.

15. DHS performs monthly matches of active TANF recipients with the federal National Directory of New Hires (NDNH), which contains nationwide W-4 information. The TANF matches involve all active adult recipients. NDNH matches are verified through a third-party vendor or by sending Manual Employment Verification (MEV) forms to employers. DHS ESA takes appropriate case action based on the NDNH match, information from the customer, and responses from the third-party vendor and MEVs.

16. The DHS Office of Program Review, Monitoring and Investigation (OPRMI) enables the public to submit unusual incident reports and welfare fraud allegations to DHS via an online Incidents Report Form, email, telephone, facsimile, and mail. These submissions contain information regarding individuals suspected of public assistance fraud and are investigated by OPRMI and referred to the Office of the Attorney General for the District of Columbia (OAG) Welfare Fraud Unit for appropriate case action when warranted.

17. When DHS suspects it has issued benefits to a recipient as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud appears to be substantiated by the available evidence, the case is referred to the OAG Welfare Fraud Unit for potential prosecution. If the recipient is found to have committed an intentional program violation (IPV), the recipient may be disqualified from participation in the program for a period of time.

18. Moreover, as part of its internal controls, DHS conducts work participation verification reviews, which is a quality assurance process that reviews 100% of work-eligible assistance cases for purposes of verifying the accuracy of the DHS's participation reporting

processes, the accuracy of reporting, and compliance with federal and state regulations. DHS has an internal Quality Analysis Division and has an externally conducted single audit each year.

***The District's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status***

19. DHS uses the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien status.

20. When an application is submitted, the eligibility determination automatically checks the customer information against the SAVE database.

21. A record of the transaction is maintained within the eligibility database.

22. Individuals may provide additional paperwork or other supporting documents and, if supplied, all documents are attached to the relevant case and stored in our Document Imaging Management System (DIMS), a database that stores and protects customers' supporting documentation.

23. As required by law, the District imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

24. D.C. Code § 4-209.04(c) restricts access to TANF customer information to the TANF customer and to individuals the TANF customer authorizes in writing; and to third parties without the TANF customer's written authorization in strictly limited circumstances.

25. The Integrated Application Form used to apply for and recertify TANF in the District assures customers that, "*All information and documentation gathered for determining your Cash Assistance, Food Assistance, and Medical Assistance eligibility or other program related use is confidential. Each program provides safeguards, restricting the use and disclosure of information about you to purposes directly connected with the administration of the program. Releasing information concerning your eligibility to anyone not authorized to receive the*

*information is a violation of Federal and D.C. law and may result in legal action. We will keep your eligibility information confidential, unless you give us permission (or we are permitted by law) to release information to others."*

***Federal Oversight of District TANF Program***

26. Pursuant to federal statute and regulation, DHS provides certain data on families receiving TANF assistance to the Administration for Children and Families (ACF) on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

27. Among other things, DHS provides ACF with the data fields specified in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, social security number, date of birth, and, as to immigration status, an individual's status as either "U.S. Citizen," "Qualified Alien," or "Unknown."

28. DHS provides this information for all families receiving TANF assistance in the District.

29. Pursuant to the federal Single Audit Act, DHS engages an auditor with respect to its TANF program. This audit takes place annually. The auditor conducting the Single Audit is chosen by the District's Office of the Chief Financial Officer (OCFO). The Single Audit Act, as implemented through 2 CFR Part 200, Subpart F (Uniform Guidance), requires any non-Federal entity that expends $1 million or more in federal awards during a fiscal year to undergo a comprehensive audit. The purpose of this audit is to provide assurance regarding (1) the accuracy of financial statements, (2) the effectiveness of internal controls over federal awards, and (3) compliance with federal program requirements.

***Scope of the Single Audit – TANF Eligibility***

30. Under the Compliance Supplement for Assistance Listing Number 93.558 (TANF), eligibility is a core compliance area auditors must test. The eligibility review typically includes:

a. Verification of applicant and recipient eligibility factors—confirming that required documentation is present and valid, such as identity, residency, income, household composition, and citizenship/immigration status (as applicable under federal and District rules).

b. Testing compliance with federal TANF eligibility prohibitions and restrictions—for example, ensuring the agency has controls to prevent benefits to individuals convicted of certain offenses when applicable under District policy; validating compliance with work participation obligations tied to eligibility.

c. Review of eligibility determination processes—assessing whether eligibility determinations are completed timely, consistently, and in accordance with federal and local requirements; evaluating whether the agency maintains sufficient internal controls to prevent and detect improper payments.

d. Assessment of systems used for eligibility—auditors test interfaces with Income Eligibility Verification Systems (IEVS), confirm documentation is retained appropriately, and assess whether system rules align with federal requirements.

e. Identification of questioned costs and eligibility-related findings—if eligibility documentation is missing or inconsistent, or if determinations

were made without required verification, auditors may issue findings, classify questioned costs, and recommend corrective actions.

31. Other than technical assistance upon request, there has historically been no federal oversight of the District's TANF program beyond the Single Audit and required federal reporting described above.

32. To my knowledge, in the past 20 years, ACF has never performed any of the following activities with respect to the District's TANF program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures.

***TANF SORN***

33. I understand that on June 23, 2026, U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

34. ***First***, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act."

35. The TANF SORN also adds a new additional purpose:

> To ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory

> requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

36. ***Second***, the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.*, state agencies), but also "verification information" obtained "from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

37. ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.*, DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

38. ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

***Harm to the District***

39. Without Court intervention, the District faces imminent and irreparable harm stemming from the TANF SORN.

40. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

41. As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require the District to expend time and resources responding to ACF requests. The District has a small data team who also supports SNAP and Medicaid. With increased work requirements in both respective programs, these new requirements would tax the District's existing analytical and data capacity.

42. This would also create opportunity costs. The agency is focused on supporting individuals to grow their capacity and move off of public benefits. The new requirements would directly divert resources from that focus.

43. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states. *See* U.S. Dep't of Health and Human Servs., "HHS Freezes Child Care and Family Assistance Grants in Five States for Fraud Concerns" (Jan. 6, 2026), https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant

programmatic and operational impacts for the District, with likely staffing reductions and the elimination of non-mandated services.

44. Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with the Department of Homeland Security and Immigration and Customs Enforcement (ICE) for use in immigration enforcement activities. *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), 90 Fed. Reg. 53,324 (Nov. 25, 2025).

45. In this environment, the SORN's announcement that ACF plans to begin sharing the District's TANF recipients' data with the Department of Homeland Security will cause additional harm to the District, as it risks eroding the trust that DHS has developed with communities in the District. DHS has always required TANF applicants who are not citizens to attest that they have an eligible immigration status and provide documentation of that status and has told applicants that DHS would verify that status with the federal government. But DHS has also encouraged eligible households to take advantage of TANF and other assistance to help raise their children and families out of poverty. If ACF begins sharing TANF data with the Department of Homeland Security, then community fears that the Department of Homeland Security will use that data for purposes other than valid eligibility checks will impede that public trust and chill participation in the District's TANF programs by citizens and qualified non-citizens alike.

46. The District is unique in both its geographical concentration as well as the fact that it is home to generational families as well as immigrant and relocating families. The neighborhoods and schools reflect that diversity, thus a chilling effect on one population has a chilling effect on all populations. This chilling effect will extend beyond immigration-related concerns to individuals

who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in TANF if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure. Such concerns are bolstered by public reporting about the Department of Homeland Security's efforts to use consolidated data from state benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the District's TANF programs.

47. If fewer individuals participate in TANF, the District will suffer significant harms. As mentioned above, the District has a combined application. Fewer people applying for and receiving TANF means that fewer would apply for and receive SNAP and Medicaid, respectively. This has a direct impact on nutrition and the health of families. Further, it excludes families from both childcare resources as well as employment and training resources made available via the programs. All of these consequences will undermine the economic foundation of the District and increase demand on other essential services funded by the District.

48. The District will also incur a financial cost in updating communications with TANF applicants or participants that notify TANF applicants or recipients of how their personal data is used. This would entail redesigning the application as well as all messaging. The application alone would cost several hundred thousand dollars to redesign and reprogram. Translation and printing would be tens of thousands more.

DATED: July 31, 2026

Brian Campbell