# EXHIBIT 11

# DECLARATION OF JILL OUTLAND

I, Jill Outland, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Associate Director of the Office of Policy and Program Integrity at the Illinois Department of Human Services (IDHS).

2. In that role, I oversee the Bureau of Policy Development within IDHS's Division of Family and Community Services (FCS), which administers the Temporary Assistance for Needy Families (TANF) program and other federal and state benefits programs. The Bureau of Policy Development includes the policy team that ensures compliance with TANF program regulations.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with IDHS staff, or from my review of relevant documents and information.

***TANF in Illinois***

4. IDHS administers TANF in Illinois.

5. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income families with children. It is one of the largest sources of cash assistance to low-income families and a cornerstone of Illinois's anti-poverty work. Illinois receives approximately $583 million annually in TANF funding and provides over 65,000 Illinois residents with basic recurring cash assistance and non-cash assistance benefits.

6. The TANF program provides temporary financial assistance to pregnant women and families with dependent children. It provides temporary funds to pay for food, shelter, and

other necessities. Our program works with participants to build a plan to move the family toward self-sufficiency.

***Illinois's Eligibility and Accuracy Procedures***

7. FCS, on behalf of Illinois, ensures that procedures are in place to prevent ineligible TANF benefit distributions and address erroneous payments.

8. IDHS administers TANF through its local offices located throughout the state, also known as Family and Community Resource Centers (FCRCs). FCRCs are staffed by caseworkers trained on TANF eligibility rules and procedures. Cases processed by caseworkers are reviewed by caseworker supervisors and local office administrators to ensure program compliance.

9. To ensure TANF funds are issued only to TANF eligible recipients, IDHS has a robust eligibility determination process that caseworkers must follow for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF funded services and supports. Further, caseworker supervisors and local office administrators conduct reviews to ensure program compliance, in accordance with federal and State statutes, rules and regulations. IDHS provides extensive direction and support via on-site managerial support, policy directives, meetings, trainings, and emails to FCRCs to help guide them in ensuring the accuracy of their determinations.

10. Applicants and recipients of cash assistance grants must document to FCRCs that they are TANF eligible as part of the application and recertification process. Additionally, if a household experiences a change during their certifications period, they are required to report the change to the FCRC based on their reporting status. For households in Change Reporting status, changes must be reported within 10 days to ensure that the household continues to be eligible for the assistance. For households in Simplified Reporting status, only those changes specified by

Illinois policy must be reported. All TANF recipients must complete the Redetermination forms and participate in the bi-annual redetermination to determine continued eligibility. All TANF recipients are also required to provide verification when requested by the Department.

11. Such eligibility determination process includes an interview conducted by the FCRC with the applicant and recipient. As part of this determination / redetermination process, appropriate documents are collected by the district to determine eligibility. Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to the FCRC to provide verification of those factors which affect eligibility and benefit amount, including: identity, residence, family composition, housing costs, income and resources, and United States citizenship or, if not a United Citizen, evidence of satisfactory immigration status for TANF eligibility.

12. Additionally, IDHS utilizes approved federal and State processes to validate and monitor for compliance with program eligibility for each applicant and recipient of TANF funded cash assistance.

13. From the moment of onboarding, caseworkers receive progressive training on the TANF eligibility rules, actions to address overpayments and underpayments, and the Integrated Eligibility System (IES), which assists caseworkers with identifying potential overpayments and underpayments.

14. Once a potential overpayment has been identified in IES, the caseworker will report the potential overpayment to the IDHS Bureau of Collections. The Bureau of Collections then reviews the potential overpayment, makes any necessary changes in accordance with the TANF program rules, and establishes a receivable if warranted.

15. IDHS also ensures that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. IDHS utilizes the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7 to confirm continuing eligibility and benefit levels. IDHS uses IEVS to receive federal tax information, which is used to confirm whether an individual's income and resources permit them to be eligible for TANF. Federal law and the written agreements that IDHS signs to access this income and eligibility information require IDHS to confirm the accuracy of any red flags raised by such data matches, and to provide affected individuals an opportunity to contest these data findings, before terminating, denying, suspending or reducing benefits to an applicant or recipient. Accordingly, cases that appear to have income exceeding TANF income are referred to the Bureau of Collections.

16. Through IES, caseworkers also review the Public Assistance Reporting Information System (PARIS) Interstate match to identify if an individual is receiving benefits in more than one state at the same time. Caseworkers take necessary action to verify the accuracy of the match and determine if changes to the case or closure of the case are needed. If closure of the case is warranted, caseworkers take action to recoup any overpayment, including referring match results to Bureau of Collections for review and appropriate case action.

17. IDHS conduct a Prison Match via a real-time clearance that provides federal, state and county data. to identify cash assistance recipients who are incarcerated. In addition IDHS runs a monthly crossmatch with the Illinois Department of Corrections.

18. Through IES, caseworkers perform monthly matches of active TANF recipients with the federal National Directory of New Hires (NDNH). The TANF matches involve all active adult recipients. .

19. IDHS, through IES, also run weekly matches against the Illinois Department of Employment Security new hires database, to identify applicants and recipients who have filed a W-4 with Illinois and thus potentially identify new employment that could impact TANF eligibility.

20. The IDHS website directs the public to submit welfare fraud allegations in person, by phone, or electronically at https://www.dhs.state.il.us/page.aspx?item=146937. . Submissions that contain information regarding individuals suspected of TANF fraud are referred to the Illinois Department of Healthcare & Family Services Office of the Inspector General by IDHS for investigation and appropriate case action.

21. In addition to computer matches, FCRCs are required to refer potential overpayment claims to recover any benefits issued in error to Bureau of Collections. When an FCRC determines it has issued TANF benefits to a recipient the facts used in the determination are reviewed.

***Illinois's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status***

22. IDHS utilizes the federal Systematic Alien Verification for Entitlements (SAVE) system, to verify an applicant or recipient's qualified alien status. at the point of application, renewal, member add or if a change is reported that indicates a change in status from ineligible to eligible. In some instances, additional information must be provided to UCIS before immigration status can be confirmed.

23. As required by state and federal law, Illinois imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

24. Under Illinois law, any information about a TANF customer or case is confidential, and may only be used for purposes directly related to program administration, such as establishing the eligibility of the customer. Use of customer or case information for personal, political, or commercial purposes is strictly prohibited. *See* Illinois Public Aid Code, 305 ILCS 5/11-9. When

information is shared with another governmental agencies or authorized entity for program administration, the receiving agency is informed of its responsibility to maintain the confidentiality of the information.

25. IDHS could have never anticipated the new "routine use" of TANF data announced in the SORN and therefore had no opportunity to draft disclosures to prior TANF recipients to disclose this new use of their data.

26. Applicants and recipients are informed of their rights and responsibilities during the application process. They receive a complete copy of the Rights and Responsibilities describing program requirements, reporting obligations, participation requirements, fair hearing rights, confidentiality protections, and the consequences of providing false information or committing fraud. A complete copy of the Rights and Responsibilities is also available on the Illinois Department of Human Services website. *See* https://www.dhs.state.il.us/page.aspx?item=12299

27. When applying for TANF, applicants are also given the IDHS Form IL444-586 TANF Brochure and an explanation of the program. IDHS staff are required to explain Rights and Responsibilities at initial application, redetermination, when a change is reported, or when asked.

***Federal Oversight of Illinois TANF Program***

28. Pursuant to federal statute and regulation, IDHS provides certain data on families receiving TANF assistance to ACF on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

29. Among other things, IDHS provides ACF with the data fields specified in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, social security number, date of birth, and,

as to immigration status, an individual's status as either "U.S. Citizen," "Qualified alien," or "Unknown."

30. IDHS undertakes sample TANF data collection activities, consistent with 42 U.S.C. § 611(a)(1)(B) and 45 C.F.R. § 265.5. On a monthly basis, IDHS uses random sampling to select a sufficient number of TANF/Maintenance of Effort (MOE) cases to meet federal reporting requirements. Each month IDHS's Bureau of Performance Management (BOPM) obtains a random sample of 271 active and newly-approved TANF cases. The data collected and reported includes fields specified in the ACF-199 TANF Reporting Instructions (ACF-199 TANF and ACF-209 SSP-MOE Data Reporting Instructions) such as social security number, date of birth, immigration status, household composition, employment and income, etc. The data is provided to ACF quarterly.

31. IDHS also obtains, on a monthly basis, a random sample of 86 cases that are no longer receiving assistance under the TANF program. The data collected and reported includes household composition, reason for case closure, other types of assistance received, social security number, date of birth, and other information as specified in the reporting instructions. This data is reported to the ACF on a quarterly basis.

32. Pursuant to the federal Single Audit Act, IDHS engages an auditor with respect to its TANF program. This audit takes place annually. The auditor conducting the Single Audit is chosen by the Illinois Auditor General]. The Single Audit includes 50 randomly selected TANF cases to test all eligibility factors (financial and non-financial), 40 randomly selected TANF cases that have no earned income reported to show that they are exempt from work or being sanctioned for non-cooperation, 40 randomly selected TANF cases that have a child under the age of 6 and an activity sanction to ensure appropriate sanction, and 40 randomly selected TANF cases that have

a child support sanction to ensure FCS has addressed the child support non-cooperation notice timely.

***TANF SORN***

33. I understand that on June 23, 2026, U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

34. ***First***, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act".

35. The TANF SORN adds a new additional purpose:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

36. ***Second,*** the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained

from TANF grantee agencies" (*i.e.*, State agencies), but also "verification information" obtained "from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

37. ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

38. ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

***Harm To Illinois***

39. Without Court intervention, Illinois faces harm stemming from the TANF SORN.

40. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

41. As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require Illinois to expend time and resources responding to ACF requests, including staffing resources applied to document and data collection and increased intra-agency coordination of reporting.

42. This would also create opportunity costs. Reallocating staff time to respond to additional audits and reporting requirements pulls staff away from their normal duties and negatively impacts operations.

43. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states including Illinois. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts for Illinois, with likely staffing reductions and the elimination of non-mandated services. *See* Declaration of Priya Khatkhate, *State of New York et al., v. Administration for Children and Families et al., 26-cv-00172* (S.D.N.Y. January 8, 2026)*,* Dkt. No. 9-1.

44. Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with DHS and Immigration and Customs Enforcement (ICE) for use in immigration enforcement activities. *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-information-sharing-between-the-centers-for-medicare-and-medicaid-services-and.

45. In this environment, the TANF SORN will erode the trust that IDHS has developed with immigrant communities and deter individuals from participating in TANF. IDHS has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, and has told applicants that State and local TANF administrators would confirm that status with the federal government. But IDHS has also encouraged eligible households—including families with U.S. citizen children who are and have always been eligible for TANF— to take advantage of TANF and other assistance to help raise their children and families out of poverty. Illinois has also made assurances to TANF recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in Illinois's TANF programs by citizens and qualified non-citizens alike.

46. This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in the TANF program if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure. Such concerns are bolstered by public reporting into DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' TANF programs.

47. Illinois will also incur a financial cost in updating communications with TANF applicants or participants that notify TANF applicants or participants of how their personal data is collected, used, and shared. Caseworkers will be required to undergo updated confidentiality training. Caseworkers may be required to respond to an increased volume of customer inquiries regarding the changes. Examples include the process for evaluating the legal requirements, incorporating those requirements into new disclosures, and then the procedures for actually effectuating the changes, such as the costs of updating paper forms

DATED: July 31, 2026

Jill Outland Digitally signed by Jill Outland Date: 2026.07.31 18:02:19 -05'00'

DECLARANT