# EXHIBIT 12

**DECLARATION OF LESA DENNIS**

I, Lesa Dennis, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of the Commonwealth of Kentucky. I am over the age of 18 and understand the obligations of an oath.
2. I am the Commissioner of the Kentucky Cabinet for Health and Family Services, Department for Community Based Services (DCBS), as appointed by Governor Andy Beshear on January 16, 2023. Prior to holding this position, I served as Deputy Commissioner of the Kentucky Department for Community Based Services. I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.
3. Among the programs administered by the Cabinet for Health and Family Services, Department for Community Based Services, is the Temporary Assistance for Needy Families stance Program (TANF).
4. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with DCBS staff, or from my review of relevant documents and information.

***TANF in Kentucky***

5. DCBS administers TANF in Kentucky.
6. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income families with children. It is one of the largest sources of cash assistance to low-income families and is a cornerstone of Kentucky's anti-poverty work. Kentucky receives approximately $180 million annually in TANF funding.

7. Kentucky uses TANF block grant dollars to ensure children can be cared for in their homes or in the homes of their relatives. The Kentucky Transitional Assistance Program (KTAP) and the Kinship Care Program support an average of 22,000 children annually with financial assistance for critical needs such as housing, food, and other basic necessities. In addition, Kentucky's TANF dollars support eligible families with non-cash assistance services like employment services, work supports, and child care.

***Kentucky's TANF Fraud Prevention Procedures***

8. DCBS ensures that robust procedures are in place to prevent ineligible TANF benefits distributions and address erroneous payments or attempted fraud.

9. To ensure TANF funds are issued only to TANF eligible recipients, DCBS has a robust eligibility determination process that staff must follow for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF-funded services and supports. Further, DCBS conducts reviews of contractors to ensure program compliance, in accordance with federal and State statutes, rules and regulations. DCBS provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, phone calls, and emails to DCBS local office staff to help guide them in ensuring the accuracy of their eligibility determinations.

10. Applicants and recipients of cash assistance grants must document to DCBS staff that they are TANF eligible as part of the application and recertification process. Additionally, if a household experiences a change in between certifications, they are required to report the change to DCBS within 10 days to ensure that the household continues to be eligible for the assistance.

11. The eligibility determination process includes an interview conducted by local office staff with the applicant/recipient. As part of this determination/redetermination process, appropriate documents are collected by DCBS to determine eligibility. Each applicant/recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to DCBS to provide verification of those factors which affect initial eligibility and benefit amount, including identity, residency, household composition, housing costs, income and resources, and United States citizenship or, if not a United States citizen, evidence of satisfactory immigration status for TANF eligibility.

12. Additionally, DCBS requires that local offices utilize approved federal and state processes to validate and monitor for compliance with program eligibility for each applicant/recipient of TANF funded cash assistance. Within Kentucky's application process, there are opportunities present that could alert DCBS staff on potential fraud or misleading/erroneous statements in the application. If these alerts cannot be resolved by the eligibility worker, they are referred for investigation prior to the case being processed.

13. DCBS also ensures that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. DCBS utilizes the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7 to confirm continuing eligibility and benefit levels. DCBS uses IEVS to receive federal tax information, which is used to confirm whether an individual's income and resources permit them to be eligible for TANF. Federal law and the written agreements that DCBS signs to access this income and eligibility information require DCBS to

confirm the accuracy of any red flags raised by such data matches, and to provide affected individuals an opportunity to contest these data findings, before terminating, denying, suspending or reducing benefits to an applicant or recipient. Accordingly, cases that appear to have income exceeding Kentucky's defined gross income limit and resources are referred to DCBS Case Management staff to determine if the identified income and resources are available and if they impact the recipient's continuing eligibility.

14. DCBS also reviews the Public Assistance Reporting Information System (PARIS) Interstate match to identify if an individual is receiving benefits in more than one state at the same time. DCBS also conducts a National Accuracy Clearinghouse (NAC) Match with participating states to identify duplication of benefits. DCBS refers match results to DCBS Claims staff (and the Office of the Inspector General, if applicable) for investigation and appropriate case action.

15. DCBS uses a Prison Match to identify cash assistance recipients who are incarcerated and have been sentenced to a term in a Kentucky prison as reported to Department of Corrections or a federal prison as reported on the SSA Federal Prison file. DCBS refers match results to DCBS Claims staff for investigation and appropriate case action.

16. DCBS also undertakes a quarterly match to identify individuals whose Electronic Benefits Transfer (EBT) cash transactions are conducted 100% out of state during a calendar quarter, which may indicate residency in a state other than Kentucky. The matches are reviewed by DCBS' Integrity and Analysis Section (IAS) for

investigation. Based upon the results of that investigation, appropriate case action is then taken by DCBS local office staff.

17. DCBS performs monthly matches of active TANF recipients with the federal National Directory of New Hires (NDNH), which contains nationwide W-4 information. The TANF matches involve all active adult recipients. NDNH matches are verified through a third-party vendor or by sending Manual Employment Verification (MEV) forms to employers. Responses from the third-party vendor and MEVs are provided to DCBS staff for investigation and appropriate case action.

18. DCBS also runs daily and monthly matches against the Kentucky Directory of New Hires, to identify applicants and recipients who have filed a W-4 with Kentucky and thus potentially identify new employment that could impact TANF eligibility.

19. The Office of Inspector General (OIG), Division of Audits and Investigations, Hotline Referral (Fraud@ky.gov) enables the public to electronically submit welfare fraud allegations to OIG. These submissions contain information regarding individuals suspected of public assistance fraud and are referred to IAS or DCBS by OIG for investigation and appropriate case action.

20. In addition to computer matches, DCBS requires each local office to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When a local office determines it has issued benefits to a recipient as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to DCBS Claims staff. If the recipient is found to have committed an intentional program violation (IPV), the claim is established and recovery is pursued from the recipient. If a recipient is found

to have committed an IPV, the recipient may be disqualified from the participation in the program for a period of time.

21. Moreover, as part of its internal controls, DCBS conducts work participation verification reviews, which is a quality assurance process that selects representative samples of work-eligible assistance cases for purposes of verifying the accuracy of the local office's participation reporting processes, the accuracy of reporting, and compliance with federal and state regulations. DCBS conducts a yearly review of a sample of cases according to Kentucky's HHS approved Work Verification Plan.

22. The Auditor of Public Accounts (APA) office conducts annual audits of the TANF program for correct eligibility.

***Kentucky's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status***

23. Kentucky requires local offices to use the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien status.

24. When an immigrant's SAVE request needs to be submitted, local office staff provide the individual's information and documentation to the SAVE system to retrieve necessary immigration status. Once SAVE returns verification of the individual's status, elevated DCBS staff provide that verification to local office staff for processing programmatic eligibility.

25. Documents pertaining to an immigrant's SAVE request submission is maintained within the individual's electronic case file of Kentucky's integrated eligibility and enrollment system.

26. DCBS staff monitor immigration status verification as part of the regular eligibility process, requesting updated documentation from households. Documentation that is provided to DCBS is maintained within the electronic case file.

27. As required by law, Kentucky imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

28. Kentucky restricts the use and disclosure of case information to those with whom the case is comprised. This is completed via a formal request documenting the reason for disclosure along with what documentation is requested.

29. Kentucky provides assurances on the confidentiality of individual information by including statements within programmatic applications, self-service portal access, and call services scripts. Systems are in place to notify appropriate entities if and when there is a breach. Kentucky has protocols that must be implemented when this occurs.

***Federal Oversight of Kentucky's TANF Program***

30. Pursuant to federal statute and regulation, DCBS provides certain data on families receiving TANF assistance to ACF on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

31. Among other things, DCBS has historically provided ACF with the data fields specified in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, social security number, date of birth, and, as to immigration status, an individual's status as either "U.S. Citizen," "Qualified alien," or "Unknown."

32. DCBS provides this information for all families receiving TANF assistance in Kentucky.

33. Pursuant to the federal Single Audit Act, DCBS engages the Auditor of Public Accounts annually for a Single Audit, including the TANF program. The most recent audit can be reviewed at https://app.fac.gov/dissemination/summary/2025-06-GSAFAC-0000396391.

34. Historically, federal oversight of Kentucky's TANF program has typically been through the Single Audit and required federal reporting described above.

35. To my knowledge, during my tenure as Commissioner, ACF has never performed any of the following activities with respect to Kentucky's TANF Program: program integrity reviews; program integrity projects; additional audits beyond the annual Single Audit; on-site or virtual visits to TANF agencies; or periodic reviews of policies and procedures.

***TANF SORN***

36. I understand that on June 23, 2026, U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

37. ***First***, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act."

38. The TANF SORN adds a new additional purpose:

> … to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

39. ***Second***, the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.*, State agencies), but also "verification information" obtained "from other HHS records, and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

40. ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.*, DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

41. ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

***HARM To Kentucky***

42. Without Court intervention, Kentucky faces harm stemming from the TANF SORN.

43. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

44. As noted above, apart from the annual Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require Kentucky to expend time and resources responding to ACF requests. For many of the eligibility requirements, documentation is maintained by local offices. Any additional information required to be provided by Kentucky would necessitate a time- and labor-intensive process of collecting documentation from local offices. This would be separate from the process that, as noted above, Kentucky already engages in on a regular basis as part of its efforts to monitor local offices to ensure that DCBS staff follow all state and federal requirements regarding TANF eligibility.

45. As to immigration status verification in particular, these agency oversight activities are likely to lead to misleading and improper results.

46. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts for Kentucky, with likely staffing reductions and the elimination of services for some of Kentucky's most vulnerable families.

47. Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with DHS and Immigration and Customs Enforcement (ICE) for use in immigration enforcement activities. *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-information-sharing-between-the-centers-for-medicare-and-medicaid-services-and. In this environment, the SORN's announcement that ACF plans to begin sharing Kentucky's TANF recipients' data with DHS will cause additional harm to Kentucky, as it risks eroding the trust that DCBS and the Office of Refugee Resettlement have developed with immigrant communities in Kentucky. DCBS has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, provide documentation of that status, and has told applicants that DCBS would verify that status with the federal government. But

DCBS has also encouraged eligible households to take advantage of TANF and other assistance to help raise their children and families out of poverty. If ACF begins sharing TANF data with DHS, then community fears that DHS will use that data for purposes other than valid eligibility checks will impede that public trust.

48. Kentucky has made assurances to TANF recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in Kentucky's TANF programs by citizens and qualified non-citizens alike.

49. This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in TANF if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure. Such concerns are bolstered by public reporting into DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' TANF programs.

50. If fewer individuals participate in TANF, Kentucky will suffer significant harms. Kentucky's TANF program supports family stability and provides temporary

financial assistance and services for more than 22,000 children. Without this assistance, many parents and relative caregivers would not be able to support children in their community and children will instead enter foster care.

51. Kentucky will also incur a financial cost in updating communications with TANF applicants or participants that notify TANF applicants or participants of how their personal data is collected, used, and shared. Kentucky takes extensive actions to notify individuals and households of changes to the TANF program, and this would require a mass mailing for approximately 20,000 households.

DATED: July 28, 2026

Lesa Dennis
Commissioner
Department for Community Based Services