# EXHIBIT 15

**DECLARATION OF MICHAEL COLE**

I, Michael Cole, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Commissioner of the Massachusetts Department of Transitional Assistance (DTA).
2. As Commissioner, I provide executive leadership and strategic direction for DTA, oversee its statewide operations and fiscal management, ensure the administration of agency programs in accordance with applicable federal and state law, and represent DTA in matters involving state and federal agencies and community stakeholders.
3. DTA operates as Massachusetts' primary agency for administering public assistance programs, with a statutory mission to assist and empower low-income individuals and families to meet their basic needs, improve their quality of life, and achieve long-term economic self-sufficiency. DTA serves one in seven residents of the Commonwealth with direct economic assistance, food assistance, and workforce training opportunities. DTA administers a comprehensive portfolio of both state- and federally-funded programs, including the state's Temporary Assistance for Needy Families (TANF) cash assistance program, Transitional Aid to Families with Dependent Children (TAFDC); the Supplemental Nutrition Assistance Program (SNAP), a federally-funded food assistance program serving, among others, families with children, older adults, and persons with disabilities; Emergency Aid to the Elderly, Disabled, and Children (EAEDC), a state-funded program serving elderly and disabled adults and children; and optional state-funded State Supplemental Payments (SSP) to Supplemental Security Income (SSI). The agency operates employment services through its "Pathways to Work" programs, which connect TAFDC and SNAP clients to career pathways, education, and training opportunities

designed to promote economic mobility and sustained employment. As of July 2026, DTA operates through a workforce of 1,950 employees and 21 local transitional assistance offices throughout the Commonwealth, supported by specialized units including program integrity investigators, administrative hearing officers, and policy specialists.

4. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with DTA staff, or from my review of relevant documents and information.

***TANF in Massachusetts***

5. DTA administers the Commonwealth's TANF basic cash assistance program, TAFDC. In Massachusetts, TAFDC is state- rather than locally- administered.

6. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income families with children. It is one of the largest sources of cash assistance to low-income families and a cornerstone of Massachusetts' anti-poverty work. Massachusetts received $457,855,191 in TANF funds for federal fiscal year 2026 from the State Family Assistance Grant; and we have used these funds to date to provide an average of 94,896 Massachusetts residents per month with TAFDC basic cash assistance.

7. In addition to basic cash assistance, TANF dollars fund subsidized child care in Massachusetts for low-income working parents and relative caregivers who take over the care of children whose own parents can no longer care for them. This funding gives Massachusetts families access to quality child care and allows relative caregivers to maintain employment, without placing a child in the foster care system.

***Massachusetts' TANF Fraud Prevention Procedures***

8. DTA, on behalf of Massachusetts, employs robust procedures to prevent ineligible TAFDC benefit distributions and address erroneous payments or attempted fraud.

9. To ensure TANF funds are issued only to TANF eligible recipients, DTA staff follow a thorough eligibility determination process for applicants of TAFDC. Case managers enter applicant data into the Benefit Eligibility and Control Online Network (BEACON), which is the computer application used by DTA to determine benefit eligibility and required verifications, store case data and documentation, and calculate benefit levels. BEACON also matches each household member with all existing TAFDC recipients to ensure that there is no duplication of benefits. It incorporates a Program Integrity Checklist that consolidates and automates 20 data matches and generates case maintenance activities initiated through the receipt of external matches. DTA case managers initiate a TAFDC BEACON eligibility calculation once all applicant verifications have been received, all data fields are complete, and all matches are addressed. The TAFDC case is then forwarded to a supervisor for review before approval of the eligibility determination. In addition, DTA staff conduct two additional matches outside of BEACON: a wage match with the Massachusetts Department of Revenue, that matches data collected by the Massachusetts Department of Unemployment Assistance from Massachusetts employers; and a match with the Massachusetts Comptroller's Office. To ensure that staff members are fully versed on application processes and will make accurate determinations, DTA provides extensive direction and support to local offices via policy directives, meetings, trainings, phone calls, and emails.

10. DTA's eligibility determination process also includes an interview conducted by DTA staff with the applicant or recipient. As part of this determination / redetermination process,

appropriate documents are required to determine eligibility. Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to DTA to verify those factors which affect initial eligibility and benefit amount, including: identity, residence, family composition, housing costs, income and resources, and United States citizenship or, if not a United Citizen, evidence of satisfactory immigration status for TAFDC eligibility. Also, during this interview, DTA staff flag situations of Suspected of Living Above Means (SLAM), meaning when household expenses exceed the household's income. In that situation, the applicant or recipient's household circumstances must be explored further to ensure accuracy of reporting.

11. Additionally, DTA requires that staff utilize approved federal and state processes to validate and monitor for compliance with program eligibility for each applicant and recipient of TAFDC. If between certifications recipients experience an event that might affect their eligibility, such as a change in income, household composition, or residence, they are required to report the change to DTA within 10 days. *See* 106 CMR 701.420(A). This requirement allows DTA to ensure that the household continues to be eligible for TAFDC.

12. DTA also ensures that various computer matches, some required by the Income Eligibility Verification System (IEVS), under 42 U.S.C. § 1320b-7, take place to confirm eligibility. These matches involve information from certain financial institutions, the Massachusetts Department of Unemployment Assistance, the Massachusetts Lottery Commission, the Work Number, the State Verification & Exchange System (SVES), the State Data Exchange (SDX), and the Beneficiary & Earnings Data Exchange (BENDEX). DTA also reviews the Public Assistance Reporting Information System (PARIS) Interstate quarterly match to identify if an individual is receiving benefits in another state. DTA also conducts an

additional Border Match with the neighboring State of New York to identify duplication of benefits. This Border Match is run monthly and checks for duplications of other household members, rather than just members who are heads of households. In the event of a match in PARIS or the New York Border Match, DTA informs the relevant state and further investigates to determine how to proceed.

13. DTA conducts two prison matches. The first is with the Massachusetts Department of Correction and identifies cash assistance recipients who are incarcerated and have been sentenced to a term in a Massachusetts prison. The second utilizes the SSA Federal Prison file to identify cash assistance recipients who are incarcerated in a federal prison. DTA refers these match results to DTA's Program Integrity Division's Data Match Unit for investigation and appropriate case action.

14. DTA monitors the out of state benefit usage of TAFDC households. If a TAFDC household exclusively uses its benefits outside of Massachusetts for a period of 45 days or longer, DTA's Program Integrity Division's Fraud Investigation Unit will review the case and take appropriate case action.

15. DTA encourages members of the general public to submit benefit fraud allegations to DTA by online form, email, phone, fax, or mail.[1] These submissions contain information regarding individuals suspected of public assistance fraud and are referred to DTA's Program Integrity Division's Fraud Investigation Unit for investigation and appropriate case action.

16. DTA takes allegations of benefit fraud seriously. As mentioned above, DTA refers cases of suspected fraud to its Program Integrity Division's Fraud Investigation Unit. If, following

[1] https://www.mass.gov/how-to/report-retailer-or-client-fraud-to-dta

an administrative hearing, a recipient is found to have committed an Intentional Program Violation (IPV) related to TAFDC benefits, then DTA takes action to recover any overpayment resulting from the fraud. Also, the recipient is disqualified from participation in the program for a period of six months for the first finding, for a period of 12 months for the second finding, and permanently for the third finding.

17. Massachusetts is subject to a centralized Statewide Single Audit, as required by law, every fiscal year. This audit covers the Commonwealth's financial statements, including the expenditure of federal funding by state agencies. DTA, as a state agency, is evaluated as part of these annual audits.

***Massachusetts' Process for Verifying Eligibility for TAFDC Based on Immigration Status***

18. DTA uses the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien status.

19. An applicant who is a noncitizen must present documentation of TAFDC-eligible status at the time of application. At application and at each subsequent reevaluation, DTA initiates a new SAVE search for all noncitizen household members who are applying for benefits or are already actively in the grant. Documentation is maintained in the electronic case record.

***Notice to TAFDC Recipients about Use of Personal Data***

20. As required by law, Massachusetts imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TAFDC.

21. In the DTA Notice of Rights and Responsibilities,[2], provided to every participant in DTA programs, DTA states it will only share recipients' information with:

> • Banks, schools, employers, governmental entities landlords, utility companies and other agencies to verify eligibility for benefits.

[2] https://www.mass.gov/doc/combination-cash-and-snap-rights-and-responsibilities-english/download

- Electric, gas and telephone companies so recipients may be offered utility discounts.
- Other governmental entities that offer benefits or social services.
- The United States Citizenship and Immigration Services (USCIS), to verify recipients' immigration status.

The notice further states DTA will use recipients' social security numbers to:

- Check the identity and eligibility of each household member through data matching programs.
- Monitor compliance with program rules.
- Collect money in the event of an overpayment.
- Help law enforcement agencies catch fleeing felons.

22. The DTA Notice of Rights and Responsibilities also informs recipients, "Information from USCIS may affect my household's eligibility and amount of DTA benefits" and "Even if you are not eligible for benefits due to immigration status, DTA will not report you to immigration authorities unless you show DTA a final order of deportation." DTA assures TAFDC recipients that their data will be used for eligibility determinations but not for immigration enforcement.

***Federal Oversight of Massachusetts' TAFDC Program***

23. Pursuant to federal statute and regulation, DTA provides certain data on families receiving TAFDC assistance to ACF, including quarterly caseload and financial reporting, and the TANF Annual Report.

24. DTA provides ACF quarterly with the data fields specified in 45 C.F.R. § 265.3 and further detailed in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, social security number, date of birth, family affiliation, and, as expressly provided for in the federal data reporting instructions, an individual's citizenship/immigration status as "U.S. Citizen," "Qualified alien," "Non-qualified alien," or "Unknown."

25. DTA undertakes sample TANF data collection activities, consistent with 42 U.S.C. § 611(a)(1)(B) and 45 C.F.R. § 265.5. On a monthly basis, DTA uses random sampling to select a sufficient number of TANF/Maintenance of Effort (MOE) cases to meet federal reporting requirements. DTA provides data for approximately 3,000 newly approved and ongoing TANF households and 800 closed TANF cases per year.

26. There has historically been no compliance- or program-integrity-related federal oversight of Massachusetts' TANF program beyond the Statewide Single Audit, the required federal reporting described above, and site visits.

27. To my knowledge, in at least the past six years, ACF has never performed any of the following activities with respect to Massachusetts' TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Statewide Single Audit, virtual visits focused on program integrity to TANF agencies, or periodic reviews of policies and procedures.

***TANF SORN***

28. I understand that on June 23, 2026, U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

29. ***First***, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act."

30. The TANF SORN adds a new additional purpose:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

31. ***Second***, the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.*, State agencies), but also "verification information" obtained "from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

32. ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

33. ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

***Harm To Massachusetts***

34. Without Court intervention, Massachusetts faces harm stemming from the TANF SORN.

35. DTA could have never anticipated the new routine use of TANF data announced in the TANF SORN and therefore had no opportunity to draft disclosures to TAFDC recipients to disclose this new routine use of their data.

36. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

37. As noted above, apart from the Statewide Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other "agency oversight activities" listed in the SORN and their doing so would be a sea change in administration of the TANF block grant. Should that happen, Massachusetts would be expected to expend time and resources responding to ACF oversight that it never experienced before. Any new information required to be provided by Massachusetts would likely necessitate a time- and labor-intensive process of collecting documentation, possibly including phone contact with current or former recipients.

38. The TANF SORN would also create opportunity costs. Time spent gathering data and information in response to additional audit and oversight activity is time that DTA staff from throughout the agency are unable to carry out the necessary and important work of implementing policy and procedure changes to keep the program running smoothly. The

opportunity cost ultimately detracts from DTA's ability to fulfill the four core purposes of the TANF program, *see* 42 U.S.C. § 601, such as providing for children to be cared for in their homes to promoting job preparation and family formation. This activity also subtracts from the time available to fulfill federal existing reporting requirements.

39. In addition, Massachusetts will face harm in its operation of its TAFDC program because of decreased opportunities for direct communication with ACF. The updated TANF SORN necessitates significant federal analyst staff time to compile, code, analyze, and package state submissions and follow-up requests using the expanded program eligibility data. As a direct result, the ability of the few federal staff left at ACF/OFA would be detracted from the important program work of supporting states, including Masschusetts, in their administration of TANF programs. There already were extremely long lag times for federal staff to answer states' routine questions and process required state reporting even before the drastic spring 2025 HHS/ACF staff reductions, and in the months since, the wait is even longer to get answers now to states. There is a real hazard in the longer lags, as Massachusetts depends on prompt answers to consider program refinements and risks liability acting without federal concurrence.

40. ACF's proposed oversight activities pursuant to the SORN are also likely to lead to misleading and improper results with regard to TANF immigrant eligibility. When DTA determines TADC eligibility for eligible noncitizens it verifies their immigration status via SAVE. However, immigration status changes over time, so a person ineligible for a TANF benefit such as TAFDC at one point in time per the citizenship rules provided for in the program's authorizing legislation, PRWORA, could be eligible in another period. Further, immigration, citizenship and financial data provided for in required data and matching

systems like IEVS and SAVE is not current, and therefore a roster of people meeting a criterion or criteria at the time data is accessed could be significantly different than the current caseload composition. Overall, if ACF used only data matching to evaluate a state's TANF program without further investigation and without regard to the currentness of the matching information, then likely ACF would render incorrect decisions about the state's application and verification processes and whether the state had previously rendered an eligibility decision correctly.

41. The SORN does not expand on what ACF will do if an agency does not comply with the new oversight activities contemplated within. However, if funding were withheld as a result of this oversight, that would likely have significant programmatic and operational impacts for Massachusetts especially in the areas of child care (as transfers to the Child Care and Development Fund), myriad social services to low-income children, older adults, and families (through transfers to the Social Services Block Grant), and TAFDC cash assistance grants. Massachusetts funds all of these benefits through federal TANF expenditures, and even a delay in releasing the State Family Assistance Grant would directly imperil these crucial work supports as Massachusetts operates its TANF program without an unobligated balance. A number of other programs in Massachusetts would additionally be threatened by a delay because of a substitution effect – though these other programs are funded through state MOE expenditures in TANF, a delay in federal TANF funds would create immense pressure on the entire state budget to make up the shortfall.

42. The TANF SORN's announcement that ACF plans to begin sharing Massachusetts' TAFDC recipients' data with DHS will cause additional harm to Massachusetts, as it risks eroding the trust that DTA has developed with clients, especially in immigrant communities. DTA

has always required TAFDC applicants who are not citizens to attest that they have an eligible immigration status and provide documentation of that status, and DTA has told applicants that it would verify that status with the federal government.

43. Further, the TANF SORN will deter households from participating in TAFDC. Massachusetts has also encouraged eligible households—including families with U.S. citizen children who are and have always been eligible for TAFDC— to take advantage of TAFDC and other assistance to help raise their children and families out of poverty. Massachusetts has also made assurances to TAFDC recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute and as stated in DTA's Rights and Responsibilities. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in the TAFDC programs by citizens and qualified non-citizens alike. To properly effectuate its safety net programs, DTA has devoted years of work to overcome stigma, misinformation, and other barriers to access. DTA has fostered trust with Massachusetts residents and stakeholders by consistently representing to them that TAFDC eligibility and compliance with application and reporting requirements will lead to timely and full benefits issuance for low-income families.

44. This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the TANF SORN to share their sensitive personal information with any federal, state, or private entity. Individuals are less likely to participate in TAFDC if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure.

45. If fewer individuals participate in TAFDC, Massachusetts will suffer significant harms. The withdrawal of eligible families from the program will have harmful downstream effects on the greater safety net, leaving vulnerable populations especially at risk. For instance, research has shown that decreased use of TANF programs results in higher rates of child abuse and neglect and increased participation in the foster care system. Decreased use also may drive more families into housing instability and homelessness, which could in turn place an added strain on housing assistance and shelter programs.

46. Massachusetts will also incur both administrative and financial costs in updating communications with TAFDC applicants or participants that notify them of how their personal data is collected, used, and shared. All applicants and participants in DTA programs receive a written "Notice of Rights, Responsibilities and Penalties," that describes the precise purposes for which their information may be used. DTA will need to revise this notice for all future applicants and provide an updated copy to all TAFDC households.

DATED: August 3, 2026

Michael A. Cole

Michael Cole, Commissioner
Massachusetts Department of
Transitional Assistance