# EXHIBIT 16

**DECLARATION OF ERIN FRISCH (MICHIGAN)**

I, Erin Frisch, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am currently employed by the Michigan Department of Health and Human Services ("MDHHS") as the Senior Deputy Director of the Economic Stability Administration ("ESA").

2. In my role, I oversee the implementation of MDHHS policy and manage operations of the ESA, including more than 5,000 staff across 100 locations throughout Michigan. My responsibilities include program development and oversight with the Business Service Centers, Migrant Programs, Payment Accuracy Unit, Disability Determination Services, Public Assistance Operations, Supportive Adult Services Section, Technology and Cross Enrollment. I also direct strategic programing, quality assurance activities, resource allocation, internal communication strategies, and audit remediation.

3. Among the programs administered by MDHHS, and within the scope of ESA, is the Temporary Assistance for Needy Families ("TANF") program.

4. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with MDHHS staff, or from my review of relevant documents and information.

***TANF in Michigan***

5. MDHHS administers TANF in Michigan.

6. TANF is a block grant program that provides billions of dollars in federal funds to states, which in turn provide cash assistance and non-cash benefits and services to low-income families with children. It is one of the largest sources of cash assistance to low-income families

and a cornerstone of Michigan's anti-poverty work. Michigan received approximately $772 million in TANF funding for Fiscal Year 2025 and utilized approximately $476 million in TANF Maintenance of Effort (MOE).

7. TANF funding supports the Family Independence Program ("FIP"), Michigan's core cash assistance program, along with employment and training services and related supportive services for low-income families with children. These supports are a central component of the State's efforts to reduce child poverty and promote family self-sufficiency. Extensive research demonstrates that income support is exceptionally effective at reducing poverty and its effects, promoting work, and contributing to the well-being of children and families.

***Michigan's TANF Fraud Prevention Procedures***

8. MDHHS ensures that robust procedures are in place to prevent distribution of TANF benefits to ineligible individuals and to address erroneous payments or attempted fraud.

9. To ensure TANF funds are issued only to TANF eligible recipients, MDHHS utilizes a vigorous eligibility determination process, outlined below. MDHHS local offices must follow this process to confirm the eligibility of applicants and recipients of recurring cash assistance and non-cash benefits. MDHHS also outlines clearly defined program requirements for other TANF funded services and supports.

10. To ensure compliance with these processes and requirements, MDHHS conducts reviews of MDHHS local offices in accordance with federal and State statutes, rules, and regulations. MDHHS provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, phone calls, and emails to MDHHS local offices to help guide them in ensuring the accuracy of their determinations.

11. Applicants and recipients of cash assistance grants must document TANF eligibility as part of MDHHS's application and recertification process. Additionally, if a household experiences a change between certifications, they are required to report the change to MDHHS within ten days to ensure that the household continues to be eligible.

12. The eligibility determination / redetermination process includes an interview of the applicant and recipient, conducted by the MDHHS local office, and collection of appropriate documents from the applicant and recipient. Each applicant and recipient must, for themselves or others in the applying household, furnish evidence to MDHHS that verifies their initial eligibility and benefit amount, including: identity, residence, family composition, housing costs, income and resources, and United States citizenship or, if not a United Citizen, evidence of immigration status.

13. Additionally, MDHHS requires that MDHHS local offices utilize approved federal and State processes to validate and monitor compliance with program eligibility for each applicant and recipient of TANF funded cash assistance. To do so, MDHHS utilizes the Front End Eligibility ("FEE") program.

14. FEE is a fraud prevention initiative established by the MDHHS Office of Inspector General ("OIG") to reduce errors and overpayments in public assistance benefit programs when applications or recertifications for public assistance contain suspicious or error-prone information. The goal of the FEE program is to support a partnership between MDHHS OIG and MDHHS local office staff early in the eligibility determination, which results in significant cost savings for MDHHS.

15. Under the FEE process, MDHHS local office staff refer suspicious applications to MDHHS OIG, and MDHHS OIG investigators confirm the accuracy of the applicant's residency, citizenship, income, household composition, and/or asset information. The investigation is

completed within 15 workdays. MDHHS OIG recipient eligibility fraud investigators determine whether a recipient was truthful in their public assistance benefit program application and whether their eligibility determination was accurate. The OIG investigator responds to the MDHHS local office eligibility staff with their findings, and the eligibility staff determines eligibility based on these findings.

16. MDHHS also ensures that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. For instance, MDHHS utilizes the Income Eligibility Verification System ("IEVS"), as required by 42 U.S.C. § 1320b-7, to confirm continuing eligibility and benefit levels. MDHHS receives federal tax information through IEVS, which is used to confirm whether an individual's income and resources permit them to be eligible for TANF IV-A cash assistance. Federal law and the written agreements that MDHHS signs to access this income and eligibility information require MDHHS to review any red flags raised by such data matches and provide affected individuals an opportunity to contest these data findings before MDHHS terminates, denies, suspends, or reduces benefits to an applicant or recipient. To do so, cases that appear to have income exceeding TANF income and resources are referred to MDHHS OIG to determine if the identified income and resources are available and if they impact the recipient's continuing eligibility.

17. MDHHS also reviews the Public Assistance Reporting Information System ("PARIS") Interstate match to identify if an individual is receiving benefits in more than one state at the same time. MDHHS refers match results to MDHHS local offices for investigation and appropriate case action.

18. MDHHS further conducts a Prison Match to identify cash assistance recipients who are incarcerated and have been sentenced to a term in a Michigan prison as reported to the

Michigan Department of Corrections ("MDOC") or a federal prison as reported on the SSA Federal Prison file. MDHHS refers match results to MDHHS local offices for investigation and appropriate case action.

19. MDHHS also undertakes a routine match to identify individuals whose Electronic Benefits Transfer ("EBT") cash transactions are conducted 100% out of state during a calendar quarter, which may indicate residence in a state other than Michigan. The matches are then referred to MDHHS OIG for investigation. Based upon the results of that investigation, appropriate case action is then taken by the MDHHS local office.

20. MDHHS also runs daily matches against the Michigan Directory of New Hires, to identify applicants and recipients who have filed a W-4 in Michigan, and thus potentially are engaging in new employment that could impact TANF eligibility.

21. Additionally, MDHHS maintains the Welfare Fraud Online Complaint Submission, which enables the public to electronically submit welfare fraud allegations to MDHHS. The submission can be completed if fraud is suspected, and requests information about the suspected fraud, including individually identifying information about the benefit recipient.

22. Moreover, as part of its internal controls, MDHHS conducts work participation verification reviews, which is a quality assurance process that selects representative samples of work-eligible assistance cases for purposes of verifying the accuracy of the MDHHS local office participation reporting processes, the accuracy of reporting, and compliance with federal and state regulations. MDHHS conducts a monthly review of a sample of cases according to MDHHS's approved Work Verification Plan.

23. MDHHS is required to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When MDHHS suspects it has issued benefits to a

recipient as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to MDHHS OIG. If the recipient is found to have committed an intentional program violation ("IPV"), the claim is established and recovery is pursued from the recipient. If a recipient is found to have committed an IPV, the recipient may be disqualified from the participation in the program for a period of time.

24. In fiscal year 2024, MDHHS OIG performed 16,982 public assistance benefit investigations (includes TANF and other public benefit programs) resulting in $80.9 million in cost avoidance and 3,354 fraud investigations resulting in $19.9 million in fraud found.

25. MDHHS also participates in the Statewide Single Audit. The Statewide Single Audit for TANF allows the Auditor General to evaluate and audit TANF funded programs to ensure the State is adhering to State and Federal regulations. Processes include pulling payments made from TANF funds and auditing that the local office specialist verified that the applicant and recipient met the financial and non-financial criteria to be eligible for the assistance.

***Michigan's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status***

26. In accordance with Section 1137(d) of the Social Security Act, MDHHS requires the declaration of citizenship status for each person who applies for cash assistance. Non-citizen status must be verified for each person who is not a United States citizen. Eligibility for cash assistance in Michigan is limited to U.S. citizens and noncitizens who meet a qualified non-citizen status in accordance with the limitations and restraints of Title IV of PL 104-192 of 1996 as amended.

27. MDHHS local offices must use the federal Systematic Alien Verification for Entitlements ("SAVE") system to verify an applicant or recipient's qualified alien status.

28. The SAVE system enables federal, state, local government agencies and licensing bureaus to obtain immigration status information needed to determine a noncitizen applicant's eligibility for many public benefits to ensure that only eligible noncitizen applicants receive federal, state, or local public benefits. The SAVE process is implemented when an MDHHS specialist records a noncitizen's documentation in the integrated eligibility system. Any discrepancies must be addressed, and eligibility must be confirmed by the SAVE system.

***TANF Data Confidentiality in Michigan***

29. As required by law, Michigan imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

30. Michigan Complied Law § 400.35 deems public assistance records confidential and allows inspection only pursuant to Michigan Complied Law § 400.64. It is the policy of MDHHS that the external use and sharing of MDHHS data must be documented in a signed written agreement known as a data use agreement, which outlines what data will be shared and how the data will be used, disclosed, and protected. Data use agreements extending beyond a year must be reviewed annually.

31. MDHHS could never have anticipated the new routine use of TANF data announced in the SORN and therefore had no opportunity to draft disclosures to TANF recipients to notify them of this new routine use of their data.

***Federal Oversight of Michigan's TANF Program***

32. Pursuant to federal statute and regulation, MDHHS provides certain data on families receiving TANF assistance to ACF, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

33. Among other things, MDHHS provides ACF with the data fields specified in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, social security number, date of birth, and immigration status (i.e., "U.S. Citizen," "Qualified alien," or "Unknown").

34. MDHHS undertakes sample TANF data collection activities, consistent with 42 U.S.C. § 611(a)(1)(B) and 45 C.F.R. § 265.5. On a monthly basis, MDHHS uses random sampling to select a sufficient number of TANF/MOE cases to meet federal reporting requirements. Michigan provides data for approximately 136,000 families per year under TANF MOE.

35. There has historically been little federal oversight of Michigan TANF program beyond the Single Audit and required federal reporting described above.

36. To my knowledge, ACF has never performed any of the following activities with respect to Michigan's TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures.

***TANF SORN***

37. I understand that on June 23, 2026, U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

38. The TANF SORN replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to

determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act".

39. The TANF SORN also adds a new purpose:

> [T]o ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

40. Additionally, the TANF SORN significantly broadens the categories of records included in the system. The TANF Data System of Records now includes not only information "obtained from TANF grantee agencies" (*i.e.*, State agencies), but also must include "verification information" obtained "from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

41. The TANF SORN also adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

42. Finally, the TANF SORN lists new statutory authority: In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

***Harm To Michigan***

43. Without Court intervention, Michigan faces significant harm stemming from the TANF SORN.

44. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

45. As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so, as a result of the TANF SORN, would require Michigan to expend significant time and resources responding to ACF requests.

46. As to immigration status verification in particular, these agency oversight activities are likely to lead to misleading and improper results. While Michigan utilizes the SAVE process for all cash assistance applications, MDHHS also requires actual "paper" verification of an individual's status. This includes, but is not limited to, actual copies of I-94, Arrival/Departure Record, I-551, Lawful Permanent Residence, and I-766, Employment Authorization document.

An individual's documentation and status may change over the course of their eligibility period as a result of a change or adjustment of status.

47. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states.[1] If the agency oversight activities were to result in similar action here, that would likely have significant programmatic and operational impacts for Michigan, with likely staffing reductions and the elimination of non-mandated services.

48. Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with DHS and Immigration and Customs Enforcement ("ICE") for use in immigration enforcement activities.[2] In this context, the SORN's announcement that ACF plans to begin sharing Michigan's TANF recipients' data with DHS will cause additional harm to Michigan, as it risks eroding the trust that MDHHS has developed with immigrant communities in Michigan and will deter individuals from participating in TANF.

49. MDHHS has always required TANF applicants who are not citizens to attest that they have an eligible immigration status and to provide documentation of that status. Applicants are also informed that MDHHS would verify that status with the federal government. MDHHS has assured TANF recipients that this information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute.

---

[1] *See* HHS, *HHS Freezes Child Care and Family Assistance Grants in Five States for Fraud Concerns* (Jan. 6, 2026), available at https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html.

[2] *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-information-sharing-between-the-centers-for-medicare-and-medicaid-services-and.

50. MDHHS has also encouraged eligible households—including families with U.S. citizen children who are and have always been eligible for TANF—to take advantage of TANF and other assistance to help raise their children and families out of poverty. If ACF begins sharing TANF data with DHS without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for purposes other than valid eligibility checks will impede the public trust that MDHHS has worked for decades to build. Fear among Michigan's immigrant community may chill participation in Michigan's TANF programs, leading to U.S. citizen children not receiving benefits for which they are eligible, and thus creating a greater risk of food insecurity, housing insecurity, and family instability.

51. This chilling effect may extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in TANF if they believe that doing so will expose sensitive personal information to widespread disclosure. Such concerns are bolstered by public reporting into DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in Michigan's TANF program.

52. If fewer individuals participate in TANF, Michigan will suffer significant harms.

53. Families who disengage from TANF do not stop needing help; they shift to other, often costlier, systems and go without basic necessities. Michigan can expect to see increased SNAP benefit costs and a greater reliance on emergency relief programs. Reduced TANF participation also risks increased health care costs, including higher Medicaid expenditures, as families lose a pathway to coordinated benefits and preventive support. It risks increased child

welfare referrals and associated costs, as TANF serves as a poverty mitigation tool that helps keep families intact and out of the child welfare system. It also threatens Michigan's ability to meet its TANF MOE spending requirements, risking a reduction in the State's federal block grant, and may skew Michigan's Work Participation Rate calculations, with associated penalty exposure.

54. Reduced TANF participation also weakens an important connection between families and Michigan's child support program. Families receiving TANF are automatically referred for child support services, allowing the State to establish parentage and support orders, locate parents, secure health care coverage, and collect consistent financial support for children. When eligible families do not enter or remain connected to TANF, many will not independently apply for child support services. As a result, Michigan can expect fewer families to receive help establishing and enforcing support, leaving them with less reliable income and increasing their dependence on SNAP, Medicaid, housing assistance, emergency relief, and other public programs. A declining child support caseload also reduces Michigan's opportunity to engage noncustodial parents, connect them with employment and other services, and establish realistic support obligations before arrears accumulate. Over time, fewer cases and lower collections may also affect the federal funding and incentive payments that support Michigan's child support program, further weakening the State's capacity to serve families. Child support is one of the few public systems that brings additional private resources into a household; losing the TANF-to-child-support connection does not eliminate families' need for support—it makes it more likely that children will go without it and that public programs will absorb the resulting costs.

55. The economic costs of poverty, hunger, housing instability, lack of health care coverage, and child maltreatment are borne not only by the individuals and families experiencing

them, but by society as a whole, impacting the workforce and the marketplace.[3] Child poverty is particularly damaging. Children who experience even brief instances of homelessness can be significantly affected throughout their lives, with higher rates of behavioral, emotional, and immediate- and long-term health problems among children who experience homelessness.[4] TANF assistance helps families remain housed, keep utilities connected, and obtain food—the basic stability that prevents these harms from materializing in the first place. In 2018, the aggregate annual economic cost of childhood poverty in the United States was estimated at $1.0298 trillion, or roughly 5.4% of the nation's gross domestic product. It is estimated that the nation saves $7 in costs associated with poverty for every dollar spent on reducing childhood poverty—savings tied to reduced health-related problems, crime, maltreatment, and homelessness, and increased economic productivity.[5]

56. Michigan will also incur a financial cost in updating communications with TANF applicants or participants to notify TANF applicants or participants of how their personal data is collected, used, and shared. In order to make the necessary changes to notify applicants and participants as appropriate, MDHHS would incur a significant administrative effort and cost. Paper application forms would require updates, legal review, compliance review, various program administration approvals, translations, printing, storage and distribution costs. Updating the online

---

[3] M. Ray Perryman, *Perryman: Compassion: An Economic Perspective*, Rio Grande Guardian (Dec. 24, 2020), available at https://riograndeguardian.com/stories/perryman-compassion-an-economic-perspective,12205.

[4] Council on Community Pediatrics, Policy Statement, *Providing Care for Children and Adolescents Facing Homelessness and Housing Insecurity*, American Academy of Pediatrics (June 2013, reaffirmed Oct. 2016 and Feb. 2022), 1206–1210, available at https://publications.aap.org/pediatrics/article/131/6/1206/31138/Providing-Care-for-Children-and-Adolescents Facing?autologincheck=redirected.

[5] Michael McLaughlin and Mark R. Rank, *Estimating the Economic Cost of Childhood Poverty in the United States*, Social Work Research, Volume 42, Issue 2 (June 2018), pp. 73–83, available at https://doi.org/10.1093/swr/svy007.

application system would require technology updates, legal review, compliance review, translations, and program administration approvals. Additionally, MDHHS would be required to update policy manuals, training guides, notices to applicants and recipients, and other public facing forms and publications.

Dated: July 30, 2026

Erin Frisch
Senior Deputy Director of the Economic
Stability Administration
MDHHS