# EXHIBIT 17

**DECLARATION OF DR. SHANEEN MOORE**

I, Dr. Shaneen Moore, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of the State of Minnesota. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. The Minnesota Department of Children, Youth, and Families (DCYF) is responsible for the administration of public social services throughout Minnesota, except for Housing Support, General Assistance, Minnesota Supplemental Aid, WIC, Refugee Assistance Programs, health care services and Medical Assistance. DCYF responsibilities include the administration of TANF and the Minnesota Family Investment Program (MFIP).

3. I am the Assistant Commissioner of the Family Wellbeing administration of the Minnesota Department of Children, Youth, and Families. My educational background includes a Bachelor of Business degree, Master of Business Administration degree, and a Doctor of Philosophy in Public Service and Management. I have been employed as the Assistant Commissioner of the Family Wellbeing administration since July 11, 2024. Prior to my role as Assistant Commissioner, I served as a Deputy Assistant Commissioner for the Children and Family Services Administration at the Minnesota Department of Human Services, as Director and Deputy Director of the Child Support Division. My professional experience in this and similar capacities expands almost 12 years working for state government. I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

4. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with DCYF staff, or from my review of relevant documents and information.

***TANF in Minnesota***

5. As noted above, DCYF is the agency tasked with administering TANF in Minnesota.

6. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income families with children. It is one of the largest sources of cash assistance to low-income families and a cornerstone of Minnesota's anti-poverty work. Minnesota receives approximately $260 million annually in TANF funding and in recent years, has provided approximately 23,000 Minnesota families (including approximately 44,000 children) with basic recurring cash assistance and non-cash assistance benefits.

7. In Minnesota, TANF is administered by DCYF through the Minnesota Family Investment Program (MFIP) and provides cash and food assistance to eligible low-income households. MFIP is administered by local county and Tribal agencies.

8. In Minnesota, TANF funds support a range of entitlement programs, grants, and program administration and oversight. Minnesota TANF funds are utilized to partner with the Department of Health for community health boards (CHBs) and Tribal Nations for family support programs. Services funded with TANF funds are targeted toward families with children or pregnant women who are at or below 200 percent of the federal poverty guidelines and exhibit risk factors such as a history of child abuse or neglect, substance abuse, or homelessness. The funds are specifically for non-medical interventions designed to foster healthy beginnings, improve pregnancy outcomes, promote school readiness, and prevent child abuse and neglect.

The primary goal of using TANF funds aligns with federal TANF objectives, including providing assistance so children can be cared for in their homes, ending dependence on government benefits, and promoting self-sufficiency and family well-being. Payments are disbursed to recipients on a monthly basis.

***Minnesota's TANF Fraud Prevention Procedures***

9. Because individuals or households which meet income-level thresholds for program eligibility may be eligible for multiple forms of assistance, Minnesota has adopted Combined Application Form procedures that allow applicants to submit one application and their required supporting documentation to be used to determine eligibility and, if applicable, enrollment in a number of programs (including TANF, SNAP, Housing Support, and more) rather than requiring separate applications for each program. In Minnesota, county and Tribal agencies are responsible for processing benefit applications and enrolling eligible individuals and households (in other words: applications, eligibility determinations, and recertifications are processed at the county level, not by DCYF directly.)

10. As set forth below, Minnesota implements a number of mechanisms designed to prevent and minimize program fraud, both at the application and recertification stages, and where red flags of potential fraud or program violations have been identified or otherwise reported.

11. Specifically as to MFIP and TANF, to ensure TANF funds are issued only to TANF eligible recipients, DCYF has a robust eligibility determination process that Minnesota counties and participating Tribal Nations must follow for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF funded services and supports.

12. Further, DCYF conducts reviews of Minnesota counties to ensure program compliance, in accordance with federal and state statutes, rules and regulations. DCYF provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, phone calls, and emails to its county partners to help guide them in ensuring the accuracy of their determinations.

13. Additionally, in order to further support counties in ensuring program integrity, the State of Minnesota reimburses counties for the staffing costs associated with maintaining Fraud Prevention Investigation ("FPI") units. FPI units address both TANF and MFIP programs, but also a number of other public assistance programs. Currently, 85 of Minnesota's 87 counties participate in the FPI program either as a single-county or regional operation. The FPI program has been successful: in fiscal year 2025 alone, the FPI program saved over $21 million from being issued to ineligible applicants and identified over $8 million in overpayments across all public assistance programs.

14. To receive TANF funds, Minnesota must submit to ACF a plan that outlines how it will conduct the TANF program in compliance with federal work requirements, privacy protections, and other provisions. 42 U.S.C. § 602(a). The following procedures are in place at the TANF application and recertification stages, and have been approved by ACF as part of Minnesota's state plan:

15. Applicants and recipients of cash assistance grants must document to Minnesota county offices that they are TANF eligible as part of the application and recertification process. Additionally, if a household experiences a change in between certifications, they are required to report the change to their county office. Certain changes which impact eligibility must be reported by the 10th of the month following the change, including but not limited to changes to

household composition, change in citizenship or immigration status, changes in assets, and changes in address or residence. Other changes must be reported at six-month review or recertification whichever is the earliest.

16. The eligibility determination process includes an interview conducted by the county administrators with the applicant and recipient.

17. As part of this determination / redetermination process, appropriate documents are collected by the county administrators to determine eligibility. Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to the county program administrators to provide verification of those factors which affect initial eligibility and benefit amount, including: identity, residence, family composition, housing costs, income and resources, and United States citizenship or, if not a United Citizen, evidence of satisfactory immigration status for TANF eligibility.

18. Additionally, DCYF requires that county administrators utilize approved federal and State processes to validate and monitor for compliance with program eligibility for each applicant and recipient of TANF funded cash assistance.

19. DCYF also requires that county administrators ensure that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. For example:

20. DCYF requires county administrators to utilize the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7 to confirm continuing eligibility and benefit levels. As required by DCYF, counties use IEVS to receive federal tax information, which is used to confirm whether an individual's income and resources permit them to be eligible for

TANF. Federal law and the written agreements that DCYF signs to access this income and eligibility information require DCYF to confirm the accuracy of any red flags raised by such data matches, and to provide affected individuals an opportunity to contest these data findings, before terminating, denying, suspending or reducing benefits to an applicant or recipient. DCYF extends the responsibility of addressing red flags to county administrators, and counties in turn are expected to either refer matters to their county fraud prevention investigation ("FPI") units, or provide program participants 10 days to cooperate with verifying match information.

21. Minnesota also requires county administrators to review the Public Assistance Reporting Information System (PARIS) Interstate match to identify if an individual is receiving benefits in more than one state at the same time. If the query of that system results in a match, county administrators are required to investigate the matter further and take appropriate case action, which may include denial of benefits, and/or referral to the county's FPI unit.

22. County administrators are also required to conduct a Prison Match to identify cash assistance recipients who are incarcerated and have been sentenced to a term in a Minnesota prison as reported to Minnesota Department of Corrections, or a federal prison as reported on the SSA Federal Prison file. This information is automatically added each month to the information system used by counties and participating Tribal Nations to determine eligibility. If the query determines a prison match, county workers are required to investigate the matter further and take appropriate case action, which may include denial of benefits, and/or referral to the county's FPI unit.

23. DCYF also circulates quarterly reports to each participating county involving out of state EBT usage for all beneficiaries within that county. FPI units within counties also track out of state EBT usage. Where out of state usage may indicate residence in a state other than

Minnesota, matters are referred to county FPI units for investigation. Based upon the results of that investigation, appropriate case action is then taken.

24. Counties also conduct monthly comparisons of active TANF recipients with the federal National Directory of New Hires (NDNH), which contains nationwide W-4 information. NDNH interfaces with MAXIS, the state data system used for determining eligibility. If a match indicates new employment impacting eligibility, counties are required to investigate whether the change was reported, if it impacts eligibility, and may refer the matter for appropriate case action. MAXIS also incorporates information from the Minnesota New Hire Reporting Center, identifying applicants and recipients who have filed a W-4 with Minnesota potentially indicating new employment that could impact TANF eligibility.

25. In addition to these application and recertification requirements, Minnesota also provides members of the public several ways to submit tips on suspected fraud or program abuse. DCYF provides a Fraud Reporting Portal that enables the public to electronically submit welfare fraud allegations to the DCYF Office of Inspector General. Minnesota's Bureau of Criminal Apprehension also offers an online reporting form related to program fraud and abuse. Submissions on either portal are required to contain information regarding individuals suspected of public assistance fraud, and where those tips or reports implicate a particular county, DCYF and the BCA are required to notify the participating county so that their FPI can also be involved in appropriate investigation and case action.

26. In addition to computer matches, DCYF requires each county to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When a county suspects it has issued benefits to a recipient as a result of fraud, the case is referred to the county FPI. If the suspected fraud is substantiated by the available evidence, benefits may be

reduced or benefits will end. If the recipient is found to have committed an intentional program violation (IPV), the claim is established and recovery is pursued from the recipient. If a recipient is found to have committed an IPV, the recipient may also be disqualified from participation in the program for a period of time. Depending on the nature and severity of the suspected fraud, it can also be referred for criminal prosecution.

27. Moreover, as part of its internal controls, DCYF conducts work participation verification reviews, which is a quality assurance process that selects representative samples of work-eligible assistance cases for purposes of verifying the accuracy of the county's participation reporting processes, the accuracy of reporting, and compliance with federal and state regulations. DCYF conducts a yearly review of a sample of cases according to Minnesota's HHS approved Work Verification Plan.

***Minnesota's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status***

28. Minnesota's Combined Application Form requires applicants to disclose their social security number, and their citizenship status, among other data fields.

29. Where certain application criteria are met, Minnesota requires county TANF administrators to use the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien status.

30. County and Tribal nation eligibility workers use SAVE to verify the immigration status of those who are non-citizens or naturalized or derived U.S. citizens.

31. Records on immigration status are maintained in state data systems including MAXIS and the Data Warehouse and follow an agency-wide state records retention schedule for DCYF, counties, and Tribes.

32. Before using SAVE, all users register for access and are trained. User training includes USCIS required training, review of the SAVE Program Guide, completion of an online tutorial and USCIS webinars, and state-wide web-based training on the use of SAVE for health care and cash and food programs. SAVE user IDs are limited to workers who need to perform SAVE verification procedures or oversee the use of SAVE. User access is terminated in accordance with USCIS policy for misuse.

***Minnesota Safeguards on Data Sharing***

33. As required by law, Minnesota imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

34. Minnesota's Data Practices Act (Minn. Stat. Ch. 13) and Data Practices Rule (Minn. Rules Ch. 1205) govern the lawful collection, storage, use, and release of personal data by the government. Data on DCYF program recipients is categorized as welfare data under the Data Practices Act. Minn. Stat. 13.46, subd 2. Disclosure of welfare data is restricted to specific enumerated exceptions in statute, including, for example, personnel in the welfare system who require the data to determine eligibility or investigate suspected fraud.

35. DCYF could have never anticipated the new routine use of TANF data announced in the SORN and therefore had no opportunity to draft disclosures to prior TANF recipients to disclose this new routine use of their data.

36. Minnesota's Combined Application Form (CAF) includes a Notice of Privacy Practices that informs applicants that the information they provide will only be shared as needed and as allowed or required by law. For non-citizen applicants, the application includes notice that they are giving county eligibility workers permission to contact federal immigration agencies to verify any immigration documents that they submit. Applicants are informed that the purpose of this information sharing is to verify immigration status and eligibility for public assistance.

***Federal Oversight of Minnesota TANF Program***

37. Pursuant to federal statute and regulation, DCYF provides significant data on families receiving TANF assistance to ACF, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

38. Each quarter, DCYF provides ACF with disaggregated data on families receiving TANF, disaggregated data on families who exited TANF, aggregated data reporting including but not limited to: applications, active/closed cases, births, noncustodial parent work engagement, and caseload by stratum. DCYF provides ACF with annual reports that details program characteristics and how TANF and Maintenance-of-Effort funds are used and TANF participation metrics.

39. Pursuant to the federal Single Audit Act, DCYF engages an auditor with respect to its TANF program. This audit takes place annually. The Minnesota Office of State Auditor (OSA) conducts the audit. The audit process reviews TANF issuances, eligibility, and accounts for overpayments and underpayments. This audit report supplements Minnesota's Management and Budget (MMB) office's Annual Comprehensive Financial Report. OSA sends the Single Audit

findings to HHS for any follow up, repayment or additional questions HHS may have about the findings.

40. In addition to the Single Audit of TANF, Minnesota's Office of State Auditor performs annual audits of all 87 counties in Minnesota. The Minnesota Department of Human Services (DHS) is designated as cognizant agency by MMB and is responsible for ensuring subrecipients have resolved all cross-cutting findings cited in Single Audit Reports. DCYF's Office of Inspector General – Compliance Division in partnership with DHS receives and reviews county audits to monitor county compliance with federally funded programs.

41. There has historically been little to no federal oversight of Minnesota's TANF program beyond the Single Audit, and required federal reporting described above. To my knowledge, prior to 2025, HHS has never performed any of the following activities with respect to Minnesota's TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures.

***TANF SORN***

42. I understand that on June 23, 2026, U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

*43.* ***First***, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and

time-limit requirements”) with the following: “to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act”.

44. The TANF SORN adds a new additional purpose:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients’ citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

*45.* ***Second,*** the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information “obtained from TANF grantee agencies” (*i.e.*, State agencies), but also “verification information” obtained “from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects.” 91 Fed. Reg. at 37408.

*46.* ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

47. ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

***HARM To Minnesota***

48. Without Court intervention, Minnesota faces harm stemming from the TANF SORN.

49. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud

investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures).”

50. As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed “agency oversight activities.” ACF doing so as a result of the TANF SORN would require Minnesota to expend time and resources responding to ACF requests. For many of the eligibility requirements, documentation is not kept at the state level and instead is maintained by counties and participating Tribal Nations. Any additional information required to be provided by Minnesota would necessitate a time- and labor-intensive process of collecting documentation from local agencies. This would be separate from the process that, as noted above, Minnesota already engages in on a regular basis as part of its efforts to monitor counties to ensure that counties follow all state and federal requirements regarding TANF eligibility.

51. As to immigration status verification in particular, these agency oversight activities are likely to lead to misleading and improper results. Immigration status has many areas of complexity, including that immigration status changes over time or through Department of Homeland Security action, that individuals may have multiple immigration classifications at the same time, and that information for some immigration statuses is not housed in USCIS but rather in immigration court records with the Executive Office of Immigration Review under the Department of Justice, the Department of State, or the Office of Trafficking in Persons (OTIP) under the Department of Health and Human Services.

52. Earlier this year, ACF announced that it had “froze[n] access to” TANF funds in five states, including Minnesota. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were

to result in similar action, that would likely have significant programmatic and operational impacts for Minnesota, with likely staffing reductions and the elimination of non-mandated services. Loss of TANF funding can lead to higher long-term costs due to increased poverty, poorer health outcomes, and lower educational attainment. TANF funds often help survivors of domestic violence leave abusive situations. Losing TANF funding may keep individuals and their children in unsafe relationships.

53. Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with DHS and Immigration and Customs Enforcement (ICE) for use in immigration enforcement activities. *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-information-sharing-between-the-centers-for-medicare-and-medicaid-services-and. In this environment, the SORN's announcement that ACF plans to begin sharing Minnesota's TANF recipients' data with DHS will cause additional harm to Minnesota, as it risks eroding the trust that DCYF and counties have developed with immigrant communities in Minnesota. DCYF has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, and to provide documentation of that status, and has told applicants that DCYF would verify that status with the federal government. But DCYF has also encouraged eligible households to take advantage of TANF and other assistance to help raise their children and families out of poverty. If ACF begins sharing TANF data with DHS, then community fears that DHS will use that data for purposes other than valid eligibility checks will impede that

public trust. Using SAVE for immigration enforcement is also an improper use of SAVE, which is meant to verify noncitizen eligibility for benefit programs.

54. Further, the TANF SORN will erode the trust that Minnesota has developed with immigrant communities and deter individuals from participating in TANF. Minnesota has always required TANF applicants who are not citizens to attest that they have an eligible immigration status and has told applicants that State and local TANF administrators would confirm that status with the federal government. Minnesota has also made assurances to TANF recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. Minnesota's Combined Application Form (CAF) notifies applicants that they are giving county eligibility workers permission to contact federal immigration agencies to verify the immigration documents submitted. Applicants are informed that the purpose of this information sharing is to verify immigration status and eligibility for public assistance. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in Minnesota's TANF programs by citizens and qualified non-citizens alike.

55. This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in TANF if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure. Such concerns are bolstered by public reporting into DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential

data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' TANF programs.

56. If fewer individuals participate in TANF, Minnesota will suffer significant harms. Without cash assistance, families may struggle to afford basic needs like food, housing, utilities, diapers, and clothing, increasing homelessness and food insecurity. Increased financial stress can lead to neglect, unstable housing, or unsafe living conditions, and may increase involvement with child welfare systems. Parents may struggle to work or stay employed. If TANF participation decreases, the strain on other public systems increases such as emergency shelters, food banks, Medicaid, schools, and hospitals.

57. Minnesota will also incur a financial cost in updating communications with TANF applicants or participants that notify TANF applicants or participants of how their personal data is collected, used, and shared.

58. For the foregoing reasons, Minnesota will be harmed and the privacy of its residents will be violated if ACF makes the changes outlined in the SORN.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and accurate to the best of my ability.

Executed this 31th day of August, 2026, in Minneapolis, Minnesota.

Dr. Shaneen Moore

Dr. Shaneen Moore
Assistant Commissioner, Family Wellbeing Administration
Department of Children, Youth, and Families