# EXHIBIT 20

**DECLARATION OF Rajni Chawla**

I, Rajni Chawla, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Executive Deputy Commissioner of the New York State Office of Temporary and Disability Assistance (OTDA).

2. As OTDA's Executive Deputy Commissioner, I am the principal assistant to the Commissioner of OTDA. I advise on matters of policy and co-manage the operations of the agency with the Commissioner.

3. The mission of OTDA is to help vulnerable New Yorkers meet their essential needs and advance economically by providing opportunities for stable employment, housing, and nutrition. The agency's vision is to empower New Yorkers to improve their financial security and household stability in support of strong families and communities. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with OTDA staff, or from my review of relevant documents and information.

***TANF in New York***

4. OTDA administers a wide range of programs that provide services and support to low-income families and individuals, including programs funded through the federal Temporary Assistance for Needy Families (TANF) block grant and contingency grant. OTDA oversees these programs, which are administered through social services districts, providing policy guidance and systems support to the social services districts in their implementation of OTDA programs, as well as monitoring and quality assurance of district operations and adjudication of fair hearings reviewing district determinations.

5. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income

families with children. It is one of the largest sources of cash assistance to low-income families and a cornerstone of New York's anti-poverty work. New York State receives approximately $2.7 billion annually in TANF funding and provides hundreds of thousands of residents with basic recurring cash assistance and non-cash assistance benefits.

6. TANF funding is critical for the health and well-being of over 190,000 people in New York State, providing a lifeline to housing, heat, and basic necessities. This includes approximately 127,000 children whose households depend on TANF for their essential needs, including electricity, heat, housing, clothing, and transportation. These children are the poorest of the poor, and these families are already incredibly vulnerable. A typical TANF household is a single mother of two, and approximately half of all Public Assistance households with more than one person have no other source of income. These families have already searched for any other resource and demonstrated their need and lack of income as this is an eligibility requirement for families to receive Public Assistance in New York State.

7. TANF funds are essential to housing stability. A core purpose of TANF is to provide assistance to needy families so that children can be cared for in their own homes or with relatives. Without TANF, these families cannot afford electricity, heat, housing, diapers, clothing, or transportation. Should families disenroll from the TANF they currently rely on because of the System of Record Notice (SORN), it will likely lead to evictions, loss of placements in hotels, motels, and shelters, and loss of heat.

***New York's TANF Fraud Prevention Procedures***

8. OTDA, on behalf of New York, ensures that robust procedures are in place to prevent ineligible TANF benefits distributions and address erroneous payments or attempted fraud.

9. To ensure TANF funds are issued only to TANF eligible recipients, OTDA has a robust eligibility determination process that social services districts must follow for applicants and

recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF funded services and supports. Further, OTDA conducts reviews of social services districts to ensure program compliance, in accordance with federal and State statutes, rules and regulations. OTDA provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, phone calls, and emails to social services districts to help guide them in ensuring the accuracy of their determinations.

10. Applicants and recipients of cash assistance grants must document to social services districts that they are TANF eligible as part of the application and recertification process. Additionally, if a household experiences a change in between certifications, they are required to report the change to the applicable district within ten days to ensure that the household continues to be eligible for the assistance.

11. Such eligibility determination process includes an interview conducted by the social services district with the applicant and recipient. As part of this determination / redetermination process, appropriate documents are collected by the district to determine eligibility. Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to the district to provide verification of those factors which affect initial eligibility and benefit amount, including: identity, residence, family composition, housing costs, income and resources, and United States citizenship or, if not a United States Citizen, evidence of satisfactory immigration status for TANF eligibility.

12. Additionally, OTDA requires that social services districts utilize approved federal and State processes to validate and monitor for compliance with program eligibility for each applicant and recipient of TANF funded cash assistance. The Front End Detection System (FEDS) program is mandated by New York for every social services district. There are specified indicators

that could uncover potential fraud or misleading/erroneous statements on the application. Any indicators that cannot be resolved by the eligibility worker are referred for investigation prior to the case being opened.

13. OTDA also ensures that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. OTDA utilizes the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7 to confirm continuing eligibility and benefit levels. OTDA uses IEVS to receive federal tax information, which is used to confirm whether an individual's income and resources permit them to be eligible for TANF. Federal law and the written agreements that OTDA signs to access this income and eligibility information require OTDA to confirm the accuracy of any red flags raised by such data matches. Accordingly, cases that appear to have income exceeding TANF income and resources are referred to the applicable social services district to determine if the identified income and resources are available and if they impact the recipient's continuing eligibility.

14. OTDA also reviews the Public Assistance Reporting Information System (PARIS) Interstate match to identify if an individual is receiving benefits in more than one state at the same time. OTDA also conducts a Border Match with Massachusetts Department of Transitional Assistance to identify duplication of benefits. OTDA refers match results to social services districts for investigation and appropriate case action.

15. OTDA conducts a Prison Match to identify cash assistance recipients who are incarcerated and have been sentenced to a term in a New York State prison as reported to the New York State Department of Corrections and Community Supervision (DOCCS), a New York local jail as reported to New York State Division of Criminal Justice Services (DCJS) or Rikers Island

Prison, or a federal prison as reported on the SSA Federal Prison file. OTDA refers match results to social services districts for investigation and appropriate case action.

16. OTDA also undertakes a quarterly match to identify individuals whose Electronic Benefits Transfer (EBT) cash transactions are conducted 100% out of state during a calendar quarter which may indicate residence in a state other than New York. The matches are then referred to the social services districts for investigation. Based upon the results of that investigation, appropriate case action is then taken by the social services district.

17. OTDA performs monthly matches of active TANF recipients with the federal National Directory of New Hires (NDNH), which contains nationwide W-4 information. The TANF matches involve all active adult recipients. NDNH matches are verified through a third-party vendor or by sending Manual Employment Verification (MEV) forms to employers. Responses from the third-party vendor and MEVs are provided to the social services districts for investigation and appropriate case action.

18. OTDA also runs daily and monthly matches against the New York State Directory of New Hires, to identify applicants and recipients who have filed a W-4 with New York State and thus potentially identify new employment that could impact TANF eligibility.

19. The Welfare Fraud Reporting Web-based Referral System enables the public to electronically submit welfare fraud allegations to OTDA. These submissions contain information regarding individuals suspected of public assistance fraud and are referred to the applicable social services districts by OTDA for investigation and appropriate case action.

20. In addition to computer matches, OTDA requires each social services district to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When a social services district determines it has issued benefits to a recipient as a result

of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to the appropriate prosecutor's office authorized to act on the matter, or to OTDA's Office of Administrative Hearing for an Administrative Disqualification Hearing (ADH). If the recipient is found to have committed an intentional program violation (IPV), a claim is established and recovery is pursued from the recipient. If a recipient is found to have committed an IPV, the recipient will be disqualified from participation in the program for a specified period of time.

21. Moreover, as part of its internal controls, OTDA conducts work participation verification reviews, which is a quality assurance process that selects representative samples of work-eligible assistance cases for purposes of verifying the accuracy of the social services district's participation reporting processes, the accuracy of reporting, and compliance with federal and state regulations. OTDA conducts a yearly review of a sample of cases according to New York's HHS approved Work Verification Plan. Social services districts are also required to submit work participation self-audits on a sample of cases, on a semi-annual basis. Both work participation verification reviews and self-audits are conducted to determine the correctness of the wage reporting status of a case. If errors in the sampled cases are discovered, the social services district is notified, and recommendations on process improvements and training needs are made.

***New York's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status***

22. New York requires social services districts to use the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien status.

23. Social services districts have staff with unique SAVE user accounts that are used to access the online SAVE system to verify the immigration documentation presented by a non-

citizen TANF applicant or recipient. The SAVE verification process begins by creating a case in the SAVE system, inputting information from the immigration documentation provided by the non-citizen TANF applicant or recipient, and initiating Initial Verification, which is automated. If the system locates the applicant's or recipient's immigration status, it will return a response to the district. In some instances, the system may be unable to provide the immigration status information at initial response, in which case Additional Verification may be required, which includes automated or manual processes.

24. Social services districts use the SAVE system response to verify the validity of the immigration document provided by a TANF non-citizen applicant or recipient. The immigration documentation used by the district to determine TANF eligibility for non-citizen applicants and recipients, as well as the SAVE system response, must be imaged and retained in the case record. Social services districts are responsible for maintaining these records in their local document repository or in the state document repository system which is made available to Social Services Districts for record keeping purposes.

25. OTDA oversees and monitors immigration status verification by social services districts through various mechanisms. These include policy directives and guidance that OTDA issues to social services districts on the federal requirement to use the SAVE system to verify a non-citizen applicant's or recipient's qualified alien status for TANF benefit eligibility purposes. These directives also include other guidance related to the SAVE system, in accordance with United States Citizenship and Immigration Services (USCIS) requirements. Additionally, OTDA conducts annual TANF reviews of selected social services districts. These are used as an element in the State Single Audit when the TANF program is reviewed as part of the State Single Audit.

SAVE is a review element included as part of the TANF reviews to ensure social services districts are verifying the immigration documentation presented by the TANF non-citizen applicant or recipient.

26. The SAVE system verification process described above is only performed for non-citizens. U.S. citizens are not subject to that process. U.S. citizens are subject to a different process: they must provide social services districts with proof of citizenship status and that documentation must be imaged and retained in the case record. Acceptable forms of documentation to prove citizenship status include a U.S. birth certificate, U.S. passport, U.S. Citizenship Certificate, or a Naturalization Certificate.

27. As required by law, New York imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF. These include Social Services Law sections 21 and 136 as well as 18 NYCRR Part 357 and guidance such as 18-LCM-10-T.[1]

28. Social services law section 21 provides that "information relating to persons applying for or receiving benefits under programs pursuant to this chapter shall be considered confidential and *shall not be disclosed to persons or agencies other than those considered entitled to such information in accordance with section one hundred thirty-six of this chapter, when such disclosure is necessary for the proper administration of such programs*." (emphasis added).

29. Social services law 136 provides that "[a]ll communications and information relating to a person receiving public assistance or care obtained by any social services official, service officer, or employee in the course of his or her work shall be considered confidential and,

[1] Available at: https://otda.ny.gov/policy/directives/2018/LCM/18-LCM-10-T.pdf

except as otherwise provided in this section, shall be disclosed only…" to specified individuals considered entitled to it.

30. Regulations at 18 NYCRR 357.3 provide that "[i]nformation shall be released to another agency or person only when the public welfare official providing such data is assured that:

(1) the confidential character of the information will be maintained;

(2) the information will be used for the purposes for which it is made available, such purposes to be reasonably related to the purposes of the public welfare program and the function of the inquiring agency; and

(3) the information will not be used for commercial or political purposes."

31. The New York State Application for Certain Benefits and Services and Recertification Form for Certain Benefits and Services which are used to apply and recertify for TANF-funded assistance, among other programs, contains numerous notices, authorizations and consents for disclosure of an individual's information. However, such authorizations and consents do not inform U.S. Citizens that their information could be shared with the U.S. Department of Homeland Security (DHS), nor do they inform non-citizens that their information could be shared with DHS, apart from notifying applicants that information from their immigration documents will be verified with USCIS. The application and recertification form information also assures applicants that "the use or disclosure of the information … is restricted to persons and organizations directly connected with the verification of citizenship status, and the administration or enforcement of the provisions of the Public Assistance…" and other applicable programs.

32. OTDA could have never anticipated the new routine use of TANF data announced in the SORN and therefore had no opportunity to draft disclosures to prior TANF recipients to disclose this new routine use of their data.

***Federal Oversight of New York TANF Program***

33. Pursuant to federal statute and regulation, OTDA provides certain data on families receiving TANF assistance to the Administration for Children and Families (ACF) on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

34. Among other things, OTDA provides ACF with the data fields specified in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, social security number, date of birth, and immigration status, categorized as "U.S. Citizen," "Qualified alien," or "Unknown."

35. OTDA undertakes sample TANF data collection activities, consistent with 42 U.S.C. § 611(a)(1)(B) and 45 C.F.R. § 265.5. On a monthly basis, OTDA uses random sampling to select a sufficient number of TANF cases to meet federal reporting requirements. Such sample data includes U.S. Citizens and non-U.S. citizens. New York provides data for approximately 3,800 households per year. For each of the individuals in the TANF household, New York provides the data in the "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions."

36. Included within the sample data, is information pertaining to certain recipients of state and local-only-funded Safety Net Assistance (SNA) as part of New York's MOE/SSP reporting obligations. SNA is a program that provides similar benefits to households who may not be eligible for TANF because they have exceeded the TANF time limits, among other reasons.

37. Pursuant to the federal Single Audit Act, OTDA engages an auditor with respect to its TANF program. This audit takes place in accordance with the requirements set forth in the annual Compliance Supplement issued by the Federal Office of Management and Budget (OMB). The auditor conducting the Single Audit is procured by New York State. More information about the State's participation in the Single Audit process is available at https://www.budget.ny.gov/guide/bprm/l/l-0300.pdf.

38. Historically, beyond the Single Audit, and required federal reporting described above, the only federal oversight of the New York State TANF Program has been triennial IRS audits of the IEVS application and process, along with monthly reviews of the sample data and other regular program reports provided by OTDA.

39. To my knowledge, in the past ten years, with the exception of one HHS Office of the Inspector General (OIG) audit, ACF has never performed any of the following activities with respect to New York's TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures.

***TANF SORN***

40. I understand that on June 23, 2026, U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

41. ***First***, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act".

42. The TANF SORN adds a new additional purpose:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits,

and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

43. ***Second*****,** the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.*, State agencies), but also "verification information" obtained "from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

44. ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

45. ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373. Notably 42 U.S.C. 1320b-7 does not require verification of U.S. citizenship through SAVE for TANF eligibility purposes.

***Harm To New York***

46. Without Court intervention, New York faces harm stemming from the TANF SORN.

47. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

48. As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require New York to expend time and resources responding to ACF requests. The frequency and scope of these additional reviews is unclear, which poses challenges with planning workflow, developing and issuing training on new auditing requirements, and increases administrative burden on state and district staff. Audit coordination and participation require significant staff time and resources, diverting staff from core operations to coordinate and attend meetings and interviews; track, identify, gather, and produce requested documentation; review and validate documentation for accuracy and completeness; and respond to auditor inquiries and follow-up requests, among other tasks. Additionally, for many of the eligibility requirements, documentation is not kept at the State level and instead is maintained by social services districts. Generally, information required to be provided by New York would necessitate a time-and labor-intensive process of collecting documentation from social services districts. This would be separate from the process that, as noted above, New York already engages in on a regular basis as part of its efforts to monitor social

services districts to ensure that social services districts follow all state and federal requirements regarding TANF eligibility.

49. This would also create opportunity costs as it would take OTDA staff away from work on other important initiatives and may result in costs due to increased staffing needs, with no provision of funding to support these activities.

50. As to immigration status verification in particular, these agency oversight activities are likely to lead to misleading and improper results. The information contained in OTDA's TANF/MOE sample data is taken at a specific point in time each month – it is a snapshot of the household circumstances at the exact time of the data pull. Once State staff receive the sample, they investigate further into the case and document any new, changed, or newly available information pertaining to the household, including immigration status. There are both State and Federal processes that take time to complete and that may not be captured at the time the sample is pulled, but that become available over time. OTDA reports TANF/MOE sample data quarterly, after the cases have been completed by State staff. The exact length of time between when a case is sampled and when a case is transmitted also depends on the specific month of the quarter. For example, a case selected for the review month of January (the first month of the quarter) is sampled on approximately February 15th and transmitted by June 29th. Cases selected for the review month of March (the last month of the quarter) are sampled on approximately April 15th and transmitted by June 29th. The period of time between sampling and transmission allows State staff to capture newly available information that would not necessarily be reflected in the documentation originally saved by review staff to support the existing household circumstances. There are also times where case circumstances continue to change after the quarterly transmissions to ACF – this requires additional updates to be made to the sample data in retransmissions and further highlights

that our initial sample data pull is just representative of a specific point in time, rather than of the current case circumstances. In addition, immigration status is not always permanent and can change over time. Certain TANF eligible non-citizen populations may experience changes to their immigration status. For example, Ukrainian Humanitarian Parolees that meet certain criteria are eligible for TANF, however, should they lose parole, the SAVE system response may then indicate that they have applied for or are beneficiaries of a different immigration category such as Temporary Protected Status (TPS) or an applicant for asylum. While no longer eligible for TANF assistance, the non-citizen would have been eligible at the time TANF eligibility was determined. If ACF is using the aged sample data and cross-checking it with present immigration status/category, the data may not align, but this would not be due to district/state error. Additionally, in instances where the SAVE system response is pending, but the district determines that the TANF non-citizen applicant or recipient meets all other eligibility requirements, benefits must not be delayed, denied, reduced or terminated while awaiting verification of the non-citizen's documentation through the SAVE system. If all other factors of eligibility have been met and the non-citizen is otherwise eligible, benefits must be granted pending the SAVE system response.

51. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states, including New York. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts in New York, with likely staffing reductions and the elimination of non-mandated services.

52. Additionally, the TANF statute contains significant penalties for failing to meet certain requirements such as not complying with IEVS and/or failing to submit certain required reports. Should TANF penalties be assessed against states as a result of such oversight activities

that could also lead to program shortfalls or other consequences depending on the severity of the penalty.

53. The SORN's announcement that ACF plans to begin sharing New York's TANF recipients' data with DHS will cause additional harm to New York, as it risks eroding the trust that OTDA and social services districts have developed with immigrant communities in New York. OTDA requires TANF applicants who are not citizens to attest that they have an eligible immigration status, provide documentation of that status, and has told applicants that OTDA would verify that status with the federal government. But OTDA has also encouraged eligible households – including families with U.S. citizen children who are and have always been eligible for TANF - to utilize TANF and other assistance to help raise their children and families out of poverty. For example, the Family Centered Case Management Services (FCCMS) program provides funds to social services districts so they may hire caseworkers who work at coordinating services for families, helping ensure they have access to vital programs. New York also aims to make information on how to apply and recertify easily available via website and the inclusion of a pre-screening tool on its benefit portal, myBenefits. If ACF begins sharing TANF data with DHS, then community fears that DHS will use that data for purposes other than valid eligibility checks will impede that public trust. Further, the TANF SORN will erode the trust that New York has developed with immigrant communities and deter individuals from participating in TANF.

54. New York has made assurances to TANF recipients, both U.S. citizens and non-citizens alike, that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. New York thoroughly describes how personal information will be used in the New York State Application for Certain Benefits and Services, the Recertification Form for Certain Benefits and Services, the "What You Should Know About Your

Rights and Responsibilities" booklet, and the "What You Should Know About Social Services Programs" booklet so that applicants and recipients know how the information they provide on the application and recertification forms will be used. The uses described in the SORN are not presently included in the application or recertification forms, or other documents that support the application and recertification processes, creating a mismatch between applicant and recipient expectations regarding privacy and how ACF proposes to use recipient data. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede public trust and participation in New York's TANF programs by citizens and qualified non-citizens alike.

55. This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in the TANF program if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the states' TANF programs.

56. If fewer individuals participate in TANF, New York State will suffer significant harm as the inability of households to meet their basic needs through TANF is likely to increase reliance on other state programs and resources. Additionally, the trauma associated with already vulnerable families foregoing assistance designed to meet their basic essential needs will likely cause immediate irreparable harm to the children who depend on TANF, and such harm will

reverberate through their lives, potentially causing Adverse Childhood Experiences (ACES)[2] that lead to increased risks in adulthood of substance use, poorer educational outcomes, negative impacts on physical health, mental health challenges, and even suicide. The harm of losing TANF is not limited to children, as the individuals supporting their families on TANF would experience significant harm as well. For those who are getting on their feet, a loss of TANF will likely cause cascading setbacks. If a parent cannot afford diapers for their children, bus fare for a new job, basic toiletries, or a winter coat, they cannot move forward. Instead, they will need to struggle to provide the most basic necessities. A lack of TANF is likely to increase housing instability which has downstream consequences and costs such as shelter and healthcare costs among others.

57. Further, the SORN will harm New York because it will require OTDA to update communications with TANF applicants and participants that notify them of how their personal data is collected, used, and shared. Applicants are notified on the New York State Application for Certain Benefits and Services, on the Recertification Form for Certain Benefits and Services, in the "What You Should Know About Your Rights and Responsibilities" booklet, and in the "What You Should Know About Social Services Programs" booklet about how the information they provide will be used. Any time there is a change to how such information is used, staff from multiple areas within the agency must evaluate the change and determine which sections of these documents must be updated. Revised language must be developed for the documents that is not only legally adequate, but also plain-language, meaning that it conveys the change clearly and succinctly to applicants and recipients. Additionally, OTDA must collaborate with other state agencies regarding the changes because these documents are used to apply for multiple benefits

[2] Adverse Childhood Experiences (ACES) are potentially traumatic events that occur in childhood. They may include, but are not limited to, not having enough food to eat, experiencing homelessness, or unstable housing. *See*, https://www.cdc.gov/aces/about/index.html.

and services, some of which are not overseen by OTDA. OTDA, as well as the other affected agencies, must clear the revised language for publication through agency leadership and also prepare guidance for social services districts that explains the changes. The application must then be translated into 12 additional non-English languages, as required by State law, and also converted into four different types of alternative formats for individuals who are visually impaired. Such changes take months to implement and involve significant staff time and resources as well as costs for translation, conversion of the documents to alternative formats, printing, and distribution to social services districts. Once a new document is published, social services districts must destroy any remaining printed stock of prior versions, and staff must be adequately informed about the requirement to use the most current version.

58. The SORN also risks harming New York by implementing new data sharing that is beyond what OTDA has disclosed to TANF recipients about how their data is used. OTDA could not have anticipated the new uses of this data announced by the SORN at the time information was collected from TANF recipients. This not only risks violating the public trust OTDA has developed, but also risks potential claims against OTDA by individuals asserting that OTDA has violated their information privacy rights.

DATED: August 3, 2026

s/ Rajni Chawla

Rajni Chawla