# EXHIBIT 22

# DECLARATION OF HOA PHAM

I, Hoa Pham, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of the Commonwealth of Pennsylvania and over the age of 18. I am Deputy Secretary for the Pennsylvania Department of Human Services ("DHS"). I am familiar with the information in the statements set forth below either through personal knowledge, in consultation with DHS staff and/or DHS subcontractors, or from documents that have been provided to and reviewed by me.

2. I have been in my current role as Deputy Secretary since 2023. As Deputy Secretary, I oversee DHS's Office of Income Maintenance ("OIM"), which serves low-income Pennsylvanians through numerous beneficial means-tested assistance programs, including but not limited to the Temporary Assistance for Needy Families (TANF) program, Supplemental Nutrition Assistance Program (SNAP), Disaster SNAP, Sun Bucks (Summer EBT), and Low Income Home Energy Assistance Program.

3. In this capacity, I am intimately familiar with how DHS administers TANF, including how Pennsylvania determines eligibility for TANF cash applicants accurately and timely, and supports TANF's core purposes and tracks and reports its performance.

4. Before becoming Deputy Secretary of DHS's OIM, I served as OIM's Director for the Bureau of Employment Programs, where I oversaw education and job training programs designed to help reduce dependencies on DHS' various public assistance programs, including TANF. Prior to joining the Commonwealth and OIM in 2021, I worked in various social impact-related positions with successive responsibility and leadership throughout the Greater Philadelphia region. These positions have included direct service delivery and management of various programs

serving low-income individuals; managing philanthropic investment portfolios; conducting local, state and federal advocacy; and providing technical assistance to community-based service providers. I have a Bachelor of Arts from Swarthmore College.

***TANF in Pennsylvania***

5. DHS is Pennsylvania's comprehensive social services agency. Its mission is to assist Pennsylvanians in leading safe, healthy, and productive lives through equitable and outcome-focused services while being an accountable steward of Commonwealth and federal resources. DHS carries out its mission through collaboration with individuals, families, community and advocacy organizations, and state and federal partners to facilitate the safety and economic security of individuals and families who qualify for DHS benefits and services in the Commonwealth of Pennsylvania.

6. DHS administers TANF in Pennsylvania.

7. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income families with children. It is one of the largest sources of cash assistance to low-income families and a cornerstone of Pennsylvania's anti-poverty work. Pennsylvania receives approximately $717 million annually in TANF funding. In federal fiscal year 2025, TANF provided 22,470 Pennsylvania families with basic recurring cash assistance and work supports. DHS anticipates serving 19,320 households, including 36,247 children through direct cash assistance in state fiscal year 2026-2027. In federal fiscal year 2025, TANF also provided for a wide range of non-cash assistance benefits such as childcare for approximately 215,399 Pennsylvania families.

8. Pennsylvania invests its annual TANF block grant to support each of the four federal TANF purposes. Services include but are not limited to: direct cash assistance, employment and training programs, work supports, and child care. The TANF program is designed to help

families with children experiencing low-income achieve economic security and stability and decrease poverty in the state. The TANF program in Pennsylvania is designed to provide short-term assistance to families when the support of one or both parents is interrupted. It also provides supplemental support when family income from employment and other sources is not sufficient to meet basic needs. It is not intended to provide long-term support. Families undergo assessments of skills and employability and are required to engage in activities that enhance self-sufficiency and ensure the well-being of their children. TANF acts as a bridge to help families from permanently falling into poverty due to a sudden unexpected change. TANF also acts as a bridge to help those in poverty to engage in activities that can get them out of poverty.

***Pennsylvania's TANF Fraud Prevention Procedures***

9. DHS ensures that robust procedures are in place to prevent ineligible TANF benefit distributions and address erroneous payments or attempted fraud.

10. To ensure TANF funds are issued only to TANF eligible recipients, DHS evaluates each TANF cash applicant for key eligibility factors, including: identity, residence, family composition, housing costs, income and resources, and United States citizenship or satisfactory immigration status, meeting certain work requirements, prior convictions of welfare fraud or other sanctions for intentional program violations, cooperation in establishing eligibility for certain state and federal benefits and where applicable, cooperation in established paternity and court ordered child support. Each applicant must, as a condition of eligibility for themselves or others applying in the household, furnish evidence to DHS to verify each of these eligibility factors.

11. DHS deploys several strategies to ensure we accurately determine eligibility for TANF. These strategies include but are not limited to conducting detailed interviews as a condition of TANF eligibility; verifying information provided by TANF applicants through regular review of fifteen state and federal databases in addition to meeting specific work requirements; and

requiring eligibility rechecks at least once every six months for the vast majority of TANF households. The databases DHS uses provide either direct verification of factors relevant to eligibility or leads for DHS to seek applicant-produced verification for information related to income and assets, citizenship status, residency in Pennsylvania, household composition, incarceration, death records, fulfillment of work requirements, and health and disability status.

12. DHS OIM utilizes verification data from multiple sources to issue and adjust benefits appropriately. These data exchange sources include the Pennsylvania Department of Labor and Industry, Pennsylvania Department of Revenue, Social Security Administration, Internal Revenue Service, Veterans Administration, Administration of Children and Families, Pennsylvania Department of Corrections, Pennsylvania Board of Probation and Parole, and the Administrative Office of Pennsylvania Courts. The information provided by these sources is submitted through overnight batch processes, as well as real-time interfaces. A direct result of having this information readily available is an increase in DHS's ability to perform Real Time Eligibility (RTE) determinations.

13. DHS tracks the effectiveness of its electronic data exchanges and publishes an annual report detailing their usage. From July 2024 to June 2025, DHS received 5,616,298 data exchanges. This led to 8,164 TANF case closures, and preventing what would have been $1,184,785 in cash payments.

14. If DHS detects fraud or other issues during any of the checkpoints outlined above, DHS has processes in place to ensure proper payment. For example, if DHS discovers that it overpaid benefits to a TANF household, DHS recovers the payment from the household by a single, lump sum payment, by installment payments, by recoupment through the monthly cash assistance benefit, or by referral to the Pennsylvania Office of State Inspector General (OSIG) or

Pennsylvania Attorney General's Office for collection. For individuals who no longer receive assistance, the OSIG will send a collection letter that notifies the individual of the amount of the overpayment claim and requests full repayment. The OSIG may initiate civil proceedings or other collection activities if the individual does not repay or set up a payment plan. *See* 55 Pa. Code § 255.4(e).

15. Further, DHS works closely with OSIG to refer suspected fraud and abuse so that it may be investigated and handled as needed. Referrals are made following concerns flagged through applications and questionable use of benefits observed by DHS or from tips made by the public. In 2025, DHS received 19,937 tip complaints resulting in 3,114 OSIG field investigations, and $8,505,978 in costs avoided by DHS.

16. Further, DHS carefully monitors contracted partners who provide TANF-funded services for TANF recipients to ensure program compliance, in accordance with federal and State statutes, rules and regulations. DHS reviews each contracted program's performance annually to determine whether services provided meet core performance requirements and comply with DHS' federal approved TANF Work Verification Plan. Monitoring review elements include but are not limited to: activities offered meet the federal definitions of work activities; actual hours of participation match available verification; and daily supervision of unpaid activities is being provided. This review includes on-site or remote monitoring; monthly case reviews and desk audits. Contracted providers that do not achieve performance requirements must take specific corrective actions in plans that are submitted in writing to DHS. In addition to being placed on a corrective action plan, failure to achieve program performance requirements can result in reduction of funds and if necessary, termination of the contract.

17. Further, DHS has a team of program advisors that provide extensive technical assistance to the contracted vendors to ensure TANF data and programmatic integrity. Technical assistance topics often pertain to strategies to achieve performance requirements and adherence to their Statement of Work which outlines work/work-related activities, and their proper use, tracking participation, verification requirements, and the expectation of provision of daily supervision and/or ongoing contact. In addition to technical assistance and training opportunities on an as-needed basis, DHS proactively holds monthly contractor calls, quarterly collaborative calls, and at least monthly meetings between contractors and DHS/CAO staff. Provider letters are issued to ensure the employment and training contractors follow the most updated guidelines in between policy handbook and annual program manual updates.

18. Additionally, DHS has controls in place to ensure that contracted partners serve only eligible TANF recipients. Not only do DHS' contracts with partners explicitly limit provision of services to eligible TANF recipients, but also DHS only allows these contracted providers to serve individuals who are deemed eligible by DHS and directly referred to the contract providers. These referrals are tracked by DHS' proprietary system of record, Commonwealth Workforce Development System.

***Pennsylvania's Process for Verifying Eligibility for TANF Cash Assistance Based on Immigration Status***

19. Pennsylvania requires its eligibility staff to use the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien status.

20. The U.S. Citizenship and Immigration Service (USCIS) provides primary and secondary verification methods in the SAVE system that DHS requires its eligibility staff to use at TANF application, when an adjustment to status is reported or expected, and at TANF renewal.

Primary verification uses the noncitizen's Alien Registration Number (A-Number) to query the SAVE system. Secondary verification is required when SAVE returns an Institute Additional Verification (IAV) response and requires upload of citizen documentation. Benefits must be authorized if all other requirements are met except SAVE verification of noncitizen status. After the SAVE response is received, eligibility is determined based on the verified status.

21. As required by law, Pennsylvania imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

22. States are required to take such reasonable steps as the State deems necessary to restrict the use and disclosure of information about individuals and families receiving assistance under the program attributable to funds provided by the Federal Government (here, TANF). *See* 42 U.S.C. § 602(a)(1)(A)(iv). Pennsylvania has its confidentiality statute for TANF and other programs codified at 62 P.S. § 404. State regulations protecting the confidentiality of these records are also located in 55 Pa. Code, Chapter 105.

23. DHS could have never anticipated the new routine use of TANF data announced in the SORN (91 Fed. Reg. 37406) and therefore had no opportunity to draft disclosures to prior TANF recipients informing them of this new routine use of their data. DHS' application for benefits specifically provides assurances to applicants and recipients that DHS will safeguard their information. Page 13 of the Pennsylvania Application for Benefits states: "RIGHT TO CONFIDENTIALITY We will keep your information private. It will only be used to decide which programs you may be eligible for. The county assistance office (CAO), when requested, must provide federal, state and local law enforcement officials with the address, Social Security number (SSN) and photograph (if available) of an individual who is fleeing to avoid prosecution, custody or confinement for a felony or violating probation or parole. Any person knowingly violating any

of the rules and regulations of this department shall be guilty of a misdemeanor and, upon conviction shall be sentenced to pay a fine, not exceeding one hundred ($100) dollars, or to undergo imprisonment, not exceeding six months, or both (62 P.S. section 483)".

24. Further, benefit applicants sign a Rights & Responsibilities agreement that states "I understand that the information entered in this application will be kept confidential and used only to administer benefits. I authorize the release of personal, financial and medical information for the purpose of determining eligibility."

25. The proposed disclosure of TANF applicant information for the purposes contemplated by the modified TANF SORN exceeds current permissible use by DHS under the current TANF confidentiality law. States are required to take the reasonable steps they deems necessary to restrict the use and disclosure of information about individuals and families receiving assistance under the program attributable to funds provided by the Federal Government. 42 U.S.C. § 602(a)(1)(A)(iv). DHS currently does that and notifies applicants and recipients of this restriction. The uses contemplated in the TANF SORN will not be restricted to use in the TANF program.

***Federal Oversight of Pennsylvania's TANF Program***

26. Pursuant to federal statute and regulation, DHS provides certain data on families receiving TANF assistance to ACF on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

27. Among other things, DHS provides ACF with the data fields specified in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, social security number, date of birth, and, as to immigration status, an individual's status as either "U.S. Citizen," "Qualified alien," or "Unknown."

28. DHS undertakes sample TANF data collection activities, consistent with 42 U.S.C. § 611(a)(1)(B), 45 C.F.R. § 265.5 and DHS' federally approved TANF Sampling Plan. On a monthly basis, DHS uses a stratified random sampling to select sufficient TANF/Maintenance of Effort (MOE) cases to meet federal reporting requirements. Pennsylvania provides data for approximately 3,000 cases a year.

29. DHS constructs the random sample frame using cases that received TANF or TANF MOE funding. Cases receiving non-recurring benefits (such as Diversion or Work Support) or Excess MOE/State Only funding are excluded. DHS creates a file of all cases with a TANF or TANF MOE grant and removes any that did not receive these benefits. The remaining cases form the sample frame, which is divided into three required strata. Stratum codes are assigned before selection, and each stratum is sampled using its specific parameters.

30. Pursuant to the Uniform Guidance, Pennsylvania engages an independent auditor with respect to its TANF program. This audit is conducted annually. The Single Audit of Pennsylvania is conducted jointly by the Pennsylvania Department of Auditor General and an independent Certified Public Accounting Firm, currently the CPA Firm Clifton, Larson, Allen. Pennsylvania's Single Audit reports can be found at https://www.pa.gov/agencies/budget/publications-and-reports/state-level-single-audit

31. There has historically been no federal oversight of Pennsylvania's TANF program beyond the annual Single Audit, and required federal reporting described above.

32. To my knowledge, in the past 18 years, ACF has never performed any of the following activities with respect to Pennsylvania's TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures.

***TANF SORN***

33. I am aware that on June 23, 2026, U.S. Administration for Children and Families (ACF), a part of the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

34. ***First***, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act".

35. The TANF SORN adds a new additional purpose:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

36. ***Second*****,** the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.*, State agencies), but also "verification information" obtained

"from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

37. ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

38. ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

***HARM To Pennsylvania***

39. Pennsylvania and DHS face harm stemming from the TANF SORN.

40. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

41. As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require DHS to

expend time and resources responding to ACF requests. For example, DHS would need to onboard additional staff to track, validate and report on the expanded data reporting requirements contemplated by ACF. DHS currently reports to ACF approximately 3,000 cases per year. The TANF SORN may require DHS to report on all TANF cash cases. In federal fiscal year 2025, DHS supported 22,470 families with recurring TANF cash benefits. Reporting on all TANF cash cases would constitute a sevenfold growth in DHS' reporting requirements and staff workload.

42. As to immigration status verification in particular, these agency oversight activities are likely to produce misleading and improper results. Eligibility rules also vary in what kind of verification information must be provided based on specific immigration status; SAVE is one method to verify immigration status, however documents on hand such as a Legal Permanent Resident Card (I-551) or certification of human trafficking from HHS is also acceptable. Further, it is unclear whether ACF's proposed oversight activities will parse federally funded cash benefits from state-funded TANF MOE cash benefits; Pennsylvania provides state-funded TANF to eligible, lawful permanent residents who are ineligible for TANF benefits under the five-year bar. Finally, DHS frequently sees case where immigration status changes over time, so accurate assessments of satisfactory immigration status must be conducted at key eligibility determination checkpoints rather than at random points in time.

43. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts for Pennsylvania and DHS, with likely staffing reductions and the elimination of non-mandated services. For example, a freeze in access to TANF funds could jeopardize access to childcare for more than 215,000 low-

income Pennsylvania families and likely disrupt their ability to seek or sustain employment. A freeze in TANF funds would also present cash flow challenges for DHS' contracted partners, who range from local county governments to not-for-profit community-based organizations, to small childcare centers. Finally, a freeze in TANF funds would likely limit DHS' ability to fulfill its contractual and legal obligations with other Commonwealth agencies. For example, DHS, in its capacity as Pennsylvania's TANF agency, is a mandatory, federally required partner for American Job Centers supported by the Workforce Innovation and Opportunity Act.

44. Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with the U.S. Department of Homeland Security and Immigration and Customs Enforcement (ICE) for immigration enforcement activities. *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-information-sharing-between-the-centers-for-medicare-and-medicaid-services-and. In this environment, the SORN's announcement that ACF plans to begin sharing Pennsylvania's TANF recipients' data with the UDepartment of Homeland Security will cause additional harm to Pennsylvania, as it risks eroding the trust that DHS has developed with immigrant communities in Pennsylvania. DHS has always required TANF applicants who are not citizens to verify their eligible immigration status. But DHS has also encouraged eligible households –including families with U.S. citizen children who are and have always been eligible for TANF—to take advantage of TANF and other assistance to help raise their children and families out of poverty. If ACF begins sharing TANF data with the Department of Homeland Security without clearly defined purposes

and limits required by federal law, then fear that data will be used for purposes other than DHS's valid eligibility checks will be realized, which will impede that public trust and chill participation in Pennsylvania's TANF programs by citizens and qualified non-citizens alike. DHS often requires highly personal information from clients. DHS uses this information only or to perform tasks that are essential to the proper discharge of DHS's responsibilities. Current confidentiality rules balance the need for DHS to determine eligibility for assistance while also preserving, insofar as possible, confidence between DHS and its clients, and DHS and the public at large, all of which is vital to efficient administration.

45. The public knows that DHS takes precautions against their information being misused. This SORN will likely cause DHS to lose public trust it has worked hard to build. Organizations in Pennsylvania that work with DHS and benefits recipients have communicated to DHS that they are concerned about a likely chilling effect caused by disclosure of applicant data for reasons other than eligibility functions. These organizations have further communicated to DHS that clients will likely not pursue public benefits programs if their personal data is used for reasons other than eligibility functions.

46. This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in the TANF if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure. Such concerns are bolstered by public reporting into the U.S. Department of Homeland Security's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further,

any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' TANF programs.

47. If fewer individuals participate in TANF, Pennsylvania will suffer significant harms. Without the bridge of TANF, Pennsylvania will have to spend more in state resources to help families trapped by poverty to meet their basic needs. Without TANF, these individuals have very few options to support meeting their basic needs, which will result in increased reliance on other benefit programs and increased strain on charitable food networks. Without TANF, families who rely upon TANF-funded work support services like childcare or transportation assistance may be unable to sustainably retain employment which will result in income loss for the family, as well as Pennsylvania's gross domestic product.

48. Pennsylvania and DHS will also incur a financial cost in updating communications with TANF applicants or participants that notify TANF applicants or participants of how their personal data is collected, used, and shared. For example, DHS would need to create new benefit application and related client eligibility notices that meets new legal requirements; translate each of these new documents to ensure language access for the wide range of Pennsylvanians DHS serves; and provide these documents both in hard copy and digital form. Further, DHS would also need to update procedure and training materials for eligibility and call center staff to prepare them to field constituent inquiries and concerns about their personal data being used and shared in new ways. Finally, DHS would waste resources by having to destroy all existing hard copy inventory of Pennsylvania's Benefit Application and replace them with new applications including updated language. Not only would DHS need to destroy hard copy inventory within each of DHS' 92 in-person customer service centers, but DHS also would likely need to conduct extensive outreach to

community partners in each of Pennsylvania's 67 counties to destroy their local inventory and reproduce new applications.

Executed this 1 day of August 2026, in Philadelphia, Pennsylvania.



____________________________

Hoa Pham