# EXHIBIT 24

**DECLARATION OF MELISSA BOCASH**

I, Melissa Bocash, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Reach Up Program Director in the Vermont Department for Children and Families (DCF).

2. My major job duties include strategic planning and oversight of the Temporary Assistance for Needy Families (TANF) program in Vermont, which is called the "Reach Up" program and administered by DCF in Vermont. As part of my job responsibilities, I develop the program budget and grant proposals. I also work with the State's district offices and the federal Administration for Children and Families to ensure TANF is properly and consistently administered across Vermont.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with DCF staff, or from my review of relevant documents and information.

***TANF in Vermont***

4. DCF administers TANF in Vermont.

5. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income families with children. Vermont receives approximately $47 million annually in TANF funding and provides almost 7,000 Vermont residents with basic recurring cash assistance and non-cash assistance benefits.

6. TANF is a key support for low-income families in Vermont and helps parents become financially self-sufficient. About 53% of Vermont's TANF funds pay for child care so parents can work, look for work, or go to school. TANF also helps to pay for child welfare and

foster care services. TANF funds are used to pay for case managers, transportation, work clothes, education, and training, among other things. TANF also provides basic cash assistance to help families pay for rent, heat, and groceries. These investments help families stay stable, keep kids safe and supported, and give parents a real chance to build skills and increase their income, while bringing flexible federal dollars into Vermont to meet changing needs.

***Vermont's TANF Fraud Prevention Procedures***

7. DCF ensures that robust procedures are in place to prevent ineligible TANF benefits distributions and address erroneous payments or attempted fraud. DCF has a Fraud and Claims Unite to investigate overpayments. If an overpayment is identified, DCF may seek reimbursements, withhold future payments, or take other legal action, as appropriate.

8. To ensure TANF funds are issued only to TANF eligible recipients, DCF has a robust eligibility determination process that it follows for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF funded services and supports. Further, DCF conducts reviews of its district offices to ensure program compliance, in accordance with federal and State statutes, rules and regulations. DCF provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, phone calls, and emails to district offices and staff to help guide them in ensuring the accuracy of their determinations.

9. Applicants and recipients of cash assistance grants must provide documentation to DCF to show that they are TANF eligible as part of the application and recertification process. Additionally, if a household experiences a change in between certifications, they are required to report the change to the DCF within ten days to ensure that the household continues to be eligible for the assistance.

10. Such eligibility determination process includes an interview conducted by the staff at a DCF district office with the applicant and recipient. As part of this determination / redetermination process, appropriate documents are collected by the district to determine eligibility. Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to DCF to provide verification of those factors which affect initial eligibility and benefit amount, including: identity, residence, family composition, housing costs, income and resources, and United States citizenship or, if not a United States citizen, evidence of satisfactory immigration status for TANF eligibility.

11. DCF also ensures that various computer matches confirm eligibility, in compliance with federal laws and regulations. DCF utilizes the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7 to confirm continuing eligibility and benefit levels. DCF uses IEVS to receive federal tax information, which is used to confirm whether an individual's income and resources permit them to be eligible for TANF. Federal law and the written agreements that the State signs to access this income and eligibility information require DCF to confirm the accuracy of any red flags raised by such data matches, and to provide affected individuals an opportunity to contest these data findings, before terminating, denying, suspending or reducing benefits to an applicant or recipient. Accordingly, cases that appear to have income exceeding TANF income and resources are returned to the DCF district office for further review. There, district staff verify whether the identified income and resources are actually available to the household and then determine how the recipient's continuing eligibility is affected.

12. DCF also reviews the Public Assistance Reporting Information System (PARIS) Interstate match to identify if an individual is receiving benefits in more than one state at the same

time. DCF refers match results to the Fraud and Claims Unit for investigation and appropriate case action.

13. DCF conducts a Prison Match to identify cash assistance recipients who are incarcerated and refers match results to the Fraud and Claims Unit for investigation and appropriate case action.

14. DCF also reviews cases when a TANF recipient's Electronic Benefits Transfer (EBT) cash transactions are conducted 100% out of state during a calendar quarter which may indicate residence in a state other than Vermont. The matches are then referred to the Fraud and Claims Unit for investigation. Based upon the results of that investigation, appropriate case action is then taken by DCF.

15. DCF performs daily and monthly matches of active TANF recipients with the Vermont Department of Labor to identify new employment that may impact a recipient's eligibility. DCF refers match results to the Fraud and Claims Unit for investigation and appropriate case action.

16. DCF performs monthly matches of all active adult TANF recipients with the federal National Directory of New Hires (NDNH), which contains nationwide W-4 information. The matches are verified through a third-party vendor or by using wage data from the Vermont Department of Labor. The results are provided to the Fraud and Claims Unit for investigation and appropriate case action.

17. The public may also electronically submit welfare fraud allegations to DCF. These submissions contain information regarding individuals suspected of public assistance fraud and are referred to the Fraud and Claims Unit by DCF for investigation and appropriate case action.

18. In addition to computer matches, DCF's the Fraud and Claims Unit establishes claims to recover any benefits issued in error when it is determined that fraud has occurred. When DCF determines it has issued benefits to a recipient as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to the Fraud and Claims Unit. If the recipient is found to have committed an intentional program violation (IPV), the claim is established and recovery is pursued from the recipient.

19. Moreover, as part of its internal controls, DCF conducts work participation verification reviews, which is a quality assurance process that selects representative samples of work-eligible assistance cases for purposes of verifying the accuracy of participation reporting processes, the accuracy of reporting, and compliance with federal and state regulations. DCF conducts a yearly review of a sample of cases according to Vermont's HHS approved Work Verification Plan. DCF is required to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When DCF determines benefits were issued as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to the Fraud and Claims Unit. If the client is found to have committed an IPV, the claim is established and recovery is sought from the client.

20. DCF also engages internal reviews for accuracy, including a "Senior Review Process," which confirms whether a TANF application is complete and ready for a final decision. The Senior Review Process is conducted by subject-matter experts and aims to improve accuracy and timely decisions while supporting staff development and tracking trends that inform training, policy, and workflow improvements.

***Vermont's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status***

21. DCF uses the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien status.

22. Applicants must declare their citizenship or immigration status, and non-citizens must provide immigration documents, such as visas or residency cards. DCF uses SAVE when reviewing initial applications, when adding a non-citizen to a TANF household, and during recertification, even if no status change is reported. If SAVE results conflict with the immigration documents provided, DCF investigates further and takes appropriate case action. State oversight of immigration status verification is built into multiple steps of the eligibility process and monitored regularly through the Senior Review process and monthly Quality Assurance reviews.

23. As required by law, Vermont imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

24. Information about Vermont residents who receive TANF assistance is confidential and used only for case management, eligibility determinations, and legally required reporting. All records are stored in a secure electronic system with role-based, least-privilege access, limited to DCF staff in the economic services division, who may only access records when necessary.

25. DCF could have never anticipated the new routine use of TANF data announced in the SORN and therefore had no opportunity to draft disclosures to prior TANF recipients to disclose this new routine use of their data.

26. In addition to statutes and DCF policies that assure TANF recipients that their personal information will remain confidential, all applications for benefits state: "Information about my application and benefits is confidential and protected by state and federal law. [DCF] will not share any information about me unless it is directly connected to program administration, allowed by law or a court order, or I give my permission."

***Federal Oversight of Vermont TANF Program***

27. Pursuant to federal statute and regulation, DCF provides certain data on families receiving TANF assistance to ACF on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

28. Among other things, DCF provides ACF with the data fields specified in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, social security number, date of birth, and, as to immigration status, an individual's status as either "U.S. Citizen," "Qualified alien," or "Unknown."

29. DCF provides this information for all families receiving TANF assistance in Vermont.

30. DCF submits all required MOE/SSP reports to ACF. DCF provides disaggregated, case-level data for individuals served in Separate State Programs that count toward MOE (SSP-MOE), even if they are not receiving federally funded TANF. This SSP-MOE data mirrors TANF reporting and includes family and individual demographics, household composition, income, work activities and hours, assistance status, and sanctions. For other MOE-funded activities that do not fall under SSP-MOE, DCF reports aggregate information—program descriptions, eligibility criteria, counts of families served, and expenditures by category—through the financial and annual MOE reports (e.g., ACF-196R and ACF-204). In short, individual-level data is provided for TANF and SSP-MOE participants; broader MOE activities are reported in aggregate with expenditures and counts.

31. Pursuant to the federal Single Audit Act, DCF engages an auditor with respect to its TANF program. This audit takes place every three years, unless there are significant adverse findings, in which case audits occur yearly until no major problems are found; afterwards, audits

return to their three-year cycle. Among other things, auditors check whether eligibility decisions are accurate and supported by signed applications and required documentation. The audit also examines whether child-support noncooperation sanctions were properly approved and applied. To ensure the proper operation of the program, auditors also examine matches from federal and state databases (e.g., SSA, Vermont DOL, SAVE, IEVS), work-related sanctions, exemptions for single parents with young children, and compliance with the State's Work Verification Plan.

32. There has historically been no federal oversight of Vermont's TANF program beyond the Single Audit, and required federal reporting described above.

33. To my knowledge, in the past ten years, ACF has never performed any of the following activities with respect to Vermont's TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures.

***TANF SORN***

34. I understand that on June 23, 2026, U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

35. ***First***, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act".

36. The TANF SORN adds a new additional purpose:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

37. ***Second***, the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.*, State agencies), but also "verification information" obtained "from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

38. ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

39. ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

***Harm To Vermont***

40. Without Court intervention, Vermont faces harm stemming from the TANF SORN.

41. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

42. As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require Vermont to expend time and resources responding to ACF requests. Vermont is a small state with a limited team, so additional oversight and audits require substantial staff time to compile records, produce reports, meet with auditors, and answer follow-up questions. This added burden diverts DCF's limited staff from core duties like processing applications, serving households, and completing existing Senior Reviews and Quality Assurance (QA) activities. This strain increases administrative costs, slows decisions, and can create backlogs. If findings occur, the costs grow further because fixes often require policy updates, system changes, vendor work, testing, and statewide staff training. As a result, added audits can duplicate existing oversight without providing benefits proportional to the resources they consume. Vermont will also incur a financial cost in updating communications with TANF applicants or participants that notify TANF applicants or participants of how their personal data is collected, used, and shared

43. In addition to direct costs, added oversight creates significant opportunity costs. Time spent preparing for audits, meeting with auditors, and fixing adverse findings is time not available for other important duties related to program administration, such as resolving complex cases, completing Senior Reviews and QA, training and coaching staff, and improving systems and policies. For a small team, these tradeoffs can slow service delivery, reduce accuracy and service quality, and delay modernization efforts that would otherwise improve outcomes for TANF recipients.

44. As to immigration status verification in particular, these agency oversight activities are likely to lead to misleading and improper results. If DCF's limited staff are spending more time on increased oversight activities, less staff time is available to ensure SAVE checks are properly made, immigration documentation is complete, and eligibility is correctly determined. This will likely result in processing delays and errors.

45. The TANF SORN will erode the trust that Vermont has developed with immigrant communities and deter individuals from participating in TANF. Vermont has always required TANF applicants who are not citizens to attest that they have an eligible immigration status and has told applicants that State TANF administrators would confirm that status with the federal government. But Vermont has also encouraged eligible households—including families with U.S. citizen children who are and have always been eligible for TANF—to take advantage of TANF and other assistance to help raise their children and families out of poverty. Vermont has also made assurances to TANF recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then

community fears that DHS will use that data for other purposes will impede that public trust and chill participation in Vermont's TANF programs by citizens and qualified non-citizens alike.

46. This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in the TANF if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure.

47. If fewer individuals participate in TANF, Vermont will suffer significant harms. When TANF participation falls, state costs can rise even if cash assistance spending goes down. Lower TANF participation can shift needs to other state and locally funded systems: more housing instability and shelter use, greater demand for emergency assistance, higher child welfare involvement, and increased health care and behavioral health costs from untreated needs. Families who leave TANF without stable income often return later in crisis, creating "churn" that drives up administrative costs for applications, hearings, and corrections. Communities feel the impact as children lose resources their parents need to meet goals, which can affect school readiness and long-term outcomes, and increase demand on nonprofits and municipal services. In short, maintaining steady TANF participation helps the state meet program requirements and is more cost-effective than dealing with downstream crises.

DATED: July 31, 2026

_*/s/ Melissa Bocash*___________

MELISSA BOCASH