# EXHIBIT 25

# DECLARATION OF DUKE STOREN

I, Duke Storen, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Commissioner of the Virginia Department of Social Services ("VDSS").

2. My responsibilities include the oversight and implementation of social service programs across the Commonwealth of Virginia including programs funded by the Temporary Assistance for Needy Families ("TANF") block grant.

3. VDSS operates within a three-part social services system that includes the State Department of Social Services, 120 local departments of social services, and 31 community action agencies. VDSS serves alongside 13,000 state and local human services professionals who ensure that millions of Virginians have access to critical services and resources. Its mission is to design and deliver high-quality human services that help Virginians achieve safety, independence and overall well-being.

4. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with VDSS staff, or from my review of relevant documents and information.

***TANF in Virginia***

5. VDSS administers TANF in Virginia.

6. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income families with children. It is one of the largest sources of cash assistance to low-income families and a cornerstone of Virginia's anti-poverty work. Virginia receives approximately $158 million annually in TANF funding and provides 27,000 Virginia residents with basic recurring cash assistance and non-cash assistance benefits.

7. TANF provides assistance to needy families across the state. This important form of aid helps families with children by providing monetary assistance as well as employment and training services to move families toward becoming self-supporting. In addition, TANF funds numerous other services aimed at assisting families in crisis including domestic violence programs, supports to at-risk children, childcare assistance, services provided by community action agencies, boys and girls clubs, homelessness assistance, and transportation. These services are vitally important to at-risk families and each meet one or more of the four purposes of TANF.

***Virginia's TANF Fraud Prevention Procedures***

8. VDSS, on behalf of Virginia, ensures that procedures are in place to prevent ineligible TANF benefits distributions and address erroneous payments or attempted fraud.

9. To ensure TANF funds are issued only to TANF eligible recipients, VDSS has a robust eligibility determination process including the use of an automated eligibility system that local departments of social services (LDSS) must follow for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF funded services and supports. Further, VDSS conducts reviews of LDSSs to ensure program compliance, in accordance with federal and State statutes, rules and regulations. VDSS provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, phone calls/virtual meetings, and emails to LDSSs to help guide them in ensuring the accuracy of their determinations.

10. Applicants and recipients of cash assistance grants must document to LDSSs that they are TANF eligible as part of the application and recertification process, and much of these processes are automated through an on-line application and third-party income verification services. Additionally, if a household experiences a change in between certifications, they are

required to report the change to the LDSS within ten days to ensure that the household continues to be eligible for the assistance.

11. Such eligibility determination process includes an interview conducted by the LDSS with the applicant and recipient. As part of this determination/redetermination process, appropriate documents are collected by the LDSS to determine eligibility. Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to the LDSS to provide verification of those factors which affect initial eligibility and benefit amount, including: identity, residence, family composition, income, and United States citizenship or, if not a United States citizen, evidence of satisfactory immigration status for TANF eligibility.

12. Additionally, VDSS requires that LDSSs utilize approved federal and State processes to validate and monitor for compliance with program eligibility for each applicant and recipient of TANF funded cash assistance. The applicant and recipient's social security numbers are verified through the Social Security Administration. Alien status is verified through queries directly into Systematic Alien Verification for Entitlements (SAVE), an online service administered by U.S. Citizenship and Immigration Services (USCIS) that provides point in time immigration status. Numerous SSA databases are queried, including the State Data Exchange (SDX), Beneficiary Earnings Exchange Record (BEER), Beneficiary and Earnings Data Exchange (BENDEX), State On-Line Query (SOLQ), State Verification and Exchange System (SVES). Unemployment benefits and earned income are verified through the Virginia Employment Commission and The Work Number (TWN). VDSS also ensures that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. VDSS utilizes the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7 to

confirm continuing eligibility and benefit levels. VDSS uses IEVS to receive federal tax information, which is used to confirm whether an individual's income and resources permit them to be eligible for TANF. Federal law and the written agreements that VDSS signs to access this income and eligibility information require VDSS to confirm the accuracy of any red flags raised by such data matches, and to provide affected individuals an opportunity to contest these data findings, before terminating, denying, suspending or reducing benefits to an applicant or recipient. VDSS also reviews the Public Assistance Reporting Information System (PARIS) Interstate match to identify if an individual is receiving benefits in more than one state at the same time.

13. Each LDSS operates a fraud management program to strengthen program integrity by identifying, investigating, and pursuing the collection of benefits paid as a result of fraud.

14. In addition to computer matches, VDSS requires each LDSS to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When an LDSS determines it has issued benefits to a recipient as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to the local Commonwealth Attorney for prosecution. If the recipient is found to have committed an intentional program violation (IPV), the claim is established and recovery is pursued from the recipient. If a recipient is found to have committed an IPV, the recipient may be disqualified from the participation in the program for a period of time.

15. Moreover, as part of its internal controls, regional VDSS staff review local case records to ensure that the data system entries are reflected by supporting documentation. The case review process involves work participation verification reviews, which is a quality assurance process that selects representative samples of work-eligible assistance cases for purposes of verifying the accuracy of the LDSS participation reporting processes, the accuracy of reporting,

and compliance with federal and state regulations. VDSS conducts a yearly review of a sample of cases according to the VDSS subrecipient monitoring plan. The LDSS is required to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When the LDSS determines benefits were issued as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to the local Commonwealth's Attorney. If the client is found to have committed an IPV, the claim is established and recovery is sought from the client.

16. The Virginia Auditor of Public Accounts conducts an annual audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in Government Auditing Standards issued by the Comptroller General of the United States (Government Auditing Standards), the financial statements of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund including TANF, and the aggregate remaining fund information of the Commonwealth of Virginia. This audit includes an assessment of the internal controls for payment accuracy in TANF.

***Virginia's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status***

17. All immigrants must provide documentation of immigration status using the documents provided by the U.S. Citizenship and Immigration Services. Virginia requires LDSSs to verify the validity of the immigration status documentation by inquiring the federal SAVE system to verify an applicant or recipient's qualified alien status. SAVE will return status information by entering the seven, eight, or nine-digit Alien Registration Number, which is displayed on the alien's USCIS documents.

18. As required by law, Virginia imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

19. The local department may not release information about the client without the client's written consent except for purposes directly connected with the administration of public assistance programs. Any disclosed information must be noted in the case record.

20. VDSS could have never anticipated the new routine use of TANF data announced in the SORN and therefore had no opportunity to draft disclosures to prior TANF recipients to disclose this new routine use of their data.

21. The current Virginia application for services does not state that application data will be shared with any federal agency. Sharing demographic/PII of any current applicant with a federal agency would violate the current agreement on data sharing of current TANF participants.

***Federal Oversight of Virginia TANF Program***

22. Pursuant to federal statute and regulation, VDSS provides certain data on families receiving TANF assistance to ACF on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

23. Among other things, VDSS provides ACF with the data fields specified in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, social security number, date of birth, and, as to immigration status, an individual's status as either "U.S. Citizen," "Qualified alien," or "Unknown." This data is collected and reported for all recipients of TANF, including children.

24. VDSS provides this information for all families receiving ongoing TANF cash assistance in Virginia.

25. Pursuant to the federal Single Audit Act, VDSS engages an auditor with respect to its TANF program. This audit takes place at least every three years. The auditor conducting the Single Audit is chosen by Virginia. The audit review of the single state audit has several objectives:

a. Evaluate the accuracy of recorded financial transactions in the Commonwealth's financial accounting and reporting system, VDSS' internal financial accounting and reporting system, and other financial information reported to the Department of Accounts (DOA);

b. Determine if VDSS has adequate internal controls over financial transactions;

c. Determine if VDSS is in compliance with applicable laws, regulations, and provisions of contracts or grant agreements;

d. Determine if management has established, documented, and maintained adequate internal controls over each major federal program, including TANF, that provides reasonable assurance that the Commonwealth has managed federal awards in compliance with the types of compliance requirements identified as subject to audit in the current year Compliance Supplement issued by the Office of Management and Budget (OMB) and which could have a direct and material effect on each major federal program managed by the agency.

26. There has historically been little federal oversight of Virginia's TANF program beyond the Single Audit, and required federal reporting described above. To my knowledge, in the past five years, ACF has never performed any of the following activities with respect to Virginia's TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures.

***TANF SORN***

27. I understand that on June 23, 2026, U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

28. ***First***, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act".

29. The TANF SORN adds a new additional purpose:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

30. ***Second*,** the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.*, State agencies), but also "verification information" obtained

"from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

31. ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

32. ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

***Harm To Virginia***

33. Without Court intervention, Virginia faces harm stemming from the TANF SORN.

34. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

35. As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require Virginia

to expend time and resources responding to ACF requests. For many of the eligibility requirements, documentation is not kept at the state level and instead is maintained by the vendors that are contracted to provide TANF-funded services. Any additional information required to be provided by Virginia would necessitate a time- and labor-intensive process of collecting documentation from LDSSs. This would be separate from the process that, as noted above, Virginia already engages in on a regular basis as part of its efforts to monitor LDSSs to ensure that LDSSs follow all state and federal requirements regarding TANF eligibility. Vendor information systems are not integrated with Virginia's information system and it would be costly both to vendors and Virginia to develop integrated information systems.

36. As to immigration status verification in particular, these agency oversight activities are likely to lead to misleading and improper results. As noted above, SAVE returns an individual's immigration status as of the point in time the query is submitted. An individual's immigration status may lawfully change after that date. A person granted asylum may later adjust to lawful permanent resident status, and a lawful permanent resident may later naturalize. VDSS verifies status at the time of application and at redetermination, and the data VDSS reports to ACF reflects the individual's status as verified at that time. If ACF compares data VDSS previously reported against a current federal record, that comparison may reveal an apparent discrepancy that reflects nothing more than the passage of time and a lawful change in the individual's circumstances. Such a discrepancy would not establish that the individual was ineligible when the determination was made, or that VDSS failed to verify status properly. In addition, the immigration status information VDSS reports to ACF consists of three broad categories: "U.S. Citizen," "Qualified alien," and "Unknown." These categories do not convey the documentation VDSS reviewed, the basis for the determination, or the date on which verification occurred. Oversight activities premised on this

reported data, without reference to the underlying case record maintained by VDSS and the LDSS, would not accurately reflect the verification VDSS actually performed.

37. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts for Virginia, with likely staffing reductions and the elimination of non-mandated services. As envisioned in the federal block grant legislation, TANF funds are used for a variety of services, beyond providing monetary assistance, including vocational training, employment supportive services, and rehabilitation. Any penalty, freeze, or enforcement action would result the likely elimination of these programs aimed at assisting families to become gainfully employed. Additionally, a freeze in federal funds would prevent the Commonwealth from maintaining its TANF cash assistance program, increasing hunger, homelessness, and toxic stress for thousands of Virginia's children. Multiple studies have shown that TANF cash assistance reduces the incidence of child abuse and neglect, and in Virginia, TANF funds directly support child welfare services.

38. Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with DHS and Immigration and Customs Enforcement (ICE) for use in immigration enforcement activities. *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-information-sharing-between-the-centers-for-medicare-and-medicaid-services-and. In this environment, the SORN's announcement that ACF plans to begin sharing Virginia's TANF

recipients' data with DHS will cause additional harm to Virginia, as it risks eroding the trust that VDSS and LDSSs have developed with immigrant communities in Virginia. VDSS has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, provide documentation of that status, and has told applicants that VDSS would verify that status with the federal government. But VDSS has also encouraged eligible households to take advantage of TANF and other assistance to help raise their children and families out of poverty. If ACF begins sharing TANF data with DHS, then community fears that DHS will use that data for purposes other than valid eligibility checks will impede that public trust.

39. Further, the TANF SORN will erode the trust that Virginia has developed with immigrant communities and deter individuals from participating in TANF. Virginia has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, and has told applicants that State and local TANF administrators would confirm that status with the federal government. But Virginia has also encouraged eligible households—including families with U.S. citizen children who are and have always been eligible for TANF— to take advantage of TANF and other assistance to help raise their children and families out of poverty. Additional information regarding immigration status will likely create a dampening effect so that immigrant families do not apply for assistance, even when eligible Virginia has also made assurances to TANF recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in Virginia's TANF programs by citizens and qualified non-citizens alike.

40. This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in the TANF if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure. Such concerns are bolstered by public reporting into DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' TANF programs.

41. If fewer individuals participate in TANF, Virginia will suffer significant harms. Families who forgo assistance for which they are eligible do not cease to have needs. In my experience, families who do not receive TANF cash assistance turn instead to other programs administered or funded by the Commonwealth and its localities, including emergency assistance, homelessness services and shelter, energy assistance, and locally funded general relief. Because those programs are supported in substantial part by State and local funds rather than by the federal TANF block grant, a decline in TANF participation shifts costs from the federal government to Virginia and its localities. VDSS expects the most significant of these costs to arise in child welfare. As noted above, cash assistance is associated with a reduced incidence of child abuse and neglect, and family economic instability is a recognized risk factor for child maltreatment and for the removal of children from their homes. A decline in TANF participation among eligible families is therefore likely to increase demand for child protective services and to increase the likelihood of foster care placements. The cost to the Commonwealth of maintaining a child in foster care substantially exceeds the cost of the TANF cash assistance that may have allowed the family to

remain intact. In addition, TANF in Virginia funds employment and training services, and transportation supports designed to move families toward self-sufficiency. Families who do not participate in TANF do not receive those services. VDSS expects that reduced participation will extend the period during which families require public assistance of some form, increasing costs to the Commonwealth over time. At the same time, the cost of administering TANF is largely fixed, as VDSS and the 120 local departments of social services must maintain the same eligibility, verification, monitoring, and fraud prevention infrastructure regardless of how many families participate.

42. Virginia will also incur a financial cost in updating communications with TANF applicants or participants that notify TANF applicants or participants of how their personal data is collected, used, and shared. Information is shared to all applicants and recipients, both orally and in writing, about the protection of personal information and the circumstances under which it is shared. Changes in these procedures will incur costs for updating forms, updating the information system, revising scripts used by agency staff and call center staff. New mailing costs will be incurred through notifying all current recipients of the changes related to sharing personal data.

DATED: July 30, 2026

*<u>/s/ Duke Storen</u>*
Duke Storen