# EXHIBIT 26

# DECLARATION OF CARLA REYES

I, Carla Reyes, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

## Professional and Agency Background

1. I am the Assistant Secretary of the Economic Services Administration of the Department of Social and Health Services (ESA). I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

2. The Department of Social and Health Services (DSHS) is an agency of the State of Washington. It is composed of five Administrations and one Division, each with distinct roles within the agency. These are the Behavioral Health and Habilitation Administration, the Developmental Disabilities Administration, the Home and Community Living Administration, the Finance, Technology, and Analytics Administration, the Economic Services Administration, and the Division of Vocational Rehabilitation. DSHS's mission is: "We partner with people to access support, care, and resources." And its vision is: "People find human services to shape their own lives." This mission and vision are accomplished with a strategic plan, specific to each administration and division, which is available on our website at this URL: https://www.dshs.wa.gov/office-of-the-secretary/os-strategic-goals. DSHS has many duties that have been delegated to it by the Washington State Legislature, including cash and cash equivalent benefits programs, medical services, and other social service programs.

3. The ESA administers assistance with resources to provide a better life, including cash, food, child support, disability determination, transition to employment and other services.

4. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with DSHS staff, or from my review of relevant documents and information.

**TANF in Washington State**

5. The ESA administers Temporary Assistance for Needy Families (TANF) in Washington State.

6. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide temporary cash assistance and non-cash benefits and services to eligible families for critical services. It is one of the largest sources of cash assistance to low-income families and a cornerstone of Washington's poverty reduction work. Washington receives over three hundred million annually in federal TANF funding. In 2025, nearly 36,000 Washington households received assistance benefits[1].

7. TANF funds are a critical component of the ESA's core services focusing on poverty reduction and stability. The funds ensure families facing a loss of income can buy basic necessities for their kids, and acquire additional help such as gas, educational expenses, or clothing vouchers[2].

**Washington's TANF Fraud Prevention Procedures**

8. ESA, on behalf of Washington, ensures that robust procedures are in place to prevent ineligible TANF benefits distributions and address erroneous payments or attempted fraud. The ESA takes fraud very seriously. The ESA's approach to fraud is strong and multi-faceted:

[1] ESA Briefing Book, *Appendix 6: Changes in Federal Cash Grant Assistance Programs* (2025) https://www.dshs.wa.gov/sites/default/files/ESA/briefing-manual/2025Appendix%206.pdf.

[2] RCW 74.04.770.

prevention, detection, referrals for benefits disqualification and for prosecution and cost-recovery. ESA coordinates with staff, statewide, in Community Services Offices and Customer Service Contact Center (call center), with county prosecutors, and with local, state, federal, and international law enforcement agencies when necessary.

9. To ensure TANF funds are issued only to TANF eligible recipients, ESA has a robust eligibility determination process that local Community Service Offices and its call center must follow for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF funded services and supports. Further, ESA conducts reviews to ensure program compliance, in accordance with federal and State statutes, rules and regulations. ESA provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, phone calls, and emails to local Community Service Offices and the call center to help guide in ensuring the accuracy of determinations.

10. Applicants and recipients of cash assistance grants must document to their local Community Services Office and the call center that they are TANF eligible as part of the application and recertification process. Additionally, if a household experiences a reportable change, and it could impact eligibility in between certifications, they are required to report the change by the 10th of the next month after the change to ensure that the household continues to be eligible for the assistance. There are some changes that have a more aggressive reporting timeline (e.g. child leaves the home).

11. Such eligibility determination process includes an interview conducted by the local Community Services Office or the call center with the applicant and recipient. As part of this determination and redetermination process, appropriate documents are collected to determine eligibility. Each applicant and recipient must, as a condition of eligibility for themselves or others

in the applying household, furnish evidence as needed to the local Community Services Office or call center to provide verification of those factors which affect initial eligibility and benefit amount, including identity, residence, family composition, housing costs, income and resources, and United States citizenship or, if not a United States Citizen, evidence of satisfactory immigration status for TANF eligibility.

12. Additionally, ESA requires that local Community Services Offices and the call center utilize approved federal and State processes to validate and monitor for compliance with program eligibility for each applicant and recipient of TANF funded cash assistance. When a local Community Services Office or call center determines it has issued benefits to a recipient as a result of fraud, the facts used in the determination are reviewed. The Fraud Early Detection (FRED) process is utilized to investigate these circumstances. This includes a referral to the Office of Fraud and Accountability, a special unit within DSHS, to investigate the situation. The case is investigated for appropriate action and, if warranted, referred to appropriate law enforcement agencies. If the recipient is found to have committed an intentional program violation (IPV), the claim is established and recovery is pursued from the recipient. If a recipient is found to have committed an IPV, the recipient may be disqualified from the program for a period of time.

13. ESA ensures that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. Community Service Offices and the call center utilize the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7, to confirm initial and continuing eligibility and benefit levels. IEVS is used to receive federal tax information, which is used to confirm whether an individual's income and resources permit them to be eligible for TANF. Federal law and the written agreements that ESA signs to access this income and eligibility information require it to confirm the accuracy of any red

flags raised by such data matches, and to provide affected individuals an opportunity to contest these data findings, before terminating, denying, suspending or reducing benefits to an applicant or recipient.

14. Community Service Offices and the call center also review the Public Assistance Reporting Information System (PARIS) Interstate match to identify if an individual is receiving benefits in more than one state at the same time.

15. Community Service Offices and the call center also check the Felony Offender Reporting System (FORS) to identify cash assistance recipients who are incarcerated and have been sentenced to a term in a Washington prison or a federal prison as reported on the SSA Federal Prison file. Additional verification is requested from the applicant or recipient when a match result is yielded. If there is any suspected fraud, a FRED referral is initiated.

16. Community Service Offices and the call center review regular matches of active TANF recipients with the federal National Directory of New Hires (NDNH), which contains nationwide wage information. The TANF matches involve all active adult recipients. NDNH information is verified through a third-party vendor or by employers sending Manual Employment Verification (MEV) forms to the federal government. When a match is received through NDNH, Community Services Offices and the call center review the case for accuracy and for whether eligibility is impacted.

17. In addition to computer matches, ESA requires each local Community Services Office and the call center to establish claims to recover any benefits issued in error when it is determined that fraud has occurred.

18. ESA also undertakes checks to ensure Electronic Benefits Transfer (EBT) cash transactions are conducted in appropriate locations, per 42 U.S.C. § 608 (e.g. prohibiting use of benefits at casinos).

19. The Welfare Fraud Hotline or Web Referral form enables the public to report suspected welfare fraud to ESA. These submissions contain information regarding individuals suspected of public assistance fraud and are referred to Office of Fraud and Accountability for investigation and appropriate case action.

**Washington's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status**

20. Washington requires local Community Services Offices and the call center to use the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified immigrant status for TANF. This match is done at initial application, annual eligibility reviews, when a new member is added to the TANF assistance unit or they report a change in immigration status.

21. The system used by Community Services Office and call center staff to determine TANF eligibility and benefit levels is programed to interface with SAVE to verify an individual's current immigration status with USCIS. Community Services Office and call center staff request immigration documents for each individual reporting they are a lawfully present immigrant. The immigration documents are used to verify eligibility for TANF. When the immigration verification is obtained, the information is entered into the systems and an automatic interface match with SAVE is performed. SAVE then responds with the individual's current immigration status.

22. Information provided to Community Service Office and call center staff through this interface is recorded in our eligibility system for each query. Copies of the immigration

verification documents are electronically saved into the individuals Electronic Case Record (ECR) system.

23. Regular, routine quality monitoring and oversight is done for all eligibility processes administered by ESA through Community Services Offices and the call center to support accurate delivery of benefits and services.

24. As required by law, Washington imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

25. ESA is responsible for ensuring that confidential information is not released to clients or third parties inappropriately or illegally. Policies related to disclosure of confidential information are contained in Wash. Admin. Code § 388-01 (2026) and in departmental administrative policies. Per the Social Security Act §402(1)(A)(iv) states are bound, in administering their TANF program, to take "such reasonable steps as the State deems necessary to restrict the use and disclosure of information about individuals and families receiving assistance under the program attributable to funds provided by the Federal Government," with the requirement to attest to this practice in their TANF State Plan. Additionally, 45 CFR § 250.50(a)(1)(iii) (2026) describes safeguards for any SSA Title IV-A data (TANF), including provisions around disclosure. ESA interprets this CFR to limit disclosure of TANF client-level data for purposes that are not directly connected to administration of the TANF program.

26. The application for TANF (as well as food) assistance for Washington includes a declaration that must be signed by the applicant authorizing DSHS "to contact other persons or agencies when necessary" to assist in obtaining proof of eligibly. Applicants must "swear under penalty of perjury under the laws of the State of Washington" that information provided in the application, including citizenship and alien status information for household members applying

for benefits is "true and correct." The application also states that "alien status of applicant household members may be subject to verification by USCIS" and that "information received from USCIS, based on this submission, may affect eligibility and benefit amounts."

27. ESA could not have anticipated the new routine use of TANF data announced in the SORN and therefore had no opportunity to consider whether additional disclosures are necessary for prior TANF recipients regarding this new routine use of their data by federal agencies.

**Federal Oversight of Washington TANF Program**

28. Pursuant to federal statute and regulation, ESA provides certain data on families receiving TANF assistance to ACF on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

29. Among other things, ESA provides ACF with the data fields specified in a publication titled *ACF-199 TANF and ACF-209 SSP-MOE Data Reporting Instructions*. OMB Control Number 0970-0338 (expires 10/31/2026) https://acf.gov/sites/default/files/documents/ofa/ACF199_209%20TANF_SSP%20data%20report%20instructions%20-%20valid%20thru%202026-10_compliant_FINAL.pdf. These include, for example, social security number, date of birth, and, as to immigration status, an individual's status as either "U.S. Citizen," "Qualified alien," or "Unknown."

30. ESA extracts and reports information for all families receiving TANF and Separate State Program assistance in Washington. Washington's quarterly submission of the ACF-199 includes the entire TANF/SFA (federally and state Maintenance of Effort (MOE) funded) caseload. This includes information on households who receive federally funded or MOE claimed assistance, including TANF child-only households. The data set includes both information on recipients of TANF/SFA assistance, as well as non-needy or ineligible household members (e.g. kinship

caregivers, ineligible parents including those who are undocumented immigrants). The information shared, at an individual level, is a vast set of characteristics data including citizenship status (U.S. citizen, qualified immigrant, or unknown), date of birth, Social Security Number (if available), county of residence, and zip code of residence.

31. Pursuant to the federal Single Audit Act, ESA engages an auditor with respect to its TANF program. This audit takes place every three years, or more frequently if there are recent past findings. The auditor conducting the Single Audit is chosen by Washington. Public information about the Statewide Single Audit Report can be found online: OFM, *Federal Assistance Reporting Policies & Procedures* (June 1, 2016) https://ofm.wa.gov/wp-content/uploads/sites/default/files/public/accounting/policysc/95.10sc154.pdf.

32. Federal oversight of Washington's TANF program has consisted largely of the Single Audit, and required federal reporting described above.

33. To my knowledge, in the past 10 or more years, ACF has not performed any of the following activities with respect to Washington's TANF Program: program integrity reviews, program integrity projects, additional audits beyond the Single Audit, on-site or virtual visits to TANF agencies, or periodic reviews of policies and procedures.

**TANF SORN**

34. I understand that on June 23, 2026, U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice (SORN) regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

35. ***First***, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain

requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act."

36. The TANF SORN adds a new additional purpose:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

37. ***Second*****,** the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.*, State agencies), but also "verification information" obtained "from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

38. ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

91 Fed. Reg. at 37409.

39. ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601–619 (TANF Statute), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

**Harm to Washington**

40. Without Court intervention, Washington faces harm stemming from the TANF SORN.

41. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (*e.g.* comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (*e.g.* financial audits, programmatic audits, and fraud investigations), and monitoring (*e.g.* regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)." 91 Fed. Reg. at 37407.

42. As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed "agency oversight activities." ACF doing so as a result of the TANF SORN would require Washington to expend time and resources responding to ACF requests. This would be separate from the process that, as noted above, Washington already engages in on a regular basis as part of

its efforts to monitor local offices to ensure compliance with all state and federal requirements regarding TANF eligibility.

43. As to immigration status verification in particular, "agency oversight activities" are likely to lead to misleading and improper results. For example, the TANF SORN would permit ACF to share TANF data with DHS to verify citizenship or immigration status. But Washington already uses DHS data to verify eligibility based on citizenship or immigration status and requests additional documentation when DHS data does not provide clear initial verification since status may have changed. Matching TANF data against DHS's data system alone without additional verification may result in false red flags.

44. Any disruption to TANF funding would have devastating consequences for Washington. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states. *See* Dep't of Health & Human Servs., *HHS Freezes Child Care & Family Assistance Grants in Fives States for Fraud Concerns*, (Jan. 6, 2026) https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts for Washington, with likely staffing reductions and the elimination of non-mandated services.

45. The SORN's announcement that ACF plans to begin sharing Washington's TANF recipients' data with DHS will cause additional harm to Washington, as it risks eroding the trust that the Department has developed with immigrant communities in Washington. ESA has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, and to provide documentation of that status, and has told applicants that the Department would verify that status with the federal government. But ESA has also encouraged eligible

households to take advantage of TANF and other assistance to help raise their children and families out of poverty. If ACF begins sharing TANF data with DHS, then community fears that DHS will use that data for purposes other than valid eligibility checks will impede that public trust.

46. Further, the TANF SORN will erode the trust that Washington has developed with immigrant communities and deter individuals from participating in TANF. Washington has encouraged eligible households—including families with U.S. citizen children who are and have historically been eligible for TANF—to leverage TANF and other assistance to help raise their children and families out of poverty. Washington has also made assurances to TANF recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in Washington's TANF programs by citizens and qualified non-citizens alike.

47. This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in TANF if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure. Such concerns are bolstered by public reporting into DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in the States' TANF programs.

48. If fewer individuals participate in TANF, Washington will suffer significant harms. As documented in Washington's Blueprint for a Just and Equitable Future (10-year Plan to Dismantle Poverty in Washington), every dollar spent on poverty reduction efforts yields seven dollars in economic benefit for the state. *See* waeconomicjusticealliance.com/wp-content/uploads/2024/08/Final10yearPlan.pdf.

49. Washington will also incur a financial cost in updating communications with TANF applicants or participants that notify TANF applicants or participants of how their personal data is collected, used, and shared. Examples include the process for evaluating the legal requirements, incorporating those requirements into new disclosures, and then the procedures for actually effectuating the changes, such as the costs of updating paper forms.

Executed this 29 day of July 2026, in Olympia, Washington.

CARLA REYES
Assistant Secretary
Washington State Department of
Social and Health Services