# EXHIBIT 27

**DECLARATION OF PATARA HORN**

I, Patara Horn, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Director of the Bureau of Working Families of the Wisconsin Department of Children and Families (DCF).

2. I am responsible for the administration of the Temporary Assistance for Needy Families' (TANF) funding issued through grants to local organizations for the provision of employment, economic support, and related services. I am also responsible for the management oversight of program policy analysis and development, procedure development, automation of program policies and processes, program implementation and monitoring contractor operations and performance.

3. DCF is the state agency responsible for the oversight and implementation of human service programs across Wisconsin including child welfare, child support, child care subsidies, child care regulation, child care quality and Temporary Assistance for Needy Families (TANF).

4. DCF is responsible for supervising state programs that provide assistance and support to income-eligible families and individuals. One such program is Wisconsin Works (W-2), which is funded by the Temporary Assistance for Needy Families Program (TANF) block grant. In Federal Fiscal Year (FFY) 2025, Wisconsin received a total of $312,845,980 in TANF funding to support a variety of programs in the state.

5. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Wisconsin DCF staff, or from my review of relevant documents and information.

***TANF in Wisconsin***

6. DCF administers TANF in Wisconsin.

7. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income families with children. It is one of the largest sources of cash assistance to low-income families and a cornerstone of Wisconsin's anti-poverty work. Wisconsin received a total of $312,845,980 in TANF funding in FFY 2025 and annually provides approximately 11,200 Wisconsin residents with basic recurring cash assistance and more with other non-cash assistance benefits.

8. TANF helps fund state-run programs of cash assistance for needy families with children. However, TANF is not a program focused solely on cash assistance, but a broad-purpose block grant that helps fund a wide range of benefits and services for both cash assistance and non-cash benefit families. These benefits and services include employment and training (Wisconsin Works, Transitional Job program, and Transform Milwaukee Jobs program), Wisconsin Shares Child Care Subsidy Program, short-term economic aid (Emergency Assistance program due to homelessness, energy crisis and natural disaster and a short term, no interest loan through the Job Access Loan program), state refundable tax credits (the Earned Income Tax Credit), child welfare prevention services, services for children at risk for removal from the home because of neglect or abuse, and programs for youth, such as, the Brighter Futures program that supports positive youth development and prevention programs in high-risk communities and high-poverty neighborhoods. Many of these programs also support fatherhood initiatives and two-parent families as a stabilizing force in the lives of children.

***Wisconsin's TANF Fraud Prevention Procedures***

9. DCF, on behalf of Wisconsin, ensures that robust procedures are in place to prevent ineligible TANF benefit distributions and address erroneous payments or attempted fraud. For example, DCF requires each W-2 agency to establish a W-2 program integrity program and plan to operate fraud, waste, and abuse to prevent, detect, and investigate fraud or errors as outlined in

the W-2 Manual Chapter 13. This requirement includes the submission of standard operating procedures for agency program integrity management and administrative tracking and reporting on findings, investigations, and outcomes (e.g., front-end program eligibility verification, error-prone profile, participation in earned and unearned income system data exchanges, participation in the ACF Public Assistance Reporting Information System (PARIS), substantiated overpayment issuance, intentional program violations, coordination with other state benefit programs, etc.). In addition, DCF has the ability to pursue a civil or criminal action against any entity that receives funds to which it was not entitled; this includes and is not limited to W-2 agency fraud.

10. To ensure TANF funds are issued only to TANF-eligible recipients, DCF has a robust eligibility determination process that W-2 contracted agencies must follow for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF-funded services and supports. Further, DCF conducts reviews of its W-2 contracted agencies to ensure program compliance, in accordance with federal and State statutes, rules and regulations. DCF provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, telephone calls, and emails to W-2 contracted agencies to help guide them in ensuring the accuracy of their determinations.

11. Applicants and recipients of cash assistance grants must document to the W-2 agencies that they are TANF eligible as part of the application and recertification process. Additionally, if a household experiences a change in between certifications, they are required to report the change to the W-2 agencies within 10 calendar days of any change in circumstance that may impact eligibility (e.g., Wisconsin residency, income or assets, etc.) or 5 working days for the absence of a child to ensure that the household continues to be eligible for the assistance.

12. Such eligibility determination process includes an interview conducted by the W-2 agencies with the applicant and recipient. As part of this determination / redetermination process, appropriate documents are collected by the agency to determine eligibility. Each applicant and recipient must, as a condition of eligibility for themselves or others in the applying household, furnish evidence to the W-2 agency to provide verification of those factors which affect initial eligibility and benefit amount, including: identity, residence, family composition, housing costs, income and resources, and United States citizenship or, if not a United States Citizen, evidence of satisfactory immigration status for TANF eligibility.

13. Additionally, DCF requires that W-2 agencies utilize approved federal and State processes to validate and monitor for compliance with program eligibility for each applicant and recipient of TANF funded cash assistance. For example, DCF coordinates with the Wisconsin Department of Health Services on a multitude of automation projects that include and is not limited to various required data exchange processes to enhance shared state applications that are utilized to determine and verify TANF eligibility for the household.

14. DCF also ensures that various computer matches take place to confirm eligibility, in compliance with several federal laws and regulations. Through multiple automated systems and programs, DCF utilizes the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7 to confirm continuing eligibility and benefit levels. For example, part of the IEVS requirement is to receive federal tax information (FTI), which is used to confirm whether an individual's income and resources permit them to be eligible for TANF. Federal law and the written agreements that DCF signs to access this income and eligibility information require DCF FTI-certified staff to verify the information. Accordingly, cases that have been verified are referred to the W-2 agency by DCF to determine if the third-party-verified income and resources (e.g., assets)

are available to the individual and if they impact the applicant's or recipient's continuing TANF eligibility. The W-2 agency will determine the accuracy of any red flags raised by such data matches, and to provide affected individuals an opportunity to contest these data findings, before terminating, denying, suspending or reducing benefits to an applicant or recipient. In addition to DCF's program integrity efforts and as part of subrecipient contract monitoring, DCF monitors W-2 agency contract requirement and performance. This includes but is not limited to monitoring the W-2 agency's appropriate use of funds, program integrity efforts, and appropriate case management processing, etc.

15. DCF also participates in and reviews the Public Assistance Reporting Information System (PARIS) Interstate match to identify if an individual is receiving benefits in more than one state at the same time. DCF refers match results to the W-2 agency for investigation and appropriate case action.

16. Through an automated state system, DCF conducts a Prison Match to identify cash assistance recipients who are incarcerated and have been sentenced to a term in a Wisconsin prison. Incarceration information is reported through different systems depending on where the individual is incarcerated. For a county incarceration, the information is reported through VINELink or the Wisconsin Department of Corrections – Offender Search. For the state, it is reported through the State of Wisconsin Offender Locator. For the federal prisons, it is reported through the Federal Bureau of Prisons or as reported on the SSA Federal Prison file that is sent to the state system Client Assistance for Re-employment and Economic Support (CARES). DCF refers match results to the W-2 agency for investigation and appropriate case action.

17. DCF performs a multitude of data matches at various application or ongoing case management points in time. For example, monthly data matches of active TANF recipients who

also receive Foodshare with the federal National Directory of New Hires (NDNH), which contains nationwide W-4 information. The TANF matches involve all active adult recipients. NDNH matches are verified through a third-party vendor or by sending Manual Employment Verification (MEV) forms to employers. Responses from the third-party vendor and MEVs are provided to the W-2 Agency for investigation and appropriate case action.

18. DCF also runs daily and monthly matches against the Wisconsin Directory of New Hires, to identify applicants and recipients who have filed a W-4 with Wisconsin and thus potentially identify new employment that could impact TANF eligibility.

19. DCF provides multiple ways for individuals to report suspected fraud. The DCF website enables the public to electronically submit fraud allegations to DCF. DCF also has a Customer Service line and a fraud email box where individuals may report suspected fraud. These submissions may contain information regarding individuals suspected of public assistance fraud and are then referred to the W-2 Agency by DCF for investigation and appropriate case action.

20. In addition to computer matches, DCF requires each W-2 agency to identify and investigate potential fraud or error, and to establish claims to recover any benefits issued in error when their investigation determines that fraud or error has occurred. The W-2 agency tracks and documents all steps of the investigation process including claim creation in a state system called the Benefit Recovery and Investigation Tracking System (BRITS). BRITS also tracks repayment and if needed, refers the claim to DCF collections. Pursuant to Wis. Stat. § 49.151.(2), if the recipient is found to have committed an intentional program violation (IPV), the recipient may be ineligible for the W-2 program, including the receipt of payments, for either 6 months, a year, or permanently, dependent upon the number of IPVs the recipient has committed.

21. Moreover, as part of its internal controls, DCF conducts work participation verification reviews, which is a quality assurance process that selects representative samples of work-eligible assistance cases for purposes of verifying the accuracy of the W-2 agency's participation reporting processes, the accuracy of reporting, and compliance with federal and state regulations. DCF conducts a yearly review of a sample of cases according to Wisconsin's HHS approved Work Verification Plan. The W-2 agencies are required to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When the W-2 agencies determine benefits were issued as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, claims are created by the W-2 agency. If the client is found to have committed an IPV, the claim is established and recovery is sought from the client.

***Wisconsin's Process for Verifying Eligibility for TANF Assistance Based on Immigration Status***

22. Wisconsin requires W-2 agencies verify an applicant or recipient's qualified alien status or citizenship as part of TANF eligibility. Pursuant to W-2 Policy Manual section 4.1.2, citizenship status can be verified using a birth certificate, hospital birth record, US passport, Certificate of Nationalization or Citizenship, and other official documents. Qualified alien/non-citizen status can be verified using United States Citizenship and Immigration Services documents issued to the person according to their specific situation and status.

23. All applicants of W-2 must meet eligibility criteria with verification of said requirements. Verification documents are stored in the Electronic Case File (ECF) when the verification is paper documentation. System checks for all applicants are verified in real time for certain criteria such as SSN through the Social Security Administration or income when run through IEVS. Applicants are required to provide written documents of eligibility criteria and are

then saved in the ECF. The ECF is a shared application with DHS so when individuals apply for multiple programs, verification does not need to be repeated by each program area.

24. All applicants who pass financial and nonfinancial eligibility requirements are subject to quarterly monitoring by the Program Integrity and Customer Service Section. A random sample of participants are thoroughly monitored on nine criteria: citizenship, date of birth, identity, SSN, WI residency, assets, earned income, unearned income, and school enrollment for the household children. Agencies code the type of verification in CWW and PICSS audits the codes and verification documents. Agencies also receive automated alerts and notices when verification is not yet obtained or is due and addresses issues if they should arise.

25. As required by law, Wisconsin imposes safeguards to restrict the use and disclosure of information about individuals and families receiving assistance under TANF.

26. ] Wisconsin Stat. § 49.83 prohibits DCF and W-2 agencies from disclosing or using information about applicants or participants for purposes other than the administration of W-2 and related programs. It states in pertinent part, "… no person may use or disclose information concerning applicants and recipients of relief funded by a relief block grant, aid to families with dependent children, Wisconsin Works under ss. 49.141 to 49.161, …for any purpose not connected with the administration of the programs, except that the departments of children and families and health services may disclose, including by transmitting or granting access to electronic data, such information, including social security numbers, to the department of revenue for the sole purposes of administering state taxes, including verifying refundable individual income tax credits, and collecting debts owed to the department of revenue. Any person violating this section may be fined not less than $25 nor more than $500 or imprisoned in the county jail not less than 10 days nor more than one year or both.

27. DCF could have never anticipated the new routine use of TANF data announced in the SORN and therefore had no opportunity to draft disclosures to prior TANF recipients to disclose this new routine use of their data.

28. W-2 recipients are assured multiple times throughout the W-2 application process of the confidentiality of the information they provide. The right to have private information kept confidential is outlined in both the W-2 Participation Agreement and the publication, "A Help Guide to Rights and Responsibilities -Wisconsin Works (W-2)". In addition to this, all DCF forms include a reference to Wis Stats s. 49.83, which explicitly prohibits the disclosure of participant information for reasons other than program administration.

***Federal Oversight of Wisconsin TANF Program***

29. Pursuant to federal statute and regulation, DCF provides certain data on families receiving TANF assistance to ACF on a quarterly basis, including quarterly reporting, the TANF Annual Report, and quarterly financial reports.

30. Among other things, DCF provides ACF with the data fields specified in a publication titled "ACF-199 TANF and ACF-209 SSPMOE Data Reporting Instructions," OMB Control Number 0970-0338. These include, for example, social security number, date of birth, and, as to immigration status, an individual's status as either "U.S. Citizen," "Qualified alien," or "Unknown."

31. DCF provides this information for all families receiving TANF assistance in Wisconsin.

32. Pursuant to the federal Single Audit Act, DCF engages an auditor, the Wisconsin Legislative Audit Bureau (LAB), with respect to its TANF program. This audit takes place every three years, or more often as deemed by the LAB. LAB often reviews aspects of eligibility and reviews DCF's compliance with 2 CFR Part 200.500 and 200.518.

***TANF SORN***

33. I understand that on June 23, 2026, U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), published a System of Records Notice ("SORN") regarding the Temporary Assistance for Needy Families (TANF) program. 91 Fed. Reg. 37406 (June 23, 2026).

34. ***First***, the TANF SORN adds two new purposes. It replaces one of the prior purposes of the TANF Data System of Records ("to determine whether grantees are meeting certain requirements prescribed by the Social Security Act, including work participation and time-limit requirements") with the following: "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV–A of the Social Security Act".

35. The TANF SORN adds a new additional purpose:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Naturalization Service (INS)). See 45 U.S.C. 265.7(b); 42 U.S.C. 1320b–7(d); 6 U.S.C. 552(d).

36. ***Second***, the TANF SORN significantly broadens the categories of records included in the system. Now, the TANF Data System of Records includes not only information "obtained from TANF grantee agencies" (*i.e.*, State agencies), but also "verification information" obtained

"from other HHS records; and from other federal or state agencies or entities engaged to assist ACF with program integrity reviews or projects." 91 Fed. Reg. at 37408.

37. ***Third***, the TANF SORN adds a new "routine use" to the TANF Data System of Records that provides broad authority for ACF to share the records with other states, other federal agencies, and other unspecified "entit[ies]":

> *Disclosure to Another Agency/Entity Engaged to Assist ACF With Program Integrity Reviews or Projects, for TANF Program Compliance Purposes.* Records may be disclosed from this system of records to another federal or grantee agency or entity engaged by ACF (*e.g.,* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status.

38. ***Fourth***, the TANF SORN lists new statutory authority. In addition to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-619 (the "TANF Statute"), the TANF SORN adds two additional statutes: 42 U.S.C. § 1320b–7 and 8 U.S.C. § 1373.

***HARM To WISCONSIN***

39. Without Court intervention, Wisconsin faces harm stemming from the TANF SORN.

40. The TANF SORN states that one of the purposes of the modified system of records is "to ensure and confirm grantee compliance with TANF program requirements through agency oversight activities including but not limited to program integrity reviews (e.g. comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (e.g. financial audits, programmatic audits, and fraud investigations), and monitoring (e.g. regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures)."

41. As noted above, apart from the Single Audit and the data reporting required by the TANF Statute, *see* 42 U.S.C. § 611, ACF has not historically conducted any of the other listed

"agency oversight activities." ACF doing so as a result of the TANF SORN would require Wisconsin to expend time and resources responding to ACF requests. For example, when responding to ACF requests, DCF would likely duplicate efforts it already made to respond to the LAB audit, which would include staff time and leadership oversight. Additionally, if additional data is requested as a result of additional oversight activities, it may require costly IT hours to query the data.

42. Earlier this year, ACF announced that it had "froze[n] access to" TANF funds in five states. *See* https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. If the agency oversight activities were to result in similar action, that would likely have significant programmatic and operational impacts for Wisconsin, with likely staffing reductions and the elimination of non-mandated services. An immediate freeze is immediate harm to TANF-funded programs, including but not limited to cash assistance for low-income families, child care subsidies to working families, as well as other economic support programs for vulnerable populations. Further, these federal funds also pay for state administrative staff responsible for policy oversight, program integrity, and payment error identification and recoupment efforts. Delays in reimbursements will have negative consequences, as service providers rely on regular payments in order to serve TANF-eligible families.

43. Similarly, HHS announced last year that it was reversing decades of agency policy and intends to share data from the Medicaid program with DHS and Immigration and Customs Enforcement (ICE) for use in immigration enforcement activities. *See* HHS Centers for Medicare & Medicaid Services, *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security* (Nov. 25, 2025), available at https://www.federalregister.gov/documents/2025/11/25/2025-20911/notice-of-medicaid-

information-sharing-between-the-centers-for-medicare-and-medicaid-services-and. In this environment, the SORN's announcement that ACF plans to begin sharing Wisconsin's TANF recipients' data with DHS will cause additional harm to Wisconsin, as it risks eroding the trust that DCF and W-2 agencies have developed with immigrant communities in Wisconsin.

44. Further, the TANF SORN will erode the trust that Wisconsin has developed with immigrant communities and deter individuals from participating in TANF. As stated above, Wisconsin has always required TANF applicants who are not citizens to attest that they have an eligible immigration status, and has told applicants that State and local TANF administrators would confirm that status with the federal government. But Wisconsin has also encouraged eligible households—including families with U.S. citizen children who are and have always been eligible for TANF— to take advantage of TANF and other assistance to help raise their children and families out of poverty. Wisconsin has also made assurances to TANF recipients that their information will be safeguarded and subject to disclosure only in narrow, defined circumstances, as required by statute. If ACF can proceed with sharing TANF data with DHS, without clearly defined purposes and limits required by federal law, then community fears that DHS will use that data for other purposes will impede that public trust and chill participation in Wisconsin's TANF programs by citizens and qualified non-citizens alike. This could lead to eligible individuals not seeking benefits in multiple programs at the detriment of Wisconsin families.

45. This chilling effect will extend beyond immigration-related concerns to individuals who have concerns about the broad authority asserted in the SORN to share their sensitive personal information with any federal, State, or private entity. Individuals are less likely to participate in TANF-funded programs if they believe that doing so will expose the sensitive personal information of themselves and their family members to widespread disclosure. Such concerns are bolstered by

public reporting into DHS's efforts to use consolidated data from State benefit programs and other sources to support a variety of surveillance activities. Further, any potential data breach or mishandling of this data by these entities would have the potential to further erode trust in Wisconsin's TANF programs.

46. If fewer individuals participate in TANF, Wisconsin will suffer significant harms. W-2 advances the individual economic security of participants by providing case management services with the goal of job attainment and retention. Reducing family access to TANF is associated with increased risk of involvement with the child welfare system (Slack et al., 2023); whereas, increases in family access to TANF is associated with reductions in deep child welfare system involvement (e.g., foster care placement).

47. Wisconsin will also incur a financial cost in updating communications with TANF applicants or participants to notify them of how their personal data is collected, used, and shared. Areas impacted would include education, costly automation and system enhancements including notice updates and required forms, staff training for the Bureau of Working Families' employees and for the W-2 agency staff, additional administrative work to inform the applicant/participant, as well as potential legislative changes. Examples include the process for evaluating the legal requirements, incorporating those requirements into new disclosures, and then the procedures for actually effectuating the changes, such as the costs of updating paper forms.

DATED: July 30, 2026

PATARA HORN

DECLARANT