# EXHIBIT 28

**SUPPLEMENTAL DECLARATION OF Lisa Witchey**

I, Lisa Witchey, am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except as to those matters stated upon information and belief; as to those matters, I believe them to be true. I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct

1. I am the California Work Opportunities and Responsibility to Kids (CalWORKs) and Temporary Assistance for Needy Families (TANF) Director in the California Department of Social Services (CDSS) and have held this position since December 2022. I oversee the CalWORKs and Family Resilience Branch, which administers the CalWORKs program, California's version of TANF. I am submitting this Declaration to supplement my declaration dated August 3, 2026, regarding information I have learned since then.

2. After this action was filed, I learned for the first time that, in September 2025, ACF shared individual-level TANF data collected from states for Fiscal Year 2024 with the Department of Homeland Security (DHS) (the "September 2025 Data Transfer"). I understand that ACF asserts that this data sharing was for "program integrity" purposes and was authorized by Routine Use 7 of the then-effective system of records notice, which governs disclosure of information to "contractors, grantees, consultants, or volunteers."

3. To the best of my knowledge, neither CDSS nor any CalWORKs recipients were ever notified about the September 2025 Data Transfer and that Transfer was not otherwise made public prior to the initiation of this lawsuit. I am not aware of any other instance in which ACF has shared any TANF data collected from States with DHS. California faces harm stemming from the September 2025 Data Transfer and the policy underlying it.

4. CDSS must undertake the process of review to determine whether we must update our disclosures prospectively based on ACF's assertion that state TANF data can be transferred to DHS and other entities as "contractors, grantees, consultants, or volunteers." CDSS must also undertake the process of review to determine whether we must provide notice to current or past CalWORKs recipients whose data may have been provided to DHS as part of the September 2025 Data Transfer. This review process is itself time and resource intensive.

5. Any updates to California's application or individualized notice to current and former recipients about the previous disclosure would be resource intensive and costly. These updates also differ from the notice that would be required under the proposed SORN. Paper applications can take up to a year to update. California will also need to update electronic platforms. If individualized notification is required, CDSS would also be required to identify every impacted current or former participant—for whom CDSS may not have current contact information—to provide direct notice. However, even generalized notices to the general public or to the CalWORKs population generally, are still time intensive. Further, the administrative burden will affect CDSS program staff, as well as county eligibility workers and program staff who provide direct service and support to CalWORKs recipients, when participants have questions or concerns about the disclosure. Specifically, the County Health and Human Services Agencies that supervise and administer CalWORKs at the local level are likely to receive increased communications from participants who are alarmed by the notice or who have questions about the scope of the disclosure and impact to their case and families, as well as their legal rights and protections. They may also see an increase in grievances regarding the retroactive nature of the disclosure. There may also be an increased amount of in-person agency visits due to the sensitive nature of the disclosure.

6. I understand that DHS continues to hold the data from Plaintiff States that it obtained in the September 2025 Data Transfer, and both DHS and ACF maintain the ability to use that data. Public awareness that this data sharing has already occurred at least once without any notice, and that the data can be used by DHS, is likely to have a chilling effect on future CalWORKs applications and use of public benefits. The September 2025 Data Transfer demonstrates to the public that any data a CalWORKs applicant or participant provides to CDSS may be shared with DHS, an organization that has terrorized immigrant communities throughout the nation. Further, public awareness that data sharing with DHS or other entities will continue under ACF's newly disclosed policy of sharing data with DHS or other entities under Routine Use 7 is likely to have the same effect. The erosion of public trust in state and federal government to protect personal information will likely cause more families to forgo seeking governmental assistance and/or public benefits across all programs. In many cases, the fear of arrest and detention of the individual or a family member due to the sharing of personal information provided for receipt of public benefits will also likely cause more families to forgo seeking that benefit.

7. This chilling effect will lead to decreased participation with the same impacts as those identified in my August 3, 2026, declaration, including increasing the risk for vulnerable children to be placed in institutional settings due to lack of financial support and resources to meet their basic needs. If fewer individuals participate in CalWORKs, California will suffer the significant harms described in my August 3, 2026, declaration; harms that are at odds with the purposes of the TANF program to assist needy families so that they can work towards self-sufficiency, their children may be cared for in their family homes, and family stability may be maintained.

8. The risk of a chilling effect from the September 2025 Data Transfer and continued disclosure pursuant to Routine Use 7 is likely to be even higher than under the proposed SORN. This is because applicants and recipients will now have an awareness that their data has been shared without notice and without following applicable legal and procedural safeguards.

9. Sharing the data that Plaintiff States provide to ACF as part of the quarterly reporting requirements for the purposes espoused by ACF—i.e. for "program integrity"—also risks future harm to Plaintiff States, including that ACF may take enforcement action based on data that may be outdated and stale. Reliance on this isolated, repurposed data can thus lead to incorrect conclusions about program integrity. DHS already has CalWORKs recipient data in its hands, making it possible that the newly announced oversight and enforcement activities could be imminent.

DATED: August 21, 2026

Lisa Witchey

__________________________

Lisa Witchey