**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

State of New York, et al.

*Plaintiffs*,

vs.

Administration for Children and Families, et al.

*Defendants*.

Civil Action No. 1:26-cv-2726-JEB

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' OPPOSITION TO A PRELIMINARY INJUNCTION AND STAY UNDER 5 U.S.C. §705**

## TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 3

LEGAL STANDARD ........ 5

ARGUMENT ........ 5

I. PLAINTIFFS CANNOT ESTABLISH STANDING LET ALONE IRREPARABLE HARM ........ 5

A. Plaintiffs' alleged chilling effects are insufficient to establish standing ........ 6

B. Plaintiffs will not be harmed through compliance with the law ........ 8

C. Enforcement action under the statute does not harm the Plaintiffs ........ 9

D. The 2025 Disclosure illustrates that Plaintiffs have not and will not suffer any harm ........ 11

E. Plaintiffs' Privacy Act Claims Cannot Establish Irreparable Harm ........ 14

II. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS ........ 15

A. Plaintiff Fails to State a Claim Under the APA Because Their APA Claims Are Predicated on the Privacy Act ........ 15

B. Routine Use Ten Complies with the Privacy Act. ........ 20

C. Routine Use 10 Complies with the TANF statute ........ 23

D. The SORN Complies with the APA ........ 26

1. Routine Use 10 is Lawful ........ 27

2. Routine Use 10 is Neither Arbitrary Nor Capricious ........ 27

E. Routine Use 10 Complies with Both Section 405 of the Social Security Act as well as the Trade Secrets Act. ........ 28

F. The Spending Clause is Inapplicable to these facts. ........ 29

III. THE EQUITABLE FACTORS WEIGH AGAINST PRELIMINARY INJUNCTIVE RELEIF ........ 30

CONCLUSION ........ 31

## TABLE OF AUTHORITIES

### CASES

*Am. Fed'n of Tchrs. v. Bessen*,
152 F.4th 162 (4th Cir. 2025), *abrogated on other grounds by Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361 (4th Cir. 2026) .................... 19, 20

*Amalgamated Transit Union v. Skinner*,
894 F.2d 1362 (D.C. Cir. 1990) .................... 17

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
397 U.S. 150 (1970) .................... 17

*Bartel v. F.A.A.*,
725 F.2d 1403 (D.C.Cir.1984) .................... 28

*Bennett v. Spear*,
520 U.S. 154 (1997) .................... 16, 17

*Berardi v. U.S. Dep't of the Air Force*,
Civ. A. No. 05-2269 (JR), 2006 WL 8448631 (D.D.C. Sep. 29, 2006) .................... 19

*Bierly v. Dep't of Def.*,
Case No. 23-cv-2386-RCL, 2024 WL 4227154 (D.D.C. Sep. 18, 2024) .................... 19

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) .................... 14, 15, 16

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .................... 15

*Brodsky v. U.S. Nuclear Regul. Comm'n*,
704 F.3d 113 (2d Cir. 2013) .................... 26

*California v. Texas*,
593 U.S. 659 (2021) .................... 7

*Cell Assocs., Inc. v. NIH, Dep't of Health, Educ. & Welfare*,
579 F.2d 1155 (9th Cir. 1978) .................... 18, 19

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
536 U.S. 424 (2002) .................... 25

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................... 6, 8, 13

*Cookeville Reg'l Med. Ctr. v. Leavitt*,
531 F.3d 844 (D.C. Cir. 2008) .................... 12

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .... 26

*Doe v. Chao*,
435 F.3d 492 (4th Cir. 2006) .... 20

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988) .... 18, 20

*Doe v. U.S. Dep't of Justice*,
660 F. Supp. 2d 31 (D.D.C. 2009) .... 21

*El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*,
396 F.3d 1265 (D.C. Cir. 2005) .... 15

*FAA v. Cooper*,
566 U.S. 284 (2012) .... 16, 18

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .... 6, 8

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005) .... 9

*Garcia v. Vilsack*,
563 F.3d 519 (D.C. Cir. 2009) .... 15

*Haleem v. U.S. Dep't of Def.*,
Civ. A. No. 23-1471 (JEB), 2024 WL 230289 (D.D.C. Jan. 22, 2024) .... 18, 19

*Harrison v. Fed. Bureau of Prisons*,
248 F. Supp. 3d 172 (D.D.C. 2017) .... 19

*Hinck v. United States*,
550 U.S. 501 (2007) .... 19

*Jones v. HUD*,
No. 11 CV 0846, 2012 WL 1940845 (E.D.N.Y. May 29, 2012) .... 15, 16

*Koretoff v. Vilsack*,
614 F.3d 532 (D.C. Cir. 2010) .... 14, 15, 16

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
---F. Supp. 3d---, 2016 WL 1784297 (D.D.C. June 22, 2026),
*appeal filed*, No. 26-5243 (D.C. Cir. June 29, 2026) .... 20

*Levy v. Sterling Holding Co.*,
544 F.3d 494 (3d Cir. 2008) .... 12

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .......... 16, 17

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 6

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 17

*Make the Road New York v. Noem*,
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) .......... 5

*Match-E-Be-Nash-She- Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) .......... 17

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) .......... 17

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 26, 27

*MST Exp. v. Dep't of Transp.*,
108 F.3d 401 (D.C. Cir. 1997) .......... 12

*Munaf v. Geren*,
553 U.S. 674 (2008) .......... 5, 6

*Mylan Pharms., Inc. v. Shalala*,
81 F. Supp. 2d 30 (D.D.C. 2000) .......... 31

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) .......... 29

*New York v. U.S. Dep't of Educ.*,
477 F. Supp. 3d 279 (S.D.N.Y. 2020) .......... 9

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 5, 31

*Parks v. IRS*,
618 F.2d 677 (10th Cir. 1980) .......... 19

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 29, 30

*Pennsylvania v. DeVos*,
480 F. Supp. 3d 47 (D.D.C. 2020) .......... 9

*Poss v. Kern*,
No. 23-cv-2199 (DLF), 2024 WL 4286088 (D.D.C. Sep. 25, 2024) .......... 18

*Rimmer v. Holder*,
700 F.3d 246 (6th Cir. 2012) .......... 15

*South Dakota v. Dole*,
483 U.S. 203 (1987) .......... 29

*Sussman v. U.S. Marshals Serv.*,
494 F.3d 1106 (D.C. Cir. 2007) .......... 18

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 6

*Tripp v. Dep't of Def.*,
193 F. Supp. 2d 229 (D.D.C. 2002) .......... 19

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*,
978 F.2d 68 (2d Cir. 1992) .......... 26

*United States v. Texas*,
599 U.S. 670 (2023) .......... 7

*Westcott v. McHugh*,
39 F. Supp. 3d 21 (D.D.C. 2014) .......... 18

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) .......... 6

*Winter v. Nat'l Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 5

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 8 .......... 29

**STATUTES**

5 U.S.C. § 552a .......... *passim*

5 U.S.C. § 553 .......... 27

5 U.S.C. § 702 .......... 29

5 U.S.C. § 704 .......... 15

5 U.S.C. § 705 .......... 1, 5, 31

5 U.S.C. § 706 .......... 26

7 U.S.C. § 2011 *et seq.* .......... 3

18 U.S.C. § 1905 .......... 29

31 U.S.C. § 7503 .......... *passim*

42 U.S.C. § 405 .......... 28

42 U.S.C. § 601 *et seq.* .......... 3

42 U.S.C. § 602 .......... 3

42 U.S.C. § 603 .......... 3

42 U.S.C. § 604 .......... 3

42 U.S.C. § 608 .......... 25

42 U.S.C. § 609 .......... *passim*

42 U.S.C. § 610 .......... 11

42 U.S.C. § 611 .......... 22

42 U.S.C. § 617 .......... 10, 24

42 U.S.C. § 1320b-7 .......... 25

42 U.S.C. § 1396a *et seq.* .......... 3

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
Pub. L. No. 104–193, 110 Stat. 2105 .......... 3

**RULES**

Fed. R. Civ. P. 12 .......... 6, 31

**REGULATIONS**

45 C.F.R. §§ 260-265 .......... 24

45 C.F.R. § 262.1 .......... 11

45 C.F.R. § 262.3 .......... 10, 24

45 C.F.R. § 262.4 .......... 10, 11

45 C.F.R. § 262.6 .......... 10, 11

45 C.F.R. § 262.7 .......... 11

45 C.F.R. § 262.10 .......... 10

Statement of Organization, Functions, and Delegation of Authority,
62 Fed Reg. 52,133 (Oct. 6, 1997) .......... 3

Privacy Act of 1974; System of Records Notice,
67 Fed. Reg. 48,914 (July 26, 2002) .......... 3

Privacy Act of 1974; System of Records Notice,
80 Fed. Reg. 17,894 (Apr. 2, 2015) .......... 4, 12, 22

Privacy Act of 1974; System of Records,
89 Fed. Reg. 25,880 (Apr. 12, 2024) .......... 23

Privacy Act of 1974; System of Records Notice,
91 Fed. Reg. 37,406 (June 23, 2026) .......... *passim*

Privacy Act of 1974; System of Records,
91 Fed. Reg. 45,278 (July 20, 2026) .......... 4

Privacy Act of 1974; System of Records,
91 Fed. Reg. 53,876 (Aug. 20, 2026) .......... 4

**OTHER AUTHORITIES**

H.R. Rep. No. 104–651 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2183 .......... 3

H.R. Rep. No. 104–725 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 2649 .......... 3

## INTRODUCTION

Plaintiffs are twenty-two states, two governors' offices, and the District of Columbia who collectively challenge revision to a system of records notice promulgated by the Administration for Children and Families (ACF), a component of the Department of Health and Human Services (HHS) to support the administration of the Temporary Assistance for Needy Families (TANF) program. Plaintiffs seek a preliminary injunction and a stay under 5 U.S.C. § 705. They allege that ACF's modification of the system of records notice (SORN) runs afoul of both the Privacy Act and the Administrative Procedure Act (APA) and that they face a danger of irreparable harm. But Plaintiffs' application for preliminary injunctive relief fails at every level.

Plaintiffs are first unlikely to succeed on the merits because they have failed to demonstrate that they have standing to bring this suit. Plaintiffs have alleged speculative chilling effects from Defendant's alleged actions that could only hypothetically lead to financial consequences. They also fail to establish any causation between the complained of conduct (*i.e*., revision to the SORN), and the "harms" they believe they will suffer, because any harm would be the end result of a chain of speculative leaps. Plaintiffs also mistake the ordinary compliance costs of interacting with federal law for injuries that are cognizable under Article III of the Constitution.

Plaintiffs are also unlikely to succeed on the merits because they incorrectly view the revisions to the SORN as imposing new requirements on them, when in fact the prior versions of the SORN permitted the same data to be disclosed for most of the last decade.

Plaintiffs also improperly attempt to use the APA to bring Privacy Act claims. The APA does not grant a cause of action where there is already another adequate remedy, or where another statutory review scheme precludes judicial review. Here, Plaintiffs as States are not entitled to review under the Privacy Act generally. But the choices made by Congress about what remedies

are (or are not) available for violations of the Privacy Act cannot be evaded by pleading an APA claim.

Even were the Court to consider Plaintiffs' claims under the APA, they are unlikely to succeed. The SORN itself complies with the Privacy Act because the purpose of the data disclosure has been noticed to the public and the Routine Use complained of by Plaintiffs is authorized by statute. Similarly, because the Routine Use is authorized by statute it is neither arbitrary nor capricious.

Not only do Plaintiffs fail at the first prong of the preliminary injunction test, but they also fail to demonstrate irreparable harm, the lynch pin of any emergency relief. Plaintiffs' theory of harm is undermined at the outset because they cannot articulate a single harm traceable to a prior data transmission, from 2025, that Plaintiffs only now complain of. Because Plaintiffs are unable to articulate any harms beyond speculative ripple effects or ordinary compliance costs, they cannot demonstrate a need for an emergency injunction or stay.

Nor can Plaintiffs ignore the remedies provided for in the Privacy Act in favor of speculative harms that amount to little more than generalized anxiety caused by lawful – and long-standing -- disclosure of data by government agencies. The same data disclosure that now distresses Plaintiffs could have been lawfully performed for over a decade under previously promulgated Routine Uses. Because the Privacy Act provides for damages remedies, Plaintiffs' asserted harms, were they to occur, can be remedied under that statute.

Finally, the balance of equities and public interest, which merge where the Government is the opposing party, favor Defendants. Plaintiffs have not made any serious effort to explain how the balance favors their position. In contrast, Defendants have a significant interest in carrying out congressional intent and ensuring that public money is correctly spent and accounted for.

**BACKGROUND**

Prior to 1996, three important federal programs provided assistance to people in need: Aid to Families with Dependent Children (AFDC), 42 U.S.C. § 601 *et seq.*; Medicaid, *id*. § 1396a *et seq.*; and the Food Stamp program, 7 U.S.C. § 2011 *et seq*. In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub. L. No. 104–193, 110 Stat. 2105 (codified as amended in sections of Title 42 and other titles of U.S.C.). PRWORA replaced AFDC with the TANF program. Unlike AFDC, which was an individual entitlement program, TANF provides federal block grants that states may use to administer their own TANF public assistance programs. *See* 42 U.S.C. § 601 *et seq.*; H.R. Rep. No. 104–725, at 261 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 2649; H.R. Rep. No. 104–651, at 1322 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2183, 2381. The amount of a state's TANF grant is based on the amount of the reimbursement paid to the state under AFDC during a historical base period. *See* 42 U.S.C. § 603. In order to receive a TANF grant, a state must submit a state plan, which HHS must determine is complete, describing how the state intends to use the grant. *Id*. § 602. A state may spend its grant "in any manner that is reasonably calculated to accomplish the purpose of" the TANF program, or "in any manner that the State was authorized to use amounts received" under AFDC. *Id*. § 604(a).

Administration of TANF has been delegated to ACF. *See* Statement of Organization, Functions, and Delegation of Authority, 62 Fed Reg. 52,133 (Oct. 6, 1997). In 2002, ACF published notice of what would become system of record notice 09-80-0375 (SORN). Privacy Act of 1974; System of Records Notice, 67 Fed. Reg. 48,914 (July 26, 2002). The SORN was promulgated following the passage of PRWORA as well as its implementing regulations. *See id*. Several amendments and revisions followed. Of relevance to this litigation are modifications to the TANF SORN made in 2015, wherein ACF promulgated routine uses allowing disclosure to

contractors and others. *See* Privacy Act of 1974; System of Records Notice, 80 Fed. Reg. 17,894, 17,903-04 (Apr. 2, 2015). Specifically, ACF adopted Routine Use 7, which provides that ACF may disclose information to "contractors, grantees, consultants, or volunteers performing or working on a contract, service, grant, cooperative agreement, job, or other activity for HHS and who have a need to have access to the information in the performance of their duties or activities for HHS." *Id*. at 17,904. In June 2026, ACF provided notice of further revisions to the SORN. Privacy Act of 1974; System of Records Notice, 91 Fed. Reg. 37,406 (June 23, 2026). Specifically, ACF revised its authorities, the purpose of the SORN, and added a new Routine Use, Routine Use 10. *Id*. Routine Use 10 provides that ACF may disclose information "to another federal or grantee agency or entity engaged by ACF (e.g., DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status." *Id*. at 37,409. The initial comment period was extended from July 23, 2026, to August 11, 2026. Privacy Act of 1974; System of Records, 91 Fed. Reg. 45,278 (July 20, 2026). Routine Use 10 is scheduled to become effective on September 30, 2026. Privacy Act of 1974; System of Records, 91 Fed. Reg. 53,876 (Aug. 20, 2026).

On August 3, 2026, Plaintiffs filed their Complaint, ECF No. 1, as well as a motion for preliminary injunction. Pls.' Mot. for a TRO, Prelim. Inj. & Stay Under 5 U.S.C. § 705, ECF No. 14. Plaintiffs refiled their motion on August 5 after the initial motion was struck by order of the Court. Pls.' Mot. for a Prelim. Inj. & Stay Under 5 U.S.C. § 705, ECF No. 31. Plaintiffs then amended their Complaint First Am. Compl. ECF. No. 42 ("Am. Compl."), and filed an amended motion on August 25. Pls.' Mot. for a Prelim. Inj. & Stay Under 5 U.S.C. § 705, ECF No. 45 ("Pls.' Mot.").

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). A district court should enter preliminary relief only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted). The moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20. Finally, when "the Government is the opposing party[,]" the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The APA authorizes a district court, in reviewing agency action, to grant "[r]elief pending review" when and "to the extent necessary to prevent irreparable injury[.]" 5 U.S.C. § 705. Specifically, if warranted, the court may "issue all necessary and appropriate process to postpone the effective date of any agency action or to preserve status or rights pending conclusion of the review proceedings." *Id*; *see also Make the Road New York v. Noem*, No. 25-5320, 2025 WL 3563313, at *33 (D.C. Cir. Nov. 22, 2025).

## ARGUMENT

### I. PLAINTIFFS CANNOT ESTABLISH STANDING LET ALONE IRREPARABLE HARM

Despite bearing the burden to establish standing Plaintiffs conspicuously fail to assert any theory explaining how they satisfy the required elements to bring this action. *See generally* Am. Compl.; Pls. Mot. Instead, Plaintiffs recycle their alleged injuries to double as alleged irreparable harms. *Compare* Pls. Mot. at 12-16 *with id.* at 38-44.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). To support standing, "an injury must be concrete, particularized, and actual or imminent[.]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.* (quoting *Lujan*, 504 U.S. at 564 n.2). To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon.").

At the preliminary injunction stage, a lack of Article III standing is grounds for denial of the motion, and can also justify outright dismissal of the suit. *See Munaf*, 553 U.S. at 691 ("Review of a preliminary injunction is not confined to the act of granting the injunction, but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of the bill, and, if so, to directing a final decree dismissing it." (citation modified)); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Plaintiffs assert three distinct theories in support of their claimed injuries. None is sufficient to convey standing.

**A. Plaintiffs' alleged chilling effects are insufficient to establish standing**

Plaintiffs' first theory of injury focuses on supposed chilling effects that could lead to speculative financial consequences arising from Defendants' actions. Pls. Mot. at 12-14, 39-40. As they tell it, Defendants' actions will deter individuals from participating in TANF. Suppl. Decl. of Stacy L. Rogers ¶ 7, ECF No. 45-32 ("Maryland Decl.") (Plaintiffs do not claim that their injuries materially differ from each other; Maryland's declaration is, consequently, used for illustrative purposes). A decline in participation due to this "chilling effect," *Id.* ¶ 6, will then allegedly burden Plaintiffs with more fiscal responsibility because former enrollees will no longer take advantage of other TANF program resources such as "childcare scholarships, transportation assistance like bus passes, and vital workforce development supports." *Id.* ¶ 7.

This is not a sound basis for Article III standing. Many "federal policies . . . generate indirect effects on state revenues or state spending," and a state's standing assertions are "more attenuated" when federal action "produce[s] only those kinds of indirect effects." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). Indeed, Plaintiffs' theory is nearly identical to the one a different set of state plaintiffs advanced in *California v. Texas*, 593 U.S. 659 (2021), that similarly relied upon conjecture about impact to state finances. In *California*, a consortium of states alleged that the minimum essential coverage provision of the Affordable Care Act (ACA) would lead to increased enrollment in Medicaid, CHIP, and state employee health plans, giving them standing to challenge that provision. *Id.* at 674–75. The Supreme Court rejected this theory because there was no sound evidence that more people would sign up for these state programs because of the ACA's requirement. *Id.* at 675–76.

The standing theory of this case is similarly attenuated. It assumes: (1) individuals will *not* sign up for TANF benefits for which they are eligible once they learn of Defendants' information

sharing practices, even though federal law has long allowed such information sharing and benefits have long been restricted based on immigration status; (2) those individuals will continue to require state assistance; and (3) the failure to provide benefits will result in higher costs to the states as the negative consequences from, for example, an individual no longer having a bus pass creating an ever increasing cascade of costs to Plaintiffs. This "highly attenuated chain of possibilities" is not a sound basis for invoking district court jurisdiction. *Clapper*, 568 U.S. at 410.

Nor does it establish causation. As the Supreme Court has explained, "the line of causation between the illegal conduct and injury – the links in the chain of causation, . . . must not be too speculative or too attenuated." *All. for Hippocratic Med.*, 602 U.S. at 383 (internal citations omitted). "The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *Id*. "The causation requirement also rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *Id*. Plaintiffs allegations fail on both counts because it is impossible to predict how TANF recipients will react to learning about data sharing and because even if some TANF recipients cease their participation that does not necessarily lead to the cascading harms that Plaintiffs allege. Plaintiffs also lack standing because they are not within the APA's zone of interest, as only "individuals" are permitted to sue under the Privacy Act. That argument is addressed in the merits discussion, *infra* at Part IIA.

**B. Plaintiffs will not be harmed through compliance with the law**

Plaintiffs' second theory of injury fares no better. Plaintiffs argue that they will be irreparably harmed because the SORN will "impose on Plaintiff States an immediate obligation to review [and revise] their disclosures to TANF applicants." Pls. Mot. at 14-15, 40-42. But these are

"ordinary compliance costs" which are typically insufficient to constitute irreparable harm. *See New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 303 (S.D.N.Y. 2020) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005)). This is a sensible approach given that, were the rule as Plaintiffs wished, there would be no need to establish the likelihood of immediate and irreparable injury where any government regulatory action is challenged because there will always be a compliance cost with the new regulation. *See id*.

Courts in this district have also opined on ordinary compliance costs. For example, in *Pennsylvania v. DeVos*, the court noted that "[e]conomic harm may . . . be irreparable if the loss is serious in terms of its effect on the plaintiff[,]" but ultimately concluded that the plaintiff states in that case, which concerned pandemic era regulations promulgated by the Department of Education, had "not demonstrated that complying with the Final Rule would impose significant injuries on their operations[.]" 480 F. Supp. 3d 47, 67-68 (D.D.C. 2020) (citation omitted). Similarly, in this case Plaintiffs have not alleged any "serious" losses or that the SORN could somehow create "significant injuries" to their operations, but rather have instead asserted costs that "are certainly not zero" but "are not so substantial relative to Plaintiffs' budgets[.]" *See id*. at 68.

### C. Enforcement action under the statute does not harm the Plaintiffs

Plaintiffs' final theory is even more far-fetched. Plaintiffs' assert that the SORN will place them "at immediate risk of new oversight and enforcement actions." Pls. Mot. at 15, 42. Plaintiffs themselves acknowledge that ACF has general authority, subject to auditing procedures, to penalize a State for violations of the statute. *Id.* at 22. The SORN does not represent "new oversight and enforcement action." Rather, as discussed at length *infra*, the SORN is instead a clarification of pre-existing rules that already justified the disclosure of data that Plaintiffs find objectionable.

Additionally, the SORN does not alter either the statutory or regulatory framework that ACF utilizes to assess penalties for noncompliance. The TANF statute provides the steps that ACF and HHS must follow when implementing a penalty against a state for noncompliance with the TANF program requirements, including when an audit finds that the state's funds have been used in violation of the law, or a finding that the state failed to submit required reports. 42 U.S.C. § 609(a); 45 C.F.R. §§ 262.3, 263.10; *see also* 42 U.S.C. § 617 ("No officer or employee of the Federal Government may regulate the conduct of States under" the TANF program "except to the extent expressly provided in this part.").

First, the Government identifies if a state is subject to a penalty under TANF based on audits, reviews, submitted state records, and other data sources, as appropriate. 45 C.F.R. § 262.3. Second, if the agency finds a state violation, the Government must notify the state of the violation in writing. 42 U.S.C. § 609(c)(1)(A); 45 C.F.R. § 262.4(a). This notification must: (1) specify the penalty provision at issue, including the penalty amount; (2) specify the source of information and the reason for the decision; (3) invite the state to present its arguments; and (4) explain how the state can, where applicable, dispute the penalty, submit a reasonable cause justification or other defense, or submit a corrective compliance plan. 45 C.F.R. § 262.4(a).

Third, the federal agency must allow the state 60 days to submit a written response that either outlines the state's defenses against the finding or details the state's corrective compliance plan, which outlines how the state will discontinue or correct the violation in a timely manner and how the state will ensure continuing compliance. 42 U.S.C. § 609(c)(1)(A)–(B); 45 C.F.R. §§ 262.4(b), 262.6(d). If the federal agency finds that the penalty was determined erroneously or the state "has adequately demonstrated that it had reasonable cause for failing to meet one or more requirements," the Government will not impose the penalty. 45 C.F.R. § 262.4(c). Otherwise, the

Government will notify the state in writing of its findings and decision regarding the state's defenses or its corrective compliance plan, if this was submitted, within 60 days of the state's response. 42 U.S.C. § 609(c)(1)(D); 45 C.F.R. § 262.4(f).

If the state's reasonable cause argument or other defenses fail, and it did not submit a corrective compliance plan, the state has an additional 60 days from the date it receives the Government's second notice and finding to submit this plan. 45 C.F.R. § 262.6(c). The federal agency can only impose penalties on the state if it rejects the state's proposed compliance plan or if the state otherwise does not correct or discontinue the violation. 42 U.S.C. § 609(c)(1)(D), (c)(2); *see also* 42 U.S.C. § 609(c)(3).

Fourth, if the Government takes any adverse action against a State—which may include the imposition of a penalty—ACF must notify the State within five days. *Id.* § 610(a). This notification must include "the factual and legal basis for taking the penalty in sufficient detail for the State to be able to respond in an appeal." 45 C.F.R. § 262.7(a)(2). Finally, after this decision, the state has sixty days to appeal, 42 U.S.C. § 610(b)(1), and upon a final decision, the penalty can include the amount by which a state misused its TANF funds, an additional five percent penalty if the misuse was intentional, or the outstanding loan amount for failure to repay a federal loan, 45 C.F.R. § 262.1.

The SORN does not alter any of the above-described processes but instead simply allows ACF to better fulfill its statutory and regulatory obligation to serve as a steward of the public's money. Plaintiffs retain the same rights and defenses that the statute and regulations already provide. Hence assuming, *arguendo*, that additional enforcement action resulted from the SORN, the statute and regulations would prevent any harm.

**D. The 2025 Disclosure illustrates that Plaintiffs have not and will not suffer any harm**

It is well established that an agency may not promulgate rules that operate retroactively unless Congress has expressly delegated to the authority to do so. *See Levy v. Sterling Holding Co.*, 544 F.3d 494 (3d Cir. 2008). But where a new rule constitutes a clarification, rather than a substantive change of the law as it existed beforehand, the application of that new rule to pre-promulgation conduct necessarily does not have an impermissible retroactive effect. *Id.*; *see also Cookeville Reg'l Med. Ctr. v. Leavitt*, 531 F.3d 844 (D.C. Cir. 2008). Here, Routine Use 10, although not a rule, *see MST Exp. v. Dep't of Transp*. 108 F.3d 401, 402 (D.C. Cir. 1997); Pls. Mot. at 23, merely clarifies the scope of the data disclosure that was already permissible under Routine Use 7 of the SORN. Plaintiffs, therefore, cannot have suffered an injury because Routine Use 7 has been in effect for over a decade. *See* 80 Fed. Reg. at 17,903-04. Routine Use 7 allows for ACF to disclose data to "contractors, grantees, consultants, or volunteers performing or working on a contract, service, grant, cooperative agreement, job, or other activity for HHS [related to the purposes of this system of records] and who have a need to have access to the information in the performance of their duties or activities for HHS." *Id.* Hence, Routine Use 10 merely expands on the already allowed Routine Use 7 to clarify that ACF may share data to assist with compliance reviews, which it is lawfully permitted to do.

The 2025 transfer, as discussed *supra*, occurred in September 2025. It defies common sense that Plaintiffs now allege that a data transfer that occurred last year can somehow constitute irreparable harm when they fail to allege that that transfer inflicted any harm whatsoever. Instead, Plaintiffs reiterate the same arguments for harm in relation to Routine Use 10 and the SORN and attempt to simply recycle those arguments for the 2025 transfer. *See, e.g.*, Pls. Mot. at 13, 15. The prime difference, however, is that a year has elapsed since the transfer and Plaintiffs are still

discussing the possibility that the transfer could have harmed them. *See, e.g.*, Suppl. Dec. of Rajni Chawla ¶9; ECF. No. 45-34 ("public awareness that this data sharing has already occurred at least once without any notice, and that the data can be used by DHS, is *likely* to have a chilling effect on future TANF applicants…") (emphasis added); Pls. Mot. at 40 ("And insofar as the 2025 Data Transfer already *may* have harmed trust with TANF recipients. . ." (emphasis added)). If the only effects that have manifested a year after the supposedly unlawful action are *likely* harms that *may* have happened then it is fair to say that those harms are speculative and not irreparable, given that they still have yet to happen and no evidence has been proffered that they are "certainly impeding." *See Clapper*, 568 U.S. at 409.

This fatally undermines Plaintiffs global claims of harm, given that Plaintiffs can provide no evidence that the 2025 transfer led to any financial harm, chilling effects, increased enforcement operations, or any other certainly impeding harms. Because Routine 10 represents a clarification of Routine Use 7, which itself fully authorized the 2025 transfer, the fact that Plaintiffs cannot allege any actual harm resulting from the transfer demonstrates that their claims of harm for the pending action are similarly baseless.

Further, Plaintiffs continuously misread the strictures of the Privacy Act by alleging that ACF's failure to disclose the 2025 transfer somehow contributes to their speculative harms. *See, e.g.* Pls. Mot. at 13 ("Indeed, ACF has already inflicted this harm to some degree by disclosing a year's worth on TANF information without the recipients' consent . . . But because that Transfer was never previously disclosed to TANF participants (or to Plaintiff States), and because it occurred just a single time, its effect on TANF-recipients' behavior will not be as great . . . ."). In reality, however, the routine use is a pre-announced authorization to disclose records and does not impose on ACF, or any agency, a requirement to notify the public of every instance where the

routine use is invoked. Rather, the Privacy Act instead mandates that agencies retain an internal accounting of disclosures which may be provided to individuals upon request. *See* 5 U.S.C. § 552a(c). Consequently, Plaintiffs again fail to establish any harm or irreparable harm as a result of either Routine Use 10 or the 2025 data transfer.

**E. Plaintiffs' Privacy Act Claims Cannot Establish Irreparable Harm**

For reasons discussed at length *infra*, Part IIA, Plaintiffs, as sovereign states, are implicitly precluded from relief under the Privacy Act. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *see also Koretoff v. Vilsack*, 614 F.3d 532, 536 (D.C. Cir. 2010) (Kavanaugh J.). But even parties who are not precluded, unlike Plaintiffs, cannot establish irreparable harm under Privacy Act related claims. For example, in *Make the Road States, et al. v. Kennedy, et al.*, 1:26-cv-04713-EK-CHK (E.D.N.Y.) ("*Make the Road States*"), a companion case to this litigation, the court recently found that plaintiffs, a collection of non-profits suing on behalf of their individual constituent members had standing to bring a lawsuit but could not establish a likelihood of irreparable harm because, "(1) the Privacy Act authorizes damages for intentional or willful violations; and (2) to the extent that damages alone might not be enough, plaintiffs also fail to explain why a reparative permanent injunction would be legally inadequate to remedy any lingering harm." Mem. & Order at 15-16, ECF No. 30, *Make the Road States*. The court also summarily rejected plaintiffs' arguments that data disclosures would cause "chilling effects" because "they [plaintiffs] do not explain the causal mechanism by which this chilling effect would emerge, even at the theoretical level . . . [w]hy the *incremental* sharing of TANF

recipients' information within the federal government would have a chilling effect, plaintiffs do not say." *Id*. at 19.

Plaintiffs' failure to establish a likelihood of irreparable harm compels denial of their motion for preliminary injunctive relief.

## II. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A. Plaintiff Fails to State a Claim Under the APA Because Their APA Claims Are Predicated on the Privacy Act

Plaintiffs' APA claims (Counts I, II, III, V, VI, and VII) fail because the APA does not grant a cause of action where there is "[an]other adequate remedy in a court." 5 U.S.C. § 704. This statutory provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Accordingly, a plaintiff has adequate relief—and thus cannot rely on the cause of action in 5 U.S.C. § 704 "'where a statute affords an opportunity for *de novo* district-court review' of the agency action." *Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005)). Stated differently, where an agency action is subject to review in some manner under a separate statutory review scheme, then the general rule is that action must be reviewed within the confines of that scheme. The mode of review established by the statutory review scheme is presumed exclusive. This is true even where a statutory review scheme only provides for review of issues by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA. *Block*, 467 U.S. at 349 ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *see also Koretoff*, 614 F.3d at 536 (Kavanaugh J.). It is also true even where the plaintiff may not succeed

on the merits of her claim under the alternative statutory review procedure; the existence of that procedure alone suffices. *See Rimmer v. Holder*, 700 F.3d 246, 261-62 (6th Cir. 2012); *Jones v. HUD*, No. 11 CV 0846, 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted").

Under these principles, Plaintiffs may not challenge purported violations of the Privacy Act under the APA for two distinct reasons. First, because Congress has foreclosed review to the class to which Plaintiffs belong. *See Koretoff*, 614 F.3d at 536. The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information, *FAA v. Cooper*, 566 U.S. 284, 287 (2012), and authorizes adversely affected individuals to bring suit for violations of those requirements, 5 U.S.C. § 552a(g)(1)(D). The Privacy Act, however, applies only to individuals, not states. *Id.* (authorizing a cause of action for adversely affected "individuals"); *id.* § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence."). Here, Plaintiffs are a collection of States and other governmental offices and, consequently, are not entitled to bring a cause of action under the Privacy Act. *See id*. Congress' limitations of who may bring a cause of action under the Privacy Act represent an implicit preclusion of the States to bring such challenges. *See Block,* 467 U.S. at 349.

Further, even under the APA Plaintiffs are not entitled to bring suit based on alleged violations of the Privacy Act, because Plaintiffs are not within the Privacy Act's "zone of interest." The zone-of-interests requirement is a general presumption about Congress's intended limits on the scope of *all* causes of action, not just congressionally authorized causes of action under the APA or other statutes. As the Supreme Court has made clear, the zone-of-interests test "is a 'requirement of general application'" that "*always* applies and is never negated[.]" *See Lexmark*

*Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (emphasis in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 163–64 (1997)). Indeed, the zone-of-interests test indisputably applies to claims brought under the APA. *See id.* (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150 (1970)); *Match-E-Be-Nash-She- Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Here, the "[t]he relevant statute" for zone-of-interests purposes "is the statute whose violation is the gravamen of the complaint," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990), as confirmed "by reference to the particular provision of law upon which the plaintiff relies," *Bennett*, 520 U.S. at 175–76; *see Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014) ("we look to whether [the plaintiffs] fall within the zone of interests sought to be protected by the substantive statute pursuant to which the Department of Labor acted: the INA"); *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1366 (D.C. Cir. 1990) (applying zone-of-interests test to the substantive statute under which the agency acted where the plaintiff claimed the agency lacked statutory authority for the challenged program). That statute is indisputably the Privacy Act. *See* Am. Compl. ¶¶ 74, 78, 99, 106, 129, 134, 137-38. Congress only permitted "individuals" to vindicate rights under the Privacy Act, such that states are indisputably outside that statute's zone of interest.

Second, the Privacy Act already provides an adequate alternative remedy for individuals entitled to sue under that statute. Civil remedies are available—and thus the United States' sovereign immunity has been waived—in four circumstances: (1) when the agency "makes a determination . . . not to amend an individual's record in accordance with his request," 5 U.S.C. § 552a(g)(1)(A),(2) (an "Amendment Action"), (2) when the agency refuses to comply with an individual's request for access to her records, *id.* § 552a(g)(1)(B),(3) (an "Access Action"), (3)

when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual," *id.* § 552a(g)(1)(C), or (4) (a "Benefits Action"), or (4) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual," *id.* § 552a(g)(1)(D), (an "Other Action").

For Benefits Actions or Other Actions, a plaintiff may be entitled to "actual damages sustained by the individual as a result of the refusal or failure," subject to a $1,000 statutory minimum, but only if the agency acted in a manner which was intentional or willful and if that plaintiff could prove "actual damages," which is "limited to proven pecuniary or economic harm." *Cooper*, 566 U.S. at 291, 299 (quoting 5 U.S.C. § 552a(g)(4)(A)).

Beyond these monetary damages, the Privacy Act allows for injunctive relief in only two narrow circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records of an individual, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); and (2) to order an agency to allow an individual access to his records, *id.* § 552a(g)(1)(B), (g)(3)(A). But Plaintiffs here have not sought any such relief, because they are not entitled to it. And injunctive relief, as the D.C. Circuit has recognized, is otherwise unavailable for any other situation arising out of the Privacy Act. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs" (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988))); *see also Cell Assocs., Inc. v. NIH, Dep't of Health, Educ. & Welfare*, 579 F.2d 1155, 1161-62 (9th Cir. 1978).

Because of the Privacy Act's comprehensive remedial scheme, courts have recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation."

*Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also, e.g.*, *Poss v. Kern*, No. 23-cv-2199 (DLF), 2024 WL 4286088, at *6 (D.D.C. Sep. 25, 2024); *Haleem v. U.S. Dep't of Def.*, Civ. A. No. 23-1471 (JEB), 2024 WL 230289, at *13-14 (D.D.C. Jan. 22, 2024); *Bierly v. Dep't of Def.*, Case No. 23-cv-2386-RCL, 2024 WL 4227154, at *8-9 (D.D.C. Sep. 18, 2024); *Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017); *Berardi v. U.S. Dep't of the Air Force*, Civ. A. No. 05-2269 (JR), 2006 WL 8448631, at *6 (D.D.C. Sep. 29, 2006); *Tripp v. Dep't of Def.*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002).

This result is consistent with the principle that, "where, as here, [a] statute provides for certain types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief." *Parks v. IRS*, 618 F.2d 677, 684 (10th Cir. 1980) (citing *Cell Assocs.*, 579 F.2d at 1161-62). In short, Congress concluded that suits for money damages provide an adequate remedy for violations of § 552a(b) and limited relief to suits for such damages. That congressional determination forecloses Plaintiffs' APA claims. *See Hinck v. United States*, 550 U.S. 501, 506 (2007) (applying the "the well-established principle that, in most contexts, a precisely drawn, detailed statute pre-empts more general remedies" (citation omitted)).

This result is especially sensible with respect to the Privacy Act, because Congress "link[ed] particular violations of the Act to particular remedies in a specific and detailed manner[,]" which "points to a conclusion that Congress did not intend to authorize the issuance of [other] injunctions." *Cell Assocs.*, 579 F.2d at 1158-59. Indeed, were injunctive relief freely available for violations of the Privacy Act generally—such as through the sort of generic APA claims that Plaintiffs bring here—"the detailed remedial scheme adopted by Congress would make little sense." *Id.* at 1160. It is "unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it

had intended to make injunctions available across the board." *Id.*; *see also Am. Fed'n of Tchrs. v. Bessen*, 152 F.4th 162, 175 (4th Cir. 2025) ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here."), *abrogated on other grounds by Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361 (4th Cir. 2026).

Defendants recognize that there is some recent adverse precedent, which Plaintiffs point to in an attempt to justify their invocation of the APA. Pls. Mot. at 26. But *Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988) is inapposite for several reasons. First, the D.C. Circuit reiterated that "the Privacy Act does not by itself authorize the injunctive relief sought[.]" *Id*. at 1463. Second, the court specifically denied the plaintiff's request for injunctive relief under the APA and instead ordered declaratory relief because of the highly specific facts raised by the case itself. *See id.* at 1467. Third, the *Doe* plaintiff had standing to contest the violation, unlike the instant Plaintiffs. Fourth, *Doe* contains little to no reasoning on why the Privacy Act fails to provide an "adequate remedy" under the APA.

Plaintiffs' invocation of *Doe v. Chao*, 435 F.3d 492 (4th Cir. 2006) is flawed for a wholly separate reason because the Fourth Circuit's discussion in that matter was limited to dicta. *See Am. Fed'n of Tchrs.*, 152 F.4th at 176. Indeed, the panel in *Am. Fed'n of Tchrs.* specifically noted that "there is more generally a dearth of case law on how the Privacy Act intersects with the APA." *Id*. *League of Women Voters v. U.S. Dep't of Homeland Sec.*, ---F. Supp. 3d---, 2016 WL 1784297 (D.D.C. June 22, 2026), *appeal filed*, No. 26-5243 (D.C. Cir. June 29, 2026), was incorrectly decided for the reasons discussed above and a stay petition is pending in the Supreme Court.

Accordingly, the Court should reject Plaintiffs' efforts to make an end run around the restrictions that Congress enacted in the Privacy Act through its invocation of the APA.

**B. Routine Use Ten Complies with the Privacy Act.**

5 U.S.C. § 552a(b)(3) prohibits agencies from disclosing records unless "disclosure of the record would be . . . for a routine use," which the statute defines as "the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. §§ 552a(b)(3), 552a(a)(7). In order for the "routine use" exception to apply, the agency must "publish in the Federal Register . . . a notice of the existence and character of the system of records, which notice shall include . . . each routine use of the records contained in the system, including the categories of users and the purpose of such use." *Id*. § 552a(e)(4)(D). Thus, to fall within the Privacy Act's routine use exception: (1) notice of the routine use must be published in the Federal Register pursuant to 5 U.S.C. § 552a(e)(4); and (2) the use must be compatible with the purpose for which the information was collected. *See Doe v. U.S. Dep't of Justice*, 660 F. Supp. 2d 31, 47 (D.D.C. 2009). Notice of the routine use was unquestionably published in the Federal Register, *see* 91 Fed. Reg. at 37,406. Hence, the only question remaining is whether the use is compatible with the purpose for which the information was collected. It is.

ACF has highlighted two separate purposes behind Routine Use 10, each of which independently justifies it. First, the TANF data is used "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV-A of the Social Security Act." *Id.* at 37,407. Second, the data will be used

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (*e.g.* comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (*e.g.* financial audits, programmatic audits, and fraud investigations), and monitoring (*e.g.* regular review of data reports, on-site or virtual visits to TANF agencies,

> periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)).

*Id*. The purpose of collecting eligibility data in the first place is to establish eligibility to receive a benefit. The purpose of the routine use is to ensure eligibility for receipt of benefits. Hence, the purpose for collection and the purpose for the routine use are perfectly compatible. Routine Use 10 is also lawful for the disclosure of past data because, for reasons discussed *supra*, Routine Use 10 is a clarification of Routine Use 7. The 2015 SORN contained three purposes, of which the first is of relevance to this action. The first listed purpose provided that the purpose for the TANF Data Reporting System included "[t]o determine whether States are meeting certain requirements prescribed by the Act, including prescribed work and time-limit requirements." 80 Fed. Reg. at 17,904. Hence, Routine Use 10 is lawful because (1) it was published in the Federal Register and (2) it is compatible with the reason the data was collected in the first instance – to establish eligibility for benefits.

Plaintiffs also argue that the Government has acted unlawfully because "ACF did not provide the individualized notice the statute requires before undertaking or authorizing these disclosures." Pls. Mot. at 29. The statute requires an agency to "inform each individual" from whom the information is collected of "the routine use which must be made of the information." 5 U.S.C. § 552a(e)(3). But ACF does not collect information from individuals; that is a responsibility assigned, by Congress, to grantees. *See, e.g.* 42 U.S.C. § 611(a)(1)(A) (requiring grantees to collect and report a wide range of demographic information to ACF). Separately, because Routine Use 7

has been in effect since 2015, 80 Fed. Reg. at 17,903-04 and because Routine Use 10 is a clarification of Routine Use 7, *see supra*, notice has already been provided.

Plaintiffs also take issue with the wording of Routine Use 7 and its application to the 2025 disclosure. Pls. Mot. at 31-32. But these arguments are meritless. For example, the 2015 SORN provided that disclosure could be made to determine whether grantees were meeting certain requirements prescribed by the Social Security Act. Privacy Act of 1974; System of Records, 89 Fed. Reg. 25,880, 25,882 (Apr. 12, 2024). Plaintiffs believe that because the SORN uses the word "certain" to modify "requirements" that ACF was consequently barred from disclosing data for all TANF requirements. Pls. Mot. at 32. But the 2015 SORN does not enumerate a list of requirements and every requirement imposed by TANF is also, definitionally, a certain requirement of TANF.

Plaintiffs' reliance on the Computer Matching and Privacy Protection Act ("CMPPA") misunderstands the provisions of the statute. *See id.* at 32-33. Merely disclosing the data pursuant to a routine use would not be an adverse action or implicate the CMPPA because the obligation to publish a computer matching agreement only applies to a "computerized comparison of . . . two or more automated systems of records . . . for the purpose of" verifying eligibility for "cash or in-kind assistance or payments under Federal benefit programs" or "recouping payments or delinquent debts under such Federal benefit programs." 5 U.S.C. § 552a(a)(8). Here, however, no computer matching agreement is implicated because the purpose is not to verify individual eligibility, but instead, as the SORN plainly spells out, is instead to ensure *states* are complying with the TANF requirements. *See* 91 Fed. Reg. 37,406.

Finally, Plaintiffs allege that the 2026 SORN failed to comply with the procedural requirements of the Privacy Act, specifically that the public have a meaningful opportunity to comment. Pls. Mot. at 33. But even if this point were true, it would not provide a basis to invalidate

the SORN. Rather, the proper remedy would be for the Court to order ACF to consider further the comments received and then take the action it believes to be correct. Nothing in the Privacy Act requires an agency to respond to each comment received, or to any comment. *See infra*.

**C. Routine Use 10 Complies with the TANF statute**

Plaintiffs misunderstand ACF's enforcement abilities, *see* Pls. Mot. at 19-23, because although ACF is limited in its ability to enforce the statute, *see* 42 U.S.C. § 617, it does retain the ability to conduct additional audits "which are necessary to carry out its responsibilities under Federal law or regulation." 31 U.S.C. § 7503(b). As the Federal agency administering the TANF program, ACF has a responsibility to ensure compliance with Part IV-A of the Social Security Act, its implementing regulations at 45 C.F.R. §§ 260-265, and the terms and conditions of the grant. Specifically, 42 U.S.C § 609 mandates that ACF assess a penalty if States do not meet certain statutory requirements and further requires that ACF utilize audits conducted under chapter 75 of title 31. *Id*. The penalties promulgated by § 609 include a misuse of funds penalty for expending funds that are not allowable under Title IV-A, including providing services and benefits to families who do not meet the eligibility criteria for TANF. 42 U.S.C. § 609(a)(1)(A). Compliance was so important to Congress that this provision also included an enhanced penalty for intentional misuse of TANF funds. *Id.* § 609(a)(1)(B). Penalties are also imposed on States that fail to participate in an income and eligibility verification system. *Id.* § 609(a)(4).

The single audit described in 31 U.S.C. § 7503(a) provides an overall snapshot of the program, but there are instances when ACF must conduct more comprehensive, targeted reviews to ensure that TANF funding is spent in accordance with law. Section 7503(b) allows the agency to conduct additional reviews and Routine Use 10 supports these reviews by expressly allowing ACF to engage others, including contractors and other Federal agencies, in its review. ACF has

also set forth in regulation that it will use the single audit "in conjunction with other reviews, audits, and data sources, as appropriate, to determine if a State is subject to a penalty . . . ." 45 C.F.R. § 262.3(a)(1). If ACF was restricted to only proceeding via a solitary annual audit, as Plaintiffs assert, *see* Pls. Mot. at 22, then ACF would be powerless to act even where evidence of failure to comply with the statutory requirements such as work participation verification procedures is self-evident. That result would be absurd. 31 U.S.C. § 7503(b) specifically permits ACF to conduct further audits to enforce its responsibilities. The SORN, and Routine Use 10, implement that authority. That the agency wants to enlist other federal agencies to assist it, such as DHS, is perfectly permissible. ACF has provided public notice and an opportunity to comment, and the reason for sharing the data is in accordance with the purpose of the collection. Additionally, as discussed, Routine Use 10 serves as a clarification of Routine Use 7. Consequently, individuals have already received actual notice. Nothing more is required under the Privacy Act.

Plaintiffs' arguments that ACF possesses no authority to conduct additional audits are uniformly baseless. First, Plaintiffs assert that because Congress provided that "when State agencies verify an individual's immigration status, they [the States] must use a system that permits 'efficient verification' and 'protects the individual's privacy to the maximum degree possible.'" Pls. Mot. at 20 (citation omitted). But this is a negative inference that, as the Supreme Court put it, "grows weaker with each difference in the formulation of the provisions under inspection." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 436 (2002). Indeed, the two statutes cited by Plaintiffs, 42 U.S.C. § 608(a)(9)(B) and 42 U.S.C. § 1320b-7(d)(3) are both specifically directed towards *States*; no mention is made of the Federal government in either provision. In contrast, 42 U.S.C § 609(a)(1) allows ACF to utilize the Single Audit Act to assess

penalties. Plaintiffs' negative inference is, consequently, undermined by the clear statutory language.

Plaintiffs' invocation of AFDC's provisions allowing audits are similarly unpersuasive. *See* Pls. Mot. at 20. AFDC was substantially different from TANF, *see supra*; Pls. Mot. at 4, but the idea that Congress would restrict ACF to a single annual audit is belied by the text of the Single Audit Act. *See* 31 U.S.C. § 7503(b). The Single Audit Act, and § 7503(b) also provide the authorization that Plaintiffs claim does not exist within the TANF statute. Pls. Mot. at 20. Indeed, as discussed *supra*, 42 U.S.C § 609(a)(1) allows ACF to utilize the Single Audit Act to assess penalties, and the Single Audit Act, specifically 31 U.S.C. § 7503(b) allows an agency to carry out "additional audits which are necessary to carry out its responsibilities under Federal law or regulation." Here, ACF is responsible for assessing penalties when States fail to comply with the TANF statute. Hence, ACF may conduct additional audits to support its statutory responsibilities.

**D. The SORN Complies with the APA**

Courts may set aside a final agency action under the APA if that action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *accord United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 978 F.2d 68, 73 (2d Cir. 1992). This is a deferential standard, under which courts review agency actions to determine if the agency articulated a rational relationship between the factual findings and its decision. *See Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013). The "standard is narrow and [the] court [should not] substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also id.* Instead, the court should "assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation omitted). Courts reverse agency decisions as arbitrary or capricious only if the agency relied on factors Congress did not intend for it to consider, entirely failed to consider an important aspect of the case, offered an explanation that ran counter to the evidence before the agency, or offered an explanation that was so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *State Farm*, 463 U.S. at 43.

**1. Routine Use 10 is Lawful**

Plaintiffs first assert that ACF lacks authority to promulgate Routine Use 10. Pls. Mot. at 20. As discussed, *supra*, however, Plaintiffs fundamentally misunderstand not only ACF's authorities, but also the Single Audit Act. *See* Pls. Mot. at 22. The purpose of the SORN clearly establishes that ACF contemplates "program integrity review," "additional audits," and "monitoring." 91 Fed. Reg. 37,407. The Single Audit Act specifically permits this sort of action, especially additional audits in 31 U.S.C. § 7503(b), discussed *supra*.

**2. Routine Use 10 is Neither Arbitrary Nor Capricious**

Plaintiffs once more misunderstand the SORN, and Routine Use 10 in particular, through their continued assertions that ACF has failed to provide meaningful reasoning to justify the changes in the SORN. Pls. Mot. at 35. But the process for publication of a modified SORN under the Privacy Act is governed by specific notice and-comment procedures set forth in the Privacy Act. Unlike for an APA rulemaking which starts with a notice of proposed rulemaking and ends with a final rule, a Privacy Act SORN publication does not end with any agency obligation to state "in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). So arbitrary-and-capricious review based on the explanation provided in the Federal Register Notice does not make sense in this distinct Privacy Act context. If the APA standard for review is

appropriate in the Privacy Act context, which as discussed above, the government contends it is not, then review under the arbitrary and capriciousness standard would be based on an administrative record provided by the agency. However, in this context, no consideration of costs and benefits, reliance interests, or alternative courses of actions are needed because the new routine use is merely a clarification of what ACF could already do under the already-established routine use.

### E. Routine Use 10 Complies with Both Section 405 of the Social Security Act as well as the Trade Secrets Act.

Plaintiffs next argue that the information-sharing at issue here violates the Social Security Act. Pls. Mot. at 24. Specifically, Plaintiffs point to 42 U.S.C. 405 which purports to prohibit future federal statutes, beginning in 1990, from changing the rules surrounding sharing of SSNs. *See id*. (citing 42 U.S.C. § 405(c)(2)(C)(viii)(I)). As a threshold matter, Plaintiffs misapprehend the relevance of 42 U.S.C. § 405(c)(2)(C)(viii)(I).

Specifically, the Privacy Act specifically permits disclosures of a broad range of records. *See* 5 U.S.C. § 552a(a)(4) (defining records as any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph). Plaintiffs' argument would, if accepted, require this Court to find that 42 U.S.C. § 405(c)(2)(C)(viii)(I) has overruled the Privacy Act. But that is an illogical position because the Privacy Act aims to "safeguard[ ] the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records. It does so by allowing an individual to participate in ensuring that his records are accurate and properly used, and by imposing responsibilities on federal agencies to maintain their records

accurately." *Bartel v. F.A.A.*, 725 F.2d 1403, 1407 (D.C.Cir.1984) (footnote omitted). Furthermore, the Privacy Act was enacted in 1974, which places it beyond the remit of 42 U.S.C. § 405(c)(2)(C)(viii)(I) assuming, *arguendo*, that it was even applicable to the Privacy Act at all.

Plaintiffs' reliance on the Trade Secrets Act is similarly misplaced for two distinct reasons. *See* Pls. Mot. at 24. First, the statute specifically carves out disclosures that are "authorized by law". 18 U.S.C. § 1905. Consequently, this argument also fails given that, as previously discussed, the disclosures here *are* authorized by law, specifically 31 U.S.C. § 7503(b). *See supra*. Second, Plaintiffs are, once again, precluded from seeking relief from a statute that does not contemplate their interests as sovereign States. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . ., is entitled to judicial review thereof." 5 U.S.C. § 702. But Plaintiffs have failed to argue specifically how they have been "adversely affected or aggrieved" by Routine Use 10 within the context of the Trade Secrets Act. *Id.* Rather, they instead correctly note that any disclosure would affect "TANF recipients", Pls. Mot. at 25. The Plaintiffs, however, are not TANF recipients, and consequently cannot bring any APA challenge under the Trade Secrets Act.

**F. The Spending Clause is Inapplicable to these facts.**

Article I of the Constitution confers expansive authority on Congress to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The Supreme Court has recognized some "general restrictions" on that power. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576–82 (2012) ("*NFIB*"); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981).

Plaintiffs' assert that Routine Use 10 and the 2025 disclosure constitute a "new requirement[]" that they could not have foreseen when accepting the TANF funding. Pls. Mot. at 37. But neither is a new requirement. Rather, as discussed *supra*, Routine Use 10 is a clarification of Routine Use 7 which grants ACF substantially similar authority. Similarly, Plaintiffs having "no reason to believe that ACF could . . . claim a programmatic review power[,]" *id*. at 38, demonstrates their fundamental misinterpretation of the Single Audit Act and the mistaken belief that ACF may only investigate potential fraud via a single annual audit. This is not only contrary to statute, but illogical. *See supra*.

Additionally, Plaintiffs misapprehend the remit of the Spending Clause. The Spending Clause is one of *Congress's* enumerated powers found in Article I; it does not restrict (or empower) the President or the Executive Branch, whose powers are conferred by Article II. If Congress had conditioned spending on a delegation so broad that the Executive Branch's discretion is an unconstitutional condition, that *statute* can be struck down under the Spending Clause. But it is a categorical error to strike down executive action to carry out statutory delegations of authority under the Spending Clause. Notably, Plaintiffs do not allege that TANF itself is unconstitutional. Instead, they attempt to use the Spending Clause as a backdoor into APA review.

Plaintiffs' invocation of *Pennhurst State School & Hospital* crystalizes this misinterpretation. 451 U.S. at 25. In that instance, the Court, while discussing the obligations that Pennsylvania owed to the plaintiffs stated:

> The crucial inquiry, however, is not whether a State would knowingly undertake that obligation, but whether *Congress* spoke so clearly that we can fairly say that the State could make an informed choice. In this case, *Congress* fell well short of providing clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with . . .

*Id*. (emphasis added).

Plaintiffs cannot point to any precedent that supports their position, because the Spending Clause is self-evidently not invoked where the action at issue originates solely with Article II powers, as is the case here.

## III. THE EQUITABLE FACTORS WEIGH AGAINST PRELIMINARY INJUNCTIVE RELEIF

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Here, neither favors Plaintiffs' request for preliminary relief.

In addressing this factor, Plaintiffs make no serious effort to explain why the equities and the public interest fall in their favor—rather, their arguments largely collapse into their argument as to why Defendants would not suffer any harm if their Routine Use were temporarily enjoined. Pls. Mot. at 44. But this is not an argument in favor of preliminary relief, especially where, as is the case here, Defendants have already delayed the implementation date of the Routine Use, *see* ECF. No. 29, and it is Plaintiffs' burden to establish their need for extraordinary relief, not Defendants. Plaintiffs have flipped the burden of proof entirely on its head.

On the other side of the ledger, the federal government has a significant interest in carrying out congressional intent, by fully and effectively carrying out its obligations under 42 U.S.C. § 609. *See, e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 45 (D.D.C. 2000) ("It is in the public interest for courts to carry out the will of Congress and for an agency to implement properly the statute it administers."). Therefore, the balance of equities weighs in favor of Defendants and necessitates denial of the injunctive request.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction or for a stay under 5 U.S.C. § 705 should be denied. And, if the Court denies the motion due to lack of Article III standing, the Court should also dismiss the case on that basis, without prejudice, under Rule 12(h)(3).

Dated: September 11, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

/s/ *Patrick K. Keating*
PATRICK K. KEATING (MD Bar No. 2211140001)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 598-0256
Email: Patrick.K.Keating@usdoj.gov

*Counsel for Defendants*