**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF NEW YORK, *et al.*,

*Plaintiffs*,

v.

ADMINISTRATION FOR CHILDREN AND FAMILIES, *et al.*,

*Defendants*.

Case No. 1:26-cv-02726-JEB

**PLAINTIFF STATES' REPLY MEMORANDUM**
**IN SUPPORT OF THEIR MOTION FOR**
**A PRELIMINARY INJUNCTION AND STAY UNDER 5 U.S.C. § 705**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 2

I. The Court Has Jurisdiction ........ 2

II. Plaintiffs Are Likely to Succeed on the Merits ........ 7

A. The Disclosure Actions Are Contrary to Law ........ 7

1. 42 U.S.C. § 1306 and the TANF Statute Bar the Disclosure Actions ........ 7

2. The Disclosure Actions Violate the Social Security Act ........ 9

3. The Disclosure Actions Violate the Trade Secrets Act ........ 10

4. The Disclosure Actions Violate the Privacy Act ........ 12

a. Plaintiff States may assert violations of the Privacy Act under the APA ........ 12

b. The Disclosure Actions do not satisfy the Privacy Act's routine use exception ........ 15

c. Defendants did not enter into a computer matching agreement ........ 17

d. ACF failed to comply with the Privacy Act's procedural requirements ........ 18

B. The Disclosure Actions Are Arbitrary and Capricious ........ 19

C. The Disclosure Actions Violate the Spending Clause ........ 20

III. Plaintiffs Will Suffer Irreparable Harm ........ 21

IV. The Balance of the Equities and Public Interest Favor Plaintiffs ........ 24

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ames v. DHS*,
861 F.3d 238 (D.C. Cir. 2017) ....................15–17

*Arlington Cent. Sch. Dist. v. Murphy*,
548 U.S. 291 (2006) ....................20–21

*Ass'n of Priv. Sector Colleges & Univs. v. Duncan*,
681 F.3d 427 (D.C. Cir. 2012) ....................4

*Bartholdi Cable Co., Inc. v. FCC*,
114 F.3d 274 (D.C. Cir. 1997) ....................10–11

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................14

*Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin.*,
972 F.3d 83 (D.C. Cir. 2020) ....................19

*Block v. Community Nutrition Institute*,
467 U.S. 340 (1984) ....................14

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ....................13

*California v. U.S. Dep't of Transp.*,
808 F. Supp. 3d 291 (D.R.I. 2025) ....................21

*Campaign Legal Ctr. v. Fed. Elec. Comm'n*,
520 F. Supp. 3d 38 (D.D.C. 2021) ....................7, 17

*CAN Fin. Corp. v. Donovan*,
830 F.2d 1132 (D.C. Cir. 1987) ....................12

*Cell Assocs., Inc. v. NIH*,
579 F.2d 1155 (9th Cir. 1978) ....................13

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ....................24

*Chichakli v. Tillerson*,
882 F.3d 229 (D.C. Cir. 2018) ........................................ 15

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ........................................ 10–12

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ........................................ 20

*City of Los Angeles v. Barr*,
929 F.3d 1163 (9th Cir. 2019) ........................................ 21

*Colorado v. Trump*,
823 F. Supp. 3d 1251 (D. Colo. 2026) ........................................ 23

*CREW v. U.S. Dep't of Justice*,
846 F.3d 1235 (D.C. Cir. 2017) ........................................ 13

*Ctr. for Taxpayer Rts. v. Internal Revenue Servs.*,
No. 26-5006, __ F.4th __, 2026 WL 2635380 (D.C. Cir. Sept. 8, 2026) ........................ 4–5, 14

**Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................ 1, 3–4

*DHS v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020) ........................................ 20

*Diamond Alt. Energy, LLC v. Env't Prot. Agency*,
606 U.S. 100 (2025) ........................................ 2

**District of Columbia v. U.S. Dep't of Agric.*,
444 F. Supp. 3d 1 (D.D.C. 2020) ........................................ 22

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988) ........................................ 1, 12–14

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........................................ 2

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) ........................................ 20

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005) ........................................ 23

*Freedom Network USA v. Trump*,
830 F. Supp. 3d 681 (N.D. Ill. 2026) ....................21

*Haleem v. U.S. Dep't of Defense*,
No. 23-1471, 2024 WL 230289 (D.D.C. Jan. 22, 2024)....................12–13

*Jibril v. Mayorkas*,
20 F.4th 804 (D.C. Cir. 2021)....................5

*Landor v. La. Dep't of Corr. & Pub. Safety*,
146 S. Ct. 1931 (2026)....................20

**League of Women Voters v. DHS*,
835 F. Supp. 3d 79 (D.D.C. 2026) ....................18–19

*League of Women Voters v. DHS*,
No. 26-5243, 2026 WL 2643439 (D.C. Cir. Sept. 4, 2026)....................9–10

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ....................25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)....................14

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................2

*Make the Road States v. Kennedy*,
No. 26-CV-4713, 2026 WL 2607277 (E.D.N.Y. Sept. 3, 2026) ....................22, 24

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012)....................11, 14

*Minnesota v. U.S. Dep't of Agric.*,
826 F. Supp. 3d 975 (D. Minn. 2026)....................23

*New Jersey v. U.S. Dep't of Transp.*,
824 F. Supp. 3d 416 (S.D.N.Y. 2026)....................24

**New York v. Admin. for Child. & Fams.*,
833 F. Supp. 3d 361 (S.D.N.Y. 2026)....................5

*New York v. U.S. Dep't of Educ.*,
477 F. Supp. 3d 279 (S.D.N.Y. 2020)....................23

*New York v. U.S. Dep't of Health & Hum. Servs.*,
414 F. Supp. 3d 475 (S.D.N.Y. 2019)....................21

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020)....................23

*New York v. U.S. Dep't of Just.*,
804 F. Supp. 3d 294 (D.R.I. 2025)....................23, 25

*Northern Mariana Islands v. United States*,
686 F. Supp. 2d 7 (D.D.C. 2009)....................19

*Parker v. District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007)....................6–7

*Parks v. IRS*,
618 F.2d 677 (10th Cir. 1980)....................13

*Pennsylvania v. DeVos*,
480 F. Supp. 3d 47 (D.D.C. 2020)....................22–23

*Poss v. Kern*,
No. 23-cv-2199, 2024 WL 4286088 (D.D.C. 2024)....................13

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....................10

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)....................17

*Robert F. Kennedy Ctr. for Just. & Hum. Rts. v. McMahon*,
No. 25-03860 (AHA), 2026 WL 1893511 (D.D.C. June 30, 2026)....................4

*Rural Cellular Ass'n v. FCC*,
588 F.3d 1095 (D.C. Cir. 2009)....................19

*Sussman v. U.S. Marshals Serv.*,
494 F.3d 1106 (D.C. Cir. 2007)....................13

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................5

**U.S.P.S. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
9 F.3d 138 (D.C. Cir. 1993)....................15–16

*UnitedHealthcare Ins. Co. v. Price*,
248 F. Supp. 3d 192 (D.D.C. 2017) .......... 4

*Westcott v. McHugh*,
39 F. Supp. 3d 21 (D.D.C. 2014) .......... 13

**Federal Statutes**

5 U.S.C.
§ 552a .......... 10, 15, 18–19
§ 704 .......... 13
§ 705 .......... 25

31 U.S.C.
§ 7503 .......... 7–8, 11

42 U.S.C.
§ 405 .......... 9–10
§ 609 .......... 6, 8–9, 21, 25
§ 611 .......... 10, 16
§ 617 .......... 1, 7–8
§ 1306 .......... 1, 7–8

**Federal Regulations**

89 Fed. Reg. 25,880 .......... 17

91 Fed. Reg. 13,485 .......... 5

91 Fed. Reg. 37,406 .......... 2, 3, 5, 18

## PRELIMINARY STATEMENT

Defendants' opposition brief forfeits much of this case. It contains no meaningful response to Plaintiff States' principal merits argument: that 42 U.S.C. §§ 1306(a) and 617 require express statutory authorization before the Administration for Children and Families (ACF) may disclose information about Temporary Assistance for Needy Families (TANF) recipients, and that Defendants have identified no such authorization here. *See* Mem. in Supp. of Mot. For Prelim. Inj. ("Mot.") 19–23, ECF No. 45-1. It does not address multiple independently sufficient reasons why the Disclosure Actions violate the Privacy Act. *See id.* at 30–32. Still further, it does not dispute that the records at issue are protected by the Social Security Act and the Trade Secrets Act; that ACF failed to provide any reasoned explanation for its decisions; and that the Disclosure Actions are final agency actions. On these issues—and still others—Defendants have forfeited any defense.

Where Defendants do muster a defense, their arguments are uniformly without merit. Defendants take the extreme position that States may not establish standing based on the harms arising from the chilling effect of federal policies on third parties, even though courts routinely find standing on precisely this theory. *See, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 767–68 (2019). They assert that litigants may never bring Administrative Procedure Act (APA) claims alleging violations of the Privacy Act, despite the fact that the D.C. Circuit has expressly permitted such claims. *See Doe v. Stephens*, 851 F.2d 1457, 1465–66 (D.C. Cir. 1988). And they contend that the Spending Clause does not restrict the Executive Branch, notwithstanding the many precedents enjoining executive actions for violating that constitutional limit. *See infra* pp. 20–21.

As these and many other precedents make clear, Defendants lack any colorable defense for the Disclosure Actions. That should come as little surprise. Defendants disclosed, in secret, the personal information of hundreds of thousands of TANF recipients to the Department of Homeland

Security (DHS). Then they tried to paper over their misconduct with a series of policies that contravene multiple confidentiality statutes, the reasoned-decisionmaking requirements of the APA, and the Spending Clause. The Court should put a stop to this lawless disclosure regime, restore the protections Congress enacted, and grant the States' motion.

## ARGUMENT

### I. The Court Has Jurisdiction

Defendants' standing arguments ignore well-settled precedent. *See* Defs.' Opp. to Pls.' Mot. For Prelim. Inj. ("Opp.") 5–15, ECF No. 46. "[T]here is ordinarily little question" that Plaintiffs have standing where, as here, they are themselves "an object of the" challenged agency "action[s]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 114–16 (2025). The Disclosure Actions are aimed directly at States: they purport to authorize the sharing of *States'* data for the purpose of monitoring *States'* compliance and threaten new enforcement and oversight against *States*. Indeed, the 2026 SORN mentions "grantees" (*i.e.*, States) twenty-six times in its four pages. 91 Fed. Reg. 37,406 (June 23, 2026).

What is more, Plaintiff States assert three distinct injuries that are caused by each of the Disclosure Actions and redressable by the Court. Each is well-supported in Plaintiffs' unrebutted declarations, in which senior State officials describe injuries inflicted by the Disclosure Actions that are "concrete," "particularized" to Plaintiff States, and "actual or imminent." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

*First*, the Disclosure Actions will erode the trust that TANF recipients have with Plaintiff States and will chill TANF participation, causing Plaintiff States to incur expenses as the "poorest" families in their States, NY-Chawla ¶ 6, are destabilized and disenroll from TANF and rely instead on costlier programs funded by States. *See* Mot. 12–14, 39–40. Plaintiffs' declarations specify the causal mechanism: Each of the Disclosure Actions explicitly involves actual or threatened

disclosure to DHS. *See* 91 Fed. Reg. at 37,409 (Routine Use 10 stating that "[r]ecords may be disclosed" to "DHS"). TANF recipients will reasonably believe that DHS will use their data for immigration enforcement, a belief made all the more reasonable because the Department of Health and Human Services (HHS) has said it will do so for other individual data collected from States and shared with DHS. *E.g.*, DC-Campbell ¶ 45. This is particularly true for mixed-status households, including families with children receiving TANF whom ACF targeted in a recent report. Mot. 9–10; MD-Rodgers ¶ 47. Accordingly, some TANF recipients will decline to participate in the program, whether because of specific fears relating to DHS or generalized privacy concerns. *E.g.*, DC-Campbell ¶ 45. Because TANF is "a program of last resort" to provide stability to needy families, individuals who withdraw from the TANF program will burden other mandatory State services, including child welfare, juvenile justice, public hospitals, and emergency shelters. CO-McMahon ¶ 53; *see, e.g.*, CT-Hadler ¶ 57; DE-Horn ¶ 48; NJ-Cha ¶ 48; MN-Moore ¶ 56; OR-Carpenter-Seguin ¶ 53; VT-Bocash ¶ 47.

Defendants do not attempt to dispute any of this evidence. Instead, they take the extreme position that States may *never* assert standing based on harms arising from the "chilling effect" of federal policies. Opp. 7. That position is meritless. The Supreme Court made clear in *California v. Texas* that standing can be based on a "predictable" "decision of an independent third party," including an individual's decision whether to enroll in a public benefits program. 593 U.S. 659, 661 (2021) (citation omitted). In *California*, the problem the Court identified was that the State plaintiffs had not provided any evidence that the challenged action would actually have such an effect. *Id.* at 676–78. Here, by contrast, Plaintiffs have provided ample and unrebutted evidence explaining the chilling effect stemming from the Disclosure Actions. *See* Mot. 12–14. This case is thus on all fours with *Department of Commerce v. New York*, in which the Court found that States

had standing because they demonstrated that it was "predictable" that noncitizens' "fears that the Federal Government will" use their information "for law enforcement purposes" would make them less likely to provide that information, resulting in increased State expenses. 588 U.S. 752, 767–68 (2019); *see also Ctr. for Taxpayer Rts. v. IRS*, No. 26-5006, __ F.4th __, 2026 WL 2635380, at *4–5 (D.C. Cir. Sept. 8, 2026) (citing *Department of Commerce* and affirming standing based on "predictable effect" of IRS data sharing policy on behavior of third-party taxpayers).

*Second*, the Disclosure Actions will require Plaintiffs to incur costs to review and update their disclosures to TANF recipients and applicants to ensure they are compatible with the Disclosure Actions. Mot. 14–15, 40–42. These compliance costs are a type of pecuniary harm well recognized to support standing. *See, e.g.*, *Ctr. for Taxpayer Rights*, 2026 WL 2635380, at *5 (compliance costs are cognizable where they are necessary for a plaintiff to continue carrying out its core activities); *UnitedHealthcare Ins. Co. v. Price*, 248 F. Supp. 3d 192, 200–01 (D.D.C. 2017) (finding standing where a rule required "proactive compliance activities"); *cf. Ass'n of Priv. Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 458 (D.C. Cir. 2012) (even a party not directly regulated by agency rule can have standing based on increased compliance costs). Defendants do not argue otherwise: they do not dispute that States are required to disclose to TANF applicants the uses of their data, *see* Mot. 40, nor do they claim that these costs are insufficient to confer standing, *see* Opp. 8–9 (citing cases and arguing only that such costs do not establish "irreparable harm"); *but see infra* pp. 22–23 (explaining that they do). It follows that the Disclosure Actions "require[] the plaintiffs to take 'some action' they would not otherwise take" and incur the costs of doing so, straightforwardly establishing standing. *Robert F. Kennedy Ctr. for Just. & Hum. Rts. v. McMahon*, No. 25-03860 (AHA), 2026 WL 1893511, at *4 (D.D.C. June 30, 2026) (citation omitted).

*Third*, the Disclosure Actions will subject the States to a substantial risk of future oversight and enforcement actions. Mot. 15–16, 42–44. "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021). The risk here meets this standard. The 2026 SORN announces a litany of oversight mechanisms—such as "program integrity reviews or projects," "programmatic audits," and "on-site or virtual visits to TANF agencies"—that are mentioned nowhere in the TANF statute or regulations and that ACF has never previously undertaken. 91 Fed. Reg. at 37,407; *e.g.*, DC-Campbell ¶ 32 (stating that "in the past 20 years, ACF has never performed" any of these activities). As Plaintiffs' evidence shows, each of these new oversight mechanisms would be burdensome, diverting limited State resources. Mot. 15–16; *see, e.g.*, NY-Chawla ¶ 48 (detailing that responding to such oversight actions would "require significant staff time and resources, diverting staff from core operations"). As above, this is a well-settled pecuniary harm sufficient for standing. *Ctr. for Taxpayer Rights*, 2026 WL 2635380, at *5.

Further, the risk of future enforcement action cutting off Plaintiffs' TANF funds is not "far-fetched," as Defendants claim. Opp. 9. Not only did the President direct agencies to "maximize enforcement," 91 Fed. Reg. 13,485, 13,487 (Mar. 16, 2026), but earlier this year the same Defendants froze over $7 billion in TANF funding to five Plaintiff States without taking any of the steps required by statute and regulation that Defendants now assert "would prevent any harm." *Compare* Opp. 9–11, *with New York v. Admin. for Child. & Fams.*, 833 F. Supp. 3d 361, 397 (S.D.N.Y. 2026). This "'past wrong[]'" is evidence of the "real and immediate threat of repeated injury" to Plaintiffs. *Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021) (citation modified). More fundamentally, Defendants' argument that Plaintiffs face no risk of enforcement is

irreconcilable with their merits argument that the Disclosure Actions are authorized by 42 U.S.C. § 609(a)(1)—a provision allowing Defendants to impose financial penalties, *see* Opp. 24–26—and their claim that the government's primary interest in this litigation is to "fully and effectively carry[] out its obligations under 42 U.S.C. § 609," Opp. 31.

*Finally*, contrary to Defendants' arguments (at 12–14), each of the three types of harm independently gives Plaintiffs standing to challenge each of the Disclosure Actions. The 2026 SORN, Revision, and the Data Disclosure Policy plainly inflict all three injuries: by granting ACF forward-looking authority to share TANF recipients' information, those actions will chill participation in the program, require States to disclose a new use of their information, and subject States to new oversight and enforcement. And the 2025 Data Transfer will inflict all three harms as well: as the declarations explain, the fact that DHS currently (and unlawfully) possesses TANF recipients' information will deter individuals from participating in the program, require States to make new disclosures, and subject States to oversight and enforcement based on information DHS already possesses. *E.g.*, MD-Rodgers Suppl. ¶¶ 4–9; NY-Chawla Suppl. ¶¶ 5–11.

Defendants' contrary arguments lack merit. Their complaint that Plaintiffs have "provide[d] no evidence that the 2025 transfer led to any . . . chilling effect[]" or compliance costs, Opp. 13, is nonsensical, as Defendants kept that transfer secret until after this lawsuit was initiated, and these harms will arise in substantial part from the newfound knowledge of this policy. *E.g.*, CA-Witchey ¶ 6 ("Public awareness that this data sharing has already occurred at least once without any notice, and that the data can be used by DHS, is likely to have a chilling effect. . . ."). Likewise, Defendants' suggestion that Routine Use 10 cannot inflict any new injury because it merely "clarifies" Routine Use 7, Opp. 12, simply frontloads Defendants' incorrect merits argument. But "when considering whether a plaintiff has Article III standing, a federal court must assume

*arguendo* the merits of his or her legal claim." *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007).

## II. Plaintiffs Are Likely to Succeed on the Merits

### A. The Disclosure Actions Are Contrary to Law

#### *1. 42 U.S.C. § 1306 and the TANF Statute Bar the Disclosure Actions*

As Plaintiff States have explained, 42 U.S.C. § 1306(a) and 42 U.S.C. § 617 bar ACF from disclosing any information obtained from Plaintiff States unless a statute "expressly provide[s]" otherwise and the HHS Secretary "prescribe[s]" "regulations" authorizing the disclosure. Mot. 19. The Disclosure Actions violate these limits twice over. No statute authorizes the disclosure of TANF recipients' information, "expressly" or otherwise. Mot. 19–23. And the SORNs are not "regulations," nor do they "prescribe" any identifiable standards governing disclosure, Mot. 23.

Defendants offer no response to any of this. They do not dispute that Sections 1306 and 617 require ACF to identify a statute affirmatively authorizing disclosure and to issue regulations prescribing when disclosure may occur—indeed, they do not address (or even cite) Section 1306 once in their brief. Nor do Defendants attempt to identify any statute that authorizes disclosure of TANF information, or claim that the SORNs (or any other agency action) are "regulations" that prescribe identifiable standards for disclosure. *Cf.* Opp. 12 (conceding that Routine Use 10 is "not a rule"). Defendants have therefore forfeited any defense to Plaintiff States' principal statutory claim. *See Campaign Legal Ctr. v. Fed. Elec. Comm'n*, 520 F. Supp. 3d 38, 50 (D.D.C. 2021).

Instead, Defendants devote pages of their brief to arguing that 31 U.S.C. § 7503 permits ACF to conduct audits separate from the "single audit" prescribed by Chapter 75 of Title 31. Opp. 24–26. That is beside the point. Even if this section authorized ACF to conduct *audits* separate from the Chapter 75 "single audit," it says nothing about *disclosure*. Mot. 20–21. It therefore fails to provide the "express" statutory authorization for disclosure that both Section 1306 and Section

617 require, let alone address the absence of any "regulations" "prescrib[ing]" disclosure standards, 42 U.S.C. § 1306(a)(1).

Regardless, Defendants' interpretation of Section 7503 fails on its own terms. Section 617 prohibits *any* action to "enforce any provision of this part, except to the extent expressly provided in this part." 42 U.S.C. § 617. As Defendants appear to concede, the only provision of the TANF statute that allows ACF to assess States' compliance with the statute's eligibility-verification requirements is Section 609(a)(1). *See* Opp. 24. That provision, in turn, permits ACF to impose penalties only "[i]f an audit *conducted under* chapter 75 of title 31 . . . finds that an amount paid to a State . . . has been used in violation of this part." 42 U.S.C. § 609(a)(1)(A) (emphasis added). The audits referenced in Section 7503 are not audits "conducted under chapter 75 of title 31." Instead, Section 7503—which is entitled "Relation to *other* audit requirements"—states that "the provisions of this chapter do not limit the authority of Federal agencies" to conduct audits "*in addition to* the audits . . . conducted pursuant to this chapter," 31 U.S.C. § 7503(c), (e) (emphasis added), where "[a]n audit conducted in accordance with this chapter" does not yield the necessary information, *id.* § 7503(a). Section 7503, in other words, generally preserves the ability of agencies to conduct audits *outside of chapter 75* where they have separate authority to do so. ACF therefore cannot invoke Section 7503 to conduct audits separate from the independent audit "conducted under chapter 75" to ensure compliance with the statute's eligibility-verification requirements. 42 U.S.C. § 609(a)(1)(A).

This straightforward textual reading is not "absurd." Opp. 25. The remaining fifteen provisions of Section 609(a) allow ACF to impose penalties whenever "the Secretary finds" or "determines" that specific provisions of the statute have been violated, including its "work participation" requirements, Opp. 25; *see* 42 U.S.C. § 609(a)(3), (15). But Congress conspicuously

chose a more restrictive trigger for penalties under Section 609(a)(1): the independent and rigorous audit "conducted under chapter 75." Reading this provision to allow imposition of penalties whenever the Secretary finds a violation of any statutory requirement would negate Congress's careful choice of words and cause Section 609(a)(1) to swallow much of the subsequent fifteen provisions. That is no way to read a statute.

Finally, context and history confirm that Defendants cannot be correct. In enacting the TANF statute, Congress took great care to protect the privacy of TANF recipients' personal information. *See* 42 U.S.C. §§ 602(a)(1)(A)(iv), 1320b-7(d)(3). In doing so, it deliberately departed from the Aid to Families with Dependent Children (AFDC) statute, which authorized open-ended disclosure of beneficiary information to other agencies, Mot. 20, and gave ACF broad authority to penalize States for any statutory violation. Mot. 22. It is highly implausible that, alongside these changes, Congress would have buried in Section 609(a)(1)—through a cross-reference to a provision that does not even mention disclosure—implicit authorization for ACF to disclose TANF information to any federal, State, or private entity. And the clear-statement requirements in Section 617, Section 1306(a), and the Spending Clause itself preclude the Court from finding such implicit authorization.

### ***2. The Disclosure Actions Violate the Social Security Act***

Defendants also offer no plausible defense of their violations of the Social Security Act. They do not dispute that all of the TANF records at issue are "Social security account numbers and related records" to which the Act applies. Mot. 24. Nor do they dispute that the TANF provisions under which they collected those records were enacted when the Act's requirements apply—that is, "on or after October 1, 1990." 42 U.S.C. § 405(c)(2)(C)(viii)(I). It follows that the Social Security Act makes those records "confidential" and prohibits Defendants from "disclos[ing]" them. *Id.*; *see League of Women Voters v. DHS*, No. 26-5243, 2026 WL 2643439, at *12 (D.C. Cir.

Sept. 4, 2026).

Defendants' only counterargument is that the Privacy Act overrides this prohibition. Opp. 28. But the Privacy Act does not contain any standalone authorization to disclose information; it *prohibits* the disclosure of personal records and then exempts particular types of disclosures from that prohibition. *See* 5 U.S.C. § 552a(b) ("No agency shall disclose any record which is contained in a system of records . . . unless" an enumerated exception applies). It thus contains no authorization that could supersede the confidentiality protections in other statutes. And even if there were a conflict between the Privacy Act and the Social Security Act, the Social Security Act would prevail, as it is a narrower, later-in-time statute that explicitly addresses its interaction with other laws. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Nor does it help Defendants that the Privacy Act was enacted in 1974. *Cf.* Opp. 28. The Social Security Act protects any records that "are obtained *or* maintained . . . pursuant to any provision of law[] enacted on or after October 1, 1990." 42 U.S.C. § 405(c)(2)(C)(viii)(I) (emphasis added). The TANF records at issue were indisputably "obtained" by ACF pursuant to 42 U.S.C. § 611, which was enacted in 1996. Mot. 24. And they are "maintained" pursuant to that statute, not the Privacy Act, as the Privacy Act simply sets rules governing access to and disclosure of records that are "maintained by an agency" pursuant to separate authority. 5 U.S.C. § 552a(a)(4).

### ***3. The Disclosure Actions Violate the Trade Secrets Act***

Defendants fare no better in their effort to evade the Trade Secrets Act. Defendants do not contest that the records at issue "concern[] or relate[] to the identity . . . of any person," and therefore fall within the Act's protections. Mot. 24–25 (quoting 18 U.S.C. § 1905). Nor do they dispute that this Act bars disclosure unless another statute "delegat[es] . . . disclosure authority" to ACF, and the agency exercises that authority by issuing "properly promulgated, substantive agency regulations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 306 (1979); *see Bartholdi Cable Co.,*

*Inc. v. FCC*, 114 F.3d 274, 281 (D.C. Cir. 1997). Defendants have not identified any such statute nor promulgated any such regulation, and so the Trade Secrets Act bars the Disclosure Actions.

Defendants briefly assert (at 29) that 31 U.S.C. § 7503(b) constitutes the requisite grant of disclosure authority. But, again, Section 7503(b) says nothing about disclosure; it simply clarifies that chapter 75 does not "limit" an agency's authority to conduct "additional audits." 31 U.S.C. § 7503(a)–(c); *see Chrysler Corp.*, 441 U.S. at 306 (rejecting contention that the Trade Secrets Act was superseded by statutes that merely "implie[d] some authority to collect information" but did not speak to disclosure). Further, Defendants do not attempt to identify any authorization that was "promulgated as [a] substantive rule[]" with "the binding effect of law." *Chrysler Corp.*, 441 U.S. at 315.

Defendants also claim that Plaintiff States fall outside the zone of interests of the Trade Secrets Act. Opp. 29. Not so. The zone-of-interests test is a "not . . . especially demanding" standard, which merely requires a plaintiff to demonstrate that "[t]he interest he asserts" is "arguably within the zone of interests to be protected or regulated by the statute." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 (2012) (citation modified). This test does "not require any 'indication of congressional purpose to benefit the would-be plaintiff,'" and "the benefit of any doubt goes to the plaintiff." *Id.* at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987)). Here, Plaintiff States assert an interest in protecting the privacy of information that individuals provided to them under assurances of confidentiality to ensure that those individuals are not deterred from using State services. Mot. 12–14. That interest is at least "arguably" related to the interests Congress sought to protect in enacting the Trade Secrets Act, which was designed to ensure that "confidential information" was not subject to "unauthorized disclosure" by every "petty officer" in the federal government. *Chrysler*

*Corp.*, 441 U.S. at 296–97 & n.22 (citations omitted); *see CAN Fin. Corp. v. Donovan*, 830 F.2d 1132, 1140 (D.C. Cir. 1987) (noting that "[t]he language of the Act is exceedingly broad" and extends to "information pertaining to . . . even the 'identity' of 'any person.'").

#### ***4. The Disclosure Actions Violate the Privacy Act***

The Disclosure Actions are also contrary to the Privacy Act. Although Defendants devote the lion's share of their brief to addressing this statute, *see* Opp. 15–24, it constitutes just one of four contrary-to-law claims the States raise, and each of the remaining claims would prevail regardless of whether the Privacy Act claim succeeds. In any event, Defendants' Privacy Act arguments lack merit: Plaintiff States may rely on the APA to assert violations of the Privacy Act, and each of the Disclosure Actions violates that statute.

##### *a. Plaintiff States may assert violations of the Privacy Act under the APA*

As Plaintiff States have explained, binding precedent provides that they may bring an APA claim asserting violations of the Privacy Act. Mot. 26. The D.C. Circuit explicitly held that a plaintiff could bring Privacy Act claims under the APA in a similar posture in *Doe v. Stephens*. 851 F.2d 1457, 1465–66 (D.C. Cir. 1988). And district courts in this circuit have repeatedly made clear that such claims are proper where—as here—the Privacy Act's cause of action does not afford them "relief of the same genre" that they seek under the APA (or, as in this case, any relief at all). *Haleem v. U.S. Dep't of Defense*, No. 23-1471, 2024 WL 230289, at *13 (D.D.C. Jan. 22, 2024).

Defendants do not meaningfully grapple with this precedent. They grudgingly acknowledge (at 20) that the D.C. Circuit's decision in *Stephens* constitutes "adverse precedent," but offer no plausible reason why this Court may disregard that binding decision. To the contrary, their observation that the D.C. Circuit permitted APA review even though the "Privacy Act d[id] not by itself authorize the injunctive relief sought," 851 F.2d at 1463, *refutes* their view that the Act's remedies are exclusive. And the court's decision to award "declaratory" relief because it

found "injunctive relief" unnecessary under the "highly specific facts" of that case, Opp. 20, has no bearing on the amenability of APA review in the first place. *See Stephens*, 851 F.2d at 1467.

Defendants also offer a string cite of district court decisions that they claim ruled in their favor. Opp. 19. But every one of those cases found that APA review was precluded because the court found that the plaintiff "*may* seek relief through the Privacy Act," and thus the Privacy Act provided an "'adequate remedy'" apart from the APA. *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014) (emphasis added) (quoting 5 U.S.C. § 704); *see, e.g.*, *Poss v. Kern*, No. 23-cv-2199, 2024 WL 4286088, at *6 (D.D.C. 2024) (dismissing APA claim because "the Privacy Act provides [plaintiff] with the same type of equitable relief he requests"); *Haleem*, 2024 WL 230289, at *14 (similar). None of those cases adopted the counterintuitive position that the Privacy Act supplies an "adequate remedy" under 5 U.S.C. § 704 where, as here, it provides the plaintiff no form of redress at all—an understanding of Section 704 that the Supreme Court and the D.C. Circuit have long rejected. *See Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988) (rejecting the "novel submission" that an action "is barred by § 704" where a plaintiff may obtain only "doubtful and limited relief" through another statute); *CREW v. U.S. Dep't of Justice*, 846 F.3d 1235, 1245 (D.C. Cir. 2017) ("if the very existence of an alternative remedy is 'doubtful,' or 'uncertain[],' there is scant basis to displace APA review" (citations omitted)).

Left without any on-point precedent in their favor, Defendants invoke a series of inapposite lines of authority. They cite cases (at 19) holding that, in suits brought directly under the Privacy Act, courts may not award injunctive relief beyond what that statute authorizes. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007); *Parks v. IRS*, 618 F.2d 677, 684 (10th Cir. 1980); *Cell Assocs., Inc. v. NIH*, 579 F.2d 1155, 1159–60 (9th Cir. 1978). Those cases did not involve APA claims. And contrary to Defendants' suggestion, it is entirely proper (and typical) for

plaintiffs to invoke the APA to obtain injunctive relief not afforded by the underlying statute. *See, e.g.*, *Stephens*, 851 F.2d at 1466 (explaining that a "grant of injunctive relief to prevent violations of [a statute] could rest on . . . the APA even though the underlying enactment gave rise to no private right of action for damages" (citing *Chrysler Corp.*, 441 U.S. at 317)).

Defendants also err in their reliance on *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984). That case held that a statute may overcome the "presumption favoring judicial review of administrative action" if its "structure," "objectives," "legislative history," and "the nature of the administrative action involved" indicate that Congress intended to preclude APA review. *Id.* at 345, 349. Defendants, however, point to no structural or other indicia that Congress intended to preclude APA review of Privacy Act violations. They merely point out that the Privacy Act contains a private "cause of action." Opp. 16. But the Supreme Court has emphatically rejected the proposition that the existence of a statutory cause of action "suggest[s] a purpose to" "preclude[] review under the APA." *Bennett v. Spear*, 520 U.S. 154, 175 (1997). And the D.C. Circuit and other courts routinely permit plaintiffs to invoke the APA to allege violations of statutes that include a standalone cause of action. *See, e.g.*, *Ctr. for Taxpayer Rights*, 2026 WL 2635380, at *10.

Finally, Defendants are incorrect that Plaintiff States fall outside of the Privacy Act's zone of interests. Opp. 16. As noted, that "not . . . especially demanding" test merely requires a showing that the plaintiff seeks to advance interests "arguably . . . related to . . . the purposes implicit in the statute." *Patchak*, 567 U.S. at 225. (Contrary to Defendants' suggestion (at 8), this test has no bearing on the court's jurisdiction. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014).) It is therefore irrelevant (*contra* Opp. 17) whether the underlying statute affords the plaintiff a cause of action. *See, e.g.*, *Bennett*, 520 U.S. at 175 (concluding that plaintiffs lack a cause of action under the ESA but nonetheless fall within its zone of interests). And the

interests that Plaintiff States seek to advance are closely aligned with the reasons Congress enacted the Privacy Act, which was designed to regulate the compilation of "computerized data banks" that Congress feared would erode trust in government, among other harms. Mot. 25.

*b. The Disclosure Actions do not satisfy the Privacy Act's routine use exception*

Defendants' Privacy Act arguments also fail on the merits. The Privacy Act broadly prohibits federal agencies from disclosing individuals' personal information without their consent unless they can show that an enumerated exception applies. 5 U.S.C. § 552a(a)(4), (b). Defendants argue (at 21) that the Disclosure Actions satisfy the Privacy Act's "routine use" exception. *See* 5 U.S.C. § 552a(a)(7), (b)(3). To justify a disclosure under that exception, the government must satisfy three requirements: (1) the disclosure must be "for a purpose which is compatible with the purpose for which it was collected," *Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018) (citing 5 U.S.C. § 552a(a)(7)); (2) the agency must provide individuals with "actual notice" of the routine use "at the time the information is collected," *U.S.P.S. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 146 & n.12 (D.C. Cir. 1993) (citing 5 U.S.C. § 552a(e)(3)(C)); and (3) the disclosure must be "within the scope of a routine use notice published by the agency," *Ames v. DHS*, 861 F.3d 238, 240 (D.C. Cir. 2017) (citing 5 U.S.C. §§ 552a(a)(7), (e)(4)(D)). *See* Mot. 27. None of these three requirements is met in this case.

*First*, Defendants' disclosure is not "compatible" with the purpose for which ACF collected the information. 5 U.S.C. § 552a(a)(7). Defendants contend that the purpose for their disclosure (to "ensure eligibility for receipt of benefits") is "perfectly compatible" with the States' "purpose of collecting eligibility data in the first place," namely to "ensure eligibility for the receipt of benefits." Opp. 22. But the Privacy Act's compatibility requirement looks to "the *agency's* purpose in collecting the record." *Ames*, 861 F.3d at 240 n.1 (emphasis added; citing cases). And as Plaintiff States have already explained (and Defendants do not dispute), ACF collected the information

under 42 U.S.C. § 611 for the principal purpose of compiling public reports about the effectiveness of the TANF program. Mot. 28. These reports bear no "'meaningful degree of convergence'" with enforcing State "compliance with all TANF program requirements." *Ames*, 861 F.3d at 240 n.1 (citation omitted).

*Second*, Defendants do not dispute that they failed to provide TANF beneficiaries with "actual notice" of the disclosures "at the time the information [was] collected," *Nat'l Ass'n of Letter Carriers*, 9 F.3d at 146 & n.12. Though Defendants suggest (at 22–23) that they satisfied the notice requirement by publishing Routine Use 7 in 2015, constructive notice does not suffice. *See Nat'l Ass'n of Letter Carriers*, 9 F.3d at 146 (holding that "actual notice" must "be provided either on the form with which the information is gathered, or on another form that may be retained" by the subject individual). Nor did Routine Use 7 in fact provide any constructive notice: contrary to Defendants' repeated unsupported assertion that Routine Use 10 is a mere "clarification" of Routine Use 7, Routine Use 10 is nothing of the sort. As Plaintiff States have explained, Routine Use 7 authorizes information sharing with private parties under contractual arrangements and does nothing to alert the public that ACF would share information with other federal agencies, or for oversight purposes. Mot. 30–32; *infra* p. 17. Although Defendants suggest that ACF has no obligation to provide notice to TANF beneficiaries because it is the States that collect this information in the first instance, Opp. 22, that suggestion ignores that ACF requires the States to collect and report TANF beneficiary information, *see* ECF No. 45-5 at 3, 48, 90, and the States themselves could not have known that Defendants would, in secret, interpret Routine Use 7 beyond its terms.

*Third*, Defendants do not meaningfully dispute that neither the 2025 Data Transfer nor the Data Disclosure Policy falls "within the scope of a routine use notice published by the agency."

*Ames*, 861 F.3d at 240. At the time ACF transferred TANF recipient data to DHS and initiated its Data Disclosure Policy, it had not yet published Routine Use 10. As Plaintiff States have explained, Routine Use 7 permits disclosure to only a limited class of recipients ("contractors, grantees, consultants, or volunteers . . . who have a need to have access to the information in the performance of their duties or activities") working on a limited set of tasks ("a contract, service, grant, cooperative agreement, job, or other activity for HHS") for a limited set of purposes (those "related to the purposes of this system of records"). Mot. 30–31. Defendants do not dispute that federal agencies like DHS are not "contractors, grantees, consultants, or volunteers"—terms that refer to private entities engaged by the government. Mot. 31. Nor do Defendants contest that the 2025 Data Transfer was not conducted pursuant to a "contract, service, grant, cooperative agreement, job, or other activity for HHS." Mot. 31. These matters are thus conceded, and resolve this issue. *See Campaign Legal Ctr.*, 520 F. Supp. 3d at 50.

Defendants halfheartedly claim (at 23) that the 2024 SORN's reference to "certain requirements" in the Social Security Act should be read to include *all* TANF program requirements. Even if that were the case, it would not overcome the fact that the 2025 Data Transfer and the Data Disclosure Policy do not satisfy the other requirements of Routine Use 7. And, in any event, such a reading would not only deprive the word "certain" of any meaning, *see Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (noting importance of "giv[ing] effect, if possible, to every word"), but would also ignore ACF's express statement that it added the "related to the purposes of the system of records" language to Routine Use 7 specifically to ensure that the "routine use wording is not overly broad." 89 Fed. Reg. 25,880, 25,881 (Apr. 12, 2024).

*c. Defendants did not enter into a computer matching agreement*

The Disclosure Actions also violate the computer-matching requirements of the Privacy Act. That Act provides that, when agencies engage in bulk data matching to check public benefits

eligibility, they must execute and publish detailed computer-matching agreements, *see* 5 U.S.C. § 552a(a)(8), (e)(12), (o). Defendants are plainly authorizing disclosure for bulk data matching purposes, as the Disclosure Actions all involve the sharing of information with DHS to compare the list of TANF recipients with DHS's own list of noncitizens. *See* ECF No. 41 ¶¶ 2–4; 91 Fed. Reg. at 37,407. Further, Defendants do not dispute that they have failed to publish or even execute a computer-matching agreement. Opp. 23.

Defendants briefly attempt to defend their failure to enter computer-matching agreements by claiming that the Act's computer-matching requirement applies only to data matching conducted for the purpose of "verifying eligibility." *Id*. That is demonstrably false: the relevant language of the Privacy Act—which Defendants conspicuously omit from their quotation—provides that the statute's matching requirement applies to any computerized comparison "for the purpose of[] establishing or verifying the eligibility of, *or continuing compliance with statutory and regulatory requirements by*, applicants for, recipients or beneficiaries of, participants in, or providers of services with respect to cash or in-kind assistance or payments under Federal benefit programs." 5 U.S.C. § 552a(a)(8) (emphasis added). Defendants themselves admit that their purpose in sharing information is to "ensure states are complying with the TANF requirements," Opp. 23 (emphasis omitted), thus conceding that they meet the very standard set forth in the statute. And even if the statute were limited to matching for the purpose of verifying eligibility, Defendants concede one page earlier they are sharing information for that purpose, too. *See* Opp. 22 ("The purpose of the routine use is to ensure eligibility for receipt of benefits.").

*d. ACF failed to comply with the Privacy Act's procedural requirements*

As Plaintiffs have explained, *see* Mot. 33, the 2026 SORN also does not comply with the Privacy Act's procedural requirements, which require agencies to provide the public with a "meaningful" opportunity to comment on a SORN prior to its effective date. *League of Women*

*Voters v. DHS*, 835 F. Supp. 3d 79, 128 (D.D.C. 2026); *see* 5 U.S.C. § 552a(e)(4), (11). Defendants respond simply that they have no obligation to "respond to each comment received, or to any comment," and that the "proper remedy would be for the Court to order ACF to consider further the comments received and then take the action it believes to be correct." Opp. 24. But an opportunity to comment is not "meaningful" if the agency is not "sufficiently open-minded," *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009), and Defendants have not been able to represent that "anybody inside the government has even read the comments" that were submitted, ECF No. 45-41 at 72:14–19. Because, under the Privacy Act, "notice and comment is required '*prior to*' [a] new use" of data, *League of Women Voters*, 835 F. Supp. 3d at 130 n.14 (quoting 5 U.S.C. § 552a(e)(11)) (emphasis added), the proper remedy at this point is to stay the 2026 SORN and enjoin its implementation. *See, e.g.*, *Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17, 22 (D.D.C. 2009).

**B. The Disclosure Actions Are Arbitrary and Capricious**

The Disclosure Actions are also arbitrary and capricious. Mot. 34–37. Defendants do not even attempt to argue that they have provided a reasoned explanation for any of the Disclosure Actions. Nor could they: Defendants can hardly be said to have "explain[ed]" "the bases" for the 2025 Data Transfer and the Data Disclosure Policy when they failed at any time prior to this lawsuit to acknowledge them. *Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020). And Defendants do not dispute that the 2026 SORN contains no explanation for the agency's change of course, "consideration of costs and benefits," assessment of "reliance interests," or any other matter the APA requires. Opp. 28.

Rather than defending the rationality of the Disclosure Actions, Defendants take the remarkable position that they were not required to offer *any* explanation for new Routine Use 10 because the publication of a SORN is not subject to the APA's notice-and-comment rulemaking

requirements. Opp. 27 (citing 5 U.S.C. § 553(c)). As an initial matter, that response furnishes no defense for the agency's failure to provide a reasoned explanation for the 2025 Data Transfer and the Data Disclosure Policy, both of which preceded the adoption of Routine Use 10. Furthermore, the federal government's suggestion that only notice-and-comment rules are subject to arbitrary-and-capricious review is plainly incorrect, as a mountain of precedent confirms. *See, e.g.*, *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 3 (2020); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417–21 (1971). And even if a brief explanation would typically suffice to justify a routine SORN or data-sharing action, ACF was required to say more here because each of its actions amounted to a dramatic and highly consequential change in position from decades of prior practice. Mot. 34; *see Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025).

### C. The Disclosure Actions Violate the Spending Clause

Finally, the Disclosure Actions violate the Spending Clause because no statute placed the States on clear notice that ACF would claim a programmatic review power or share their TANF information at will with federal, State, and private entities. Mot. 37–38. Defendants raise two counter-arguments, but neither has merit.

*First*, Defendants claim that the 2026 SORN and the 2025 Data Transfer are consistent with the Spending Clause because Routine Use 7 previously granted "ACF substantially similar authority." Opp. 30. As an initial matter, Routine Use 7 cannot plausibly be read to allow for data transfers to other government agencies for oversight purposes, *see* Mot. 30–32; *supra* p. 17, and it certainly did not "clearly and unambiguously alert" the States to ACF's newly claimed powers. *Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1941 (2026). More fundamentally, Routine Use 7 is irrelevant to the Spending Clause analysis: What matters is that States were "unable to ascertain" any ACF power to conduct open-ended reviews, audits, investigations, and monitoring of the States when Congress enacted the TANF statute in 1996. *Arlington Cent. Sch.*

*Dist. v. Murphy*, 548 U.S. 291, 296 (2006) (citation omitted). Though Defendants maintain that the TANF statute gives ACF such powers, Opp. 38, that is incorrect: The only provision in the TANF statute that allows ACF to assess State compliance with eligibility-verification requirements is 42 U.S.C. § 609(a), and that provision refers to *independent* audits conducted under chapter 75 (and, in any event, does not confer authority to *disclose* data). *Supra* pp. 7–9.

*Second*, Defendants argue (at 30) that the Spending Clause does not apply to the Executive Branch at all. That claim is inconsistent with the basic logic of our Constitution. Outside of a few narrow areas of inherent executive authority, the Executive Branch can act only pursuant to a valid delegation of authority by Congress. And if Congress cannot violate the Spending Clause, it cannot grant the Executive Branch authority to do so, either. Consistent with these principles, numerous courts have applied the Spending Clause to Executive Branch actions. *See, e.g.*, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 n.6 (9th Cir. 2019); *Freedom Network USA v. Trump*, 830 F. Supp. 3d 681, 708–09 (N.D. Ill. 2026); *California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291, 311 (D.R.I. 2025); *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 572 (S.D.N.Y. 2019).

## III. Plaintiffs Will Suffer Irreparable Harm

Plaintiffs' unrebutted evidence shows that they will suffer irreparable harm if the Disclosure Actions are not enjoined.

*First*, Plaintiffs have provided substantial, unrebutted evidence showing that the Disclosure Actions will result in individuals disenrolling in TANF, undermining the trust that States have developed with TANF recipients and burdening other State programs. *See supra* pp. 2–4. Defendants assert that this harm is "attenuated" or "speculative" because "it is impossible to predict how TANF recipients will react to" the Disclosure Actions. Opp. 7–8. But, in contrast to Defendants' unsupported generalizations, the record includes a wealth of specific facts substantiating Plaintiff States' claims of irreparable harm. As noted above, well-substantiated

predictions about how third parties will react to government policies are an established basis for injury. *See supra* pp. 2–4; Mot. 12–14, 39–40 (collecting cases). Although Defendants attempt to rely upon another court's skepticism as to the chilling effect of the 2026 SORN, *see* Opp. 14, that record lacked the "factual support" that Plaintiffs have proffered here. *See Make the Road States v. Kennedy*, No. 26-CV-4713, 2026 WL 2607277, at *7 (E.D.N.Y. Sept. 3, 2026). And Defendants' assertion (at 8) that TANF participants cannot be chilled because Routine Use 7 "has long allowed [the] information sharing" challenged in this lawsuit is both legally erroneous, *see supra* p. 17, and contrary to the unrebutted record evidence, *see, e.g.*, NY-Chawla Suppl. ¶ 4 ("I am not aware of any . . . instance [other than the 2025 Data Transfer] in which ACF has shared any TANF data collected from states with DHS.").

*Second*, Plaintiffs have provided substantial, unrebutted evidence showing that, absent an injunction, each State will immediately need to review, and in many cases revise, their privacy disclosures to TANF applicants and recipients, causing the State to expend resources. Mot. 14–15, 40-42; *see supra* p. 4. Defendants do not dispute that Plaintiffs will incur these harms absent an injunction, and that Plaintiffs have no way to be later compensated for these expenditures. *See* Opp. 8–9. Rather, Defendants argue that "ordinary compliance costs are typically insufficient to constitute irreparable harm." Opp. 9 (citation omitted). But as Defendants' own authority explains, "courts in this circuit have considered administrative and compliance costs" as "part of the irreparable harm analysis," *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 67 (D.D.C. 2020), and have found irreparable injury where government actions required a state to incur "significant regulatory and administrative burdens," *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 39 (D.D.C. 2020). While Defendants cherry-pick a handful of cases in which courts have found that particular alleged compliance costs did not rise to the level of irreparable harm, those

cases were very different from this one: they relied either on the fact that the compliance costs had already been incurred and therefore could not support forward-looking relief, *see New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 303 (S.D.N.Y. 2020) ("[M]uch of these costs should have been incurred already."); *Pennsylvania*, 480 F. Supp. 3d at 68, or that those costs entailed merely the loss of the "time-value of . . . money" while in escrow. *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005). By contrast, courts find irreparable harm where, as here, States face the cost of implementing prospective federal changes to State-administered public benefits programs. *See, e.g.*, *District of Columbia*, 444 F. Supp. 3d at 38 (changes to State activities based on "a complex program serving" millions of people would be "self-evidently onerous to implement"); *New York v. U.S. Dep't of Just.*, 804 F. Supp. 3d 294, 330 (D.R.I. 2025), *appeal dismissed*, No. 25-2099, 2025 WL 4717710 (1st Cir. Dec. 11, 2025) ("[C]ompliance costs are, indeed, costly."); *Colorado v. Trump*, 823 F. Supp. 3d 1251, 1278 (D. Colo. 2026); *Minnesota v. U.S. Dep't of Agric.*, 826 F. Supp. 3d 975, 1004 (D. Minn. 2026); *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020). And here, Plaintiffs must comply not only to align with federal action, but also to meet their own independent obligations under State law. *E.g.*, DC-Campbell ¶ 24.

*Third*, Plaintiffs have provided substantial, unrebutted evidence showing that they face an imminent risk of new oversight and enforcement actions stemming from the Disclosure Actions, which will at minimum require them to expend resources responding to such oversight actions, and potentially lead to a loss of TANF funding. *See* Mot. 15–16, 42–44. Defendants repeat their assertion (at 9) that the "[t]he SORN does not represent new oversight and enforcement action," but that assertion is wrong on both the law and the record. *See supra* pp. 5–6; Mot. 15. As to potential penalties, Defendants spuriously claim that Plaintiffs are protected by a set of statutory

and regulatory procedures that, earlier this year, Defendants ignored in implementing a $7 billion TANF freeze against five Plaintiff States. *See* Opp. 10–11; *supra* p. 5. And Defendants simply ignore Plaintiffs' argument that any potential enforcement stemming from the Disclosure Actions is likely to be erroneous based on inaccurate data matching. *See* Mot. 43.

Finally, Defendants argue that the Privacy Act forecloses a finding of irreparable harm. Opp. 14–15. But unlike the individuals who brought suit in *Make the Road*, the plaintiff States have identified injuries that would not even arguably be remedied by "damages" under the Privacy Act or a "permanent injunction." *Cf. Make the Road States*, 2026 WL 2607277, at *6. The States cannot obtain money damages under the Privacy Act. In any event, neither money damages nor a permanent injunction at the end of this litigation could undo the harms resulting from a chill of participation in the States' TANF programs, the need for the States to revise their disclosures, and the costs of undergoing new oversight and enforcement. A harm that cannot be recovered "at a later date" is the definition of irreparable injury. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–98 (D.C. Cir. 2006); *see New Jersey v. U.S. Dep't of Transp.*, 824 F. Supp. 3d 416, 422 (S.D.N.Y. 2026) (finding plaintiff States would be irreparably harmed where they would incur losses unique to States that they "would have no means to recoup"), *aff'd*, No. 26-282, 2026 WL 696286 (2d Cir. Mar. 11, 2026).

## IV. The Balance of the Equities and Public Interest Favor Plaintiffs

Defendants fail to address the arguments Plaintiffs make explaining why the equities and the public interest fall in their favor. *See* Mot. 44–45. As detailed above, Plaintiffs face irreparable harm in the form of harms from chilled TANF participation, compliance costs to disclose the use of TANF recipient data, and the risk of enforcement. Critically, Plaintiffs explain—and Defendants nowhere dispute—that it will be virtually impossible to claw back any data shared in the absence of a preliminary injunction, meaning that Plaintiffs' injuries would be impossible to redress at final

judgment and are thus quintessentially irreparable. *See* Mot. 38–39, 44. Defendants also have no rejoinder to Plaintiffs' argument that "the balance of the equities and the public interest favors maintaining the status quo" while this litigation is pending; nor do they dispute that the status quo favors Plaintiffs: for nearly three decades ACF did *not* share individuals' TANF data with DHS. *See New York*, 804 F. Supp. 3d at 332; Mot. 44.

The only interest Defendants assert weighs in their favor is the government's "significant interest in carrying out congressional intent, by fully and effectively carrying out its obligations under 42 U.S.C. § 609." Opp. 31. But, as explained above, Defendant's actions fly in the face of the numerous statutes. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). And the challenged Disclosure Actions are plainly not necessary for the government to "carry[] out" its obligations under Section 609, since all of the data at issue in this case is available to, and will remain available to, ACF—the entity authorized to enforce Section 609. *See* Mot. 44. It will merely halt the sharing of such information with agencies that have no entitlement to such data and who are squarely foreclosed from obtaining it.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction and Stay under 5 U.S.C. § 705 should be granted.

Dated: September 18, 2026

Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: /s/ *Jessica Ranucci*
Jessica Ranucci
Mark Ladov
Stephen Thompson
*Special Counsel*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
28 Liberty St.
New York, NY 10005
(929) 736-3392
jessica.ranucci@ag.ny.gov
mark.ladov@ag.ny.gov
stephen.thompson@ag.ny.gov
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: /s/ *Mitchell P. Reich*
Mitchell P. Reich (1044671)
*Senior Counsel to the Attorney General*
/s/ *Karthik P. Reddy*
Karthik Reddy (1048848)
*Special Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth St. NW
Washington, DC 20001
(202) 279-1261
mitchell.reich@dc.gov

*Counsel for the District of Columbia*

**ROB BONTA**
Attorney General of California

By: /s/ *Camille Framroze*
Todd Grabarsky
Matthew Wise
*Supervising Deputy Attorneys General*
William Bellamy
Camille Framroze
Harald Kirn
Andrew Kushner
*Deputy Attorneys General*
455 Golden Gate Ave., Ste. 11000
San Francisco, CA 94102-7004
(415) 510-3619
Camille.Framroze@doj.ca.gov

*Counsel for the State of California*

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: /s/ *Luci D. Davis*
Luci D. Davis
Jaylia Yan (90007649)
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Luci.Davis@azag.gov
Jaylia.Yan@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**PHIL WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
David Moskowitz (994469)
*Deputy Solicitor General*
Reed W. Morgan
*Assistant Solicitor General*
1300 Broadway, 10th Fl.
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Katherine Zdrojeski*
Katherine Zdrojeski
*Assistant Attorney General*
165 Capitol Ave.
Hartford, CT 06106
(860) 808-5210
Katherine.Zdrojeski@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Lison
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Delaware Department of Justice
820 N. French St.
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General for the State of Hawai‘i

By: */s/ Kaliko‘onālani D. Fernandes*
Kaliko‘onālani D. Fernandes
*Solicitor General*
425 Queen St.
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai‘i*

**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Harpreet K. Khera*
Harpreet K. Khera
*Bureau Chief, Special Litigation*
Sherief Gaber
*Assistant Attorney General*
115 S. LaSalle St., 35th Fl.
Chicago, IL 60603
(773) 590-7127
Harpreet.Khera@ilag.gov
Sherief.Gaber@ilag.gov

*Counsel for the State of Illinois*

**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
In his official capacity as Governor of the Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo
*General Counsel*
Sam Flynn
*Chief Deputy General Counsel*
Laura C. Tipton
*Deputy General Counsel*
Office of the Governor
501 High St.
Frankfort, KY 40601

(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Brendan Kreckel*
Brendan Kreckel
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
brendan.kreckel@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Keith M. Jamieson*
Keith M. Jamieson (187911)
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6960
kjamieson@oag.maryland.gov

*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Michelle Pascucci*
Michelle Pascucci
*State Trial Counsel*
Jak Kundl
*Assistant Attorney General*
One Ashburton Pl.
Boston, MA 02108
(617) 963-2255
Michelle.pascucci@mass.gov
jak.kundl@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

**KEITH ELLISON**
Attorney General of the State of Minnesota

By: */s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp
*Special Counsel, Rule of Law*
445 Minnesota St., Suite 600
St. Paul, MN 55101
(651) 300-0711
lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
Attorney General of the State of Nevada

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-3420
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Kashif T. Chand*
Kashif T. Chand
*Assistant Attorney General*
New Jersey Office of the Attorney General,
Division of Law
124 Halsey St., 5th Fl.
Newark, NJ 07101
(973) 648-2052
Kashif.Chand@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: */s/ Anjana Samant*
Anjana Samant
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 270-4332
asamant@nmdoj.gov

*Counsel for the State of New Mexico*

**DAN RAYFIELD**
Attorney General State of Oregon

By: */s/ Leanne Hartmann*
Leanne Hartmann
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
(971) 673-1880
Leanne.Hartmann@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSH SHAPIRO**
In his official capacity as Governor of the Commonwealth of Pennsylvania

By: */s/ Jacob B. Boyer*
Jennifer C. Selber
Jacob B. Boyer
Governor's Office of General Counsel
30 North 3rd St.
Suite 200
Harrisburg, PA 17101
(717) 831-2847
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Marissa D. Pizaña*
Marissa D. Pizaña
*Special Assistant Attorney General*
150 South Main St.
Providence, RI 02903
(401) 274-4400
MPizana@riag.ri.gov

*Counsel for the State of Rhode Island*

**JAY JONES**
Attorney General for the Commonwealth of Virginia

By: */s/ Megan C. Keenan*
Megan C. Keenan (1672508)
*Deputy Solicitor General*
202 North Ninth St.
Richmond, VA 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General of the State of Wisconsin
By: */s/ Faye B. Hipsman*
Faye B. Hipsman
*Assistant Attorney General*
Wisconsin Department of Justice
PO Box 7857
Madison, WI 53707-7857
(608) 264-9487
faye.hipsman@wisdoj.gov

*Counsel for the State of Wisconsin*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan Patrick Kane*
Ryan Patrick Kane
*Deputy Solicitor General*
109 State St.
Montpelier, VT 05609
(802) 828-3171
Ryan.kane@vermont.gov

*Counsel for the State of Vermont*

**NICHOLAS W. BROWN**
Attorney General of the State of Washington

By: */s/ Mina Shahin*
Mina Shahin
*Assistant Attorney General*
William McGinty
*Deputy Solicitor General*
800 Fifth Ave., Ste. 2000
Seattle, WA 98104
(206) 464-7744
Mina.Shahin@atg.wa.gov
William.McGinty@atg.wa.gov

*Counsel for the State of Washington*