UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF NEW YORK, *et al.*,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ADMINISTRATION FOR CHILDREN AND FAMILIES, *et al.*,**<br><br>**Defendants.** | **Civil Action No. 26-2726 (JEB)** |

**MEMORANDUM OPINION**

Plaintiffs — twenty-two states, two governors' offices, and the District of Columbia — brought this suit challenging two central actions of the Administration for Children and Families related to disclosure of data collected under the Temporary Assistance for Needy Families program. One is ACF's issuance of a new System of Records Notice authorizing the agency to disclose a broader scope of TANF information to a wider array of federal, state, and private entities. The other is ACF's admission that, in September of 2025, it disclosed a swath of TANF data pursuant to a previously unannounced policy. Asserting that those disclosure actions violate a slew of statutes and the Constitution's Spending Clause, Plaintiffs now move for a preliminary injunction and stay. Because they fail to establish a substantial likelihood of standing or irreparable harm, as is necessary at this stage, the Court will deny their Motion.

## I. Background

### A. Legal Background

In 1996, Congress created the TANF program. See Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. No. 104-193, tit. I, 110 Stat. 2105,

2110–85 (codified as amended at 42 U.S.C. §§ 601–619). TANF "provides federal block grants" to states to "use for their own public assistance programs." Arizona v. Thompson, 281 F.3d 248, 250 (D.C. Cir. 2002). In designing TANF, Congress put the states in the program's driver's seat. To receive a grant, states must submit a plan to ACF detailing how they intend to use the funds. See 42 U.S.C. § 602. Yet the criteria are not particularly restrictive, and states generally may use the funds "in any manner that is reasonably calculated to accomplish the purpose of" TANF: to assist needy families. Id. § 604(a); see, e.g., id. §§ 607, 608(a)(4) (imposing work-related mandate and schooling requirement for teenage parents). TANF also makes the states responsible for determining whether a potential recipient meets the "income and eligibility" requirements for the program and for conducting a yearly audit to ensure compliance with the statute's requirements. See 42 U.S.C. 609(a)(1); see also id. § 1320b-7(a), (b)(1); 31 U.S.C. § 7502(a)(1)(A), (b)(1).

The federal government, conversely, has much more circumscribed involvement in TANF. And purposefully so. TANF's predecessor program, Aid to Families with Dependent Children, gave the federal government the lead role in implementing and overseeing each state's low-income assistance programs. See, e.g., 42 U.S.C. §§ 602, 604 (1994). Following widespread agreement that a more effective program would capitalize on the benefits of federalism, Congress enacted TANF with the stated purpose of "increas[ing] the flexibility of States in operating [assistance] program[s]." See id. § 601(a). Consistent with that innovation, the Department of Health and Human Services has a limited role in TANF beyond approving each state's plan. Indeed, the statute expressly bars the federal government from "regulat[ing] the conduct of States under this part or enforc[ing] any provision of this part, except to the extent expressly provided by this part." Id. § 617. The Secretary may penalize states for violating the

program's requirements only by withdrawing funds — and only if an "audit conducted" under the Single Audit Act "finds that" a state has used TANF funds "in violation of" the statute. See id. § 609(a)(1)(A); 31 U.S.C. §§ 7501–7506. Beyond that, the Secretary must send annual reports to Congress detailing the demography of program participants and the states' success in meeting TANF's goals. See 42 U.S.C. § 611(b). To facilitate those reports, states must submit to ACF data on their program participants. See id. § 611(a); but see also id. § 611(a)(1)(B)(i) (permitting states to submit statistical sample of such data). Otherwise, once it hands states the funds, the federal government largely sits back.

States — and through them, ACF — collect highly sensitive data about current and former TANF recipients and their family members, including their Social Security numbers, income and employment status, parentage, marital status, and citizenship status, among other things. See id. § 611(a)(1)(A); see also id. § 1320b-7(a)(1), (b)(1). That sensitive data is contained in a system of records, identified here as the TANF System of Records, which ACF maintains. See 89 Fed. Reg. 25,880, 25,882 (Apr. 12, 2024). A bevy of federal statutes imposes requirements on the states and federal government to protect that information. TANF itself instructs states to "[t]ake such reasonable steps" as they "deem[] necessary to restrict the use and disclosure of information about individuals and families receiving assistance under the program." 42 U.S.C. § 602(a)(1)(A)(iv). A general confidentiality statute prohibits HHS employees from disclosing "any file, record, report . . . or information" obtained through their duties except as the head of their agency "may by regulations prescribe and except as otherwise provided by Federal law." Id. § 1306(a)(1)-(2). The Social Security Act requires that "[s]ocial security account numbers and related records . . . be confidential" and provides that no person "shall disclose any such Social Security account number or related record." Id. § 405(c)(2)(C)(viii)(I). Federal law

also makes it a crime for federal employees to "make[] known in any manner" any information concerning the identity or income of any person, to which they become privy in the course of their employment and for which there is not a separate disclosure authorization. See 18 U.S.C. § 1905.

The Privacy Act, meanwhile, bans the disclosure of "any record" about an individual "which is contained in a system of records" without consent, unless disclosure fits within a statutory exception. See 5 U.S.C. § 552a(b). One such exception allows disclosure for a "routine use" that is "for a purpose which is compatible with the purpose for which [the record] was collected." Id. § 552a(a)(7), (b)(3). To avail itself of the routine-use exception, however, an agency must jump through several procedural hoops, including publishing in the Federal Register a system-of-records notice (SORN) that describes the intended use and gives the public 30 days to comment before it goes into effect. Id. § 552a(e)(4)(D), (11).

Until recently, the TANF System of Records was governed by a SORN published in 2024. See generally 89 Fed. Reg. at 25,880. The 2024 SORN listed three purposes for which the records could be used: (1) to "determine whether grantees are meeting certain requirements prescribed by" the TANF statute, "including work participation and time-limit requirements"; (2) to "compile information used in the report to Congress" mandated by 42 U.S.C. § 611; and (3) to "perform research on the caseload dynamics and employment trajectories of TANF recipients." Id. at 25,881. The 2024 SORN also authorized disclosure of TANF data for nine narrow "routine uses" — each of which is standard across many agency SORNs — including statistical research, mitigation of security-breach harms, and records-management inspections by the National Archives. Id. at 25,882. As relevant in this case, Routine Use 7 permits disclosure to "contractors, grantees, consultants, or volunteers performing or working on a contract, service,

grant, cooperative agreement, job, or other activity for HHS related to the purposes of this system of records and who have a need to have access to the information in the performance of their duties or activities for HHS." Id.

B. Factual Background

Plaintiffs — New York, the District of Columbia, California, Arizona, Colorado, Connecticut, Delaware, Hawaii, Illinois, the Governor's Office of Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, the Governor of Pennsylvania in his official capacity, Rhode Island, Vermont, Virginia, Washington, and Wisconsin — rely on TANF "block grants" to fund their "anti-poverty work." See ECF No. 42 (Am. Compl.), ¶ 49; see, e.g., ECF Nos. 45-7 (Declaration of Angela Rodgers (Arizona)), ¶¶ 6–9; 45-14 (Declaration of Lesa Dennis (Kentucky)), ¶¶ 6–7; 45-25 (Declaration of Kimberly Merolla-Brito (Rhode Island)), ¶ 7. In late 2025, Defendants began accusing several Plaintiffs of facilitating fraudulent activities through their TANF programs. See New York v. ACF, 833 F. Supp. 3d 361, 377–80 (S.D.N.Y. 2026); see also id. at 392–93 (noting that Defendants' allegations of fraud were devoid of any concrete evidence). On June 23, 2026, apparently prompted by concerns about fraud, ACF issued a new SORN that, in the agency's words, made several "significant" modifications to the TANF System of Records. See 91 Fed. Reg. 37,406, 37,407 (June 23, 2026).

Three changes are relevant here. First, the 2026 SORN expands the set of records contained in the system, adding "verification information obtained from [TANF grantee] agencies, other HHS records, or other government agencies or entities." Id. at 37,408. Second, the 2026 SORN broadens the purposes for which the system may be used. It revises the first purpose to provide that records may be employed "to determine whether grantees are ensuring

that TANF recipients are eligible in accordance with the requirements of" the TANF statute as a whole — not just "certain requirements," like work participation and time limits. Compare id. at 37,407, with 89 Fed. Reg at 25,881 (2024 SORN). Mirroring that revision, the 2026 SORN adds a new purpose for which records may be used: "to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship and immigration status." 91 Fed. Reg. at 37,407 (emphasis added); see also id. (noting that ACF may conduct "agency oversight activities" including "program integrity reviews," "additional audits," and "monitoring"). Third, the 2026 SORN introduces Routine Use 10, which authorizes disclosure of TANF information "to another federal or grantee agency or entity engaged by ACF (e.g., DHS or TANF program administrators) to assist ACF with program-integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status." Id. at 37,409.

Routine Use 10, unlike the 2026 SORN's first two modifications, has not yet gone into effect. After Plaintiffs sued, challenging the 2026 SORN, and sought a temporary restraining order against Routine Use 10, ACF agreed to extend its effective date — initially to September 1, 2026, and then to September 30. See 91 Fed. Reg. 51,174 (Aug. 7, 2026); 91 Fed. Reg. 53,876 (Aug. 20, 2026); see also ECF Nos. 29, ¶ 1; 41 (Data Disclosure Notice), ¶ 7.

In the meantime, ACF admitted to Plaintiffs that it had already adopted an undisclosed policy of sharing information for the very purposes identified in Routine Use 10. Specifically, it apprised Plaintiffs that in September 2025, it had disclosed to DHS individual-level data from the system to advance "program integrity" — that is, to help ACF ensure that states are

complying with citizenship-status-verification requirements in the Social Security Act. See Data Disclosure Notice, ¶¶ 1–2. To support that disclosure, ACF pointed not to Routine Use 10 but to Routine Use 7, which — as a reminder — authorizes disclosure to certain entities, like contractors, grantees, and volunteers, who are performing activities for HHS related to one of the purposes specified in the TANF System of Records. Id., ¶ 3 (quoting 89 Fed. Reg. at 25,882). ACF contends that Routine Use 7 already provided authority to disclose information for compliance and program-integrity purposes, and that Routine Use 10 merely clarifies that preexisting authority. Id., ¶ 4. Even if the Court enjoins Routine Use 10, then, ACF posits that it can continue to disclose records to DHS pursuant to Routine Use 7. Id. Plaintiffs of course see things differently, casting ACF's interpretation of Routine Use 7 as a novel "Data Disclosure Policy." See Am. Compl., ¶¶ 115, 121–24.

Following that revelation, Plaintiffs amended their Complaint, tacking on challenges to ACF's September 2025 data transfer and Data Disclosure Policy in addition to the 2026 SORN. See id., ¶¶ 209–42 (additional claims challenging September 2025 transfer). Plaintiffs designate the contested actions from 2025 and 2026 collectively as the "Disclosure Actions." See ECF No. 45-1 (PI Mot.) at 12. The Complaint pleads eight counts. Six arise under the Administrative Procedure Act, alleging that the Disclosure Actions (1) are contrary to law and in excess of statutory authority, see Am. Compl., ¶¶ 158–72, 197–208; (2) were taken without observance of procedure required by law, id., ¶¶ 173–85, 209–24; and (3) are arbitrary and capricious. Id., ¶¶ 186–99, 225–36. The remaining counts contend that the Disclosure Actions violate the Spending Clause. Id., ¶¶ 200–06, 237–42.

Plaintiffs sought interim relief on August 25, seeking to preliminarily enjoin ACF from "implementing the Disclosure Actions as to Plaintiff States" and to DHS from "using or relying

on any TANF data obtained by ACF from Plaintiff States." PI Mot. at 45. The Government opposed that motion, see generally ECF No. 46 (Opp.), and the Court heard oral argument on September 24. See Minute Entry of September 24, 2026. This Opinion now follows.

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. NRDC, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (alterations in original) (quoting Winter, 555 U.S. at 20). "[I]f the government is the opposing party," the latter two factors "merge." Glob. Health Council v. Trump, 153 F.4th 1, 12 (D.C. Cir. 2025).

"The moving party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is warranted." Hosp. Staffing Sols., LLC v. Reyes, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006)). A court "may deny a motion for preliminary injunction, without further inquiry, upon finding that a plaintiff is unable to show either irreparable injury or a likelihood of success on the merits," making those two factors "particularly crucial." Luokung Tech. Corp. v. Dep't of Def., 538 F. Supp. 3d 174, 182 (D.D.C. 2021) (quotation marks omitted).

Plaintiffs also move for a stay under 5 U.S.C. § 705. That standard "matches the one for whether to grant a PI." Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Sonderling, 2026 WL 1906727, at *2 (D.D.C. July 2, 2026). The Court therefore collapses its analysis of the preliminary injunction and stay into one.

## III. Analysis

The Court need not address all four preliminary-injunction factors. As "[t]he likelihood of success and irreparability of harm 'are the most critical' factors," Trump v. Thompson, 20 F.4th 10, 31 (D.C. Cir. 2021) (quoting Nken v. Holder, 556 U.S. 418, 434 (2009)), the Court begins — and ends — with them.

### A. Likelihood of Success on Merits

To prevail on their Motion, Plaintiffs must demonstrate, at a minimum, that they are likely to succeed on the merits of this case. This includes showing that they have standing to proceed. "[A]n inability to establish a substantial likelihood of standing requires denial of [a] motion for preliminary injunction." Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015); see Green v. U.S. Dep't of Just., 54 F.4th 738, 744 (D.C. Cir. 2022).

Article III restricts the power of the federal judiciary to the resolution of "cases and controversies," a phrase given meaning by the doctrine of "standing." Whitmore v. Arkansas, 495 U.S. 149, 154–55 (1990); see U.S. Const. art. III, § 2, cl. 1. "Every plaintiff in federal court bears the burden of establishing the three elements that make up the 'irreducible constitutional minimum' of Article III standing: injury-in-fact, causation, and redressability." Dominguez v. UAL Corp., 666 F.3d 1359, 1362 (D.C. Cir. 2012) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). For the first element, the plaintiff must have suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (quotation marks and citations omitted). Because injunctions "regulate future conduct," moreover, the plaintiff must "allege[], and ultimately prove[], a real and immediate . . . threat of future injury." Nat'l Res. Def. Counc. v. Pena, 147 F.3d 1012, 1022 (D.C. Cir. 1998) (citation omitted) (emphasis added). For the second

element, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Lujan, 504 U.S. at 560 (cleaned up). And for the third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 561 (quotation marks and citation omitted).

The "manner and degree of evidence required" to establish standing varies according to the "stage[] of the litigation." Id. "In the context of a preliminary injunction motion," the plaintiff is required to "show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity, 878 F.3d 371, 377 (D.C. Cir. 2017) (quotation marks and citation omitted). Under that standard, the plaintiff "cannot 'rest on mere allegations, but must set forth by affidavit or other evidence specific facts' that, if 'taken to be true,' demonstrate a substantial likelihood of standing." Id. (quoting Lujan, 504 U.S. at 561) (cleaned up).

"Standing is not dispensed in gross." Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008) (cleaned up). Rather, a plaintiff must "demonstrate standing for each claim he seeks to press and for each form of relief that is sought." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006) (quotation marks and citation omitted). The Court separately analyzes Plaintiffs' standing based on the three alleged injuries that underpin their claims.

1. *Chilled Participation in TANF*

Plaintiffs first allege that the Disclosure Actions will damage the trust individuals place in the TANF program and chill their participation in it. Specifically, the States contend that TANF recipients in multi-citizenship-status families — concerned that DHS will use their sensitive information to engage in immigration enforcement against them or their family

members — will decline to participate in the TANF program in the future. See, e.g., ECF Nos. 45-9 (Declaration of Ian McMahon (Colorado)), ¶ 51 (explaining that data sharing will "chill participation in the Colorado Works program by citizens and qualified non-citizens alike"); 45-10 (Declaration of Peter Hadler (Connecticut)), ¶ 55 (same with respect to Connecticut program); see also ECF No. 45-16 (Declaration of Stacy L. Rodgers (Maryland)), ¶ 47 (asserting that domestic-violence survivors would be "subject to further risks" from data disclosure and thus may "decline to disclose such abuse during the TANF assessment process"). They also argue, more generally, that anyone concerned about potential exposure of their sensitive information will be chilled from participating in TANF. See, e.g., ECF Nos. 45-8 (Declaration of Lisa Witchey (California)), ¶ 42 (noting that such concerns are "bolstered by public reporting into DHS's efforts to use consolidated data from State benefit programs . . . to support a variety of surveillance activities"); 45-21 (Declaration of Stephen Cha (New Jersey)), ¶ 47 (same).

That chilling effect generates financial harm to the states, Plaintiffs contend, because TANF-reliant individuals and families will shift their dependence to costlier state-provided services. See, e.g., Witchey Decl. (Cal.), ¶¶ 45–46 (describing potential for increased reliance on "food, shelter, childcare and housing supports from community resources" and warning that decreased participation in TANF will drive an increase in "child welfare involvement"); McMahon Decl. (Colo.), ¶ 53 (explaining that without TANF program, "participants may need to access other, more expensive services, such as child welfare and the judicial system"); ECF No. 45-18 (Declaration of Erin Frisch (Michigan)), ¶ 53 (predicting greater dependence on SNAP, Medicaid, housing assistance, emergency relief, and other public programs).

Defendants respond that such a "highly attenuated chain of possibilities" does not support the Court's exercise of jurisdiction in this case. See Opp. at 8 (quoting Clapper v. Amnesty Int'l

USA, 568 U.S. 398, 410 (2013)); see also United States v. Texas, 599 U.S. 670, 680 n.3 (2023) (noting that when federal policies produce "only . . . indirect effects" on state spending, "the State's claim for standing can become more attenuated"). For clarity, the "chain of possibilities" flows as follows: TANF recipients will learn that ACF has taken the position that it may — and, in some cases, already has — disclose their data to other state and federal agencies. As a result, many of those recipients will be concerned that the disclosed information could be used against them or their families. Recipients from multi-citizenship-status families, for instance, might worry that DHS will use the information to engage in immigration enforcement, even though the government has made no statements signaling its intent to do so. Domestic-violence victims may fear that the sensitive details of their abuse will be publicly exposed. And, as a general matter, TANF recipients may be concerned that the information will be used for surveillance activities. Next, those fears will drive down TANF participation, and former TANF recipients will then pivot to more expensive state-funded programs, driving up Plaintiffs' fiscal burdens.

Putting aside whether Plaintiffs' purported harm is as attenuated as the five-layer-chain rejected in Clapper, the Court disposes of this standing theory on a simpler basis: Plaintiffs have not provided sufficient evidence that the Disclosure Actions will actually have such a chilling effect on TANF participation. To show that a harm stems from the "predictable effect of Government action on the decisions of third parties," a plaintiff must provide some evidence of that effect. Dep't of Commerce v. New York, 588 U.S. 752, 768 (2019). In Department of Commerce, states, cities, and nongovernmental organizations challenged the Commerce Secretary's decision to reinstate a citizenship question on the 2020 census. Id. at 761, 764. They asserted several injuries, including loss of federal funds and diversion of resources, that "turn[ed] on their expectation that reinstating a citizenship question [would] depress the census response

rate and lead to an inaccurate population count." Id. at 766–67. The Court concluded that those forward-looking injuries stemmed from noncitizens' "predictable" reaction to the citizenship question — based, in large part, on plaintiffs' evidence that "established that noncitizen households have historically responded to the census at lower rates than other groups." Id. at 767. Similarly, the D.C. Circuit recently accepted a plaintiff's assertion that declining engagement was a predictable effect of the challenged IRS policy because "the district court reasonably found," based on evidence presented by the plaintiffs, "that many taxpayers 'are no longer willing to engage with the Center due to the IRS's' new policy and that the policy 'has interfered with the Center's ability to provide its pro bono or nominal fee representation services.'" Ctr. for Taxpayer Rts. v. IRS, -- F.4th --, 2026 WL 2635380, at *5 (D.C. Cir. Sept. 8, 2026) (quoting Ctr. for Taxpayer Rts. v. IRS, 815 F. Supp. 3d 1, 29 (D.D.C. 2025)).

Here, conversely, Plaintiffs have not provided concrete evidence that many TANF recipients will cease participation in the programs solely because of ACF's new data-disclosure policy. While such a consequence — and, indeed, Plaintiffs' logical chain of events — seems plausible to the Court, it cannot rest on its own intuitions; it must, instead, consider the "specific facts" provided. EPIC, 878 F.3d at 377 (quotation marks and citation omitted). Plaintiffs submitted myriad declarations from state officials involved in TANF administration, each of whom made the bare assertion that the new disclosure policies would chill participation in their respective programs. But those statements, unaccompanied by any supporting factual material, are insufficient. Plaintiffs could have produced declarations from TANF recipients attesting to the chilling effect themselves or from state officials or community organizers that described specific past experiences or some other factual basis for believing that the new disclosure regime might dissuade TANF recipients from relying on the program. See, e.g., ECF No. 45-24

(Declaration of Hoa Pham (Pennsylvania)), ¶ 45 (attesting only that community organizations in Pennsylvania that work with benefits recipients have communicated that "they are concerned about a likely chilling effect"). To be clear, the Court need not and does not determine that declarations to this effect would necessarily be sufficient to establish standing. Indeed, as noted by Defendants at the hearing, scattered attestations across twenty-two states may not suffice. The point of the Court's discussion is merely to highlight the deficiencies in the current record.

Alternatively, perhaps Plaintiffs could have provided statistical evidence that the rising salience of data disclosure affects TANF participation or explained in more detail the immigrant community's reluctance to participate in TANF programs in the first place. See Witchey Decl. (Cal.), ¶ 40 (asserting, without elaboration, that California has developed "trust" with "immigrant communities"). Instead, Plaintiffs offer only generalized predictions from state officials that awareness of these new disclosure incidents and policies will chill TANF participation. Without more, "it is impossible to predict how TANF recipients will react to learning about data sharing." Opp. at 8.

Plaintiffs point to only one tangentially related piece of statistical evidence: a study examining the impact of the first Trump Administration's expanded public-charge rule on immigrant participation in safety-net programs. See Witchey Decl. (Cal.), ¶ 41 (citing Dulce Gonzalez & Hamutal Bernstein, One in Four Adults in Mixed-Status Families Did Not Participate in Safety Net Programs in 2022 Because of Green Card Concerns, Urban Inst. (Aug. 2023)). Under that expanded rule, certain immigrants who received Medicaid, SNAP, housing assistance, and other benefits could be deemed a "public charge" — a label that carries harsh penalties, like denial of admission to the United States or the inability to become a lawful

permanent resident. See Yeganeh Torbati, Trump Administration May Target Immigrants Who Use Food Aid, Other Benefits, Reuters (Feb. 8, 2018), https://perma.cc/HB6C-YZ26. According to that study, the rule caused a substantial proportion of adults in mixed-status families to decline to participate in government-benefit programs for fear of jeopardizing their or a family's member's ability to obtain a green card. See Gonzalez & Bernstein, supra, at 2.

The federal government's express proclamation of its intent to penalize immigrants for relying on safety-net programs, however, is a far cry from the situation here. ACF has made clear that its data-sharing policy is aimed at ensuring state compliance with TANF eligibility requirements, not at enabling DHS to engage in deportations. Likewise, DHS has not indicated any plans to rely on TANF data for immigration enforcement — nor, according to the terms of the 2026 SORN, could it. See 91 Fed. Reg. at 37,407, 37,409 (authorizing disclosure of TANF records only for purpose of ensuring states' compliance with the program's eligibility requirements). Rather than identifying government statements showing an intent to target immigrants, Plaintiffs proffer vague, unsubstantiated predictions about immigrant communities' fears that DHS will use disclosures for immigration enforcement.

On the current slate of evidence, the Court concludes that non-participation in TANF programs is not a "predictable effect" of the Disclosure Actions. Plaintiffs' alleged chilling is insufficiently supported by evidence and thus speculative. This theory of standing thus does not make the grade.

2. *Costs of Compliance*

Plaintiffs next allege that the Disclosure Actions will impose substantial administrative costs and burdens associated with reviewing and updating assurances to TANF recipients and applicants. See Mot. at 14–15. State laws, according to Plaintiffs, obligate their officials to

inform TANF participants about data sharing. See, e.g., D.C. Code § 4-209.04(d); Mich. Comp. Laws § 400.64; Or. Rev. Stat. §§ 411.320, 412.072. The new and anticipated uses of states' TANF data pursuant to the 2026 SORN and Data Disclosure Policy, moreover, are not reflected in the states' previous communications to participants. See S. Rodgers Decl. (Md.), ¶ 28 (describing Maryland disclosures as "facially inconsistent" with SORN's Routine Use 10); ECF No. 45-22 (Declaration of Rajni Chawla (New York)), ¶ 31 (explaining that uses described in 2026 SORN are not presently included in New York's assurances to TANF recipients). The states' disclosure obligations thus entail administrative burdens to notify TANF participants of the federal government's changing policies regarding the usage and sharing of their data. See, e.g., Witchey Decl. (Cal.), ¶¶ 47–49 (describing need for California to "update application and renewal forms," "update the automated systems that describe the intended uses of the data," and "provide notice to current recipients," requiring "staff time and state resources"); McMahon Decl. (Colo.), ¶ 54 (discussing Colorado's financial costs associated with updating communications, including legal review, plain-language review, translations, printing, and technological updates); ECF No. 45-13 (Declaration of Jill Outland (Illinois)), ¶ 47 (explaining that Illinois "[c]aseworkers will be required to undergo updated confidentiality training" and "may be required to respond to an increased volume of customer inquiries regarding the changes"); Pham Decl. (Pa.), ¶ 48 (noting that Pennsylvania would also have to engage in costly process of "destroy[ing] all existing hard copy inventory" of its prior benefit application and "replac[ing] them with new applications" with "updated language"); Chawla Decl. (N.Y.), ¶ 57 (explaining that in New York, notifying TANF recipients will "involve significant staff time and resources as well as costs for translation, conversion of the documents to alternative formats, printing, and distribution to social services districts"). Steep costs are associated with

implementing those changes. See, e.g., ECF No. 45-12 (Declaration of Brian Campbell (District of Columbia)), ¶ 48 (explaining that updates will cost District of Columbia "several hundred thousand dollars").

The September 2025 data transfer, too, exacts new administrative costs. To determine whether they must provide notice to past and present TANF recipients whose data may have been transferred to DHS, states must engage in a "time and resource intensive" legal review. See ECF No. 45-32 (Supplemental Declaration of S. Rodgers (Maryland)), ¶ 4; see ECF Nos. 45-30 (Supplemental Declaration of Lisa Witchey (California)), ¶ 4; 45-36 (Supplemental Declaration of Rajni Chawla (New York)), ¶ 6; 45-37 (Supplemental Declaration of Carla Reyes (Washington)), ¶ 4. If individualized notice to former recipients proves necessary, it will be similarly "resource intensive and costly, because it would require technology system updates along with printing and mailing costs." ECF No. 45-31 (Supplemental Declaration of Lesa Dennis (Kentucky)), ¶ 4; see Reyes Supp. Decl. (Wash.), ¶ 4 (explaining that individualized notices require "research, evaluation and drafting work, as well as coordination with other agencies within Washington State"); Witchey Supp. Decl. (Cal.), ¶ 5 (describing costs associated with "identify[ing] every impacted current or former participant . . . to provide direct notice" and explaining that even "generalized notices" are "time intensive").

As an initial matter, the Court notes that Defendants never contest Plaintiffs' compliance-cost theory of standing; they maintain only that ordinary compliance costs cannot constitute irreparable harm. See Opp. at 8–9. Ordinarily, "[a] party forfeits an argument by failing to raise it in his opening brief." Al-Tamimi v. Adelson, 916 F.3d 1, 6 (D.C. Cir. 2019). "[S]tanding," however, "is jurisdictional," and "it can never be forfeited or waived." Bauer v. Marmara, 774

F.3d 1026, 1029 (D.C. Cir. 2014); see Virginia House of Delegates v. Bethune-Hill, 587 U.S. 658, 662–63 (2019) (same). The Court therefore must dive in.

Generally, "monetary harms" like the ones Plaintiffs allege are some of the most "obvious" "concrete injuries under Article III." TransUnion LLC v. Ramirez, 594 U.S. 413, 425 (2021); Angelo v. District of Columbia, 180 F.4th 324, 335 (D.C. Cir. 2026) ("[M]onetary harm readily satisfies the injury-in-fact requirement."). But that general premise collapses where the alleged monetary harms are entirely self-inflicted. As the D.C. Circuit has held, "[S]elf-inflicted harm" fails to "satisfy the basic requirements for standing." Nat'l Fam. Planning & Reprod. Health Ass'n, Inc. v. Gonzales, 468 F.3d 826, 831 (D.C. Cir. 2006). For one, "[s]uch harm does not amount to an 'injury' cognizable under Article III." Id.; see Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (explaining that "self-inflicted harms stemming from the [plaintiff's] own budgetary choices . . . did not constitute an 'injury' for purposes of standing") (quotation marks and citation omitted). Even if such harm qualified as an injury, moreover, "it would not be fairly traceable to the defendant's challenged conduct." Gonzales, 468 F.3d at 831 (emphasis added); see Petro-Chem Processing, Inc. v. EPA, 866 F.2d 433, 438 (D.C. Cir. 1989) (noting that self-inflicted injury does not support standing if it is "so completely due to the [plaintiff's] own fault as to break the causal chain"). The question, then, is whether Plaintiffs' compliance costs are indeed self-inflicted.

Resolving that question turns out to be Plaintiffs' undoing. As the Supreme Court first clarified in Pennsylvania v. New Jersey, 426 U.S. 660 (1976), "[I]njuries to . . . plaintiffs' fiscs [are] self-inflicted" when they "result[] from decisions by their respective state legislatures." Id. at 664. In that case, a group of states unilaterally decided to reimburse their residents for taxes levied by other states. Id. The former group of states then challenged the latter group's taxes as

unconstitutional. Id. at 664–65. The Court disposed of those claims on the basis that the defendant states had not "inflicted any injury" upon the plaintiff states. Id. at 664. As the Court noted, "Nothing required" the plaintiff states "to extend a tax credit . . . for income taxes paid to" the defendant states, and nothing "prevent[ed]" them from withdrawing that credit. Id. "No State can be heard to complain about damage inflicted by its own hand." Id.; see also Fed. Election Comm'n v. Cruz, 596 U.S. 289, 297 (2022) (explaining that in Pennsylvania, "[n]othing in the challenged taxes required the plaintiff States to offer reimbursements; accordingly, the financial injury those States suffered was due to their own independent response to taxes levied on others").

Like the plaintiff states in Pennsylvania, Plaintiffs here have unilaterally decided to foist upon themselves the obligation to notify TANF applicants and recipients about the use or sharing of their data. Indeed, the wide array of compliance costs they identify — legal reviews, revisions to application and renewal forms, technological updates to automated systems, translations, conversions to alternative formats for the visually impaired, updates to caseworker-confidentiality training, destruction of hard copies of outdated applications, distribution to social services, and individualized notice of disclosure to former recipients, to name a few — derive from generally applicable state laws. See, e.g., A. Rodgers Decl. (Ariz.), ¶ 35 (citing Arizona law); Hadler Decl. (Conn.), ¶ 33 (citing Connecticut law); Campbell Decl. (D.C.), ¶ 24 (citing D.C. law); Outland Decl. (Ill.), ¶ 24 (citing Illinois law); Frisch Decl. (Mich.), ¶ 30 (citing Michigan law). Because "it is state law that is the impetus" for Plaintiffs' "expenditures, then any loss or harm to the States' fiscs is a quintessentially self-inflicted wound." Maryland v. U.S. Dep't of Educ., 474 F. Supp. 3d 13, 35 (D.D.C. 2020), vacated and remanded on other grounds, 2020 WL 7868112 (D.C. Cir. Dec. 22, 2020); see id. at 35 (explaining that injury was self-

inflicted because "the States have voluntarily opted to provide their residents with grants and student loans" and "do not assert that federal law requires them to provide such financial support").

The Court acknowledges that non-binding cases from other Circuits have declined to deem a state's injury, even one stemming from state law, "self-inflicted" when it arises in the context of a new federal regulation. See Texas v. United States, 809 F.3d 134, 157–60 (5th Cir. 2015); California v. Azar, 911 F.3d 558, 566, 570–74 (9th Cir. 2018). In Texas, for instance, the state challenged the Deferred Action for Parents of Americans and Lawful Permanent Residents program and asserted a financial injury — namely, that DAPA would enable noncitizens to apply for and receive driver's licenses under state law, which would cost millions of dollars since Texas provided the licenses at a loss. Id. at 155. The Fifth Circuit concluded that Texas's monetary harms were not self-inflicted for two reasons. First, it explained that "[t]he fact that Texas sued in response to a significant change in the defendants' policies shows that its injury is not self-inflicted." Id. at 158. Second, it asserted that because "Texas seeks to issue licenses only to those lawfully present in the United States, and the state is required to use federal immigration classifications to do so," the state law was the only means by which Texas could accomplish its policy goal. Id. According to the Fifth Circuit, these considerations meant, in essence, that Texas had not impermissibly "manufactured" its standing. Id. at 159 (citing Clapper, 568 U.S. at 416).

The Court finds neither consideration relevant to the self-inflicted-injury analysis here. In Pennsylvania, the Court did not ask whether the plaintiff states were suing in response to a new policy, nor whether they had other ways to accomplish their policy goals. Those peripheral, pragmatic considerations are beside the point. To determine whether a state's injury is self-

inflicted, we must ask simply whether the damage is "inflicted by [the state's] own hand." 426 U.S. at 664. So, as Pennsylvania made clear, when a state law causes a state to incur costs in response to another jurisdiction's laws or regulations, it is the state law itself that inflicts the injury. That precedent continues to bind this Court. Cf. Pub. Citizen v. U.S. Dist. Ct. for D.C., 486 F.3d 1342, 1355 (D.C. Cir. 2007) ("The Supreme Court has repeatedly cautioned that we should not conclude that its more recent cases have, by implication, overruled an earlier precedent.") (cleaned up and citation omitted); United States v. Texas, 579 U.S. 547, 548 (2016) (equally divided Court affirming Fifth Circuit's judgment in Texas without precedential opinion).

The Court does not find the Ninth Circuit's reasoning in California compelling either. There, California and several other states sued to challenge interim final rulemakings that expanded the availability of categorical exemptions to the Affordable Care Act's contraceptive-coverage requirement. See 911 F.3d at 567. According to the states' theory of injury, employers would take advantage of those expanded exemptions, women would lose contraceptive coverage from their employers, and states would thus suffer economic costs from their own, state-funded contraceptive-care programs. Id. at 571–73. The Ninth Circuit apparently attempted to distinguish the case before it from Pennsylvania on the ground that the California plaintiff states' laws did not "directly and explicitly tie[] the states' finances (revenue loss caused by tax credit) to another sovereign's laws." Id. at 574. It concluded, therefore, that the plaintiff states' alleged injuries were not self-inflicted, even though they were the result of the states' voluntary decisions to provide money for contraceptive care to their residents through state programs.

That analysis is in tension with Pennsylvania, which broadly asserts that "injuries to . . . plaintiffs' fiscs [are] self-inflicted" when they "result[] from decisions by their respective

state legislatures." 426 U.S. at 664. Contrary to the distinction drawn by the Ninth Circuit, the Supreme Court did not limit that holding only to laws that are "tethered to the legislative decisions of other sovereigns." California, 911 U.S. at 574. The pertinent question for the self-inflicted-injury inquiry, then, is not whether a state law explicitly or directly references other sovereigns' choices, but whether the asserted harm results from that state law. "It is the source of the injury that is the hallmark of a self-inflicted injury within the meaning of Article III." Maryland, 474 F. Supp. 3d at 41.

The only D.C. Circuit case to have grappled with these questions is inapposite. In New Jersey v. EPA, 989 F.3d 1038 (D.C. Cir. 2021), New Jersey petitioned for review of an EPA rule, maintaining that the agency's "inadequate recordkeeping and reporting requirements impair [the state's] delegated authority to implement" the federal program. Id. at 1046. The government responded that the state's alleged injury was self-inflicted because it could easily have imposed its own, more stringent recordkeeping and reporting requirements. Id. Rejecting that argument, the D.C. Circuit pointed out that in Pennsylvania, "plaintiffs' alleged injuries . . . stemmed from their own voluntary actions": "'decisions by their respective state legislatures'" to "extend the tax credits." Id. (quoting Pennsylvania, 426 U.S. at 664). In contrast, New Jersey's harm stemmed directly from EPA's failure to promulgate adequate recordkeeping and reporting requirements, not from any provision of state law. Id. Here, however, Plaintiffs' alleged harms fall within the bucket New Jersey itself identified as self-inflicted: their compliance costs "stem[] from their own voluntary actions" — namely, Plaintiffs' enactment of state laws that require them to inform public-benefits recipients about the use or disclosure of their data. Id.

To be sure, "nothing here indicates that" Plaintiffs have intentionally incurred these burdens "in order to manufacture standing." Id. at 1047. But the question of intention is irrelevant. In Pennsylvania, the Court did not assess the plaintiff states' motives in enacting their state laws. Nor will this Court. The key inquiry is not what prompted a state to enact a law, but whether the obligation imposed by that law is the source of the state's alleged harm.

The Supreme Court's binding precedent in Pennsylvania, and the careful analysis of these complex issues in Maryland, confirm that the self-inflicted designation applies here. Plaintiffs do not argue that the relevant state laws were specifically promulgated as part of their duties to implement TANF, and their disclosure obligations are not interstitial to the TANF program. The financial burdens incurred in complying with Plaintiffs' own state laws are therefore entirely of their own making.

If there exists some federal impetus for Plaintiffs' disclosure obligations, they do not identify it. See Mot. at 14 (vaguely asserting that "[s]tate and federal law requires Plaintiff States to maintain confidentiality of TANF applicants' data and to disclose its use," but failing to pinpoint any relevant federal statute); see also Witchey Decl. (Cal.), ¶ 25 (claiming that California provides assurances about information use in accordance with "the California Information Practices Act and the Federal Privacy Act," but omitting citation to specific provision). Without more, the Court must conclude that Plaintiffs' alleged monetary harms are self-inflicted, making them neither a cognizable injury nor traceable to the Disclosure Actions. See Gonzales, 468 F.3d at 831; Maryland, 474 F. Supp. 3d at 35–36.

3. *Oversight and Enforcement*

Plaintiffs' final theory of standing fares similarly. That theory begins from the premise that the Disclosure Actions will "place Plaintiff States at immediate risk of new oversight and

enforcement actions." Mot. at 15. Given the different consequences stemming from such actions, the Court will assess each in turn.

As to oversight, the 2026 SORN introduced a litany of new ACF mechanisms, including "program integrity reviews or projects," "programmatic audits," and "on-site or virtual visits to TANF agencies." 91 Fed. Reg. at 37,407. Historically, ACF has not conducted such oversight activities despite longstanding authority to do so. See ECF Nos. 45-17 (Declaration of Michael Cole (Massachusetts)), ¶ 37; 45-15 (Declaration of Ian Yaffe (Maine)), ¶ 40; 45 C.F.R. § 262.3(a)(1). Plaintiffs allege that ACF's undertaking of those novel oversight measures would "burden State agencies with unnecessary and time-consuming work," such as coordinating meetings, producing documentation, gathering data, and generating additional reports. See Mot. at 15–16; see, e.g., Witchey Decl. (Cal.), ¶ 38; Cha Decl. (N.J.), ¶ 42; Chawla Decl. (N.Y.), ¶ 48. Those administrative burdens would allegedly cause Plaintiffs financial harm or, at a minimum, require them to divert time and resources to respond to ACF monitoring. See S. Rodgers Decl. (Md.), ¶ 42; Chawla Decl. (N.Y.), ¶¶ 48–49; ECF No. 45-29 (Declaration of Patara Horn (Wisconsin)), ¶ 41.

These prospective injuries are too speculative to confer standing. See Elec. Priv. Info. Ctr. v. Fed. Aviation Admin., 892 F.3d 1249, 1255 (D.C. Cir. 2018). As each declarant implicitly admits, the asserted administrative burdens will arise only if ACF chooses to undertake new oversight activities. See Cole Decl. (Mass.), ¶ 37 ("Should [ACF conduct those new activities], Massachusetts would be expected to expend time and resources responding to ACF oversight . . . .") (emphasis added); Reyes Decl. (Wash.), ¶ 42 ("ACF [conducting oversight] as a result of the TANF SORN would require Washington to expend time and resources responding to ACF requests.") (emphasis added). While Plaintiffs may hypothesize

about whether and to what extent ACF will conduct administrative oversight with respect to their TANF programs, the 2026 SORN neither independently authorizes nor requires it to engage in such activities; the SORN merely delineates the means by which the agency might do so. See Clapper, 568 U.S. at 412 (holding that when statute does not "mandate or direct" oversight activities that plaintiffs "fear," their "allegations are necessarily conjectural"). In making decisions about whether to perform a program-integrity review, programmatic audit, or visit to a TANF agency, moreover, ACF "exercises discretion." Union of Concerned Scientists v. U.S. Dep't of Energy, 998 F.3d 926, 930 (D.C. Cir. 2021). Here, the "discretion [ACF] has" in making oversight decisions takes the risk of administrative burdens on Plaintiffs "from the decidedly likely to the speculative." Id.; see Clapper, 568 U.S. at 412 (concluding that plaintiffs could "only speculate as to how" relevant actors "will exercise their discretion in determining which communications to target").

The Court dispenses with Plaintiffs' enforcement-based theory even more easily. Plaintiffs warn that ACF may "rely on [its oversight] authority," as "listed in the 2026 SORN [and] Data Disclosure Policy," "to attempt to impose penalties on States." Mot. at 15–16. Any fear of enforcement, however, is undermined by Plaintiffs' very next sentence, which asserts that it is "plainly unlawful for ACF to penalize States outside of the narrow circumstances provided by statute and without following the statutorily required procedures." Id. at 16 (citing 42 U.S.C. §§ 609(c), 610). Plaintiffs have repeatedly assured the Court of their adherence to TANF's statutory requirements. Id. at 8; Yaffe Decl. (Me.), ¶¶ 6–20; Cole Decl. (Mass.), ¶¶ 8–19; Witchey Decl. (Cal.), ¶¶ 13–25; Chawla Decl. (N.Y.), ¶¶ 8–26. A reticulated statutory and regulatory process governs ACF's assessment of penalties for noncompliance with the TANF statute; as a legal matter, ACF cannot engage in enforcement against states that comply with that

statute. See Opp. at 10–11. At bottom, then, Plaintiffs' theory of harm hinges entirely on the assumption that ACF is poised to violate the law — an assumption the Court will not make. See Waite v. Macy, 246 U.S. 606, 609 (1918). Plaintiffs "cannot allege an imminent [enforcement] harm without assuming the independent violation of other laws by [ACF]. This is too speculative to support standing." Elec. Priv. Info. Ctr. v. U.S. Dep't of Com., 928 F.3d 95, 104 (D.C. Cir. 2019).

Resisting that conclusion, Plaintiffs emphasize that ACF flouted those very laws earlier this year, when it "fr[oze] access to all TANF funds for five Plaintiff States with no statutory basis and no procedure at all." Mot. at 16 (cleaned up). That argument, however, is not the life raft Plaintiffs imagine it to be; instead, it is a weight around the ankles. If ACF is inclined to freeze access to TANF funds or otherwise penalize Plaintiff States regardless of its statutory or regulatory authorization to do so, then the 2026 SORN and Data Disclosure Policy — which, as the Court has explained, do not give the agency any new authorization to act — have no bearing on whether the agency will take enforcement actions against Plaintiffs in the future. Their suggestion that ACF will engage in further lawbreaking severs any causal connection between enforcement against the states and the Disclosure Actions. See Lujan, 504 U.S. at 560 (describing need for "causal connection between the injury and the conduct complained of").

As a result, the Court must conclude that Plaintiffs have not shown that they are likely to succeed on the merits of their APA claims at this stage because they lack standing.

B. Irreparable Harm

Even if Plaintiffs had established standing, the Court would still deny them preliminary relief because they likely have not proven irreparable harm. The "inquiry" for irreparable injury "overlaps with the standing issue somewhat," for "without adequate proof of a threatened injury,

plaintiff lacks both standing and an adequate basis in equity for an injunction." Taylor v. Resol. Tr. Corp, 56 F.3d 1497, 1508 (D.C. Cir. 1995). For reasons reminiscent of the Court's standing analysis, Plaintiffs' injuries do not amount to irreparable harm.

Their first (chilling effects) and third (risk of oversight and enforcement actions) theories of irreparable injury are clearly foreclosed by this Circuit's precedent. The D.C. Circuit has instructed that "the injury must be both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). As to chilling, "[i]njury that is hypothetical or speculative does not rise to the level of irreparable harm." Henke v. Dep't of Interior, 842 F. Supp. 2d 54, 59 (D.D.C. 2012). As to oversight and enforcement, the alleged harm must be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Wisconsin Gas, 758 F.2d at 674 (quotation marks and citation omitted). Because, as discussed above, Plaintiffs offer only unsubstantiated predictions that the Disclosure Actions will chill participation in TANF or spur ACF to engage in oversight and enforcement actions, their alleged harm is too speculative to be irreparable. Id. (requiring movant to provide "proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future") (emphasis added). "Courts will not grant injunctive relief 'against something merely feared as liable to occur at some indefinite time.'" Henke, 842 F. Supp. 2d at 59 (quoting Wisconsin Gas, 758 F.2d at 674).

Likewise, Plaintiffs' second (compliance costs) theory of irreparable injury trips over the same hurdle that disqualified it for standing purposes: those monetary harms are entirely self-inflicted. Courts in this district have consistently held that "a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." Barton v. District of Columbia, 131 F. Supp. 2d 236, 247 (D.D.C. 2001) (cleaned up); Safari Club Int'l v.

Salazar, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (same); Steele v. Dep't of Def., 2022 WL 22329872, at *1 (D.D.C. Dec. 8, 2022) ("[S]elf-inflicted injuries do not constitute irreparable harm"); Aviel v. Gor, 2025 WL 2576682, at *2 (D.D.C. Apr. 10, 2025) ("[Movants'] irreparable-harm arguments are thus plainly insufficient, as it is well settled that a litigant cannot cry foul over a 'self-inflicted' injury."). Costs stemming from Plaintiffs' obligations to notify TANF recipients of past and future data disclosures — imposed, as they are, by state law — are thus insufficient to establish irreparable harm.

## IV. Conclusion

For the foregoing reasons, the Court will deny Plaintiff's Motion for Preliminary Injunction and Stay. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: September 28, 2026