**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

State of New York, et al.

*Plaintiffs*,

vs.

Administration for Children and Families, et al.

*Defendants*.

Civil Action No. 1:26-cv-2726-JEB

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION .......... 1

BACKGROUND .......... 2

LEGAL STANDARD .......... 4

ARGUMENT .......... 5

I. PLAINTIFFS CANNOT ESTABLISH STANDING .......... 5

A. Plaintiffs' alleged chilling effects are insufficient to establish standing. .......... 6

B. Plaintiffs will not be harmed through compliance with the law. .......... 9

C. Enforcement action under the statute does not harm the Plaintiffs .......... 10

II. REVIEW UNDER THE APA IS FORECLOSED. .......... 11

A. The Privacy Act Provides an Adequate Remedy for Relief .......... 11

B. 8 U.S.C. § 1373 Commits the Decision to Verify Citizenship Information to Agency Discretion by Law. .......... 15

C. The 2026 SORN, Routine Use Ten, and the 2025 Data Disclosure Comply with the Privacy Act. (Counts II and VI) .......... 17

III. The SORN Complies with the APA. .......... 21

A. The SORN, Routine Use 10, and the 2025 Data Disclosure Comply with the APA. .......... 21

1. The SORN, Routine Use 10, and the 2025 Data Disclosure are Lawful. (Counts I and V) .......... 22

2. The SORN, Routine Use 10, and the 2025 Data Disclosure are Neither Arbitrary Nor Capricious. (Counts III and VII) .......... 25

IV. The Spending Clause is Inapplicable to these Facts. (Counts IV and VIII) .......... 26

CONCLUSION .......... 27

## TABLE OF AUTHORITIES

### CASES

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) ..... 5

*Amalgamated Transit Union v. Skinner*,
894 F.2d 1362 (D.C. Cir. 1990) ..... 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 4, 5

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
397 U.S. 150 (1970) ..... 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..... 4, 5

*Bennett v. Spear*,
520 U.S. 154 (1997) ..... 13

*Berardi v. U.S. Dep't of the Air Force*,
Civ. A. No. 05-2269 (JR), 2006 WL 8448631 (D.D.C. Sep. 29, 2006) ..... 15

*Bierly v. Dep't of Def.*,
Case No. 23-cv-2386-RCL, 2024 WL 4227154 (D.D.C. Sep. 18, 2024) ..... 15

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ..... 11, 12

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ..... 11

*California v. Texas*,
593 U.S. 659 (2021) ..... 7

*Cell Assocs., Inc. v. Nat'l Insts. of Health, Dep't of Health, Educ. & Welfare*,
579 F.2d 1155 (9th Cir. 1978) ..... 14, 15

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ..... 6, 7, 10

*Cookeville Reg'l Med. Ctr. v. Leavitt*,
531 F.3d 844 (D.C. Cir. 2008) ..... 19

*DHS v. League of Women Voters*,
609 U.S.---, 2026 WL 2879700 (2026) ..... 16, 24

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ..... 21

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988) ..... 14

*Doe v. U.S. Dep't of Justice*,
660 F. Supp. 2d 31 (D.D.C. 2009) ..... 18

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*,
396 F.3d 1265 (D.C. Cir. 2005) ..... 11

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ..... 26

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ..... 6, 8

*Fed. Aviation Admin. v. Cooper*,
566 U.S. 284 (2012) ..... 12, 14

*Garcia v. Vilsack*,
563 F.3d 519 (D.C. Cir. 2009) ..... 11

*Haleem v. U.S. Dep't of Def.*,
Civ. A. No. 23-1471 (JEB), 2024 WL 230289 (D.D.C. Jan. 22, 2024) ..... 15

*Harrison v. Fed. Bureau of Prisons*,
248 F. Supp. 3d 172 (D.D.C. 2017) ..... 15

*Heckler v. Chaney*,
470 U.S. 821 (1985) ..... 17

*Hinck v. United States*,
550 U.S. 501 (2007) ..... 15

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
928 F.3d 42 (D.C. Cir. 2019) ..... 5

*Jones v. HUD*,
No. 11 CV 0846 (RJD)(JMA), 2012 WL 1940845 (E.D.N.Y. May 29, 2012) ..... 12

*Koretoff v. Vilsack*,
614 F.3d 532 (D.C. Cir. 2010) ..... 12

*Levy v. Sterling Holding Co.*,
544 F.3d 494 (3d Cir. 2008).......................................................................................... 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)...................................................................................................... 13

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)...................................................................................................5, 6

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990)...................................................................................................... 13

*Maryland v. U.S. Dep't of Educ.*,
474 F. Supp. 3d 13 (D.D.C. 2020), *vacated and remanded on other grounds*,
2020 WL 7868112 (D.C. Cir. Dec. 22, 2020)................................................................... 9

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012)...................................................................................................... 13

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) ..................................................................................... 13

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................................................ 21

*MST Exp. v. Dep't of Transp.*,
108 F.3d 401 (D.C. Cir. 1997) ....................................................................................... 19

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012)...................................................................................................... 26

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) ....................................................................................... 21

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
366 F.3d 930 (D.C. Cir. 2004), *abrogated on other grounds by*
*Perry Capital v. Mnuchin*, 848 F.3d 1072 (D.C. Cir. 2017)........................................................ 8

*Parks v. U.S. Internal Revenue Serv.*,
618 F.2d 677 (10th Cir. 1980) ....................................................................................... 15

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981).......................................................................................................... 26

*Poss v. Kern*,
No. 23-cv-2199 (DLF), 2024 WL 4286088 (D.D.C. Sep. 25, 2024)........................................ 15

*Rimmer v. Holder*,
700 F.3d 246 (6th Cir. 2012) .......... 12

*South Dakota v. Dole*,
483 U.S. 203 (1987) .......... 26

*Stuttering Found. of Am. v. Springer*,
498 F. Supp. 2d 203 (D.D.C. 2007) .......... 5

*Sussman v. U.S. Marshals Serv.*,
494 F.3d 1106 (D.C. Cir. 2007) .......... 14

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 5

*Tripp v. Dep't of Def.*,
193 F. Supp. 2d 229 (D.D.C. 2002) .......... 15

*Trump v. Boyle*,
606 U.S. ---, 145 S.Ct. 2653 (2025) .......... 16

*Twin Metals Minn. LLC v. United States*,
No. 22-cv-2506 (CRC), 2023 WL 5748624 (D.D.C. Sep. 6, 2023) .......... 5

*United States v. Texas*,
599 U.S. 670 (2023) .......... 7

*Westcott v. McHugh*,
39 F. Supp. 3d 21 (D.D.C. 2014) .......... 15

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) .......... 6

**CONSTITUTION**

U.S. Const. art. I, § 8, cl. 1 .......... 26

**STATUTES**

5 U.S.C. § 552 .......... 9

5 U.S.C. § 552a .......... *passim*

5 U.S.C. § 553 .......... 25

5 U.S.C. § 702 .......... 25

5 U.S.C. § 704 ........ 11

5 U.S.C. § 705 ........ 4

5 U.S.C. § 706 ........ 21

7 U.S.C. § 2011 ........ 2

8 U.S.C. § 1373 ........ *passim*

18 U.S.C. § 1905 ........ 24

31 U.S.C. § 7503 ........ 22, 23, 24

42 U.S.C. §1306 ........ 23

42 U.S.C. § 405 ........ 24

42 U.S.C. § 601 ........ 2, 16

42 U.S.C. § 602 ........ 3

42 U.S.C. § 603 ........ 2

42 U.S.C. § 604 ........ 3

42 U.S.C. § 609 ........ 10, 22, 23

42 U.S.C. § 617 ........ 10, 20, 22

42 U.S.C. §§ 601-619 ........ 16

42 U.S.C. § 1306 ........ 23

42 U.S.C. § 1320b-7 ........ 16

42 U.S.C. § 1396a ........ 2

Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub. L. No. 104–193, 110 Stat. 2105 ........ 2

**RULES**

Fed. R. Civ. P. 56(a) ........ 5

**LEGISLATIVE HISTORIES**

H.R. Rep. No. 104–651 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2183 ....................................... 2

H.R. Rep. No. 104–725 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 2649 ................... 2

**REGULATIONS**

28 C.F.R. § 16.21 ........................................................................................................ 5

45 C.F.R. § 262.3 ........................................................................................................ 10, 23

45 C.F.R. §§ 260-265 ........................................................................................................ 22

45 C.F.R. § 263.10 ........................................................................................................ 10

Privacy Act of 1974; System of Records Notice,
67 Fed. Reg. 48914 (July 26, 2002) ........................................................................ 3

Statement of Organization, Functions, and Delegation of Authority,
72 Fed. Reg. 8742 (Feb. 27, 2007) ........................................................................ 3

Privacy Act of 1974; System of Records Notice,
80 Fed. Reg. 17894 (Apr. 2, 2015) ........................................................................ 3, 19

Privacy Act of 1974; System of Records,
89 Fed. Reg. 25880 (Apr. 12, 2024) ........................................................................ 19

Privacy Act of 1974; System of Records,
91 Fed. Reg. 37406 (June 23, 2026) ........................................................................ 4, 15, 18, 20

Privacy Act of 1974; System of Records,
91 Fed. Reg. 45278 (July 20, 2026) ........................................................................ 4

Privacy Act of 1974; System of Records,
91 Fed. Reg. 51174 (Aug. 7, 2026) ........................................................................ 21

Privacy Act of 1974; System of Records,
91 Fed. Reg. 53876 (Aug. 20, 2026) ........................................................................ 4, 21

**OTHER AUTHORITIES**

*Volunteer*, Webster's II New Riverside University Dictionary (1984) ....................................... 20

## INTRODUCTION

Plaintiffs are twenty-two states, two governors' offices, and the District of Columbia who collectively challenge revision to a system of records notice ("SORN") promulgated by the Administration for Children and Families ("ACF"), a component of the Department of Health and Human Services ("HHS") to support the administration of the Temporary Assistance for Needy Families ("TANF") program. The new SORN clarifies what has long been true—ACF can share data with appropriate partners to ensure that state TANF programs comply with statutory and regulatory requirements, including those covering beneficiary eligibility. Plaintiffs allege that ACF's modification of the SORN runs afoul of both the Privacy Act and the Administrative Procedure Act ("APA"). But Plaintiffs' allegations fail at every level.

Plaintiffs have failed to demonstrate that they have standing to bring this suit. Plaintiffs' theory of injury is that HHS's clarified ability to review federally-funded programs will itself cause otherwise eligible TANF beneficiaries to disclaim benefits that they would be otherwise entitled to under law, and that those putatively deterred beneficiaries would then turn to the states for replacement benefits. This theory stacks speculation on top of speculation, as this Court already held when rejecting Plaintiffs' preliminary injunction motion. Nor do Plaintiffs establish causation between the challenged conduct (*i.e.*, the SORN revision) and their putative injury. To the extent their concern is the enforcement of certain eligibility requirements, it is *separate* statutes and regulations that impose those requirements—not the SORN. And those statutes and regulations are not challenged here. Moreover, the updated SORN clarifies—but does not fundamentally change—a SORN from a decade ago that allowed for comparable information sharing, thus further defusing any claims of redressability or causation.

Plaintiffs also fail on the merits. The Plaintiffs improperly attempt to use the APA to bring Privacy Act claims. But Congress has precluded States from seeking remedies under the Privacy

Act. Nor does the APA grant a cause of action where there is already another adequate remedy, or where another statutory review scheme precludes judicial review. But the choices made by Congress about what remedies are (or are not) available for violations of the Privacy Act cannot be evaded by pleading an APA claim.

Even were the Court to consider Plaintiffs' claims under the APA, those claims fail. ACF has complied with the Privacy Act by publishing the SORN modifying the Routine Uses and the Routine Use complained of by Plaintiffs is authorized by statute (both the Privacy Act itself and, to the extent it covers the transfer of immigration information, 8 U.S.C. § 1373). And sharing information to ensure effective program management, including ensuring that eligible people are covered, is neither arbitrary nor capricious. This Court should dismiss Plaintiffs claims or, in the alternative, grant summary judgment in favor of the Defendants.

**BACKGROUND**

Prior to 1996, three important federal programs provided assistance to people in need: Aid to Families with Dependent Children ("AFDC"), 42 U.S.C. § 601 *et seq.*; Medicaid, *id.* § 1396a *et seq.*; and the Food Stamp program, 7 U.S.C. § 2011 *et seq*. In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub. L. No. 104–193, 110 Stat. 2105 (codified as amended in sections of Title 42 and other titles of U.S.C.). PRWORA replaced AFDC with the TANF program. Unlike AFDC, which was an individual entitlement program, TANF provides federal block grants that states may use to administer their own TANF public assistance programs. *See* 42 U.S.C. § 601 *et seq.*; H.R. Rep. No. 104–725, at 261 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 2649; H.R. Rep. No. 104–651, at 1322 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2183, 2381. The amount of a state's TANF grant is based on the amount of the reimbursement paid to the state under AFDC during a historical base period. *See* 42 U.S.C. § 603. In order to receive a TANF grant, a state must submit a state plan, which

HHS must determine is complete, that describes how the state intends to use the grant. *Id.* § 602. A state may spend its grant "in any manner that is reasonably calculated to accomplish the purpose of" the TANF program, or "in any manner that the State was authorized to use amounts received" under certain AFDC programs. *Id.* § 604(a).

Administration of TANF has been delegated to ACF. *See* Statement of Organization, Functions, and Delegation of Authority, 72 Fed. Reg. 8742 (Feb. 27, 2007). In 2002, ACF published notice of what would become system of record notice 09-80-0375 (SORN). Privacy Act of 1974; System of Records Notice, 67 Fed. Reg. 48914 (July 26, 2002). The SORN was published following the passage of PRWORA as well as its implementing regulations. *See* 72 Fed. Reg. 8742. Several amendments and revisions followed. Of relevance to this litigation are modifications to the TANF SORN made in 2015, wherein ACF adopted Routine Use 7, which provides that ACF may disclose family-level, adult-level/minor child head-of-household, and child data maintained in the system of records to "contractors, grantees, consultants, or volunteers performing or working on a contract, service, grant, cooperative agreement, job, or other activity for HHS and who have a need to have access to the information in the performance of their duties or activities for HHS." Privacy Act of 1974; System of Records Notice, 80 Fed. Reg. 17894, 17903-04 (Apr. 2, 2015).

In September 2025 ACF utilized Routine Use 7 to provide TANF files to DHS through a secure file transfer method. Administrative Record at 114-117. This transfer was made "to help monitor state compliance with the Social Security Act." *Id.* at 114. DHS, through its voluntary efforts to assist ACF, committed to utilizing its Systematic Alien Verification of Entitlements ("SAVE") system to verify state compliance with the TANF program's laws and regulations. *Id.* at 118.

In June 2026, ACF provided notice of further revisions to the SORN. Privacy Act of 1974; System of Records, 91 Fed. Reg. 37406 (June 23, 2026). Specifically, ACF revised its authorities, the purpose of the SORN, and added a new Routine Use, Routine Use 10. *Id.* Routine Use 10 provides that ACF may disclose information "to another federal or grantee agency or entity engaged by ACF (e.g., DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying citizenship or immigration status." *Id.* at 37409. The initial comment period was extended from July 23, 2026, to August 11, 2026. Privacy Act of 1974; System of Records, 91 Fed. Reg. 45278 (July 20, 2026). Routine Use 10 became effective on September 30, 2026. Privacy Act of 1974; System of Records, 91 Fed. Reg. 53876 (Aug. 20, 2026).

On August 3, 2026, Plaintiffs filed their Complaint, ECF No. 1, as well as a motion for preliminary injunction. Pls.' Mot. for a TRO, Prelim. Inj. & Stay Under 5 U.S.C. § 705, ECF No. 14. Plaintiffs refiled their motion on August 5 after the initial motion was struck by order of the Court. Pls.' Mot. for a Prelim. Inj. & Stay Under 5 U.S.C. § 705, ECF No. 31. Plaintiffs then amended their Complaint, First Am. Compl. ECF No. 42 ("Am. Compl.") and filed an amended motion on August 25, Pls.' Mot. for a Prelim. Inj. & Stay Under 5 U.S.C. § 705, ECF No. 45. This Court denied Plaintiffs' Motion on September 28, 2026. Mem. Op., ECF No. 54.

## LEGAL STANDARD

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555

(citation omitted); *see Twin Metals Minn. LLC v. United States*, No. 22-cv-2506 (CRC), 2023 WL 5748624, at *3 (D.D.C. Sep. 6, 2023). Allegations of unlawful conduct are not facially plausible given an "obvious alternative explanation" that is "necessarily incompatible with the plaintiffs' versions of events." *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 57 (D.C. Cir. 2019) (per curiam); *Iqbal*, 556 U.S. at 682; *Twombly*, 550 U.S. at 567; *see* 28 C.F.R. § 16.21(a)(1)-(2).

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing agency action under the APA, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007). "[T]he district judge sits as an appellate tribunal[] [and] [t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote omitted).

## ARGUMENT

### I. PLAINTIFFS CANNOT ESTABLISH STANDING

This Court already found that Plaintiffs lack standing at the preliminary injunction stage. *See generally*, Mem. Op. The operative amended complaint similarly shows a lack of standing, and this Court should follow its previous reasoning and dismiss this case for lack of jurisdiction.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61

(1992)). To support standing, "an injury must be concrete, particularized, and actual or imminent[.]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.* (quoting *Lujan*, 504 U.S. at 564 n.2). To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon.").

Plaintiffs assert three distinct theories in support of their claimed injuries. None are sufficient to establish standing.

**A. Plaintiffs' alleged chilling effects are insufficient to establish standing.**

Plaintiffs' first theory of injury focuses on supposed chilling effects from the SORN that could lead to speculative financial consequences arising from Defendants' actions. Am. Compl. ¶¶ 149-150. In their view, Defendants' actions will deter individuals from participating in TANF. *See* Suppl. Decl. of Stacy L. Rogers ¶ 7, ECF No. 45-32 ("Maryland Decl.") (Plaintiffs do not claim that their injuries materially differ from each other; Maryland's declaration is, consequently, used for illustrative purposes). A decline in participation in TANF due to this "chilling effect," *Id.* ¶ 6, will then allegedly burden Plaintiffs with more fiscal responsibility, because former enrollees will no longer take advantage of other TANF program resources such as "childcare scholarships, transportation assistance like bus passes, and vital workforce development supports." *Id.* ¶ 7.

This is not a sound basis for Article III standing. Many "federal policies . . . generate indirect effects on state revenues or state spending," and a state's standing assertions are "more attenuated" when federal action "produce[s] only those kinds of indirect effects." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). Indeed, Plaintiffs' theory is nearly identical to the one a different set of state plaintiffs advanced in *California v. Texas*, 593 U.S. 659 (2021), that similarly relied upon conjecture about impact to state finances. In *California*, a consortium of states alleged that the minimum essential coverage provision of the Affordable Care Act (ACA) would lead to increased enrollment in Medicaid, CHIP, and state employee health plans, giving them standing to challenge that provision. *Id*. at 674–75. The Supreme Court rejected this theory because there was no sound evidence that more people would sign up for these state programs because of the ACA's requirement. *Id*. at 675–76.

The standing theory of this case is similarly attenuated. It assumes: (1) otherwise eligible individuals will learn of Defendants' information sharing practices, which are focused on ensuring eligibility; (2) because of the SORN (as opposed to the eligibility standards themselves) those same individuals will *not* sign up for TANF benefits, or withdraw from their respective programs, for which they are eligible; (3) those otherwise eligible individuals will continue to require state assistance from other sources; and (4) the failure to provide benefits will result in higher costs to the states as the negative consequences from, for example, an individual no longer having a bus pass creating an ever increasing cascade of costs to Plaintiffs. This "highly attenuated chain of possibilities" is not a sound basis for invoking district court jurisdiction. *Clapper*, 568 U.S. at 410.

But as the Court previously recognized, "Plaintiffs have not provided sufficient evidence that the Disclosure Actions will actually have such a chilling effect on TANF participation. Mem.

Op. at 12. Plaintiffs "myriad declarations" are "bare assertion[s]" "unaccompanied by any supporting factual material" which "do[] not make the grade." *Id.* at 13-15.

Nor does it establish causation. As the Supreme Court has explained, "the line of causation between the illegal conduct and injury – the links in the chain of causation, . . . must not be too speculative or too attenuated." *All. for Hippocratic Med.*, 602 U.S. at 383 (citations omitted). "The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *Id.* "The causation requirement also rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *Id.* Plaintiffs allegations fail on both counts because it is impossible to predict how TANF recipients will react to learning about data sharing, assuming they learn of it at all, and because even if some TANF recipients cease their participation that does not necessarily lead to the cascading harms that Plaintiffs allege. Indeed, the purpose of the routine use added to the SORN is to allow ACF to identify *otherwise ineligible* persons who should not be receiving benefits under federal law. Plaintiffs must establish that it is the SORN—and not the independent requirements under federal law—that will purportedly disincentivize persons within their jurisdiction. This is "substantially more difficult" and requires Plaintiffs to "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury" mere "unadorned speculation as to the existence of a relationship between the challenged government action and the third-parry conduct will not suffice to invoke the federal judicial power." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (citations omitted), *abrogated on other grounds by Perry Capital v. Mnuchin*, 848 F.3d 1072 (D.C. Cir. 2017). This they have not established.

**B. Plaintiffs will not be harmed through compliance with the law.**

Plaintiffs' second theory of injury fares no better. Plaintiffs allege that they will be harmed because the SORN will require them to "evaluate and update their privacy disclosures and descriptions of how their personal information collected from TANF recipients [are] used." Am. Compl. ¶ 146. But these alleged harms are entirely self-inflicted. *See* Mem. Op. at 18-23.

Plaintiffs here have unilaterally decided to foist upon themselves the obligation to notify TANF applicants and recipients about the use or sharing of their data. Indeed, the wide array of compliance costs they identify — legal reviews, revisions to application and renewal forms, technological updates to automated systems, translations, conversions to alternative formats for the visually impaired, updates to caseworker-confidentiality training, destruction of hard copies of outdated applications, distribution to social services, and individualized notice of disclosure to former recipients, to name a few — derive from generally applicable state laws. *See*, *e.g.*, A. Rodgers Decl. (Ariz.), ¶ 35, ECF No. 45-7 (citing Arizona law); Hadler Decl. (Conn.), ¶ 33, ECF 45-10 (citing Connecticut law); Campbell Decl. (D.C.), ¶ 24, ECF No. 45-12 (citing D.C. law); Outland Decl. (Ill.), ¶ 24, ECF No. 45-13 (citing Illinois law); Frisch Decl. (Mich.), ¶ 30, ECF No. 45-18 (citing Michigan law). None of them are required by the SORN itself. Because "it is *state* law that is the impetus" for Plaintiffs' "expenditures, then any loss or harm to the States' fiscs is a quintessentially self-inflicted wound." *Maryland v. U.S. Dep't of Educ.*, 474 F. Supp. 3d 13, 35 (D.D.C. 2020), *vacated and remanded on other grounds*, 2020 WL 7868112 (D.C. Cir. Dec. 22, 2020); *see id.* at 35 (explaining that injury was self- inflicted because "the States have *voluntarily* opted to provide their residents with grants and student loans" and "do not assert that federal law *requires* them to provide such financial support"). Notably, the Privacy Act is only applicable to Executive Branch agencies, not states. 5 U.S.C. § 552(f) ("agency . . . includes any executive

department, military department, Government corporation, Government controlled corporation, or other establishment in the *executive branch* of the Government . . ." (emphasis added)). Hence, the only mechanism compelling Plaintiffs to incur compliance costs are of their own devising. Plaintiffs have thus failed to identify an independent basis for their harms absent their own statutes, which render their harms self-inflicted and deprive them of Article III standing.

**C. Enforcement action under the statute does not harm the Plaintiffs.**

Plaintiffs' final theory is even more removed. Plaintiffs assert that the SORN will place them at risk of new oversight and enforcement actions. *See* Am. Compl. ¶¶ 151-154. Plaintiffs themselves acknowledge that ACF has general authority, subject to auditing procedures, to penalize a State for violations of the statute. *Id.* ¶ 152. The SORN does not represent new oversight and enforcement action. Rather, as discussed at length *infra*, the SORN is instead a clarification of pre-existing rules that already justified the disclosure of data that Plaintiffs find objectionable. And even if it does, Plaintiffs would have to show that a future enforcement action made possible *by the SORN* is "certainly impending," *Clapper*, 568 U.S. at 401-02, not just possible.

Additionally, the SORN does not alter either the statutory or regulatory framework that ACF utilizes to assess penalties for noncompliance. The TANF statute provides the steps that ACF and HHS must follow when implementing a penalty against a state for noncompliance with the TANF program requirements, including when an audit finds that the state's funds have been used in violation of the law, or a finding that the state failed to submit required reports. 42 U.S.C. § 609(a); 45 C.F.R. §§ 262.3, 263.10; *see also* 42 U.S.C. § 617 ("No officer or employee of the Federal Government may regulate the conduct of States under" the TANF program "except to the extent expressly provided in this part."). It is independent legal obligations that impose those consequences. Consequently, the SORN does not alter any rights or defenses that the statute and

regulations already provide. Hence assuming, *arguendo*, that additional enforcement action resulted from the SORN, the statute and regulations would prevent any harm if those enforcement actions are improper—and if the enforcement actions are proper, it is because the States did not comply with independent legal obligations. The Court has already recognized that this theory only makes sense if Defendants intend to violate the law, Mem. Op. at 26, which is a bridge too far to establish standing, and is unsupported by the facts undergirding this action.

## II. REVIEW UNDER THE APA IS FORECLOSED.

### A. The Privacy Act Provides an Adequate Remedy for Relief.

Plaintiffs' APA claims (Counts I, II, III, V, VI, and VII) fail because the APA does not grant a cause of action where there is "[an]other adequate remedy in a court." 5 U.S.C. § 704. This statutory provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Accordingly, a plaintiff has adequate relief—and thus cannot rely on the cause of action in 5 U.S.C. § 704 "'where a statute affords an opportunity for *de novo* district-court review' of the agency action." *Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005)). Stated differently, where an agency action is subject to review in some manner under a separate statutory review scheme, then the general rule is that action must be reviewed within the confines of that scheme. The mode of review established by the statutory review scheme is presumed exclusive. This is true even where a statutory review scheme only provides for review of issues by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to

be impliedly precluded."); *see also Koretoff v. Vilsack*, 614 F.3d 532, 536 (D.C. Cir. 2010) (Kavanaugh J.). It is also true even where the plaintiff may not succeed on the merits of their claim under the alternative statutory review procedure; the existence of that procedure alone suffices. *See Rimmer v. Holder*, 700 F.3d 246, 261-62 (6th Cir. 2012); *Jones v. HUD*, No. 11 CV 0846 (RJD)(JMA), 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted").

Under these principles, Plaintiffs may not challenge purported violations of the Privacy Act under the APA for three distinct reasons. First, Congress has foreclosed review to the class to which Plaintiffs belong. *See Koretoff*, 614 F.3d at 536. The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information, *Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 287 (2012), and authorizes adversely affected individuals to bring suit for violations of those requirements, 5 U.S.C. § 552a(g)(1)(D). The Privacy Act, however, applies only to individuals, not states. *Id.* (authorizing a cause of action for adversely affected "individual[s]"); *id.* § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence."). Here, Plaintiffs are a collection of States and other governmental entities and, consequently, are not entitled to bring a cause of action under the Privacy Act. *See id.* Congress' limitations of who may bring a cause of action under the Privacy Act represent an implicit preclusion of the States to bring such challenges. *See Block,* 467 U.S. at 349.

Second, even under the APA Plaintiffs are not entitled to bring suit based on alleged violations of the Privacy Act, because Plaintiffs are not within the Privacy Act's "zone of interest." The zone-of-interests requirement is a general presumption about Congress's intended limits on the scope of *all* causes of action, not just congressionally authorized causes of action under the

APA or other statutes. As the Supreme Court has made clear, the zone-of-interests test "is a 'requirement of general application'" that "*always* applies and is never negated[.]" *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 163–64 (1997)). Indeed, the zone-of-interests test indisputably applies to claims brought under the APA. *See id.* (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150 (1970)); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Here, the "[t]he relevant statute" for zone-of-interests purposes "is the statute whose violation is the gravamen of the complaint," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990), as confirmed "by reference to the particular provision of law upon which the plaintiff relies," *Bennett*, 520 U.S. at 175–76; *see Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014) ("we look to whether [the plaintiffs] fall within the zone of interests sought to be protected by the substantive statute pursuant to which the Department of Labor acted: the INA"); *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1366 (D.C. Cir. 1990) (applying zone-of-interests test to the substantive statute under which the agency acted where the plaintiff claimed the agency lacked statutory authority for the challenged program). That statute is the Privacy Act. *See* Am. Compl. ¶¶ 74, 78, 99, 106, 129, 134, 137-38. Congress only permitted certain "individuals" to vindicate rights under the Privacy Act, such that states are indisputably outside that statute's zone of interest.

Third, the Privacy Act already provides an adequate alternative remedy for individuals entitled to sue under that statute. Civil remedies are available—and thus the United States' sovereign immunity has been waived—in four circumstances: (1) when the agency "makes a determination . . . not to amend an individual's record in accordance with his request," 5 U.S.C. § 552a(g)(1)(A),(2) (an "Amendment Action"), (2) when the agency refuses to comply with an

individual's request for access to her records, *id.* § 552a(g)(1)(B),(3) (an "Access Action"), (3) when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual," *id.* § 552a(g)(1)(C), or (4) (a "Benefits Action"), or (4) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual," *id.* § 552a(g)(1)(D), (an "Other Action").

For Benefits Actions or Other Actions, a plaintiff may be entitled to "actual damages sustained by the individual as a result of the refusal or failure," subject to a $1,000 statutory minimum, but only if the agency acted in a manner which was intentional or willful and if that plaintiff could prove "actual damages," which is "limited to proven pecuniary or economic harm." *Cooper*, 566 U.S. at 291, 299 (quoting 5 U.S.C. § 552a(g)(4)(A)).

Beyond these monetary damages, the Privacy Act also allows for injunctive relief in two narrow circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records of an individual, 5 U.S.C. § 552a(g)(1)(A), (2)(A); and (2) to order an agency to allow an individual access to his records, *id.* § 552a(g)(1)(B), (3)(A). But Plaintiffs here have not sought any such relief, because they are not entitled to it. And injunctive relief, generally, as the D.C. Circuit has recognized, is otherwise unavailable for any other situation arising out of the Privacy Act. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs" (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988))); *see also Cell Assocs., Inc. v. Nat'l Insts. of Health, Dep't of Health, Educ. & Welfare*, 579 F.2d 1155, 1161-62 (9th Cir. 1978).

Because of the Privacy Act's comprehensive remedial scheme, some courts have recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also, e.g.*, *Poss v. Kern*, No. 23-cv-2199 (DLF), 2024 WL 4286088, at *6 (D.D.C. Sep. 25, 2024); *Haleem v. U.S. Dep't of Def.*, Civ. A. No. 23-1471 (JEB), 2024 WL 230289, at *13-14 (D.D.C. Jan. 22, 2024); *Bierly v. Dep't of Def.*, Case No. 23-cv-2386-RCL, 2024 WL 4227154, at *8-9 (D.D.C. Sep. 18, 2024); *Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017); *Berardi v. U.S. Dep't of the Air Force*, Civ. A. No. 05-2269 (JR), 2006 WL 8448631, at *6 (D.D.C. Sep. 29, 2006); *Tripp v. Dep't of Def.*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002). The Government recognizes that some courts have adopted an alternative approach, but believes that those decisions were wrongly decided for the reasons explained above.

This result is consistent with the principle that, "where, as here, [a] statute provides for certain types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief." *Parks v. U.S. Internal Revenue Serv.*, 618 F.2d 677, 684 (10th Cir. 1980) (citing *Cell Assocs.*, 579 F.2d at 1161-62). In short, Congress concluded that suits for money damages provide an adequate remedy for violations of section 552a(b) and limited relief to suits for such damages. That congressional determination forecloses Plaintiffs' APA claims. *See Hinck v. United States*, 550 U.S. 501, 506 (2007) (applying the "the well-established principle that, in most contexts, a precisely drawn, detailed statute pre-empts more general remedies" (citation omitted)).

**B. 8 U.S.C. § 1373 Commits the Decision to Verify Citizenship Information to Agency Discretion by Law.**

Routine Use 10 specifically authorizes disclosure to Department of Homeland Security (DHS) to "verify[] citizenship or immigration status" in order "to verify whether TANF grantee agencies are complying with TANF program requirements." 91 Fed. Reg. at 37409.

The SORN itself provides two statutes to support disclosure under its enumerated Routine Uses: the TANF Statutes (42 U.S.C. §§ 601-619; 42 U.S.C. § 1320b-7) and 8 U.S.C. § 1373. Of relevance to this aspect of the routine use is § 1373(b):

> Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual.

*Id.* The "following" activities include "[s]ending such information to, or requesting or receiving such information from, the [DHS]." *Id.* § 1373(b)(1). Notably, section 1373 does not require an agency to send information to DHS, but forbids others from preventing that discretionary decision.

In *DHS v. League of Women Voters*, 609 U.S.---, 2026 WL 2879700 (2026) (per curiam), the Supreme Court recently granted a stay when plaintiffs similarly alleged that modifications to DHS's SAVE program violated confidentiality provisions in the Social Security Act, as well as substantive and procedural protections in the Privacy Act, and represented arbitrary and capricious agency action under the APA. *Id.* at 2.

As the Supreme Court has recently explained:

> By prohibiting interference with the disclosure of information regarding citizenship status to DHS— "[n]otwithstanding any other provision of Federal, State, or local law"—Congress necessarily authorized DHS to request and receive that information. Otherwise, agencies, entities, and officials could find themselves in the impossible predicament of either disclosing information consistent with section 1373 but in violation of legislation like the Social Security Act and Privacy Act or withholding that information consistent with those Acts but in violation of section 1373. It is improbable that Congress intended to place officials in such a bind when it passed [section 1373], so section 1373 likely supersedes restrictions on disclosure elsewhere in the Code.

*Id.*. Although Supreme Court interim orders "are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 606 U.S. -

--, 145 S.Ct. 2653, 2654 (2025). Plaintiffs' objections to the SORN and Routine Use 10 are variations on the *League of Women Voters* theme and are answered via the same mechanism: section 1373's grant of discretionary authority to ACF removes any means by which this Court could reliability assess whether Defendants have abused their discretion under the APA. As the Supreme Court explained in a much earlier case:

> [E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely. This construction avoids conflict with the "abuse of discretion" standard of review in § 706—if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for "abuse of discretion."

*Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Here, the clear language promulgated via section 1373 establishes both the inapplicability of the APA as well as the absence of any standard against which to judge the agency's exercise of discretion. Congress did not cabin the ability of an agency to share citizenship data with DHS, instead Congress specifically proclaimed that notwithstanding any other law such sharing could occur. Consequently, review under the APA is foreclosed.

**C. The 2026 SORN, Routine Use Ten, and the 2025 Data Disclosure Comply with the Privacy Act. (Counts II and VI)**

5 U.S.C. § 552a(b)(3) prohibits agencies from disclosing records unless "disclosure of the record would be . . . for a routine use," which the statute defines as "the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(b)(3), (a)(7). In order for the "routine use" exception to apply, the agency must "publish in the Federal Register . . . a notice of the existence and character of the system of records, which notice shall include . . . each routine use of the records contained in the system, including the categories of

users and the purpose of such use." *Id.* § 552a(e)(4)(D). Thus, to fall within the Privacy Act's routine use exception: (1) notice of the routine use must be published in the Federal Register pursuant to 5 U.S.C. § 552a(e)(4); and (2) the use must be compatible with the purpose for which the information was collected. *See Doe v. U.S. Dep't of Justice*, 660 F. Supp. 2d 31, 47 (D.D.C. 2009). Notice of the routine use was unquestionably published in the Federal Register, *see* 91 Fed. Reg. at 37406. Hence, the only question remaining is whether the use is compatible with the purpose for which the information was collected. *See* Am. Compl. ¶ 166. It is.

ACF has highlighted two separate purposes behind Routine Use 10, each of which independently justifies it. First, the TANF data is used "to determine whether grantees are ensuring that TANF recipients are eligible in accordance with the requirements of Title IV-A of the Social Security Act." 91 Fed. Reg. at 37407. Second, the data will be used:

> to ensure and confirm grantee compliance with TANF program requirements through HHS agency oversight activities including but not limited to program integrity reviews (*e.g.* comprehensive assessments of how grantees administer TANF programs and follow statutory requirements), additional audits (*e.g.* financial audits, programmatic audits, and fraud investigations), and monitoring (*e.g.* regular review of data reports, on-site or virtual visits to TANF agencies, periodic review of policies and procedures). The purpose is to ensure compliance with all TANF program requirements including but not limited to the work participation rate and time-limits, the requirement to provide complete and accurate data, and the requirement to verify TANF recipients' citizenship or immigration status in records maintained by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (formerly the U.S. Immigration and Nationalization Service (INS)).

*Id.* Collecting eligibility data aids ACF in assessing whether states are complying with requirements for determining eligibility to receive a benefit. The purpose of the routine use disclosure is to ensure states are in compliance with requirements for determining eligibility for receipt of benefits. Hence, the purpose for collection and the purpose for the routine use are compatible.

Routine Use 10 is also lawful for the disclosure of past data because Routine Use 10 is a clarification of the 2015's SORN's Routine Use 7. It is well established that an agency may not promulgate rules that operate retroactively unless Congress has expressly delegated to the authority to do so. *See Levy v. Sterling Holding Co.*, 544 F.3d 494, 506 (3d Cir. 2008). But where a new rule constitutes a clarification, rather than a substantive change of the law as it existed beforehand, the application of that new rule to pre-promulgation conduct necessarily does not have an impermissible retroactive effect. *Id.*; *see also Cookeville Reg'l Med. Ctr. v. Leavitt*, 531 F.3d 844 (D.C. Cir. 2008). Here, Routine Use 10, although not a rule, *see MST Exp. v. Dep't of Transp*. 108 F.3d 401, 402 (D.C. Cir. 1997), merely clarifies the scope of the data disclosure that was already permissible under Routine Use 7 of the 2015 SORN.

The 2015 SORN allows data to be shared for three purposes, of which the first is of relevance to this action. The first listed purpose in the 2015 SORN for the TANF Data Reporting System included "[t]o determine whether States are meeting certain requirements prescribed by the Act, including prescribed work and time-limit requirements." 80 Fed. Reg. at 17904. That is the same essential purpose as the challenged SORN Routine Use 10.

Plaintiffs also take issue with the wording of Routine Use 7 and its application to the 2025 disclosure. Am. Compl. ¶¶ 130-131. Plaintiffs believe that DHS is not "a contractor, grantee, consulate, or volunteer for" HHS, the relevant criteria in the 2015 SORN, and that the disclosure activity was not related to any of the enumerated purposes in the SORN. But these allegations fail. *Id*. at ¶ 130. For example, the 2015 SORN provided that disclosure could be made to determine whether grantees were meeting certain requirements prescribed by the Social Security Act. Privacy Act of 1974; System of Records, 89 Fed. Reg. 25880, 25882 (Apr. 12, 2024). Plaintiffs believe that because the 2015 SORN uses the word "agencies" in other Routine Uses, but not Routine Use

7 that ACF could not disclose records to DHS. *See* Am. Compl. ¶ 131. But this illustrates ACF's desire to clarify its SORN. DHS acted as a volunteer during the 2025 data disclosure because a volunteer is "[o]ne who serves or acts of his or her own free will." *Webster's II New Riverside University Dictionary* (1984). But ACF, recognizing that that approach was not as seamless as it could be elected to clarify its prior Routine Use through the implementation of Routine Use 10.

Plaintiffs' invocation of the Computer Matching and Privacy Protection Act ("CMPPA") misunderstands the provisions of the statute. Am. Compl. ¶ 170. Merely disclosing the data pursuant to a routine use would not implicate the CMPPA because the obligation to publish a computer matching agreement only applies to a "computerized comparison of . . . two or more automated systems of records . . . for the purpose of" verifying eligibility for "cash or in-kind assistance or payments under Federal benefit programs" or "recouping payments or delinquent debts under such Federal benefit programs." 5 U.S.C. § 552a(a)(8). Here, however, no computer matching agreement is implicated because the purpose is not to verify individual eligibility, but instead, as the SORN plainly spells out, to ensure *states* are complying with the TANF requirements. *See* 91 Fed. Reg. 37406; *see also* 42 U.S.C. § 617 (HHS has no authority to enforce penalties on individuals).

Finally, Plaintiffs allege that the 2026 SORN failed to comply with the procedural requirements of the Privacy Act, specifically that the public did not have a meaningful opportunity to comment. Am. Compl. ¶ 180. But even if this point were true, it would not provide a basis to invalidate the SORN. Nothing in the Privacy Act requires an agency to respond to each comment received, or to any comment. *See infra*. Rather, the Privacy Act requires a 30-day effective period before any SORN can go into effect, where the agency is to consider any comments received. 5

U.S.C. § 552a(e)(11). That was met here. *See* Privacy Act of 1974; System of Records, 91 Fed. Reg. 51174 (Aug. 7, 2026); 91 Fed. Reg. 53876.

**III. The SORN Complies with the APA.**

Even if the APA applies, Plaintiffs' claims fail as a matter of law because relief under the APA, the Trade Secrets Act, and the Social Security Act are all foreclosed by 8 U.S.C. § 1373's unambiguous language. *See supra* Part II, B.

**A. The SORN, Routine Use 10, and the 2025 Data Disclosure Comply with the APA.**

Courts may set aside a final agency action under the APA if that action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a deferential standard, under which courts review agency actions to determine if the agency articulated a rational relationship between the factual findings and its decision. *See Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 204 (D.C. Cir. 2013). The "standard is narrow and [the] court [should not] substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Instead, the court should "assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation omitted). Courts reverse agency decisions as arbitrary or capricious only if the agency relied on factors Congress did not intend for it to consider, entirely failed to consider an important aspect of the case, offered an explanation that ran counter to the evidence before the agency, or offered an explanation that was so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *State Farm*, 463 U.S. at 43.

**1. The SORN, Routine Use 10, and the 2025 Data Disclosure are Lawful. (Counts I and V)**

Plaintiffs allege a number of arguments to support their position that the SORN, Routine Use 10, and the 2025 Data Disclosure are unlawful. *See, e.g.* Am. Compl. ¶¶ 164-170; ECF No. 42 at 60-63.[1]

Plaintiffs first say that ACF has exceeded its authority under PRWORA by taking steps to enforce the TANF statute beyond the specific responsibilities laid out by Congress. But in doing so, Plaintiffs misunderstand ACF's enforcement abilities. *see* Am. Compl. ¶ 164; ECF No. 42 at 61 While ACF is limited in its ability to enforce the statute in certain ways, *see* 42 U.S.C. § 617, it does have express enforcement authority through the penalty provision in 42 U.S.C. § 609 and has the ability to conduct monitoring and additional audits "which are necessary to carry out its responsibilities under Federal law or regulation." 31 U.S.C. § 7503(b). As the Federal agency administering the TANF program, ACF has a responsibility to ensure compliance with Part IV-A of the Social Security Act, its implementing regulations at 45 C.F.R. §§ 260-265, and the terms and conditions of the grant. Specifically, 42 U.S.C § 609 expressly mandates that ACF assess a penalty if States do not meet certain statutory requirements and further requires that ACF utilize audits conducted under chapter 75 of title 31. *Id*. The penalties promulgated by section 609 include a misuse of funds penalty for expending funds that are not allowable under Title IV-A, including providing services and benefits to families who do not meet the eligibility criteria for TANF. 42 U.S.C. § 609(a)(1)(A). Compliance was so important to Congress that this provision also included an enhanced penalty for intentional misuse of TANF funds. *Id.* § 609(a)(1)(B). Penalties are also

[1] Plaintiffs raise the same arguments in support of Count V but the paragraph numbers in the amended complaint appear to repeat and are misnumbered. In instances where reference is necessary to misnumbered paragraphs the Government will include a reference to the ECF stamped page number for ease of reference.

imposed on States that fail to participate in an income and eligibility verification system. *Id.* § 609(a)(4).

The single audit described in 31 U.S.C. § 7503(a) provides an overall snapshot of the program, but there are instances when ACF must conduct more comprehensive, targeted reviews to ensure that TANF funding is spent in accordance with law. Section 7503(b) allows the agency to conduct additional reviews and Routine Use 10 supports these reviews by expressly allowing ACF to engage others, including contractors and other Federal agencies, in its review. ACF has also set forth in regulation that it will use the single audit "in conjunction with other reviews, audits, and data sources, as appropriate, to determine if a State is subject to a penalty . . . ." 45 C.F.R. § 262.3(a)(1). If ACF were restricted to only proceeding via a solitary annual audit then ACF would be powerless to act even where evidence of, for example, failure to comply with the statutory requirements regarding work participation verification procedures are self-evident. That result would be absurd. 31 U.S.C. § 7503(b) specifically permits ACF to conduct further audits to enforce its responsibilities. The SORN, and Routine Use 10, implement that authority. Additionally, as discussed, Routine Use 10 serves as a clarification of Routine Use 7. That ACF had wanted to enlist other federal agencies to assist it, such as DHS, is perfectly permissible.

Next, Plaintiffs allege that the SORN violates 42 U.S.C. § 1306. Am. Compl. ¶ 167; ECF No. 42 at 66. That provision forbids disclosure of any information obtained by agency employees in the course of discharging their duties, while also specifically allowing for disclosure "as otherwise provided by Federal law." 42 U.S.C. §1306(a)(1)-(2). Here, ACF can rely on three separate statutes to justify disclosure: the Privacy Act itself, which provides for the restricted disclosure of data; 8 U.S.C. § 1373, which allows for disclosure of citizenship information to DHS,

and; ACF's oversight authority as the administering agency for the TANF program including under 42 U.S.C. § 609. All of which have been discussed at length *supra*.

Plaintiffs next allege that the information-sharing at issue here violates the Social Security Act. Am. Compl. ¶ 168; ECF No. 42 at 65. Specifically, Plaintiffs point to 42 U.S.C. § 405 which purports to prohibit future federal statutes, beginning in 1990, from changing the rules surrounding sharing of SSNs. *See id.* (citing 42 U.S.C. § 405(c)(2)(C)(viii)(I)). As a threshold matter, Plaintiffs misapprehend the relevance of 42 U.S.C. § 405(c)(2)(C)(viii)(I).

Specifically, the Privacy Act specifically permits disclosures of a broad range of records. *See* 5 U.S.C. § 552a(a)(4) (defining records as any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph). Plaintiffs' argument would, if accepted, require this Court to find that 42 U.S.C. § 405(c)(2)(C)(viii)(I) has overruled the Privacy Act. But section 405 only applies to statutes that post-date its 1990 enactment, and the Privacy Act was enacted in 1974, which places it beyond the remit of 42 U.S.C. § 405(c)(2)(C)(viii)(I) assuming, *arguendo*, that it was even applicable to the Privacy Act at all. And, the Supreme Court has implicitly held that 8 U.S.C. § 1373 provides an independent basis to overcome this section of the Social Security Act. *See League of Women Voters*, 609 U.S. at 4-5.

Plaintiffs' reliance on the Trade Secrets Act is similarly misplaced for two distinct reasons. *See* Am. Compl. ¶ 169; ECF No. 42 at 66. First, the statute specifically carves out disclosures that are "authorized by law". 18 U.S.C. § 1905. Here as previously discussed, the disclosures here *are* authorized by law, specifically the Privacy Act, 8 U.S.C. § 1373, and 31 U.S.C. § 7503(b). *See*

*supra*. Second, Plaintiffs are, once again, precluded from seeking relief from a statute that does not contemplate their interests as sovereign States. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . , is entitled to judicial review thereof." 5 U.S.C. § 702. But Plaintiffs have failed to allege specifically how they have been "adversely affected or aggrieved" by Routine Use 10 within the context of the Trade Secrets Act and consequently cannot bring any APA challenge under the Trade Secrets Act. *Id*.

**2. The SORN, Routine Use 10, and the 2025 Data Disclosure are Neither Arbitrary Nor Capricious. (Counts III and VII)**

Plaintiffs once more misunderstand the SORN, and Routine Use 10 in particular, through their continued assertions that ACF has failed to provide meaningful reasoning to justify the changes in the SORN. *See* Am. Compl. ¶ 195. But the process for publication of a modified SORN under the Privacy Act is governed by specific notice and-comment procedures set forth in the Privacy Act. Unlike for an APA rulemaking which starts with a notice of proposed rulemaking and ends with a final rule, a Privacy Act SORN publication does not end with any agency obligation to state "in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). So arbitrary-and-capricious review based on the explanation provided in the Federal Register Notice does not make sense in this distinct Privacy Act context. If the APA standard for review is appropriate in the Privacy Act context, which as discussed above, the government contends it is not, then review under the arbitrary and capriciousness standard would be based on the administrative record provided by the agency. The administrative record here demonstrates that the government considered factors required by the TANF statute. For example, ACF conducted a survey of four states and found that "States vary in the level of certainty they have about a person's status when reporting them." Administrative Record at 43. However, no

consideration of costs and benefits, reliance interests, or alternative courses of actions are needed because the new Routine Use 10, is merely a clarification of what ACF could already do under the already-established Routine Use 7. Because ACF has not changed its policy it also has not "engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (citation omitted). Plaintiffs attempt to confuse this straightforward point through an allegation that the government acted "in secret" and "failed to acknowledge" a change in position for the 2025 Data Disclosure. ECF No. 42 at 71. But, as discussed *supra*, the 2025 Data Disclosure was made in accordance with Routine Use 7, which has been in effect for over a decade. And the plain text of Routine Use 7 allows for the 2025 Data Disclosure, as previously discussed. Even if Plaintiffs had standing to contest Routine Use 7's plain language they are too late, because the Privacy Act imposes a two-year statute of limitations. 5 U.S.C. § 552a(g)(5).

**IV. The Spending Clause is Inapplicable to these Facts. (Counts IV and VIII)**

Article I of the Constitution confers expansive authority on Congress to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The Supreme Court has recognized some "general restrictions" on that power. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576–82 (2012) ("*NFIB*"); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981).

Plaintiffs' allege that the SORN, Routine Use 10 and the 2025 disclosure violate the Spending Clause because the government failed to provide notice to them of the disclosures made pursuant to the SORN. *See* Am. Compl. ¶¶ 203-204; ECF No. 42 at 72. But neither the SORN nor Routine Use 10 are new requirements. Rather, as discussed *supra*, Routine Use 10 is a clarification

of Routine Use 7 which grants ACF substantially the same authority. Similarly, Plaintiffs' alleged harm demonstrates their fundamental misinterpretation of the Single Audit Act and the mistaken belief that ACF may only investigate potential fraud via a single annual audit. This is not only contrary to statute, but illogical. *See supra*.

Additionally, Plaintiffs misapprehend the remit of the Spending Clause. The Spending Clause is one of *Congress's* enumerated powers found in Article I; it does not restrict (or empower) the President or the Executive Branch, whose powers are conferred by Article II. If Congress had conditioned spending on a delegation so broad that the Executive Branch's discretion is an unconstitutional condition, that *statute* can be struck down under the Spending Clause. But it is a categorical error to strike down executive action to carry out statutory delegations of authority under the Spending Clause. Notably, Plaintiffs do not allege that TANF itself is unconstitutional. Instead, they attempt to use the Spending Clause as a backdoor into APA review.

**CONCLUSION**

The Court should also dismiss the amended complaint or, in the alternative, grant summary judgment to Defendants.

Dated: November 12, 2026

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

/s/ *Patrick K. Keating*
PATRICK K. KEATING (MD Bar No. 2211140001)
Trial Attorney
United States Department of Justice

Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 598-0256
Email: Patrick.K.Keating@usdoj.gov

*/s/ Jordan A. Hulseberg*
JORDAN A. HULSEBERG
(D.C. Bar No. 90033542)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 598-3856
Email: Jordan.A.Hulseberg2@usdoj.gov

*Counsel for Defendants*